Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
Kelly Singer (AZ Bar No. 022024) ksinger@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Squire, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

Proposed Counsel to the Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Case No. 2:09-bk-_____ |
| DEWEY RANCH HOCKEY, LLC, | (Jointly Administered) |
| COYOTES HOLDINGS, LLC, | Chapter 11 |
| COYOTES HOCKEY, LLC, and | **MOTION OF THE DEBTORS FOR AN ORDER UNDER SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE (i) AUTHORIZING COYOTES HOCKEY, LLC'S SALE OF SUBSTANTIALLY ALL OF ITS ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS, AND (ii) APPROVING AN ASSET PURCHASE AGREEMENT** |
| ARENA MANAGEMENT GROUP, LLC, | |
| Debtors. | |
| | **Date of Hearing:  TBD**<br>**Time of Hearing:  TBD** |

This Filing Applies to:
- ■ All Debtors
- ☐ Specified Debtors

DEWEY RANCH HOCKEY, LLC ("**Dewey**"), COYOTES HOLDINGS, LLC

("**Coyotes Holdings**"), COYOTES HOCKEY, LLC ("**Coyotes Hockey**"), and ARENA

MANAGEMENT GROUP, LLC ("**Arena Management**", and together with Dewey, Coyotes

Holdings, and Coyotes Hockey, the "**Debtors**"), debtors-in-possession in the above-captioned

Chapter 11 cases (these "**Cases**"), move this Court for an **order under 11 U.S.C. §§ 105(a), 363, and 365 and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the sale of substantially all of Coyotes Hockey, L.L.C. ("Coyotes Hockey") assets and approving the form of an asset purchase agreement attached to this Motion as Exhibit "A."**

This Motion is supported by the entire record before the Court, the "Declaration Of Michael Nealy In Support Of Chapter 11 Petitions And First Day Motions" (the "**Nealy Declaration**"), the "Declaration Of Earl Scudder In Support Of Sale Motion" (the "**Scudder Declaration**"),[1] both filed contemporaneously with this Motion, and by the following memorandum of points and authorities.

## BACKGROUND

### Jurisdiction and Venue

1.     On May 5, 2009 (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Arizona (the "**Court**").

2.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession in accordance with Bankruptcy Code §§ 1107 and 1108.

3.     The Court has jurisdiction over the Cases under 28 U.S.C. §§ 157 and 1334. These matters constitute core proceedings under 28 U.S.C. § 157(b)(2).

4.     Dewey is an Arizona limited liability company with its principal place of business located in Yavapai County, Arizona.     The remaining Debtors are affiliates of Dewey.

---

[1] The Scudder Declaration contains sensitive and confidential information with respect to the pre-petition investment and sale efforts, and therefore, is filed under seal.

Accordingly, venue of the Cases is proper in the District of Arizona under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105, 363, and 365 and Bankruptcy Rules 2002 and 6004.

**Background Facts Concerning The Debtors**

6.      In support of this Motion, the Debtors incorporate by reference the statements set forth in the "Omnibus Statement of Facts in Support of Chapter 11 Petitions And First Day Motions" filed contemporaneously with this Motion (the "**Omnibus Statement**"), and the Nealy Declaration.

7.      Coyotes Hockey's most significant asset is the Phoenix Coyotes professional hockey team (the "**Phoenix Coyotes**"), which is a member of the National Hockey League (the "**NHL**"). Since moving to Phoenix in 1996, the Phoenix Coyotes professional hockey franchise has operated at significant losses. Indeed, since 2001, Jerry Moyes ("**Moyes**") and his wife Vickie Moyes, the ultimate super-majority owners of the franchise, have provided the franchise with approximately $300 million to fund operations. Nealy Declaration.

8.      In November of 2008, Mr. Moyes notified the NHL that he would no longer provide the funds to cover Coyotes Hockey's substantial operating losses. Although the NHL has provided Coyotes Hockey with certain advances and a line of credit -- amounting to an aggregate of approximately $36 million in borrowed funds secured by certain of the Coyotes Hockey's assets -- the NHL has no obligation to fund Coyotes Hockey and can refuse to provide the organization with further advances and loans. Nealy Declaration.

9.      Because Coyotes Hockey has no certain source of funding to cover its operating losses, Coyotes Hockey has explored with numerous third parties and current investors the

possibility of additional capital infusions or a sale of the organization. To date, and as set forth in the Scudder Declaration, professionals specifically retained by Coyotes Hockey have devoted a substantial amount of time to solicit further capital investment into Coyotes Hockey and bids to purchase the hockey team. Nealy Declaration.

10.　　As described in greater detail in the Scudder Declaration, Citi Private Bank Group at Citibank, N.A. ("**Citi**") and the Scudder Law Firm, P.C. (the "**Scudder Firm**"), have identified and contacted strategic investors that may be interested in purchasing Coyotes Hockey's assets or investing in the organization. Both Citi and the Scudder Firm have provided interested investors and purchasers with substantial amounts of information regarding the Debtors to assist them with their evaluation of the business of Coyotes Hockey. Furthermore, Citi and the Scudder Firm received and evaluated proposals from interested purchasers and investors. Nealy Declaration and Scudder Declaration.

11.　　A detailed description of these efforts is set forth in the Scudder Declaration filed contemporaneously with this Motion.

**The Asset Purchase Agreement**

12.　　After substantial pre-petition marketing efforts to find one or more investors or purchasers, Coyotes Hockey located PSE Sports & Entertainment L.P. (the "**Proposed Buyer**"), which is an acquisition vehicle owned by Jim Balsille, a founder of Research In Motion.[2] After substantial arm's-length negotiations, Coyotes Hockey and the Proposed Buyer entered into the Asset Purchase Agreement dated May 5, 2009 (the "**APA**"), under which the Proposed Buyer has agreed to purchase substantially all of Coyotes Hockey's assets in the context of a Chapter 11 bankruptcy for an aggregate purchase price of over $200 million (the "**Proposed Sale**"). A copy of the APA is attached to this Motion as Exhibit "**A**." Nealy Declaration.

---

[2] Research In Motion is the maker of the Blackberry communication devices.

13.    The Debtors, in the exercise of their best business judgment, and in consultation with the Proposed Buyer and its advisors, have decided that the Proposed Sale and the APA represents the highest and best disposition of Coyotes Hockey's assets. Furthermore, the Debtors submit that the Proposed Sale reflects the highest offer for assets (subject to higher and better bids), and it is the reasonable business judgment of the Debtors that this transaction benefits the Debtors, creditors, parties-in-interest, and the estates. Citi and the Scudder Firm, however, will continue to market Coyotes Hockey's assets during the post-petition period to solicit further bids or investments into Coyotes Hockey. Nealy Declaration.

14.    Indeed, without substantial investment in or a sale of substantially all of Coyotes Hockey's assets, the operations of Coyotes Hockey -- and hence, the Debtors as a whole -- may terminate, and the Phoenix Coyotes franchise will "go dark." The financial issues surrounding the Phoenix Coyotes have been the subject of public discussion over the last several weeks.[3] Moreover, the NHL has informed representatives of the Debtors that the NHL may effectively take control of Coyotes Hockey and the Phoenix Coyotes if, on or around May 1, 2009, there is not a reasonable proposal for the disposition of or investment in the franchise acceptable to the NHL. Nealy Declaration.

The Assets To Be Purchased

15.    Certain salient provisions of the APA are summarized in this Motion, and are qualified entirely by reference to the APA itself. The APA, which is attached to this Motion as

---

[3] See, e.g., NHL Denies Interest In Second GTA Franchise, April 23, 2009 at www.canada.com ("Rumors of a potential second team in the [Greater Toronto Area] have been circulating for more than six months, and have gained momentum since the financial struggles facing the Phoenix Coyotes have been made public. Coyotes owner Jerry Moyes has received interest from potential investors in the team, which will reportedly lose more than $30 million US this season"); NHL Loans Keep Coyotes Operating, April 28, 2009 at www.azcentral.com ("The Coyotes have never made money since owner Jerry Moyes became an investor in 2001, and annual financial losses have exceeded $20 million during his tenure"); Glendale Official: NHL Has Run The Team For Months, Arizona Republic, April 30, 2009, Section C1 ("In August, the Coyotes stopped paying the City rent, parking fees and most of its security costs at Jobing.com Arena").

Exhibit A, provides for the sale of substantially all of Coyotes Hockey assets (the "**Assets**"),[4] free and clear of all liens, encumbrances, security interests, claims and adverse interests except as specifically agreed otherwise by the Proposed Buyer. The Assets the Proposed Buyer seeks to purchase are set forth in Section 2.2 of the APA and include the following property:

(i) The Phoenix Coyotes' NHL franchise (the "**Franchise**") and membership interest in the NHL ("**Membership Interest**"), as modified and assigned under the Sale Approval Orders;

(ii) all items of tangible personal property and fixtures owned by Coyotes Hockey and Coyotes Hockey's interest in all items of tangible personal property and fixtures leased by Coyotes Hockey and, in either case, used in connection with the Business ("**Tangible Personal Property**"), including, without limitation, furniture, fixtures, furnishings, equipment including hockey, exercise and weight training and medical equipment, computer hardware and software and related materials, machinery, office equipment, telephone systems, instruments supplies, inventory, automobiles and other vehicles, all as will be set forth in Schedule 2.2(a) of the APA and approved by the Proposed Buyer and attached to the APA at or prior to Closing;

(iii) those amounts which have been accrued but not yet paid by the NHL to Coyotes Hockey in connection with the Business as of the Closing (the "**NHL Accounts**"), all as more particularly described in Schedule 2.2(a) attached to the APA;

(iv) all Intellectual Property owned by or licensed by Coyotes Hockey and all licenses of Intellectual Property held by Coyotes Hockey and used in connection with the Business (the "**Acquired Intellectual Property**"), including, without limitation, all associated trade names, proprietary product names, service marks, logos, trademarks, and the goodwill associated therewith, and all copyrights, trade secrets, and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), patents, patent applications, inventions, know-how (whether or not patented, patentable or already reduced to practice), the Phoenix Coyotes' interest in its website, website domain names, and all off-the-shelf software and Coyotes Hockey's rights therein, all as set forth in Schedule 2.2(a) attached to the APA;

---

[4] All capitalized terms used in relation to the APA have the meaning given such terms in the APA.

(v)     all Books and Records of Coyotes Hockey relating to the Business;

(vi)    all rights of Coyotes Hockey under contracts for the employment of Phoenix Coyotes players (the "**Assumed Player Contracts**") and rights to Phoenix Coyotes players who are not under Assumed Player Contracts, all as set forth in Schedule 2.2(a) attached to the APA with the cure amounts asserted by Coyotes Hockey to be payable in connection with assumption and assignment of such Assumed Player Contracts;

(vii)   all rights of Coyotes Hockey under the other Contracts set forth in Schedule 2.2(a) attached to the APA with the cure amounts asserted by Coyotes Hockey to be payable in connection with assumption and assignment of such other Contracts (collectively, the "**Acquired Contracts**");

(viii)  all causes of action of Coyotes Hockey, whether mature, contingent, or otherwise, against any Person relating to any of the Acquired Assets or the Business, whether arising in tort, contract, or otherwise (but excluding causes of action set forth on Schedule 2.3 of the APA as Excluded Assets);

(ix)    all insurance benefits, including rights and proceeds, arising from or relating to the Acquired Assets or the Assumed Liabilities prior to the Closing Date;

(x)     all other intangible assets of Coyotes Hockey relating to the Business, including all goodwill associated with the Business;

(xi)    all of Coyotes Hockey's interest in 3051349 Nova Scotia Company, a Nova Scotia unlimited liability company; and

(xii)   prepaid insurance as set forth in Schedule 2.2(a) attached to the APA.

16.   As set forth in the Section 2.3 of the APA, the Assets do not include certain "**Excluded Assets**" which is defined in the APA as: (1) all assets owned by Debtor Arena Management; (2) any asset that the Proposed Buyer elects to exclude either by listing it on Schedule 2.3 of the APA or by requiring that such item does not appear on any of the Schedules referred to in Section 2.2 of the APA; (3) all rights of Coyotes Hockey under any Contracts other than the Assumed Player Contracts and the Acquired Contracts; and (4) any causes of action arising under Chapter 5 of the Bankruptcy Code.

17.     As set forth in Section 2.4 of the APA, at Closing, the Proposed Buyer will assume the following liabilities of Coyotes Hockey (collectively, "**Assumed Liabilities**"): all Liabilities relating to the Acquired Assets that accrue after the Closing Date, including without limitation all Liabilities under the Assumed Player Contracts and Acquired Contracts, except Liabilities for any breaches by Coyotes Hockey of any of the Assumed Player Contracts and Acquired Contracts that occurred before the Closing Date, which shall be satisfied and/or discharged by Coyotes Hockey's payment of any cure amount held due before assumption and assignment or under Coyotes Hockey's Chapter 11 plan.

The Purchase Price

18.     Under Section 3.1 of the APA, the "**Purchase Price**" is $212,500,000.00 consisting of:

  (a)     $20,000,000.00 cash Escrow Deposit;

  (b)     $170,000,000.00 additional cash payment at the Closing, subject to reduction by the amount, if any, by which the chief financial officer of the Phoenix Coyotes determines and certifies to the Proposed Buyer and Coyotes Hockey that the amount that will be recoverable with respect to the NHL Accounts will be less than $25,000,000 (the "**NHL Accounts Shortfall**");

  (c)     $8,000,000.00 to be paid directly to Wayne Gretzky ("**Mr. Gretzky**") on behalf of Coyotes Hockey to discharge Coyotes Hockey's deferred compensation obligation to Mr. Gretzky

  (d)     An "Additional Payment" of $14,500,000.00 cash (representing amounts that would be contractually owing to Mr. Gretzky under the terms of his current employment arrangement with Coyotes Hockey if Mr. Gretzky elected to terminate his employment arrangement because of a sale of control of Coyotes Hockey) payable <u>either</u>:

    (i)     to Mr. Gretzky, if Mr. Gretzky elects to terminate his employment arrangement with Coyotes Hockey because of a sale of control of Coyotes Hockey and in connection therewith Mr. Gretzky does not waive his right to receive the $14.5 million that would have

otherwise been paid to him through the end of his employment term; or

(ii)    to Coyotes Hockey if Mr. Gretzky signs a written waiver under which Mr. Gretzky waives his rights to receive the $14.5 million that would have otherwise been paid to him through the end of his employment term, with such waiver to be delivered to the Escrow Agent for delivery to the Proposed Buyer at Closing; provided, however, that the amount payable to Coyotes Hockey hereunder shall not exceed the amount of the NHL Accounts Shortfall.

## The Closing Date And Conditions To Closing

19.    The closing date of the Proposed Sale (the "**Closing Date**") is to take place on *June 30, 2009*, or a date mutually acceptable to Coyotes Hockey and the Proposed Buyer after all conditions precedent to closing are met but not later than the fifth business day after such conditions are met (the "**Closing Date**"). As set forth in Section 7.1 of the APA, the Proposed Buyer's obligation to pay the Purchase Price and consummate the Proposed Sale and related transactions under the APA is subject to satisfaction, or waiver by the Proposed Buyer, of the following conditions precedent at or before close of the Proposed Sale (the "**Closing**");

(a)    the representations and warranties made by Coyotes Hockey in the APA were accurate in all material respects as of the date of the APA and will be accurate in all material respects on the Closing Date;

(b)    the Court has entered the Sale Approval Order which, if not a Final Order, has not been stayed, or postponed or prohibited in effect in whole or in part by any court of Governmental Body, and meets the requirements of Section 6.2(b) of the APA;

(c)    Coyotes Hockey has complied in all material respects with those obligations that it is required to comply with before the Closing Date;

(d)    Coyotes Hockey has obtained any Consent, given any notice, and made any filing required in connection with its execution and delivery of the APA and each of the other Transaction Documents to which it is party and its performance of its obligations hereunder and thereunder, except such Consents as the Proposed Buyer agrees may be obtained and determined in conjunction with confirmation and approval of the Plan;

(e)    The waiting period applicable to the purchase and sale of the Assets under the HSR Act shall have expired;

(f)    No statute, rule or regulation shall have been enacted or promulgated by any Governmental Body which prohibits the consummation of the transactions contemplated hereby; and there shall be no order or injunction of a court of competent jurisdiction in effect precluding consummation of such transactions;

(g)    Since the date of the APA, there shall not have been commenced or threatened against the Proposed Buyer or Coyotes Hockey, or against any Person affiliated with the Proposed Buyer or Coyotes Hockey, any proceeding by a Governmental Body: (a) involving any challenge to, or seeking damages or other relief in connection with the transactions contemplated hereby, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of such transactions

(h)    Coyotes Hockey has delivered the NHL Accounts Shortfall certification of its Chief Financial Officer;

(i)    the Proposed Buyer has received the following items (the "Seller Deliverables") through the Escrow:

        (i)    a bill of sale substantially in the form of <u>Exhibit B</u> (the "Bill of Sale"), signed by the Seller;

        (ii)    an assignment and assumption agreement substantially in the form of <u>Exhibit C</u> (the "Assignment and Assumption Agreement"), signed by the Seller.

20.    Under the Section 6.2 of the APA, Coyotes Hockey is required to file a sale procedures motion in the form mutually agreed to between the Proposed Buyer and Coyotes Hockey with the Court no later than May 5, 2009 (with notice to all 30 members of the NHL), providing for an auction and hearings on sale approval no later than the week of *June 22, 2009*, and an Order approving this Motion as soon as possible thereafter and in any event no later than *June 29, 2009*.

21.    It is absolutely imperative that the Proposed Sale, or a transaction with another party, close as soon as possible. In order to maximize the sale value of the Assets, any sale would need to be completed before the start of the upcoming 2009-2010 season. Indeed, the NHL draft will occur on June 26 and 27, 2009, and the NHL will release its schedule for

PHOENIX/479176.6        10
Case 2:09-bk-09488-RTB   Doc 18   Filed 05/05/09   Entered 05/05/09 17:17:34   Desc
Main Document    Page 10 of 23

upcoming 2009-2010 season in early July 2009. It will be very difficult to transfer the Phoenix Coyotes to another location (as contemplated by the APA) once the 2009-2010 schedule is released. Accordingly, if the Proposed Sale could not close in time, potential investors or buyers of the Coyotes would resist funding an additional season of financial losses or reduce their proposed purchase price accordingly. Therefore, the upcoming NHL draft and the NHL's need to complete the 2009-2010 schedule by July 2009 mandated that an expedited sale be completed and that an Order approving this Motion be entered before the NHL draft on June 26-27 if possible, and no later than *June 29, 2009*. Nealy Declaration.

## RELIEF REQUESTED

22.     By this Motion, the Debtors request entry of an Order under Bankruptcy Code §§ 105(a), 363(b), (f) and (m), and 365(f) and Bankruptcy Rules 2002 and 6004, authorizing the sale of substantially all of Coyotes Hockey's Assets to the Proposed Buyer and approving the form of the APA.

23.     As set forth in greater detail below, the Debtors respectfully requests that the proposed Order, among other things, as set forth in Section 6.2(b) of the APA:

(i)     providing that the Proposed Buyer shall not incur any liability as a successor to the Coyotes Hockey unless such liability is expressly assumed;

(ii)     approving the sale of the Assets to the Proposed Buyer on the terms and conditions set forth in the APA, or such higher and better terms and conditions offered at the auction, and authorizing Coyotes Hockey to proceed with this transaction;

(iii)     stating that any objections timely filed with respect to the sale of the Assets, which have not been withdrawn, are overruled or the interests of such objecting parties have been otherwise satisfied or adequately provided for by the Court;

(iv)     holding that, if NHL and those of its constituent members that have, or claim to have, consent rights pursuant to the last two sentences of Article 4.3 of the NHL Constitution, does not consent in writing to transfer and/or

assumption and assignment (as applicable) of the Phoenix Coyotes to the Proposed Buyer to be performed by the Proposed Buyer with its home games to be played at the location of the Proposed Buyer's choice in Southern Ontario, Canada subject to terms and conditions no less advantageous than those currently enjoyed by the Toronto Maple Leafs hockey team (which, for greater certainty, shall not include any obligation of the Proposed Buyer to provide any payments or other consideration to the NHL or any of its constituent members), (1) such written consent was deemed given, or objections to such operations were waived, and/or (2) the restrictions on assignment to the Proposed Buyer do not bar transfer, assumption and assignment under Bankruptcy Code § 363(f)(4) and 365(b)(2), (c)(1), (f)(1), and they are transferred and assigned free and clear of any such claims, rights or objections as set forth in the Order and as set forth in subsection (viii), below;

(v)     finding that the Purchase Price (as approved in the Sale Approval Orders) represents fair value for the Assets,

(vi)    finding that the sale is in the best interests of Coyotes Hockey's estate and creditors,

(vii)   finding that the Proposed Buyer is a good faith purchaser of the Assets under Bankruptcy Code § 363(m) and that the provisions of such section have not been violated and the Proposed Buyer is entitled to all protections of that section;

(viii)  providing that the sale of the Assets to the Proposed Buyer shall be free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Bankruptcy Code § 363 and any other applicable sections of the Bankruptcy Code, including claims of the NHL, its related entities, and those of its constituent members that have, or claim to have, consent rights pursuant to the last two sentences of Article 4.3 of the NHL Constitution for relief of any kind on account of the sale and the Proposed Buyer's relocation of the Phoenix Coyotes to the location of Proposed Buyer's choice at which the team's home games will be played in Southern Ontario, Canada, whether such member is located in the United States or Canada (collectively, the "**Liens and Claims**");[5]

(ix)    providing that the Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Orders including, without limitation, compelling delivery of the Assets to the Proposed Buyer and protecting the Proposed Buyer against any liens, claims, interests, obligations and encumbrances against Coyotes Hockey or the Assets as transferred to the Proposed Buyer, and to the extent permitted by

---

[5] Liens and Claims also include the following secured claims as set forth and defined in the Omnibus Statement: (1) the SOF Facility; (2) the NHL Priority Advances; and (3) the Secured Line of Credit with the NHL.

applicable law granting injunctive relief, including permanently enjoining each and every holder of any claim for such liabilities, wherever located, from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against the Proposed Buyer or the Assets;

(x)     finding that there are no brokers involved in consummating the sale and no brokers' commissions are due;

(xi)    authorizing and directing Coyotes Hockey to execute, deliver, perform under, consummate and implement the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; and

(xii)   determining that the Proposed Buyer is not a successor to Coyotes Hockey or otherwise liable for any liabilities not expressly assumed under the APA.

24.     The Debtors intend to file a motion to assume and assign certain executory contracts and unexpired leases designated by the Proposed Buyer, including the Assumed Player Contracts (as defined in the APA), and to determine the amount of any pre-petition defaults that Coyotes Hockey will need to cure to assume and assign such contracts and leases. The Debtors anticipate that this motion will be filed so that any hearing held with respect to the relief requested will be held on or before the final hearing to approve the Proposed Sale of the Assets.

25.     Contemporaneously with the filing of this Motion, the Debtors also filed the "Motion Of The Debtors For An Order: (A) Authorizing The Conduct Of An Auction Of Coyotes Hockey, LLC's Assets; (B) Establishing Procedures To Be Employed In Connection With The Sale, Including Approval Of Termination Fee; And (C) Approving Form And Manner Of Notice Of Conditional Cure Notice And Notice Solicitation," which seeks, among other relief, approval of the bid procedures to be utilized in connection with an auction of the Assets.

## BASIS FOR RELIEF REQUESTED

26.     The Debtors have determined that the best method of maximizing the value of the Coyotes Hockey estate for the benefit of its creditors at this time is through a sale of substantially

all of Coyotes Hockey's Assets under the terms of the APA. The Debtors -- given that entry of an Order approving this Motion is required no later than June 29, 2009, under the APA -- thus recognize the need to seek approval of the immediate sale of the Assets as set forth in this Motion.

**The Sale Of The Assets**

27.     Bankruptcy Code § 363(b)(1), provides that "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).   Although Bankruptcy Code § 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have uniformly held that approval of a proposed sale of property under Bankruptcy Code § 363(b) is appropriate if the transaction is supported by the reasonable business judgment of the debtor. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); *In re Abbotts Dairies Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986).

28.     In the instant case, the Debtors submit that the most important consideration in assessing the Debtors' business judgment are the consequences to the Debtors, their estates, creditors and other parties-in-interest if they are without sufficient funds to continue operating as a going concern.  As set forth above, Coyotes Hockey's -- and hence, the other Debtors' -- operations and maintenance of the Phoenix Coyotes may "go dark" without a sale of substantially all of Assets to a qualified buyer.  Moreover, the NHL has informed representatives of the Debtors that the NHL may effectively take control of Coyotes Hockey and the Phoenix

Coyotes if, on or around May 1, 2009, there is not a reasonable proposal for the disposition of or investment in the team acceptable to the NHL. As such, an orderly sale of Coyotes Hockey's Assets in a prompt manner is essential to maximize the value of the estates.

29.     The Debtors submit that the factors described in this Motion, which require a prompt sale of the Assets to preserve value for the estates, are entirely consistent with the longstanding rationale for authorizing a sale outside a Chapter 11 plan. *See In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir.), *cert. denied*, 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the debtor's property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets.") (citations omitted). Indeed, in view of the extensive pre-petition sale efforts engaged in by representatives of Coyotes Hockey and their professionals before the filing of these Chapter 11 cases, and submission of the APA to competitive bidding, the Debtors believe that maximum value for the transferred Assets will be obtained.

30.     Furthermore, the APA certainly does not dictate the terms of a plan of reorganization, because it does not attempt to restructure the rights of creditors. In the instant case, there are no conditions in the APA that predetermine the rights of creditors under a Chapter 11 plan. The APA's sole impact is to transform the composition of the Assets to cash and relieve the estates of significant liabilities. The distribution of Coyotes Hockey's and the other Coyotes Hockey's assets will be managed consistent with the Bankruptcy Code under a Chapter 11 plan. *See In re Torch Offshore, Inc.*, 327 B.R. 254, 259 (E.D. La. 2005) (noting that the sales were "only exchanges of assets for cash. They [did] not contain any provisions dictating the terms of

any future reorganization plan, preordaining the way creditors will vote on such a plan, or attempting to vary the priorities of Torch's creditors." *Id.*

**Sale Free And Clear Of Liens, Claims, And Interests**

31.     The Debtors request authorization to sell the Assets free and clear of liens, claims, encumbrances and interests, including the Liens and Claims.   Bankruptcy Code § 363(f) authorizes debtors-in-possession to sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §§ 363(f)(1) - (f)(5).

32.     Case law generally provides that a sale of a debtor's assets free and clear of all liens, claims, encumbrances and interests is permissible under section 363(f) as long as the liens, claims, encumbrances and interests attach to the net proceeds of the sale. *See In re Wells*, 296 B.R. 728, 734 (Bankr. E.D. Va. 2003) (holding that a trustee could sell property free and clear of equitable interest in property with interest to attach to proceeds); *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000) ("The holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the sale").

Case 2:09-bk-09488-RTB    Doc 18    Filed 05/05/09    Entered 05/05/09 17:17:34    Desc
Main Document        Page 16 of 23

33.     The Debtors submit that the consideration (*i.e.* the Purchase Price) provided under the APA will allow the satisfaction in full of any secured claims or interests against the Assets under Bankruptcy Code § 363(f)(3) (which as set forth and defined in the Omnibus Statement comprise the SOF Facility, the NHL Priority Advances, and the Secured Line of Credit with the NHL), with those Liens and Claims to transfer and attach to the net sale proceeds with the same validity, priority, force and effect that the Liens and Claims had on the Assets immediately before the Closing.   Indeed, the Proposed Sale contemplated by the APA will provide a significant and meaningful distribution to Coyotes Hockey's unsecured creditors.   Furthermore, the Debtors submit that to the extent the entities holding the Liens and Claims have consented to the Proposed Sale, then the Proposed Sale is allowed under Bankruptcy Code § 363(f)(2).

34.     Additionally, to the extent the NHL or its members do not consent to the Proposed Sale or the relocation of the Phoenix Coyotes to Hamilton, Ontario, as contemplated by the Section 6.2(b) of the APA, the Debtors submit that this Court can allow the Proposed Sale under Bankruptcy Code § 363(f)(4).   The NHL and its members' interests in the Phoenix Coyotes, and more specifically, any asserted (or to-be-asserted) right to block the Proposed Sale, are in *bona fide* dispute under Bankruptcy Code § 363(f)(4).

35.     The same holds true under Bankruptcy Code § 365, which provides in relevant part:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contact or lease unless, at the time of the assumption of such contract or lease, the trustee . . . (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease.

\* \* \*

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . .

> The trustee may assign an executory contract or unexpired lease of the debtor only if . . . (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. §§ 365(b)(1), (f)(1), and (f)(2). Accordingly, even if assignment is prohibited, restricted, or conditioned under applicable law, the Bankruptcy Code allows a debtor to assign an executory contract or unexpired lease if it properly assumes the contract under § 365(b)(1) and provides the non-debtor party to the contract adequate assurance of future performance of such contract. In this context, the non-debtor party to an executory contract or lease cannot force a debtor to assume a contract that contains illegal provisions. In other words, an executory contract or unexpired lease may be assumed and assigned absent the invalid or illegal provisions contained in the agreement. *See, e.g., In re Boogaart of Florida, Inc.*, 17 B.R. 480, 486 (Bankr. S.D. Fla. 1981) ("[T]he spector (sic) of a possible violation of the antitrust laws militates against the Court's giving effect to the [anti-transfer] provisions."); *In re Paul Harris Stores*, 1992 Bankr. LEXIS 2418, *22 (Bankr. S.D. Ind. 1992) (upholding transfer of lease to party which would comply with all terms of the lease except those terms that were unenforceable as against public policy or the Bankruptcy Code).

36. Here, the Debtors anticipate that the NHL or other members of the NHL, including, the Toronto Maple Leafs (who benefit by being the sole team in the Toronto area), or other parties, may seek to block or prohibit the Proposed Sale because of purported rights or

interests to prevent the relocation of the Phoenix Coyotes from Glendale, Arizona to Hamilton, Ontario. These purported Liens or Claims are dependent on terms or provisions interpolated in the NHL/Coyotes Hockey relationship that are clear violations of federal law and public policy.

37. Section 1 of Sherman Act proscribes agreements or other concerted activity that unreasonably restrain trade. *NCAA v. Bd. of Regents*, 468 U.S. 85, 98 (1984). To establish a Section 1 claim, a party must establish (i) the existence of a contract, combination or conspiracy among two or more separate entities that (ii) unreasonably restrains trade. The by-laws governing the NHL and teams within the league constitute the requisite agreement among separate entities for purposes of a Section 1 claim. Indeed, the Ninth Circuit Court of Appeals and other courts have held that sports leagues -- like the NHL -- comprise independent economic actors that are capable of conspiring under the antitrust laws. *L.A. Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1389 (9th Cir. 1984); *National Hockey League v. Plymouth Whalers*, 419 F.3d 462, 469-70 (6th Cir. 2005) (eligibility rules adopted by NHL affiliate hockey league constitute agreement among separate entities).

38. Whether the application of the NHL by-laws in this context unreasonably restrains competition in violation of the antitrust laws is analyzed under the "Rule of Reason." *NBA v. SDC Basketball Club, Inc.*, 815 F.2d 562, 567 (9th Cir. 1987); *L.A. Mem'l Coliseum Comm'n*, 726 F.2d at 1390-92. Under the Rule of Reason, a court must consider whether, on balance, application of the NHL by-laws would be anticompetitive or pro-competitive. *California Dental Ass'n v. FTC*, 224 F.3d 942, 947 (9th Cir. 2000). The relevant market for analyzing the competitive effects of the NHL's by-laws is the market for major league professional ice hockey contests. *San Francisco Seals Ltd. v. National Hockey League*, 379 F. Supp. 966, 969 (C.D. Cal. 1974).

39.     In this regard, it is axiomatic that the NHL has monopoly power over the market for major league professional ice hockey contests. Monopoly power is defined as the power to control prices or exclude competition. *See U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Furthermore, the market over which the NHL has monopoly power is characterized by high barriers to entry. Restrictions on intra-league competition (*e.g.*, relocation restrictions) which are imposed by an entity with monopoly power are generally found to be unreasonable and illegal under the rule of reason. *See, e.g., Graphic Prods. Distribs. v. Itek Corp.*, 717 F.2d 1560, 1572 (11th Cir. 1983). Not only are these restrictions as by applied by the NHL illegal as horizontal agreements among competing teams, but they are also illegal as unnecessary restraints on intra-league competition when there is little inter-league competition.

40.     The denial of the Debtors' and the Proposed Buyer's request to move the Phoenix Coyotes franchise to Hamilton, Ontario would result in significant anticompetitive effects. First, denial of the relocation request would effectively terminate the Phoenix Coyotes as a going concern because there are no other viable purchasers or other investors for the Phoenix Coyotes. This would have devastating effects on the Debtors, the estates, their creditors, and all parties-in-interest, including NHL players. Output and competition among the remaining NHL teams would be reduced in the relevant and monopolized market and have detrimental effects on competition for NHL players -- talented NHL players will have fewer teams competing for their services.[6] Even the NHL Players' Association recognizes the benefit of moving

---

[6] Even a representative of the NHL Players' Association (the "**NHLPA**") recognizes the need and importance of relocating the Phoenix Coyotes to Canada. A recent article titled *Coyotes Time in the Desert Could Be Up* by Dan Bickley of the *Arizona Republic* provides: "And just the other day, something important happened. A representative from the NHL's players union publicly endorsed the idea of relocation." Quoting the NHLPA's Glenn Healy, "They [the Phoenix Coyotes] have been trying to fit a square peg into a round hole for a lot of years." *See Coyotes Time in the Desert Could Be Up*, Arizona Republic, May 1, 2009, Sections C1 and C3.

Case 2:09-bk-09488-RTB    Doc 18    Filed 05/05/09    Entered 05/05/09 17:17:34    Desc
Main Document        Page 20 of 23

41. Third, denying the request would also deprive consumers of the lower prices that would inevitably flow from relocating the Phoenix Coyotes. Hamilton is located in Southern Ontario approximately halfway between Buffalo, New York, and Toronto, Ontario. Both Buffalo and Toronto have NHL teams (the Buffalo Sabres and the Toronto Maple Leafs). Allowing relocation of the Phoenix Coyotes and adding a third team to this geographic region would increase competition for, among other things, broadcast rights, media contracts, team merchandise, and fan support, all of which would lower prices for such goods and services and directly and indirectly benefit consumers. Higher prices and lower output -- the direct result of what is likely to be sought by the NHL -- are the hallmarks of anticompetitive behavior. *NCAA*, 468 U.S. at 113.

42. There is no pro-competitive business justification for denying the Debtors' and the Proposed Buyer's relocation request. The only reason for denying such request would be to protect the Toronto and Buffalo hockey teams -- both of which maintain dominant market positions -- from the increased competition that otherwise would result from relocation. Courts have routinely rejected such justifications as insufficient under the Rule of Reason. *See, e.g., NCAA*, 468 U.S. at 117 ("The Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable").

43. In short, application of the NHL's by-laws in a manner that blocks or otherwise restricts the Proposed Buyer's attempts to relocate the Phoenix Coyotes would violate antitrust laws. As set forth above, the pertinent interests of the NHL under its by-laws are in *bona fide* dispute in accordance with Bankruptcy Code § 363(f) and/or Bankruptcy Code § 365 allows assumption and assignment without enforcement of such interests. Accordingly, the Debtors request that the Assets be transferred to the Proposed Buyer, or other successful bidder, free and

clear of all liens, claims, encumbrances and interests, including the Liens and Claims, with such liens, claims, encumbrances and interests attaching to the proceeds of the Proposed Sale in the same order of priority as such interests existed as of the Petition Date, as modified by any Court order entered in these proceedings.

44.     The Debtors submit that the Proposed Sale to the Proposed Buyer under the terms of the APA reflects the highest and best use of the Assets for the benefit of Coyotes Hockey's creditors. Indeed, as set forth in detail in the Omnibus Statement, the Phoenix Coyotes have not posted a profit since moving to Phoenix in 1996. The Debtors believe that the team has a higher value in Hamilton, Canada.[7]

**Good Faith Purchaser**

45.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147 (citations omitted). As set forth in the Scudder Declaration, the Debtors submit, and if necessary will present evidence at the hearing to approve the Proposed Sale, that the proposed APA is the result of, and due to, the open and competitive nature of an open auction, and will be, by definition, the result of arm's-length negotiations in good faith.

**Waiver Of Ten-Day Stay Imposed by Bankruptcy Rules 6004(h) And 6006(d)**

46.     In addition, it is imperative that Coyotes Hockey is able to close the Proposed Sale as soon as practicable after the entry of an order approving the Proposed Sale. Nealy

---

[7] If necessary, the Debtors will supplement this Motion to provide the Court with ample authority and evidence to sell the Assets free and clear of these or any other asserted interests.

Declaration. Accordingly, the Debtors request that the Court in the discretion provided to it under Bankruptcy Rules 6004(h) and 6006(d), waive the ten-day stay of an order approving the sale of the Assets and the assumption and assignment of the executory contracts to the Proposed Buyer arising under those same Bankruptcy Rules.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the Debtors the relief requested in this Motion and such other and further relief as the Court deems just.

Dated this 5th day of May, 2009.

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By:     /s/ Thomas J. Salerno
　　　　Thomas J. Salerno
　　　　Jordan A. Kroop
　　　　Kelly Singer
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

Proposed Counsel to the Debtors-In-Possession