Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
Kelly Singer (AZ Bar No. 022024) ksinger@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Squire, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

Proposed Counsel to the Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC, and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>Debtors. | Case No. 2:09-bk-_____<br>(Jointly Administered)<br><br>Chapter 11<br><br>**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING; (B) AUTHORIZING USE OF CASH COLLATERAL; AND (C) DETERMINING SUFFICIENCY OF ADEQUATE PROTECTION**<br><br>**Date of Hearing: TBD**<br>**Time of Hearing: TBD** |
| This Filing Applies to:<br>　■　　All Debtors<br>　❏　　Specified Debtors | |

DEWEY RANCH HOCKEY, LLC, COYOTES HOLDINGS, LLC, COYOTES HOCKEY, LLC, and ARENA MANAGEMENT GROUP, LLC (collectively, the "**Debtors**"), debtors-in-possession in the above-captioned Chapter 11 cases (these "**Cases**"), file this Motion for the entry **of an interim and a final order under 11 U.S.C. §§ 105(a) 361, 362, 363, and 364, and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to obtain post-petition, debtor-in-possession financing,**

**authorizing the Debtors to use cash collateral of pre-petition lenders, and determining that certain pre-petition secured lenders of the Debtors are adequately protected.** This Motion seeks immediate entry of an order granting the Motion and is brought on an emergency basis on expedited notice under Local Bankruptcy Rule 9103-1(h) to avoid immediate and irreparable harm to the Debtors' estates.

> The relief requested in this Motion would **authorize the Debtors to obtain post-petition, debtor-in-possession financing, authorize the Debtors to use cash collateral of pre-petition lenders, and determine that certain pre-petition lenders of the Debtors are adequately protected. This Motion seeks an order that would grant the debtor-in-possession lender liens that would prime the security interests held by pre-petition secured creditors.** The basis for the relief requested in this Motion is set forth in paragraphs 29 through 59 below.

This Motion is supported by the entire record before the Court, the "Declaration Of Michael Nealy In Support Of DIP Motion" (the "**Nealy Declaration**"), the "Omnibus Statement Of Facts In Support Of Chapter 11 Petitions And First Day Motions" (the "**Omnibus Statement**"), both filed contemporaneously with this Motion, and by the following points and authorities.

**BACKGROUND**

**Jurisdiction and Venue**

1.      On May 5, 2009 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are pending before the United States Bankruptcy Court for the District of Arizona (the "**Court**").

2.      The Debtors continue to operate their businesses and manage their assets as debtors-in-possession under 11 U.S.C. §§ 1107 and 1108.

3.      This Court has jurisdiction over these Chapter 11 cases (these "**Cases**") under 28 U.S.C. §§ 157 and 1334. These matters constitute core proceedings under 28 U.S.C. § 157(b)(2).

4.      Dewey Ranch Hockey, LLC is an Arizona limited liability company with its principal place of business located in Yavapai County, Arizona. The remaining Debtors are affiliates of Dewey Ranch Hockey, LLC. Accordingly, venue of these Cases is proper in this District under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105, 361, 362, 363, and 364, and Bankruptcy Rule 4001.

## Background Facts Concerning The Debtor

6.      The Debtors incorporate here by this reference the "Description Of The Debtors" section of the Omnibus Statement.

## The Pre-Petition Debt And Security Interests

7.      The majority of debt of the Debtors is held at Coyotes Hockey, LLC ("**Coyotes Hockey**") and consists of: (i) a $75 million secured credit facility with two tranches; (ii) certain secured advances and a senior secured line of credit from the National Hockey League (the "**NHL**"); and (iii) an unsecured revolver from Jerry Moyes.

8.      Coyotes Holdings, LLC ("**Coyotes Holdings**") has guaranteed some of the obligations of Coyotes Hockey, which guarantees are secured by certain of Coyotes Holdings' assets.

### The SOF Facility

9.      Coyotes Hockey currently has outstanding principal obligations of $75 million under a secured loan facility (the "**SOF Facility**") with SOF Investments, L.P., White Tip Investments, LLC, and Donatello Investments, LLC (collectively "**SOF**"). The SOF Facility is evidenced by a "Credit Agreement" dated December 31, 2003 and consists of two tranches -- Tranche A which comprises a $20 million secured promissory note, and Tranche B which

comprises a $55 million secured promissory note. The SOF Facility matured on December 31, 2008 and is secured by substantially all of Coyotes Hockey's assets.[1]

10.     As of the Petition Date, the approximate amount outstanding on the SOF Facility with interest is $79.6 million.

<u>NHL Letter Agreement</u>

11.     Coyotes Hockey and the NHL executed an agreement evidenced by a letter dated November 21, 2008 (as subsequently modified, the "**NHL Letter Agreement**"), under which the NHL made certain cash advances to Coyotes Hockey in the amount of approximately $31.4 million (the "**NHL Priority Advances**").

12.     The NHL Priority Advances represent advances of cash that Coyotes Hockey is likely to be entitled to receive from its share of the NHL's league-generated television revenues from the 2008–2009 season and other potential distributions calculated for the 2008–2009 season. The NHL Priority Advances accrue interest at a rate tied to the NHL's own cost of borrowing from the date any such advance is made until repaid or set off against amounts owing from the NHL to Coyotes Hockey.

13.     SOF has expressly subordinated the SOF Facility to the NHL, and therefore, the NHL Priority Advances are senior to and have priority over all secured and unsecured indebtedness owed by Coyotes Hockey. The current outstanding principal balance of the NHL Priority Advances is approximately $23.6 million.

---

[1] The SOF Facility was originally two separate loan facilities that comprised a $20 million senior loan facility from SOF Investments, L.P., and a $55 million second facility from SOF Investments, L.P., White Tip Investments, LLC, and Donatello Investments, LLC. In accordance with a "<u>Fifth Amended to Credit Agreement and First Amendment to Pledge Agreement and Limited Recourse Guaranty</u>" dated September 17, 2008, these two facilities were combined into the single SOF Facility with two tranches.

<u>Senior Secured Line of Credit</u>

14.     On February 24, 2009, after the NHL notified Coyotes Hockey that it would no longer fund NHL Priority Advances, the NHL and Coyotes Hockey entered into a "<u>Secured Credit Agreement</u>" (the "**Senior Secured Line of Credit**"). The Senior Secured Line of Credit is an open-ended line of credit secured by substantially all of the assets of Coyotes Hockey. While there is no cap on the amount that could be borrowed under the Senior Secured Line of Credit, the NHL is under no obligation to make loans under the Senior Secured Line of Credit. To date, the NHL has loaned Coyotes Hockey approximately $13.4 million under the Senior Secured Line of Credit. All obligations under the Senior Secured Line of Credit are due on demand, and such outstanding obligations under the Senior Secured Line of Credit are senior in rights of payment and collection to the SOF Facility and the Moyes Revolver (discussed below).

<u>The Moyes Revolver</u>

15.     Beginning in September 2006, Jerry Moyes has provided Coyotes Hockey with the funds necessary to cover its operating losses. These funds have been provided under the terms of the "<u>Sixth Amended and Restated Revolving Loan Agreement</u>" and the corresponding "<u>Sixth Amended and Restated Promissory Note</u>" each in the principle amount of $95 million and dated April 16, 2008 (together, the "**Moyes Revolver**"). Coyotes Hockey owes Moyes approximately $104.4 million in principal and unpaid interest under the Moyes Revolver. The Moyes Revolver is an unsecured obligation of Coyotes Hockey.

16.     Under the "<u>Security Agreement</u>" dated March 31, 2009, Mr. Moyes assigned all of his rights to receive payments under the Moyes Revolver to Hillcrest Bank ("**Hillcrest**"), to secure guaranties that Mr. Moyes has made on certain loans owing to Hillcrest.

<u>Coyotes Holdings' Guarantees</u>

17. Under a "<u>Limited Recourse Guaranty</u>" dated December 31, 2003, Coyotes Holdings has guaranteed Coyotes Hockey's obligations under the SOF Facility. This limited recourse guaranty is secured by an interest in Coyotes Holdings' ownership interest in Coyotes Hockey, which is junior in priority to the security interest granted to the NHL in the same ownership interest.

18. Under a "<u>Limited Recourse Guaranty</u>" dated February 24, 2009, Coyotes Holdings has guaranteed Coyotes Hockey's obligations under the NHL Letter Agreement and the Senior Secured Line of Credit. This guaranty is secured by an interest in Coyotes Holdings' ownership interest in Coyotes Hockey, which is senior in priority to the security interest granted to SOF in the same ownership interest.

19. Under the "<u>Collateral Assignment and Security Agreement</u>" dated March 31, 2009, Coyotes Holdings assigned to Hillcrest its rights to, and granted Hillcrest a security interest in, any distribution on account of the Coyotes Hockey membership interests.

**<u>Necessity Of DIP Financing</u>**

20. The Debtors operate on a fiscal year beginning in June. For the 2005-2006 fiscal year, Coyotes Hockey (which, from an operational perspective, is the largest and most significant of the Debtors) experienced approximately $54,078,000 in revenues and $75,947,000 in expenses, resulting in a $21,870,000 EBITDA loss. Nealy Declaration.

21. Similarly, in the 2006-2007 season, Coyotes Hockey experienced approximately $59,460,000 in revenues and $88,971,000 in expenses, with a $29,511,000 EBITDA loss. Nealy Declaration.

22. In 2007-2008, Coyotes Hockey had $56,584,000 in revenues and $84,311,000 in expenses, resulting in a $21,727,000 EBITDA loss. Nealy Declaration.

23.     In November of 2008, Mr. Moyes notified the NHL that he would no longer provide funds under the Moyes Revolver to cover Coyotes Hockey's operating losses. Additionally, the NHL has informed Coyotes Hockey that it will no longer advance funds under the NHL Letter Agreement. Additionally, although the NHL and Coyotes Hockey have entered into the Senior Secured Line of Credit, the NHL is under no obligation to fund the Senior Secured Line of Credit, and amounts due under such loan (approximately $4.6 million) are payable on demand. Nealy Declaration.

24.     Because Coyotes Hockey has no certain source of funding to cover its operating losses, Coyotes Hockey has recently explored with numerous third parties and current investors the possibility of additional capital infusions or a sale of the organization. A detailed description of these efforts is set forth in the "Declaration Of Earl Scudder In Support Of Sale Motion" filed contemporaneously with this Statement. In this regard, Coyotes Hockey and PSE Sports & Entertainment LP (the "**Proposed Buyer**") have entered into the Asset Purchase Agreement dated May 5, 2009 (the "**APA**"), under which the Proposed Buyer has agreed to purchase substantially all of Coyotes Hockey's assets (the "**Proposed Sale**"). Nealy Declaration.

25.     It is absolutely imperative that this transaction, or a transaction with another party, close before July 2009. In order to maximize the sale value of Coyotes Hockey's assets, any sale would need to be completed before the start of the upcoming 2009-2010 season. Potential investors or buyers of Coyotes Hockey's assets would resist funding an additional season of financial losses or reduce their proposed purchase price accordingly. Furthermore, the team could not be transferred to another location once the 2009-2010 schedule was released. The need to complete the 2009-2010 schedule by July 2009 mandated that an expedited marketing process (and if applicable, a sale) be completed prior to July 2009. Nealy Declaration.

26.     Additionally, Coyotes Hockey's ongoing financial difficulties exacerbate the circumstances and underscore the need for an expedited transaction. A transaction, however, cannot proceed without financing to fund Coyotes Hockey's operations pending such transaction. Nealy Declaration.

27.     As such, post-petition financing is necessary in these Cases. Nealy Declaration.

## RELIEF REQUESTED.

28.     By this Motion, the Debtors seek entry of an interim order substantially in the form attached as Exhibit "**A**" to this Motion (the "**Interim Order**") and a final order (the "**Final Order**") under Bankruptcy Code §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), and 364(d):

a.     Authorizing the Debtors to obtain post-petition, debtor-in-possession financing up to a maximum principal amount of $17 million (the "**DIP Facility**") in accordance with the term sheet attached to this Motion as Exhibit "**B**" (the "**Term Sheet**"),[2] executed among the Debtors, as borrowers, and S&E Interim Facility Corporation, as lender (the "**DIP Lender**"), and DIP Budget (as defined in the Term Sheet and attached to this Motion as Exhibit "**C**"), and any related documents to be drafted and required to be delivered in connection with the Term Sheet (collectively with the Term Sheet, the "**DIP Loan Documents**");[3]

b.     Approving the terms and conditions of the DIP Loan Documents and authorizing the Debtors to execute and enter into the DIP Loan Documents;

---

[2] Capitalized terms as used but not defined in this Motion retain the meanings given to them in the Term Sheet. If any conflict exists between the Term Sheet as described in this Motion and the provisions contained in the Term Sheet, the provisions of the Term Sheet control.

[3] The Debtors propose that the DIP Facility be granted on an interim basis under the terms of the Term Sheet and the Interim Order. Prior to a final hearing on this Motion, the Debtors and the DIP Lender will have a credit agreement and other documents drafted to reflect the agreement set forth in the Term Sheet.

c.     Authorizing the Debtors to execute and deliver, from time to time, all such other documents, instruments, and agreements and to perform all such other acts as may be required in connection with the DIP Loan Documents;

d.     Authorizing the Debtors under Bankruptcy Code §§ 364(c)(1), (c)(2), and (c)(3) to obtain debtor-in-possession superpriority financing under the DIP Loan Documents (all such financing, loans, extensions of credit, and other indebtedness including related interest and fees are the "**Postpetition Advances**"), under which the superpriority administrative claim, liens and security interests are subordinate and subject to the Carve-Out (as defined below):

(i)     under Bankruptcy Code § 364(c)(1), the Postpetition Advances have priority over all administrative expenses of the kind specified in or created or awarded under, *inter alia*, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726;

(ii)     under Bankruptcy Code § 364(c)(2), all Postpetition Advances are secured by a first-priority, senior lien and secured interest in all Litigation Claims (defined below), and the proceeds thereof;

(iii)     under Bankruptcy Code § 364(d)(1), all Postpetition Advances are secured by a first-priority, senior lien and security interest in substantially all of the Debtors' assets;

e.     Modifying the automatic stay under Bankruptcy Code § 362 to the extent reasonably necessary to permit the Debtors and the DIP Lender to implement the terms of the Interim Order and the Final Order;

f.     Authorizing the Debtors, after an emergency hearing (the "**Interim Hearing**"), to obtain debtor-in-possession financing from the DIP Lender up to the maximum

amount of $2 million under the terms of the Term Sheet and the Interim Order pending a final

hearing on this Motion (the "**Final Hearing**") at which the Debtors will seek entry of a Final

Order approving the obtaining of debtor-in-possession financing up to the maximum amount of

$17 million on terms substantially identical to those contained in the Interim Order in accordance

with Bankruptcy Rules 4001(b) and (c);

g. Deeming under Bankruptcy Code § 361 that the NHL, SOF, and Hillcrest

(collectively, the "**Pre-Petition Secured Creditors**") are adequately protected with respect to

any diminution in the value of the Coyotes Hockey's assets in which they have an interest

resulting from the granting of first-priority senior lien and security interest to the DIP Lender

under Bankruptcy Code § 364(d);

h. Authorizing the Debtors to use cash collateral of the Pre-Petition Secured

Creditors under Bankruptcy Code § 363(b)(2); and

i. Scheduling the Final Hearing and establishing notice procedures for the

Final Hearing and the proposed Final Order.

## BASIS FOR RELIEF

29. The Debtors have determined that the DIP Facility is necessary to meet the

Debtors' short-terms operating needs pending the closing of the Proposed Sale or other

transaction. In this regard, the Debtors have concluded that obtaining the post-petition financing

contemplated by this Motion is necessary and in the best interest of the Debtors and their estates.

## The DIP Facility

30. The terms and conditions of the proposed DIP Facility are set forth in the Term

Sheet itself, which is attached as Exhibit B to this Motion, and need not be reiterated here.

Nonetheless, the Debtors specifically note the following key provisions of the Term Sheet and the proposed Interim Order:

j.     *Termination Date.* All Postpetition Advances shall be repaid on or before the earliest of the following (the "**Termination Date**"): (i) June 30, 2009, unless extended in DIP Lender's sole discretion; (ii) the closing date of a sale of all or substantially all assets of Coyotes Hockey; (iii) the effective date of a plan of reorganization in these Cases; (iv) the date of the acceleration of any outstanding extensions of credit under the DIP Facility (v) entry of an order reversing in any respect the Final Order, unless waived in writing by the DIP Lender; (vi) the conversion of these Cases to cases under Chapter 7 of the Bankruptcy Code; and (vii) dismissal of these Cases.

k.     *Pricing and fees.* Interest on the Postpetition Advances will accrue monthly at the rate of 7% per annum. In the event of a default, the interest rates applicable to all Post-Petition Advances will be increased by 4% per annum, with all interest calculated and compounded daily. The Debtor is not required to pay any fees.

l.     *Grant of Superpriority Administrative Claim and Priority of Security Interests to DIP Lender.* The superpriority administrative expense claim and the extent, perfection, and priority of postpetition liens and security interests to be granted to the DIP Lender in connection with the DIP Facility are described in paragraph 28.d above and paragraphs 5 through 7 of the proposed Interim Order.

m.     *Carve-Out.* The superpriority administrative expense claim and the liens and security interests granted to the DIP Lender under the DIP Loan Documents and the proposed Interim Order are subject a limited carve-out (the "**Carve-Out**"). The Carve-Out will be shared pro rata by (i) professionals employed by the Committee, for services rendered while the Borrowers are chapter 11 debtors in possession, (ii) fees pursuant to 28 U.S.C. § 1930, and (iii) any fees

payable to the clerk of the Bankruptcy Court. The the aggregate amount of the Carve-Out is not to exceed the sum of:

> (i) unpaid professional fees and expenses incurred before the Event of Default by the Committee; and

> (ii) $50,000.

n. *Litigation Claims*: Under the proposed Interim Order and the Final Order, the superpriority administrative expense claim, the liens, and security interests granted to the DIP Lender under the DIP Loan Documents will attach to all the Debtors' causes of action, whether mature, contingent, or otherwise, against any person or entity relating to the Coyotes Hockey's assets or business, whether arising in tort, contract, or otherwise, but excluding causes of action arising under Chapter 5 of the Bankruptcy Code (the "**Litigation Claims**").

o. *Payments.* The Postpetition Advances will be made in minimum amounts of $500,000 and whole multiples of $100,000. All outstanding Postpetition Advances are due and payable on the Termination Date. The Debtors may prepay the Postpetition Advances in whole or part at any time.

p. *Post-Petition Retainer.* Proceeds of the DIP Facility will be used to pay a postpetition retainer of $5 million for the benefit of and to be shared by all of the Borrowers' professionals (the "**Postpetition Retainer**") for use upon Bankruptcy Court approval of any such professional fees and disbursements.

## Negotiation of the DIP Facility

31. The Debtors negotiated the terms of the DIP Facility and the Interim Order with the DIP Lender in good faith and at arms' length. The Debtors have determined that their existing financial circumstances, and in the context of the Proposed Sale, are not sufficient to meet the Debtors' short-term operating expenses. Accordingly, the DIP Facility and the Interim

Order are most favorable in light of the Debtors' working capital needs pending the Proposed Sale or other transaction. Nealy Declaration. The Debtors, in their sound business judgment, have accepted the DIP Lender's proposal for post-petition financing. *See, e.g., In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (that the trustee contacted other financial institutions in the immediate geographic areas and was unsuccessful satisfied the requirements of Bankruptcy Code § 364); *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (unsuccessful attempts to secure financing from other sources justified senior priority loan under Bankruptcy Code§ 364); *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (that the debtors had contacted four lenders satisfied Bankruptcy Code § 364's requirement that the debtors were unable to obtain comparable financing on an unsecured basis).

32. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.,* 789 F.2d at 1088. Where there are few lenders likely able or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Savings Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

33. The DIP Facility constitutes a financing package in the best interests of the Debtors and their estates. The DIP Lender presented the Debtors with the most attractive economic package available under the circumstances. Nealy Declaration.

## **APPLICABLE AUTHORITY**

34. This Court may authorize the Debtors to enter into the DIP Facility under Bankruptcy Code § 105(a), which grants a bankruptcy court broad authority to enforce the provisions of the Bankruptcy Code under equitable, common-law doctrines. Moreover, if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code § 503(b)(1), then the Court, under Bankruptcy Code § 364(c), after notice and hearing, may authorize the debtor to obtain credit or incur debt:

> (1) With priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code; or
> (2) Secured by a lien on property for the estate that is not otherwise subject to a lien; or
> (3) Secured by a junior lien on property of the estate that is subject to a lien.

Bankruptcy Code § 364(c).

35. Furthermore, under Bankruptcy Code § 364(d):

> The court may authorize the obtaining of credit or the incurring of debt by a senior or equal lien on property of the estate that is subject to a lien only if . . . (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

2. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

The foregoing provisions of Bankruptcy Code §§ 105 and 364 and Bankruptcy Rule 4001(c) authorize this Court to grant the relief requested in this Motion and set forth in the proposed Interim Order.

**Approval Of The DIP Facility Is Necessary In These Cases**

36.      It is essential to the success of these Cases that the Debtors obtain access to comprehensive and sufficient post-petition financing that will provide the stability needed pending the Proposed Sale or other transaction.  Without the DIP Facility, the Debtors will be unable to ensure uninterrupted business operations.  Absent access to the working capital financing that will be available to the Debtors under the DIP Facility, the Debtors may be unable to meet their ordinary course expenses, and thus will be unable to preserve their value for the benefit of their creditors.  Nealy Declaration.

37.      In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d at 1088.  Where there are few lenders likely to be able or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

38.      After appropriate investigation and analysis, the Debtors have concluded that the DIP Lender's proposal was the best alternative available to the Debtors.  Nealy Declaration.

39.      Consequently, the Debtors' efforts in this regard satisfy the statutory requirement of Bankruptcy Code §§ 364(c) and (d)(1).

**The Terms of the DIP Facility are Fair, Reasonable, and Appropriate**

40.      The proposed terms of the DIP Facility and the Interim Order are fair, reasonable, and adequate in that the terms neither tilt the conduct of these Cases nor prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors.  The purpose of the

Case 2:09-bk-09488-RTB    Doc 21   Filed 05/05/09   Entered 05/05/09 17:35:34   Desc
Main Document      Page 15 of 44

DIP Facility is to enable the Debtors to maintain the stability of these Cases and their operations pending the Proposed Sale or other transaction. *See In re First South Sav. Ass'n*, 820 F.2d 700, 710-15 (5th Cir. 1987); *In re Tenney Village Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989).

41.     The proposed DIP Facility and the Interim Order provide that the liens, security interests, and administrative expense claims granted to the DIP Lender are subject to the Segregated Cash. The liens, security interests, and administrative expenses claims granted to the DIP Lender are also subject to the Carve-Out, which ensures that professionals for the Debtor appointed in these cases will be able to work to preserve and maximize the value of the assets of the Coyotes Hockey, which benefits all creditors of the estates. In *re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990), the bankruptcy court found that such carve-outs for professional fees are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. *In re Ames Dep't Stores*, 115 B.R. at 40.

42.     Furthermore, the granting of a lien on the Litigation Claims, and the proceeds thereof, is necessary to protect the DIP Lender's claims resulting from the Postpetition Advances. The Debtors respectfully submit that, given the Debtors' need to obtain comprehensive and sufficient post-petition financing, the granting of a security interest in the Litigation Claims, and the proceeds thereof, benefits the Debtors' estates and serves the interest of their creditors. Nealy Declaration.

43.     With access to the DIP Facility, which includes immediate access to $2 million and, pending entry of the Final Order, access to an additional $15 million (a total of $17 million), the Debtors are confident that they can maintain the stability of the Debtors' operations pending closing of the Proposed Sale or other transaction. In reaching this conclusion, the Debtors are

mindful that vendors and customers often respond favorably to approval of a comprehensive debtor-in-possession financing package. Nealy Declaration.

44.    The Debtors submit that denial of comprehensive post-petition financing such as the DIP Facility, which is meant to bridge the Debtors' operations pending the Proposed Sale, will gravely jeopardize the stability of these Cases. Nealy Declaration.

**Application of the Business Judgment Standard**

45.    As described above, after appropriate investigation and analysis, the Debtors have concluded that the DIP Facility is the best alternative available under the circumstances. Bankruptcy courts routinely defer to the Debtors' business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

46.    In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 507, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *In re Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

47. The Debtors have exercised sound business judgment—seeking advice from their legal professionals—in determining that the DIP Facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Facility and the Interim Order are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, under Bankruptcy Code §§ 364(c) and (d), the Debtors should be granted authority to enter into the DIP Facility and to borrow funds from the DIP Lender on the basis described above.

**Sufficiency Of Adequate Protection To Pre-Petition Secured Creditors**

48. The Debtors submit that, under Bankruptcy Code § 361, the Pre-Petition Secured Creditors are adequately protected with respect to any diminution in the value of their interests in any of the Coyotes Hockey's assets resulting from the granting of first-priority senior lien and security interest to the DIP Lender. Although the Bankruptcy Code does not define "adequate protection," it is axiomatic that post-petition periodic payments can provide a secured creditor adequate protection of its interest in property. Indeed, under Bankruptcy Code § 361:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by . . . requiring [the debtor] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property.

Bankruptcy Code § 361(1).

49. In this regard, the Debtors offer the following post-petition adequate protection payments to the Pre-Petition Secured Creditors (the "**Adequate Protection Payments**"):

    a.    Subject to the terms of the Final Order, the Pre-Petition Secured Creditors will maintain liens on the collateral securing the DIP Facility, junior and subordinate to the liens securing the DIP Facility;

b. The Pre-Petition Secured Creditors shall be granted replacement liens on, and security interests in, the collateral securing the DIP Facility, subject only to the liens on, and security interests in, the collateral granted to the DIP Lender under the DIP Facility and the Final Order, as the case may be, and subject to the Carve-Out;

c. The Pre-Petition Secured Creditors shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the superpriority claims granted to the DIP Lender under the DIP Facility and the Final Order, as the case may be; and

d. The DIP Budget (as defined in the Term Sheet) will provide for regular payments of interest to all Pre-Petition Secured Creditors.

50. For these reasons, the Debtors submit that the Pre-Petition Secured Creditors are adequately protected to the extent their interest in the Coyotes Hockey's assets is diminished by the granting of a first-priority lien and secured interest to the DIP Lender under Bankruptcy Code § 364(d).

**Authorization To Use Cash Collateral**

51. The Debtors also seek authority to use, in the ordinary course of business, the cash collateral in which the Pre-Petition Secured Creditors may have an interest (the "**Cash Colalteral**"). The Debtors' use of property of their estates is governed by Bankruptcy Code § 363(c), which provides in relevant part:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

Bankruptcy Code § 363(c). A debtor-in-possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Bankruptcy Code § 363. *See* 11 U.S.C. § 1107(a).

52.     Under Bankruptcy Code § 363(c)(2), the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditors consent or are adequately protected. *See In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *In re Delta Resources, Inc.*, 54 F.3d 722 (11th Cir. 1995); *In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (providing that use of cash collateral of a secured creditor requires the secured creditor's consent or adequate protection of the secured creditor's interest in the cash collateral); *In re Senior Care Properties, Inc.*, 137 B.R. 527 (Bankr. N.D. Fla. 1992); *In re Lane*, 108 B.R. 6 (Bankr. D. Mass. 1989).

53.     "Cash collateral" is defined by the Bankruptcy Code as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . . ." Bankruptcy Code § 363(a).

54.     As of the date of this Motion, the Debtors do not have an agreement with the Pre-Petition Secured Creditors concerning consensual use of Cash Collateral. Regardless of whether the Pre-Petition Secured Creditors consent to the Debtors' use of the Cash Collateral, the Court may approve the Debtors' use of the Cash Collateral if the Court determines that sufficient adequate protection exists. Bankruptcy Code § 361 provides that replacement liens, periodic cash payments, or relief constituting the "indubitable equivalent" of the creditor's interest may constitute adequate protection. *See In re Potvin Lumber Company, Inc.*, 24 B.R. 54 (Bankr. D. Vt. 1982) (ordering that the debtor could use cash collateral, and finding that the bank was adequately protected because the total value of the debtor's personal property exceeded the

bank's indebtedness); *see also In re Coventry Commons Associates*, 149 B.R. 109 (Bankr. E.D. Mich. 1992); *In re Resolution Trust Company v. Swedeland Development Group. Inc. (In re Swedeland Development Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994).

55.     In this regard, the Debtors submit that the Adequate Protection Payments set forth above are sufficient to adequately protect the Pre-Petition Secured Creditors with respect to the DIP Facility **and** with respect to the Debtors' use of Cash Collateral.

56.     Courts have held that the determination of adequate protection requires a case-by-case factual analysis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978). For example, in *In re O'Connor*, the court authorized the debtor to use $721,000 of cash collateral to drill three new gas wells that were expected to produce revenues with a present value of $3,674,000. *See In re O'Connor*, 808 F.2d at 1398. Finding that the secured creditor was adequately protected by the debtor's excellent prospects of success and the potential value of the new revenues, despite the inherent risk of drilling dry holes, the court held that "[i]n order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard." *Id.* (citations omitted). *See also In re Quality Interiors, Inc.*, 127 BR. 391 (Bankr. N.D. Ohio 1991) (holding that the granting of a replacement lien provided adequate protection); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (projected property improvements constituted adequate protection when rental income from lease conditioned on improvements would increase value of real estate).

57.     The Debtors submit that by virtue of the Adequate Protection Payments, the Pre-Petition Secured Creditors are adequately protected with respect to any diminution in the value

of the Cash Collateral resulting from the Debtors' use of such Cash Collateral under Bankruptcy Code §§ 361 and 363.

58.     Moreover, the Debtors are also continuing and preserving the going concern value of their businesses during the requested time period for use of the Cash Collateral. *See, e.g., In re Erie Hilton Joint Venture*, 125 B.R. 140, 149 (Bankr. W.D. Pa. 1991) ("Preservation of the going-concern value of the business can constitute a benefit to the secured creditor."); *In re Princeton Square Assocs.*, 201 B.R. 90, 96 (Bankr. S.D.N.Y. 1996) ("[T]his court concludes that no monetary protection is required to be provided by the debtor in possession to the secured creditor to the extent that the rents are applied for the maintenance of the property in the manner a received would apply the rents.")

59.     Courts have granted relief similar to the relief sought in this Motion in other recent Chapter 11 cases. *See, e.g., In re ILX Resorts Inc.*, No. 09-03594, Docket No. 43 (Bankr. D. Ariz. Mar. 10, 2009); *In re Tousa, Inc.*, No. 08-10928, Docket No. 113 (Bankr. S.D. Fla. Jan. 31, 2008); *see also In re All American Semiconductor, Inc.*, No. 07-12963 (Bankr. S.D. Fla. May 21, 2007) (authorizing the use of cash collateral in accordance with the terms of the DIP credit documents and the approved budget for DIP financing); *In re ITG Vegas, Inc.*, No. 06-16350, Docket No. 20 (Bankr. S.D. Fla. Dec. 7, 2006); *In re Gemini Cargo Logistics, Inc.*, No. 06-10870 (Bankr. S.D. Fla. Apr. 10, 2006).

## NOTICE WITH RESPECT TO FINAL ORDER

60.     The Debtors respectfully request the authorization to serve, no later than 3 days after entry of the Interim Order, by U.S. mail, notice of entry of the Interim Order and of the date and time of the Final Hearing (the "**Notice**), a copy of the Interim Order, and (to the extent not previously served) this Motion with all exhibits and attachments on: (i) the Pre-Petition Secured Creditors and their counsel (if known); (ii) the DIP Lender and its counsel; (iii) any official

committee appointed in these Cases and its counsel; (iv) the Office of the U.S. Trustee; and (v) any other party that has filed, as of the date of the Interim Order's entry, a request for notices with the Clerk of the Court.

61.    The Notice will state, among other things, that the Debtors will seek authorization at the Final Hearing, on a final basis, to borrow up to $17 million under the DIP Facility and the DIP Loan Documents, and approval of substantially identical relief to that granted in the Interim Order. The Notice will also set forth the procedures and deadline for filing any objection to such relief. The Debtors respectfully request that the Court consider such Notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an Interim Order substantially in the form attached to this Motion as Exhibit A and grant any additional relief the Court deems appropriate.

Dated: May 5, 2009.

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By:    _/s/ Thomas J. Salerno_
        Thomas J. Salerno
        Jordan A. Kroop
        Kelly Singer
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

Proposed Counsel to Debtors-in-Possession

## EXHIBIT A

### Interim Order

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

In re

DEWEY RANCH HOCKEY, LLC,

COYOTES HOLDINGS, LLC,

COYOTES HOCKEY, LLC, and

ARENA MANAGEMENT GROUP, LLC,

        Debtors.

Case No. 2:09-bk-_____
(Jointly Administered)

Chapter 11

**INTERIM ORDER GRANTING (I) EMERGENCY MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 364(c)(1) & (2), AND 364(e), FED. R. BANKR. P. 2002, 4001, AND 9014, AND LOCAL RULE 4001-1, 4001-4 AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY AND SECURED BASIS, (II) GRANTING INTERIM RELIEF, AND (III) SCHEDULING A FINAL HEARING UNDER FED. R. BANKR. P. 4001(c)**

This Filing Applies to:
- ■ All Debtors
- ☐ Specified Debtors

On May 5, 2009, the Debtors[1] and Debtors in Possession in the above-captioned cases

filed their *Emergency Motion for Order Under 11 U.S.C. §§ 105, 364(c)(1) & (2), and 364(e),*

---

[1] The Debtors are: Coyotes Hockey, LLC; Coyotes Holdings, LLC; Arena Management Group, LLC; and Dewey Ranch Hockey, LLC. This Order refers to these entities collectively as the "Debtors" and the "Debtors in Possession."

*Fed. R. Bankr. P. 2002, 4001, and 9014, (I) Authorizing Debtors to Obtain Postpetition Financing On Superpriority And Secured Basis, (II) Granting Interim Relief, and (III) Scheduling a Final Hearing Under Fed. R. Bankr. P. 4001(c)* (the "Motion") [DE _____]. The Motion came before the Court on _____, 2009, and appearances were as noted in the record.

Upon this Court's review and consideration of the pleadings and other documents filed in connection with the Motion, and the record and proceedings on the Motion, and after due deliberation and good cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

B.      Determination of the Motion is a core proceeding under 28 U.S.C. § 157(b).

C.      The Debtors gave all parties proper, timely, adequate, and sufficient notice of the Motion, and of the proposed relief described therein.  The Debtors' notice was reasonable and appropriate under the circumstances and comports in all regards with the requirements of due process, Bankruptcy Rule 4001, and the rules of this Court.  No other or further notice of the foregoing or of the entry of this Order is required, except as provided herein.

D.      The Debtors and their estates would suffer immediate and irreparable harm unless the Court authorizes the Debtors to obtain up to $2,000,000 in financing (the "Interim Borrowing Cap") on an emergency basis, prior to a final hearing on the Motion.

E.      The terms of the agreement titled "Coyotes Hockey, LLC and Its Debtor Affiliates Commitment to Terms and Conditions for Debtor-In-Possession Financing" (the "Agreement") among the Debtors (the "Borrowers") and S&E Interim Facility Corporation (the "Lender") are fair, reasonable, and in the best interests of the estates and their creditors.

F.    Any amounts loaned by the Lender pursuant to this Order and the Agreement, up to and including the Interim Borrowing Cap, are and shall be deemed in "good faith" in accordance with 11 U.S.C. § 364(e).

**IT IS HEREBY ORDERED:**

1.    The Motion is granted as set forth in this Order and in accordance with 11 U.S.C. § 364, and Bankruptcy Rule 4001(c)(2).

2.    The Debtors are authorized to borrow amounts up to and including the Interim Borrowing Cap pursuant to the terms of the Agreement, prior to a final hearing on the Motion.

3.    Subject to the Interim Borrowing Cap, the Agreement, and the DIP Facility (as defined in the Agreement) provided thereunder are approved in all respects, and this Order shall be final and binding with respect to the amounts advanced under this Order and the Agreement up to and including the Interim Borrowing Cap.

4.    Each of the Debtors is authorized to become bound by the Agreement and to execute any further definitive documentation consistent with it.

5.    Pursuant to 11 U.S.C. § 364(c)(1), all amounts loaned by the Lender in accordance with this Order and the Agreement, up to and including the Interim Borrowing Cap, shall be entitled to a super-priority administrative expense claim over all other costs and expenses of the kinds specified in, or ordered pursuant to, 11 U.S.C. §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provisions of the Bankruptcy Code, subject only to the Carve-Out (as defined in the Agreement).

6.    All amounts loaned by the Lender in accordance with this Order and the Agreement, up to and including the Interim Borrowing Cap, shall be secured by a fully perfected, first-priority security interest in the Collateral (as defined in the Agreement) pursuant to 11 U.S.C. § 364(c)(2), subject only to the Carve-Out. The Collateral shall include all Collateral that is described in the Agreement.

7.    This Order constitutes automatic perfection of all of the Lender's liens and security interests in the Collateral, without the need for recordation of documents or other action.

8.      The automatic stay of 11 U.S.C. § 362 is modified to the extent necessary to permit or effectuate the terms of this Order, the Agreement, and any other documents evidencing the DIP Facility, including, without limitation, to permit recordation of documents in the Lender's discretion to evidence the creation and perfection of the Lender's interests in the Collateral.

9.      Subject only to the availability of the Court, following an Event of Default (as defined in the Agreement), the Lender shall be entitled to an emergency hearing on a motion for relief from the automatic stay upon five business days' notice to permit the enforcement of the Lender's remedies under the DIP Facility, to the extent that such relief is required under the Agreement.

10.     No proceeds of the DIP Facility, the Collateral securing the same, nor the Carve-Out shall be used by any party or professional to assert causes of action against the Lender, including but not limited to with respect to rights and remedies under the DIP Facility.

11.     Neither the Debtors nor their estates shall incur any debt with priority equal to or greater than that of the Lender without full repayment of the DIP Facility.

12.     The Debtors shall not permit the granting or imposition of any liens on the Collateral other than liens that are acceptable to the Lender, without full repayment of the DIP Facility.

13.     The Carve-Out is approved in all respects.

14.     A final hearing on the Motion shall take place in this Court on _____, 2009 at _____ .m.  Notice of the final hearing shall be mailed by the Debtors no later than May ___, 2009, and objections to final approval shall be filed and served no later than _____, 2009, at _____.m.

**Entered as of the date set forth above.**

## Exhibit B

## Term Sheet

# COYOTES HOCKEY, LLC AND ITS DEBTOR AFFILIATES

## COMMITMENT TO TERMS AND CONDITIONS

### FOR DEBTOR-IN-POSSESSION FINANCING

**S&E Interim Facility Corporation, or its nominee, hereby commits to loan funds on the following terms and conditions, subject to negotiation and execution of acceptable documentation and approval of the United States Bankruptcy Court of the District of Arizona**

| | |
|---|---|
| **Borrowers:** | Coyotes_Hockey, LLC, Coyotes Holdings, LLC, Arena Management Group, LLC and Dewey Ranch Hockey, LLC (the "Borrowers") as debtors and debtors-in-possession in cases to be filed in the United States Bankruptcy Court for the District of Arizona under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") shall be jointly and severally obligated under the DIP Facility (defined below). |
| **Lender:** | S&E Interim Facility Corporation, an affiliate of_PSE Sports & Entertainment LP, shall become the lender under the DIP Facility ("Lender") |
| **DIP Facility:** | Loans shall be advanced and made available to the Borrowers under a senior secured first priority DIP term loan (the "DIP Facility"). The initial amount of such DIP Financing shall be up to $ 17,000,000, estimated to be the amount needed to fund operations of the Team and expenses of the Bankruptcy Proceeding through June 30, 2009 (and an additional $4,500,000 for each month thereafter, if the DIP Facility term is extended). The DIP Facility shall be funded in multiple advances in minimum amounts of $500,000 and whole_multiples of $100,000. |
| **Maturity Date:** | The commitment of the Lender in respect of the DIP Facility shall terminate on, and Borrowers shall repay any outstanding advances and loans under the DIP Facility, on the earliest of: |

    (i)     June 30, 2009, unless extended in Lender's sole discretion;

    (ii)    the closing date of a sale of all or substantially all assets of the Borrowers;

    (iii)   the effective date of a plan of reorganization in the Chapter 11 Case;

    (iv)   the date of the acceleration of any outstanding extensions of credit under the DIP Facility;

    (v)    entry of an order reversing in any respect the DIP Facility Order (unless waived in writing by Lender);

    (vi)   the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; and

    (vii)  the dismissal of the Chapter 11 Case.

**Use of Proceeds and
DIP Budget:**

The proceeds of the DIP Facility will be used solely to pay:

(i)     operating expenses reasonable and necessary for preservation and enhancement of the Collateral (as defined below) and meeting the Borrowers' obligations and responsibilities under Court orders and contracts not yet rejected by Borrowers;

(ii)     current interest, fees and expense reimbursements of Borrowers and Lender under or in respect of the DIP Facility;

(iii)     a postpetition retainer of $5 million for the benefit of and to be shared by all of the Borrowers' professionals (the "**Postpetition Retainer**") for use upon Bankruptcy Court approval of any such professional fees and disbursements (and Lender shall not be obliged to advance any additional DIP Facility funds for such professionals' fees and costs); and

(iv)     expenses of the administration of the Chapter 11 Case (including the payment of any Official Unsecured Creditors Committee's (the "**Committee**") professional fees and costs), and similar costs, all in accordance with and pursuant to the budget (the "DIP Budget") attached hereto as Exhibit A and the Carve-Out (as defined below).

The DIP Budget shall be an operating budget consisting of a 4-month cash flow forecast on a line item basis in form and substance satisfactory to Lender. The Borrowers shall be entitled to deviate from the DIP Budget (as updated each week pursuant to the "Budget Process" described below) without prior approval of the Lender, notice to other parties secured by the Collateral, the Committee, or order of the Bankruptcy Court, provided that all reasonable and necessary expenditures to maintain the Collateral are made and that expense variances do not exceed 15% as to any existing or newly-included line-item or 5% in the aggregate.

No portion of the DIP Facility (including the Postpetition Retainer), the Collateral (as defined below), including any cash collateral, are to be used by any party or professional to:

(i)     challenge the validity, perfection, priority, extent or enforceability of the DIP Facility or the liens on or security interests in the assets of the Borrowers securing the DIP Facility,

(ii)     pursue through motion, complaint, or otherwise any other claims against the Lender in connection with the DIP Facility or DIP Facility Order (defined below), including any appeal of the DIP Facility Order, or

(iii)     pursue through motion, complaint or otherwise any litigation against the Lender entity named above (including in its capacity as Buyer of assets) or its nominee in connection with any other claim or cause of action.

| | |
|---|---|
| **Interest:** | Interest on the DIP Facility will be at the rate of 7% per annum and accrue monthly adding to the principal amount outstanding under the DIP Facility. |
| **Fees:** | None. |
| **Default Rate:** | During the continuance of an Event of Default, the interest rates applicable to all advances and loans under the DIP Facility will be increased by 4% *per annum*, with all interest calculated and compounded daily. |
| **Collateral:** | To secure all obligations of the Borrowers under the DIP Facility, Lender will receive a fully perfected first priority security interest in all prepetition and postpetition assets of Borrowers wherever situated (the "Collateral"), including without limitation: |

(i) The NHL franchise of the Coyotes Hockey Team (the "Franchise" and "Team") and the membership interest of Borrower Coyotes Hockey, LLC in the NHL, as it may be modified by court order;

(ii) all items of tangible personal property and fixtures owned by Borrowers and Borrowers' interest in all items of tangible personal property and fixtures leased by Borrowers and, in either case, used in connection with the Borrowers' business;

(iii) all accounts receivable, notes receivable and other amounts owed by the NHL to any of the Borrowers in connection with the Borrowers' business;

(iv) all intellectual property owned by or licensed to Borrowers and used in connection with the Borrowers' business;

(v) all books and records of Borrowers relating to the Borrowers' business;

(vi) all rights of Borrowers under contracts for the employment of Team players and rights to Team players who are not under player contracts;

(vii) all rights of Borrowers under other executory contracts;

(viii) all causes of action of the Borrowers, whether mature, contingent, or otherwise, against any person or entity relating to the Borrowers' assets or business, whether arising in tort, contract, or otherwise, but excluding causes of action arising under Chapter 5 of the Bankruptcy Code;

(ix) all insurance benefits, including rights and proceeds,

arising from or relating to the Borrowers assets or business;

(x)     all other intangible assets of the Borrowers relating to the Borrowers' business, including all goodwill associated with the business;

"Collateral" shall also include any and all proceeds, rents, issues, products, and profits generated by any item of Collateral, without the necessity of any further action of any kind or nature by Lender in order to claim or perfect such proceeds, rents, issues, products, offspring, and/or profits.

The Lender's security interest shall be senior to, and thus prime under section 364(d) of the Bankruptcy Code, the liens and security interests of other parties holding security interests in any of Borrowers' assets ("Prepetition Secured Lenders").

All obligations of the Borrowers under and with respect to the DIP Facility (the "DIP Obligations") will be secured by, pursuant to sections 364(c)(2) and section 364(d)(1) of the Bankruptcy Code, a first priority lien senior to all prepetition liens and will also receive and be entitled, pursuant to section 364(c)(1) of the Bankruptcy Code, to a super-priority administrative expense claim (the "Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code.

All the above-described security interests shall be deemed created and fully perfected and effective upon entry of the DIP Facility Order to the extent of advances made pursuant to it, without the need for any additional documentation, provided that Borrowers shall cooperate with Lender to execute and record further documentation on terms, and pursuant to documentation, satisfactory to the Lender, and, subject to customary and limited exceptions to be agreed upon, including that none of the Collateral shall be subject to any other pledges, security interests, or mortgages (other than the prepetition liens, which prepetition liens shall in each case be junior in all respects to the liens securing the DIP Facility).

**Carve-Out:**     So long as there is no Event of Default (or an event which with the giving of notice or lapse of time or both would constitute an Event of Default) the allowed professional fees and disbursements incurred in the Chapter 11 Case and in accordance with the DIP Budget by the Committee may be paid, subject to entry of an order of the Bankruptcy Court allowing for the interim payment of such amounts, and subject further to final Bankruptcy Court approval of any such professional fees and disbursements;

In addition, the Lender's liens on the Collateral and the Lender's administrative claims provided for herein shall be subject to a carve out (the "Carve-Out") in an amount not to exceed the sum of

<blockquote>
(i)      unpaid professional fees and expenses incurred before the Event of Default by the Committee, and

(ii)      $50,000.
</blockquote>

The Carve-Out shall be shared, *pro rata*, by:

<blockquote>
(i)      professionals employed by the Committee, for services rendered while the Borrowers are chapter 11 debtors in possession,

(ii)      fees pursuant to 28 U.S.C. § 1930, and

(iii)      any fees payable to the clerk of the Bankruptcy Court.
</blockquote>

In the event the Chapter 11 Cases are dismissed or the jurisdiction of the Bankruptcy Court is otherwise terminated, fees and expenses allowed and paid to professionals on an interim or final basis shall not be subject to disgorgement for the benefit of the Lender; and

Notwithstanding the foregoing, no portion of the Carve-Out or the Prepetition Retainer, and no portion of any amounts approved for payment prior to an Event of Default, are to be utilized for the payment of professional fees, disbursements, costs, or expenses of any party, under 11 U.S.C. §§ 326-331, 503(b)(3) or otherwise, in connection with:

<blockquote>
(i)      the investigation or assertion of any claims or causes of action against the Lender with respect to the DIP Facility or the DIP Obligations, or

(ii)      any litigation against Lender or Lender's affiliates (including in the capacity of bidder for or buyer of any of the Borrowers' assets) in connection with any other claim or cause of action, provided, however, that professional fees incurred by the Committee may be paid with DIP Facility proceeds for services in connection with investigation of any such claim or cause of action, up to $50,000.
</blockquote>

In partial consideration of the Carve-Out and Postpetition Retainer, Borrowers waive any right or claim to surcharge the Lender, the DIP Facility, or Collateral pursuant to 11 U.S.C. § 506(c) or otherwise.

**Application of Proceeds from Asset Sales; Prepayments:**

The net cash proceeds of Bankruptcy Court-authorized asset sales shall be used first for repayment of the DIP Facility, with the balance to be distributed in accordance with orders of the Court, following notice and a hearing. Borrowers may prepay the DIP Facility in whole or part at any time.

**Closing Date:**

The date upon which all Conditions to Closing are satisfied, but no later than May 20, 2009 unless extended by Lender in its sole discretion (the "Closing Date").

**Conditions to Closing and to Each Disbursement Under the DIP Facility:**

The following conditions precedent to the occurrence of the Closing Date and the making of the Loans and to each draw on the DIP Facility shall be met:

(i)    The DIP Budget, as updated, shall have been reviewed and approved by the Lender, provided, however, that the initial DIP Budget has been approved.

(ii)    The DIP Facility Order shall have been entered by the Bankruptcy Court, after notice given and a hearing conducted in accordance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (and any applicable local bankruptcy rules), authorizing and approving the transactions contemplated by the documents evidencing the DIP Facility and finding that the Lender is extending credit to the Borrowers in good faith within the meaning of Bankruptcy Code section 364(e), which DIP Facility Order shall

    (a)    approve the payment by the Borrowers of all of the fees and expense reimbursements provided for herein,

    (b)    otherwise be in form and substance satisfactory to the Lender, and

    (c)    be in full force and effect and shall not have been stayed, reversed, vacated, subject to appeal, or otherwise modified in a manner materially adverse to the Lender.

(iii)    Execution and delivery by Borrowers of all documentation in respect of the DIP Facility, reasonably satisfactory to the Lender.

(iv)    Payment of all costs, fees, and expenses owing to the Lender, which shall be funded from the DIP Facility.

(v)    Confirmation of sufficient insurance coverage for all property of Borrowers, general liability insurance and other forms of insurance in amounts with deductibles reasonably satisfactory to the Lender, and that the Lender is an additional insured or loss payee.

(vi)    There is no Event of Default or event which, with the giving of notice or lapse of time or both would constitute and Event of Default, and no material adverse change of condition of the Borrowers, including no termination of the Franchise or Borrowers' rights under contracts for the employment of Team players and rights to Team players not under player contracts.

| **Representations and Warranties:** | The Borrowers represent and warrant to Lender that they have full corporate power and authority, subject to entry of the DIP Facility Order, to enter into the DIP Facility and grant security interests in the Collateral, with any covenants against such borrowing in the loan documentation of the Prepetition Secured Lenders superseded by the DIP Facility Order, and the DIP Obligations are binding and enforceable upon entry of the DIP Facility Order. |
|---|---|

| **Affirmative Covenants:** | The Borrowers make the following affirmative covenants, and the documents evidencing the DIP Facility shall contain affirmative covenants usually and customarily contained in DIP credit facilities of the type referenced herein, including customary exceptions and qualifiers. Such affirmative covenants shall include but not be limited to the following: |
|---|---|

| (i) | delivery of financial statements and reports as provided below; |
|---|---|
| (ii) | payment of all postpetition taxes and other obligations when due unless being contested in good faith; |
| (iii) | continuation of business and maintenance of existence and material rights and privileges; |
| (iv) | no rejection of contracts for the employment of Team players or rights to Team players who are not under player contracts without the consent of the Lender in its sole discretion; |
| (v) | no rejection of the Franchise or Borrowers' membership interest in the NHL, as it may be modified by the Bankruptcy Court or a Canadian court; |
| (vi) | compliance with applicable laws, including the Bankruptcy Code, and material contractual obligations that are not excused by virtue of the Chapter 11 Case; |
| (vii) | maintenance of adequate hazard, property and casualty and business interruption insurance; |
| (viii) | maintenance of books and records; |
| (ix) | right of the Lender to inspect property and books and records (including, upon request, a Collateral audit); |
| (x) | delivery of notices of defaults, litigation and other material events; |
| (xi) | compliance with environmental laws; |
| (xii) | service of all pleadings filed or received by the Borrowers in the Chapter 11 Case; |
| (xiii) | compliance at all times with the DIP Budget on a line-item basis (subject to expense variances no greater than 15% as to any existing or newly-included line-item or 5% in the aggregate). |

The Lender may require additional covenants.

**Negative Covenants:**    Borrowers shall not file a reorganization plan failing to provide for full and indefeasible payment of the DIP Facility and release of all claims and causes of action held by or assertable by the Borrowers against the Lender on account of the DIP Facility.

**DIP Facility Order:**    The DIP Facility Order shall comprise interim and final orders and be in form and substance acceptable in all respects to the Lender and shall include, without limitation, provisions:

(i)    approving in all respects the DIP Facility, and making it final and binding with respect to the amounts advanced under DIP Facility Order;

(ii)    authorizing and directing the Borrowers to execute and become bound by any further definitive documentation evidencing the DIP Facility and consistent with this term sheet;

(iii)    determining that the DIP Facility Order constitutes automatic perfection of liens and security interests in the Collateral, without the need for recordation of documents or other action, without releasing the Borrowers from the obligation to execute further documentation of the DIP Facility that Lender may prepare in its sole discretion;

(iv)    modifying the automatic stay to the extent necessary to permit or effectuate the terms of the DIP Facility Order and the documents evidencing the DIP Facility, including, without limitation,

(a)    to permit the execution and recordation of documents in Lender's discretion to evidence the creation and perfection of the Lender's liens on the Collateral; and

(b)    exercise of the Initial Remedies (as defined below) upon an Event of Default;

(v)    providing for an emergency hearing (dependent on the Court's calendar) on motion for relief from the automatic stay to permit the exercise of Enforcement Remedies (as defined below), on not less than three (3) business days' notice (which shall be given to Borrowers and such other parties as may be entitled to notice, including other creditors secured by the Collateral);

(vi)    prohibiting the incurrence of debt with priority equal to or greater than that of the Lender without full and indefeasible repayment of the DIP Facility;

(vii)    prohibiting the granting or imposition of any liens on the Collateral other than the with the Lender's prior written consent in its sole discretion; and prohibiting imposition of any surcharge against the Lender, the DIP Facility, or the Collateral pursuant to Bankruptcy Code § 506(c).

The interim order may be granted on an emergency basis under Bankruptcy Rule 4001(c)(2), authorizing Borrowers to draw up to $2

million of the DIP Facility on entry of the interim order to avoid immediate and irreparable harm to the Borrowers' estates pending the final hearing and entry of the final order.

**Financial Reporting:**  The Borrowers shall provide the Lender with the following financial reporting, and the documents evidencing the DIP Facility will require that the Borrowers provide:

(i)     monthly financial statements and operating reports, budget and operating plans for each period, with all financial statements of Borrowers prepared on a consolidated basis;

(ii)    on an as-requested basis all other information reasonably requested by the Lender;

(iii)   copies of all pleadings, motions, applications, judicial information and other documents filed by or on behalf of the Borrowers with the Bankruptcy Court or the U.S. Trustee in the Chapter 11 Case, or distributed by or on behalf of the Borrowers to any official committee in any Chapter 11 Case;

(iv)    no later than weekly, an update of the DIP Budget (which shall be re-forecast to reflect any material variances), with a weekly reconciliation report comparing actual cash flows and financial results versus budgeted, in each case, in form satisfactory to Lender;

(v)     notice of significant changes to material contracts with suppliers, utility providers, governmental authorities and others, including new material contracts and contract renewals;

(vi)    monthly reviews of all expenditures and annual budgets;

(vii)   notice of significant changes to employment agreements; and

(viii)  notice of any changes in management.

**Budget Process:**  Each week the cash flow forecast shall be subject to the Lender's review and approval, which will not be unreasonably withheld. The approved cash flow forecast shall be incorporated into a revised and restated DIP Budget, which will be subject to the Lender's approval, which will not be unreasonably withheld. The approved DIP Budget shall then be used to authorize disbursements under the DIP Facility.

**Events of Default:**  An Event of Default under the DIP Facility shall occur upon:

(i)     the occurrence of any of the following events, with no cure period, without the prior written consent of Lender:

(a)   entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a chapter 7 case;

(b)   entry of an order appointing a chapter 11 trustee in the Chapter 11 Case (provided that, for clarity, appointment of a monitor by a Canadian court is not a default);

(c)   entry of an order of the Chapter 11 Case appointing an examiner with powers to take any action other than

investigate and report;

(d) entry of an order granting any other super-priority claim or lien equal or superior to that granted to the Lender prior to full and indefeasible repayment of the DIP Facility;

(e) entry of an order reversing, vacating or otherwise modifying, or staying for more than three (3) business days the DIP Facility Order, or the DIP Facility Order shall otherwise cease to be in full force and effect;

(f) the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of any of the Borrowers;

(g) the consummation of the sale of any material portion of any of the Borrowers' assets without the DIP Facility being paid in full from the sale of such assets;

(h) a change in control of any of the Borrowers;

(ii) the occurrence of any of the following events, after the expiration of two (2) business days after notice of such default is not cured:

(a) the failure of Borrowers to pay interest, fees, or principal when due;

(iii) the occurrence of any of the following events, after the expiration of three (3) business days after notice of such default is not cured:

(a) failure of any of the Borrowers to perform or comply with any other term or covenant of the DIP Facility;

(b) the filing of a plan of reorganization by any party that does not indefeasibly pay in full in cash all obligations owed to the Lender under the DIP Facility;

(c) Borrowers shall fail to comply in any material respect with the DIP Budget (accounting for authorized line-item variances);

(d) the filing by the any of the Borrowers of any motion or proceeding that could reasonably be expected to result in material impairment of the Lender's rights under this Agreement, including any motion to surcharge the Lender, the DIP Facility or the Collateral under 11 U.S.C. § 506(c) or otherwise;

(e) any material impairment of Lender's Collateral, including termination of the Franchise.

**Remedies:**                          The Lender's remedies upon the occurrence of an Event of Default shall include, without limitation,

(i)     The following remedies (the "Initial Remedies") without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading:

(a)   terminate the DIP Facility;

(b)   charge the default rate of interest on the DIP Facility; and/or

(c)   declare the principal of and accrued interest, fees, and expenses constituting the DIP Obligations to be due and payable.

(ii)    The Lender shall also be entitled to a hearing, subject to the Court's calendar, on not less than three (3) business days' notice (which shall be given to the Borrowers and such other parties as may be entitled to notice, including other creditors secured by the Collateral) on a motion for relief from the automatic stay or any other pleading, to permit the Lender to exercise any and all of its rights and remedies under applicable nonbankruptcy law (the "Enforcement Remedies") with respect to the Collateral or any part thereof (including, without limitation),

(a)   to foreclose on all or any portion of the Collateral or to otherwise liquidate the Collateral or any part thereof; and/or

(b)   to exercise any and all other remedies available in law or equity.

Creditors secured by the Collateral, parties in interest, and the Official Committee of Unsecured Creditors may appear and be heard at any such expedited hearing.

**Indemnification:**                   Borrowers shall indemnify and hold harmless, and provide limitations of liability to the Lender, and each of its affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives in connection with the DIP Facility, subject to customary limitations for gross negligence and willful misconduct.

**Expenses:**                          Borrowers shall pay the fees and disbursements of Lender's counsel in connection with the preparation and negotiation of the DIP Facility and any amendments thereto. Borrowers shall also pay the costs of implementation and enforcement of the DIP Facility and the DIP Facility Order, including travel costs of Lender's officers in connection with the DIP Facility and hearings in the Bankruptcy Court, and fees and disbursements of Lender's counsel and other professionals, periodic field audits, monitoring of assets, and other miscellaneous disbursements.

**Governing Law:**                     Arizona, except as governed by the Bankruptcy Code.

| **Adequate Protection for Prepetition Secured Lenders:** | As adequate protection to the First Lien Lenders for any diminution in the value of their interests in the Borrowers' property resulting from (i) the priming liens granted in favor of the Lender under the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, and (ii) the use, sale, or lease of the Borrowers' property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy Code: |
|---|---|

      (i)     The Prepetition Secured Lenders will, subject to the terms of the DIP Facility Order, maintain liens on the Collateral, junior and subordinate to the liens securing the DIP Facility;

      (ii)    The Prepetition Secured Lenders shall be granted replacement liens on, and security interests in, the Collateral, subject only to the liens on, and security interests in, the Collateral granted to the Lender under the DIP Facility and the DIP Facility Order, as the case may be, and subject to the Carve-Out;

      (iii)   The Prepetition Secured Lenders shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Borrowers, subject only to the super-priority claims granted to the Lender under the DIP Facility and the DIP Facility Order, as the case may be;

      (iv)   The DIP Budget will provide for regular payments of interest to all Prepetition Secured Lenders.

**Exhibit C**

**DIP Budget**

PHOENIX/479679.5

Coyotes Hockey, LLC / Arena Management Group, LLC
Operating Cash Forecast
To W/E 7/25/09

| For the Week Ending | 5/2/2009 | 5/9/2009 | 5/16/2009 | 5/23/2009 | 5/30/2009 | 6/6/2009 | 6/13/2009 | 6/20/2009 | 6/27/2009 |
|---|---|---|---|---|---|---|---|---|---|
| Opening Bank Balance | 433,800 | 33,800 | (446,556) | (2,111,902) | (4,936,705) | (6,631,748) | (7,168,243) | (8,373,589) | (9,007,748) |
| **Cash Inflows:** | | | | | | | | | |
| Hockey Tickets Sales & Renewals 09/10 | | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Corporate & Suite Sponsorships | | 100,000 | 100,000 | 100,000 | 100,000 | | | 30,000 | |
| Merchandise (FMI) | | | | | 16,826 | | | | |
| Aramark | | | | | 124,889 | | | | |
| **Subtotal** | | 200,000 | 200,000 | 200,000 | 341,715 | 100,000 | 100,000 | 130,000 | 100,000 |
| **Total Cash Inflows** | 0 | 200,000 | 200,000 | 200,000 | 341,715 | 100,000 | 100,000 | 130,000 | 100,000 |
| **Cash Outflows:** | | | | | | | | | |
| Admin. Payroll | (400,000) | | (625,000) | (400,000) | (675,000) | | (625,000) | | (710,000) |
| Revenue Sharing - WG Comp | | | (625,000) | | | | | | (650,000) |
| Player Signing Bonus | | | | | | | (65,000) | | |
| Arena Rent and Renewal and Replacement pmt | | (43,861) | | (1,143,098) | | | | | (67,012) |
| Accounts Payable | | (400,000) | (400,000) | (1,215,959) | (400,000) | (400,000) | (400,000) | (400,000) | (300,000) |
| BWD/Insurance | | | | | | | | | |
| AMG Event Expenses | | | | | (604,812) | | | (148,812) | (680,306) |
| AZ Dept. of Rev - Ticket Taxes | | | | | (66,000) | | | | (125,000) |
| MSD Int | | | | | | | | | |
| Interest on NHL Loans | | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) |
| Westgate CAM Charges | | (15,346) | (15,346) | (15,346) | (15,346) | (15,346) | (15,346) | (15,346) | (15,346) |
| Parking & Developer Fee | | (21,149) | | (50,400) | (75,600) | (21,149) | | | (63,000) |
| **Total Cash Outflows** | (400,000) | (680,356) | (1,865,346) | (3,024,803) | (2,036,758) | (636,495) | (1,305,346) | (764,158) | (2,810,664) |
| **Net Cash Inflow (Outflow)** | (400,000) | (480,356) | (1,665,346) | (2,824,803) | (1,695,043) | (536,495) | (1,205,346) | (634,158) | (2,710,664) |
| **Ending Balance** | 33,800 | (446,556) | (2,111,902) | (4,936,705) | (6,631,748) | (7,168,243) | (8,373,589) | (9,007,748) | (11,718,412) |

Page 1 of 2

**Coyotes Hockey, LLC / Arena Management Group, LLC**
Operating Cash Forecast
To W/E 7/25/09

| For the Week Ending | 7/4/2009 | 7/11/2009 | 7/18/2009 | 7/25/2009 |
|---|---|---|---|---|
| Opening Bank Balance | (11,718,412) | (12,613,959) | (14,254,305) | (14,719,651) |
| **Cash Inflows:** | | | | |
| Hockey Tickets Sales & Renewals 09/10 | 100,000 | 100,000 | 100,000 | 100,000 |
| Corporate & Suite Sponsorships | | | | |
| Merchandise (FMI) | | | | |
| Aramark | | | | |
| **Subtotal** | 100,000 | 100,000 | 100,000 | 100,000 |
| **Total Cash Inflows** | 100,000 | 100,000 | 100,000 | 100,000 |
| **Cash Outflows:** | | | | |
| Admin. Payroll | | (625,000) | | (650,000) |
| Revenue Sharing - WG Comp | | | | |
| Player Signing Bonus | (347,500) | (700,000) | (150,000) | |
| Arena Rent and Renewal and Replacement pmt | (43,861) | | | |
| Accounts Payable | (200,000) | (200,000) | (200,000) | (200,000) |
| BWD/Insurance | | | | (85,000) |
| AMG Event Expenses | (172,040) | | | |
| AZ Dept. of Rev. - Ticket Taxes | | | | (75,000) |
| MSD Int. | (200,000) | (200,000) | (200,000) | (200,000) |
| Interest on NHL Loans | (15,346) | (15,346) | (15,346) | (15,346) |
| Westgate CAM Charges | | | | |
| Parking & Developer Fee | (16,800) | | | (75,600) |
| **Total Cash Outflows** | (995,547) | (1,740,346) | (565,346) | (1,300,946) |
| **Net Cash Inflow (Outflow)** | (895,547) | (1,640,346) | (465,346) | (1,200,946) |
| **End Balance** | (12,613,959) | (14,254,305) | (14,719,651) | (15,920,597) |