Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
Kelly Singer (AZ Bar No. 022024) ksinger@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Squire, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

Proposed Counsel to the Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC, and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>Debtors. | Case No. 2:09-bk-_____<br>(Jointly Administered)<br><br>Chapter 11<br><br>**DECLARATION OF MICHAEL NEALY IN SUPPORT OF DIP MOTION**<br><br>**Date of Hearing: TBD**<br>**Time of Hearing: TBD** |
| This Filing Applies to:<br>■  All Debtors<br>❒  Specified Debtors | |

Michael Nealy, under penalty of perjury, states:

**Personal Background and Experience**

1. I am Executive Vice President and Chief Financial Officer of Coyotes Hockey, LLC ("**Coyotes Hockey**"). I earned a Bachelor of Science in Business degree (1987) and a Master of Business Administration (1993) degree from the University of Minnesota's Carlson School of Management. Prior to joining Coyotes Hockey, I spent four years with the Minnesota Wild hockey franchise and member of the National Hockey League (the "**NHL**"), and Minnesota Sports & Entertainment as Vice President of Finance and Corporate Controller. Before working

in the sports industry, I worked in both private and public companies. I spent nearly 13 years with the Deluxe Corporation/eFunds where I held a variety of management and financial leadership positions, including Senior Financial Analyst and Director of Planning and Analysis at the corporate level. I also served as Corporate Controller of a wholly-owned subsidiary of Deluxe in Columbus, Ohio, and as Chief Financial Manager of a subsidiary in Milwaukee, Wisconsin.

2. I joined Coyotes Hockey from the Minnesota Wild on January 30, 2006. In my capacity as Executive Vice President and Chief Financial Officer of Coyotes Hockey, I oversee treasury, finance and accounting, legal, information technology, human resources, and the box office operations for Coyotes Hockey and Jobing.com Arena. I also serve as Treasurer on the board for Coyotes Charities and served as an Alternate Governor for the Arizona Sting, formerly of the National Lacrosse League.

3. I submit this Declaration in support of the "Debtors' Motion for Interim and Final Orders: (A) Authorizing Debtors to Obtain Post-Petition Financing; (B) Authorizing Use of Cash Collateral; and (C) Determining Sufficiency of Adequate Protection" (the "**DIP Motion**").

4. Except as otherwise indicated, I have personal knowledge of the matters set forth below and, if called to testify regarding such matters, I would do so competently.

**Financial Condition Of Debtors**

5. The Debtors operate on a fiscal year beginning in July. For the 2005-2006 fiscal year, Coyotes Hockey (which, from an operational perspective, is the largest and most significant of the Debtors) experienced approximately $54,078,000 in revenues and $75,947,000 in expenses, resulting in a $21,870,000 EBITDA loss.

6. Similarly, in the 2006-2007 season, Coyotes Hockey experienced approximately $59,460,000 in revenues and $88,971,000 in expenses, with a $29,511,000 EBITDA loss.

7. In 2007-2008, Coyotes Hockey had $56,584,000 in revenues and $84,311,000 in expenses, resulting in a $21,727,000 EBITDA loss.

8. Over the last three seasons, therefore, Coyotes Hockey has operated at an approximately $73,000,000 aggregate loss. Indeed, the Phoenix Coyotes professional hockey team has never posted a profit since moving to Arizona in 1996. In this regard, Jerry Moyes has provided the organization approximately $380,000,000 to fund operations, which includes a $95,000,000 revolving line of credit executed between Mr. Moyes and Coyotes Hockey on April 16, 2008 (the "**Moyes Revolver**").

5. In November of 2008, Mr. Moyes notified the NHL that he would no longer provide the funds to cover Coyotes Hockey's operating losses. Additionally, the NHL has informed Coyotes Hockey that it will no longer advance funds under that certain agreement evidenced by a letter dated November 21, 2008 (as subsequently modified, the "**NHL Letter Agreement**"). Under the NHL Letter Agreement, the NHL advanced Coyotes Hockey with approximately $31.4 million, which is offset by normally-scheduled future distributions to Coyotes Hockey.

6. Although the NHL and Coyotes Hockey have entered into a "Secured Credit Agreement" (the "**Senior Secured Line of Credit**"), the NHL is under no obligation to fund the Senior Secured Line of Credit, and amounts due under such loan (approximately $13.4 million) are payable on demand.

**Necessity of the Debtor-In-Possession Financing**

7.  Because Coyotes Hockey has no certain source of funding to cover its operating losses, Coyotes Hockey has recently explored with numerous third parties and current investors the possibility of additional capital infusions or a sale of the organization. A detailed description of these efforts is set forth in the "Declaration Of Earl Scudder In Support Of Sale Motion" filed contemporaneously with this Statement. In this regard, Coyotes Hockey and PSE Sports & Entertainment L.P. (the "**Proposed Buyer**") have entered into the Asset Purchase Agreement dated May 5, 2009 (the "**APA**"), under which the Proposed Buyer has agreed to purchase substantially all of Coyotes Hockey's assets in the context of a Chapter 11 bankruptcy.

8.  It is absolutely imperative that this transaction, or a transaction with another party, close before July 2009. In order to maximize the sale value of Coyotes Hockey, LLC's assets, any sale would need to be completed before the start of the upcoming 2009-2010 season. Potential investors or buyers of the Coyotes would resist funding an additional season of financial losses or reduce their proposed purchase price accordingly. Furthermore, the team could not be transferred to another location once the 2009-2010 schedule was released. The need to complete the 2009-2010 schedule by July 2009 mandated that an expedited marketing process (and if applicable, a sale) be completed prior to July 2009.

9.  Additionally, it is my belief that Coyotes Hockey's ongoing financial difficulties exacerbate the circumstances and underscore the need for an expedited transaction. However, such transaction cannot proceed without financing to fund Coyotes Hockey's operations pending such transaction. The proposed debtor-in-possession financing (the "**DIP Facility**") sought under the DIP Motion will provide sufficient capital necessary to bridge Coyotes Hockey's

operations pending conclusion of the sale to the Proposed Buyer (or other transaction if one arises).

10. As such, it is my belief that, based on my knowledge of and experience with Coyotes Hockey and its financial circumstances outlined above, post-petition financing is necessary in the bankruptcy cases, and the DIP Facility reflects a proper exercise of Coyotes Hockey's business judgment.

**Negotiation of the DIP Facility**

11. The Debtors negotiated the terms of the DIP Facility and the Interim Order with the DIP Lender in good faith and at arms' length. The Debtors have determined that their existing financial circumstances, and in the context of the Proposed Sale, are not sufficient to meet the Debtors' short-term operating expenses. Accordingly, the DIP Facility and the Interim Order are most favorable in light of the Debtors' working capital needs pending the Proposed Sale or other transaction.

12. The DIP Facility constitutes a financing package in the best interests of the Debtors and their estates. The DIP Lender presented the Debtors with the most attractive economic package available under the circumstances.

**Approval Of The DIP Facility Is Necessary In These Cases**

13. It is essential to the success of these Cases that the Debtors obtain access to comprehensive and sufficient post-petition financing that will provide the stability needed pending the Proposed Sale or other transaction. Without the DIP Facility, the Debtors will be unable to ensure uninterrupted business operations. Absent access to the working capital financing that will be available to the Debtors under the DIP Facility, the Debtors may be unable

to meet their ordinary course expenses, and thus will be unable to preserve their value for the benefit of their creditors.

14. After appropriate investigation and analysis, the Debtors have concluded that the DIP Lender's proposal was the best alternative available to the Debtors.

**The Terms of the DIP Facility are Fair, Reasonable, and Appropriate**

15. The granting of a lien on the Litigation Claims, and the proceeds thereof, is necessary to protect the DIP Lender's claims resulting from the Postpetition Advances. Given the Debtors' need to obtain comprehensive and sufficient post-petition financing, the granting of a security interest in the Litigation Claims, and the proceeds thereof, benefits the Debtors' estates and serves the interest of their creditors.

16. With access to the DIP Facility, which includes immediate access to $2 million and, pending entry of the Final Order, access to an additional $15 million (a total of $17 million), the Debtor can maintain the stability of their operations pending closing of the Proposed Sale or other transaction. In reaching this conclusion, I am mindful that vendors and customers often respond favorably to approval of a comprehensive debtor-in-possession financing package.

17. Denial of comprehensive post-petition financing such as the DIP Facility, which is meant to bridge the Debtors' operations pending the Proposed Sale, will gravely jeopardize the stability of these Cases.

Dated this 5th day of May, 2009

                                                          */s/ Michael Nealy*
                                                          Michael Nealy