Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
George Brandon (AZ Bar No. 017947) gbrandon@ssd.com
Kelly Singer (AZ Bar No. 022024) ksinger@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

Counsel to the Debtors-In-Possession

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC, and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>        Debtors. | Case No. 2:09-bk-09-09488<br>(Jointly Administered)<br><br>Chapter 11<br><br>**DEBTORS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SELL SUBSTANTIALLY ALL OF COYOTES HOCKEY'S ASSETS (NHL ISSUES)** |
| This Filing Applies to:<br>■    All Debtors<br>☐    Specified Debtors | **Hearing Date: June 9, 2009**<br>**Hearing Time: 9:00 a.m. (PDT)** |

DEWEY RANCH HOCKEY, LLC (“**Dewey**”), COYOTES HOLDINGS, LLC (“**Coyotes Holdings**”), COYOTES HOCKEY, LLC (“**Coyotes Hockey**”), and ARENA MANAGEMENT GROUP, LLC (“**Arena Management**”, and together with Dewey, Coyotes Holdings, and Coyotes Hockey, the “**Debtors**”), debtors-in-possession in the above-captioned

Chapter 11 cases (these "**Cases**"), file this Memorandum of Points and Authorities in support of the "Motion Of The Debtors For An Order Under Sections 105(a), 363, and 365 Of The Bankruptcy Code (i) Authorizing Coyotes Hockey, LLC's Sale Of Substantially All Of Its Assets, Free And Clear Of Liens, Claims, And Encumbrances, Subject To Higher And Better Offers, And (ii) Approving An Asset Purchase Agreement" filed on May 5, 2009 [Docket No. 18] (the "**Sale Motion**"). More specifically, this Memorandum is filed in support of the transfer of Coyotes Hockey's assets (the "**Assets**") as set forth in that certain Asset Purchase Agreement dated May 5, 2009 (as may be amended from time to time, the "**APA**") between Coyotes Hockey and PSE Sports & Entertainment, L.P. ("**PSE Sports**"), including a relocation of the Phoenix Coyotes professional hockey team (the "**Team**").

### *General Introduction And Overview of Case*

Notwithstanding the media attention that these Cases have generated, it is important to put this into the context of what these Cases are about, and conversely, what they are not about.

***What are these Cases about?*** What these Cases are most decidedly about is allowing an open and transparent sale process which will maximize value for all creditors and stakeholders-- not just the NHL or its undefined "interests" that it believes it must protect (regardless of the impact on creditors)[1]. These Cases are clearly about the need for an expedited sale process in such a way such that the Assets will bring the maximum amount possible for payment of all creditor claims. The Court has specifically asked about the economic impact on the bankruptcy estates with respect to the pending APA (which clearly envisions a rejection of the lease with the

---

[1] In the words of the NHL: More importantly, the NHL's fundamental interest in taking control of the Coyotes is to preserve the viability, good will and success of the NHL as a major professional sports league rather than to protect any creditor interest. "Memorandum of Points and Authorities In Support of NHL's Motion For Determination (I) Of Authority To Manage The Business And Affairs Of The Debtors, And (II) That William Daly Is The Representative Of The Estates" filed May 13, 2009 (Docket No. 91).

483839.8

City of Glendale), and other possible scenarios which might not involve a rejection of the lease. Put simply, would the approval of the Sale Motion and sale to PSE Sports create such massive claims as to dwarf and dilute recoveries to other unsecured creditors in these Cases? The City of Glendale has stated that upon rejection it would have a "huge" claim and has used the amount of $500 million in Court hearings.

Attached hereto as Exhibit "1" is a document entitled *Impact on Coyotes Hockey LLC Estate* which provides the economic analysis that the Court requested. The analysis deals with the existing Sale Motion, and then compares and contrasts it with three other potential bids based upon expressions of interest that the Debtors received prior to the filing of the Chapter 11 case on May 5, 2009. As the Court can see, the existing Sale Motion would result in a materially greater recovery to unsecured creditors than any of the other existing expressions of interest that the Debtors have seen (all of which involve keeping the team in Arizona, but at a significantly reduced purchase price), even if the City of Glendale has the "huge" claim it asserts (which it will not by virtue of operation of Bankruptcy Code §502(b)(6)). In any event, this is a mathematical calculation that the Court and parties can make depending upon what other bids are actually received through the sale process.

The Sale Motion does not seek approval of a sale that would move the Team from Arizona simply because the Debtors desire to do so -- far from it. The Sale Motion is the culmination of arms-length negotiation that has shown, undeniably, that the value of these Assets are far greater outside of Arizona than they are in Arizona. This is not surprising to anyone who has looked at the historical and projected financial information regarding the Debtors and their operations in Arizona. From the time the Team moved to Arizona in 1996 through the 2009 season which recently ended, the Team has had a cumulative EBITDA loss of

over $314 million. This is a harsh economic reality. Accordingly, any sale of the Assets which involve the Team remaining in Arizona will bring materially less money from a purely economic standpoint.

These Cases are also about the need for quick action. While the NHL has told the Court of the logistical "nightmares" that would result from a relocation of the Team to a new location assuming a closing at the end of June, 2009, the NHL is being disingenuous with the Court. In fact, while the NHL has aggressively defended any attempts to conduct discovery on this point, the NHL has moved very quickly in the past to authorize and approve relocation of hockey teams. By way of example, the sale of the *Quebec Nordiques* was announced on May 25, 1995 and moved from Quebec to Denver, Colorado (to become the *Colorado Avalanche*) on June 21, 1995 -- and indeed the *Avalanche* played its inaugural season commencing October 6, 1995 in Denver. *See* discussion in attached "Memorandum of Points and Authorities" ("**Memorandum**") at note 10. This is effectively the same timeline we are dealing with in these Cases. Moreover, the use of a bankruptcy proceeding to implement expedited sales of professional sports franchises has, in fact, happened before. While major league baseball has filed pleadings before this Court urging the Court not to intrude in any way upon professional sports leagues rules and regulations, the current Commissioner of Baseball, Bud Selig, himself was the architect of a bankruptcy proceeding of the then *Seattle Pilots* in 1970, which used a Bankruptcy Act Chapter XI proceeding to accomplish bankruptcy court approval of a sale (to his entity as buyer) and a relocation of the *Seattle Pilots* to Milwaukee (where they played their first season as the *Milwaukee Brewers*).[2] This move occurred six days before the start of the 1970 baseball season -- indeed, the entire sale/approval process took 12 days. *See* Memorandum at

---

[2] The *Pilots* had been in Seattle one year as an expansion team, and had lost money in its first year of operation.

- 4 -

483839.8

paragraphs 63 through 77. In short, these Cases are about bankruptcy policy which allows expedited action when necessary to preserve asset value in the face of entrenched constituencies who seek to block such action. Bankruptcy Courts are uniquely qualified to conduct these types of expedited sales processes.

**Conversely, what are these Cases not about?** Notwithstanding the media circus that has surrounded these Cases, there are many things these Cases are not about. Should the Court approve the Sale Motion resulting in the Team being sold and moved to Hamilton, Ontario, it will not be the end of the world as we know it. Professional sports franchises move all the time-- the *Seattle Pilots* and *Quebec Nordiques* examples above are just two examples. This will not destroy the NHL (or MLB, or the NFL, or the NBA, or indeed the Professional Badminton Association).[3] In the 31 years since the Bankruptcy Code's enactment in 1978, only four (4) professional sports franchises have filed for protection under the Bankruptcy Code (including this case).[4] These Cases will not involve the complete destruction of the NHL Constitution and the NHL By-Laws -- indeed, the Debtors and PSE Sports are doing everything in their power to comply with the objective and lawful provisions of the NHL Constitution and the NHL By-Laws. *See* Memorandum at paragraphs 13; 115 through 121. These Cases also do not involve this Court's destruction of some sort of sacred fifty-mile exclusive home territory within the NHL. Indeed, as long as the markets can support multiple teams, there is no prohibition in the NHL Constitution or the NHL By-Laws against teams playing within a fifty mile exclusive home territory, and the NHL already has five teams that all play within fifty miles of another NHL

---

[3] The NFL even survived the middle-of-the-night move of the *Baltimore Colts* to Indianapolis in 1984 to avoid a proposed eminent domain seizure by the State of Maryland.

[4] Those cases are one basketball team (the Los Angeles Kings) and three hockey teams (the Pittsburgh Penguins, the Buffalo Sabres and the Phoenix Coyotes). *See* "Comment: A Critical Analysis Of Sport Organization Bankruptcies In The United States And England: Does Bankruptcy Law Explain The Disparity In Number Of Cases?.", 18 *Seton Hall J. Sports & Ent.l* 297, 298 (2008).

team.[5] The primary issue under the NHL By-Laws is whether the markets support the team within that fifty-mile radius. In this regard, once again, PSE Sports and the Debtors have made a showing to the NHL that such a move within the *Maple Leafs'* fifty-mile home territory is into a market that can more than adequately support another hockey team. *See* Memorandum, at paragraphs 119 through 120.

Bankruptcy proceedings are about maximizing value of assets for creditors. Bankruptcy law and policy encourages and supports this goal.

### *General Overview Of Legal Arguments*

The attached Memorandum presents the legal and factual bases upon which this Court can (and should) approve the Sale Motion, and should PSE Sports be the highest or best bid, approve and authorize a relocation of the Team to a location outside of Glendale, Arizona. By way of summary, and as set forth in detail in the attached Memorandum, the Debtors respectfully submit the following:

1. ***Nature of Assets.*** The Assets consist of both ownership rights (governed by Bankruptcy Code § 363) and executory contract rights (governed by Bankruptcy Code § 365). Memorandum, Section I.

2. ***Owned Assets.*** With respect to the owned Assets:

(a) ***Business Justification Standard***. The Debtors meet the "proper business justification" standard to support a sale of substantially all Assets outside of a plan of reorganization. Memorandum, Section II(A).

---

[5] Madison Square Garden (where the New York Rangers play) is approximately 21 miles from Nassau Coliseum (where the Islanders play), and only six miles from the Meadowlands Sports Complex (where the New Jersey Devils play). The Nassau Coliseum is itself only approximately 26 miles from the Meadowlands Sports Complex. Accordingly, there are three teams in the New York metropolitan area all playing within about 26 miles of each other. On the West Coast, the Staples Center (where the Kings play) is only about 28 miles from the Honda Center (where the Mighty Ducks play).

**(b)      Sales Free And Clear Of Adverse "Interests".**  The Bankruptcy Code (§ 363(f)) allows for sale of the Assets free and clear of "interests" to the extent those interests are in *bona fide* dispute or consent has already been given. Memorandum, Section II(B).

**(c)      "Interest" Is A Broadly Defined Term.**  "Interest" is broadly defined under the Bankruptcy Code § 363, and would include rights of the NHL to "veto" an ownership or location transfer of the Team.  Memorandum, Section II(C), (D).

**(d)      The NHL Interests Are Subject To A Bona Fide Dispute.**  The NHL "interests" are subject to a *bona fide* dispute by virtue of the pending adversary proceeding, and assertion of tenable antitrust claims against the NHL. As such, the Court can approve a sale free and clear of such disputed interests. Memorandum, Section II(E).

**(e)      Court Need Not Resolve Dispute On Merits.**  In order to sell free and clear of the disputed NHL interests, the Court need not make an adjudication of the underlying merits of the dispute, but only find an "objective basis" for the dispute.  Memorandum, Section II(E)(3).

**(f)      Expedited Timelines Have Happened Before**.  In all events, expedited approval and relocation (on the same timelines contemplated in these Cases) of professional sports franchise has been done--once in a bankruptcy (involving the *Seattle Pilots*, which were sold within three weeks of a purchase contract being signed, through a bankruptcy process that lasted 12 days, which team was relocated six days before the start of the 1970 baseball season); and

- 7 -

once outside of bankruptcy (involving the *Quebec Nordiques*, which sale contract was announced on May 25, 1995, was approved for transfer to Denver, and actually moved, by June 21, 1995, playing its first game as the *Colorado Avalanche* on October 6, 1995). Memorandum, Section II(F).

(g)     **The Disputed NHL Interests Will Be Adequately Protected.** The NHL disputed interests will be adequately protected under Bankruptcy Code §§ 363(e) and 361 by an evidentiary showing that PSE Sports meets the objective criteria of the NHL Constitution and By-Laws for ownership transfer and relocation transfers (should PSE Sports be found to be the highest or best bid). Such a showing is the indubitable equivalent of the NHL interest. Memorandum, Section II(G).

3.     ***Executory Contract Assets.*** With respect to the executory contract Assets:

(a)     **Not "Personal Services" Contracts.** The contracts at issue are not in the nature of "personal services" contracts that may not be assumed and assigned pursuant to Bankruptcy Code § 365(c)(1). Even assuming, *arguendo*, they were such types of contracts, the NHL has already consented to such assignment by virtue of the parameters set forth in the NHL By-Laws. Memorandum, Section III(A)(1), (2).

(b)     **No Intellectual Property Licenses At Issue.** There are no intellectual property licenses under which the NHL is a licensor and the Debtors are licensees -- as such, the prohibition on assumption and assignment under Bankruptcy Code § 365(c) is not applicable. Memorandum, Section III(B).

- 8 -

(c) **The Debtors Meet Business Judgment Standard On Assumption**. The Sale Motion, with the assumption and assignment of certain executory contracts and rejection of others, meets the business judgment standard required in the Bankruptcy Code. Memorandum, Section III(C).

(d) **The Debtors Will Demonstrate Adequate Assurance Of Future Performance.** The Debtors will be able to demonstrate adequate assurance of future performance under the assumed and assigned NHL contracts by an evidentiary hearing demonstrating that PSE Sports' meets all objective economic, financial and other criteria for ownership/location transfers, and PSE Sports' willingness to abide by standard and lawful NHL rules and regulations. In all events, the NHL is not entitled to adequate assurance of future performance of unlawful contractual restrictions. Memorandum, Section III(D)(1), (2).

(e) **The "Good Faith" Overlay.** Finally, the NHL's refusal to approve a transfer of ownership and location after an evidentiary showing that such transfer meets the objective, stated NHL criteria would be an arbitrary and capricious decision by the NHL, and would contravene the legal duty of good faith owed by the NHL to Coyotes Hockey as a team member of the NHL. Memorandum, Section III(D)(3). Accordingly, the Court can approve such assumption and assignment over the NHL's objections.

This Memorandum is supported by: (1) the entire record before the Court; (2) the "Omnibus Statement of Fact in Support of Chapter 11 Petitions and First Day Motions," filed on May 5, 2009 [Docket No. 7] (the "**Omnibus Statement of Facts**"); (3) the "Debtors' Memorandum of Points And Authorities In Support Of Motion To Sell Substantially All Of

Coyotes Hockeys' Assets (City of Glendale Issues)" filed contemporaneously herewith; (4) the

"NHL Transfer Application of PSE Sports & Entertainment, L.P." submitted to the NHL on May

22, 2009, as supplemented (the "**Transfer Application**") and the "Application For Transfer Of

Franchise Location" submitted to the NHL on June 1, 2009 (the "**Relocation Application**")[6]; (5)

the attached Memorandum of Points and Authorities and exhibits thereto; and (6) the attached

Declarations of Earl Scudder, Jeff Shumway, Andrew Zimbalist and James Balsillie (all of which

are incorporated by this reference herein).

Respectfully submitted this 5th day of June, .

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By: _____ /s/ Thomas J. Salerno _____
    Thomas J. Salerno
    Jordan A. Kroop
    George Brandon
    Kelly Singer
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

Counsel to the Debtors-In-Possession

---

[6] The Ownership Transfer Application was filed under seal in accordance with the "Order Authorizing The Debtors To File NHL Transfer And Relocation Applications Under Seal" entered by the Court on May 27, 2009 [Docket No. 211]. The Transfer Application was also supplemented on June 1, 2009. *See* "Notice Of Filing Supplement To NHL Transfer Application" dated June 2, 2009 [Docket No. 237]. The Location Transfer Application was filed under seal as well. *See* "Notice Of Filing NHL Relocation Application Under Seal" filed June 1, 2009 (Docket No. 236).

# TABLE OF CONTENTS

|  |  |  | *Page* |
|---|---|---|---|
| I. | | *SYNOPSIS OF ASSETS BEING SOLD AND ASSIGNED* | 1 |
| II. | | *SECTION 363 ANALYSIS* | 2 |
| | A. | Coyotes Hockey May Sell Substantially All Its Assets Under Bankruptcy Code § 363 | 2 |
| | B. | Bankruptcy Code § 363 Authorizes A Sale Free And Clear Of Adverse "Interests" | 4 |
| | C. | "Interest" Is Broadly Defined Under Bankruptcy Code § 363 | 5 |
| | D. | The NHL's Asserted Veto Rights Are "Interests" Under The Bankruptcy Code | 7 |
| | E. | The NHL Interests Are In *Bona Fide* Dispute | 13 |
| | | (1) The Pending Adversary Proceeding | 13 |
| | | (2) The Antitrust Analysis | 16 |
| | | (3) The Court Need Not Adjudicate The *Bona Fide* Dispute To Approve The Sale | 31 |
| | F. | Expedited Approval of Ownership/Location Transfer On Club Relocation Has Happened Before | 34 |
| | G. | The NHL Interests Are Adequately Protected | 42 |
| | | (1) Indubitable Equivalent Under Bankruptcy Code § 361(3) | 42 |
| | | (2) Coyotes Hockey Will Provide The NHL With The Indubitable Equivalent Of The Disputed Interests | 43 |
| III. | | *COYOTES HOCKEY MAY ASSUME AND ASSIGN EXECUTORY CONTRACTS UNDER BANKRUPTCY CODE § 365* | 45 |
| | A. | Bankruptcy Code § 365(c) Regarding "Personal Services" Contracts | 47 |
| | | (1) The Contracts At Issue Here Are Not "Personal Services" Contracts | 47 |
| | | (2) The NHL Previously Consented To Assignment Under | 49 |

Defined Terms

B.    The NHL's IP Rights Argument Is Misguided    **53**

   (1)    Unincorporated Associations Do Not Own Intellectual    **53**
          Property – Its Members Do

   (2)    The NHL Previously Consented To Assignment Of The    **57**
          League Marks

C.    The Proposed Sale Complies With The Business Judgment Standard    **59**
   Under Section 365

D.    The Debtors Will Be Able To Demonstrate Adequate Assurance Of    **61**
   Future Performance

   (1)    PSE Sports Will Meet All Objective Economic, Financial And    **63**
          Character Criteria For Ownership/Location Transfers

   (2)    Adequate Assurance Of Performance Of Unlawful    **65**
          Contractual Restrictions

   (3)    The NHL's Refusal To Consent To Ownership Or Location    **70**
          Transfers Constitutes Bad Faith

IV.    ***REQUEST FOR JUDICIAL NOTICE***    **73**

V.    ***CONCLUSION AND RELIEF REQUESTED***    **74**

# EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1 | Economic Analysis |
| 2 | NHL Constitution |
| 3 | NHL By-Laws |
| 4 | Second Amended Complaint, Adv. Proc. 2:09-ap-494-RTBP |
| 5 | May 27, 2009 Hearing – Excerpts of Transcripts |
| 6 | May 7, 2009 Hearing – Excerpts of Transcripts |
| 7 | *Les Nordiques - Chronologie* (in the original French with an unofficial partial translation), and *Colorado Avalanche 1995-1996 Game Log And Scores* from database Hockey.com |
| 8 | Declaration of Earl Scudder |
| 9 | Declaration of Jeff Shumway |
| 10 | Sale Agreement (*Pacific Northwest* Bankruptcy Proceeding) |
| 11 | Memorandum of Opposition of Debtors' Injunction Request |
| 12 | In Proceedings for An Arrangement |
| 13 | Petition for Authority for Sale and for Injunctive Relief |
| 14 | Order to Show Cause |
| 15 | Injunction |
| 16 | In Proceedings for An Arrangement Under Chapter XI |
| 17 | Ruling of the Court |
| 18 | Affidavit of Joseph E. Cronin |
| 19 | License Agreement |
| 20 | Declaration of James Balsillie |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    SYNOPSIS OF ASSETS BEING SOLD/ASSIGNED

1.    Is Coyotes Hockey's membership in the NHL an asset that it owns outright or an executory contract right?  Where these two overlap and intersect is not always clear.  While not specifically or neatly defined (like the lease arrangement with the City of Glendale, for example), it is probably both.  Accordingly, any analysis of Coyotes Hockey's rights to consummate the APA (or to sell to the highest bidder as determined by the Court) must be analyzed under both Bankruptcy Code §§ 363 and 365.

2.    The Sale Motion seeks an order under Bankruptcy Code §§ 363 and 365 authorizing:  (1) sales of assets owned primarily by Coyotes Hockey, free and clear of certain (but not all) interests of, *inter alia*, the National Hockey League ("**NHL**"); and (2) assumption and assignment of certain executory contract rights of Coyotes Hockey related to those assets. The primary asset to be acquired would, of course, be the membership in the NHL of the Phoenix Coyotes ("**Team**").   The Team is comprised of both owned assets (subject to Bankruptcy Code § 363) and executory contract rights (subject to Bankruptcy Code § 365).

3.    The crux of the dispute centers on the NHL's assertion that it has unfettered and unrestricted power to block any sale by withholding consent to such a transaction, citing to the "Constitution Of The National Hockey League (An Unincorporated Association Not For Profit)," a true and correct copy of which is attached hereto as Exhibit "2" (the "**NHL Constitution**") and the "By-Laws" of the NHL, a true and correct copy of which is attached hereto as Exhibit "3" (the "**NHL By-Laws**").[1]   The NHL's position is that no transaction is possible unless it approves and blesses such a transaction.  There are, in actuality, two separate and distinct transactions --

---

[1] The parties do not dispute that the copies being used are the versions of these documents currently in force.

the first involving a change of ownership for the Team ("**Ownership Transfer**"); the second involving a relocation of the Team (under the APA) to a new location in Hamilton, Ontario ("**Location Transfer**"). Both are governed by distinct provisions in the NHL Constitution (Articles 3.5 and 4.1 to 4.3, respectively) and the NHL By-Laws (Sections 35 and 36, respectively). The NHL's position that it has the exclusive power to grant, block, and solely determine the Ownership Transfer and Location Transfer, regardless of the economic consequences to the creditors of these cases and bankruptcy policy, is wrong for the reasons set forth below. Both were also the subject of the Transfer Application and Relocation Application (which are defined below and further discussed at paragraphs 29 and 80-81, *infra*.).

## II.    SECTION 363 ANALYSIS

### A.    Coyotes Hockey May Sell Substantially All Its Assets Under Bankruptcy Code § 363

4.    As an initial matter, a debtor may sell substantially all of its assets outside the context of a Chapter 11 plan if the transaction has "a proper business justification" that has the potential to lead toward confirmation of a plan.[2] Of course, the proposed sale should not be designed to evade the plan confirmation process. *In re Iridium Operating, LLC*, 478 F.3d 452, 466-67 (2d Cir. 2007) (citing *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983)); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (adopting *Lionel* factors to consider when approving sale outside confirmation of a plan, which include: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and

---

[2] The parties are engaged in simultaneous briefing. While not raised as a specific objection at this point, this issue is addressed out of an abundance of caution.

reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided).

5.     A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation to govern the distribution of the sale proceeds. *See Florida Dept. Of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2331 n.2 (2008). This is often employed when there is a need to preserve the going concern value of the assets where revenues are insufficient to sustain the continued operation of the business and there are no viable sources for financing. *In re Decora Industries*, 2002 U.S. Dist. LEXIS 27031, at *8-10 (D. Del. May 20, 2002).

6.     Here, Coyotes Hockey has established a very sound business justification for the sale of substantially all of its Assets on an expedited basis.  As set forth in the Omnibus Statement of Facts, Coyotes Hockey has suffered over $70 million in operating losses over the last three years alone. *See* Omnibus Statement of Facts, Paragraph 41, page 13.  Furthermore, as detailed in the "Declaration Of Earl Scudder In Support Of Sale Motion" filed under seal on May 5, 2009 (Docket No. 75), Coyotes Hockey has undertaken substantial efforts to locate an investor or buyer of its Assets.  At this point, the only viable option for Coyotes Hockey that would preserve value of the assets for its creditors is to sell substantially all of its Assets as soon as possible.  The Debtors submit that further secured financing from parties (such as the NHL) merely depletes the pool of recovery to Coyotes Hockey's unsecured creditors and perpetuates the continuation of a business enterprise that has lost money operationally every year since 1996, with no viable prospects of making money in the near future. *See, e.g.*, Relocation Application at pages 7-11; Appendix 1 attached thereto (further discussed at paragraphs 29 and 80-81, *infra.*).

7. Under these circumstances, the proposed sale to PSE Sports, which involves a cash purchase price of $212,500,000, can be consummated outside a Chapter 11 plan in accordance with Bankruptcy Code § 363. The sale proceeds, which would be distributed in accordance with the Bankruptcy Code in a liquidating plan, would satisfy all secured debt of Coyotes Hockey and would provide a meaningful recovery to unsecured creditors. *See* Economic Impact Chart, Exhibit "1."

**B. Bankruptcy Code § 363 Authorizes A Sale Free And Clear of Adverse "Interests"**

8. Coyotes Hockey is seeking to sell its Assets under Bankruptcy Code § 363(b) "free and clear of ***any interest*** in such property of an entity other than the estate," which can be approved if one of the following conditions is satisfied:

(1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §§ 363(f)(1) - (f)(5) (emphasis added). Thus, Coyotes Hockey can sell its Assets free and clear of *any interest* if the purported interest is in *bona fide dispute* under Bankruptcy Code § 363(f)(4).

484443.4

**C.    "Interest" Is Broadly Construed Under Bankruptcy Code § 363**

9.      "Interest" is not defined in the Bankruptcy Code, but it is clear that "interest" includes all types of adverse claims as well as encumbrances.  Although a small minority of courts have limited the scope of "interest" for purposes of Bankruptcy Code § 363(f) to lien (*or in rem*) interests in property, the Bankruptcy Appellate Panel for the Ninth Circuit unequivocally rejected this restricted reading in *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (B.A.P. 9th Cir. 2008), stating "[w]e believe that Congress intended 'interest' to have an expansive scope, as shown by *United States v. Knox-Schillinger (In re Trans World Airlines, Inc.)*, 322 F.3d 283 (3d Cir. 2003)." *Clear Channel*, 391 B.R. at 36.  In *Trans World Airlines*, the Third Circuit Court of Appeals authorized the sale of an airline's assets free and clear of employment discrimination claims that had been settled with travel vouchers.  The Third Circuit stated the following:

> Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen.  Furthermore, TWA's investment in commercial aviation is inextricably linked to its employment of the Knox-Schillinger claimants as flight attendants, and its ability to distribute travel vouchers as part of the settlement agreement. While the interests of the EEOC and the Knox-Schillinger class in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, the reasoning of *Leckie* and *Folger Adam* suggests that they are interests in property within the meaning of section 363(f) in the sense that they arise from the property being sold.

*Trans World Airlines*, 322 F.3d 289-90.[3]  Under this reasoning, an "interest" under Bankruptcy Code § 363(f) includes any obligation that arises from the property being sold.

---

[3] The Third Circuit also analyzed *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996), and determined that "interest" referred to obligations that are "connected to, or arise from, the property being sold." *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor NV*, 209 F.3d 252, 259 (3rd Cir. 2000). *See also Trans World Airlines*, 322 F.3d at 289.

10.     The *Clear Channel* and *Trans World Airlines* cases are among the latest in a trend of cases following *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996), *cert. denied*, 520 U.S. 1118, 117 S. Ct. 1251, 137 L. Ed. 2d 332 (1997), which find that "interest" under Bankruptcy Code § 363(f) encompasses obligations, other than liens, that may flow from ownership of the property. *See also Myers v. United States*, 297 B.R. 774 (S.D. Cal. 2003) (sale free and clear of unsecured environmental clean-up claims); *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90 (Bankr. E.D. Va. 1995) (holding that 363(f) permitted sale free and clear of state's statutory tax interest on the property); *WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97 (Bankr. E.D. Va. 1995) (same); *In re White Motor Credit Corp.*, 75 B.R. 944 (Bankr. N.D. Ohio 1987) (holding that 363(f) precluded tort claims against asset purchaser).

11.     A number of courts have adhered to the reasoning that "interest" includes much more than liens, and in fact, encompasses interests that were not yet created. *See, e.g., FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002), *cert. denied*, 538 U.S. 962, 123 S. Ct. 1769, 155 L. Ed. 2d 513 (2003) (sale free and clear of grant of intellectual property that was not yet created); *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252 (3d Cir. 2000) (free and clear of set-off rights); *Car-Tec v. Venture Indus., Inc. (In re Autostyle Plastics, Inc.)*, 227 B.R. 797 (Bankr. W.D. Mich. 1998) (sale free and clear of unsecured claims for commissions, which had been fully earned prepetition); *The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Company v. Johns-Manville Corp. (In re*

*Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); *In re P.K.R. Convalescent Centers, Inc.*, 189 B.R. 90, 92-94 (Bankr. E.D. Va. 1995) (holding that § 363(f) permitted sale free and clear of state's depreciation-recapture interest in the debtor's property); *In re WBQ Partnership*, 189 B.R. 97 (Bankr. E.D. Va. 1995) (holding statutory right to recover depreciation was within "interests" under § 363(f)).

**D.    The NHL's Asserted Veto Rights Are "Interests" Under The Bankruptcy Code**

12.    The Debtors assert that Coyotes Hockey's membership interests in the NHL can be sold free and clear of certain interests of the NHL contained in the NHL Constitution, and the NHL By-Laws, which govern the 30 member teams of the NHL.  Those limited interests are set forth in Articles 3.5, 4.1, 4.2, and 4.3 of the NHL Constitution, and Sections 35 and 36 of the NHL By-Laws, and are specifically set forth below (collectively, the "**NHL Interests**") (emphasis added).

- ***Article 3.5 of the NHL Constitution*** prevents transfer of an ownership in a

hockey team without, among other things, the three-fourths vote of the member clubs:

> *Transfer of Membership or Ownership Interest in a Member Club.*
> ***No membership or ownership interest in a Member Club may be sold, assigned or otherwise transferred except (a) with the consent of three-fourths of the members of the League, and (b)***

*upon the condition that the transferee will at all times be bound by and comply with the terms, provisions and conditions of this Constitution, and (c) upon the further condition that the transferee shall assume or guarantee all debts, liabilities and obligations of the transferor member existing at the date of transfer.* Application for the sale, transfer or assignment of a membership or ownership interest must be made in writing to the Commissioner. Upon receipt of such application, the Commissioner shall conduct such investigation as he deems appropriate. Upon completion of the investigation, the Commissioner shall submit the application to the members for approval, together with his recommendations thereon and all such information that the Commissioner deems pertinent. Transfer of membership or ownership interest in a Member Club shall not release the transferor from any debt, liability or obligation to the League existing at the date of transfer. Upon transfer of membership or ownership in a Member Club any and all interest of the transferor in and to any and all funds, property, rights and interests in the League shall cease.

- *Section 35 of the NHL By-Laws* further governs member ownership transfer. It

provides in pertinent part the following:

In determining whether to consent to the sale, assignment or transfer of a membership or of an ownership interest in a Member Club pursuant to Section 3.5 of the [NHL Constitution], each Member Club shall be guided by the following considerations: (a) Whether the persons who would be holders of an ownership interest in the Member Club and the entity or entities which would hold the franchise, player contracts and/or other assets of the Member Club in question after the proposed sale, assignment or transfer, are able and willing to commit sufficient financial resources to provide for the financial stability of the franchise; [and] (b) Whether the persons who would be holders of an ownership interest in the Member Club are of good character and integrity.

Section 35 of the NHL By-Laws further provides that "[a]ny such consent by the Member Clubs may be made subject to the appropriate conditions," which include provisions: (1) to assure that all liens and security interests will be subject to the NHL Constitution; (2) to assure that the transferee will be assuming the debts, liabilities, and obligations of the transferor member, and

specify how such obligations will be assumed, guaranteed, or paid; (3) regarding corporate structure, or those persons who are authorized to bind the member club in transactions involving the NHL and to assure the maintenance of such control relationship; (4) to assure working capital; (5) for the pre-payment of NHL dues and assessments; (6) specifying agreements to be assumed and performed by the transferee; (7) to prevent commingling of funds; and (8) regarding the delivery of a consent agreement or other agreements containing some or all of the foregoing provisions.

- *Article 4.2 of the NHL Constitution* prevents relocation of a hockey team without compliance with Article 4.3 of the NHL Constitution, and as set forth further below, relocation is subject to Section 36 of the NHL By-Laws:

> *Territorial Rights of League.* The League shall have exclusive control of the playing of hockey games by Member Clubs in the *home territory* of each member, subject to the rights hereinafter granted to members. The members shall have the right to and agree to operate professional hockey clubs and play the League schedule in their respective cities or boroughs as indicated opposite their signatures hereto. No member shall transfer its club and franchise to a different city or borough.[4] No additional cities or boroughs shall be added to the League circuit without the consent of three-fourths of all the members of the League. Any admission of new members with franchises to operate in any additional cities or boroughs shall be subject to the provisions of Section 4.3.

- *Article 4.3 of the NHL Constitution* further prevents relocation into the home territory of another member club without that club's written consent:

> *Territorial Rights of Members.* Each member shall have exclusive control of the playing of hockey games within its home territory including, but not being limited to, the playing in such home territory of hockey games by any teams owned or controlled by such member or by other members of the League. Subject only to the exclusive rights of other members with respect to their respective home territories as hereinabove set forth, nothing herein

---

[4] Although this purports to prevent relocation of a member club, Article 4.3 of the NHL Constitution and Section 36 of the NHL By-Laws (discussed further below) allows relocation of a member club's team.

contained shall be construed to limit the right of any Member Club to acquire any interest in any hockey team, whether professional or amateur in any league which recognizes and honors the territorial rights, contracts and reserves lists of the National Hockey League, except as limited by Section 8.1(a) of this Constitution. *No other member of the League shall be permitted to play games (except regularly scheduled League games with the home club) in the home territory of a member without the latter member's consent. No franchise shall be granted for a home territory within the home territory of a member, without the written consent of such member.*[5]

- *Article 4.1 of the NHL Constitution* defines "home territory" to mean:

  Each Member Club shall have exclusive territorial rights in the city in which it is located and within fifty miles of that city's corporate limits.

- *Section 36 of the NHL By-Laws* also governs relocation of a member club. It provides in pertinent part that "[i]n determining whether to consent to the transfer of a Member Club's franchise to a different city or borough pursuant to Section 4.2 of the Constitution, each Member Club shall be guided by" a laundry list of 24 factors for Member Clubs to consider. These factors are summarized as follows: (1) The financial viability of the team in its current location; (2) historical support of fans; (3) historical profit and loss of the team at its current location; (4) whether the present team owner made a good faith effort to keep the team at its current location, (5) whether a new purchaser will sustain losses during initial operation of team;

---

[5] The NHL, while insisting that its written and codified rules and regulations are sacrosanct, apparently deviates from them by practice and policy -- hence, what the real "rules" of the NHL are at any point in time is known perhaps only by the NHL Commissioner. *See* "Declaration of William L. Daly" dated May 13, 2009 [Docket No. 93], Paragraph 51 ("To be clear, it remains the policy of the NHL that a proposed team relocation to southern Ontario would be subject to a majority vote of the NHL Board of Governors and no individual team, wherever located, would have any veto right over any majority vote in favor of relocation.") Accordingly, while the NHL Constitution at Article 4.3 clearly sets forth "veto rights," Deputy NHL Commissioner Daly states this particular provision of the NHL Constitution is simply ignored as a matter of "policy" by the NHL. Furthermore, Section 36 of the NHL By-Laws allows relocation of a member club on the vote of three-fourths of the members -- not just a majority vote. It remains a mystery what other portions of the NHL Constitution and the NHL By-Laws are ignored by the NHL and which are strictly enforced, or how the NHL can ignore the NHL Constitution.

(6) if the team could operated in its present location in a more prudent or cost-effective manner; (7) the prospect of additional revenues that may become available to the team; (8) whether local governmental authorities are willing to reduce operating costs; (9) whether the arena authority can reduce operating costs; (10) the adequacy of the arena for home games and whether arena authority can remedy any deficiencies in the arena; (11) whether there is a suitable arena in the proposed new location; (12) whether support exists in the new location to make the team financially viable; (13) whether owners of the team are willing to sustain losses during initial operation at new location; (14) whether consent to the proposed transfer would damage the NHL or have adverse affect on its ability to market and promote hockey in the United States or Canada; (15) whether transfer would adversely affect traditional rivalries; (16) whether transfer would result in absence of team in a major market; (17) whether the transfer would draw more or fewer fans when playing as the visiting team in the home arenas of other Member Clubs; (18) whether the transfer would present disadvantages to the NHL with respect to the travel, scheduling, or a divisional realignment; (19) whether there was public financing for the current location; (20) whether the proposed transfer would affect any contract between the team and any public or private party; (21) whether consent would expose the NHL to liability; (22) the extent to which the ownership or management of the team contributed to the need to transfer; (23) the extent to which the team engaged in good faith negotiations with community representatives; and (24) any other relevant considerations.

13.    It is clear that the NHL's purported rights to block the Ownership Transfer or Location Transfer of Coyotes Hockey's Assets, including the Team, constitute "interests" under the Bankruptcy Code's expansive meaning of that term. Indeed, the NHL's purported rights in this regard are no different than an unsecured claim against Coyotes Hockey's Assets, just like

the unsecured employment discrimination claims in the *Trans World Airlines* case. These portions of the NHL Constitution and the NHL By-Laws are simply obligations of Coyotes Hockey that flow from its membership in the NHL, and are thus "interests" under Bankruptcy Code § 363(f). *See also Myers v. United States*, 297 B.R. 774; *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90; *WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97; *In re White Motor Credit Corp.*, 75 B.R. 944. *See* discussion in paragraphs 12-13, *supra*.

14. The NHL has argued for a narrow reading of "interest," citing *Jandel v. Precision Colors, Inc.* 19 B.R. 415 (Bankr. S.D. Ohio 1982). The *Jandel* court's conclusions (that the Bankruptcy Code only allows sales free and clear of liens) are contrary to modern authority on the issue cited above and by the plain reading one is required to give to the statute. For example, the introductory sentence to Bankruptcy Code § 363(f) broadly refers to "any interest," and the next four subsections refer back to "such interest." Subsection 363(f)(3) explicitly states that it applies only if "such interest is a lien," making it clear that Congress intended a lien to be a *type* of interest. The NHL's restrictive interpretation flies in the face of the clear language of Bankruptcy Code § 363(f) as well as Ninth Circuit BAP authority. If, as the NHL may argue, "interest" only includes a "lien," Bankruptcy Code § 363(f)(3) would be surplusage, because it provides that the Court may sell assets free and clear of "interests" if "such interest is a lien," and the sales price exceeds the amount of the liens in question.

15. Under these circumstances, given the authority discussed above and the broad definition of "interests" under the Bankruptcy Code, the NHL Interests qualify as "interests" under Bankruptcy Code § 363(f).

484443.4

**E.     The NHL Interests Are In Bona Fide Dispute**

16.     Many of the NHL Interests contained in the NHL Constitution and the NHL By-Laws, under the circumstances of these Cases, violate federal and state antitrust laws. The Debtors here are not seeking to invalidate each provision of the NHL Constitution and the NHL By-Laws -- the Debtors are not even suggesting that the NHL Interests on their face *per se* violate federal and state antitrust laws. The Debtors rather contend that the NHL Interests as applied to the proposed sale of the Assets -- ***in this situation and under the unique facts and circumstances of these Cases*** -- violates federal and state antitrust law.

### *(1)     The Pending Adversary Proceeding*

17.     Coyotes Hockey filed the "Second Amended Complaint" on June 4, 2009 (as may be further amended, the "**Complaint**"), in Adversary Proceeding Case Number 2:09-ap-494-RTBP (the "**Adversary Proceeding**"). The Complaint, which is attached hereto as Exhibit "4," asserts specific facts and contains allegations as to how the NHL Interests as applied here violate federal and state antitrust law. For example, the Complaint contains factual allegations (which are beyond reasonable dispute) that the Phoenix Coyotes are not financially viable in the Phoenix market. *See* Complaint, Paragraphs 22-26, pages 7-8. *See also* Relocation Application, pp. 7-12; 15-19; Appendices 1.1, 1.2 and 1.3 thereto. The Complaint also asserts that the NHL is conspiring to oppose relocation of the Phoenix Coyotes. *See* Complaint, Paragraphs 27-43, pages 8-16. The Complaint specifically alleges the following with respect to Article 4.3 of the NHL Constitution:

> The purpose and effect of Article 4.3 of the NHL Constitution is to unreasonably restrain trade by granting *de facto* exclusive territories to the NHL member clubs and allowing member clubs to protect their respective monopolies by preventing new team entry into territories where NHL franchises already exist.

Complaint, Paragraph 29, page 9.

18. Moreover, the Complaint provides that "[o]ther provisions in the NHL Constitution and the NHL By-Laws concerning club relocation are equally exclusionary and anticompetitive and are without any pro-competitive justification . . . . Among these provisions is Article 4.2 of the NHL Constitution." Complaint, Paragraphs 35-36, page 10. The Complaint also alleges that Articles 4.2 and 4.3 taken together "unduly and unlawfully restrict the ability of NHL member clubs to relocate. . . . [E]ven if the NHL could proffer pro-competitive justifications for these provisions, their application to block the [Phoenix Coyotes'] proposed relocation to Hamilton, Ontario, would be unreasonable and anticompetitive." Complaint, Paragraph 38, page 11.

19. With respect to Section 36 of the NHL By-Laws, the Complaint asserts the following:

> Any application of Article 4.2 or Section 36 of the By-Laws would be unreasonable and anticompetitive, intended solely to prevent the proposed sale and subsequent move of the Coyotes to Hamilton. NHL Commissioner Gary Bettman has publicly stated in response to the bankruptcy filing that the Coyotes should and will remain in Arizona. Similarly, Bill Daly, Deputy Commissioner of the NHL, is quoted as saying within the last month that the NHL has "no desire to relocate any of our existing franchises," and further stated that "[t]here is no consideration of bringing a second franchise to Toronto." In short, the NHL has prejudged the relocation of the Coyotes in violation of its own anticompetitive provisions and already concluded that the relocation will be opposed. Any attempt to apply Article 4.2 or Section 36 would be entirely pretextual and motivated by a desire to limit competition.

> Application of the procedural requirements of Section 36 of the By-Laws is likewise anticompetitive because it would result in an unreasonably protracted investigation into the proposed sale and relocation. Any such delay would effectively scuttle the proposed sale to PSE and, in the absence of any other viable purchaser, result in the liquidation of the Coyotes franchise. Allowing the NHL to invoke these provisions would, in essence, grant the NHL a "pocket veto" of the transaction and the termination of the Coyotes franchise. Output, and therefore competition, in the

- 14 -

> relevant market would thereby be reduced to the detriment of consumers.
>
> There is no pro-competitive justification to support application of Section 36 of the By-Laws in this context. Section 36.5 of the NHL By-Laws outlines a list of factors each member club must consider in determining whether to consent to the relocation of a member club. Consideration of these factors unquestionably counsels in favor of relocation . . . .

Complaint, Paragraphs 39-41, pages 11-12. The Complaint then goes to allege why the proposed sale under the APA meets 24 factors set forth in Section 36.5 of the NHL By-Laws[6] that purportedly govern the decision to allow relocation. *See* Complaint, Paragraph 41, pages 12-16.

20. The Complaint also contains facts alleging that the NHL is conspiring to oppose the Ownership Transfer of the Assets to PSE Sports (James Balsillie). *See* Complaint, Paragraphs 44-49, pages 17-18. For example, the Complaint asserts that "[i]n addition to the club relocation provisions in the NHL Constitution and By-Laws, provisions concerning the transfer of ownership in clubs are being applied unreasonably without any pro-competitive justification." Complaint, Paragraph 44, page 17. The Complaint specifically alleges, among other things, that "[t]he prospective owner of the Coyotes, Mr. Balsillie through [PSE Sports], unquestionably satisfies the criteria identified by the NHL to guide a decision about whether to consent to the sale or transfer of an ownership interest in a member club [(*i.e.*, Sections 35.1 and 36 of the NHL By-Laws)]" as indicated by the submission of the Transfer Application and Relocation Application (defined below) and Mr. Balsillie's good character and integrity. Complaint, Paragraph 46, page 17. *See also* Transfer Application (as discussed in paragraph 29 and 80-81, below).

21. The Complaint further asserts that "Section 4.2 and 4.3 of the NHL Constitution and Section 35 of the NHL By-Laws, both in fact and in application with regard to the sale of the

---

[6] *See also* Relocation Application.

484443.4

[Phoenix] Coyotes, arbitrarily and unreasonably restrict both competition between NHL clubs and competition for ownership of NHL clubs (and in particular, the Phoenix Coyotes)." Complaint, Paragraph 49, page 18.

22. The Complaint also contends that the NHL's refusal to permit relocation of the Assets, including the Team, restrains competition for NHL hockey and restrains potential bidders for the Assets. *See* Complaint, Paragraphs 50-54, pages 18-19.

23. The Complaint asserts that under the facts and circumstances presented, the NHL Interests, and specifically, the application of the NHL Interests: (a) Violate Section 1 of the Sherman Act; (b) allow the NHL to maintain monopoly power in violation of Section 2 of the Sherman Act; (c) constitute a conspiracy to maintain monopoly power in violation of Section 2 of the Sherman Act; (d) violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stats. § 44-1402; and (e) violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stats. § 44-1403. *See* Complaint, Paragraphs 55-72, pages 20-22.

24. The Complaint seeks to permanently enjoin the NHL from enforcing Articles 4.2 and 4.3 of the NHL Constitution and Section 36 of the NHL By-Laws to prohibit the relocation of the Team to Hamilton, Ontario, and permanently enjoin the NHL from enforcing Section 35 of the NHL By-Laws in such a manner as to restrict the persons who may bid to purchase the Team to only those persons who agree to keep the team in Phoenix.

### (2) *The Antitrust Analysis*

#### (a) *Coyotes Hockey's Antitrust Complaint Is Ripe For Adjudication*

25. The NHL asserts that Coyotes Hockey's antitrust claim is premature as the NHL has yet to officially deny Coyotes Hockey's ownership transfer or relocation applications. However, applicable Federal law does not limit standing in antitrust cases to those having

- 16 -

already suffered harm. Section 16 of the Clayton Act, rather, entitles "[a]ny person, firm, corporation, or association . . . to sue for and have injunctive relief . . . against **threatened** loss or damage by a violation of the antitrust laws." *See* 15 U.S.C. § 26 (emphasis added); *Drug Mart Pharm. Corp. v. Am. Home Prods. Corp.*, 2007 U.S. Dist. LEXIS 93493, at *10 (E.D.N.Y. Dec. 20, 2007) ("Section 16 [of the Clayton Act] permits a plaintiff to obtain an injunction prior to sustaining actual injury by demonstrating that the defendant's anticipated violation of the antitrust laws threatens to cause injury to the plaintiff if consummated.")

26.     Moreover, standing under Section 16 of the Clayton Act encompasses those, such as Coyotes Hockey, bringing antitrust claims pursuant to the Sherman Act. *See Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 375 (1958) ("Sections 4 and 16 of the Clayton Act permit private actions . . . for injuries resulting from practices forbidden by the "antitrust laws" as defined in § 1 of the Clayton Act, namely; (1) the Sherman Act"); 15 U.S.C. § 12(a). Thus, as a matter of law, Coyotes Hockey need not have had its ownership transfer or relocation applications denied, or indeed suffered any harm at all, prior to filing the Complaint.

27.     In addition to Section 16 of the Clayton Act, which confers standing in antitrust matters upon a party anticipating threatened losses, the First Circuit in *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994), held that a member of a professional sports league is not denied standing to bring a Sherman Act claim simply because the member's demand has not been officially refused by the league. *See Sullivan*, 34 F.3d at 1104 ("There is certainly no blanket requirement, as the NFL maintains . . . that Sullivan must call for a vote and obtain an official refusal from the NFL, even if such a request would be futile.") De facto refusal by the league, rather, is enough to confer standing. *Id.* In *Sullivan*, such de facto refusal was evidenced by (1) the NFL Commissioner, Pete Rozelle, stating that he opposed Sullivan's

proposal and that the chances for league approval were "very dubious," (2) the NFL's long-standing public policy against the action proposed by Sullivan, and (3) the tabling of Sullivan's requests to waive or amend the policy in question during a meeting of the owners. *Id.*

28.     The NHL's actions here plainly constitute no less of a prospective denial of Coyotes Hockey's ownership transfer and relocation applications than did the NFL's actions in *Sullivan*. At a minimum, the NHL conduct poses a threat of loss or damage through a violation of the antitrust laws, thus giving Coyotes Hockey standing to bring its claims pursuant to Section 16 of the Clayton Act.

29.     Indeed, the NHL's position throughout these Cases and prior to the Petition Date makes it abundantly clear that the NHL will not willingly permit the transfer or relocation of the Phoenix Coyotes. As indicated by the "Notice Of Filing NHL Transfer Application Under Seal" dated May 29, 2009 [Docket No 228], PSE Sports submitted its "NHL Transfer Application Of PSE Sports & Entertainment, L.P.," on May 22, 2009, and supplemented it at the NHL's request on May 29, 2009 (as may be further supplemented, the **"Transfer Application"**).[7] The Transfer Application is required to be submitted under Section 35 of the NHL By-Laws any time there is a proposed sale, assignment, or transfer of a membership in the NHL.[8] Likewise, in accordance with Article 36.1(a) of the NHL Constitution, on June 1, 2009, Coyotes Hockey and PSE Sports submitted to the NHL their NHL Relocation Application Of The Phoenix Coyotes (as may be supplemented, the **"Relocation Application"** and together with the Transfer Application, the

---

[7] The Transfer Application was filed under seal in accordance with the "Order Authorizing The Debtors To File NHL Transfer And Relocation Applications Under Seal" entered by the Court on May 27, 2009 [Docket No. 211]. The Transfer Application was also supplemented on June 1, 2009. *See* "Notice Of Filing Supplement To NHL Transfer Application" dated June 2, 2009 [Docket No. 237].

[8] The Transfer Application was filed without prejudice to the allegations in the Adversary Proceeding.

"**Applications**"). *See* "Notice Of Filing NHL Relocation Application Under Seal" dated June 1, 2009 [Docket No 236].[9]

30.     Accordingly, PSE Sports and Coyotes Hockey have complied with the NHL Constitution and the NHL By-Laws by submitting the Applications.  However, notwithstanding the filing of the Applications and the exigent circumstances that require the NHL to make a swift decision on such Applications, the Debtors and PSE Sports believe that the NHL will not make a timely decision on the Applications.  The prospect of delay by the NHL in this regard is striking, given that the NHL's counsel in open court has conceded the NHL could approve a proposed transfer "very quickly."  Indeed, swift action by the NHL has been specifically sought by the Court:

> ***THE COURT***:  Well, let me ask you the same question that I asked Ms. Freeman and I think Mr. Salerno.  Let's say I adopt your schedule and then, on the 29th, you've had your auction and the A Company has been the high bidder and they've qualified and the League's approved them.  And Bill Gates walks in.
>
> ***MR. CLARK***:  I don't think we'll have a problem with Bill Gates, Your Honor.  If somebody else walks in who's a --
>
> ***THE COURT***:  So you're going to have to build in that there's some -- the Court has the power at the [sale] hearing -- if it concludes that we have a new bidder who is making a higher bid, the Court can hear that bid and open the bidding back up.
>
> ***MR. CLARK***:  That wasn't my point, Your Honor.  *My point was that the League has the power to approve persons who want to become owners of the League and to transfer teams, and if Bill [Gates] came in and said to the League, you know, I'd like to be the owner at this price and in this place, I think Mr. Bettman could get on the phone and talk to the other owners and get some . . . response very quickly.*
>
> ***THE COURT***:  Well, but my point is then, on potentially August 29, you're going to have to build into your procedures that there is a mechanism that if what I'll call a qualified bidder comes in, the

---

[9] The Relocation Application was filed without prejudice to the allegations in the Adversary Proceeding.

League and the Court may allow them to bid and the bidding may be reopened that day.

* * *

**MR. CLARK:** Your Honor asked about if somebody shows up at the auction who hasn't showed up before. The League's position would be that anybody who is a, quote, qualified bidder, as the term is defined, which includes having gone through the League's ownership transfer process, can up and bid. If they have not done that, then we can talk about reopening the process to allow somebody to that and then come back to Your Honor.

* * *

**THE COURT:** Well I don't need to decide this right now . . . [b]ut I'm going to tell you and I want you to communicate this very clearly to your client and the Board of Governors and the League if you have to, I think they're going to have to figure out by telephone or some manner that if somebody shows up -- I mean, I'm just going to use a name that's been out there, that's in the Scudder declaration. *Let's assume nobody hears from Mr. Reinsdorf until the auction day whenever that is, August 29th or September 8th, whenever it is. But he walks in here on that day and makes the highest bid. I'm going to expect you to get on the phone with Mr. Bettman or Mr. Bettman to get on the phone with whoever he needs to get on the phone with, and to sign off on that bidder yea or nay, very promptly.*

**MR. CLARK:** I understand the message, and the message will be delivered, Your Honor.

*See* Transcript of May 27, 2009 Hearing, 60:19-25, 61:1-25, 69:8-25, 70:1-9 (emphasis added), the pertinent portions of which are attached hereto as Exhibit "5."

31.     Despite the NHL's admissions on May 27, 2009 that approval can be done "very quickly" (and presumably at a sale hearing with respect to a new purchaser that was not even a qualified bidder), the NHL's counsel had previously stated in open Court that relocation would not be approved for the 2009-2010 season, commencing in October 2009, and indicated that relocation somehow could not be approved before the end of the 2009 calendar year:

> **MR. CLARK**: We will be arguing, if we get to it, that even if you started today there isn't enough time between now and the end of June -- frankly, there's not enough time between now and the end of 2009 to go through the process of approving a relocation . . . .

Transcript of May 7, 2009 Hearing, 15:16-20, the pertinent portions of which are attached hereto as Exhibit "6."[10]

32.     Coyotes Hockey has heard this refrain of delay from the NHL before.  The NHL has always stood firm on its position that no transfer of the Phoenix Coyotes would involve a relocation of the team outside Glendale, Arizona.  *See* Declaration of Earl Scudder dated June 5, 2009 ("**Scudder Dec.**") at ¶ 12; *see also* Declaration Of Jeff Shumway dated June 4, 2009 ("**Shumway Dec.**") at ¶¶ 37 and 40 attached hereto as Exhibits "8" and "9," respectively.

33.     Similarly, the Declaration Of Gary B. Bettman dated May 18, 2009 ("**Bettman Dec.**") [Docket Nos. 125 and 130], sheds further light on the NHL's position with respect to a Phoenix Coyotes relocation.  Mr. Bettman specifically stated that "*the League* held the franchise opportunity in Southern Ontario."  *See* Bettman Dec. at 2:9-10; Exhibit "A" thereto  (emphasis added).

34.     Taken together, these facts and circumstances reflect that the NHL will control the results of the application process to preclude PSE Sports' bid for the Assets, at least a "pocket veto" by the NHL.

---

[10] The foregoing notwithstanding, the NHL doggedly refuses to submit to any discovery on this very issue, and resists any attempts by the Debtors to obtain such information.  That said, in at least one instance involving the move of the *Quebec Nordiques* from Quebec to Denver in 1995, the *Nordiques* were sold to Comsat Video on May 25, 1995, and on June 21, 1995 (less than one month later), the NHL approved the relocation of the team to Denver (to play as the *Colorado Avalanche*), with the first game being played on October 6, 1995 against the Detroit Red Wings *See Les Nordiques - Chronologie* (in the original French with an unofficial partial translation), and *Colorado Avalanche 1995-1996 Game Log And Scores* from database Hockey.com, attached hereto as Exhibit "7."  The Debtors recognize this is not, perhaps, the best evidence of this, but given the NHL's resistance to any discovery on this matter, the Debtors ask the Court for leeway.

484443.4

35.     Coyotes Hockey has lost over $70 million dollars operationally over the last three years.  *See* Omnibus Statement of Facts, Paragraph 41, page 13.  PSE Sports has indicated that it will not agree to fund Coyotes Hockey's losses for the 2009-2010 season in Glendale, Arizona -- it will withdraw its bid to purchase the Assets under the APA.  Nor is this an unreasonable position from a purely business and economic perspective.  The team has not made money since moving to Arizona in 1996 -- it has a total EBITDA loss for that time period (through last season) of over $315 million!  *See* Relocation Application at 7.  The NHL knows this, which is why it will delay any decision on the Applications for as long as possible.  The NHL's course of conduct has made plain its effective denial of Coyotes Hockey's ownership transfer and relocation applications, thereby providing an independent basis for Coyotes Hockey's standing to make its antitrust claims.

### (b)     The Sherman Act

36.     As noted above, Coyotes Hockey's complaint alleges, among other things, that the NHL's application of Articles 4.2 and 4.3 of the NHL Constitution and Sections 35 and 36 of the NHL By-Laws violate Sections 1 and 2 of the Sherman Act.  In relevant part, Section 1 of the Sherman Act states that "every contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  *See* 15 U.S.C. § 1.  To establish a claim pursuant to Section 1 of the Sherman Act, a party must establish (1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains competition in a relevant market.  *See L.A. Mem'l Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1391 (9th Cir. 1984) ("Raiders I"); *see also National Hockey League Players Association v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 469 (6th Cir. 2005).  Additionally, Section 2 of the Sherman Act deems it illegal to "monopolize, or attempt to monopolize, or combine or

conspire with any other person or persons, to monopolize any part of the trade or commerce." *See* 15 U.S.C. § 2.

37.     Member clubs of a professional sports league "do not constitute a single enterprise but rather, are separate entities which [are] capable of conspiring with each other." *See Sullivan*, 34 F.3d at 1099; *Raiders I*, 726 F.2d at 1388-89 ("While the NFL clubs have certain common purposes, they do not operate as a single entity. NFL policies are not set by one individual or parent corporation, but by the separate teams acting jointly"); *Whalers*, 419 F.3d at 469 ("professional sports leagues [are] joint ventures whose members act in concert (i.e., *agree*) to promulgate league rules, rather than one solitary acting unit.") (emphasis in original). Accordingly, where as here the member clubs of the NHL have adopted and apply ownership transfer and relocation restrictions, the member clubs constitute separate entities acting in concert, and thereby satisfy the multiple actor requirement for Sherman Act liability.

38.     Whether a restraint is unreasonable is determined under either a *per se* rule or the "rule of reason." *Id.* The *per se* rule is only appropriate where the challenged practice is "entirely void of redeeming competitive rationales." *Id.* (quoting *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998)). The rule of reason is appropriate in all other circumstances, including those relating to franchise ownership transfer and relocation restrictions in professional sports leagues, as is the case here. *See, e.g., Sullivan*, 34 F.3d at 1102-1103 (NFL restriction on public ownership subject to rule of reason analysis); *Nat'l Basketball Assoc. v. SDC Basketball Club, Inc.*, 815 F.2d 562, 567 (9th Cir. 1987) ("rule of reason analysis govern[s] a professional sports league's efforts to restrict franchise movement"); *Raiders I*, 726 F.2d at 1392 ("the unique structure of the NFL precludes application of the per se rule . . . [i]nstead we must examine Rule 4.3 to determine whether it reasonably serves the legitimate collective concerns of the owners or

- 23 -

instead permits them to reap excess profits at the expense of the consuming public"); *North Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1259-1262 (2d Cir. 1982) (applying rule of reason analysis to an NFL cross-ownership rule that prohibited owners from acquiring any interest in another major league sports team); *see also* accompanying Declaration of Andrew Zimbalist, executed on June 4, 2009 ("**Zimbalist Dec.**") at ¶ 13 ("sports leagues require some coordination among their members . . . [t]hus, each case involving a potential restraint of trade or monopolization is *sui generis* and subject to a rule of reason test.")

39.     Under the rule of reason, if the anticompetitive effects of the ownership transfer and relocation restrictions at issue, here Articles 4.2 and 4.3 of the NHL Constitution and Sections 35 and 36 of the NHL By-laws, are applied in a manner unreasonably restraining trade, they violate Section 1 of the Sherman Act. *See Sullivan*, 34 F.3d at 1096; *Raiders I*, 726 F.2d at 1389; *SDC Basketball*, 815 F.2d at 568. Ownership transfer and relocation restrictions also run afoul of the rule of reason if a less restrictive alternative exists. *See Sullivan*, 34 F.3d at 1103 ("One basic tenet of the rule of reason is that a given restriction is not reasonable, that is, its benefits cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits as the current restraint.")

### (c)     The NHL's Ownership Transfer And Relocation Restrictions, As Applied, Fail The Rule Of Reason Test

40.     By erroneously asserting that no *bona fide* dispute exists, the NHL is in essence requesting this Court to hold that the ownership transfer and relocation restrictions in the NHL Constitution and By-Laws are *per se* **legal** -- that there is no conceivable application of Articles 4.2 and 4.3 of the NHL Constitution or Sections 35 and 36 of the NHL By-laws whereby the anticompetitive effects outweigh legitimate business justifications. This is facially ridiculous.

41. On the contrary, it is evident that numerous possible applications of the NHL Constitution and By-Laws could result in an unreasonable restraint on trade. Indeed, as applied here, the NHL's ownership transfer and relocation restrictions amount to an unreasonable and thus illegal restraint on trade in the market for the production of major league professional ice hockey, both locally in southern Ontario and generally in the North American market. *See* Zimbalist Dec. at ¶¶ 13, 18, 32. The NHL's application of its ownership transfer and relocation restrictions similarly rise to the level of an unreasonable restraint on trade in the market for ownership interests in major league professional ice hockey franchises. *Id.* at ¶ 19. Any purported procompetitive rationales for the NHL's refusal to permit Coyotes Hockey to relocate to Hamilton, Ontario are belied by the undisputed facts of this case, and in any event could be achieved utilizing less restrictive means then those currently employed. *Id.* at ¶¶ 12, 21, 23.

42. The NHL is the only producer of major league professional ice hockey in North America. *Id.* at ¶ 7 As a result, the NHL has significant market power and is able to act like a cartel, dividing territories and charging arbitrary prices completely divorced from free market forces. *Id.* at ¶ 7. The NHL Constitution serves to maintain this cartel-like structure by permitting each NHL member team to act as a monopolist in its "home territory," an area within 50 miles of the corporate limits of the city in which it plays its home games. *Id.* at ¶¶ 11-12. Specifically, Article 4.3 of the NHL Constitution constitutes an *absolute* bar to the relocation of member clubs, and it also specifically grants member clubs the right to preclude any relocation of a team within their designated home territory.[11] *See* NHL Constitution Art. 4.3. "The veto's

---

[11] The NHL maintains that relocation to southern Ontario is "subject to a majority vote of the NHL Board of Governors and no individual team, wherever located, would have any veto right over any majority vote in favor of relocation." Daly Declaration at ¶ 51; *see also id.* at ¶ 14 ("Under the By-Laws, and as a matter of the NHL's established practice since at least the early 1990s, only a majority of the Board of Governors present and voting is required to approve a proposed franchise relocation . . . no single Member Club has 'veto' power over a proposed franchise relocation, including any proposed relocation

sole purpose is to restrict competition," and the NHL is the only major professional sports league that still provides such an absolute veto right to its members. Zimbalist Dec. at ¶ 12.

43.     An absolute veto such as the one contained in Article 4.3 of the NHL Constitution raises serious antitrust concerns and is in general greatly disfavored by courts. Indeed, in *Raiders I* the Ninth Circuit, although recognizing that collective action is inherent in professional sports leagues, expressly cautioned that "legitimate collective action should not be construed to allow the owners to extract excess profits" at the expense of consumers, because in such circumstances, "the owners would be acting as a classic cartel." *See Raiders I*, 726 F.2d at 1392 ("Agreement among competitors, i.e., cartels, to fix prices or divide market territories are presumed illegal under § 1 [of the Sherman Act] because they give competitors the ability to charge unreasonable and arbitrary prices instead of setting prices by virtue of free market forces.") The Court further held that the harm from an absolute veto is "especially acute" is cases such as this one "because it prevents a move by a team into another existing team's market," thereby insulating each team from competition and "in essence allowing them to set monopoly prices to the detriment of the consuming public." *Id.* at 1395.

### (i)     Anticompetitive Effects

44.     Here, the only team that would be permitted to exercise, and thereby directly benefit from, Article 4.3's absolute veto precluding Coyotes Hockey's relocation to Hamilton, Ontario would be the Toronto Maple Leafs. *See* Zimbalist Dec. at ¶ 11. The Maple Leafs

---

of an NHL franchise to Southern Ontario"). Apart from its self-serving statements, the NHL provides no evidence of "established practice" nor does it cite to any provision of the Constitution or By-Laws abrogating the veto provided to each member club in Article 4.3. Article 12.1 of the NHL Constitution expressly prohibits amendment or alteration of any provision in Article 4, including Article 4.3, absent unanimous consent and an instrument in writing signed by all members of the League. Absent any proof of an amendment eliminating 4.3 in accordance with the amendment provisions in the Constitution, the veto power remains in force and subject to use by the Toronto Maple Leafs to insulate itself from competition.

organization is already an entrenched monopolist. *Id.* Permitting it to deny the relocation of Coyotes Hockey to Hamilton would only increase the Maple Leafs' monopoly power and allow it to continue to charge unreasonable prices, all to the detriment of consumer. By all economic measures the Maple Leafs are the most successful team in the NHL. The Maple Leafs (1) have the highest average ticket price in the NHL at $76.15, (2) have the highest yearly revenue in the NHL at $160 million, (3) have the highest operating income in the NHL at $66.4 million, (4) are reported to be the most valuable NHL franchise at $448 million, (5) exceeded its arena's official hockey capacity by at least 2.3 percent every year this decade, and (6) have a waiting list for its season's tickets of nearly 6,000 names, likely constituting a demand for between 12,000 and 18,000 seats. *Id.* at ¶¶ 10-11.

45.    A large measure of the Maple Leafs' economic success no doubt results from its status as a monopolist in the market for the production of major league professional ice hockey in Canada's most populous city. *Id.* at ¶¶ 13 and 15. Indeed, according to the NHL's own estimates, the Maple Leafs are the only NHL member team serving the 2.5 million to 3.0 million hockey fans in the Toronto/Hamilton area. *Id.* at ¶ 15. In comparison, three NHL member teams service the mere 1.9 million hockey fans in the greater New York City area. *Id.* It is thus evident that the Toronto/Hamilton area can support another NHL team, and is indisputable that a second team in Southern Ontario will provide more output, lower prices from competitive pressures, and likely inspire both more fan-friendly policies and higher quality hockey. *Id.* If the NHL succeeds in preventing the relocation of Coyotes Hockey to Hamilton, Ontario, consumers in that market will be harmed. *Id.* at ¶¶ 14-15.

46.    Consumers in the broader North American market will similarly be harmed if Coyotes Hockey is forced to remain in Glendale, Arizona, and is precluded from moving to

- 27 -

Hamilton, Ontario. *Id.* at ¶ 16. Despite having one of the lowest ticket prices in the NHL, and a similar win-loss record to Toronto during the 2008-2009 NHL season, the Phoenix Coyotes were outdrawn by the Toronto Maple Leafs by over 180,000 fans. *Id.* Thus, adding an NHL member team in Hamilton and eliminating one in Glendale will likely increase aggregate live game attendance at NHL games. *Id.* Moreover, television ratings for hockey games in Canada are many times higher than they are in the United States. For example, game seven of the 2004 Stanley Cup Final between the Calgary Flames and Tampa Bay Lightning received a 4.2 rating on ABC in the United States, while it received a 25.7 rating on CBC in Canada. *Id.* Accordingly, it is likely that television viewership of NHL games will increase as well if Coyotes Hockey relocates to Canada. *Id.*

47.     Just as there is a market for the production of major league professional ice hockey, there is also a market for ownership of major league professional ice hockey franchises. *See Sullivan*, 34 F.3d at 1097 (recognizing "a relevant market for ownership interests in NFL teams"). The NHL's ownership transfer and relocation restrictions, as applied, would eviscerate this market here by limiting it to only those people who would purchase and run Coyotes Hockey in Glendale, Arizona. *Id.* ("it is reasonable to presume that a policy restricting the buying and selling of such ownership interests injures competition.") As Coyotes Hockey is no doubt more valuable if it can be relocated to Hamilton, Ontario -- evidenced by the fact that the only bidder requires such a relocation of the team -- an unfortunate result of the NHL's application of its relocation restriction will be that the Coyotes franchise is devalued to the detriment of the creditors of these estates. *See* Zimbalist Dec. at ¶ 19.

### (ii)     *Alleged Procompetitive Rationales*

48.     Though to date the NHL has yet to articulate any procompetitive business rationale for its application of the ownership transfer and relocation restrictions, prior comments

suggest two equally pretextual and meritless possibilities: (1) the need to develop geographical balance and dispersion, and (2) an attempt to foster franchise stability.

49.     Geographical balance and dispersion has procompetitive effects to the extent it facilitates strong bidding for media rights to NHL games. Even a cursory review of the value of the NHL's media contracts, however, makes plain that the NHL's focus on member team dispersion during the 1990's, sometimes referred to as the "Sun Belt strategy," has not positively impacted the value of its media rights. *Id.* at 22. Indeed, in the past, during 1999-2000, the NHL was paid approximately $120 million by ABC/ESPN for its national television rights in the United States. *Id.* The most recent national U.S. television contract signed by the NHL with the Versus network yielded an average annual rights fee of merely $67.5 million. *Id.* Thus, there is no support for the NHL's argument that the procompetitive effects of member team geographical dispersion will outweigh the anticompetitive effects of preventing Coyotes Hockey from relocating to the more lucrative Hamilton, Ontario market.

50.     While franchise stability may have procompetitive effects to the extent it fosters fan loyalty and thereby increases ticket sales and revenue, the NHL's conduct since Commissioner Gary Bettman took office on February 1, 1993, makes plain that franchise stability is not sacrosanct, and should be balanced with franchise profitability. Indeed, from February 1, 1993 to the present, four NHL teams have been allowed to relocate early, despite a clause in the NHL's Consent Agreement requiring new franchise owners to stipulate that the franchise will not be moved for seven years following its acquisition. *Id.* at ¶¶ 27-28.

51.     Moreover, Coyotes Hockey's economic track record in Glendale belies the argument that franchise stability necessarily corresponds with franchise profitability. Coyotes Hockey has had its home territory in greater Phoenix for thirteen years. *Id.* at ¶ 25. Not once in

those thirteen years has Coyotes Hockey turned a profit. *Id.* Indeed, Coyotes Hockey has lost over $80 million is the last three years alone. *Id.*

52.     The NHL simply cannot demonstrate sufficient justification for its current application of the ownership transfer and relocation restrictions. Any procompetitive benefit obtained by preventing Coyotes Hockey's relocation is at best *de minimis*, and it cannot come close to equaling the significant anticompetitive impact associated with requiring Coyotes Hockey to remain in Glendale. *Id.* at ¶ 32. The NHL, furthermore, can achieve its procompetitive goals by utilizing less restrictive ownership transfer and relocation restrictions. No procompetitive rationale posited by the NHL can possibly require permitting member teams to exercise an absolute veto with respect to relocation decisions. Less restrictive means of authorizing team relocation, such as implementing majority or super-majority consent requirements, adequately protect the NHL's interests while decreasing the likelihood that market participants are exposed to unreasonable restraints on trade by virtue of the NHL's violation of Sections 1 and 2 of the Sherman Act. *Id.* at ¶ 26.

### (d)     *The NHL's Contention That Hamilton Is A "League Opportunity" Is Of No Consequence Here*

53.     In asserting that it may preclude Coyotes Hockey from relocating to Hamilton, the NHL contends that it is the exclusive owner of any expansion opportunity in southern Ontario, and that such opportunity cannot be usurped by any single member club. The NHL Constitution and the NHL By-Laws make plain -- though this Court need not decide the issue -- that the NHL does not own the right to expansion opportunities such that it may deny member teams the right to relocate.

54.     Moreover, Section 36.6 of the NHL By-Laws contemplates that even if southern Ontario is a legitimate expansion opportunity for the NHL, the proper remedy is monetary

- 30 -

damages not an injunction against the relocation. *See* NHL By-Laws § 36.6 ("Any such consent by the Member Clubs [to relocation] may be made subject to reasonable and appropriate conditions, including ***payment to the League of a transfer fee to reflect the goodwill developed by the League in the new location***.") (emphasis added). The Ninth Circuit in *L.A. Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d 1356 (9th Cir. 1986) ("Raiders II"), similarly held that any damage resulting from appropriation of the league's expansion opportunity can be remedied by monetary damages measured as the value of the NHL's alleged Hamilton expansion opportunity less the value of the Phoenix opportunity returned to the NHL.

55.     Importantly, however, the fact remains that Coyotes Hockey is not selling the right to relocate the Coyotes to another venue; it is only seeking to obtain the highest price for its assets by selling free and clear of the NHL's illegal ownership transfer and relocation restrictions. The choice of venue is ultimately for the purchaser to make. To the extent that the purchaser's choice harms the NHL's interests, this is an argument between the purchaser and the NHL that should be resolved in another forum.

### *(3)     The Court Need Not Adjudicate the Bona Fide Dispute to Approve The Sale*

56.     Under these facts and circumstances, there is no question that the legality of the NHL Interests as applied is the subject of a *bona fide* dispute. Coyotes Hockey commenced the Adversary Proceeding, which alleges specific facts and asserts legal arguments that the NHL Interests -- as applied here -- violate federal and state antitrust law. Moreover, the NHL has consistently taken the position that no relocation of the Phoenix Coyotes will occur in time to allow the PSE Sports APA to be approved (even though, at least in the *Nordiques*, the NHL was able to approve ownership and relocation within thirty days). *See* note 10, *supra*.

57.     *To determine that such a bona fide dispute exists, however, does not require that the Court make an adjudication on the underlying merits of the dispute.*  All that is needed is "an objective basis for either a factual or legal dispute" regarding the validity of the interest. *See In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2002); *accord In re Downtown Athletic Club of New York City, Inc.*, 2000 U.S. Dist. LEXIS 7917, *10 (S.D.N.Y. 2000); *In re Downour*, 2007 Bankr. LEXIS 1102, *3 (Bankr. N.D. Ohio 2007) ("A 'bona fide dispute' exists under § 363(f)(4) when there is an objective basis for either factual or legal dispute as to the validity of an interest in property"); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 229 (Bankr. S.D. Ohio 2008) (same).

58.     In other words, under this objective standard, the Court only needs to determine that a dispute exists. *See, e.g., In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991) ("Under this standard, a court need not determine the probable outcome of the dispute, but merely whether one exists"); *In re Gaylord Grain, L.L.C.*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004) ("Clearly this standard does not require the court to resolve the underlying dispute, just to determine its existence"); *In re Downour*, 2007 Bankr. LEXIS 1102, *3 (Bankr. N.D. Ohio 2007) ("The case law construing § 363(4) is uniform in holding that this standard does not require the court to resolve the dispute, just to determine its existence"); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 229 (Bankr. S.D. Ohio 2008) (same).

59.     For the NHL to suggest that there is no *bona fide* dispute ignores the Complaint, the NHL's own posture in these Cases, and this Circuit's legal precedent.  The Complaint and the facts and legal issues arising under it alone provide the bases necessary for this Court to find that the NHL's Interests are in *bona fide* dispute. *See, e.g., In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991) (holding that trustee was permitted to sell property free and clear of

interests under Bankruptcy Code § 363(f)(4) where trustee was challenging those interests in a pending adversary proceeding).

60. The court in *In re Downour*, 2007 Bankr. LEXIS 1102 (Bankr. N.D. Ohio 2007) permitted a trustee to sell real property under Bankruptcy Code § 363(f)(4) free and clear of a bank's purported lien on the property. The trustee contended that the bank's lien did not attach to the property under Ohio law because the bank's mortgage did not contain a legal description of the property. In response, the bank argued that no legal description was required under Ohio law for its lien to attach. Based on that sparse factual basis alone, the Court concluded that the validity of the bank's interest in the property was in *bona fide* dispute under Bankruptcy Code § 363(f)(4), and permitted the sale to go forward over the bank's objection. Moreover, ***the Court noted that the mere existence of the dispute was sufficient to authorize the sale, even though a final resolution of the dispute in the future would require an adversary proceeding***. *See id.* at *3-4 (citing Bankruptcy Rule 7001 for the proposition that "the validity, priority, and extent of a lien must be determined through an adversary proceeding" but approving the sale nonetheless because "[t]he very purpose of § 363(f)(4) is to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated").

61. Similarly, the Court in *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497 (Bankr. N.D. Ala. 2002) permitted a trustee to sell substantially all of a debtor's real and personal property free and clear of a government tax authority's disputed tax claims. In that case, the factual basis for the dispute consisted of competing valuations of the property for the purpose of assessing property taxes. Based on objections that were filed to the tax authority's valuations, the court concluded that a bona fide dispute existed under Bankruptcy Code

- 33 -