§ 363(f)(4), and approved the sale to the highest and best bidder under Bankruptcy Code § 363(b):

> While courts require evidence that shows that there is an "objective basis" for the dispute, the court is not required to determine the underlying dispute or determine the probable outcome, rather only that a dispute does in fact exist. As stated in the Findings of Fact above, a valid legal and factual dispute exists as to any taxes owed based upon the filed objections to the assessed values of the Property. Accordingly, pursuant to 11 U.S.C. § 363(f)(4) this sale will be allowed to proceed pursuant to the Sale Motion over any objection by any Tax Authority.

*Id.* at 507-08. *See also In re Bedford Square Assocs., L.P.*, 247 B.R. 140 (Bankr. E.D. Pa. 2000) (debtor-landlord could sell a portion of its property free and clear of restrictions in an unrecorded lease, which lease was therefore in *bona fide* dispute).

62.     Accordingly, the NHL Interests are in *bona fide* dispute under Bankruptcy Code § 363(f)(4) and as such Coyotes Hockey may sell its Assets free and clear of the NHL Interests.

## F.     Expedited Approval Of Ownership/Location Transfers on Club Relocation Has Happened Before

63.     This is not the first time a professional sports club needed to sell and relocate its club under the circumstances of a financial emergency. Coyotes Hockey's circumstances here are very similar to a case successfully resolved before the Honorable Sidney C. Volinn[12] in the United States Bankruptcy Court for the Western District of Washington in *In re Pacific Northwest Sports, Inc.*, Case No. 66822 (Bankr. W.D. Wash. 1970) (the "**Pacific Northwest Bankruptcy**").[13] The circumstances in the Pacific Northwest Bankruptcy were actually more

---

[12] The Honorable Sidney C. Volinn was originally appointed to the bankruptcy bench for the Western District of Washington in 1964. He later served as chief bankruptcy judge for the Western District. Judge Volinn was appointed a member of the Ninth Circuit Bankruptcy Appellate Panel in 1981 and soon thereafter became the presiding judge of the Ninth Circuit BAP. Judge Volinn remained the presiding judge until one year prior to his retirement from the BAP in January 1998.

[13] This Court may take judicial notice of pleadings on file in another bankruptcy court. Fed. R. Evid. 201(d); *In re Arden Props., Inc.*, 248 B.R. 164, 169 (Bankr. D. Ariz. 2000); *In re Haye v. United States*,

exigent than here. Interestingly, the buyer of assets in *Pacific Northwest Sports, Inc.* (a professional baseball team) was Allan H. "Bud" Selig, the current Commissioner of Major League Baseball. *See Selig v. U.S.*, 565 F.Supp. 524 (E.D. Wis. 1983), and is whose behalf an *amicus* brief will apparently be filed opposing the relief sought by Coyotes Hockey here.

64.     Pacific Northwest Sports, Inc. ("**Pacific Northwest**"), owned and operated the Seattle Pilots (the "**Pilots**"), a member of the American League of Professional Baseball Clubs (an unincorporated association) (the "**American League**"). On March 8, 1970, Pacific Northwest entered into an agreement (the "**Sale Agreement**") with the Milwaukee Brewers Baseball Club, Inc. (the "**Brewers**"), under which Pacific Northwest was to sell the Pilots to the Brewers. A copy of the Sale Agreement is attached hereto as Exhibit "10." The Brewers was a company controlled by Mr. Selig. *See Selig v. U.S., supra.*

65.     Under the Sale Agreement, which expired by its own terms on April 1, 1970, the purchase price for the Pilots was $10,800,000. *See* Sale Agreement, Section III, page 7. The State of Washington and the City of Seattle filed proceedings in state court against Pacific Northwest and other parties to stop the proposed sale. The state court issued a temporary restraining order preventing the transfer of the Pilots, and scheduled a hearing on a preliminary injunction for March 20, 1970. *See* "Memorandum In Opposition To Debtor's Injunction Request" dated March 24, 1970 filed in the Pacific Northwest Bankruptcy, and attached hereto as Exhibit "11" (the "**Injunction Opposition**").

66.     On March 19, 1970 -- the day before the March 20, 1970, preliminary injunction hearing scheduled by the state court -- Pacific Northwest filed its Petition for Proceedings for an Arrangement under Chapter XI of the Bankruptcy Act, which commenced the Pacific Northwest

---

461 F. Supp. 1168, 1174 (C.D. Cal. 1978) (judicial notice of certain deeds and a federal tax lien was proper, because they were recorded in a general index, were not subject to "reasonable dispute," and were capable of "accurate and ready determination").

Bankruptcy. *See* "In Proceedings For An Arrangement" dated March 19, 1970, attached hereto as Exhibit "12." Contemporaneously with commencing the Pacific Northwest Bankruptcy, Pacific Northwest also filed the "Petition For Authority For Sale And For Injunctive Relief" dated March 19, 1970 (the "**Sale and Injunction Petition**"), which sought approval of an emergency sale of the Pilots under the terms of the Sale Agreement. A copy of the Sale and Injunction Petition is attached hereto as Exhibit "13."

67.     Under the Sale and Injunction Petition, Pacific Northwest asserted that it had at least two secured creditors encumbering its assets and that the Sale Agreement, if consummated, would pay off its secured creditors in full. *See* Sale and Injunction Petition at 1:27-30 and 2:1-10. The Sale and Injunction Petition also sought an injunction against the State of Washington and the City of Seattle from continuing their state court action to stop the sale under the Sale Agreement. *See* Sale and Injunction Petition at 2:21-30 and 3:1-6. Indeed, with respect to the American League:

> By the petitioner's filing of the Petition for an Arrangement herein, the American League, under its constitution, may have the discretionary power to terminate the franchise owned by the petition. ***To preserve this asset for the benefit of the petitioner and its creditors, it is imperative that the American League be restrained from taking any action toward or in pursuit of terminating or otherwise affecting the value of the petitioner's franchise***.

Sale and Injunction Petition at 3:12-19 (emphasis added).

68.     Also on March 19, 1970, Judge Volinn issued an order to show cause why: (a) the Sale Agreement should not be consummated under its terms; (b) the entities with authority to approve a change of ownership in a member club of the American League should not be ordered to grant such approval to the contemplated transfer; (c) the entities with authority to approve the transfer of location of a franchise granted by the American League should not be ordered to grant

such approval to the contemplated transfer; and (d) the proceedings should not be expedited to preserve the asset of the Pilots' baseball club from being materially diminished. *See* "Order to Show Cause" dated March 19, 1970, attached hereto as Exhibit "14."

69.     Not surprisingly, the State of Washington and the City of Seattle opposed the Sale and Injunction Petition. *See* Injunction Opposition. They also requested that Judge Volinn not confirm the petition for bankruptcy and allow the state court proceedings to continue. *Id.*

70.     On March 25, 1970, Judge Volinn issued the "Injunction" (attached hereto as Exhibit "15"), which granted Pacific Northwest's request for injunctive relief against the State of Washington and the City of Seattle. The Injunction also provided the following:

> That the American League of Professional Baseball Clubs be and it is hereby restrained from taking any action toward or in pursuit of terminating or otherwise affecting the value of the petitioner's franchise. That the said American League and each of its members is authorized to take such steps that may be necessary in connection with the Order to Show Cause to be heard by this Court on March 30, 1970, including but not limited to, voting for the approval or disapproval of the transfer of debtor's franchise and assets, which such transfer, if approved, shall only become effective if this Court hereafter approves the proposed transfer.

Injunction, paragraph 2, page 2. In connection with its Injunction, Judge Volinn ordered the State of Washington, the City of Seattle, and any party in interest to show cause on March 30, 1970, why the motion to sell the Pilots to the Brewers should not be granted. *See* "Findings Of Fact And Conclusions Of Law," dated March 25, 1970, Paragraph 3, page 1, and attached thereto as Exhibit "16."

71.     After the March 30, 1970 hearing on the order to show cause, on March 31, 1970 -- ***a mere 12 days after the commencement of the Pacific Northwest Bankruptcy*** -- Judge Volinn issued the "Ruling Of The Court" concerning the bankruptcy and the injunction (the "**Ruling**"). A copy of the Ruling is attached hereto as Exhibit "17." The Ruling denied the

Injunction Opposition filed by the State of Washington and the City of Seattle, affirmed the Pacific Northwest Bankruptcy, and allowed the sale of the Pilots to proceed under the terms of the Sale Agreement. *All of this took place just 12 days after the commencement of the bankruptcy and just seven days before the start of the upcoming baseball season.* The Ruling is worth quoting at length here:

> It is clear that the debtor not only is in a position where it cannot pay its debts as they mature, but that it may well be insolvent in that its assets will be insufficient to pay its liabilities.
>
> \* \* \*
>
> There have been allusions to the capacity, if not the duty, of others particularly of the American League to carry on for the debtor, thereby providing surrogate assets, but this does not alter the financial condition of the debtor itself nor its obligations.
>
> The debtor has come before the Court alleging that it is in an extremely depressed financial condition. The evidence introduced herein graphically demonstrates this proposition. It has further alleged that its franchise and its properties, under the circumstances, are a wasting asset and petitions that an offer of purchase by the Milwaukee Brewers in the sum of $10.8 million dollars should be accepted. From the evidence, the Court finds and concludes that under the circumstances, the subject mater of the sale, that is the franchise, player contracts and equipment, because of the imminence of the baseball season coupled with the obvious incapacity of the debtor to function, are subject to imminent waste and depreciation and that an emergency does exist.
>
> \* \* \*
>
> The debtor is virtually without funds for further operations and is helpless with respect to obtaining more. *It can be kept alive only by virtue of limited advances from the American League, such advances being based on a presently felt need to protect the mutual interests of its constituents members.*
>
> The only real alternative thus far presented is that the American League in effect be impressed with an obligation which insofar as the undisputed record shows may involve deficit financing for a

484443.4

> proceedings should be and is approved, and that all steps necessary
> to consummate the transaction be and they are hereby authorized
> and the debtor in possession is directed to proceed thereon
> forthwith.

Ruling, 2:6-9, 13-25, 3:1-6, 21-5, 4:1-18, 5:2-6, 18-22, 6:19-25, and 7:1 (emphasis added).

72.     *Despite a 162-game season, the American League managed to change its schedule to accommodate the sale of the Pilots to the Brewers, which occurred only six days before the beginning of the 1970 baseball season on April 7, 1970.* *See* "Affidavit Of Joseph E. Cronin" dated March 23, 1970, Paragraph 8, pages 11-12; Paragraph 5, page 7, filed in the Superior Court of the State of Washington Case No. 720599, and attached hereto as Exhibit "18" (the "**Cronin Affidavit**"). The timing is noteworthy -- purchase contract signed March 8, 1970; bankruptcy filed March 19, 1970; sale approved March 31, 1970; closing occurred April 1, 1970; team moved from Seattle to Milwaukee, and *began playing* the 1970 baseball season as the Milwaukee Brewers, April 7, 1970.

73.     The facts of the Pacific Northwest Bankruptcy are virtually indistinguishable from the situation here, except that the Pilots team was rescued on a much more rapid schedule. Both the Pilots and Coyotes Hockey are undeniably insolvent. In both situations, the proposed sale would satisfy secured creditors, and in this situation unsecured creditors would receive a significant recovery as well. In the Ruling, Judge Volinn recognized that the American League's willingness to provide "surrogate assets" to the Pilots would not alter the financial condition of the Pilots. Even though the NHL has agreed to provide debtor-in-possession financing, such financing thus far only extends to June 22, 2009, and whatever its extent such financing simply increases the amount of secured debt against Coyotes Hockey, and thereby decreases the amount of recovery for unsecured creditors.

74.     Like the Sale Agreement in Pacific Northwest, which expired by its own terms less than a month after its execution, the APA must also be consummated on an expedited basis before the beginning of the upcoming professional sports season.  Furthermore, the purchase price under the APA, like the price under the Sale Agreement for the Pilots, will satisfy all secured creditors in full.  The Pilots and Coyotes Hockey each filed bankruptcy (within the Ninth Circuit) to, among other things, effectuate their sales as soon as possible.  The Pilots faced, and Coyotes Hockey faces, significant opposition from the cities hosting their respective teams.

75.     Moreover, much like Coyotes Hockey has requested that the NHL act swiftly to decide on the Applications, Judge Volinn issued an order to show cause regarding voting for the approval or disapproval of the Pilots transfer and relocation.  Judge Volinn also recognized that despite the state's and city's interests, it was inequitable to allow the American League to operate a sports club at significant losses.  That is no different here.  Despite the City of Glendale's interests in these Cases, it is simply inequitable to require Coyotes Hockey to continue in the Phoenix area for another year without a consummated sale transaction.  Additionally, the NHL has not agreed to fund the Team for a full year and pay losses.  The NHL can bid at the auction if it wants to do so (like the MLB did with the Montreal Expos).  The longer this asset continues to operate in Arizona at a loss, the more value for creditors is "cannibalized" by the unprofitable operations.

76.     One difference between the Pilots and Coyotes Hockey is that the Pilots' governing body -- the American League -- approved the sale of the Pilots some time after the bankruptcy proceeding was commenced.  This approval clearly came about only because of Judge Volinn's decisive action.  As indicated by Joseph E. Cronin, the then-President of the American League, the American League and its members on no less than four separate occasions

had asserted that it was "necessary" to keep the Pilots in Seattle and did not wish to approve the relocation. Notwithstanding these efforts, "[i]t is now acknowledged by all concerned that there is no financial means" of keeping the Pilots in Seattle. As such, Mr. Cronin eventually admitted that all obstacles to relocating the Pilots should be removed and relocation should occur prior to the start of the 1970 baseball season. *See* Cronin Affidavit, Paragraph 11, pages 14-15. Again, this relocation occurred six days before the start of the 1970 baseball season, not four months as proposed here.

77. Judge Volinn thus authorized the sale and relocation of a professional sports club less than one week prior to the start of its season. This Court can do the same, within the longer period of time before the next professional hockey season begins (in mid-October 2009). Indeed, it has happened in the NHL with the 1995 move of the *Nordiques* from Quebec to Denver. *See* footnote 10, *supra*. It is the only way to preserve value of the Assets for the benefit of creditors.

### G. The NHL Interests Are Adequately Protected

78. The NHL Interests are adequately protected under Bankruptcy Code §§ 363(e) and 361. Under Bankruptcy Code § 363(e), on request by an entity with an interest in property to be sold by the debtor-in-possession, the Court may condition such sale on providing such entity "adequate protection." Bankruptcy Code § 361, in turn, supplies three non-exclusive means for providing adequate protection in the form of either: (a) cash payments; (b) additional or replacement liens; or (c) other relief that will result in the realization by such entity of the "indubitable equivalent" of such entity's interest in the property to be sold.

### (1) Indubitable Equivalent Under Bankruptcy Code § 361(3)

79. The indubitable equivalent standard of Bankruptcy Code § 361(3) is "regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party." *Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland De. Group*, 16 F.3d 552, 564

- 42 -

(3d Cir. 1994).[16] Accordingly, "courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis." *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). Bankruptcy Code § 361 in general, and the indubitable equivalent catch all provision of § 361(3) in particular, intentionally provide judicial flexibility to ensure that creditors generally receive the benefit of their prepetition bargain. *See* House Report No. 95-595, 95th Cong., 1st Sess. 338-40 (1977) ("[s]ecured creditors should not be deprived of the benefit of their bargain"); *O'Connor*, 808 F.2d at 1396 ("[t]he whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy"). As noted in the legislative history of Bankruptcy Code § 361:

> There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternative means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

### (2) Coyotes Hockey Will Provide The NHL With The Indubitable Equivalent Of The Disputed Interests

80. The proposed sale to PSE Sports provides the NHL with the indubitable equivalent of the NHL Interests by preserving so much of the NHL's bargain as is lawful. More specifically, Sections 35 and 36 of the NHL By-Laws set forth the parameters of the bargained-for exchange between the NHL and member clubs regarding Ownership Transfer and Location Transfer of teams. The proposed sale to PSE Sports preserves the benefit of such bargain to the NHL by complying with *all* lawful applicable provisions of Sections 35 and 36 of the NHL By-

---

[16] Not to be confused with the stellar rock band, *The Indubitable Equivalents*, which play at numerous American Bankruptcy Institute events.

484443.4

Laws, including financial wherewithal and character criteria, which do not otherwise violate federal or state antitrust law. In particular, Section 35 of the NHL By-Laws, entitled "Transfer of Membership or Ownership Interest in Franchise," provides in pertinent part:

> In determining whether to consent to the sale, assignment or transfer of membership or of an ownership interest in a Member Club . . ., each Member Club shall be guided by the following considerations:
>
> (a) Whether the persons who would be holders of an ownership interest in the Member Club and the entity or entities which would hold the franchise, player contracts and/or other assets of the Member Club in question after the proposed sale, assignment or transfer, are able and willing to commit sufficient financial resources to provide for the financial stability of the franchise.[17]
>
> (b) Whether the persons who would be holders of an ownership interest in the Member Club are of good character and integrity.

Meanwhile, Section 36 of the NHL Bylaws, entitled "Transfer of Franchise Location," sets forth lengthy procedures and criteria regarding the application, investigation, presentation, and other considerations associated with an application to transfer team location. *See* Transfer Application and Relocation Application; discussion at paragraphs 29 *supra*, and 80-81 *infra*.

81.     The Transfer and Relocation Applications submitted to the NHL (and filed with this Court) provide *prima facie* evidentiary support that the proposed sale to PSE Sports complies with Sections 35 and 36 of the NHL By-Laws. At the Sale Hearing, which is tentatively scheduled for June 22, 2009,[18] all parties-in-interest will have the opportunity to object to the proposed sale under the APA (or any other sale that may surface after the bidding process). The NHL and each of its member teams will have the opportunity to be heard and

---

[17] Indeed, with Mr. Balsillie's CN $3 billion net worth, he may well be the closest thing to the mythical "Bill Gates" bidder there is (unless, of course, Mr. Gates develops an intense interest in hockey).

[18] *See* "Order: (A) Conditionally Authorizing Conduct Of An Auction Of Coyotes Hockey, LLC's Assets; (B) Establishing Procedures To Be Employed In Connection With The Sale Including Approval Of Termination Fee; And (C) Approving Form And Manner Of Notice Of Solicitation Notice " dated June 4, 2009 [Docket No. 260].

present their own evidence on lack of adequate protection. They may cross-examine the witnesses presented by the Debtors and/or PSE Sports. By complying with all of the otherwise legal transfer of ownership and relocation criteria contained in the NHL By-Laws, the proposed sale to PSE Sports is the indubitable equivalent of -- and, therefore, adequate protection of -- the NHL Interests. Indeed, PSE Sports' compliance with those provisions that do not violate federal or state antitrust law preserves the spirit of the NHL Constitution and the NHL By-Laws.

82. For these reasons, the Proposed Sale can be approved under Bankruptcy Code §§ 363(f)(4), 363(e), and 361(3).

## III. COYOTES HOCKEY MAY ASSUME AND ASSIGN EXECUTORY CONTRACTS UNDER BANKRUPTCY CODE § 365

83. A portion of the Assets Coyotes Hockey seeks to transfer may constitute executory contracts under the Bankruptcy Code. In this regard, Bankruptcy Code § 365 provides in pertinent part:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contact or lease unless, at the time of the assumption of such contract or lease, the trustee . . . (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease.
>
> * * *
>
> The trustee may assign an executory contract or unexpired lease of the debtor only if . . . (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

- 45 -

11 U.S.C. §§ 365(b)(1) and (f)(2). Accordingly, the Bankruptcy Code allows Coyotes Hockey to assign an executory contract if it properly assumes the contract under § 365(b)(1) and provides the non-debtor party to such contract (*i.e.*, the NHL) adequate assurance of future performance of such contract.

84.     Bankruptcy Code § 365(f) invalidates anti-assignment clauses in executory contracts.

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1). However, under Bankruptcy Code § 365(c):

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if -- (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment . . . .

11 U.S.C. § 365(c)(1). The NHL has argued that, notwithstanding the general rule that anti-assignment clauses are unenforceable under Bankruptcy Code § 365(f)(1), Bankruptcy Code § 365(c) prohibits the assignment of purported executory contracts in the nature of "personal services" types of contracts because: (a) the NHL has "consent rights" as set forth in Bankruptcy Code § 365(c)(1) that would prevent Coyotes Hockey from assuming and assigning the NHL Constitution and NHL By-Laws (to the extent such documents are executory contracts); and (b) there are intellectual property rights which cannot be assumed and assigned without the NHL's

484443.4

consent ("**IP Rights**"). *See also Perlman v. Catapult Entertainment (In re Catapult Entertainment)*, 165 F.3d 747 (9th Cir. 1999).

85. Implicit in the NHL's argument is the fact that that NHL ***does not consent***. It is not the existence of consent rights which precludes assignment, but the fact that the party "does not consent." The NHL's claim that no decision has been made rings hollow -- even to make the argument the NHL must agree that it does not consent. Obviously, the decision has been made by the NHL.

## A. Bankruptcy Code § 365(c) Regarding "Personal Services" Contracts Does Not Apply

### (1) The Contracts At Issue Here Are Not "Personal Services" Contracts

86. The NHL has argued that it has unfettered consent rights under "applicable law," as required under Bankruptcy Code § 365(c)(1), the NHL glosses over the essential fact that the applicable contracts do not fall within the limited exception of Bankruptcy Code § 365(c) to the broad assignment powers generally granted to a debtor under Bankruptcy Code § 365(a). In fact, the existence of *contractual* consent rights is not the test at all. Indeed, it is worth noting that even in all of the franchise cases cited by the NHL, it was not the right to consent that determined whether the contract could be assigned. Rather, in determining whether a contract falls within the Bankruptcy Code § 365(c) exception, courts have focused on whether there was applicable non-bankruptcy law (such as applicable state statutes) that prevented the assignment. *See Perlman v. Catapult Entertainment (In re Catapult Entertainment)*, 165 F.3d at 749-50; *In re Adelphia Commc'ns Corp.*, 359 B.R. 65 (Bankr. S.D.N.Y. 2007); *In re Pioneer Ford Sales, Inc.*

729 F.2d 27 (1st Cir. 1984); *Metropolitan Airports Comm'n v. Northwest Airlines, Inc.* (*In re Midway Airlines, Inc.*), 6 F.3d 492,494 (7th Cir. 1993).[19]

87.     As the *Adelphia* Court explained:

> Generally applicable laws which restrict or prohibit transfer of rights or duties under contracts (thereby excusing performance for the non-transferring party) ***independent of any restriction contained within the contract itself***, are covered by the provisions of § 365(c)(1). Thus, such laws may be enforced against the bankruptcy trustee to prohibit or restrict the trustee's attempt to assume and assign such contracts. ***However, laws for which operation of that law is dependent upon contractual provisions prohibiting, restricting, or conditioning transfer are not excepted from § 365(f)(1) by § 365(c)(1), and are not enforceable against a trustee seeking to assume and assign a contract of the debtor.***

*In re Adelphia Commc'ns Corp.*, 359 B.R. at 73-74 (transfer restrictions in cable ordinances enforced to the extent, but only the extent, to which the ordinances impose prohibitions or restrictions that are of general application, and that are independent of any restriction contained within the franchise agreement itself) (emphasis added); *see also Ford Motor Co. v. Claremont Acquisition Corp.* (*In re Claremont Acquisition Corp.*), 186 B.R. 977, 981 (C.D. Cal. 1995) (Bankruptcy Code § 365(f)(1) expressly prohibits the enforcement of contractual anti-assignment provisions in a bankruptcy proceeding, regardless of state laws validating those provisions. However, Bankruptcy Code § 365(c)(1)(A) requires the Bankruptcy Court to enforce those state laws which specifically prohibit the assignment of certain types of agreements).

88.     Here the NHL Constitution and the NHL By-Laws do not involve an ordinance or statute limiting assignment. The NHL Constitution and NHL By-Laws, even if they are

---

[19] If mere contractual consent rights were controlling, virtually every contract would fit within the parameters of § 365(c).

484443.4

executory contracts are assignable over the NHL's objection. *See, In re Adelphia Commc'ns Corp.*, 359 B.R. at 73-74.[20]

**(2)     *The NHL Previously Consented To Assignment Under Defined Terms***

89.     Even assuming, *arguendo*, that applicable non-bankruptcy law would allow the NHL to block assignment, the NHL Constitution and the NHL By-Laws expressly provide for the assignment of Coyotes Hockey's membership interest in the NHL upon the showing of specific, enumerated factors, and therefore remove them from the realm of Bankruptcy Code § 365(c).  *See* NHL By-Laws, Sections 35 and 36.  Indeed, a team owner's ability to sell the team is a huge potential economic benefit attached to membership in the NHL.  Courts have faced similar situations where the agreement at issue expressly contemplates assignment under certain defined circumstances and parameters.  For example, in *In re Quantegy, Inc.*, 326 B.R. 467 (Bankr. M.D. Ala. 2005), a patent license -- which is non-assignable absent consent under federal law -- provided the following:

---

[20] The NHL makes a weak attempt to seek refuge in Bankruptcy Code § 365(c) by pointing to many of the same cases cited herein for the proposition that a franchisor is entitled to withhold consent to assignment of a franchise agreement.  The case law cited by the NHL, however, makes it clear that Bankruptcy Code § 365(c) *only* permits a party to block assignment of a contract when applicable non-bankruptcy law, such as state law or trademark law, would permit a party from refusing to accept performance from a proposed assignee.  The NHL points to a line of cases under Bankruptcy Code § 365(c) which have upheld a franchisor's decision to withhold consent to assignment based on specific non-bankruptcy law.  *See In re Pioneer Ford Sales, Inc.*, 729 F.2d 27; *In re Claremont Acquisition, Corp.*, 186 B.R. 977; *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545 (Bankr. N.D. Cal. 1990); *In re Adelphia Commc'ns. Corp.*, 359 B.R. 65; and *In re Wellington Vision, Inc.*, 364 B.R. 129 (S.D. Fla. 2007).  However, each of these cases relies on specifically identified non-bankruptcy law, such as state statutes, local ordinances, or trademark law, to uphold a franchisor's ability to block assignment.  Then, the NHL makes a leap of faith to a number sports-law cases:  *Levin v. NBA*, 385 F. Supp. 149 (S.D.N.Y. 1974); *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986); *Prof'l Hockey Corp. v. World Hockey Ass'n*, 191 Cal. Rptr. 773 (Cal. Ct. App. 1983); *NBC v. SDC Basketball Club, Inc.*, 815 F.2d 562 (9th Cir. 1987); and *Mid-South Grizzlies v. NFL*, 720 F.2d 772 (3d Cir. 1983).  These cases have nothing to do with bankruptcy, let alone Bankruptcy Code § 365(c), and their only apparent connection to the first set of cases is the fact they use the word "franchise."  The NHL's leap of faith, however, fails to identify applicable, specific, non-bankruptcy statutes or ordinances that would permit the NHL to refuse performance from PSE Sports.

> Neither this Agreement nor any of its benefits nor any rights hereunder shall be directly or indirectly assigned, transferred, divided or shared by the [Licensee] to or with any individual, firm, corporation, or association, whatsoever, without prior written consent of the [Licensor], *except to successor, by merger or consolidation of, or to purchasers of, the entire business relating to the subject matter of this license and associated goodwill of the [Licensee]* . . . .

*Quantegy, Inc.*, 326 B.R. at 470 (emphasis added). Even though federal law excused the licensor from accepting performance without consent, the license agreement itself allowed assignment in certain circumstances:

> Even if [the Licensor] is correct, "applicable law" operates only in the absence of [the Licensor's] consent. Applicable law does not excuse [the Licensor's] performance under a contract in which [the Licensor] expressly consents to be bound to a third-party assignee. . . . The trademark and patent agreements at issue in this case authorize assignment under limited circumstances. To the extent that the debtor seeks to assign the agreements consistent with those clauses, [the Licensor] is not excused by "applicable law" from its self-imposed contractual obligations.

*Id.* at 471. Accordingly, the *Quantegy* Court found that § 365(c)(1) does not even apply when the non-debtor party gives consent to assignment in the executory agreement at issue.

90. The same result occurred in *In re Supernatural Foods, LLC*, 268 B.R. 759 (Bankr. M.D. La. 2001). In that case, the intellectual-property license stated:

> Neither this Agreement nor any portion or provision thereof may be assigned or otherwise transferred by [Licensee] without the express prior written consent of [Licensor], except incident to the sale of the substantial portion of [Licensee's] assets . . . .

*Supernatural Foods, LLC*, 268 B.R. at 803. The *Supernatural Foods* Court held that § 365(c)(1) did not apply *because* of this consent language. Section 365(c)(1) "is not applicable to prohibit assignment, if the parties have opted out of the generally applicable law prohibiting assignment, as long as the contractual assignability is enforceable under applicable non-bankruptcy law." *Id.* at 805. The *Supernatural Foods* Court went on to state:

- 50 -

> Once it is determined that applicable law does not excuse performance or acceptance of performance, the contract is viewed through the lens of § 365(f)(1), which clears the field of any purported restrictions on the trustee's right to assign. If there is no enforceable applicable law prohibiting assignment or examining the acceptance of performance, § 365(f)(1) controls the enforceability of transfer restrictions, and nullifies them.

*In re Supernatural Foods, LLC*, 268 B.R. at 806.

91.    The Seventh Circuit in *In re Midway Airlines, Inc.*, 6 F.3d 492 (7th Cir. 1993), confronted a similar issue regarding an airline-gate lease. The gate lease, which was non-assignable under non-bankruptcy law absent consent, specifically contemplated the valid assumption and assignment of the lease in a bankruptcy proceeding. When the debtor sought to assume and assign the gate lease, the Seventh Circuit found that "the language of Midway's gate lease does not prohibit or restrict anything or *merely* fail to prohibit or restrict anything; instead, this language affirmatively relieves this gate lease assignment of lease provisions otherwise applicable." *Midway Airlines, Inc.*, 6 F.3d at 497 (emphasis in original).

92.    Here, the NHL Constitution and the NHL By-Laws specifically contemplate consent to both an Ownership Transfer and Location Transfer (as discussed at length in paragraph 12 *supra)*, and under specific, enumerated circumstances. The identity of the party is nowhere limited. Article 3.5 of the NHL Constitution provides the following:

> *Transfer of Membership or Ownership Interest in a Member Club.* No membership or ownership interest in a Member Club may be sold, assigned or otherwise transferred except (a) with the consent of three-fourths of the members of the League, and (b) upon the condition that the transferee will at all times be bound by and comply with the terms, provisions and conditions of this Constitution, and (c) upon the further condition that the transferee shall assume or guarantee all debts, liabilities, and obligations of the transferor member existing at the date of transfer. Application for the sale, transfer or assignment of a membership or ownership interest must be made in writing to the Commissioner. Upon receipt of such application, the Commissioner shall conduct such investigation he deems appropriate. Upon completion of the

- 51 -

484443.4

investigation, the Commissioner shall submit the application to the members for approval, together with his recommendations thereon and all such information that the Commissioner deems pertinent.

NHL Constitution, Article 3.5, page 4. The NHL By-Laws further contemplate consent to assignment:

In determining whether to consent to the sale, assignment or transfer of a membership or of an ownership interest in a Member Club pursuant to Section 3.5 of the [NHL Constitution], each Member Club shall be guided by the following considerations: (a) Whether the persons who would be holders of an ownership interest in the Member Club and the entity or entities which would hold the franchise, player contracts and/or other assets of the Member Club in question after the proposed sale, assignment or transfer, are able and willing to commit sufficient financial resources to provide for the financial stability of the franchise; [and] (b) Whether the persons who would be holders of an ownership interest in the Member Club are of good character and integrity.

NHL By-Laws, Section 35.1, page 109.

93. Under these circumstances, even if applicable law would protect the NHL from assignment of rights under the NHL Constitution and the NHL By-Laws over their consent, the NHL Constitution's and the NHL By-Laws' own terms set forth a process for consent and the conditions for giving such consent. These documents provide for specific consent to assignment under certain conditions, and the identity of the assignee is not limited in any way. While the assignee's financial wherewithal and character may be an important consideration, that consideration does not depend on the identity of the assignee. As such, § 365(c) does not apply and § 365(f)(1) would strike the anti-assignment language. *See Quantegy*, 326 B.R. at 470-71 (consent to assignment in context of successor, merger, consolidation, or to purchasers of entire business); *Supernatural Foods*, 268 B.R at 803 (consent given if sale of substantial portion of assets); *Midway Airlines*, 6 F.3d at 497 (consent given if adequate assurance of future performance of gate lease provided); *and see In re Hernandez*, 285 B.R. 435, 441 (Bankr. D.

- 52 -

Ariz. 2002) (because contemplated assignment was not within the guidelines of the contract at issue, consent provision in that contract did not fall within *Supernatural Foods* and *Midway Airlines* circumstances).

94.     Accordingly, neither § 365(c) nor *Catapult* allows the NHL to block the assumption and assignment of the NHL Constitution and the NHL By-Laws (to the extent such documents are executory contracts).

## B.     The NHL's IP Rights Argument Is Misguided

95.     Citing *Catapult* and Bankruptcy Code § 365(c), the NHL has argued that Coyotes Hockey cannot assume and assign agreements governing the intellectual property rights of the NHL (*e.g.*, the NHL logo, Stanley Cup marks, etc.) (collectively, the "**League Marks**"). The NHL is mistaken. The issue has nothing to do with Bankruptcy Code § 365(c). To the best of Coyotes Hockey's knowledge, there is no license between Coyotes Hockey (as licensee) and the NHL (as licensor), under which Coyotes Hockey licenses the League Marks from the NHL. In fact, as a matter of applicable non-bankruptcy law, the NHL itself cannot own intellectual property rights.

### (1)     *Unincorporated Associations Do Not Own Intellectual Property - Its Members Do*

96.     The NHL is, according to the NHL Constitution, an "unincorporated association not for profit."[21] The NHL consists of thirty member clubs, including Coyotes Hockey. It is axiomatic that an unincorporated association is not a legal entity that is separate from its members. Indeed:

> [It is] a group of persons formed without corporate charter for the purpose of promoting a common enterprise or objective. By definition, it is not a partnership, since the profit motive is absent. An association that is organized for benevolent, political, social, or civic purposes is also not an artificial person

---

[21] *See also*, Daly Declaration, Paragraph 2, page 1.

like a corporation, which has an existence independent from its members. Absent statutory authority to the contrary, property ownership by an unincorporated association is impossible because only an entity with a recognized legal existence may own and possess property.

Matthew Bender & Company, Inc., *1-13 Business Organizations with Tax Planning § 13.01* (2009).

97.     The NHL Constitution and the NHL By-Laws do not declare the laws of the state under which the unincorporated association operates, but the NHL maintains its headquarters in New York. Assuming New York law applies, there is no New York statute conferring upon unincorporated associations the right to own property.[22] ***Because an unincorporated association in New York does not have legal status to own property, property ownership is vested in that unincorporated association's members, unless otherwise agreed under that association's charter documents (such as a constitution and by-laws).*** Applying New York law, one New York state court held the following:

> As Local 906A was an unincorporated association and there is no applicable statute making it an entity with capacity to take and hold property, ***the property which it nominally and ostensibly held as its own was in reality the property of its members -- unless there be something in the constitution of RCIA which provides to the contrary.*** The members' ownership of the property was of course, an ownership as members of such unincorporated association that is a right to the joint use and enjoyment thereof while a member and a right to a distributable share upon dissolution, and when any individual ceased to be a

---

[22] *See* "General Associations Law" of the Consolidated Laws of New York. Sections 12 and 13 of the General Associations Law provide for actions or proceedings by or against unincorporated associations, but the General Associations Law does not provide for property ownership by an unincorporated association. ("An action or special proceeding may be maintained, by the president or treasurer of an unincorporated association to recover any property, or upon any cause of action, for or upon which all the associates may maintain such an action or special proceeding, by reason of their interest or ownership therein, either jointly or in common") § 12. Other states similarly provide that an unincorporated association is a legal entity for some purposes and not for others. *See Krumbine v. Leb. County Tax Claim Bureau*, 541 Pa. 384, 389 (1995) ("[S]ee *Pa. R.C.P. 2153(a), (c)*, Actions against [Unincorporated] Associations, which authorizes civil legal action against a Pennsylvania unincorporated association in its own name. Accordingly, for purposes of suit, the law treats unincorporated associations as a separate legal entity. See also *Pa. R.C.P. 2152*, Actions by [Unincorporated] Associations, which limits civil legal action by a Pennsylvania unincorporated association only in the name of a member or members as trustees *ad litem* for such association.").

member, by resignation or expulsion before dissolution, his interest in the property ended; and of course a mere majority of the members could not by their own act transfer the property to another organization.

*Suffridge v. O'Grady*, 84 N.Y.S.2d 211, 216 (N.Y. Sup. Ct. 1948) (reviewing the property ownership of a labor union) (emphasis added); *see also Bradley v. O'Hare*, 202 N.Y.S.2d 141, 153 (Sup. Ct. N.Y. App. Div. 1960) ("[T]itle to assets held by an unincorporated association is not vested in the 'entity.' The association has no capacity to receive or hold title. Instead, title is vested in the form of undivided interests in the members").[23]

98.     Neither the NHL Constitution nor the NHL By-Laws mention anything about intellectual property rights. There are no provisions allowing the NHL to own intellectual property. As such, the League Marks are owned collectively by the member clubs of the NHL, *which includes Coyotes Hockey*. Courts have recognized this very fact. *See, e.g., Donatelli v. National Hockey League*, 893 F.2d 459, 461-62 (1st Cir. 1990) (National Hockey League Services, Inc., was then the "assignee of the NHL logo (*which the teams collectively own*)") (emphasis added).

---

[23] Other jurisdictions have passed statutes which allow for an unincorporated association to own property. For instance, *Save-A-Patriot Fellowship v. United States*, 962 F. Supp. 695, 699 (D. Md. 1996), applying Maryland law, held that "There is little precedent -- in Maryland law or elsewhere -- regarding property ownership by unincorporated associations. Presumably, those organizations that have significant assets find it beneficial to formalize their status, as a corporation, trust or other entity. However, the Court can take judicial notice of the fact that there are a multitude of unincorporated associations that function in spite of their informality." The District Court went on to find that the Maryland legislature has recognized that an unincorporated association can own property in its own right. However, the District Court cited several cases which held that unincorporated associations cannot own property. *See Krumbine* at 389: "Absent express statutory authority, however, an unincorporated association is not a legal entity; it has no legal existence separate and apart from that of its individual members. In turn, only an entity with a recognized legal existence may own and possess property." *See also Rock Creek Gardens Tenants Assoc. v. Ferguson*, 404 A.2d 972, 973 (D.C. App. 1979) ("A voluntary unincorporated association may be nothing more than individuals joining together based merely on common purpose or interest. Thus, it is a maxim of the common law that, in the absence of statutory authority, such an association has no legal existence independent of those members who comprise the organization. Such being the case, the association at common law cannot, in its own name, (1) enter into contracts, (2) take, hold, or transfer property, or (3) sue or be sued.") (applying D.C. law).

99.     This makes complete sense.  As set forth in *Madison Square Garden, L.P. v. NHL*, 2008 U.S. Dist. LEXIS 80475, \*5 (S.D.N.Y. Oct. 10, 2008), the member clubs, including Coyotes Hockey, created NHL Enterprises, L.P. (the "**NHLE**"), to license the League Marks and individual team marks.  In this regard, the NHL, as an unincorporated not-for-profit association, entered into that certain "License Agreement" effective July 1, 1996 (the "**License Agreement**"), which is attached hereto as Exhibit "19."

100.    As set forth in the License Agreement, the NHL (again, as an unincorporated not-for-profit association) purports to "own" certain "League Symbols" (*e.g.*, conference logos, NHL slogans and logos, the League awards, and trophy and program names).  As a matter of law, because the NHL Constitution and the NHL By-Laws do not grant such ownership authority, it is the member clubs, and not the NHL, that *in fact* own the League Symbols.  Under paragraph 2 of the License Agreement, the NHL granted NHLE -- not Coyotes Hockey -- the nonexclusive right to and license to use and sublicense to others, those League Symbols.  The NHLE in turn granted the NHL (more accurately, the 30 member clubs, because the NHL cannot own intellectual property as discussed above) the nonexclusive right and license to use to certain "Team Symbols" owned by the NHLE (*e.g.*, logos of individual member teams and mascots).  *See* License Agreement, ¶2(a), (b) at page 4.

101.    Contemporaneously with the License Agreement, the NHLE and the member clubs, and presumably Coyotes Hockey, executed a certain "Member Club Agreement," which presumably granted the NHLE a license to use the Team Symbols.[24]

---

[24] The only intellectual property agreement in Coyotes Hockey's possession is the License Agreement, and that was obtained by virtue of that agreement being attached to the Daly Declaration.  If necessary, Coyotes Hockey reserves the right to supplement this section of the Brief after Coyotes Hockey has obtained copies of all relevant agreements governing this issue.  Interestingly, a complete review of all documents at the Coyotes Hockey offices revealed no license agreements other than the License Agreement discussed above.

102. ***As such, it is the member clubs, like Coyotes Hockey, that own the League Marks and their individual team marks.*** The NHL cannot and does not own any intellectual property rights. [25] The separate member clubs, including Coyotes Hockey, are the rightful owners of intellectual property. The NHLE (owned by the member clubs) was merely created to facilitate the licensing of League Marks and team marks.

103. Coyotes Hockey's transfer of its rights to use the League Marks and its own team marks is not a Bankruptcy Code § 365 issue -- it is a Bankruptcy Code § 363 issue. The League Marks and its own team marks belong to Coyotes Hockey by virtue of its ownership in NHLE, which ownership interest is property of Coyotes Hockey that can be sold.

### (2)  The NHL Previously Consented To Assignment Of The League Marks

104. Even assuming, *arguendo*, that there were one or more license agreements between Coyotes Hockey (as licensee) and the NHL (as licensor) that somehow placed the NHL within the realm of § 365(c) and *Catapult*, the NHL previously consented to the assignment of such license agreements. The applicable documents that would ultimately govern Coyotes Hockey's rights to use the League Marks are either expressly subject to the NHL Constitution and NHL By-Laws, or such documents must, as a practical matter, be subject to the NHL Constitution and NHL By-Laws.

105. As set forth above, Articles 4.2 and 4.3 of the NHL Constitution and Sections 35 and 36 of the NHL By-Laws contemplate, and in fact, allow assignment of a member club's membership interest in the NHL and relocation of a hockey team under certain conditions.

---

[25] The NHL purports to be the registered "owner" of many trademarks and service marks on the applicable federal registry. As set forth above, because the NHL Constitution and the NHL By-Laws confer no such right on the NHL, the member clubs -- including Coyotes Hockey -- are the rightful owners of those registered rights.

Explicit in that must be the consent to transfer intellectual property rights. The License

Agreement makes this abundantly clear. As set forth in the License Agreement:

> League Constitution and Agreements. The parties hereto hereby
> recognize all League rules, regulations and policies heretofore
> adopted which relate to the subject matter of this agreement, and
> acknowledge and agree that notwithstanding any term or provision
> of this Agreement to the contrary, the terms and provisions of this
> Agreement are subject to (i) the [NHL Constitution] and
> Agreements as in effect on the date hereof, and (ii) such [NHL
> Constitution] and Agreements as may be adopted or amended after
> the date hereof with the consent of not less than three-fourths (3/4)
> of the Member Clubs.

License Agreement, Paragraph 10(h), page 15. Moreover, Section 35 of the NHL By-Laws

provides:

> Any consent by the Member Clubs may be made subject to
> appropriate conditions, including but not limited to some or all of
> the following: . . . (b) Provisions with respect to those debts,
> liabilities and obligations of the transferor member which are to be
> assumed, guaranteed or otherwise provided for by the transferee
> (including, for example, notes or other obligations payable to the
> League, payable to one or more Member Clubs, player contracts or
> deferred compensation agreements with players or other personnel)
> and specifying the manner in which such obligations will be
> assumed, guaranteed, paid or otherwise provided for. . . . [and] (f)
> Provisions specifying agreements to which the NHL or its Member
> Clubs are a party which are to be assumed and performed by the
> transferee.

NHL By-Laws, Section 35.2(b), page 109. Section 35, therefore, requires that the transferee of a

membership comply with the obligations with the NHL, which would include any intellectual

property agreements between the NHL and the member club transferred.

106. Just like the *Quantegy*, *Supernatural Foods*, *Midway Airlines*, and *Hernandez*

cases and analysis provided above, the NHL contemplated consenting to the transfer of the

League Marks in the NHL Constitution and the NHL By-Laws. *See* discussion in paragraphs 89

through 94, *supra*. Accordingly, there is no *Catapult* or Bankruptcy Code § 365(c) issue here

with respect to the League Marks, even if Coyotes Hockey were the licensee of such intellectual property (which Coyotes Hockey believes it is not).

107. This makes sense from a practical perspective. If a transfer and relocation of Coyotes Hockey's membership interest in the NHL is appropriate under Bankruptcy Code § 363, then the same transfer of its right to use the League Marks is *ipso facto* appropriate. Indeed, it simply makes no sense if a member club's interest could be transferred to a purchaser under the NHL Constitution and the NHL By-Laws (taking into consideration the effects of the Bankruptcy Code and federal and state antitrust considerations), but that member club could not at the same time transfer the right to use the League Marks. This is especially true given the NHL's contention that a team cannot possibly operate without use of the NHL's intellectual property, as asserted without basis by the Daly Declaration.[26]

**C.    The Proposed Sale Complies With The Business Judgment Standard Under Section 365**

108. As set forth above, under Bankruptcy Code § 365(f), an executory contract may be assigned if it is properly assumed. It is axiomatic that if a debtor meets the requirements to assume and assign, the Court should approve assumption and assignment in accordance with the business judgment rule.

109. Under Bankruptcy Code § 365(a), a debtor in possession "may assume or reject any executory contract or unexpired lease of the debtor" on court approval. 11 U.S.C. § 365(a). A debtor should be authorized to assume and assign an executory contract where it appropriately exercises its "business judgment." *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul, & Pacific RR Co.*, 318, U.S. 523, 550 (1943) ("the question whether a lease

---

[26] "A franchise that has not been granted the right to use these essential names . . . or representations . . . could not exist or operate as an 'NHL hockey team' or, practically speaking, play as part of the League in its regular season, Playoffs or Stanley Cup Final." Daly Declaration at 5:4-7.

should be rejected and, if not, on what terms it should be assumed is one of business judgment");
*In re Chi-Feng Huang*, 23 BR. 798, 800 (B.A.P. 9th Cir. 1982); *Sharon Steel Fuel Gas Distrib. Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Orion Pictures v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993). The "business judgment" test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor's estate. *See, e.g., In re Chi-Feng Huang*, 23 B.R. at 801 ("[t]he primary issue is whether rejection would benefit the general unsecured creditors"); *In re Trans World Airlines, Inc.*, No, 01-0056, 2001 Bankr LEXIS 722, at *7-8 (Bankr. D. Del. Mar. 16, 2001) (noting that the standard under § 365 requires consideration of the benefit of the rejection to the debtor's estate).

110.     Courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease. *See, e.g., Durkin v. Benedor Corp. (In re G.I. Indus.)*, 204 F.3d 1276, 1282 (9th Cir. 2000) (bankruptcy court need engage in "only a cursory review of a [debtor-in-possession's] decision to reject the contract"); *see also Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007) (same); *Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) ("court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . "). Similarly, a debtor exercises appropriate business judgment absent bad faith or an abuse of business discretion. *See, e.g., In re Trans World Airlines, Inc.*, 261 B.R. at 121 ("[a] debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice'") (quoting *Wheeling-Pittsburgh Steel Corp. v. West Penn Power*

*Co. (In re Wheeling Pittsburgh Steel Corp.)*, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987);

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985) (superseded by statute, as stated in *Newman Grill Sys., LLC v. Ducane Gas Grills, Inc. (In re Ducane Gas Grills, Inc.)*, 320 B.R. 324, 338 (Bankr. D.S.C. 2004); *In re G Survivor Corp.*, 171 BR. 755, 757 (Bankr. S.D.N.Y. 1994).

111.    The Debtors' decision to assume and assign the NHL Constitution and the NHL By-Laws (to the extent they are executory contracts) satisfies the business judgment standard and should be afforded appropriate deference by the Court.  Coyotes Hockey's decision to assume and assign the NHL Constitution and the NHL By-Laws as part of the proposed sale to PSE Sports provides benefit to these estates by permitting Coyotes Hockey to realize the highest and best value for the Assets.  Furthermore, the assumption and assignment of the NHL Constitution and the NHL By-Laws is a requirement of the proposed sale to PSE Sports, because PSE Sports' offer contemplates purchasing a full-fledged participating membership in the NHL.  As a result, Coyotes Hockey's business decision to assume and assign the NHL Constitution and the NHL By-Laws should be approved in order to realize the highest and best offer Assets.

**D.    The Debtors Will Be Able To Demonstrate Adequate Assurance Of Future Performance**

112.    A debtor-in-possession wishing to assign an executory contract must provide "adequate assurance of future performance by the assignee of such contract . . . ."  11 U.S.C. § 365(f)(2)(B).

113.    The Bankruptcy Code does not provide a definition of adequate assurance which applies to general executory contracts,[27] but in the absence of a definition, courts are "counseled

---

[27] The Bankruptcy Code does provide a precise definition for adequate assurance in the narrow context of a shopping center lease, but the factors identified in that definition are irrelevant in this context.  11 U.S.C. § 365(b)(3).

484443.4

to give the phrase a pragmatic construction." *In re Martin Paint Stores*, 199 B.R. 258, 263 (Bankr. S.D.N.Y 1996); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985) (tracing the phrase adequate assurance to § 2-609(1) of the Uniform Commercial Code and noting the phrase is "intended to be given a practical, pragmatic construction"). *Id.* Adequate assurance is to be defined by commercial rather than legal standards and based on factual conditions; while satisfaction must not be arbitrarily or capriciously withheld. *Id.* (quoting and discussing legislative history of Bankruptcy Code § 365 and UCC § 2-609(1)); *In re U.L. Radio Corp.*, 19 B.R. 537, 541-45 (Bankr. S.D.N.Y. 1982) (same). "At a minimum, the primary focus of adequate assurance concerns the assignee's ability to fulfill the financial obligations under the [contract]." *In re Martin Paint Stores*, 199 B.R. at 263; *In re U.L. Radio Corp.*, 19 B.R. at 542; *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d at 1310 (identifying three common factors considered by courts all of which primarily focus on the ability to fulfill financial obligations: (1) ability to generate sufficient income to meet obligations; (2) economic outlook for the industry; and (3) presence of a guarantee).

114.    At the core of the NHL's argument is the proposition that there can never be adequate assurance of future performance under the NHL Constitution and NHL By-Laws (to the extent these are executory contracts) because each and every provision of those agreements must be fully honored and complied with (even, presumably, those provisions which the NHL does not honor as a matter of "policy"). Put another way, the NHL asks how can PSE Sports adequately assure future performance of ownership of the Phoenix Coyotes when it wants to play in Hamilton, Ontario? The resolution of this issue is straightforward -- the NHL is entitled to adequate assurance of future performance of the lawful provisions of the contracts, and it will be so protected and assured.

*(1)*    ***PSE Sports Will Meet All Objective Economic, Financial And Character Criteria For Ownership/Location Transfers***

115.    The ability of PSE Sports as assignee of the NHL Constitution and the NHL By-Laws to fulfill the financial obligations under those agreements is literally a non-issue in these Cases.    The Transfer Application and Relocation Application submitted to the NHL in accordance with Sections 35 and 36 of the NHL By-Laws provide substantial, *prima facie*, evidentiary support of PSE Sports' (and ultimately, Mr. Balsillie's) uncontested financial wherewithal, including detailed financial information.    Indeed, if Mr. Balsillie is not the mythical "Bill Gates" bidder, he is at least the economic equivalent of a first cousin.

116.    Coyotes Hockey, PSE Sports, and Mr. Balsillie, however, have gone well beyond merely demonstrating financial wherewithal in the context of providing adequate assurance of future performance.    As noted earlier, the parties have submitted a Transfer Application and a Relocation Application under Sections 35 and 36 of the NHL By-Laws.    The pragmatic objective of these Applications and Sections 35 and 36 of the NHL By-Laws is to provide the NHL and member clubs with adequate assurance of future performance.    To that end, the Applications are themselves *prima facie* evidence, under the NHL's own standards, of adequate assurance of future performance.

117.    Moreover, the submitted Applications illustrate PSE Sports' intent and ability to satisfy and comply with each and every provision of the NHL Constitution and NHL By-Laws which do not otherwise violate federal and state antitrust law, including those provisions related to transfer of ownership and relocation.    The Applications make it abundantly clear that PSE Sports does not seek an exception from those provisions of the NHL Constitution and the NHL By-Laws that are otherwise legal and enforceable; nor does PSE Sports desire some permanent exception from the NHL Constitution and the NHL By-Laws.    PSE Sports only seeks temporary

484443.4

relief from the isolated provisions of those documents which, as applied in these circumstances, are illegal under applicable non-bankruptcy law.

118.    Mr. Basillie goes further than that in his sworn Declaration:

> I have welcomed the opportunity to provide all the information and applications required of a good NHL owner, who will work with the League and other Clubs within the rules. *I will sign a standard Consent Agreement and other standard NHL member/owner forms, modified as appropriate for the home territory I am seeking.*

"Declaration of James Balsillie" dated June 4, 2009, ¶12 at 3 (emphasis added), a copy of which is attached hereto as Exhibit "20."

119.    Notwithstanding those NHL provisions which violate applicable non-bankruptcy law, the Applications provide substantial evidentiary support for PSE Sports' good faith intent to perform under the NHL Constitution and the NHL By-Laws. For example, as required under Section 35-1(a) of the NHL By-Laws, the Transfer Application includes numerous documents regarding the character and integrity of Mr. Balisille as a proposed holder of an ownership interest in a NHL member club. Similarly, under Section 36.5 of the NHL By-Laws, the Applications contain substantial and thorough analyses of the numerous "considerations" associated with relocation of a team. The Relocation Application further provides documents analyzing the suitability and feasibility of hockey operations in Hamilton, Ontario including, but not limited to, demographics, arena suitability and availability, and local government support.

120.    In light of the evidence submitted as part of the Applications, Coyotes Hockey submits that PSE Sports and Coyotes Hockey have provided a pragmatic and complete showing of adequate assurance of future performance. More specifically, the Applications demonstrate PSE Sports' financial wherewithal and PSE Sports' intent and ability to comply with all otherwise legal and enforceable provisions of the NHL Constitution and the NHL By-Laws. In

this regard, and if necessary, Coyotes Hockey is prepared to make any additional formal evidentiary showing regarding PSE Sports' adequate assurance of future performances as circumstances may require.

121. In light of the foregoing, Coyotes Hockey submits that it has made a *prima facie* showing of adequate assurance of future performance under Bankruptcy Code § 365(f).

### (2) Adequate Assurance Of Performance Of Unlawful Contractual Restrictions

122. As set forth above, Coyotes Hockey and PSE Sports have submitted, and will if necessary, submit additional, evidentiary support that the NHL will have adequate assurance of future performance from PSE Sports with respect to assumed and assigned executory contracts. However, the Court has authority to refuse enforcement of terms of a contract for purposes of assumption and assignment. For example, in *In re U.L. Radio Corp.*, 19 B.R. 537, 544 (Bankr. S.D.N.Y. 1982), the debtor sought to assume and assign a lease containing a provision that only allowed the lessee to use the premises for television service and the sale of electrical appliances (the "**Use Clause**"). Under the circumstances facing the *Radio Corp.* Court, the proposed assignment would have provided the debtor with monthly payments of $2,000, and would have provided 100% recovery to unsecured creditors.

123. After determining that the debtor satisfied the adequate assurance of future performance provisions of Bankruptcy Code § 365, the Court went on to discuss the proposed assignment's effect on the Use Clause. The Court rejected the narrow view that a court could only invalidate *ipso facto* or anti-assignment clauses under Bankruptcy Code § 365. *Id.* at 543. The Court noted that "even under the tightly drawn definition of adequate assurance in the shopping center case, Congress did not envision literal compliance with all lease provisions . . . ." *Id.* at 544 (contrasting the "mere" adequate assurance language of § 365 with the "stringent"

requirements for unimpaired claims under Bankruptcy Code § 1124 as evidence that literal compliance with all provisions of a contract was not required under § 365). In arriving at its decision to permit deviations from the Use Clause, the Court noted, among other things, that the landlord had failed to demonstrate any actual and substantial detriment that would occur with the failure to enforce the Use Clause. The court concluded: *"[The] provision of adequate assurance of future performance does not require an assignee's literal compliance with each and every term of the lease. The Court may permit deviations from strict enforcement of any provision including a use clause."* *Id.* (emphasis added).

124. The Court in *In re Rickel Home Centers, Inc.*, 240 B.R. 826 (D. Del. 1998), similarly provided relief from certain lease provisions to clear the path for the debtor to assign leases. In *Rickel Home Centers*, the court excised certain assignment and subletting provisions in order to allow the debtor to assign the leases, however, landlords objected that permanent excise of the assignment and subletting provisions would deny them the ability to reasonably control subsequent assignment or subletting by the new tenant. *Id.* at 836-37. Accommodating the landlords' objections, the court temporarily set aside the assignment and subletting provisions to allow the debtor to effectuate assignment to the assignee but expressly noted that the assignment and subletting provisions would remain in effect and apply to the assignee thereafter *Id.*

125. Similarly, a debtor-in-possession need not assume and assign invalid or illegal provisions contained in an executory contract. *See, e.g., In re Boogaart of Florida, Inc.*, 17 B.R. 480, 486 (Bankr. S.D. Fla. 1981) ("The spector *[sic]* of a possible violation of the antitrust laws militates against the Court's giving effect to the [anti-transfer] provisions"); *In re Paul Harris Stores*, 1992 Bankr. LEXIS 2418, *22 (Bankr. S.D. Ind. 1992) (upholding transfer of lease to

party which would comply with all terms of the lease except those terms that were unenforceable as against public policy or the Bankruptcy Code); *see also* David B. Simpson, *Leases and the Bankruptcy Code: Tempering the Rights of Strict Performance*, 38 Bus. Law. 61 (1982) (analogizing certain legal and equitable principles that have been recognized in non-bankruptcy situations to support the proposition that Bankruptcy Courts, as courts of equity, have authority to waive strict enforcement of each and every term of a lease).

126.    In *Boogaart*, a sublessor objected to the debtors' plan to assume and assign certain retail store leases claiming that the assignment violated "tying" provisions of the lease and sublease that obligated the lessor to purchase consulting and other services from the sublessor.  17 B.R. at 485-86.  The Court allowed assumption and assignment of the lease, giving no effect to the tying provisions because such provisions may violate antitrust laws.  *Id.* at 486.

127.    In *Paul Harris Stores*, a landlord objected to the debtor-tenant's assumption and assignment of a lease.  1992 Bankr. LEXIS 2418 at *7.  The court upheld the assumption and assignment because the assignee would comply with all provisions of the lease except for those provisions which were "thinly veiled 'anti-assignment' clauses which are intended to circumvent the assignability provisions of the Bankruptcy Code."  *Id.* at *23-24.

128.    Bankruptcy courts have the power to refuse to enforce all of the terms of an executory contract and to allow the assumption of a lease despite less than literal compliance with all of the lease terms.  *In re Vista VI, Inc.*, 35 B.R. 564 (Bankr. N.D. Ohio 1983) (refusing to enforce a use restriction in a lease).  Generally, provisions that have the effect of prohibiting or hindering assignments are unenforceable.  *In re Bradlees Stores, Inc.*, 2001 Bankr. LEXIS 2192 (Bankr. S.D.N.Y. 2001); *see In re Standor Jewelers West, Inc.*, 129 B.R. 200, 201 (B.A.P. 9th Cir. 1991) (affirming the bankruptcy court's determination that a provision in a commercial

lease, requiring the lessee to give the landlord seventy-five percent of the appreciation value of the lease as a condition of assignment, was invalid under § 365(f)(1)).  Accordingly, courts have consistently looked beyond the literal wording of a contractual provision to determine whether it operates as a *de facto* anti-assignment clause because such clauses restrict the ability of the bankruptcy trustee to realize the full economic value upon assignment under § 365(f)(1).  *In re Crow Winthrop Operating P'ship*, 241 F. 3d 1121 (9th Cir. 2001); *see also In re Sambo's Restaurants, Inc.*, 24 B.R. 755 (Bankr. C.D. Cal. 1982) (refusing to enforce cross-default provisions under a lease finding that "any contractual restriction on assignment other than those specified in § 365(c) is proscribed by §365(f)"); *In re U.L. Radio Corp.*, 19 B.R. at 543 (refusing to strictly enforce a use clause in a lease, the court held that "any lease provision, not merely one entitled 'anti-assignment clause' [is] subject to the court's scrutiny regarding its anti-assignment effect").

129.   In *Crow Winthrop*, the debtor assigned a settlement agreement that allowed an affiliate of the debtor to manage the common areas and parking of certain office buildings.  The settlement agreement included a change of ownership term providing that the parking and management provisions would terminate if the debtor no longer owned the facility.  Even though, theoretically, the settlement agreement could be assigned without a change in ownership, the court found that practically speaking the parking and management rights under the settlement agreement were interwoven with the rights of the owner of the facility.  *Crow Winthrop*, 241 F.3d at 1124.  Therefore, the court held that enforcement of the change in ownership term would significantly reduce, if not altogether eliminate, the debtor's ability to realize the full value of its assets in conflict with fundamental bankruptcy policy.  *Id.* at 1124.  The Court concluded that a

contractual provision that restricts or conditions the ability of a debtor to realize the maximum value of its lease upon assignment is unenforceable under § 365(f). *Id.* at 203.

130.    Courts in other cases have used similar reasoning to invalidate clauses that restrict assignment of a debtor's lease or executory contract. *In Re Howe*, 78 B.R. 226 (Bankr. D. S.D. 1987) (Section 365(f)(1) precludes enforcement of a four percent assumption fee provision paid for by the purchaser in a contract for deed, noting that clear congressional intent favored assumption and assignment of leases and executory contracts, even though this may mean that "it may be necessary to compromise private rights which may conflict with the debtor's ability to receive the full benefit" of the sale); *In re Mr. Grocer, Inc.*, 77 B.R. 349 (Bankr. D. N.H. 1987) (plain statutory language of § 365(f)(1) prohibited any lease clauses that condition or restrict the assignment of any lease, and rendered the right of first refusal clause unenforceable); *In re David Orgell, Inc.*, 117 B.R. 574 (Bankr. C.D. Cal. 1990) (provisions in long-term commercial leases that allow for an increase in rent to market rate upon assignment of the lease held to be unenforceable).

131.    As set forth above, portions of what may be executory contracts are in *bona fide* dispute, in that they may violate federal and state anti-trust laws. The NHL's actions under the facts and circumstances of these cases are violative of state and federal antitrust law. *See* discussion at paragraphs 16 through 55, *supra*. These allegations are not generalized assertions, but specific and tenable. The same bankruptcy policy that allows sales free and clear of interests upon the finding of a *bona fide* dispute under Bankruptcy Code § 363 should apply equally here. Under *Boogaart* and the legal authority cited above, Coyotes Hockey need not assume and assign those portions of executory contracts that may violate federal or state anti-trust law. As such, Coyotes Hockey would not be "cherry-picking" portions of purported executory contracts.

Coyotes Hockey merely seeks to assume and assign all portions of an executory contract that are valid and enforceable under applicable law -- it would not assume and assign portions that violate antitrust laws or public policy, nor would a court countenance assumption and assignment of such illegal provisions.

132.    The result here makes sense.  If Coyotes Hockey could sell its property free and clear of NHL Interests that are in *bona fide* dispute, then it follows (under *Boogart* and the authority cited above) that Coyotes Hockey should be able to assume and assign contracts related to those assets without those same disputed contractual provisions.

### (3)    The NHL's Refusal To Consent To Ownership On Location Transfer Constitutes Bad Faith

133.    The NHL, as a party to the "contracts" at issue, has a duty of good faith and fair dealing.  As the NHL is an unincorporated association based in New York, New York law is applicable.

134.    New York law prohibits the NHL from withholding consent arbitrarily or capriciously and requires that any decision to withhold its consent be made in good faith.  The New York Court of Appeals has routinely recognized that a covenant of good faith and fair dealing is implied in every contract.  *See, e.g., Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (N.Y. 1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance"); *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500 (N.Y. 2002) (In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."); *Smith v. Gen. Acc. Ins. Co.*, 91 N.Y.2d 648, 653, 697 N.E.2d 168, 170 (N.Y. 1998) ("[A] covenant of good faith and fair dealing is implied in all contracts."); *Rowe v. Great Atl. & Pac. Tea Co., Inc.*, 46 N.Y.2d 62, 68, 385 N.E.2d 566, 569 (N.Y. 1978) ("[T]here exists in every contract certain

implied-by-law covenants, such as the promise to act with good faith in the course of performance."); *see also* New York Pattern Jury Instructions – Civil, 4:1 ("Within every contract is an implied covenant of good faith and fair dealing.").

135.    This duty of good faith encompasses "any promises which a reasonable person in the position of the promise would be justified in understanding were included." *511 West 232nd Owners Corp.*, 90 N.Y.2d at 153, 773 N.E.2d at 501 (quoting *Rowe*, 46 N.Y.2d at 69, 385 N.E.2d at 569). A number of New York decisions recognize that withholding consent, arbitrarily, capriciously, or unreasonably breaches the duty of good faith. *See, e.g., Dalton*, 87 N.Y.2d at 389, 663 N.E.2d at 290 ("Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."); *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302, 765 N.Y.S.2d 575, 587 (N.Y. App. 1st Dep. Div. 2003) ("[E]ven where one has an apparently unlimited right under a contract, that right may not be exercised solely for personal gain in such a way as to deprive the other party of the fruits of the contract."); *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 747 N.Y.S.2d 29 (N.Y. App. Div. 2d Dep. 2002) ("Here, although the Letter Agreement did not contain a provision requiring Trim to act reasonably in approving or rejecting proposed relocation sites, Trim had an implied obligation to exercise good faith in reaching its determination."); *Schefler v. Livestock & Cas. Ins. Co.,* 44 A.D.2d 811, 811, 355 N.Y.S.2d 608, 609 (N.Y. App. Div. 1st Dep. 1974) (insurer's unreasonable withholding of consent to allow insured to destroy horse for humane reasons was violative of the "requirement of good faith").[28]

---

[28] There are cases under New York law which have limited the good faith requirement to specific situations including bank loan applications and attorney consent provisions, where New York courts have found that there is no duty to act in good faith when withholding a pending request for consent. These are obviously not the situation before the Court.

484443.4

136.    In *1-10 Indus. Assocs., LLC*, a landlord, after agreeing to relocate a tenant from its current location to a "comparable 'reasonably contiguous' facility subject to [the tenant's approval]," selected four sites that were ultimately rejected by the tenant. 297 A.D.2d at 630-31, 747 N.Y.S.2d at 30.    After the fourth refusal by the tenant, the landlord sued alleging that the tenant breached the agreement by "failing to exercise good faith in its refusal to relocate to any of the alternate sites it was offered." *Id.* at 631, 747 N.Y.S.2d at 30.    The lower court dismissed the claims by the landlord noting, "under New York law a party that has the right under a contract to give or refuse consent may exercise that right, even unreasonably, unless the contract contains an express provision that such consent not be unreasonably withheld." *1-10 Indus. Assocs., LLC*, N.Y. Slip Op. 40160(U), 2001 WL 1263509 (N.Y. Sup. Ct. 6/20/01).    In reversing that decision, the Appellate division held that even though the agreement between the landlord and the tenant contained no provision that required the tenant to act reasonably in approving or rejecting the proposed relocation sites, the tenant "had an implied obligation to exercise good faith in reaching its determination." *1-10 Indus. Assocs., LLC*, 297 A.D.2d at 631-32, 747 N.Y.S.2d at 31 (citing *Dalton, supra*).

137.    Thus, when considered in conjunction with the lower court opinion, it is clear the New York Appellate Division held that where a contract allows unfettered discretion to give or refuse consent, that right may not be exercised unreasonably.    Here, the covenant of good faith and fair dealing is implicit in the NHL Constitution and the NHL By-Laws between Coyotes Hockey and the NHL.    As such, the NHL has a duty to act reasonably, non-arbitrarily, and non-capriciously in its dealings with Coyotes Hockey and, in particular, in arriving at its decision to accept or reject applications for the purchase and relocation of the Team.    The NHL has consistently expressed its refusal to allow the Team to relocate to Hamilton, Ontario and plainly

stated that at least one reason, if not the only reason, was because Hamilton was a "league opportunity." *See* Exhibit A to Gary Bettman Declaration; Scudder Declaration at ¶ 12; Shumway Declaration at ¶¶ 37 and 40.

138.    The NHL has established specific, objective criteria it is to consider in making the decision to accept or reject the Transfer Application and the Relocation Application. *See* discussion in paragraphs 80 through 81, *supra*. James Balsillie, as owner of PSE Sports, submitted detailed Applications to purchase and relocate the Phoenix Coyotes to Hamilton, Ontario. Part and parcel with that application was an extensive and detailed analysis of the various factors the NHL considers and in depth evaluation and factual support as to why PSE Sports qualifies to not only purchase the Team, but also to relocate the Team. Should the NHL continue to maintain its position that the Phoenix Coyotes will remain in Glendale, Arizona, it does so unreasonably and in breach of its duty of good faith under New York law.

139.    Indeed, the NHL's position in the filings made to date belies its claim of serious, good faith consideration of the Ownership Transfer Application and Location Transfer Application. It is difficult to imagine the NHL acting in a more arbitrary, capricious, or unreasonable manner.

## IV.    REQUEST FOR JUDICIAL NOTICE

140.    Coyotes Hockey submits that this Court may take judicial notice of the documents and pleadings referred to in this Memorandum in accordance with Federal Rule of Evidence 201(d). *See also United States v. Author Services, Inc.*, 804 F.2d 1520, 1523 (9th Cir. 1986) (court may take judicial notice of its own files), as amended by, 811 F.2d 1264 (9th Cir. 1987); *In re Arden Props., Inc.*, 248 B.R. 164, 169 (Bankr. D. Ariz. 2000) (same); *In re Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978) (finding that judicial notice of certain deeds

484443.4

and a federal tax lien was proper, because they were recorded in a general index, were not subject to "reasonable dispute", and were capable of "accurate and ready determination").

## V.    **CONCLUSION AND RELIEF REQUESTED**

141.    For the reasons set forth above, and for the reasons contained in the Sale Motion, the proposed sale with PSE Sports as the stalking-horse bidder under the APA should proceed, subject to higher or better bids.  Coyotes Hockey submits that, if necessary, it will proffer additional evidence regarding Ownership and Location Transfers (including, but not limited to, the information contained in the Applications) at a hearing on the Sale Motion if the NHL does not consent to the proposed sale.  The NHL should be required to immediately commence its approval process with respect to the Applications, report to the Court the decisions reached and reasons therefore, within sufficient time for the Court and parties to react appropriately. Moreover, Coyotes Hockey requests that the Court take judicial notice as set forth in Section IV, above.

Respectfully submitted this 5th day of June, 2009

SQUIRE, SANDERS & DEMPSEY L.L.P.

By:  _____/s/ Thomas J. Salerno_____
   Thomas J. Salerno
   Jordan A. Kroop
   George Brandon
   Kelly Singer
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

Counsel to the Debtors-In-Possession

484443.4

# TABLE OF AUTHORITIES

## STATUTES

11 U.S.C. § 361 ................................................................................42, 43

11 U.S.C. § 363 ................................1, 4, 5, 6, 12, 33, 34, 42, 45, 59, 69

11 U.S.C. § 365 ................................45, 46, 47, 48, 49, 53, 57, 58, 59, 61, 65

11 U.S.C. § 1124 ..........................................................................................66

15 U.S.C. § 1 ................................................................................................22

15 U.S.C. § 2 ................................................................................................23

15 U.S.C. § 12 ..............................................................................................17

15 U.S.C. § 26 ..............................................................................................17

Fed. R. Evid. 201 .........................................................................................34

Ariz. Rev. Stats. § 44-1402 .........................................................................16

Ariz. Rev. Stats. § 44-1403 .........................................................................16

Consolidated Laws of New York. Sections 12 ............................................54

## CASE LAW

*1-10 Industrial Associates, LLC v. Trim Corp. of America*, 297 A.D.2d 630, 747 N.Y.S.2d 29.....................................................................................71, 72

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 773 N.E.2d 496.................................................................................................70, 71

*In re Adelphia Commc'ns Corp.*, 359 B.R. 65 ....................................47, 48, 49

*Agarwal v. Pomona Valley Medical Group, Inc.* (In re Pomona Valley Med. Group, Inc.), 476 F.3d 665 ...............................................................60

*Allied Technology, Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484 ...........60

*American Living Systems v. Bonapfel* (In re All Am. Of Ashburn, Inc.), 56 B.R. 186.................................................................................................7

*In re Arden Properties, Inc.*, 248 B.R. 164 ...............................................................34, 73

*In re Bedford Square Associates, L.P.*, 247 B.R. 140 ...........................................34

*In re Boogaart of Florida, Inc.*, 17 B.R. 480 ...............................................66, 67

*In re Bradlees Stores, Inc.*, 2001 Bankr. LEXIS 2192 ....................................67

*Bradley v. O'Hare*, 202 N.Y.S.2d 141 ...............................................................55

*In re Braniff Airways, Inc.*, 700 F.2d 935 ...........................................................2

*Car-Tec v. Venture Industrial, Inc.* (In re Autostyle Plastics, Inc.), *227* B.R. *797*.............6

*In re Chi-Feng Huang*, 23 B.R. 798 ...................................................................60

*Clear Channel Outdoor, Inc. v. Knupfer* (In re PW, LLC), 391 B.R. 25 ...........................5

*Committee of Equity Sec. Holders v. Lionel Corp.* (In re Lionel Corp.), 722 F.2d
1063...............................................................................................................2

*In re Crow Winthrop Operating Partnership*, 241 F.3d 1121 ....................................68, 69

*Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 663 N.E.2d 289 .....................70, 71

*In re David Orgell, Inc.*, 117 B.R. 574 ...............................................................69

*In re Decora Industries*, 2002 U.S.Dist. LEXIS 27031...............................................3

*In re Delaware & Hudson Railway Co.*, 124 B.R. 169 ...........................................2

*Donatelli v. National Hockey League*, 893 F.2d 459...............................................55

*In re Downour*, 2007 Bankr. LEXIS 1102................................................................32, 33

*In re Downtown Athletic Club of New York City, Inc.*, 2000 U.S.Dist. LEXIS
7917..............................................................................................................32

*Drug Mart Pharm. Corp. v. America Home Products Corp.*, 2007 U.S.Dist.
LEXIS 93493 ...........................................................................................17

*Durkin v. Benedor Corp.* (In re G.I. Indus.), 204 F.3d 1276 ..................................60

*Fishman v. Estate of Wirtz*, 807 F.2d 520...............................................................49

*Florida Department Of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326.................3

*Folger Adam Sec., Inc. v. DeMatters/MacGregor NV*, 209 F.3d 252 ..............................5, 6

*Ford Motor Co. v. Claremont Acquisition Corp.* (In re Claremont Acquisition
    Corp.), 186 B.R. 977 (C.D. Cal. 1995) (Bankruptcy Code § 365(f)....................48, 49

*FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002), *cert. denied*, 538
    U.S. 962, 123 S. Ct. 1769, 155 L. Ed. 2d 513...............................................................6

*In re G Survivor Corp.*, 171 B.R. 755...................................................................................61

*In re Gaylord Grain, L.L.C.*, 306 B.R. 624..........................................................................32

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul, & Pacific RR
    Co.*, 318, U.S. 523, 550.........................................................................................................59

*In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497 ...................................................33

*In re Haye v. United States*, 461 F.Supp. 1168...........................................................34, 73

*In re Hernandez*, 285 B.R. 435 ...........................................................................................52

*In re Hoffman*, 53 B.R. 874..................................................................................................7

*In Re Howe*, 78 B.R. 226 (Bankr. D. S.D. 1987) (Section 365(f)....................................69

*In re Iridium Operating, LLC*, 478 F.3d 452 .....................................................................2

*Jandel v. Precision Colors, Inc.*, 19 B.R. 415 ...................................................................12

*Krumbine v. Leb. County Tax Claim Bureau*, 541 Pa. 384.........................................54, 55

*L.A. Mem'l Coliseum Comm. v. Nat'l Football League*, 726 F.2d 1381...22, 23, 24, 26, 31

*Levin v. NBA*, 385 F.Supp. 149 ...........................................................................................49

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.* (In re Richmond
    Metal Finishers, Inc.), 756 F.2d 1043 ...........................................................................61

*MacArthur Company v. Johns-Manville Corp.* (In re Johns-Manville Corp.), 837
    F.2d 89 ...................................................................................................................................6

*Madison Square Garden, L.P. v. NHL*, 2008 U.S.Dist. LEXIS 80475.............................56

*In re Martin Paint Stores*, 199 B.R. 258............................................................................62

*Metropolitan Airports Commission v. Northwest Airlines, Inc.* (In re Midway Airlines, Inc. ), 6 F.3d 492 ....................................................................48

*Mid-South Grizzlies v. NFL*, 720 F.2d 772 ................................................49

*In re Midway Airlines, Inc.*, 6 F.3d 492 ..............................................51, 52

*In re Mr. Grocer, Inc.*, 77 B.R. 349 ..........................................................69

*Myers v. United States*, 297 B.R. 774 ....................................................6, 12

*Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373 ..................................17

*National Basketball Associate v. SDC Basketball Club, Inc.*, 815 F.2d 562 .........23, 24, 49

*National Hockey League Players Association v. Plymouth Whalers Hockey Club*, 419 F.3d 462 ..............................................................................22, 23

*In re New England Fish Co.*, 19 B.R. 323 ....................................................7

*Newman Grill System, LLC v. Ducane Gas Grills, Inc.* (In re Ducane Gas Grills, Inc.), 320 B.R. 324 ..........................................................................61

*In re Nicole Energy Services, Inc.*, 385 B.R. 201 ......................................32

*North America Soccer League v. National Football League*, 670 F.2d 1249 ...................24

*In re O'Connor*, 808 F.2d 1393 ..................................................................43

*In re Octagon Roofing*, 123 B.R. 583 ........................................................32

*Orion Pictures v. Showtime Networks, Inc.* (In re Orion Pictures Corp.), 4 F.3d 1095 ................................................................................................60

*In re Pacific Northwest Sports, Inc.*, Case No. 66822 ................................34

*In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90 ..............................6, 7, 12

*In re Paul Harris Stores*, 1992 Bankr. LEXIS 2418................................66, 67

*Perlman v. Catapult Entertainment* (In re Catapult Entertainment), 165 F.3d 747..........47

*In re Pioneer Ford Sales, Inc.* , 729 F.2d 27 ........................................47, 49

*Prof'l Hockey Corp. v. World Hockey Association*, 191 Cal.Rptr. 773 ...........49

*In re Quantegy, Inc.*, 326 B.R. 467 .................................................................49, 50, 52

*Resolution Trust Corp. v. Swedeland Development Group (In re Swedeland De.
Group*, 16 F.3d 552 .................................................................................................42

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 .................................62

*Richbell Information Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 765
N.Y.S.2d 575 ...........................................................................................................71

*In re Rickel Home Centers, Inc.*, 240 B.R. 826 .......................................................66
*Rock Creek Gardens Tenants Associate v. Ferguson*, 404 A.2d 972 ......................55

*Rowe v. Great Atlantic & Pac. Tea Co., Inc.*, 46 N.Y.2d 62, 385 N.E.2d 566 .................70

*In re Sambo's Restaurants, Inc.*, 24 B.R. 755 ..........................................................68

*Save-A-Patriot Fellowship v. United States*, 962 F.Supp. 695 .................................55

*Schefler v. Livestock & Casualty Insurance Co.*, 44 A.D.2d 811, 355 N.Y.S.2d
608 ...........................................................................................................................71

*Selig v. U.S.*, 565 F.Supp. 524 ...........................................................................35, 39

*Sharon Steel Fuel Gas Distributing Corp. v. National Fuel Gas Distributing
Corp.*, 872 F.2d 36 ..................................................................................................60

*Smith v. General Acc. Insurance Co.*, 91 N.Y.2d 648, 697 N.E.2d 168 ..................70

*In re Standor Jewelers West, Inc.*, 129 B.R. 200 .....................................................67

*Suffridge v. O'Grady*, 84 N.Y.S.2d 211 ..................................................................55

*Sullivan v. National Football League*, 34 F.3d 1091 ..................................17, 23, 24, 28

*In re Supernatural Foods, LLC*, 268 B.R. 759 .......................................................50, 51, 52

*The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716....................6

*Trans World Airlines*, 322 F.3d at 289 .......................................................................5

*In re Trans World Airlines, Inc.*, 261 B.R. at 121.....................................................60

*In re Trans World Airlines, Inc.*, No, 01-0056, 2001 Bankr. LEXIS 722 ......................60

*In re U.L. Radio Corp.*, 19 B.R. 537..............................................................62, 65, 68

*UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.* (In re Leckie Smokeless Coal Co.), 99 F.3d 573 ...................................................................5, 6

*United States v. Author Services, Inc.*, 804 F.2d 1520 (9th Cir. 1986), as amended by, 811 F.2d 1264 ...............................................................................73

*In re Van Ness Automobile Plaza, Inc.*, 120 B.R. 545 ...................................49

*In re Vista VI, Inc.*, 35 B.R. 564 ...................................................................67

*In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057 .......................................32

*WBQ Partnership v. Commonwealth of Virginia Department of Medical Assistance Services* (In re WBQ P'ship), 189 B.R. 97 .........................6, 7, 12

*In re Wellington Vision, Inc.*, 364 B.R. 129....................................................49

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co.* (In re Wheeling Pittsburgh Steel Corp.), 72 B.R. 845 ........................................................60

*In re White Motor Credit Corp.*, 75 B.R. 944................................................6, 12

*World Airlines*, 322 F.3d 289-90 ....................................................................5

## LEGISLATIVE HISTORY

95th Cong., 1st Sess. 338-40..........................................................................43

## SECONDARY SOURCES

Matthew Bender & Company, Inc., *1-13 Business Organizations with Tax Planning § 13.01* (2009) ....................................................................54

*David B. Simpson, Leases and the Bankruptcy Code: Tempering the Rights of Strict Performance, 38 Bus.Law. 61*..............................................67