# BY-LAWS

*16B.10. Annual Supplemental Draft.* Each year, immediately prior to the Entry Draft, the League shall conduct a Supplemental Draft, at which the Member Clubs may select players to be placed on their respective Reserve Lists as "unsigned draft choices."

*16B.11. Eligibility for Claim.* Eligible for claim in the Supplemental Draft shall be any free agent who:

    *(a)*    is age 21 or older; *and*

    *(b)*    was never claimed in an Entry Draft or Supplemental Draft; *and*

    *(c)*    never played professionally; *and*

    *(d)*    played hockey for at least one season in college in North America when he was age 18, 19, or 20.

    *[NOTES:*    *(1)*    *Section 16B.9 is applicable to define age of players.*

                *(2)*    *The phrase "never played professionally" is interpreted as meaning "never played a full season under a professional contract." A player cannot become exempt from the Supplemental Draft by leaving college in mid-season and signing a minor league pro contract for the balance of that season.]*

*16B.12. Order of Selection.* The order of selection for the Supplemental Draft shall be the same as for the Entry Draft, as set forth in Subsection *16B.3* above, but subject to Subsection *16B.13* below.

*16B.13. Conduct of Supplemental Draft.* The Supplemental Draft shall be conducted the same as the Entry Draft, as set forth in Subsection *16B.4* above, except that it shall be limited to one round in which claiming Clubs shall be clubs which failed to qualify for the next preceding playoffs.

*16B.14. Non-transferability.* A Member Club's right to claim in the Supplemental Draft may not be traded, nor may it be lost through equalization compensation, nor may a Member Club's unsigned draft choice rights in a player claimed in the Supplemental Draft be traded. A signed player claimed in the Supplemental Draft may not be traded for one year.

*16B.15. Expiration of Rights.* A Member Club's unsigned draft choice rights to a claimed player shall continue until one year after conclusion of his playing of hockey in college, except as modified in Section *16B.5(b)*.

# BY-LAWS

## SECTION 16C

## EMERGENCY REHABILITATION PLAN

16C.1    (a)    The League shall secure and keep in force an indemnity insurance policy covering the playing personnel of each of the Member Clubs in the total sum of $20 Million each (20 players at $1,000,000 each) payable to the League in the event of death or disability of five or more active players of any Club as the result of a covered accident.

> *[NOTE: As Amended by Board Resolution dated June 28, 1994. See "Catastrophe Insurance," Resolutions, page 95.]*

       (b)    "Covered accident" means any accident resulting in the death or disability of five or more active players of the Club for which the League will receive indemnity payments under the special insurance policy issued to the League for the purpose of paying for player replacements obtained under the Emergency Rehabilitation Plan ("ERP").

       (c)    "Disability" under the ERP shall exist when a player is rendered, in the opinion of the Disabled Club's physician, permanently and totally disabled from playing professional hockey.

16C.2.   The League shall be trustee of any insurance monies received which monies shall be used only for the purpose of replacing the playing personnel lost by the Disabled Club in compliance with ERP.

16C.3.   As soon as practical following a covered accident the Commissioner shall notify the Member Clubs and convene a meeting of the Governors for the purpose of bringing about effective rehabilitation of the Disabled Club so as to ensure its immediate and continued operation as a genuinely competitive team in the League.

16C.4.   The Member Clubs shall first endeavor to assess the loss of playing strength occasioned by the covered accident and to replace it by voluntary sale of players to the Disabled Club at such prices as are mutually agreeable between the selling club and the Disabled Club. Payment for players so purchased shall be made from the insurance money unless, in the discretion of the Commissioner, the purchase price is so high that it would deplete the insurance money beyond the level needed to ensure reasonable restoration through the ERP draft of the minimum playing strength required by Section *16C.5(b)*. Voluntary disposition of a player in respect to any covered accident shall entitle the vendor club to an exemption in the conduct of the ERP draft.

16C.5.    (a)    When the procedure under Section *16C.4* has been completed, the playing strength of the Disabled Club shall then be determined by adding the number of players still able to play from the playing roster of the Disabled Club at the time of the covered accident and the players acquired by

# BY-LAWS

purchase under Section *16C.4*, which shall be known as "Established Playing Strength."

(b)    If the Established Playing Strength of the Disabled Club is less than one goalkeeper and fourteen players, then the ERP draft procedure must be carried on until that minimum strength is attained.

(c)    Once the Established Playing Strength of the Disabled Club reaches one goalkeeper and fourteen players, then the Disabled Club shall have the option of claiming additional players from the other Member Clubs in accordance with the ERP draft procedure set out hereafter, until its playing strength reaches two goalkeepers and eighteen players.

(d)    In no event may more than one player be claimed from any Member Club by the Disabled Club under any one covered accident. A player sold pursuant to Section *16C.4* shall be deemed claimed for purposes hereof.

*16C.6.* If it is necessary to conduct the ERP draft, it shall be carried out in the following manner:

(a)    Each Member Club shall submit to the Commissioner a Protected List from all the players on its and its Player Development Club's or Clubs' playing rosters as of the time of the covered accident, such Protected List consisting of one goalkeeper and ten players.

(b)    The Disabled Club shall be entitled to claim one player from such playing rosters of each Member Club, provided:

    (i)    no player on the Protected List may be claimed; and

    (ii)    such Member Club has not sold a player to the Disabled Club pursuant to Section *16C.4*; and

    (iii)    no player may be claimed who is a first year professional or a player who will not attain 20 years of age by December 31 following such draft; and

    (iv)    if a Member Club is itself a Disabled Club or has been a Disabled Club within one year prior to the covered accident, it shall be exempt from claim; and

    (v)    within the overall limits of Section *16C.5(c)*, players may only be claimed by the Disabled Club on a position-for-position basis, based upon the positions of the players lost in the covered accident, using three position categories: goalkeeper, defenseman and

61

forward ("forward" includes centers and wings). Disputes over the position category of any player shall be resolved by the Commissioner whose decision shall be final; and

*(vi)*     if there are two or more clubs disabled from the same or contemporaneous covered accidents, ERP draft picks shall be staggered, with first position determined by toss of coin or drawing of lots.

*(c)*     Each Member Club from whom a player is claimed shall be paid One Million Dollars ($1,000,000) from the insurance monies received by the League or additional funds posted by the Disabled Club. If the insurance proceeds are exhausted prior to conclusion of the ERP draft, by virtue of player purchase pursuant to Section *16C.4* plus payment commitments resulting from the draft up to that point, the draft shall be suspended unless and until the Disabled Club provides enough funds with the League to insure payment for drafted players. In the event part of the insurance proceeds is payable immediately (death) and part is payable in the future (disability), then the amount to be paid per claim shall be adjusted as between present and future payments on a pro rata basis.

*(d)*     Any club which has a goalkeeper claimed from it in the ERP draft shall have, at the conclusion of the draft procedure, the option of claiming a goalkeeper belonging to any other Member Club (except the Disabled Club), after each of such clubs has protected two goalkeepers. The claiming price of this process shall be Fifty Thousand ($50,000) Dollars. In the event of two claims for goalkeepers being made in the ERP draft, the Club with the lower League Standing — determined as set forth in Section *16C.9(c)* — shall have the first opportunity to make its replacement claim.

*(e)*     Any club which loses a player in the ERP draft shall be entitled to protect one additional player in the next ensuing Waiver Draft. A goalkeeper may be designated as the additional "protected player" if a goalkeeper was lost in the ERP draft. Players sold under Section *16C.4* shall not constitute players lost in the ERP draft for purposes of this subsection.

*(f)*     Players claimed in the ERP draft may not be traded, sold or otherwise disposed of until 60 days after the opening date of the season next following such draft.

*16C.7.*   *(a)*     Each player claimed shall be transferred immediately to the Disabled Club by outright assignment and such player shall be directed to report immediately to the Disabled Club.

*(b)*    If any player claimed in the ERP draft fails to report to the Disabled Club promptly, he shall be transferred to the Voluntarily Retired List of the Club from which he was claimed and the Disabled Club shall have an additional right of claim against that club without further payment.

*(c)*    If a player placed on the Voluntarily Retired List as a result of failure to report thereafter elects to return to play, the Disabled Club shall have the option (exercisable within fifteen days) of claiming his services and resuming the substitute claimed player or of retaining the latter.

*16C.8.* Any insurance money arising from a covered accident which has not been allocated for the payment for players purchased or claimed under the ERP procedure shall, at the conclusion of the ERP draft, be paid over to the Disabled Club to assist it in replacing its lost players through future player development programs and player purchases.

*16C.9.* If a player who was rendered disabled in a covered accident returns to active duty as a hockey player (regardless of which club's roster he is on at the time of his return), then the Member Clubs which lost a player in the ERP draft which resulted from such covered accident shall be entitled to reclaim such lost player or goalkeeper in the manner hereafter set out at a claiming price payable to the League, equal to the amount of insurance proceeds it had been paid when it lost the player in the ERP draft.

*(a)*    Only clubs which lost players in the ERP draft shall be entitled to participate in reclamation as a Reclaiming Club. Players sold pursuant to Section *16C.4* may not be reclaimed.

*(b)*    Eligibility to participate in reclamation upon return of a disabled player shall be further limited to those clubs which lost players in the ERP draft within the position category (goalkeeper, defenseman or forward) in which the resuming player was listed at the time of the ERP draft.

*(c)*    Among those clubs entitled to participate in reclamation, priority shall be given in reverse order of League Standings of the eligible clubs on the date the disabled player returns to active duty, except that if he returns to active duty after close of the regularly scheduled season and prior to November 1 of the next succeeding season the Final League Standings at the close of said regularly scheduled season shall govern. In case of ties in point standing, priority shall be determined by application of the rules governing the determination of Final League Standings.

*(d)*    Upon receipt of notice of return to active duty by a player who had been disabled in a covered accident, the Commissioner shall forthwith give notice to the appropriate Member Club of its eligibility for reclamation.

63

(e)    The eligible Reclaiming Club shall inform the Commissioner in writing within seventy-two hours of receipt of such notice if it wishes to reclaim its lost player. Failure to give such notice shall constitute a waiver of all reclamation rights.

(f)    In the event of a waiver of reclamation rights by an eligible Reclaiming Club, the Commissioner shall give the next eligible club notice as set forth in Section *16C.9(d)*, applying the standards for eligibility in priority set forth in Sections *16C.9(a), (b)* and *(c)*.

(g)    Upon receipt by the Commissioner of a notice of reclamation, the re-claimed player shall be transferred immediately to the Reclaiming Club by outright assignment and such player shall be directed to report immediately to the Reclaiming Club. If a reclaimed player fails to report to the Re-claiming Club promptly, he shall be transferred to the Voluntarily Retired List of the Reclaiming Club.

(h)    In the event no club eligible for reclamation elects to reclaim its lost player, then the Disabled Club shall pay to the League an amount equal to the amount of insurance proceeds that had been received as a result of the resuming player's prior determination of disability.

*16C.10.* Any Member Club which fails to present its team for any scheduled Championship or playoff game by reason of a covered accident shall not be penalized under the League Constitution or By-Laws for such failure of that club during the period in which the ERP procedure is being carried out.

# *BY-LAWS*

## SECTION 17

### FINES, SUSPENSIONS AND EXPULSIONS

*17.1.* A player suspended or expelled by any organization or body, amateur or professional, shall at the request of that organization and with the approval of the Commissioner, be deemed to be suspended by the League until such suspension has been lifted or such expulsion has been revoked by the body imposing the same, or until the Commissioner declares that such suspension or expulsion will not be observed by the League.

*17.2.* Any player or person connected with a Member Club who undertakes to contribute in any way, or does intentionally contribute in any way to the losing or attempting to lose a game of hockey by the team of that Member Club, or who solicits or attempts to induce any player or person connected with a Member Club to lose or contribute to losing any hockey game in which that player is or may be in any way concerned, or, upon being solicited to so contribute fails to inform the Commissioner immediately, shall, in the discretion and by the ruling of the Commissioner, be expelled.

*17.3.*　　*(a)*　　If, in the opinion of the Commissioner, based upon such information and reports as he may deem sufficient, any act or the conduct of an official of a Member Club or player or employee, whether during or outside the playing season, has been dishonorable, prejudicial to or against the welfare of the League or the game of hockey, he may expel or suspend such person or impose on such a person and/or Member Club a fine not exceeding One Million Dollars ($1,000,000) in the case of a Member Club or an official or employee of a Member Club, or Fifty Thousand Dollars ($50,000) in the case of a player or he may order and impose both a suspension and a fine. Should a fine not be paid within ten days of imposition the Commissioner, in addition, may order a suspension. The Commissioner, with such limitation as he deems appropriate, may delegate and authorize an officer of the National Hockey League to perform the functions and exercise the disciplinary powers vested in the Commissioner under this By-Law for incidents arising under the playing rules and relating to the discipline of players and team officials. Except for suspension orders issued for deliberate injury of an opponent or abuse of an official, or issued between the end of the regular season schedule and the end of the playoffs, all suspensions ordered pursuant to this section shall take effect on the seventh day following the date of the order, unless the suspended party waives his right to appeal pursuant to Section *17.11(c).*

*[NOTE: A Player betting or being interested in any pool or wager on the outcome of any National Hockey League Championship or Playoff game, whether or not the player has any connection with such game; or a physical attack or other violence upon a League Official (The Commissioner, President, Vice President, Secretary, Treasurer and any referee, linesman,*

65

*scorer, timekeeper, penalty timekeeper or goal judge) will be deemed to come under this Section. These instances are only given as examples and are not to be regarded as the only acts or conduct subjecting the offender to the above penalties.]*

In the event of any verbal or physical attack upon the Commissioner, the Advisory Committee of the Board of Governors may, on referral from the Commissioner, exercise the powers of the Commissioner as set forth in this subsection. In the event of any other situation in which the Commissioner, in his judgment, believes it would be inappropriate for him personally to take action, he may delegate to the Advisory Committee of the Board of Governors his powers as set forth in this subsection, which Committee shall be authorized to exercise such powers.

(b)     In addition to the penalties and discretion provided for in the NHL Constitution and By-Laws, the Commissioner may (in his sole and absolute discretion) impose a fine not to exceed One Million Dollars ($1,000,000) upon any Member Club if the Commissioner determines (based upon such information and reports as he in his sole discretion may deem sufficient) that a Member Club has taken some act or failed to act in such a manner as to willfully breach the Collective Bargaining Agreement, the NHL Rules, the By-Laws, the NHL Constitution and/or any resolution of the Board of Governors. Such fine would be placed in the general funds of the League.

(c)     Notwithstanding anything contained herein to the contrary, regardless of any fine or other penalty, each Member Club hereby agrees to protect, indemnify and hold harmless its officers and employees, the NHL and each and every Member Club thereof as against any costs, expenses, lawyer's fees, claims, actions or causes of action and/or any loss or liability arising out of or connected with any act or omission of such Member Club which causes a willful breach of the Collective Bargaining Agreement, of the Constitution, By-Laws or Rules of the NHL, or of any resolution of the Board of Governors.

17.4.    (a)     Any official, player or employee of a Member Club who gives, makes, issues, authorizes or endorses any statement having or designed to have, in the opinion of the Commissioner, an effect prejudicial to the welfare of the League or the game of hockey or of a Member Club; or who makes any public statement that is critical of the League Officiating Staff shall be liable to a fine not exceeding Ten Thousand Dollars ($10,000) in the case of officers and employees of Member Clubs, and One Thousand Dollars ($1,000) in the case of players, to be imposed by the Commissioner. In addition to or in lieu of the above, in the case of officers and employees, the Commissioner in his discretion may also impose a fine upon the

# BY-LAWS

Member Club whose officer or employee violates this By-Law. Said fine shall not exceed Ten Thousand Dollars ($10,000).

(b) No Governor, Alternate Governor or any non-playing employee of a Member Club shall make any public statement that in any manner states, implies or suggests that (1) any member of the officiating staff has performed in an unacceptable manner or (2) the officiating in the League is less than acceptable. Violation of this Section *17.4(b)* shall result in the following automatic penalties in addition to the penalties set forth in Section *17.4(a)*:

(i) individual who makes such a statement — fine of $1,000, and

(ii) his employing club — a fine of $5,000.

Anyone who violates this Section *17.4(b)* more than once shall also be subject to additional fines and/or suspensions under By-Law *17*.

This Section *17.4(b)* shall not apply to a person who is employed by a Member Club as a broadcaster and who is functioning as such at the time of making any such statements.

*[NOTE: This Section 17.4(b) shall be liberally interpreted, it being the intent of the Board to eliminate all public criticism of officials and officiating by any employee of a Member Club.]*

(c) The Commissioner, with such limitation as he deems appropriate, may delegate and authorize an officer of the National Hockey League to perform the functions and exercise the disciplinary powers vested in the Commissioner under this By-Law.

*17.5.* A player under contract, agreement or reservation by a Member Club who, without the written permission of such club, plays with a Club of any other league or organization may be suspended or expelled at the discretion and by the ruling of the Commissioner.

*17.6.* A player refusing to sign a Standard Player's Contract containing the terms awarded by an arbitrator, duly appointed by representatives of the player and of the Club, may be suspended by the Club by notification thereof to the Commissioner and upon proof of delivery to the player of a true copy of the arbitration award. During the period of any such suspension, the Club shall retain all rights to the playing services of the player and incident thereto granted under said contract.

*17.7.* A player who has signed an agreement or contract with a Member Club and who refuses to fulfill or carry out its provisions may be suspended by the Member Club by notification thereof to the Commissioner.

67

17.8. A player suspended by a Member Club may apply to the Commissioner to review such suspension. The Commissioner, after obtaining such information as he deems sufficient, may confirm or revoke the suspension or reduce the period thereof.

17.9. A player suspended shall not play or participate in any game of hockey during the period of his suspension. An official or employee suspended shall not exercise any duty or function for his Member Club or for any club of a league affiliated with the League during the period of his suspension.

17.10. A player or person expelled shall be permanently debarred from any connection whatsoever with any club of the League, or any club of any league affiliated with the League, or any organizations with which the League has an agreement respecting rights to services of players.

17.11. (a) In the case of a suspension or expulsion, or a fine in excess of Two Hundred Dollars ($200) ordered by the Commissioner, there shall be a right of appeal to the Board of Governors upon written request filed with the Commissioner within ten days from the date of the order of suspension, expulsion or fine. The appeal shall be heard at the next regularly scheduled meeting of the Board of Governors. The Governors not directly affected by the order shall review the evidence by which the Commissioner arrived at his decision to determine whether in their opinion the Commissioner reasonably exercised the powers vested in him by the Constitution and By-Laws, and shall confirm, amend or quash the order made, and confirm or mitigate the penalty imposed. The decision of the Governors shall be final and conclusive. However, when such suspension, expulsion or fine is ordered for betting on a championship or playoff game no such right of appeal or review will be available.

(b) In the appeal of a suspension order, should any appellant desire an expedited hearing prior to the next regularly scheduled meeting of the Board of Governors, he may elect same by so notifying the Commissioner in writing within 24 hours after receipt of the notice of suspension. The Commissioner shall then fix the time and place of the expedited hearing of the appeal, which time, to the extent practical, shall be within five days of the Commissioner's receipt of notice of such election. In the event of such election and in the event there is no change in the decision appealed from, the Club which appealed (or whose employee has appealed), shall be obligated, through assessment to be imposed by the League, to reimburse the League and each Member Club for all expenses incurred in attending and holding such expedited hearing, including but not limited to the cost of travel, meals and lodging of the attendees. The Board of Governors shall have the power to remit all or part of such assessment.

(c) The waiting period for commencement of a suspension shall not apply if the suspended party notifies the League office within 24 hours of the issuance of his suspension that he waives his right to appeal.

(d) A suspension issued pursuant to Playing Rule 67(a) shall be subject to the same right of appeal under this Section *17.11* as applies to suspension ordered by the Commissioner. For the purpose of such appeal, the third sentence of Section *17.11(a)* shall read "The Governors not directly affected by the order shall review the evidence by which the referee arrived at his decision, plus all available game tapes, to determine whether in their opinion the referee reasonably exercised the powers vested in him by Playing Rule 67(a), and shall confirm, amend or quash the order made, and confirm or mitigate the penalty imposed."

*17.12.* The Commissioner may fine any Member Club whose team becomes involved in a multi-player altercation that takes place before or after any period. The fine for the first offense shall be up to $10,000. The fine for each subsequent offense shall be up to $50,000.

*17.13.* A printed copy of this Section shall be kept posted in each player's dressing room.

*17.14.* (a) In all cases where a player or other employee has been suspended without pay, the Club by whom such player or other employee is employed shall be fined an amount equal to the pro-rata portion of that player's or other employee's salary covered by the suspension. The Club shall not pay to the player or other employee the portion of his salary covered by the suspension.

(b) In the event a Club, whose player or other employee has been ordered suspended without pay, pays the player or other employee his salary for the days of his suspension in defiance of the suspension-without-pay order, the Commissioner shall be authorized to impose a fine up to Five Hundred Thousand Dollars ($500,000) upon such Club.

(c) The Commissioner shall have the power to direct that an audit be made of a Club's records to insure there has been compliance with this By-Law Section.

*17.15.* (a) No Club may enter into a written agreement with any player, or any player's corporation, or any representative of a player or his corporation, which contains any provision which repeals, amends or contradicts the approved Standard Form player's contract entered into by the Club and such player, or repeals, amends or contradicts any provision of the Collective Bargaining Agreement.

69

# BY-LAWS

(b)    All written agreements, other than Standard Form contracts and addenda attached thereto, entered into by a Club with any player, or any player's corporation, or any representative of a player or his corporation, shall contain a provision making such agreement subject to the League's certification that it is in compliance with this By-Law, and rendering it void in the absence of such certification.

(c)    All such written agreements entered into by a Club with any player, or any player's corporation, or any representative of a player or his corporation, shall within one week of their execution, be submitted by the Club to the League's Central Registry for certification pursuant to paragraph *(b)* above.

(d)    The Commissioner may, in his sole and absolute discretion, impose a fine not exceeding One Hundred Thousand ($100,000) Dollars upon any Club for each violation to this By-Law.

(e)    This By-Law shall have no application to written agreements entered into prior to December 7, 1989, provided the Club has not, on or after December 7, 1989, entered into a new player's contract or an extension of an existing player's contract with the affected player.

(f)    All written employment agreements between a Member Club and any non-playing employee who is employed in the capacity of General Manager, Coach, Supervisor of Scouting, Scout or any other employee, including "assistants" to any of the above, whose primary function relates to scouting, drafting, procurement or coaching of playing personnel, shall contain a provision whereby the employee expressly agrees to be bound by the Constitution, By-Laws, Resolutions and all other orders or rules of the National Hockey League.

*17.16.* The Commissioner is authorized to impose a fine up to One Hundred Fifty Thousand ($150,000) Dollars upon a Club for the making, by any owner, officer, employee or representative thereof, of public comments regarding expansion that the Commissioner deems to be detrimental to the League.

*17.17.* The Commissioner is authorized to impose a fine up to Two Hundred Fifty Thousand ($250,000) Dollars upon a Club for the making of any public disclosure or comment by the Club, or any owner, officer, employee or representative thereof, with respect to any matter, issue, position or discussion in any NHL Governors or Committee Meeting or otherwise pertaining to the Collective Bargaining Agreement or pending or future collective bargaining negotiations or actions or responses with respect thereto.

# BY-LAWS

## SECTION 17A

## DRUG AUDIT

*17A.1. Definitions.* For the purpose of this By-Law, terminology shall have the meaning hereinafter defined:

    (a)    "Team Physician" includes any duly qualified physician or surgeon appointed by a Member Club to provide medical advice and services to its employed personnel of all categories.

    (b)    "Team Trainer" includes the Head Trainer and all Assistant Trainers or physiotherapists employed by a Member Club to provide training services for its employed personnel of all categories.

    (c)    "Drug" or "Prescription Drug" means any drug which can be obtained from a licensed pharmacy, pharmaceutical manufacturer or other legal supplier, only by means of a valid prescription issued by a duly qualified physician or surgeon and includes all narcotics, stimulants, depressants, hallucinogens and marijuana.

    (d)    "Security Department" is the NHL Security Department and includes the Director of Security and the Assistant Director of Security but not local security representatives.

*17A.2.* Control of the acquisition and dispensing of prescription drugs by Member Clubs shall be maintained through compliance with the regulations established in this By-Law.

*17A.3.* Prior to the start of each playing season the Team Trainer shall make a complete inventory (on League Form A) of all prescription drugs on hand. A true copy thereof shall be forwarded to the Security Department.

*17A.4.* Any addition to the supply of prescription drugs contained in the inventory shall be obtained by the Team Physician by means of a valid written prescription and the Team Trainer shall maintain a file containing copies of all bills for drugs showing the quantities received, and the inventory record (Form A) shall be amended accordingly. If any new prescription drug, not included in the original inventory, is acquired, the identity, quantity received and the prescription number of the new drug shall be reported promptly to the Security Department.

*17A.5.* Prescription drugs shall be stored in a secure cabinet with an effective lock. Access to these prescription drugs shall be restricted to the Team Physician and/or Team Trainer only.

*17A.6.*    (a)    Prescription drugs shall not be dispensed by a Trainer, either at home or while the team is on the road, without the specific authorization of a Team Physician.

# BY-LAWS

(b)      If deemed necessary by the Team Physician, the Team Trainer may take with him on road trips of the team, a minimal supply of prescription drugs which must not be dispensed by the Trainer unless prescribed by the Team Physician of the home club or another licensed physician.

(c)      Trainers shall not carry needles or syringes on team road trips and they shall not, at any time whether at home or on the road, give an injection of any kind to any person.

*17A.7.*   (a)      Whenever a prescription drug is dispensed a medication record (League Form B) shall be completed in duplicate, by the Team Physician or Team Trainer dispensing the drug, showing the drug dispensed and the quantity thereof, and to whom supplied. The person receiving the drug shall sign the form. One copy shall be placed in the inventory file and the other copy shall be placed in the player's medical file. All cancelled or voided forms shall be retained for audit purposes.

(b)      No prescription drug shall be prescribed for, dispensed to, or used by any employee merely to enhance his performance or to reduce fatigue.

*17A.8.* The Team Physician shall establish a formulary of non-prescription drugs which the Team Trainer may dispense without the Team Physician's further authorization. This list shall be the Team Trainer's working guide. This list shall be prepared on League Form C and a copy shall be filed with the League Security Department. This list shall be reviewed annually by the Team Physician and shall be signed and dated by him when approved, confirmed or amended.

*17A.9.*   (a)      All records required to be maintained under this By-Law shall be maintained completely and accurately and shall be available for audit upon request by the Security Department which shall supply all requisite forms.

(b)      The Security Department shall make periodic unscheduled audits of prescription drug inventories and related records to ensure compliance with the requirements of this By-Law.

*17A.10.*   (a)      Any employee of the League or of a Member Club who uses a prescription drug without proper authorization, or any employee of the League or of a Member Club who fails to report to the Security Department any known or suspected misuse or abuse of any drug is subject to the provisions of Section *17.3* (fine, suspension or expulsion from the League).

(b)      The Security Department shall be responsible for investigating all reported allegations of known or suspected drug misuse or abuse, by any employee of the League or of any Member Club.

## BY-LAWS

17A.11. Any employee of the League, or any Member Club, or anyone employed by or associated with a Member Club, who fails to comply with the regulations herein established for the acquiring, safeguarding or dispensing of drugs shall be subject to the provisions of Section *17.3* (fine, suspension or expulsion from the League).

[*NOTE: See also "National Hockey League Prescription Medication Program," Appendix II, Exhibit Q.*]

# BY-LAWS

## SECTION 18

### UNDESIRABLE EMPLOYEES

*18.* If, in the opinion of the Commissioner, the employment of any person by a Member Club would be prejudicial to or against the welfare of the League he may prohibit the employment or continuation of employment of such person by any Member Club in any capacity whatsoever.

# *BY-LAWS*

## SECTION 19

### PROTECTION FOR REFEREES AND LEAGUE OFFICIALS

*19.1.* Each Member Club shall provide at its rink a separate dressing room for the exclusive use of the referee, linesman and other League officials and shall take steps necessary to ensure that no other person, without permission of the referee, gains access to such dressing room.

*19.2.* No official or player of a Member Club shall enter such dressing room except with the permission of the referee.

*19.3.* Each Member Club shall provide at its rink adequate police protection for the referee, linesman and other League officials to and from the ice.

*19.4.* Each Member Club shall provide at its rink a separate dressing room for the exclusive use of the visiting team and its officials.

It shall also provide in its rink adequate police protection for the visiting team, its manager, coach and trainers to ensure freedom from physical interference or molestation at all times while they are in the rink for the purpose of participating in a scheduled game.

*19.5.* A Member Club failing to comply with the provisions of Section *19.1, 3* or *4* and any official or player contravening the provisions of Section *19.2* shall be liable to a fine not exceeding One Thousand Dollars ($1,000) to be imposed by the Commissioner.

*19.6.* The referee shall report any failure to comply with or contravention of this By-Law to the Commissioner.

# BY-LAWS

## SECTION 20

## WAIVER DRAFT

20.1. The Waiver Draft will be conducted each year within the seven (7) days prior to the opening of the regular season, by telephone conference call, at a date and time as determined by the Board of Governors.

20.2. Protected lists of eighteen (18) skaters and two (2) goalkeepers are to be submitted to Central Registry preceding the conduct of the draft, at a date and time as determined by the Board of Governors.

20.3. Exemptions: Exempt from claim are:

(a) All players and goalkeepers who, in the opinion of the Commissioner, are on bona fide military service for their country at the time of the Waiver Draft.

(b) A player on the Free Agent List who signs a contract with a team outside the NHL may be exempted from claim in the Waiver Draft at the election of the Club. If such player, having been so exempted, returns to play during the season, the Club will be required to place him, or some other player on the Protected List at the time of the last Waiver Draft, on waivers.

(c) All players who qualify as set forth below:

| | Goalies | | Skaters | |
|---|---|---|---|---|
| Age | Years from Signing | NHL Games Played* | Years from Signing | NHL Games Played* |
| 18 | 6 | 80 | 5 | 160 |
| 19 | 5 | 80 | 4 | 160 |
| 20 | 4 | 80 | 3 | 160 |
| 21 | 4 | 60 | 3 | 80 |
| 22 | 4 | 60 | 3 | 70 |
| 23 | 3 | 60 | 3 | 60 |
| 24 | 2 | 60 | 2 | 60 |
| 25+ | 1 | | 1 | |

*NHL "Games" includes championship and playoff games.

Exemptions from the Waiver Draft ends immediately upon a player playing in the number of NHL Games set forth in the applicable column above.

76

# BY-LAWS

The 5 year exemption for 18 year old skaters and the 4 year exemption for 19 year old skaters shall both be reduced to 3 years commencing the first season that the 18 and 19 year old skater plays in 11 or more NHL games. The next two seasons, regardless of whether the skater plays any games in either season, shall count as the second and third years toward satisfying the exemption. These same rules apply to goalies in computing the length of their waiver exemption.

The exemption for 18 and 19 year old players applies for three seasons beginning with the first season after any season in which they are 18 or 19 years old and play 11 or more NHL games. (For example, if a player who signs a contract when he is age 18 for the 1991-92 season, plays 11 NHL games during that season, he is exempt from the Waiver Draft during the 1991-92, 1992-93, 1993-94 and 1994-95 seasons.)

A player 25 years old or older who plays in one or more professional games in any season shall be exempt from the Waiver Draft in the next season.

*[NOTES: For purposes of this By-Law section:*

*(1)    a "year" of exemption means a playing season and the Waiver Draft following such season;*

*(2)    age is defined in By-Law Section 16B.9.*

*See Article XIII of the CBA for examples illustrating how the provisions in the Waiver Chart are applied.]*

    *20.4.* All other players on Reserve List (including players on Free Agent List for which club has right to equalization compensation under By-Law Section *9A)* are offered on waivers with clubs having right to claim based upon order of claim of the last Entry Draft. Non-playoff clubs shall claim for one round exclusively. In the second round and thereafter all clubs may claim. Claim of a player from the Free Agent List transfers to the claiming club whatever rights to equalization compensation were held by the Club from which the draft claim was made. No club may claim a player from the Reserve List of a Club in its own division in the first round. "Playoff club" and "non-playoff club" as used in this By-Law Section *20* relates to whether a Club participated in the immediately preceding playoffs.

    *[Section 20.5. intentionally omitted.]*

    *20.6.* When a Member Club claims a player or goalkeeper under this drafting procedure, that Member Club shall immediately place the claimed player on its Protected List and shall announce the name of a player, or, in case a goalkeeper is claimed, a goalkeeper, whose name shall be removed from its Protected List, thereby reducing said list to seventeen (17) skaters and two (2) goalkeepers.

*[NOTE: See By-Law Section 11.15 re effect on Protected List of Free Agents signed after Waiver Draft and players losing their military service exempt status after Waiver Draft.]*

77

# BY-LAWS

20.7.    *(a)*    No club shall lose more than three (3) players through draft claim made by another club(s), unless it chooses to so offer its players, except as provided in subparagraph *(b)* of this section. "Draft claim" for this purpose does not include a player transferred as a result of the option described in subsection *20.9* hereof.

       *(b)*    A club's three draft claim loss limit shall be increased by the number of draft claims it makes against other clubs.

20.8. *Goalkeepers:* No club shall lose more than one (1) goalkeeper which loss shall be included in the total of three (3) in subsection *20.7* above, unless the Club chooses to so offer additional goalkeeper(s).

20.9. The club from which the draft claim was made shall have the option, exercisable immediately, of accepting the cash payment as outlined in subsection *20.11* below, or requesting that the player or goalkeeper removed by the claiming club be transferred immediately to its Reserve List and, if it so desires, to its Protected List. If the Club elects to add such player or goalkeeper to its Protected List, it must simultaneously drop a player from said list. If the player or goalkeeper is merely transferred to the Club's Reserve List, but not placed on its Protected List, he shall remain available for regular draft claim until so claimed by any Member Club, including the Club exercising this right to transfer, in proper sequence, except that he shall not be available to be claimed by any playoff club until all non-playoff clubs have had an opportunity to claim him. The foregoing option shall not be affected by the number of draft claims which have been made against the claiming club.

20.10. All clubs will be required to amend Reserve Lists in compliance with By-Law Section 5 (Reserve List) by not later than November 1st of each year.

20.11. *Waiver or Claim Prices*

       *(a)*    Players other than goalkeepers:

           Players who have not played more than 2 professional seasons — $75,000

           Players who have not played more than 3 professional seasons — $60,000

           Players who have not played more than 4 professional seasons — $45,000

           Players who have not played more than 5 professional seasons — $30,000

           These waiver prices shall be reduced by $3,750 for each NHL year of service.

           For the purpose of this By-Law only, an NHL year of service shall be any year in which a player has been on the major league roster and dressed for

not less than 50 games except for goalkeepers (refer to subsection *(b)* below).  In the event that a player is on a major league roster and is injured in the course of his employment each game missed as a result of said injury shall be counted in computing said 50 games.

Notwithstanding the above, in no case shall the waiver price for any player with less than five (5) years of professional play be less than $22,500.

The waiver price for players with more than five (5) years of service will be as follows:

| | |
|---|---|
| Players with 6 years of service | $18,750 |
| Players with 7 years of service | $15,000 |
| Players with 8 years of service | $11,250 |
| Players with 9 years of service | $ 7,500 |
| Players with 10 years of service | $ 3,750 |

Further, any club, at its option, may at the time of filing its Protected List, set a waiver price less than required hereunder for any player who is eligible for claim.

*(b)*    *Goalkeepers:*

All regulations set forth above shall apply to goalkeepers except as follows:

Goalkeepers who have not played more than 2 professional seasons — $97,500

Goalkeepers who have not played more than 3 professional seasons — $82,500

Goalkeepers who have not played more than 4 professional seasons — $75,000

Goalkeepers who have not played more than 5 professional seasons — $67,500

For the purpose of this By-Law only, an NHL year of service shall be any year in which a goalkeeper has been on the major league roster and has played in not less than eighteen (18) games.  In the event that a goalkeeper is on a major league roster and is injured in the course of his employment each game missed as a result of said injury shall be counted in computing said 18 games.

(c)     For players and goalkeepers acquired by waivers by original club as provided in subsection *20.14(b)*, the waiver price shall be reduced by one-half.

(d)     The currency for the claiming price shall be determined by the location of the Club from which the player was claimed.

20.12.   (a)     When a claim is made, it cannot be withdrawn and the player becomes the property of the claiming club.

(b)     A Standard Assignment giving effect to each claim made shall be completed and filed with the Commissioner within ten days of the making of the claim and shall be accompanied by the payment for the claimed player.

(c)     Except for players who have been reacquired by their original club after having been claimed from such club in the Waiver Draft, no player who has been claimed under this By-Law shall be transferred to any other Member Club by the claiming Member Club or by any other Member Club during the season in which the claim is made unless the transfer results from a waiver claim or the player has cleared waivers or the player has played a minimum of 20 games and is still on the NHL roster of the claiming club.

20.13.   When the selection (draft) process has been completed under this By-Law the players and goalkeepers then on the Protected List of each Member Club shall be specially recorded and shall constitute its Protected List until the next ensuing draft proceedings unless changed in conformity with the provisions of this By-Law.

20.14.   (a)     A Member Club shall be entitled to loan to a Club of another league a player on its "Protected List" who requires to play himself into good physical condition, provided always that such player consents to such loan, and provided further that such conditioning period shall not extend for more than 14 consecutive days without the player's consent.

(b)     Except as provided in subsection *(a)* hereof or elsewhere in the By-Laws (see Section *20.11)*, no Member Club shall loan, transfer, or otherwise dispose of the rights to the services of any player or goalkeeper on its Protected List to a Club of another league from the date on which this draft is conducted unless such player has been offered on waivers. If the player so offered on waivers is a player who had been claimed in the most recent Waiver Draft, the first club having the right to claim him on waivers shall be the Club from whom he had been claimed in said Waiver Draft. When waivers have been granted the player's name shall be removed from the Protected List and the Member Club is then free to loan, transfer, or otherwise dispose of the rights to this player.

(c)    Any player on the Reserve List of a Member Club who is available for Draft Claim in the Waiver Draft and who is not claimed, shall, at the completion of the Waiver Draft, be considered to have been offered on waivers and that no claim has been made.

For this purpose, "claimed" means as a Draft Claim, not transferred solely as a result of the option described in Section *20.9*. "Available for Draft Claim" as used herein means available for draft claim at the time every club passes in the final round of the draft.

(d)    If any club having successfully claimed the services of a player under the provisions of this By-Law thereafter disposes of such player on waivers, that club shall not be permitted to make any further claim to the services of that player until the next Waiver Draft is conducted, and until that date it shall be deemed to have waived on his services for the purpose of permitting the loaning of such player.

(e)    When a player on the Protected List of a Member Club is transferred to another Member Club his name shall be removed from the Protected List of the transferor club and shall not be added to the Protected List of the transferee club. However, the transferee club shall not dispose of the services of such player by transfer, loan or otherwise to a Club of another league during the currency of that Protected List unless he has been offered on waivers and all Member Clubs have waived.

20.15.  A Member Club acquiring the services of a player under this By-Law shall have three months thereafter in which to reduce its Reserve List to conform to the League By-Laws.

20.16.  The terms of a player's contract on file with Central Registry at the time of the filing of the Protected List for the Waiver Draft shall define the obligations to be assumed by a claiming club, and any different terms which have been agreed to by the original club prior to the claim shall remain the responsibility of the original club.

20.17.  Any signed professional player forced to move as a result of being claimed in the Waiver Draft or as a result of being taken by a Club which has lost a player through Draft Claim, shall be paid $5,000 by the Club to which he moves. (This payment shall not affect or be credited against "moving expenses" to which the player might otherwise be entitled.)

20.18.  A player traded by a Club within the four weeks prior to the Waiver Draft may not be reacquired by such club within the forthcoming season.

# *BY-LAWS*

## SECTION 21

### PLAYING STRENGTH OF TEAMS

*21.1.* Each Member Club shall for Championship games play its strongest available team of players under contract.

*21.2.* A Member Club failing to comply with this By-Law shall be liable to a fine not exceeding One Hundred Thousand Dollars ($100,000) to be imposed at the discretion of the Commissioner.

# BY-LAWS

## SECTION 22

### MEDICAL ATTENTION AT HOME GAMES

22. Each Member Club shall at all home games provide for proper medical care and treatment of the players of visiting clubs. Major injuries to a player shall be at the charge of his Member Club.

# BY-LAWS

## SECTION 23

## PRESS ACCOMMODATION

*23.* Each Member Club shall be responsible for the supply of adequate facilities at its rink for the accommodation of visiting press representatives, including at least ten centrally located seats from which all parts of the rink are plainly visible, adjacent to telegraph wires and telephonic communication with minor officials.

# BY-LAWS

## SECTION 24

### EXHIBITION GAMES

*24.1.* A Member Club shall not play any exhibition games of hockey without first obtaining the consent of the Commissioner. If such exhibition game is to be played in the home territory of another Member Club, its consent must also be secured in advance.

*24.2.* No Member Club shall permit any player on its Player Lists to take part in any exhibition games not approved by the Commissioner.

# BY-LAWS

## SECTION 25

### BONUSES TO PLAYERS

*25.1.* No Member Club, Club Official or representative of such club shall offer, or pay, or agree to pay to any of its players any bonus or other reward which would be in effect a special inducement to win a game against any particular club.

*25.2.* No Member Club, Club Official or representative of such club shall offer, or pay, or agree to pay to any of its players any bonus or other reward which would be dependent upon the success of any club other than the Club with which he is under contract and for which he is playing.

*25.3.* Any Club violating the provisions of this By-Law shall be liable to a fine of up to One Million Dollars ($1,000,000) and not less than $250,000 to be imposed by the Commissioner.

86

# BY-LAWS

## SECTION 26

### SCHEDULE OF CHAMPIONSHIP GAMES

*26.1.* Not later than January 15th in each year each Member Club shall furnish the Commissioner with a list of dates available at its rink upon which it is prepared to play its home games in the ensuing season. The number of such dates to be furnished shall be at least fourteen more than the number of home games in its schedule in the ensuing season.

*26.2.* The Commissioner shall, as soon as possible thereafter, draft and distribute to the Member Clubs a tentative Schedule of Championship Games.

*26.3.* The final Schedule of Championship Games shall be adopted at the Annual Meeting of the League. It shall specify the date and place of each game and shall provide each Member Club with an equal number of home games with each of the other Member Clubs unless otherwise agreed.

*26.4.* The date or starting time of a scheduled Championship game shall not be changed otherwise than by agreement of the participating clubs and with the consent of the Commissioner.

*26.5.*   *(a)*    Each Member Club shall make all reasonable and prudent arrangements for alternative back-up transportation to ensure its appearance and participation in all of its regularly scheduled Championship and playoff games.

      *(b)*    It shall be mandatory for each Member Club to make such transportation arrangements as to provide scheduled arrival for a home or away game not less than six (6) hours in advance of the scheduled commencement of such game.

      *(c)*    In the event that a Club does not use the transportation or charter flight specified in subsections *(a)* or *(b)* above thereby resulting in the postponement of a scheduled game or playoff game, the non-arriving club shall indemnify the other participating club for loss of revenue and/or necessary expense incurred in an amount to be determined by the Commissioner.

*26.6.* Commencing with the 1992-93 season, each Member Club shall play a regular season schedule of 84 games, 41 of which shall be played in its team's home arena, as follows:

      *(a)*    Games 1 through 82 (41 in each team's home arena):

**WESTERN CONFERENCE:**

| | | | |
|---|---|---|---|
| Own Division: | 6 games vs. 5 opponents | ≈ | 30 |
| Other Division— | | | |
|   Same Conference: | 4 games vs. 6 opponents | ≈ | 24 |
|   Other Conference: | 2 games vs. 14 opponents | ≈ | <u>28</u> |
| | | | 82 |

## BY-LAWS

**EASTERN CONFERENCE:**

| Own Division: | 5 games vs. 6 opponents | = | 30 |
|---|---|---|---|
| Other Division— | | | |
| Same Conference: | 4 games vs. 7 opponents | = | 28 |
| Other Conference: | 2 games vs. 12 opponents | = | 24 |
| | | | 82 |

*(b)*     Games 83 and 84 (none in any team's home territory):

Opponents and venue of games to be determined jointly by NHL and NHLPA.

*[NOTE: As amended by "Neutral Site Games," Resolutions, p. 87, "Realignment," Resolutions, p.15, and "Modified Alignment Plan," Appendix II, Exhibit L.]*

# BY-LAWS

## SECTION 27

### LEAGUE CHAMPIONSHIP AND PLAYOFF GAMES

27.1. The championship of each Division of the League in each playing season shall be determined by the playing of a Schedule of Championship Games between the Member Clubs, which schedule shall provide an equal number of games by all clubs in the same Division.

27.2. Each regular scheduled game shall count two points to the winner and nil points to the loser or one point to each competing team in case of a tie game.

*[NOTE: Superseded in part by "Overtime Procedures," Resolutions, p. 45.]*

27.3. At the conclusion of the regular Schedule of Championship Games the standing of the teams in each Conference shall be determined in accordance with the following priorities in the order listed:

(a) First place in each of the three divisions seeded 1, 2, and 3.

(b) The higher number of points earned by the Club.

(c) The greater number of games won by the Club.

(d) The higher number of points earned in games against each other among two or more clubs having equal standing under priorities *(b)* and *(c)*.

 *[NOTE: For the purpose of determining standing under priority (d) for two or more tied clubs that have not played an even number of games with one or more of the other tied clubs, the first game played in the city that has the extra game (the "odd game") shall not be included. When more than two clubs are tied, the percentage of available points earned in games among each other (and not including any "odd games") shall be used to determine standing.].*

(e) The greater differential between goals scored for and against by Clubs having equal standing under priority *(d).*

27.4. The first eight finishing clubs in each Conference will participate in the First Round of the Stanley Cup Playoffs.

27.5. (a) For the purpose of determining the opponents and venues, the Clubs participating in the First Round shall be ranked by Conference in the order of one (1) through eight (8).

   The three regular season Division champions shall be ranked in the first three positions, the one with the higher standing in the regular season

being ranked first and so on. The team with the highest number of points in the regular season among the other teams in the Conference shall be ranked in the fourth position; the team which finished with the next highest number of points shall be ranked fifth and so on until the top eight clubs in each Conference have been ranked.

*(b)*      Following the ranking procedure, the First Round of the Stanley Cup Playoffs will be established as follows: The higher-ranked club shall have the right to play in its home rink the first, second, and if necessary, fifth and seventh games. The lower-ranked club shall have the right to play in its home rink the third, fourth and, if necessary, sixth games. The only exception is when a Club from the Pacific or Mountain time zone is playing a Club from the Central or Eastern time zone, in which case the higher-ranked Club will have the choice of either playing "2-2-1-1-1" or "2-3-2" format, where the higher-ranked team has the choice of playing the first two and, if necessary, the sixth and seventh games in its home rink, or the third, fourth, and if necessary, fifth games in its home rink. When a Club from the Pacific or Mountain time zone meets a Club from the Central or Eastern time zone, a decision on the preference of series and whether to start at home or on the road must be made by the higher-ranked Club via fax to the Commissioner at (212) 789-2111 by the earlier of: i) within 24 hours after a Playoff match-up is determined with finality; or ii) by 12:01 am (local time) on April 10, 2000, so as to allow Clubs and broadcasters the proper time to make travel, arena, broadcast, and all similar preparations. If a Club does not timely exercise the option, the Commissioner shall make the determination. All series of the Conference Quarterfinals of the Playoffs shall be on a four-out-of-seven basis. The League will notify Clubs as to dates and times of their Conference Quarterfinal Series as soon as all Playoff match-ups are determined with finality, and the schedule has been set.

> **Eastern Conference**
> Series A — One versus Eight
> Series B — Two versus Seven
> Series C — Three versus Six
> Series D — Four versus Five
>
> **Western Conference**
> Series E — One versus Eight
> Series F — Two versus Seven
> Series G — Three versus Six
> Series H — Four versus Five

*(c)*      In the event that two or more teams finish with the same number of points at the end of the regular season, the ranking for purpose of participating in

the First Round shall be determined on the same basis as the determination of the final League standings set out in Section *27.3.*

27.6.  (a)    Following completion of the First Round, each surviving winner shall participate in a four-out-of-seven Second Round of the Stanley Cup Playoffs against another surviving winner in its Conference. For the purpose of determining venue, each of the winners shall continue to be ranked based upon the rankings of the First Round.

(b)    Following the ranking procedure, the Second Round will be established as follows, with the higher-ranked team having the right to play in its home rink the first, second and, if necessary, fifth and seventh games. The lower ranked team shall have the right to play in its home rink the third, fourth and, if necessary, sixth games. The only exception is when a Club from the Pacific or Mountain time zone is playing a Club from the Central or Eastern time zone, in which case the higher-ranked Club will have the choice of either playing "2-2-1-1-1" or "2-3-2" format, where the higher-ranked team has the choice of playing the first two and, if necessary, the sixth and seventh games in its home rink, or the third, fourth, and if necessary, fifth games in its home rink. When a Club from the Pacific or Mountain time zone meets a Club from the Central or Eastern time zone, a decision on the preference of series and whether to start at home or on the road must be made by the higher-ranked Club via fax to the Commissioner at (212) 789-2111 by 12:01 am (local time) following the final game of the conference Quarterfinal Series. This will determine the match-up of the Conference Semifinals with finality, so as to allow Clubs and broadcasters the proper time to make travel, arena, broadcast, and all similar preparations. If a Club does not timely exercise the option, the Commissioner shall make the determination. The League will notify all Clubs as to dates and times of their Conference Semifinal Series as soon as the Playoff match-ups are determined.

Series I — The first versus the fourth highest ranked teams in the
          Eastern Conference
Series J — The second versus the third highest ranked teams in the
          Eastern Conference
Series K — The first versus the fourth highest ranked teams in the
          Western Conference
Series L — The second versus the third highest ranked teams in the
          Western Conference

27.7.  Following completion of the Second Round, the surviving two clubs in each Conference will participate in a four-out-of-seven Conference Championship Round of the Stanley Cup Playoffs which will be established as follows:

# BY-LAWS

Series M — Eastern Conference
Series N — Western Conference

Home ice advantage shall accrue to the team which had the higher ranking in the Second Round. The team with home ice advantage shall have the right to play in its home rink the first, second and, if necessary, fifth and seventh games, with its opponent having the right to play in its home rink the third, fourth and, if necessary, sixth games. The only exception is when a Club from the Pacific or Mountain time zone is playing a Club from the Central or Eastern time zone, in which case the higher-ranked Club will have the choice of either playing "2-2-1-1-1" or "2-3-2" format, where the higher-ranked team has the choice of playing the first two, and if necessary, the sixth and seventh games in its home rink, or the third, fourth, and if necessary, fifth games in its home rink. When a Club from the Pacific or Mountain time zone meets a Club from the Central or Eastern time zone, a decision on the preference of series and whether to start at home or on the road must be made by the higher-ranked Club via fax to the Commissioner at (212) 789-2111 by 12:01 am (local time) following the final game of the Conference Semifinal Series. This will determine the match-up of the Conference Finals with finality, so as to allow Clubs and broadcasters the proper time to make travel, arena, broadcast, and all similar preparations. If a Club does not timely exercise the option, the Commissioner shall make the determination. The League will notify all Clubs as to dates and times of their Conference Final Series as soon as the Playoff match-ups are determined.

*27.8.* The surviving two teams will participate in a four-out-of-seven Stanley Cup Final Round which will be known as Series O. Home ice advantage shall accrue to the team which had the greater number of regular season standing points. The team with home ice advantage shall have the right to play in its home rink the first, second and, if necessary, fifth and seventh games, with its opponent having the right to play in its home rink the third, fourth and, if necessary, sixth games.

*27.9.*  *(a)*  The order to play as established above shall not be modified except by mutual consent of the participating clubs plus the consent of the Commissioner.

*(b)*  In Series M, N and O no team shall be required to start play without its consent until the second day following the completion of its previous Series.

*27.10.* The schedule of games in any Playoff Series shall be subject to change by the Commissioner necessitated for the fulfillment of a League contract for the televising of such games.

*27.11.* The Governors shall formulate regulations as may be required governing the establishment and distribution of Players' Award Pools, League and team expense allowances, extra games, deficiencies and currency. Such regulations shall ensure equal treatment of all participating clubs under the same conditions.

*27.12.*  *(a)*  Each playoff game shall be played to a finish.

*(b)*　　If the score is tied at the end of three regular periods of twenty minutes each, overtime shall be played in twenty minute periods or until the deciding goal is scored. The regular rest interval of fifteen minutes shall be permitted before the start of each overtime period during which the ice shall be flooded in the usual manner.

*(c)*　　If for any cause beyond the control of the Clubs a Playoff game should be unfinished, such game shall be replayed in its entirety at the end of the Series, if necessary, and it shall be played in the rink in which the unfinished game occurred.

　　The game receipts in such replayed game shall be distributed as follows:

*(i)*　　One-third of the gross receipts (less tax) shall be paid as building rental.

*(ii)*　　The normal game expenses of the additional game shall be paid.

*(iii)*　　The balance shall be divided evenly between the participating teams.

　　*27.13.* If a contending Club in any Playoff Series is unable to play its home games on its home ice, the first or second game, or both first and second of such games, must be played on the home ice of any other Member Club of the League, provided always that no deciding game in any Series may be played on neutral ice. When any such game is played by a contending team elsewhere than on its home ice the building rental shall be 42½ percent of the gross gate after deduction of taxes and out of such rental the contending club shall be paid the sum of Two Thousand Dollars ($2,000) for each game.

　　However, in any instance in which the home ice of a contending club is not available for use for any Playoff Series due to damage or destruction partial or total, or as a consequence of any other matter over which the home team has no control, which event shall be determined at the sole discretion of the Commissioner and if so determined, a contending club must adopt the ice of any other Member Club as its home ice for any Playoff Series, the rental for which shall be negotiated between such contending club and the lessor.

　　*27.14.* No change or variation in any of these Playoff Regulations shall be permitted nor shall any arrangement be made contrary thereto except by the direction of the Commissioner pursuant to these Regulations.

　　*27.15.* *(a)*　　All non-local broadcast rights for Playoff games shall be sold by the League. In any such sale in which the League sells conventional over-the-air broadcast rights, the League may sell such rights free of blackout restrictions, and, as to the Stanley Cup Final Round and Conference Championship Rounds only, may sell such rights on a network

exclusive basis, thereby pre-empting the right a participating club might otherwise have to conduct, in its home territory, an over-the-air broadcast of the same Stanley Cup Final Round or Conference Championship Round game that is being broadcast by the League's over-the-air network broadcaster(s) on its (their) over-the-air network(s). Such network pre-emption shall not apply to the First or Second Rounds, League sales of cable broadcast rights or to a participating club's right to conduct cable broadcasts of its Playoff games in its home territory.

*[NOTE: This Section 27.15(a) shall be deemed to be amended so as to conform to the ESPN Agreement which was approved on September 2, 1992 by more than the required two-thirds vote. (See President's Ruling of June 13, 1984, Appendix p. 12.)]*

(b)     All revenues from such sale(s) shall be shared by the Member Clubs as set forth in the NHL Member Clubs broadcast agreement of November 30, 1984. *[See "TWX AGREEMENT," Appendix p. 9]*

*[NOTE: Playoff Regulations have been modified to reflect three (3) divisions. Refer to 2002 Playoff Regulations, Appendix III.]*

# *BY-LAWS*

## SECTION 28

### PLAYOFF ELIGIBILITY

*28.1.* The players eligible to participate in playoffs are those players whose names are included on their club's Reserve List as of 3 p.m. E.S.T. on the 26th day immediately preceding the final day to the Schedule of Championship Games in each season.

*28.2.* Any goalkeeper on the Reserve List of the Member Club or any goalkeeper owned outright by an NHL club on loan to an affiliated club, or, if these are exhausted, any goalkeeper not on the Reserve List of any other Member Club shall be eligible to play for the Member Club in the Playoff and Stanley Cup games.

*28.3.* Any amateur player on the Reserve List of a Member Club shall be eligible to participate on behalf of his club in the Playoffs, provided he is signed to a Standard Player's Contract which is reported and approved by the Commissioner before his name is placed on the playing roster for any Playoff game. Whenever the trade deadline established by By-Law 28 falls on a Saturday, Sunday, or legal holiday, it shall automatically be extended to the next business day.

# *BY-LAWS*

## SECTION 29

## GATE RECEIPTS

*29.1.* A statement of all gate receipts for each Championship game, certified by a duly authorized officer of the Member Club shall be mailed to the Commissioner the day after the playing of such Championship game.

*29.2.* A statement of all gate receipts for each Play-Off game, certified by a duly authorized officer of the Member Club, together with a check for the League's share of the receipts shall be sent to the Commissioner promptly after each such Play-Off game.

# *BY-LAWS*

## SECTION 30

### FINES

*30.* All fines imposed under the provisions of the Constitution or these By-Laws shall be payable to the League and shall form part of the League funds, unless otherwise specially provided.

# *BY-LAWS*

## SECTION 31

### ILLEGAL SIGNING OF PLAYERS

*31.1.* No Member Club shall sign a contract with a hockey player who is under the age for inclusion in the Entry Draft, or who has not yet been subject to the Entry Draft in the year in which he is first eligible for inclusion therein, or whose eligibility for the next succeeding Entry Draft has vested because he was an unclaimed age 18 or age 19 player who was not signed prior to the signing deadline for such draft, or whose eligibility for the next succeeding Supplemental Draft has vested.

*31.2.* In the event a Member Club signs a contract with a hockey player in violation of Section *31.1*, then such player shall not thereby lose his eligibility to be drafted in the Entry Draft and, if appropriate, the Supplemental Draft, and, in addition to its liability pursuant to Section *17.3(b)*, such Violating Member Club shall be liable as follows:

    *(a)*    In the event such player is selected by another Member Club in the next succeeding Entry Draft or Supplemental Draft for which such player is eligible, then, at the request of such Selecting Member Club, the Violating Member Club shall assign such player's contract to the Selecting Member Club.

    *(b)*    In the event of an assignment of the player's contract pursuant to subsection *(a)* above, the Violating Member Club shall thereafter pay to the League, for subsequent transmission by the League to the Selecting Member Club (or to the Selecting Member Club's successors through assignment of said player's contract), an amount or amounts of money, as determined by the Commissioner, without right of appeal, representing the difference, if any, between the financial obligations to the player under the assigned contract and the financial obligations which the Selecting Member Club would reasonably have expected to be negotiated in a playing contract with such player had the violation not occurred.

    *(c)*    In the event such player is available for selection when the Violating Member Club has an opportunity to exercise a right of selection in the next succeeding Entry Draft or Supplemental Draft for which such player is eligible, then the Violating Member Club shall be automatically deemed to have exercised such right of selection for such player.

*31.3.* No Member Club shall sign a contract with a hockey player who is listed on the Reserve List of another Member Club as an "unsigned draft choice."

*31.4.* In the event a Member Club signs a contract with a hockey player in violation of Section *31.3*, then, in addition to its liability pursuant to Section *17.3(b)*, such Violating Member Club shall be liable as follows:

98

(a)     At the request to the Member Club which owns the "unsigned draft choice" rights to such player, the Violating Member Club shall assign such player's contract to the Owning Member Club.

(b)     In the event of an assignment of the player's contract pursuant to subsection *(a)* above, the Violating Member Club shall thereafter pay to the League, for subsequent transmission by the League to the Owning Member Club (or to the Owning Member Club's successors through assignment of said player's contract), an amount or amounts of money, as determined by the Commissioner, without right of appeal, representing the difference, if any, between the financial obligations to the player under the assigned contract and the financial obligations which the Owning Member Club would reasonably have expected to be negotiated in a playing contract with such player had the violation not occurred.

(c)     In the event the Owning Member Club elects not to request an assignment of the contract pursuant to subsection *(a)* above, and if such player, absent the violation of Section *31.3*, would have been eligible for a subsequent Entry Draft as a "re-entry," then such player shall be subject to the next succeeding Entry Draft for which he would have been eligible absent the violation of Section *31.3*, and the provisions of Sections *31.2(a)*, *31.2(b)* and *31.2(c)* shall be applicable.

*31.5.* In the event a Member Club accepts the assignment from another Member Club, or from a third party, of a player's contract which was signed in violation of the spirit or letter of Sections *31.1* or *31.3*, except following an assignment pursuant to Sections *31.2(a)* or *31.4(a)*, then such assignee Member Club shall be deemed a Violating Member Club pursuant to this By-Law, and shall be subject to all provisions hereof as it would had it been the original Violating Member Club.

*31.6.* Nothing hereunder shall preclude the League from taking such other action regarding the offending Club as may be available under the Constitution or By-Laws of the League.

# BY-LAWS

## SECTION 32

## GENERAL

*32.1.* Should the Commissioner determine that a Member Club or any official, manager, coach, player or employee of a Member Club has violated any of these By-Laws for the violation of which no penalty has been provided, he may impose a fine which, in the case of a Member Club, shall not exceed Two Thousand Dollars ($2,000) or, in the case of an official, manager, coach, player or employee, shall not exceed One Thousand Dollars ($1,000).

*32.2. Procedure for Hearings Under Section 6.3(3) of the Constitution*

    *(a)*    *Initiation of Claim and Scheduling*

        *(i)*    A Member Club shall set forth, in writing, the nature of its claim and the remedies sought, and shall serve such writing upon the Commissioner of the League and the governors of each Member Club against which the claim is directed.

        *(ii)*    Upon receipt of the written claim, the Commissioner shall schedule a date for a hearing. Unless he feels there is good cause to schedule the hearing earlier or later than the time of the next regularly scheduled Board of Governors meeting, he shall schedule the hearing for that time.

        *(iii)*    The Commissioner shall give reasonable notice to all parties of the hearing date.

        *(iv)*    The Member Club(s) against which the written claim is directed shall respond in writing to the claim by serving a reply, not less than ten (10) days prior to the hearing date, upon the Commissioner, the governor of the Member Club that filed the claim and the governors of each of the other Member Clubs against which the claim was directed. If a party chooses not to reply to the claim, it will be assumed that the claim is admitted.

        *(v)*    If so directed by the Commissioner, the parties shall submit briefs on specific issues in advance of the hearing.

    *(b)*    *Composition of the Panel*

        *(i)*    The hearing panel will be composed of the governor or alternate governor of each Member Club of the League not involved in the dispute, except where, in the Commissioner's discretion, he deter

100

## BY-LAWS

mines that the dispute is the type that requires a hearing before the full Board of Governors.

*(ii)* Each member of the panel is under a duty to disclose any circumstances likely to affect his impartiality, including any bias or any financial or personal interest in the result of the hearing or any past or present relationship with the parties or their counsel.

*(iii)* Any of the parties to the dispute may present to the Commissioner any circumstance likely to affect a member's impartiality, including any bias or any financial or personal interest in the result of the hearing or any past or present relationship with the parties or their counsel.

*(iv)* The Commissioner shall determine whether any of the circumstances raised under subsections *(ii)* or *(iii)* should disqualify any panel members. His decision shall be final.

*(v)* All panel members need not be present at the hearing, but the hearing shall not go forward if there are less than a majority of the panel members present.

*(c)* *Presiding Officer*

*(i)* The Commissioner of the League or his designee shall be the Presiding Officer. The Presiding Officer shall act to maintain decorum and to assure that all participants in the hearing have a reasonable opportunity to present relevant and material evidence. The Presiding Officer shall determine the order of procedure during the hearing and shall make all rulings on matters of procedure and the admissibility of evidence. In order to make these determinations and rulings, the Presiding Officer may consult with and seek the assistance of the League's General Counsel.

*(ii)* The Commissioner shall not act as the Presiding Officer of the hearing if the panel members, by majority vote, determine that the Commissioner may be biased based on the Commissioner's past, present or future financial or personal interests in the outcome of the dispute. Where the panel members determine that the Commissioner shall not act as the Presiding Officer, they shall select a substitute person, by majority vote, to act as the Presiding Officer.

101

# BY-LAWS

(d)     Hearing

(i)     All parties to the dispute are entitled to be represented at the hearing by an attorney.

(ii)    The hearing shall be closed to the public and to the press, and the proceedings shall not be transcribed or otherwise recorded, unless directed by the Commissioner.

(iii)   The Presiding Officer may, at the beginning of a hearing, ask for statements clarifying the issues involved.

(iv)    During a hearing, each of the parties shall have the right to call and examine witnesses, introduce exhibits, and cross-examine any witnesses. The formal rules pertaining to the admissibility of evidence need not be strictly applied.

(v)     The Presiding Officer may permit a party to submit evidence of witnesses by affidavit, but the panel members shall give such affidavits only the weight which seems proper after consideration of any objections made to their admissibility.

(vi)    The parties may agree in writing to waive an oral hearing and to submit the dispute for determination to the panel members based upon documentary evidence, affidavits, written argument, written stipulations, or a combination of these.

(vii)   The hearing may proceed in the absence of a party who, after due notice, fails to appear or seek and obtain a postponement of the hearing. A decision shall not be made solely upon the default of a party.

(viii)  The Presiding Officer shall inquire of all parties whether they have further proof to offer or witnesses to be heard. Upon receiving negative replies, the Presiding Officer shall close the hearing.

(ix)    The hearing may be reopened for the admission of additional evidence by a majority vote of the panel members upon a party's motion, for good cause shown.

(x)     The claimant shall have the burden of proof by a preponderance of evidence standard.

# BY-LAWS

(e)  Decision and Award

    (i)  After duly considering the evidence, the panel members shall vote upon each claim separately as to whether it has been sustained. The affirmative vote of a majority of the panel members shall be required to determine that a claim has been sustained and to make an award.

    (ii)  The decision, made in accordance with the foregoing procedure, shall be final and binding upon all parties.

*32.3.* If a Member Club or any of its officers, attorneys, agents or employees initiates litigation against the League or any of the League's officers or employees, such Club shall reimburse to the League all costs incurred by the League in defending such litigation. Included in such costs shall be all direct expenditures for lawyers' fees and related litigation expenses, plus an amount to be determined by the Commissioner, whose decision shall be final and unappealable, representing the indirect costs to the League in executive time expended in defending the litigation, including a reasonable allocation thereto of overhead.

*32.4.* If a Member Club or any of its officers, attorneys, agents or employees obtains from any court a temporary restraining order against the League or any of its officers, which order has any effect whatsoever upon a scheduled regular season or playoff game, including without limitation an effect upon the eligibility of personnel to participate in such game, such Club shall pay to the League, as liquidated damages for the harm caused to the League's public image as a result of such action, the sum of One Million ($1,000,000) Dollars. Such liquidated damages shall not be payable in the event the temporary restraining order is made a permanent injunction by a final and unappealable court order.

*32.5.* A Member Club liable for costs under Section *32.3*, or for liquidated damages under Section *32.4*, shall have the right to appeal to the Board of Governors for mitigation thereof. The Board of Governors may, by majority vote, grant such mitigation as it deems appropriate. The action of the Board in ruling on such appeal shall be final and unappealable.

# BY-LAWS

## SECTION 33

### INTERPRETATION

*33.* In these By-Laws, words in the singular shall include the plural and words in the plural shall include the singular unless the context requires otherwise.

# BY-LAWS

## SECTION 34

### SALE OF OWNERSHIP SHARES TO THE PUBLIC

*34.1.* The provisions of this By-Law section shall be applicable after June 12, 1988 in the event a Member Club seeks approval of the Board of Governors for transfer of an ownership interest for the purpose of effecting a sale to the public and subsequent public trading of shares in the ownership (whether in the form of corporate stock, partnership units or any other form) of the Member Club, its franchise and/or an entity which holds an ownership interest in the Member Club or its franchise. All the preceding are collectively referred to in this By-Law section as the "Entity." Such shares are referred to in this By-Law section as "Units."

*34.2.* Any such approval shall be subject to the conditions set forth below in subsections *34.3* through *34.15* inclusive.

*34.3. Limitation on Percentage Sold to the Public.* The maximum amount of equity ownership in the Entity that may be sold to the public shall be 49%.

*34.4. Nationality Restriction.* The sale of Units shall be restricted to the public of the single nation in which the Entity is domiciled.

*34.5. Limitation on Ownership.* As a reasonable compromise between the League's interest in exercising control over who owns its hockey franchises and the Entity's interest in daily public trading of its Units, the League's approval shall be conditioned on the following restrictions on ownership:

    *(a)*      Any acquisition of Units which will result in a person holding a 5% or more interest in the Entity, and each acquisition of Units which will result in a person holding any multiple of a 5% interest, shall require the prior approval of the League, which may be granted or withheld in the sole discretion of the League.

    *(b)*      There shall be no direct ownership of Units by players, employees of the League or employees of other clubs.

    *(c)*      All Unit certificates issued by the Entity shall have printed thereon the foregoing ownership restrictions, plus the statement: "The NHL has the right in the future to adopt different or additional restrictions which could adversely affect Unitholders."

*34.6. Restriction Against Assumption of Debt by the Entity.* To insure that cash needed to operate the franchise is not drained to meet debt service costs arising from debt of the Entity, the League's approval shall be conditioned on the franchise being free of debt upon the transfer of the franchise to the Entity and all proceeds from advance ticket sales being reinstated to the Entity and all fees from the prepayment of TV rights being repaid to the Entity in the form of a Promissory Note

# BY-LAWS

(secured by a Letter of Credit or a Letter of Guarantee), the amount of which shall be payable to the Entity during the balance of the term of its broadcasting contract.

For the purpose hereof, "debt" of the Entity includes, without limitation, any balance payable to the League from the Entity's franchise's original expansion note and all non-hockey contingent debt such as loan guarantees and significant contingent contractual obligations, but does not include current payables and a current credit facility for (a) working capital and (b) Letters of Credit and Letters of Guarantee.

*34.7. Restrictions Against Incurring of Debt by the Entity for Initial Working Capital.* To insure that cash needed to operate the franchise is not drained to meet debt service costs arising from providing the Entity's initial working capital, the League's approval shall be conditioned upon the Entity's having provided to the League projections of its working capital requirements for the ensuing twelve months, which project a positive working capital position without borrowing, together with a certificate of compliance by the Entity's chief financial officer accompanied by a compilation report of the Entity's auditors.

*34.8. Restrictions on Cash Distribution to Unitholders.* To insure that cash needed to operate the franchise is not imprudently distributed to Unitholders, the League's approval shall be conditioned upon the following restriction on cash distribution to Unitholders:

The Entity shall not distribute more than its annual cumulative cash flow; provided that the making of such cash distributions will not impair the Entity's ability to:

    *(a)*    meet its projected expenses for the ensuing twelve month period without the use of borrowed funds, other than short-term borrowings; and

    *(b)*    maintain adequate reserves to fund the future payment of all deferred player compensation for past services and other deferred obligations for past services.

*34.9. Letter of Credit.* To insure that cash needed to operate the franchise is available to the League in the event it becomes necessary for the League to take control over the franchise, the League's approval shall be conditioned upon an annual requirement that the Entity provide to the League an unconditional and irrevocable bank letter of credit upon the commencement of each hockey season, from a bank reasonably approved by the League, to be drawn upon by the League at its discretion in order to pay the Club's operating expenses in the event the League takes control over the franchise of the Club pursuant to the League's Constitution, in the amount of Five Million ($5,000,000) Dollars.

*34.10. Indemnification of League.* To insure that the League is held harmless from all claims arising from the Entity's public sale of Units, the League's approval of the transfer of the franchise to the Entity, the League's approval of any transactions associated therewith, and the League's imposition and maintenance of controls over the Entity, and all legal fees and expenses necessary to defend against such claims, the League's approval shall be conditioned upon the Entity's

# *BY-LAWS*

agreement to indemnify the League and related parties, in a form and manner acceptable to League counsel, from all such claims and expenses.

*34.11. Firm Underwriting.* In order to avoid erosion of the perceived value of NHL franchises that could result were there to be no initial market for publicly offered shares of an Entity, the League's approval shall be conditioned upon a requirement that the Entity's proposed public offering be fully and firmly underwritten by an Underwriter or Underwriters acceptable to the League.

*34.12. NHL Information Given by the Entity to Investors.* In order to minimize the potential for confusion among the Entity's Unitholders as to the operation of the League, the subordination of Member Clubs to League authority, and the rights of Member Clubs, the League's approval shall be conditioned upon a requirement that the Entity include in any prospectus or other material issued to potential investors the following NHL information:

    *(a)*    All Member Clubs in the NHL, their owners and personnel employed by all Member Clubs, are bound by and obliged to comply with the NHL's Constitution, By-Laws, Rules and Resolutions enacted by the NHL Board of Governors, and Collective Bargaining agreements with players and game officials, as such presently exist and as they may be amended from time to time by the NHL Board of Governors.

    *(b)*    It is the position of the NHL, which is supported by the Entity, that the Commissioner of the NHL has the exclusive power to interpret the NHL's Constitution, By-Laws, Rules and Resolutions, and his decision as to the interpretation thereof is final and binding upon all Member Clubs, their owners and personnel employed by all Member Clubs.

    *(c)*    It is the position of the NHL, which is supported by the Entity, that Member Clubs in the NHL may not resort to the courts to enforce or maintain rights or claims against other Member Clubs, or to seek resolution of any dispute or controversy between Member Clubs, but instead all such matters must be submitted for final and binding determination to the NHL's Commissioner, without any right of appeal to the courts or otherwise.

    *(d)*    Pursuant to a Consent Agreement between the NHL and the Entity, there are certain limitations upon the percentage of ownership that may be reached without prior approval of the NHL and certain restrictions on the powers of the Entity to distribute cash to its Unitholders as set forth in the relevant sections of the prospectus.

    *(e)*    Neither the NHL, nor any of its Member Clubs, nor any officer or employee of the NHL or any of its Member Clubs except the Entity has reviewed in advance the information being provided herein or elsewhere to potential investors in the Entity, or assumes any responsibility for the

107

accuracy of any representations made by the Entity to its potential investors.

*34.13. Consent Agreement.* The League's approval shall be conditioned upon a consent agreement in form and substance satisfactory to the League, containing provisions not inconsistent with this By-Law section, being executed and delivered to the League by the Entity and such other parties, if any, as the League deems appropriate. The Chairman of the Board of Governors, the Commissioner and the Secretary, and each of them, shall be authorized to execute and deliver such consent agreement on behalf of the NHL and its Member Clubs

*34.14. Advisory Committee Certification.* The League's approval shall be conditioned upon the Entity's reducing its final proposal to writing, and submitting it to the League's Advisory Committee for review and certification by the Committee that it is the same proposal which was approved by the Board and that it meets all Board-imposed conditions. In the event the Advisory Committee determines there has been any substantive change from what the Board approved, said proposal shall not be deemed approved until it receives subsequent Board approval.

*34.15. Expiration Date of Approval.* The League's approval shall terminate and be considered withdrawn one year from the date it was granted if the initial sale of the Entity's Units to the public, as contemplated in the approved proposal, has not been effectuated by said date.

*34.16.* Nothing contained in this By-Law section shall be construed as meaning the Board of Governors is required to give its approval to any proposed transfer of ownership interests. Each case where such approval is requested must be dealt with on its merits, and the Board must exercise its discretion, within the powers given to it by the Constitution, in determining whether to grant or deny its approval on a case-by-case basis.

# BY-LAWS

## SECTION 35

### TRANSFER OF MEMBERSHIP OR OWNERSHIP INTEREST
### IN FRANCHISE

35.1. In determining whether to consent to the sale, assignment or transfer of a membership or of an ownership interest in a Member Club pursuant to Section 3.5 of the Constitution, each Member Club shall be guided by the following considerations:

*(a)* Whether the persons who would be holders of an ownership interest in the Member Club and the entity or entities which would hold the franchise, player contracts and/or other assets of the Member Club in question after the proposed sale, assignment or transfer, are able and willing to commit sufficient financial resources to provide for the financial stability of the franchise.

*(b)* Whether the persons who would be holders of an ownership interest in the Member Club are of good character and integrity.

35.2. Any such consent by the Member Clubs may be made subject to appropriate conditions, including but not limited to some or all of the following:

*(a)* Provisions to assure that all liens and security interests to which assets of the franchise or Member Club are or will be subject are subordinate to the NHL Constitution (including, but not limited to, Articles 3.5 and 3.9 thereof) and that the NHL Constitution has priority with respect thereto.

*(b)* Provisions with respect to those debts, liabilities and obligations of the transferor member which are to be assumed, guaranteed or otherwise provided for by the transferee (including, for example, notes or other obligations payable to the League, payable to one or more Member Clubs, player contracts or deferred compensation agreements with players or other personnel) and specifying the manner in which such obligations will be assumed, guaranteed, paid or otherwise provided for.

*(c)* Provisions with respect to the corporate, partnership or organizational structure, or with respect to instruments designating the controlling persons and the persons who are authorized to bind the Member Club in transactions involving the League and assuring the maintenance of such control relationship.

*(d)* Provisions with respect to assuring the establishment, maintenance and funding of working capital, specifying the amount of such working capital and defining the same, and providing guarantees or security for such provisions with respect to working capital.

(e)    Provisions for the pre-payment of League dues and assessments or security for the same.

(f)    Provisions specifying agreements to which the NHL or its Member Clubs are a party which are to be assumed and performed by the transferee.

(g)    Provisions for the purpose of limiting or precluding commingling of or application of funds of the Member Club for the benefit of any other operation.

(h)    Execution and delivery of a consent agreement, security agreements and related instruments containing some or all of the above or other provisions, signed by the entity acquiring the franchise and one or more of the principal owners of the Member Club.

*35.3.* Any proposed sale, assignment or transfer of a membership or of an ownership interest in a Member Club which would also involve the transfer of the Club or franchise to a different city or borough shall also be subject to the provisions of Section *4.2* of the Constitution and to the provisions of By-Law Section *36.*

*[NOTE: See also "Guidelines for Processing Applications for Transfer of Membership or Ownership Interest," Resolutions, page 5 and "Ownership Transfer Procedures," Appendix II, Exhibit O.]*

# BY-LAWS

## SECTION 36

### TRANSFER OF FRANCHISE LOCATION

*36.1. Application*

    *(a)*    Any Member Club seeking consent to a transfer of its franchise and club to a different city or borough in accordance with Section *4.2* of the Constitution, shall file a written application for such consent with the Commissioner of the League.

    *(b)*    Such application shall be filed no later than January 1 of the year prior to the year in which it is proposed the Club will commence its first season in the new location, unless a majority of the Member Clubs consents to a later filing date.

    *(c)*    The application shall include a statement as to why the applicant seeks such transfer. It shall also include a statement of reasons why the applicant believes consent to the proposed transfer should be given and shall be accompanied by such documentation as the applicant deems appropriate, in light of the provisions of this By-Law Section *36* and Section *4.2* of the Constitution.

*36.2. Investigation*

    *(a)*    The Commissioner shall assign to one or more Committees of the League responsibility for investigating the merits of the proposed transfer and of the application for consent.

    *(b)*    Each such Committee shall conduct such investigation as it deems appropriate under the circumstances and shall be guided by the considerations set forth in this By-Law section.

    *(c)*    As part of its investigation, any such Committee may, through any of its members or any officer of the League, request the applicant to submit any documentation or information which it deems pertinent to any such applicable considerations. The applicant shall promptly submit all such requested documentation or information to the Committee, or, if it is unable to do so, shall promptly submit a written statement explaining why it is unable to do so.

    *(d)*    Each such Committee shall, prior to the vote by the Member Clubs on the transfer application, present a verbal and/or written report on the results of its investigation to the Board of Governors.

111

### 36.3. *Presentation*

(a)     Prior to the vote on the transfer application, the applicant shall be afforded an opportunity to make a presentation in support of its application at a meeting of the Board of Governors.

(b)     If the proposed transfer of location also involves a sale, assignment or transfer of a membership or ownership interest in a Member Club, representatives of the proposed new owners shall also be afforded an opportunity to make a presentation in support of the application at a meeting of the Board of Governors.

(c)     At any such meeting, the Governors shall be afforded an opportunity to ask questions of the representatives of the applicant and of any proposed new owners concerning any aspects of the transactions for which consent of the Member Clubs is being sought.

### 36.4. *Vote*

(a)     Following such presentation(s) to the Board, there shall be a vote of the members as to whether to consent to the proposed transfer of location, in accordance with the provisions of Section *4.2* of the Constitution and this By-Law Section *36*, and, if applicable, as to whether to consent to any proposed sale, assignment or transfer of a membership or ownership interest in a Member Club, in accordance with the provisions of Section *3.5* of the Constitution and By-Law Section *35*.

(b)     Any such vote shall be by closed ballot if a majority of the members are in favor of conducting the vote by closed ballot but shall otherwise be by voice vote or open ballot.

(c)     A proposed transfer of location receiving the affirmative votes of a majority of the Member Clubs present and voting shall be deemed to have been consented to by the League in the event that the prohibition on transfers recited in Section *4.2* of the Constitution is determined by counsel to the League specially retained for this purpose, based on all relevant factors, to be unlawful with respect to that proposed transfer.

36.5.   In determining whether to consent to the transfer of a Member Club's franchise to a different city or borough pursuant to Section *4.2* of the Constitution, each Member Club shall be guided by the following considerations:

## BY-LAWS

(a)    Whether the Club in question is financially viable in its present location and, if not, whether there is a reasonable prospect, based on any of the considerations set forth in subsections *(b)* through *(j)* below, or for any other reason, that it could become financially viable there, either under its present ownership or under new ownership.

(b)    The extent to which the fans have historically supported the Club in its present location.

(c)    The extent to which the Club has historically operated profitably or at a loss in its present location.

(d)    Whether the present owner of the Club has made a good faith effort to find prospective purchasers who are prepared to continue operating the Club in its present location and/or has engaged in good faith negotiations with such prospective purchasers.

(e)    Whether there is any prospective purchaser of the Club and franchise who is prepared to continue operating the Club in its present location and, if so, whether any such prospective purchaser is willing and able, if necessary, to sustain losses during at least the initial years of its operation there.

(f)    The extent to which the Club might be operated in its present location in a more prudent, efficient, and/or cost-effective manner than it has been in the past.

(g)    The extent to which there is a reasonable prospect that significant additional revenues may become available to the Club within a reasonable time in its present location, either from the sale of media rights or from other sources.

(h)    The extent to which local government authorities in the present location are prepared to reduce the operating costs of the Club, either by granting tax relief or otherwise.

(i)    The extent to which the operating costs of the Club in its present location might be reduced through the willingness of the applicable arena authority to reduce the rent charged to the Club or otherwise to reduce the Club's costs or increase its revenues, and/or through the willingness of other suppliers to reduce their charges for goods or services provided to the Club.

(j)    The adequacy of the arena in which the Club plays its home games and the willingness of the applicable arena authority to remedy any deficiencies in the arena.

113

(k)     Whether there will be a suitable arena available in which the Club can play its home games in the proposed new location.

(l)     The extent to which it appears likely, based on the population, demographics, and interest in hockey in the area of the proposed new location, or based on any other relevant facts, that support for a franchise there will be sufficient to make the franchise financially viable in the proposed new location on a continuing basis.

(m)    The extent to which the owners of the Club are willing and able, if necessary, to sustain losses during at least the initial years of its operation in the proposed new location.

(n)     The extent to which consent to the proposed transfer is likely to damage the image of the League as a major sports league, be a disincentive to participation in the League, or otherwise to have an adverse effect on the League's ability to market and promote the League hockey in the United States and/or Canada.

(o)     The extent to which the proposed transfer would adversely affect traditional rivalries that have been established between the Club in its present location and other Member Clubs.

(p)     The extent to which consent to the proposed transfer would result in the absence of a League franchise in a major market.

(q)     The extent to which it appears likely that, if the proposed transfer is approved, the Club would draw more or fewer fans when playing as the visiting team in the home arenas of other Member Clubs.

(r)     The extent to which the proposed transfer would present particular disadvantages for the operation of the League, such as travel or scheduling difficulties or a need for divisional realignment.

(s)     The extent to which the Club has, directly or indirectly, received public financial support in its present location by virtue of any publicly financed arena, special tax treatment, or any other form of public financial support.

(t)     The extent to which the proposed transfer, if approved, would affect any contract or agreement in effect between the Club and any public or private party.

(u)     The extent to which League consent to the proposed transfer might expose the League to liability to any third party for breach of contract, interference with contractual relations, or for any other cause.

114

*(v)*    The extent to which the ownership or management of the Club has contributed to any circumstance which might otherwise demonstrate a need to transfer the Club to a new location.

*(w)*    The extent to which the Club has engaged in good faith negotiations with representatives of the community in which it is presently located concerning terms and conditions under which the Club would continue to operate in that location.

*(x)*    Any other considerations relevant to whether it would be in the best interest of the League to consent to the proposed transfer.

    *36.6.* Any such consent by the Member Clubs may be made subject to reasonable and appropriate conditions, including payment to the League of a transfer fee to reflect the goodwill developed by the League in the new location, and/or payment of an indemnification fee (or fees) to reflect the goodwill developed by a neighboring member (or members) in the new location.

    *36.7.* Any proposed transfer of a franchise to a different city or borough which would also involve the sale, assignment or transfer of a membership or of ownership interest in a Member Club shall also be subject to the provisions of Section *3.5* of the Constitution and By-Law Section *35*.

# BY-LAWS

## SECTION 37

## ADMISSION OF NEW MEMBERS

37. Application for admission of a new member shall be accompanied by such information as the League may require, including such supplementary information as may seem appropriate. In determining whether to grant a franchise pursuant to Section 3.3 of the Constitution, each member of the League shall cast its vote based upon its own conclusion as to whether admission of the applicant would be in the best interest of the League. In addition to any admission fee determined by the League, the League may impose an indemnification fee (or fees) in like manner as provided for transfers in By-Law Section 36.6.

# BY-LAWS

## SECTION 38

### UNDISCLOSED AGREEMENTS WITH PLAYERS

*38.1.* At the time a Club and a player enter into any agreement, player contract, or any renegotiation, extension or amendment of a player contract, or offer sheet pursuant to By-Laws *9A* or *9B*, there shall be no agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances or intent or understandings of any kind, between such player and any club that are not disclosed in writing to the League:

        *(a)*    involving consideration of any kind to be paid, furnished or made available to the player, or any person or entity controlled by or related to the player, by the Club or any entity associated with the Club, either during the terms of the player contract or thereafter; or

        *(b)*    concerning any future renegotiation, extension or amendment of the player contract.

    *38.2.* If, in the opinion of the Commissioner, based upon such information and reports as he may deem sufficient, an investigation is warranted to determine the accuracy or completeness of any contract or offer sheet, then the Commissioner, or his designated representative, shall have the power to:

        *(a)*    conduct an investigation; and

        *(b)*    require the Club to:

            *(i)*    disclose, on a confidential basis, all books, records, documents, notes, drafts and computer files that the investigator deems appropriate; and/or

            *(ii)*    execute such forms, documents or legal instruments authorizing the League to obtain documents from third parties and governmental agencies that the investigator deems appropriate; and/or

        *(c)*    take testimony under oath of any employee, player or person connected with the Club during such investigation;

and the Club shall cooperate fully in the conduct of such investigation.

    *38.3.* The Commissioner is authorized to impose a fine up to One Million Dollars ($1,000,000) upon a Club for violation of Section *38.2*, in addition to all penalties and/or corrective action to which the Club and all other persons are subject pursuant to the Constitution and other By-Law provisions.