**EXHIBIT 4**

Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
George Brandon (AZ Bar No. 017947) gbrandon@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
Tel: (602) 528-4000
Fax: (602) 253-8129

and

Barry A. Pupkin (D.C. Bar No. 236091) bpupkin@ssd.com
Christopher H. Gordon (D.C. Bar No. 464760) cgordon@ssd.com
(*pro hac vice* applications pending)
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1201 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20004
Tel.: (202) 626-6600
Fax: (202) 626-6780

Counsel to Coyotes Hockey, LLC

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re | |
| DEWEY RANCH HOCKEY, LLC, | Case No. 2:09-bk-09488 |
| COYOTES HOLDINGS, LLC, | Case No. 2:09-bk-09500 |
| COYOTES HOCKEY, LLC, and | Case No. 2:09-bk-09491 |
| ARENA MANAGEMENT GROUP, LLC, | Case No. 2:09-bk-09495 |
| Debtors. | (Request for Joint Administration under Case No. 2:09-bk-09488 Pending)<br><br>Chapter 11 Proceedings |
| COYOTES HOCKEY, LLC,<br><br>Debtor/Plaintiff, | Adversary Proceeding No. 2:09-ap-494-RTBP |

v.

NATIONAL HOCKEY LEAGUE,

Defendant.

## SECOND AMENDED COMPLAINT

Plaintiff, Coyotes Hockey, LLC, brings this action against Defendant, National Hockey League ("NHL"), stating as follows:

## NATURE OF ACTION

1. Coyotes Hockey, LLC ("Coyotes") seeks injunctive relief under federal and state antitrust laws in connection with a threatened loss or damages resulting from the NHL's unlawful exercise of market power in the market for major league men's professional ice hockey contests in the United States and Canada. The NHL is excluding competition and restraining trade in that market through the application of unreasonable restrictions in its Constitution and By-Laws which are preventing the relocation of the Coyotes from Phoenix, Arizona.

2. The NHL is made up of competitive member teams. The NHL has market power in the provision of major league professional ice hockey games in North America. Use by the NHL of Article 4.3 of its Constitution, which grants each member team absolute veto power over the relocation of a competitive team within its "home territory," as well as application of Article 4.2 of its Constitution and Section 36 of its By-Laws to restrict the transfer and relocation of the Coyotes hockey club, are unreasonable, unlawful and anticompetitive restraints under Section 1 of the Sherman Act.

3. Through the NHL and the exclusionary and anticompetitive provisions in the NHL Constitution and By-Laws, members of the NHL have conspired to maintain, and have willfully acquired and maintained, monopoly power in violation of Section 2 of the Sherman Act

within their "home territories," as defined by Section 4.1 of the NHL Constitution, by refusing to allow the relocation of NHL clubs to markets where existing clubs currently have NHL franchises.

4.     The NHL and its members have conspired to create exclusive television and radio broadcast rights within designated territories through contracts with individual NHL members, thereby maintaining monopoly power within each team's "home territory" by preventing others from broadcasting events within those territories.

5.     The NHL and its members have conspired to exercise monopoly power in the market for team ownership by excluding certain people -- in the context of this proceeding -- from bidding for the Coyotes hockey club.  In so doing, the League has illegally reduced competition for the purchase of the Coyotes, with the likely result being fewer offers to purchase the team, and from those few offers, a lower price than would have been the case had the market for team ownership been competitive.

## JURISDICTION AND VENUE

6.     On May 5, 2009, Coyotes, along with affiliated entities, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

7.     Coyotes continues to operate its businesses and manage its properties as debtor-in-possession in accordance with Bankruptcy Code §§ 1107 and 1108.

8.     The Court has jurisdiction over the Coyotes' bankruptcy case and this Adversary Proceeding under 28 U.S.C. §§ 157 and 1334.  This matter constitutes a non-core proceeding that is related to a case under 28 U.S.C. § 157.

9.      Venue of Coyotes' bankruptcy case and this Adversary Proceeding is proper in this District under 28 U.S.C. §§ 1408 and 1409.

10.     Coyotes Hockey, LLC brings this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin the NHL's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.     Coyotes Hockey, LLC also brings this action pursuant to Ariz. Rev. Stats. § 44-1408 to enjoin the NHL's violation of section 44-1402 of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stats. § 44-1402.  This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22, because the NHL transacts business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

13.     The National Hockey League, headquartered at 1251 Avenue of the Americas, New York, New York, is an unincorporated association of 30 independently owned and operated professional ice hockey teams, or clubs, located in the United States and Canada.  The NHL is the dominant provider of major league men's professional hockey contests in the world.

14.     Each club that is a member of the NHL is a separate and independent business with a separate and independent owner, exercising significant autonomy in its business operations.  While the clubs cooperate to schedule and produce professional ice hockey games and facilitate competition on the ice, the clubs compete off the ice in the sale of tickets,

sponsorships, merchandise and concessions. For antitrust purposes, the member clubs of the NHL are competitors and are capable of conspiring under Section 1 of the Sherman Act.

15. Coyotes Hockey, LLC is a Delaware limited liability company. Coyotes Hockey, LLC independently owns and operates the Phoenix Coyotes, a professional ice hockey club and member of the NHL. The Coyotes club joined the NHL in 1979 as the Winnipeg Jets, and moved to Phoenix, Arizona, in 1996.

## RELEVANT MARKET

16. The first relevant product market is the provision of major league men's professional ice hockey contests. There are peculiar and unique characteristics that set major league men's professional ice hockey apart from other sports or leisure activities. Close substitutes do not exist, and watching or participating as a fan in major league men's professional ice hockey is not interchangeable with watching or participating as a fan in other sports, leisure pursuits or entertainment activities. Assuming a small, but significant, non-transitory increase in price to attend major league men's professional ice hockey, fans will not switch to attend other sports or entertainment activities. Accordingly, there is a unique and separate demand for major league men's professional ice hockey.

17. The second relevant product market is for ownership interests in major league men's professional ice hockey franchises. Close substitutes do not exist as ownership of a major league men's professional ice hockey franchise is not interchangeable with ownership of franchises in other sports.

18. The relevant geographic market for the provision of major league men's professional ice hockey and for ownership interests in major league men's professional ice hockey franchises is Canada and the United States, where the NHL teams are located and where

NHL games are played. Various geographic submarkets also exist, defined as a city, and fifty miles from the corporate limits of that city, in which only one existing NHL franchise is located. This area is defined as the "home territory" in Section 4.1 of the NHL Constitution. One example of such a geographic submarket is the Greater Toronto Area ("GTA"), *i.e.*, the market within fifty miles of Toronto's city limits.

19.     The North American market for the provision of major league men's professional ice hockey is characterized by high barriers to entry. The NHL is the only provider of major league men's professional ice hockey in North America. No other hockey league in North America provides the quality of play comparable to the NHL. Previous attempts at forming a major league professional hockey league to compete with the NHL have failed (*e.g.*, the World Hockey Association). Additionally, while several professional hockey leagues exist in Europe, expansion by these leagues into North America is stymied by prohibitive travel costs and insurmountable logistical difficulties. Moreover, an absolute barrier to entry exists in each geographic submarket by virtue of the absolute veto power granted to each NHL member to preclude the entry of competition into its exclusive "home territory."

20.     The NHL exercises monopoly power (the ability to control prices and exclude competition) in this market as it is the only provider of major league men's professional ice hockey in North America.

21.     The NHL is engaged in conduct, complained of herein, which has affected, and directly, substantially, and foreseeably restrained, interstate and foreign commerce.

## FACTS RELEVANT TO COYOTES' CLAIMS

**A.  The Coyotes Club Is Not Financially Viable in Phoenix.**

22.  The Phoenix, Arizona, metropolitan area is a non-traditional hockey market. After 12 years in the desert, however, the Coyotes have been unable to build a large fan base. The Coyotes played in downtown Phoenix for their first six years in Arizona and moved to the current arena in Glendale, Arizona, a suburb of Phoenix, in 2003.  Indeed, while Phoenix is the fifth largest city with an NHL franchise, the Coyotes rank 24th out of 30 in the NHL in gate attendance, well behind smaller cities like Pittsburgh, Buffalo and Vancouver.

23.  Absent a large enough fan base to generate sufficient revenues, the Coyotes have operated at a substantial loss, never posting a profit since moving to Arizona in 1996.  During the last three years alone, Coyotes has suffered approximately $73 million in operating losses.  Since the Coyotes club moved to Phoenix, the ultimate-super-majority owners of the franchise have provided the franchise with approximately $300 million to fund operations.  Moreover, because the Coyotes have failed to achieve revenue and attendance standards last season and the current season just ending, the NHL penalized the club 25 percent last year and is expected to penalize the club 40 percent of its prospective revenue-sharing money for the season just ending.  The NHL has also penalized this club for the same reason in prior years.

24.  For approximately one year the ultimate-super-majority owner of the Coyotes has made good faith efforts to locate a prospective purchaser or investor who will keep the Coyotes operating in Phoenix.  Unfortunately, no one has expressed an interest or presented an offer to keep the Coyotes in Phoenix that would pay all or even most of the Coyotes' creditors.

25.  PSE Sports & Entertainment LP ("PSE"), a Delaware limited partnership, desires to purchase the Coyotes club and move it to Hamilton, Ontario, a traditional hockey market.  The

controlling partner of PSE is James Balsillie, co-CEO of Research in Motion ("RIM"), Chairman of the Canadian International Council and the founder of the Balsillie School of International Affairs.

26.     Because the Coyotes club has not demonstrated itself to be financially viable in Phoenix without substantial financial assistance from the arena landlord (the City of Glendale) or some other source, Coyotes and PSE entered into an Asset Purchase Agreement dated May 5, 2009 (the "APA"). Coyotes and certain of its affiliates (collectively, the "Debtors") sought relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Court for the District of Arizona to implement the transaction contemplated by the APA. Mr. Balsillie supplied a personal guaranty for debtor-in-possession financing to fund the Debtors' operations pending finalization of a sale of the Coyotes club.

**B.     The NHL's Conspiracy to Oppose Relocation of the Coyotes Club.**

27.     PSE wishes to move the Coyotes club to Hamilton, Ontario, which is located approximately half way between Buffalo, New York and Toronto, Ontario, two locations with existing NHL clubs. Through public comments and otherwise, the NHL has made clear that it plans to oppose and prevent the relocation of the Coyotes to Hamilton, Ontario. While the NHL intends to effect this conspiracy by, among other things, unlawfully attempting to take control of the Coyotes to prevent the sale to PSE, the NHL likewise has at its disposal various provisions in its Constitution and By-Laws that unlawfully restrict and constrain the transfer and relocation of member teams.

28.     Article 4.3 of the NHL Constitution provides in part: "No franchise shall be granted for a home territory within the home territory of a member without the written consent of such member." Article 4.1 of the NHL Constitution defines "home territory" to mean: "Each

8

Member Club shall have exclusive territorial rights in the city which it is located and within fifty miles of that city's corporate limits."

29.     The purpose and effect of Article 4.3 of the NHL Constitution is to unreasonably restrain trade by granting *de facto* exclusive territories to the NHL member clubs and allowing member clubs to protect their respective monopolies by preventing new team entry into territories where NHL franchises already exist.

30.     Because the distance between downtown Hamilton and the Air Canada Center, where the Toronto Maple Leafs play their home games, is approximately 41 miles, the relocation of the Coyotes to Hamilton would place them within the "home territory" of the Maple Leaf franchise, and therefore subject to application of Article 4.3.

31.     Granting another franchise absolute veto power over a competitor's relocation to Hamilton, Ontario, is facially anticompetitive and would deny consumers the benefits that would flow from increased competition. A new NHL franchise in Hamilton, Ontario would compete with the Toronto Maple Leafs and Buffalo Sabres. Entry of a third NHL club in this traditional hockey region would increase competition, increase the output of hockey, increase the number of fans attending hockey games and increase fan intensity levels in the relevant market.

32.     Upon information and belief, the Toronto Maple Leaf franchise has previously exercised and/or threatened to exercise its veto to block the relocation of one or more NHL franchises to Hamilton, Ontario, in each instance preserving and maintaining its market power in the GTA.

33.     In 1993, Richard Peddie, President of the Toronto Maple Leafs, dismissed the relocation of the Ottawa Senators to Hamilton as something that "would not be acceptable to us [the Toronto Maple Leafs]." Mr. Peddie elaborated that because "franchises are a function of the

market they're in, the size, the demographics," and "part of the value of the [Toronto] Maple Leafs is the territory," permitting the relocation of another NHL franchise to Hamilton "would be giving away a lot of our [Toronto Maple Leafs] territory or sharing a lot of our territory, so that would be unacceptable." As evidenced by Mr. Peddie's comments, the sole purpose and effect of Article 4.3 of the NHL Constitution is to shield member clubs from competition that otherwise would exist, absent this veto power.

34. There is no pro-competitive justification to grant each NHL franchise absolute veto over whether to permit the relocation of a competitor club into its exclusive "home territory," especially a franchise like the Toronto Maple Leafs, which is strong and established, with a large, loyal and enthusiastic fan base. Indeed, NHL teams such as the New York Rangers, New York Islanders and New Jersey Devils already compete within 50 miles of one another and have done so for many years, achieving both financial and on-ice success.

35. Other provisions in the NHL Constitution and By-Laws concerning club relocation are equally exclusionary and anticompetitive and are without any pro-competitive justification.

36. Among these provisions is Article 4.2 of the NHL Constitution, which provides in relevant part: "No member shall transfer its club and franchise to a different city or borough. No additional cities or boroughs shall be added to the League circuit without the consent of three-fourths of all the members of the League."

37. In addition, Section 36 of the NHL By-Laws imposes a lengthy and, under the circumstances, unreasonable process for relocation of an NHL club. Section 36.1 requires an application for relocation to be filed no later than January 1 of the year prior to the year in which the club proposes it will commence its first season in the new location. Upon receipt of an

application, moreover, the NHL Commissioner assigns responsibility to investigate the merits of the relocation proposal to one or more committees of the NHL, which may request any documentation or information from the applicant that the committee(s) deems necessary.

38.     Taken together, these provisions unduly and unlawfully restrict the ability of NHL member clubs to relocate.     Moreover, even if the NHL could proffer pro-competitive justifications for these provisions, their application to block the Coyotes' proposed relocation to Hamilton, Ontario, would be unreasonable and anticompetitive.

39.     Any application of Article 4.2 or Section 36 of the By-Laws would be unreasonable and anticompetitive, intended solely to prevent the proposed sale and subsequent move of the Coyotes to Hamilton.     NHL Commissioner Gary Bettman has publicly stated in response to the bankruptcy filing that the Coyotes should and will remain in Arizona.     Similarly, Bill Daly, Deputy Commissioner of the NHL, is quoted as saying within the last month that the NHL has "no desire to relocate any of our existing franchises," and further stated that "[t]here is no consideration of bringing a second franchise to Toronto."     In short, the NHL has prejudged the relocation of the Coyotes in violation of its own anticompetitive provisions and already concluded that the relocation will be opposed.     Any attempt to apply Article 4.2 or Section 36 would be entirely pretextual and motivated by a desire to limit competition.

40.     Application of the procedural requirements of Section 36 of the By-Laws is likewise anticompetitive because it would result in an unreasonably protracted investigation into the proposed sale and relocation.     Any such delay would effectively scuttle the proposed sale to PSE and, in the absence of any other viable purchaser, result in the liquidation of the Coyotes franchise.     Allowing the NHL to invoke these provisions would, in essence, grant the NHL a "pocket veto" of the transaction and the termination of the Coyotes franchise.     Output, and

therefore competition, in the relevant market would thereby be reduced to the detriment of consumers.

41.     There is no pro-competitive justification to support application of Section 36 of the By-Laws in this context.  Section 36.5 of the NHL By-Laws outlines a list of factors each member club must consider in determining whether to consent to the relocation of a member club.  Consideration of these factors unquestionably counsels in favor of relocation:

a.     "Whether the [Coyotes club] is financially viable in its present location and, if not, is there a reasonable prospect, based on any of the considerations set forth in subsections (b) through (j) below, or for any other reason, that it could become financially viable there, either under its present ownership or under new ownership."  The Coyotes have never posted a profit since moving to Arizona in 1996.  During the last three years, Coyotes has suffered approximately $73 million in operating losses.  Indeed, since the Coyotes club moved to Phoenix and Glendale, the ultimate super-majority owners of the franchise have provided the franchise with approximately $300 million to fund operations.  Additionally, despite diligent and reasonable efforts by the present owners over the last year, no prospective purchaser or investor has arisen who has offered a plan to make the club financially viable in Phoenix.

b.     "The extent to which the fans have historically supported the [Coyotes] in its present location."  The Coyotes attendance levels at home rank 24th out of 30 in the NHL.  Over the last three seasons, the Coyotes' ticket revenues equaled approximately 41.3%, 43.0%, and 40.7% of total revenues, respectively, while average ticket revenues for an NHL club comprise approximately 50% of a club's revenues.  Accordingly, even though the Coyotes' tickets are currently underpriced compared to other clubs ($12.21 below the NHL average), fan attendance ranks near the bottom of the NHL.  In short, fans have not supported the Coyotes in

sufficient numbers to make the club financially viable. Indeed, the Coyotes' twelve years in Phoenix and Glendale demonstrate little potential for the development of the fan base in the Phoenix metropolitan area that is necessary to make the club financially viable.

c. "The extent to which the Club has historically operated profitably or at a loss in its present location." The Phoenix Coyotes has never posted a profit since moving to Arizona in 1996, and during the last three years, has suffered approximately $73 million in operating losses.

d. "Whether the present owner of the [Coyotes] has made a good faith effort to find prospective purchasers who are prepared to continue operating the Club in its present location and/or has engaged in good faith negotiations with such prospective purchasers." The present owner of the Coyotes endeavored diligently over the past year to locate a prospective purchaser or investor. The owner has engaged an experienced adviser to prepare and distribute a confidential information memorandum, and, at the urging of the NHL, has retained Citibank's Private Banking Group to help sell the team. Those efforts have been unsuccessful as no one has expressed an interest or presented an offer of a magnitude that would pay most of the creditors and keep the Coyotes in Phoenix.

e. "Whether there is any prospective purchaser of the Club and franchise who is prepared to continue operating the Club in its present location and, if so, whether any such prospective purchaser is willing and able, if necessary, to sustain losses during at least the initial years of its operation there." As noted, good faith efforts to locate a prospective purchaser or investor willing to pay the creditors and operate the Coyotes in Phoenix have failed.

f. "The extent to which the Club might be operated in its present location in a more prudent, efficient, and cost-effective manner than it has been in the past." The financial

difficulties facing the Coyotes are not the result of how the club has been operated. The team has laid off personnel and reduced costs in an effort to lower the level at which it could break even, and has sought financial assistance from its landlord, but there has been no commitment that would provide potential purchasers with sufficient financial incentives. The team has also contracted with younger players to reduce its payroll. For the 2007-2008 season the Coyotes had the fourth lowest payroll expense among the NHL clubs (over $25 million lower than the highest paid team).

g.    "The extent to which there is a reasonable prospect that significant revenues may become available to the Club within a reasonable time in its present location, either from the sale of media rights or from other sources." There is no such "reasonable prospect." Given the current economic slowdown, advance sales of tickets, advertising sales and sales of suites have been depressed.

h.    "The extent to which local government authorities are prepared to reduce the operating costs of the Club, either by granting tax relief or otherwise." Funds payable to the City of Glendale from the Coyotes and its arena management company have been largely pledged to help service the $180 million in bonds issued by the City of Glendale to help fund the $220 million construction cost of the arena. Those funds cannot be diverted, which is one reason the Coyotes have sought a direct subsidy from Glendale. Although a subsidy from the City is possible, no commitment would be made until a purchaser or owner group is identified. Many prospective purchasers were discouraged by the prospect of future losses with no firm commitment by the City of Glendale to provide a subsidy sufficient to overcome negative cash flow.

i.      "The extent to which operating costs of the Club in its present location might be reduced through the willingness of the applicable arena authority to reduce the rent charged to the Club or otherwise to reduce the Club's costs or increase its revenues, and/or through the willingness of other suppliers to reduce their charges for goods or services provided to the Club." As previously noted, attempts to obtain concessions from the City of Glendale have not been successful. Reducing costs, however, is not the issue, as much as it is a need for capital to fund enough player recruitment to achieve enough success to attract fans and advertisers. The ultimate super-majority owners have expended more than $300 million in an unsuccessful effort to bring the Coyotes to the point of economic viability.

j.      "The adequacy of the arena in which the Club plays its home games and the willingness of the applicable arena authority to remedy any deficiencies in the arena." The Coyotes moved into Jobing.com Arena in December, 2003. Although suitable as a hockey venue, the arena was designed without offices for the team's management and employees. This has necessitated the lease of nearby facilities at a cost of more than $1 million per year.

k.      There will be a suitable major league professional hockey arena available in Hamilton, Ontario for the Coyotes to play its home games. Specifically, the Coyotes will play in Copps Coliseum, which has a capacity of 17,326 for hockey and previously hosted major hockey events such as the finals of the 1987 Canada Cup. The prospective owner, PSE, has arranged for funding substantial improvements in the Copps Coliseum, which will include luxury suites and other amenities that will make this arena among the best of those hosting NHL home games.

l.      The demographic interest in hockey in Ontario, Canada is extremely high, which will be sufficient to make the franchise financially viable on a continuing basis.

15

Hamilton, Ontario, moreover, has a population of approximately 500,000, and there are several nearby communities also with significant populations. Southern Ontario has a population of more than 7 million people, a substantial percentage of whom are likely to be avid hockey fans.

          m.    PSE, the prospective owner, is willing and able to sustain losses during the initial years of operation, and is further committed to operate profitably without subsidy from other NHL teams.

          n.    Relocation will improve the image of the NHL by immediately resolving the bankruptcy of a member team. Moreover, relocation of the Coyotes club to Ontario will create additional rivalries that are likely to increase substantially the number of paid fans attending Coyotes games both at home and while playing as the visiting team in the arenas of competing member clubs.

    42.    The sooner the transfer of the Coyotes to Hamilton, Ontario, is allowed to occur, the less disruptive it will be to a playing schedule in the process of being developed. In fact, travel schedules are likely to be lighter with a team in Hamilton, Ontario, because teams from distant cities could combine trips to Toronto and Buffalo when they visit Hamilton.

    43.    Upon information and belief, the NHL, without even cursory consideration of the desirability of moving the Coyotes to Hamilton, Ontario, has already determined it will not consider the relocation of the Coyotes club. Indeed, as required by the NHL Consent Agreement, Section 4(c), any prospective purchaser of the Coyotes must agree, *inter alia*, that for a period of at least seven calendar years from the date of acquisition, the purchaser will not "move or transfer, request to move or transfer, or attempt to move or transfer, the [Coyotes] to a new Home Territory" as defined by Article 4.1 of the NHL Constitution.

## C. The NHL's Conspiracy to Oppose Sale of the Coyotes Club to James Balsillie

44.     In addition to the club relocation provisions in the NHL Constitution and By-Laws, provisions concerning the transfer of ownership in clubs are being applied unreasonably without any pro-competitive justification.

45.     Section 35.1 of the NHL By-Laws provide only two criteria to guide member franchises when considering whether to consent to the sale, assignment or transfer of a membership interest in a member club: (a) whether the persons who would hold the ownership interest in the club are able and willing to commit sufficient financial resources to provide for the financial stability of the franchise and (b) whether the persons who would hold the ownership interest in the club are of good character and integrity.

46.     The prospective owner of the Coyotes, Mr. Balsillie through PSE, unquestionably satisfies the criteria identified by the NHL to guide a decision about whether to consent to the sale or transfer of an ownership interest in a member club.  Mr. Balsillie filed his application to purchase the Phoenix Coyotes on May 21, 2009.  The application, along with supporting documents, clearly demonstrates the strength and credibility of Mr. Balsillie's offer.  First, Mr. Balsillie is willing and able to sustain losses during the initial years of operation, and is further committed to operate profitably without subsidy from other NHL teams.  Second, Mr. Balsillie is unquestionably of good character and integrity as evidenced by the fact that the NHL consented to Mr. Balsillie's acquisition of the Pittsburgh Penguins in 2006.

47.     Upon information and belief, the NHL refuses to consent to the acquisition of the Coyotes by Mr. Balsillie, through PSE, because of his intention to relocate the club to Hamilton, Ontario, within the exclusive territory of another NHL club.

48.     Upon information and belief, the NHL is applying and intends to apply provisions in its Constitution and By-Laws concerning transfer of ownership to restrict bidders for the insolvent Coyotes club only to those persons who will accept the NHL's anticompetitive relocation rules and agree to keep the Coyotes in Phoenix. Such a restriction limits competition for the sale of the Coyotes and is an unreasonable restraint of trade.

49.     Section 4.2 and 4.3 of the NHL Constitution and Section 35 of the NHL By-Laws, both in fact and in application with regard to the sale of the Coyotes, arbitrarily and unreasonably restrict both competition between NHL clubs and competition for ownership of NHL clubs (and in particular, the Phoenix Coyotes).

**D.      The NHL's Refusal to Permit Relocation of the Coyotes Club Restrains Competition for NHL Hockey and for Potential Bidders Who Wish to Purchase The Club**

50.     Although individual teams are part of the NHL and many activities of the NHL are legitimate under the antitrust laws, including the negotiation of labor agreements with players, the negotiation of national television broadcasting arrangements, and the promulgation and enforcement of agreed rules of play, other activities which are anticompetitive and not necessary for the success of the NHL in providing major league, professional ice hockey games are illegal and unreasonable restraints of trade.

51.     The antitrust laws prohibit this association of competitive teams, which has market power, from restricting the competitive activities of individual members of the NHL, except where such restriction is shown to be reasonably necessary to the success of the NHL or the achievement of some other legitimate, pro-competitive purpose.

52.     NHL rules governing franchise relocations, and exclusive territories in particular, and transfer of ownership interests are harmful to consumers when, as in this case, those rules are used to create and sustain an exclusive territory as well as to prevent a team from entering

another team's market and competing for fans. This is most egregious where teams face little competition from other sports leagues or entertainment, as is the situation in the geographic areas around Toronto and Buffalo.

53. Application of artificial constraints on moving the Coyotes by, among other things, imposing a requirement that any prospective purchaser agree to keep the Coyotes in Phoenix for seven years, and arbitrarily restricting persons who are permitted to purchase the Coyotes club (*i.e.*, Articles 4.2 and 4.3 of the NHL Constitution and Sections 35 and 36 of the NHL By-Laws) are illegal under the antitrust laws. Such constraints serve no legitimate purpose, and are unreasonable in the context of this case. The effect of these provisions is solely to lessen competition and maintain the dominant positions of the Toronto club in southern Ontario and the Buffalo club in northwestern New York by preventing another team from competing with these NHL clubs for fans. Controlling the transfer of ownership and relocation of franchises, and prohibiting such transfer of ownership and relocation because of increased competition with existing franchises crosses the line from permissible activity to illegal cartel activity by depriving consumers in the relevant markets of the benefits derived from increased competition: lower prices, higher quality and more variety.

54. Unreasonably and arbitrarily limiting the number of competitors that can bid to acquire NHL teams by (i) refusing to entertain offers to purchase the Coyotes by those who wish to relocate the franchise and (ii) requiring all prospective purchasers to sign a Consent Agreement to keep the Coyotes in Phoenix for seven years is anticompetitive and has prevented and is preventing the owners of the Coyotes from obtaining the full value for the franchise.

## FIRST CLAIM FOR RELIEF
### (Violation of Section 1 of the Sherman Act)

55.     Coyotes incorporates the allegations of paragraphs 1 through 54 by reference as if set forth in their entirety.

56.     The NHL, along with the independent businesses that comprise the member clubs in the NHL, has engaged in a contract, combination or conspiracy with the purpose, intent and effect of restraining horizontal competition among the NHL member clubs.

57.     The foregoing contract, combination or conspiracy has restrained competition between and among the NHL clubs in violation of Section 1 of the Sherman Act.  It has led to anticompetitive effects in the alleged relevant markets, and caused injury to consumers and competition in those relevant markets.

58.     The NHL's anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to Coyotes' business and property, as set forth above. Coyotes will continue to suffer antitrust injury and threatened loss or damage unless the NHL is enjoined from continuing to engage in the foregoing violations of law.

## SECOND CLAIM FOR RELIEF
### (Monopolization in Violation of Section 2 of the Sherman Act)

59.     Coyotes incorporates the allegations of paragraphs 1 through 58 by reference as if set forth in their entirety.

60.     The NHL possesses monopoly power in the market for major league men's professional hockey games in the relevant geographic market and each submarket.

61.     By virtue of exclusionary and anticompetitive provisions in the NHL Constitution and By-Laws -- including the absolute veto power in Article 4.3 -- the NHL has willfully acquired and maintained monopoly power in the relevant geographic market and each submarket

by blocking the relocation of member clubs, including the relocation of a competitive team in Hamilton, Ontario, thereby inhibiting the development of competition in the relevant geographic market and each submarket.

62.     The above-described actions constitute monopolization of the relevant geographic market and each submarket in violation of Section 2 of the Sherman Act.

63.     The NHL's anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to Coyotes' business and property, as set forth above. Coyotes will continue to suffer antitrust injury and threatened loss or damage unless the NHL is enjoined from continuing to engage in the foregoing violations of law.

### THIRD CLAIM FOR RELIEF
**(Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act)**

64.     Coyotes incorporates the allegations of paragraphs 1 through 63 by reference as if set forth in their entirety.

65.     Members of the NHL, which are actual competitors in the market for major league men's professional hockey contests, have conspired with and through the NHL to maintain monopoly power in their "home markets" or "home territories" by refusing to allow the relocation of NHL clubs to markets where existing clubs currently have NHL franchises.

66.     The NHL's anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to Coyotes' business and property, as set forth above. Coyotes will continue to suffer antitrust injury and threatened loss or damage unless the NHL is enjoined from continuing to engage in the foregoing violations of law.

## FOURTH CLAIM FOR RELIEF
### (Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stats. § 44-1402)

67.     Coyotes incorporates the allegations of paragraphs 1 through 66 by reference as if set forth in their entirety.

68.     The NHL, along with the independent businesses that comprise the member clubs of the NHL, have engaged in a contract, combination or conspiracy that has restrained the free exercise of competition in the above-described markets in this state or that has resulted in a monopoly, all in violation of Arizona Revised Statutes § 44-1402.

69.     The NHL's anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to Coyotes' business and property, as set forth above. Coyotes will continue to suffer antitrust injury and threatened loss or damage unless the NHL is enjoined from continuing to engage in the foregoing violations of law.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stats. § 44-1403)

70.     Coyotes incorporates the allegations of paragraphs 1 through 69 by reference as if set forth in their entirety.

71.     The NHL has established, maintained and used a monopoly, or attempted to establish a monopoly of trade or commerce, within this state, for the purpose of excluding competition or controlling, fixing or maintaining prices, all in violation of Arizona Revised Statutes § 44-1403.

72.     The NHL's anticompetitive conduct has directly and proximately caused antitrust injury and threatened loss or damage to Coyotes' business and property, as set forth above. Coyotes will continue to suffer antitrust injury and threatened loss or damage unless the NHL is enjoined from continuing to engage in the foregoing violations of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Coyotes Hockey, LLC, prays that this Court:

(a)     Enter judgment on each cause of action alleged in this Second Amended Complaint in favor of Coyotes Hockey, LLC and against the National Hockey League;

(b)     Permanently enjoin the National Hockey League from enforcing Articles 4.2 and 4.3 of the NHL Constitution and Section 36 of the NHL By-Laws to prohibit the relocation of the Coyotes club to Hamilton, Ontario and permanently enjoin the National Hockey League from enforcing Section 35 of the NHL By-Laws in such a manner as to restrict the persons who may bid to purchase the Coyotes club to only those persons who agree to keep the team in Phoenix;

(c)     Award attorneys' fees and costs of this action; and

(d)     Award such other and further relief as the Court deems just and proper.

Dated: June __, 2009

_s/ George Brandon_
Thomas J. Salerno (Bar No. 007492)
George Brandon (Bar No. 017947)
SQUIRE, SANDERS & DEMPSEY, LLP
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Tel.: (602) 528-4000

and

Barry A. Pupkin (D.C. Bar No. 236091)
Christopher H. Gordon (D.C. Bar No. 464760)
(_pro hac vice_ applications pending)
SQUIRE, SANDERS & DEMPSEY, LLP
1201 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20004
Tel.: (202) 626-6600
Fax: (202) 626-6780

_Counsel for Coyotes Hockey, LLC_

# **EXHIBIT 5**

```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF ARIZONA
 2

 3   _____
                                            )
     In re:                                 )
 4                                          )
     DEWEY RANCH HOCKEY, LLC      CH: 11    )   2:09-bk-09488-RTBP
 5                                          )
     1) CONTINUED HEARING ON MOTION FOR     )
 6      ORDER CONFIRMING ORDINARY COURSE    )
        BUSINESS PRACTICES AND IMPOSITION OF)
 7      THE AUTOMATIC STAY                  )
                                            )
 8   2) CONTINUED MOTION FOR INTERIM AND    )
        FINAL ORDERS UNDER 11 U.S.C. §§     )
 9      105(a), 345 AND 363: (a) AUTHORIZING)
        MAINTENANCE OF EXISTING BANK        )
10      ACCOUNTS AND (b) ALLOWING DEBTORS TO)
        CONTINUE USING EXISTING BUSINESS    )
11      FORMS                               )
                                            )
12   3) CONTINUED HEARING ON MOTION FOR     )
        INTERIM AND FINAL ORDERS: (a)       )
13      AUTHORIZING THE DEBTORS TO CONTINUE )
        TO PAY AND HONOR CERTAIN            )
14      PRE-PETITION CLAIMS FOR (i) WAGES,  )
        SALARIES AND OTHER COMPENSATION,    )
15      (ii) WITHHOLDINGS AND DEDUCTIONS AND)
        (iii) REIMBURSABLE EMPLOYEE         )
16      EXPENSES; (b) AUTHORIZING THE       )
        DEBTORS TO CONTINUE TO PAY AND HONOR)
17      CERTAIN PRE-PETITION CLAIMS RELATED )
        TO EMPLOYEE BENEFITS AND (c)        )
18      DIRECTING BANKS TO RECEIVE, HONOR   )
        AND PAY ALL CHECKS AND ELECTRONIC   )
19      PAYMENT REQUESTS RELATED TO THE     )
        FOREGOING                           )
20                                          )
     4) CONTINUED HEARING ON MOTION FOR     )
21      INTERIM AND FINAL ORDERS (a)        )
        AUTHORIZING BUT NOT DIRECTING THE   )
22      DEBTORS TO REMIT AND PAY CERTAIN    )
        TAXES AND FEES AND (b) AUTHORIZING  )
23      FINANCIAL INSTITUTIONS TO HONOR ALL )
        RELATED CHECKS AND ELECTRONIC       )
24      PAYMENT REQUESTS                    )
                                            )
25   _____
```

**AVTranz**
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295

1  _____ )
2   5) CONTINUED HEARING ON EMERGENCY        )
      APPLICATION FOR ENTRY OF INTERIM AND   )
3     FINAL ORDERS UNDER U.S.C. § 327(a)     )
      AUTHORIZING THE RETENTION AND          )
4     EMPLOYMENT OF SQUIRE, SANDERS &        )
      DEMPSEY L.L.P. AS ATTORNEYS FOR THE    )
      DEBTORS                                )
5                                            )
6   6) CONTINUED HEARING ON MOTION FOR       )
      INTERIM AND FINAL ORDERS: (a)          )
7     AUTHORIZING DEBTORS TO OBTAIN POST     )
      PETITION FINANCING; (b) AUTHORIZING    )
      USE OF CASH COLLATERAL AND (c)         )
8     DETERMINING SUFFICIENCY OF ADEQUATE    )
      PROTECTION                             )
9                                            )
10  7) STATUS REPORT IN RE: MEDIATION        )
                                             )
11  8) HEARING IN RE: PROPOSED BID           )
      PROCEDURES                             )
12                                           )
    9) STATUS REPORT ON LITIGATION WITH      )
13    CITY OF GLENDALE                       )
                                             )
14  10) MOTION FOR ORDER AUTHORIZING         )
       DEBTORS TO PREPARE, BUT NOT FILE A    )
15     CONSOLIDATED LIST OF CREDITORS IN     )
       LIEU OF INDIVIDUAL MATRICES, MAKE     )
16     THE CONSOLIDATED LIST AVAILABLE       )
       ONLY UPON REQUEST & TO FILE A         )
17     CONSOLIDATED LIST OF DEBTORS' 40      )
       LARGEST UNSECURED CREDITORS           )
18                                           )
    11) APPLICATION TO EMPLOY BRYAN CAVE AS  )
19     CONFLICTS COUNSEL                     )
    _____ )

20                          U.S. Bankruptcy Court
                            230 N. First Avenue, Suite 101
21                          Phoenix, AZ 85003-1706

22                          May 27, 2009
                            9:04 a.m.
23
24          BEFORE THE HONORABLE REDFIELD T. BAUM, Judge

25

```
 1   APPEARANCES:

 2   For Debtor:                    Thomas J. Salerno
                                    Kelly Singer
 3                                  Jordan A. Kroop
                                    Brian A. Cabianca
 4                                  SQUIRE, SANDERS & DEMPSEY, L.L.P.
                                    40 N. Central Avenue, Ste. 2700
 5                                  Phoenix, AZ 85004
                                       -and-
 6                                  George Brandon
                                    SQUIRE, SANDERS & DEMPSEY, L.L.P.
 7                                  40 N. Central Ave., Suite 2700
                                    Phoenix, AZ 85004
 8                                     -and-
                                    Edward M. Zachary
 9                                  BRYAN CAVE LLP
                                    2 N. Central Ave., Ste. 2200
10                                  Phoenix, AZ 85004

11   For National Hockey League:    C. Taylor Ashworth
                                    Alan Meda
12                                  STINSON MORRISON HECKER, L.L.P.
                                    1850 N. Central Ave., Ste. 2100
13                                  Phoenix, AZ 85004
                                       -and-
14   For National Hockey League:    Anthony W. Clark
                                    SKADDEN, ARPS, SLATE, MEAGHER
15                                  & FLOM, L.L.P.
                                    One Rodney Square
16                                  Wilmington, DE 19899
                                       -and-
17                                  J. Gregory Milmoe
                                    Shepard Goldfein
18                                  SKADDEN, ARPS, SLATE, MEAGHER
                                    & FLOM, L.L.P.
19                                  4 Times Square
                                    New York, NY 10036
20
     For PSE Sports &               Susan M. Freeman
21   Entertainment LP And S&E       LEWIS AND ROCA
     Interim Facility               40 N. Central Avenue
22   Corporation:                   Phoenix, AZ 85004-4429

23   For SOF Investments, L.P.;     Donald L. Gaffney
     White Tip Investments L.L.C;   SNELL & WILMER L.L.P.
24   Donatello Investments, LLC:    One Arizona Center
                                    Phoenix, AZ 85004-2202
25
```

```
1   APPEARANCES:  (Continued)

2   For SOF Investments, L.P.;      Steven M. Abramowitz
    White Tip Investments L.L.C;    VINSON & ELKINS L.L.P.
3   Donatello Investments, LLC:     666 Fifth Ave., 26th Floor
                                    New York, NY 10103-0040
4

    For Drawbridge Special          Sean P. O'Brien
5   Opportunities Fund L.P.:        GUST ROSENFELD P.L.C.
                                    201 E. Washington, Ste. 800
6                                   Phoenix, AZ 85004-2327

7   For United States Trustee's     Richard Cuellar
    Office:                         OFFICE OF THE U.S. TRUSTEE
8                                   230 N. First Avenue, Ste. 204
                                    Phoenix, AZ 85003
9

    For City of Glendale,           William R. Baldiga
10  Arizona:                        BROWN RUDNICK, L.L.P.
                                    One Financial Center
11                                  Boston, MA 02111
                                         -and-
12                                  Cathy L. Reece
                                    FENNEMORE CRAIG
13                                  3003 N. Central Avenue, Ste. 2600
                                    Phoenix, AZ 85012-2913
14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by electronic sound technician, Juanita
25  Pierson-Williams; transcript produced by AVTranz.
```

1          MR. CLARK:  Yes, Your Honor.  I think that's a fine

2     idea.  I think the Court should set, as an alternative

3     schedule, the schedule that we had proposed, which would have -

4     - I forget exactly the dates, but the way it generally works,

5     Your Honor, is that people today can start filing with the

6     League ownership transfer applications pursuant to the modified

7     --

8          THE COURT:  If I understand your procedure correctly,

9     in a cryptic sense NHL is going to do the auction, the

10     procedure, and then come back to the Court, I believe on August

11     29th, and ask that it be approved.  But most of it's going to

12     be outside the courtroom and not subject to oversight by this

13     Court.

14          MR. CLARK:  That's exactly right, Your Honor.  What

15     we've proposed is that people can start today putting in

16     application for ownership transfer with the League.  They would

17     be allowed to submit those applications up to -- the way the

18     Debtors' chart says, it's says --

19          THE COURT:  Well, let me ask you the same question

20     that I asked Ms. Freeman and I think Mr. Salerno.

21          Let's say I adopt your schedule and then, on the

22     29th, you've had your auction and the A Company has been the

23     high bidder and they've qualified and the League's approved

24     them.  And Bill Gates walks in.

25          MR. CLARK:  I don't think we'll have a problem with

1    Bill Gates, Your Honor.  If somebody else walks in who's a --

2          THE COURT:  So you're going to have to build in that

3    there's some -- the Court has the power at the hearing -- if it

4    concludes that we have a new bidder who is making a higher bid,

5    the Court can hear that bid and open the bidding back up.

6          MR. CLARK:  That wasn't my point, Your Honor.  My

7    point was that the League has the power to approve persons who

8    want to become owners of the League and to transfer teams, and

9    if Bill Gates came in and said to the League, You know, I'd

10   like to be the owner at this price and in this place, I think

11   Mr. Betman could get on the phone and talk to the other owners

12   and get some --

13         THE COURT:  Well, but --

14         MR. CLARK:  -- response very quickly.

15         THE COURT:  Well, but my point is then, on

16   potentially August 29, you're going to have to build into your

17   procedures that there is a mechanism that if what I'll call a

18   qualified bidder comes in, the League and the Court may allow

19   them to bid and the bidding may be reopened on that day.

20         MR. CLARK:  That's right, Your Honor.  It certainly

21   -- it's fine with us to have something in the procedures that

22   say that somebody can come in and make that kind of an

23   application to the Court and to the League at that time, and

24   they may be considered or they may not; it depends on what Your

25   Honor decides to do after -- it depends on a couple of things.

1   so I'm kind of thinking maybe the week after Labor Day,

2   Tuesday's the 8th, Friday's the 11th.  I don't know if we have

3   to lock that date today.

4           MR. CLARK:  I think having that range is fine for

5   now, Your Honor.

6           THE COURT:  All right.

7           MR. CLARK:  I think it's sufficient.  The one other

8   thing I wanted to say -- look, Your Honor asked about if

9   somebody shows up at the auction who hasn't showed up before.

10  The League's position would be that anybody who is a, quote,

11  qualified bidder, as the term is defined, which includes having

12  gone through the League's ownership transfer process, can show

13  up and bid.  If they have not done that, then we can talk about

14  reopening the process to allow somebody to do that and then

15  come back to Your Honor.

16          THE COURT:  Well, I don't need to decide this right

17  now.

18          MR. CLARK:  Right.

19          THE COURT:  But I'm going to tell you and I want you

20  to communicate this very clearly to your client and the Board

21  of Governors and the League if you have to, I think they're

22  going to have to figure out by telephone or some manner that if

23  somebody shows up -- I mean, I'm just going to use a name

24  that's been out there, that's in the Scudder declaration.

25  Let's assume nobody hears from Mr. Reinstore until the auction

1   day, whenever that is, August 29th or September 8th, whenever

2   it is.

3           But he walks in here on that day and makes the

4   highest bid.  I'm going to expect you to get on the phone with

5   Mr. Betman or Mr. Betman to get on the phone with whoever he

6   needs to get on the phone with, and to sign off on that bidder

7   yea or nay, very promptly.

8           MR. CLARK:  I understand the message, and the message

9   will be delivered, Your Honor.

10          THE COURT:  All right.

11          MR. CLARK:  One last point as a factual matter,

12  because I -- because people are listening to this.

13          THE COURT:  I know.

14          MR. CLARK:  But it is the fact and I think Your Honor

15  has seen some of this in the papers that have been filed, that

16  there is indeed interest by other buyers to buy this team and

17  keep it right here in Arizona, and in fact the Commissioner was

18  on his way to Mr. Moyes's office to tell him exactly that and

19  to deliver a proposal to him to that effect, when he was hit

20  with the surprise bankruptcy filing by Mr. Moyes and Mr.

21  Balsillie .

22          THE COURT:  Let's stay on the topic now.  We'll save

23  the advocacy for the 9th.

24          MR. CLARK:  Thank you, Your Honor.

25          THE COURT:  I think it would be helpful to go ahead

# **EXHIBIT 6**

<pre>
 1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF ARIZONA
 2

 3    _____
                                      )
      In re:                          )
 4                                    )
      DEWEY RANCH HOCKEY, LLC    CH: 11 )   2:09-bk-09488-RTBP
 5                                    )
      1) DEBTOR'S MOTION FOR JOINT    )
 6       ADMINISTRATION & USE OF CONSOLIDATED )
         CAPTION                      )
 7                                    )
      2) DEBTOR'S MOTION CONFIRMING ORDINARY )
 8       COURSE BUSINESS PRACTICES &  )
         IMPOSITION OF STAY           )
 9                                    )
      3) DEBTOR'S MOTION TO EXTEND TIME TO )
10       FILE STATEMENTS & SCHEDULES  )
                                      )
11    4) DEBTOR'S MOTION FOR ORDER     )
         AUTHORIZING DEBTOR TO PREPARE, BUT )
12       NOT FILE, A CONSOLIDATED LIST OF )
         CREDITORS IN LIEU OF INDIVIDUAL )
13       MATRICES, MAKE THE CONSOLIDATED LIST )
         OF CREDITORS AVAILABLE ONLY UPON )
14       REQUEST & FILE A CONSOLIDATED LIST )
         OF THE DEBTOR'S 40 LARGEST UNSECURED )
15       CREDITORS                     )
                                      )
16    5) DEBTOR'S MOTION FOR INTERIM & FINAL )
         ORDERS AUTHORIZING MAINTENANCE OF )
17       EXISTING BANK ACCOUNTS & ALLOWING )
         DEBTORS TO CONTINUE USING EXISTING )
18       BUSINESS FORMS                )
                                      )
19    6) DEBTOR'S MOTION FOR ENTRY OF INTERIM )
         & FINAL ORDERS DETERMINING ADEQUATE )
20       ASSURANCE OF PAYMENT OF FUTURE )
         UTILITY SERVICES & ESTABLISHING )
21       DETERMINATION & OBJECTION PROCEDURES )
                                      )
22    7) DEBTOR'S MOTION FOR INTERIM & FINAL )
         ORDERS AUTHORIZING THE EMPLOYMENT & )
23       COMPENSATION OF CERTAIN       )
         PROFESSIONALS IN THE ORDINARY COURSE )
24       OF BUSINESS RETROACTIVE TO THE )
         PETITION DATE                 )
25    _____)
</pre>

```
 1  ──────────────────────────────────────  )
 2   8) DEBTOR'S MOTION FOR INTERIM & FINAL   )
        ORDERS AUTHORIZING DEBTORS TO         )
 3      CONTINUE TO PAY & HONOR CERTAIN PRE    )
        PETITION CLAIMS FOR WAGES, SALARIES    )
 4      & OTHER COMPENSATION, WITHHOLDINGS &   )
        DEDUCTIONS AND REIMBURSABLE EMPLOYEE   )
 5      EXPENSES; AUTHORIZING THE DEBTOR TO    )
        CONTINUE TO PAY & HONOR CERTAIN        )
 6      PREPETITION CLAIMS RELATED TO          )
        EMPLOYEE BENEFITS & DIRECTING BANKS    )
 7      TO RECEIVE, HONOR AND PAY ALL CHECKS   )
        & ELECTRONIC PAYMENT REQUESTS          )
 8      RELATED TO THE FOREGOING               )
                                               )
 9   9) DEBTOR'S MOTION FOR ENTRY OF INTERIM   )
        & FINAL ORDERS AUTHORIZING THE         )
10      RETENTION & EMPLOYMENT OF SQUIRE       )
        SANDERS & DEMPSEY AS ATTORNEY FOR      )
11      DEBTORS                                )
                                               )
12  10) DEBTOR'S MOTION TO FILE DOCUMENTS      )
        UNDER SEAL                             )
13                                             )
    11) DEBTOR'S MOTION FOR ORDER              )
14      AUTHORIZING COYOTES HOCKEY, LLC'S      )
        SALE OF SUBSTANTIALLY ALL OF ITS       )
15      ASSETS FREE & CLEAR OF LIENS,          )
        CLAIMS & ENCUMBRANCES SUBJECT TO       )
16      HIGHER & BETTER OFFERS & APPROVING     )
        ASSET PURCHASE AGREEMENT               )
17                                             )
    12) DEBTOR'S MOTION FOR ENTRY OF ORDER     )
18      AUTHORIZING THE CONDUCT OF AUCTION     )
        OF COYOTES HOCKEY LLC'S ASSETS,        )
19      ESTABLISHING PROCEDURES TO BE          )
        EMPLOYED IN CONNECTION WITH THE        )
20      SALE INCLUDING APPROVAL OF             )
        TERMINATION FEE & APPROVING FORM &     )
21      MANNER OF NOTICE OF CONDITIONAL        )
        CURE NOTICE & SOLICITATION NOTICE      )
22                                             )
    13) DEBTOR'S MOTION ESTABLISHING           )
23      PROCEDURES FOR INTERIM COMPENSATION    )
        & REIMBURSEMENT OF EXPENSES FOR        )
24      CERTAIN PROFESSIONALS                  )
    ──────────────────────────────────────  )
25
```

```
 1   14) DEBTOR'S MOTION FOR INTERIM & FINAL    )
         ORDERS AUTHORIZING DEBTOR'S TO         )
 2       OBTAIN POST PETITION FINANCING,        )
         AUTHORIZING THE USE OF CASH            )
 3       COLLATERAL & DETERMINING               )
         SUFFICIENCY OF ADEQUATE PROTECTION     )
 4                                              )
     15) DEBTOR'S MOTION FOR INTERIM & FINAL    )
 5       ORDERS AUTHORIZING BUT NOT             )
         DIRECTING THE DEBTORS TO REMIT AND     )
 6       PAY CERTAIN TAXES & FEES AND           )
         AUTHORIZING FINANCIAL INSTITUTIONS     )
 7       TO HONOR ALL RELATED CHECKS &          )
         ELECTRONIC PAYMENT REQUESTS            )
 8   _____)
```

 9                                    U.S. Bankruptcy Court
                                      230 North 1st Avenue
10                                    Phoenix, AZ 85003

11                                    May 7, 2009
                                      1:36 p.m.
12

13              BEFORE THE HONORABLE REDFIELD T. BAUM, Judge

APPEARANCES:
14

     For National Hockey League:    C. Taylor Ashworth
15                                   Alan Meda
                                     STINSON MORRISON HECKER LLP
16                                   1850 N. Central Ave., #2100
                                     Phoenix, AZ 85004
17

     For National Hockey League     James E. Cross
18   Players' Association:           OSBORN MALEDON P.A.
                                     2929 N. Central Ave., #2100
19                                   Phoenix, AZ 85012

20   For PSE Sports &               Susan M. Freeman
     Entertainment LP and S&E       Stefan Palys
21   Interim Facility Corporation:  LEWIS AND ROCA
                                     40 N. Central Avenue
22                                   Phoenix, AZ 85004-4429

23   For SOF Investments, LP,       Donald L. Gaffney
     Donatello Investments, LLC,    SNELL & WILMER L.L.P.
24   White Tip Investments LLC:     One Arizona Center
                                     Phoenix, AZ 85004-2202
25

```
1    APPEARANCES:   (Continued)

2    For City of Glendale, AZ:      Cathy L. Reece
                                    FENNEMORE CRAIG
3                                   3003 N. Central Ave., #2600
                                    Phoenix, AZ 85012-2913
4
     For Dewey Ranch Hockey, LLC:   Thomas J. Salerno
5                                   Jordan Kroop
                                    Kelly Singer
6                                   Barry Pupkin (Telephonic)
                                    SQUIRE, SANDERS & DEMPSEY, LLP
7                                   40 N. Central, #2700
                                    Phoenix, AZ 85004
8                                      -and-
                                    Edward M. Zachary
9                                   BRYAN CAVE LLP
                                    2 N. Central Ave., #2200
10                                  Phoenix, AZ 85004

11   For National Hockey League:    Anthony Clark
                                    Gregory Milmoe
12                                  Shepard Goldfein
                                    SKADDEN ARPS SLATE MEAGHER
13                                  & FLOM LLP
                                    4 Times Square
14                                  New York, NY 10036

15   For SOF Investments, LP,       Steven M. Abramowitz
     White Tip Investments, LLC,    (Telephonic)
16   Donatello Investments LLC:     VINSON & ELKINS LLP
                                    666 Fifth Ave., 26th Floor
17                                  New York, NY 10103-0040

18   For City of Glendale:          William R. Baldiga
                                    Andrew Sroka (Telephonic)
19                                  BROWN RUDNICK
                                    Seven Times Square
20                                  New York, NY 10036

21   For SRP:                       Carolyn J. Johnsen
                                    JENNINGS, STROUSS
22                                  & SALMON, P.L.C.
                                    The Collier Center, 11th Floor
23                                  201 East Washington Street
                                    Phoenix, AZ 85004-2385
24

25
```

```
 1    APPEARANCES:   (Continued)

 2    For U.S. Trustee:              Larry Watson
                                     OFFICE OF THE U.S. TRUSTEE
 3                                   230 N. 1st Avenue
                                     Phoenix, AZ 85003
 4
      Also Appearing:               Matt Nussbaum (Telephonic)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by electronic sound technician, Juanita
25    Pierson-Williams; transcript produced by AVTranz
```

1  it --

2          MS. FREEMAN:  That there's not a waiver here.

3          THE COURT:  -- you all are looking for a kind of

4  resolution of the sale matters by about June 22nd or so.

5          MS. FREEMAN:  Right, right.  And I do just need to

6  get on the record that nobody is going to be saying oh, now

7  we're not hearing this sale procedure motion until the middle

8  of May and therefore it's too short of a time frame.  Thank

9  you.

10          MR. CLARK:  Your Honor, the NHL will not argue that

11 because of the fact that the auction procedures motion is now

12 being scheduled to be heard on the 19th that that incremental

13 delay between from today to then is a reason -- if you ever get

14 to it -- for the Court to deny a motion to approve a sale at

15 the end of June.

16          We will be arguing, if we get to it, that even if you

17 started today there isn't enough time between now and the end

18 of June -- frankly, there's not enough time between now and the

19 end of 2009 to go through the process of approving a

20 relocation, but we're not going to argue that this incremental

21 period of days makes a difference one way or the other.

22          The other thing I wanted to clarify, Your Honor, is

23 that the hearing on the 19th, we will file our motion today as

24 Counsel indicated, raising the what I call the management

25 control issue, and it was our understanding in negotiating with