**EXHIBIT 13**

Aiken, St. Louis & Siljeg
1215 Norton Building
Seattle, Washington 98104
MA 4-2650

F I L E D
WESTERN DISTRICT OF WASHINGTON
NORTHERN DIVISION

MAR 19 1970

REFEREE IN BANKRUPTCY.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
NORTHERN DIVISION

**66822**

| | |
|---|---|
| In the Matter of ) | PETITION FOR AUTHORITY |
| ) | FOR SALE AND FOR |
| PACIFIC NORTHWEST SPORTS, INC. ) | INJUNCTIVE RELIEF |
| ) | |
| Debtor ) | |

Comes Now the debtor corporation and respectfully represents and petitions as follows:

1. That contemporaneously herewith, petitioner has filed its Petition for Proceedings for an Arrangement under Chapter XI of the Bankruptcy Act.

2. That as is set forth in said Petition, the debtor corporation has entered into a contract of sale with Brewers, Inc. for the sale of petitioner's assets, including without limitation its "franchise", its player contracts and substantiall all of its assets.

3. That a true copy of said contract of sale is annexed hereto. That it is imperative that the debtor be forthwith authorized to consummate said sale; that an escrow for the sale thereof has been entered into between the debtor, the buyer and First Wisconsin National Bank of Milwaukee, Wisconsin. That the debtor has heretofore mortgaged all of its right, title and interest in and to the franchise and in and to the player contracts and other assets being sold to The Bank of California, N.A., Seattle, Washington; that petitioner is indebted to said Bank in

Pet.for Auth for Sale
& for Inj. Relief - 1

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1215 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

the sum of $3,500,000, together with interest accrued and to
accrue and costs.

4. That your petitioner is indebted to Sportservice
Corporation, 703 Main Street, Buffalo, New York, which said in-
debtedness is secured by a second mortgage or pledge of the assets
pledged to said Bank. That all of such security interests were
created in May of 1968 or by May of 1969.

5. That a condition of the annexed contract of sale is
that said secured creditors be paid in full out of the proceeds
of such sale. That a further condition of such sale is the ap-
proval by the American League of Professional Baseball Clubs
(League) of the sale of the assets to Brewers, Inc., and the
approval by the League of the parties in control of Brewers, Inc.
and the transfer of the right to operate a professional baseball
club in the City of Milwaukee, Wisconsin.

6. That an emergency exists and it is imperative that
a prompt hearing be had upon such notice as the Court may prescribe
authorizing the debtor to consummate the sale described in the
annexed contract, all as is provided in Section 313 of the
Bankruptcy Act.

7. That as mentioned in the Petition for Arrangement,
the debtor is a party defendant in an action in the Superior Court
of the State of Washington for the County of King entitled
"Alfred J. Schweppe, plaintiff, vs. Pacific Northwest Sports, Inc.,
et al, defendants", being Cause No. 720522

That a similar action has been filed by said plaintiff
in the Circuit Court of the 13th Judicial Circuit Court of
Florida in and for Hillsborough County.

Further, the debtor is a defendant in an action in the
Superior Court of the State of Washington for King County wherein

Pet.for Auth for Sale
& for Inj. Relief - 2

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1218 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

1  the State of Washington and the City of Seattle are co-plaintiffs
2  being Cause No. 720599.

3        That in all of said actions the plaintiffs have requested
4  an injunction against the debtor to enjoin the debtor from making
5  a sale of its assets, and in particular, fulfilling the contractual
6  obligations described in the annexed contract of sale.

7        8.  That it is imperative that this Court, in addition to
8  the relief provided by Section XI of the Act, and as elsewhere
9  provided under the Bankruptcy laws, enjoin or stay until final
10 decree the commencement or continuation of said suits and any other
11 suits that may otherwise be pending against the debtor.

12       9.  By the petitioner's filing of the Petition for an
13 Arrangement herein, the American League, under its constitution,
14 may have the discretionary power to terminate the franchise owned
15 by the petitioner.  To preserve this asset for the benefit of the
16 petitioner and its creditors, it is imperative that the American
17 League be restrained from taking any action toward or in pursuit
18 of terminating or otherwise affecting the value of the petitioner's
19 franchise.

20       WHEREFORE, your Petitioner prays that this Court prescribe
21 such notice as it may desire fixing a time for hearing to authorize
22 the consummation of the sale herein described, and that this Court
23 further enter an order enjoining said suits and any other suits
24 that may otherwise be pending against the debtor, and an order
25 restraining the American League from taking any action toward or
26 in pursuit of terminating or otherwise affecting the value of the
27 petitioner's franchise.

28       DATED this 19th day of March, 1970.

29                        PACIFIC NORTHWEST SPORTS, INC.

30                        By _____
31                             Its _____

32
Pet.for Auth.for Sale
& for Inj. Relief - 3

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1218 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

**EXHIBIT 14**

F I L E D
WESTERN DISTRICT OF WASHINGTON
NORTHERN DIVISION

MAR 19 1970

REFEREES IN BANKRUPTCY

1 | Aiken, St. Louis & Siljeg
2 | 1215 Norton Building
  | Seattle, Washington 98104
3 | MAin 4-2650
4
5
6
7
8 |              IN THE UNITED STATES DISTRICT COURT
9 |                 WESTERN DISTRICT OF WASHINGTON
  |                        NORTHERN DIVISION
10 | In the Matter of          )      ORDER TO SHOW CAUSE
11 | PACIFIC NORTHWEST SPORTS, INC.)   No. 66822
12 |                 Debtor. )
13 |        Upon all the records, files and proceedings heretofore
14 | had herein and upon the affidavit of Max Soriano herein filed,
15 | it is hereby
16 |        ORDERED that the persons, associations, trusts and corpor-
17 | ations named on the schedule attached show cause, if any there be,
18 | before the Honorable SIDNEY C. VOLINN         in his courtroom,
19 | Room 227  , Federal Court House, in the City of Seattle on the
20 | _30 day of March, 1970 at _10  o'clock _A_.M., why (1)  the
21 | contract of sale dated March 8, 1970 by and between Pacific North-
22 | west Sports, Inc. (Pacific) and Milwaukee Brewers Baseball Club,
23 | Inc. (Brewers) should not be carried out in accordance with its
24 | terms; (2) each of said entities having approval authority in
25 | respect of a change of ownership in a member club of the American
26 | League should not be ordered to grant such approval to the trans-
27 | fer contemplated therein; (3) each of such entities having approval
28 | authority over the transfer of location of a franchise granted by
29 | the American League of Professional Baseball Clubs (American League)
30 | should not be ordered to grant such approval to the transfer con-
31 | templated therein; and (4) the proceedings herein should not be
32 | Order to Show Cause - 1

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1215 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

06/01/2009 MON 10:28  [TX/RX NO 5084]

1   accelerated in order to preserve the assets being administered
2   for the reason that the value of such assets, if not sold imme-
3   diately in accordance with the contract hereinabove described,
4   will be materially diminished to the detriment of petitioner and
5   its creditors.
6      A copy of the Order shall be published in the Daily Journal
7   of Commerce for three successive days, and a copy mailed postage
8   prepaid to all the parties named on the attached schedule.
9      DATED this 19 day of March , 1970.

                                        _Sidney C. Volinn_
                                              Referee

13  Presented by:

        _Wallace Aiken_
16  Wallace Aiken
    Of Aiken, St. Louis & Siljeg
17  Attorneys for Debtor

29  Order to Show Cause - 2

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1218 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

SCHEDULE

THE AMERICAN LEAGUE OF PROFESSIONAL BASEBALL CLUBS,
an unincorporated association

BALTIMORE BASEBALL CLUB, INC., a corporation

BOSTON RED SOX, a trust

ARTNELL COMPANY, a corporation

CLEVELAND INDIANS, INC., a corporation

JOHN E. FETZER, INC., a corporation

GOLDEN WEST BASEBALL COMPANY, a corporation

CHARLES O. FINLEY COMPANY, INC., a corporation

NEW YORK YANKEES, INC., a corporation

THE SENATORS, INC., a corporation

MINNESOTA TWINS, INC., a corporation

KANSAS CITY ROYALS BASEBALL CORPORATION, a corporation

MILWAUKEE BREWERS BASEBALL CLUB, INC., a corporation

THE STATE OF WASHINGTON, a state of the United States

THE CITY OF SEATTLE, a municipal corporation

ALFRED J. SCHWEPPE, and

ALL OTHER CREDITORS, CLAIMANTS AND PARTIES IN INTEREST.

Order to Show Cause - 3

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1818 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2550

**EXHIBIT 15**

1  AIKEN, ST. LOUIS & SILJEG
2  1215 Norton Building
   Seattle, Washington 98104
3  MAin 4-2650

F I L E D
WESTERN DISTRICT OF WASHINGTON
NORTHERN DIVISION

MAR 25 1970

REFEREES IN BANKRUPTCY

FILED IN THE
UNITED STATES DISTRICT COURT
Western District of Washington

MAY 2 - 1972

CHARLES A. SCHAAF, Clerk
By
Deputy

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
NORTHERN DIVISION

In the Matter of        )        No. 66822
                        )
PACIFIC NORTHWEST SPORTS, INC. )        INJUNCTION
                        )
         Debtor.        )

         This matter having come on to be heard at Seattle in said
District on the 24th day of March, 1970, being the return date fixed
on the Order to Show Cause heretofore entered herein, upon the
Petition of Pacific Northwest Sports, Inc., Debtor above named, for
the issuance of an injunction in accordance with Sec. 314 of the
Bankruptcy Act (11 U.S.C.A. 714), and counsel for the City of Seattle,
State of Washington, County of King, Alfred J. Schweppe, the Ameri-
can League of Professional Baseball Clubs, The Bank of California,
N.A., Golden West Broadcasting Co., Sportservices, Inc., and the
debtor all appearing, and the Court having heard evidence and ad-
mitted exhibits, and having heretofore entered its Findings of Fact
and Conclusions of Law, NOW, THEREFORE

         IT IS HEREBY ORDERED as follows:

         1.  Alfred J. Schweppe, the City of Seattle, a municipal
corporation, and the State of Washington, and any other creditor
claimant or party in interest, be and they hereby are enjoined
until further order of this Court from continuing said above suits
and from commencing any other suits against the above named debtor,
and until further order of this Court all creditors and stockholders
and all sheriffs, marshals and other officers, and their respective

Injunction - 1

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1215 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

attorneys, servants, agents and employees, and all other persons,
firms and corporations be and they are hereby, jointly and severally
enjoined and stayed from commencing or continuing any action at law
or suit or proceeding in equity against said debtor in any court
within or without the state, or from executing or issuing or
causing the execution or issuance out of any court of any writ,
process, summons, attachment, subpoena, replevin, execution or other
process for the purpose of impounding or taking possession of or
interfering with any property owned by or in the possession of the
said debtor, and from doing any act or thing whatsoever to interfere
with the possession or management by said debtor of the property
and assets of the within estate, or to interfere in any manner dur-
ing the pendency of this proceeding with the exclusive jurisdiction
of this Court over said debtor and its properties; and all persons,
firms or corporations owning any lands or buildings occupied by
said debtor or wherein is contained any property of the within
estate, be, and they hereby are, jointly and severally, stayed,
pending the further order of this Court, from removing or inter-
fering with any such property.

2. That the American League of Professional Baseball Clubs
be and it is hereby restrained from taking any action toward or in
pursuit of terminating or otherwise affecting the value of the pet-
itioner's franchise. That the said American League and each of its
members is authorized to take such steps that may be necessary in
connection with the Order to Show Cause to be heard by this Court on
March 30, 1970, including but not limited to, voting for the approval
or disapproval of the transfer of debtor's franchise and assets,
which such transfer, if approved, shall only become effective if
this Court hereafter approves the proposed transfer.

3. The entry of this Injunction is without prejudice to
the rights of any party, upon motion and such notice as the Court

Injunction - 2

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1818 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

may hereafter fix, to entertain a dissolution or amendment of this injunction.

DATED this 25ᵗᵉ day of March, 1970.

_Sidney C. Volin_
REFEREE\

Presented by:

_____

Wallace Aiken
of Aiken, St. Louis & Siljeg
Attorneys for Debtor

Injunction - 3

AIKEN, ST. LOUIS & SILJEG
ATTORNEYS AT LAW
1218 NORTON BLDG.
SEATTLE, WASH. 98104
MAIN 4-2650

**EXHIBIT 16**

COPY OF ORIGINAL RECEIVED

MAR 25 1970

A. L. Newbould,
CORPORATION COUNSEL

COPY RECEIVED

3-25-70
SCHWEPPE, DOOLITTLE, KRUG & TAUSEND

Attorneys for

1  PERKINS, COIE, STONE,
     OLSEN & WILLIAMS
2  1900 Washington Building
     Seattle, Washington 98101
3     MUtual 2-8770

4  Attorneys for The American League
     of Professional Baseball Clubs

Copy Recd
3-25-70
DuWard

FILED IN THE
UNITED STATES DISTRICT COURT
Western District of Washington

MAY 2- 1972

CHARLES A. SCHAAF, Clerk
By_____ Deputy

8          IN THE UNITED STATES DISTRICT COURT
9            WESTERN DISTRICT OF WASHINGTON
                    NORTHERN DIVISION

10 In the Matter of            )  IN PROCEEDINGS FOR AN
                                )  ARRANGEMENT UNDER CHAPTER XI
11 PACIFIC NORTHWEST SPORTS, INC., )
                                )  NO.  6 6 8 2 2
12                    Debtor.   )
                                )  FINDINGS OF FACT AND
13                              )  CONCLUSIONS OF LAW

FILED
WESTERN DISTRICT OF WASHINGTON
NORTHERN DIVISION

MAR 25 1970

REFEREES IN BANKRUPTCY

14              FINDINGS OF FACT

15       1.  Pacific Northwest Sports, Inc. has filed its petition

16 for an Arrangement under Chapter XI of the Bankruptcy Act but no

17 plan has been proposed.

18       2.  The Debtor herein has filed a petition to sell its

19 franchise and player contracts as perishable property.

20       3.  The Court herein has issued an order on the City of

21 Seattle, the State of Washington, Alfred J. Schweppe and any

22 other creditor, claimant or party in interest to show cause on

23 Monday, March 30, 1970, why the petition to sell should not be

24 granted.

25       4.  The American League and its constituent members are

26 parties in interest.

27       5.  The American League has, pursuant to its constitution,

28 issued a franchise to Pacific Northwest Sports, Inc. to operate a

29 major league baseball team in the City of Seattle.

30       6.  Pacific Northwest Sports, Inc. is unable to meet its

31 debts as they mature and is unable to finance the operation of a

32

Findings and Conclusions - p. 1

baseball team in Seattle during the 1970 season.

7. Pacific Northwest Sports, Inc. and a corporation known generally as the Milwaukee Brewers have entered into a contract to transfer the franchise as referred to hereinabove to the Milwaukee Brewers for the consideration of $10,800,000 which expires by its terms after April 1, 1970. The debtor herein and the American League and its members are currently restrained by orders of the Superior Court of King County, State of Washington, and by an order of the State Court in the State of Florida, County of Hillsborough, from taking any action with reference to a transfer of the franchise from Seattle to Milwaukee.

8. The conduct of the proceedings in the State of Florida and the State of Washington hereinabove referred to substantially affects jurisdiction of this Court in its administration of the debtor's estate.

CONCLUSIONS OF LAW

1. This Court has exclusive jurisdiction of the debtor and its property, wherever located.

2. This Court has jurisdiction to enjoin or stay until a final decree the commencement or continuation of lawsuits or other judicial proceedings which limit the exclusive jurisdiction of this Court.

3. This Court has jurisdiction to make provisions in a final decree in a Chapter XI proceeding by way of injunction or otherwise which may be equitable.

4. This Court has jurisdiction to enjoin suits upon claims from which a discharge would not be a release, including claims which are not provable and suits not pending at the time of the filing of the petition under Chapter XI.

5. This Court has jurisdiction to grant injunctions and to restrain suits instituted by persons who are not creditors of the debtor.

Findings and Conclusions - p. 2

6. Even though the debtor is not a defendant, there is jurisdiction to enjoin a suit which affects the administration of the debtor's estate.

7. A franchise granted to the debtor by the American League passes to the debtor in possession.

DATED March 25, 1970.

_____
                                    Referee

Presented by:

_____
David E. Wagoner

Of PERKINS, COIE, STONE,
    OLSEN & WILLIAMS
  1900 Washington Building
  Seattle, Washington 98101
  MUtual 2-8770

Attorneys for The American League
of Professional Baseball Clubs

Findings and Conclusions - p. 3

**EXHIBIT 17**

( O R I G I N A L )

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF WASHINGTON

NORTHERN DIVISION

IN THE MATTER OF THE BANKRUPTCY OF:        )
                                           )
PACIFIC NORTHWEST SPORTS, INC.,            )
                              DEBTOR.       )   NO. 6 6 8 2 2
                                           )
                                           )   RULING OF THE COURT
                                           )
                                           )
                        (HON. SIDNEY C. VOLINN, JUDGE

REPORTERS TRANSCRIPT OF PROCEEDINGS

MARCH 31, 1970                          SEATTLE, WASHINGTON

1  THE COURT: At the outset, the Court must first
2  consider whether or not it has jurisdiction. A petition
3  invoking this jurisdiction was filed under Chapter XI of
4  the Bankruptcy Act. The Act makes no provision for answer
5  to or approval of the petition. This is stated in 8 Collier,
6  Sections 4.11, 4.12. However, courts do have inherent
7  power to consider whether or not jurisdiction should be
8  entertained. An allied contention has been raised that
9  another Chapter of the Bankruptcy Act, that is, Chapter X,
10  is a more appropriate vehicle for consideration of the
11  affairs of the debtor because of broad public interest.
12  The type of public interest contemplated by Chapter X is
13  related to widespread creditor or stockholder constituency.
14  There is flexibility under the Bankruptcy Act in terms of pro-
15  ceedings instituted under one chapter being moved into another.
16  This can be accomplished without dismissal of a pending pro-
17  ceeding. Thus if it is desired that Chapter X be invoked, this
18  can be done on Petition. In any event, the essential question
19  before the Court, that is sale of the assets, would inhere
20  as much in a Chapter X proceeding as in the present
21  situation.
22  According to the petition, and the evidence
23  presented, those debts of the debtor susceptible to
24  ascertainment approximate 8.5 million dollars of which some
25  5.5 million dollars is secured. There are claims of an

1   unliquidated nature contended for by the City of Seattle

2   and the State of Washington which substantially exceed the

3   foregoing total.  It would thus appear that the debtor's assets

4   substantially exceed in value the secured debts and that

5   there is a not inconsiderable equity available for application,

6   on some basis, to unsecured indebtedness.  It is clear that

7   the debtor not only is in a position where it cannot pay

8   its debts as they mature, but that it may well be insolvent

9   in that its assets will be insufficient to pay its liabilities.

10          The Court is therefore persuaded that the Chapter

11  XI petition is sufficient to invoke the jurisdiction of

12  this Court, particularly where no countervailing financial

13  testimony has been offered.  There have been allusions to

14  the capacity, if not the duty, of others particularly of the

15  American League to carry on for the debtor, thereby providing

16  surrogate assets, but this does not alter the financial condition

17  of the debtor itself nor its obligations.

18          The debtor has come before the Court alleging that

19  it is in an extremely depressed financial condition.  The

20  evidence introduced herein graphically demonstrates this

21  proposition.  It has further alleged that its franchise and

22  its properties, under the circumstances, are a wasting asset,

23  and petitions that an offer of purchase by the Milwaukee

24  Brewers in the sum of 10.8 million dollars should be

25  accepted.  From the evidence, the Court finds and concludes

that under the circumstances, the subject matter of the
sale, that is the franchise, player contracts and
equipment, because of the imminence of the baseball season
coupled with the obvious incapacity of the debtor to
function, are subject to imminent waste and depreciation
and that an emergency does exist.

That a debtor's assets may, particularly if
perishable, be liquidated prior to the formulation or
implementation of the plan under one of the rehabilitative
sections of the Bankruptcy Act is sanctioned by case
authority.

See In re Loewer's Gambrinus Brewery Co., 141
F.2d 747 (C.C.A.2, 1944); In re Pure Penn Petroleum, 188
F.2d 851 (C.C.A,2, 1951); In re Northern Ill. Dev. Co.,
309 F.2d 882 (C.C.A.7, 1962); In re Northern Ill. Dev. Co.,
324 F.2d 104 (C.C.A.7, 1963); Frank V. Drink-o-Matic, 136
F.2d 906 (C.C.A.2, 1943); In re Solar Mfg. Corp., 176 F.2d
493 (C.C.A.3, 1969).

As stated before, the Court has found and concluded
that this matter in its present posture fits into the pattern
of the foregoing cases. The debtor is virtually without
funds for further operation and is helpless with respect
to obtaining more. It can be kept alive only by virtue of
limited advances from the American League, such advances
being based on a presently felt need to protect the mutual

1   interests of its constituent members.

2          The only real alternative thus far presented is

3   that the American League in effect be impressed with an

4   obligation which insofar as the undisputed record shows

5   may well involve deficit financing for a period of at least

6   three years with a total potential loss from $5-10,000,000.

7          While the Court is cognizant of the public issues

8   and interest involved, these are now the subject matter of

9   litigation maintained by the State and the City of Seattle

10   which is of a complex and inherently protracted nature.

11   Predictions by adversaries cannot substitute for the ultimate

12   judgment of a court. Under these circumstances, it would be

13   most ineqitable to require, assuming this Court has jurisdiction,

14   that the American League be burdened with operating an enter-

15   prise promising economic loss of major magnitude with only

16   the hope that the building of a domed stadium, itself the

17   subject of litigation, might make major league baseball a

18   profitable operation in Seattle.

19          Further, as to this phase of the matter, the

20   objecting parties have instituted suits which they

21   presumably will pursue in courts of competent jurisdiction.

22   They will have every opportunity to establish their claims

23   and if they are successful, they will receive compensatory

24   damages of a most substantial nature.

25          None of the testimony adduced in this proceeding

demonstrates that acceptance of the offer is improvident

1   or that the consideration is inadequate. On the contrary,

2   the evidence indicates that measured againt offers

3   previously made, including the so-called Carlson offer, the

4   amount proffered is in fact consistent with an offer which, in

5   terms of amount, would be most acceptable to the objecting

6   parties.

7        It should be remembered that the sale contemplated

8   here and the funds derived therefrom are subject to claims

9   of all creditors. Section 307 of the Bankruptcy Act provides

10  that claims of the broadest nature, liquidated or

11  unliquidated, fixed or contingent, are within the purview

12  of an arrangement proceeding as distinguished from straight

13  bankruptcy proceedings, Section 63, where this may not be

14  the case. It should also be pointed out, that relative

15  equities amongst the various claimants may be considered

16  in dealing with their claims and priorities relating thereto.

17  Pepper v. Litton, 308 U.S. 295 (1939).

18       As previously stated, this Court is not

19  insensitive to the unique character of a major league

20  baseball team and its importance to the community. However,

21  the problem has been created because of the inability of

22  the debtor to meet its obligations.

23       The reasons which have brought this condition

24  about are complex but whatever they may be, the fact that

25  the debtor is simply incapable of carrying on is beyond

1    question.  Again, alluding to the argument that the American

2    League constitution requires that the League field

3    and play a team where the franchise is terminated and dis-

4    regarding the corollary provision that should such an event

5    occur., the League may sell at least the franchise, this con-

6    stitutional provision is for the benefit of the constituent

7    members of the League.  These members may or may not be willing

8    that the League incur losses under such uncertain conditions

9    as already stated.  The stadium itself is not ready.  Were the

10   League to enter into the picture, the City of Seattle would

11   no doubt attempt to protect its own interests in dealing with

12   the League as a tenant, thereby involving further delay.

13   In the meanwhile, and as at the present moment, hundreds of

14   individuals dependent upon the Pilot organization are un-

15   certain as to their own future.  The interrelated activities

16   attendant to League play throughout the United States, premised

17   upon a scheduled number of baseball games taking place in

18   various cities on specific dates affects thousands more.

19         Because of the foregoing considerations, the

20   Court is constrained to find and conclude that the

21   Milwaukee offer, as initially presented and further defined

22   by its counsel in the course of these proceedings should

23   be and is approved, and that all steps necessary to con-

24   summate the transaction be and they are hereby

25   authorized and the debtor in possession is directed to

proceed thereon forthwith.

With respect to the Fred J. Ruge petition, and all matters related thereto, the Court finds and concludes that they are without substance and should be and are dismissed.

As to the claim of the Golden West Broadcasters, Inc., the Court finds and concludes that this claim and all matters pertinent thereto have been submitted to the jurisdiction of the Court and without ruling on the merits thereof, this claim is transferred to the proceeds of sale herein provided for, the validity, extent, nature and relative priority thereof to be determined by this Court on due notice to all parties concerned.

It is further ordered that with respect to any disbursements made herein to creditors, secured or un-secured, such disbursements shall be made only upon order of this Court, it being the intention of the Court that wherever such claims involve matters of an unliquidated nature such as attorney fees, the same shall not be payable without authority of the Court.

the foregoing provision with respect to payment of claims out of the funds received herein from said sale, shall also apply to the claim of Sports Service, Inc., it being the Court's intention that the debt to be assumed by the Brewers as provided for by its offer shall be subject

1    to specific allowance by the Court.

2         Finally, it is the view of the Court that a

3    receiver should be appointed for the purpose of receiving

4    and administering the debtor's funds and assets pending

5    formulation and presentation of a plan herein or such

6    other or further disposition of this matter as may be

7    warranted under the circumstances.  The Court will appoint

8    Richard T. Saunders, his initial bond being fixed in the

9    sum of $50,000.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                    C E R T I F I C A T E
3
4
5         I, PAUL C. TVETEN, do hereby certify that I am a
6    duly certified court reporter and am the reporter who reported
7    the foregoing proceedings;
8         I do further certify that the foregoing is a full,
9    true and accurate transcript of said proceedings.
10
11                                    Paul C. Tveten
12                              COURT REPORTER
13
14
15   DATED:  4/3/70        .
16
17
18
19
20
21
22
23
24
25
```

PAUL C. TVETEN
CERTIFIED COURT REPORTER
ROOM 229 — U. S. COURT HOUSE
TELEPHONE 583-7545
SEATTLE, WASHINGTON

**EXHIBIT 18**

700811
Box 117

EXHIBIT 8
3/24/70

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

THE STATE OF WASHINGTON, a )
state of the United States, )
and THE CITY OF SEATTLE, a )
municipal corporation, )
       )
    Plaintiffs, )   NO. 720599
       )
  vs. )
       )
THE AMERICAN LEAGUE OF )   AFFIDAVIT OF
PROFESSIONAL BASEBALL CLUBS, )   JOSEPH E. CRONIN
an unincorporated association; )
et al., )
       )
    Defendants. )

PERKINS, COIE, STONE,
 OLSEN & WILLIAMS
1900 Washington Building
Seattle, Washington 98101
 MUtual 2-8770

Attorneys for Defendant,
The American League of
Professional Baseball Clubs

Affidavit of
Joseph E. Cronin - p. 1

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH:

## AFFIDAVIT

JOSEPH E. CRONIN being duly sworn according to law, deposes and says as follows:

1. My name is Joseph E. Cronin. I reside at 77 Lake Avenue, Newton Center, Massachusetts 02159. I am the President of the American League of Professional Base Ball Clubs (hereinafter called "The League") and have served in that capacity since my election in 1959. The duties and responsibilities of the League President are as specified in the American League Constitution of January 1, 1966, a true and correct copy of which is attached as Exhibit A to this affidavit. As set forth in Section 6.5 of the Constitution I am required as President to preside at all meetings of the League.

2. The official business of the League is conducted at its regular and special meetings which are held annually and as circumstances require. Actions binding upon the League are taken by it at its meetings and are as set forth in resolutions and in the written minutes of the meetings which incorporate them. Committees of members are appointed from time to time to act for the League but they and the individual members and representatives of the League do not bind the League unless specifically so authorized. In connection with its Seattle franchise the League has not authorized any committee, member or representative to bind the League. The minutes of League meetings are then prepared subject to my approval, after which they are distributed to all members. Because of the press of other business and illnesses no minutes have as yet been prepared of special meetings of the League held on January 26-27, February 10-11 and March 17, 1970.

3. A special meeting of the League was held in Oakland,
California, January 26-27, 1970, to consider the status of the League's
Seattle franchise currently held by Pacific Northwest Sports, Inc.
At that meeting the League received a delegation from Seattle which
included Messrs. Edward Carlson, James Douglas and Mechlin Moore,
in which they proposed that the financially troubled Seattle Club should
be retained by the League in Seattle for the 1970 season on certain terms
and conditions of their devising which they outlined to the League but
which the League found unacceptable for a number of reasons. One
important reason was that the new funds proposed to be made avail-
able for the operations of the Seattle Club were only $2,000,000.00,
which in the light of the then available financial projections of the Seattle
Club was deemed by the members of the League to be totally inadequate
to sustain those operations for the 1970-71 and 1972 seasons. An addi-
tional feature as to which further concern was expressed was that their
proposal contemplated a non-profit charitable form of ownership and
operation. These objections were made known to the Carlson group.
However, it was also made clear to the Carlson group that the League
was most desirous of working out an arrangement whereby the Club
could be retained in Seattle and a number of problems were specified
by the League's representative which would have to be solved before
the League would be in a position to take favorable action with respect
to any application for membership in the League which might there-
after be submitted to it by the Carlson group. It was made clear to
the Carlson group that they had substantial hurdles to overcome in
convincing some League members about the appropriateness of the
non-profit format for baseball.

2

4. The League next met in Chicago, Ill, on February 10-11, 1970 to give further consideration to the Seattle problem. At that meeting a written proposal was received from the Carlson group and an oral presentation was made to the League by Mr. Edward Carlson and Mr. James Ellis. As finally submitted for the action of the League the proposal contemplated the following:

(a) That the Pilot's franchise would be purchased by a limited partnership to be composed of a number of individual Seattle investors who as limited partners would subscribe a total of $1,500,000.00 to the capital of the partnership to which would be added $1,500,000.00 in partnership interest purchased by Mr. William Daley;

(b) That the general partner of the limited partnership would be a corporation formed under the Washington Business Corporations Act which would have a paid in capital of $50,000.00, and whose Articles of Incorporation would specify that any net earnings not necessary in the conduct of its business would be distributed for charitable purposes; and

(c) That additional capital in the amount of approximately $2,700,000.00 would be made available to the limited partnership by means of loans from a non-profit corporation, which funds would be derived from bank loans secured by underwriting pledges in that amount from interested individuals and groups in the Seattle community.

3

A resolution was moved that this proposal be accepted by the League, which after much discussion, was defeated by a vote of 8 ayes and 4 nays, one vote short of the 3/4 majority necessary for passage under the League Constitution. In the discussion several reasons were advanced by the members of the League voting against the proposal, among them being that the non-profit concept remained as an essential element of the proposal which these members regarded as impractical and undesirable from the point of view of enabling the Seattle Club to compete effectively on the baseball field with the teams of the other members. Contrary to the belief of some, organized baseball has always recognized that it is a business in addition to being a sport. It is a business which requires multimillion dollar investments and involves high risks. Profit motivations are important to the maintenance of competitive and strong baseball enterprises, in the absence of which the entire structure of the League is weakened. There is a particular need for the investment of very large sums on

team should be at least $1,000,000.00 and more probably $1,500,000.00 or more per year. These considerations influenced the dissenting members in their view that the non-profit proposal was contrary to the long term best interests of competitive major league baseball.

Doubt were also expressed as to the adequacy of the Carlson group's proposal with reference to its financial ability to sustain deficit operations in the 3-year period prior to the projected completion of the Domed Stadium in 1973 and to develop a competitive team in the process. It was further pointed out that there would clearly be no net income from the partnership for a considerable period of years if the Club were to be adequately financed and developed as a competitive major league team. The dissenting members expressed concern that the League might eventually suffer in the eyes of the persons and groups in Seattle who had pledged their credit to the non-profit

corporation on the basis of assisting charity when it became clear
how remote satisfaction of the charitable objective appeared.

Following the failure by one vote of the Carlson pro-
posal the League considered other available alternatives. It was the
clear sense of the meeting throughout the 2-day session that the
Club should be retained in Seattle if any reasonable way could be found
to do so. Accordingly, consideration was given to whether the League and/or
its members could undertake to finance the Seattle Club during the 1970
season . According to then available estimates it appeared that the
amount of money which would be required to do so would be about
$2,000,000.00. A motion was made which, among other things, pro-
posed that the League instruct the Pilots to remain in Seattle and
that in consideration of this the American League would agree to
guarantee a loan of $2,000,000.00 with proportionate guarantees by each
of the Clubs in the League. This motion did not carry.

The League next considered what means were avail-
able pending final solution of the Seattle franchise problem to meet
the immediate and pressing need for current operating funds to de-
fray current and past due obligations, which included salary and bonus
payments to players and other employees. These payments were nec-
essary immediately to keep the Club in operation. The League was
informed that the sum of $650,000.00 would be required to meet these
obligations and to carry the team through its spring training season.

An informal motion was then made that the Seattle Clubbe directed
stay in Seattle for the 1970 season, that the League advance the
$650,000.00 and that a committee be appointed by the League's President to
meet with Mr. Carlson to see whether a means could be found to obtain

5

the participation of his group in the ownership or operation of the Club,
which committee would meet immediately with Mr. Carlson and then
report back to the meeting. The motion also provided that the Clubs
would investigate the extent of their respective abilities to further
support the operations of the Seattle Club and that if the discussions
with Mr. Carlson proved unsuccessful that the search would be con-
tinued for a new owner-operator in Seattle. This motion carried.

I then appointed a committee consisting of Messrs.
Hoffberger, Reynolds, Hayes, Burke, R. Short and Allyn to meet
with the Carlson group and the meeting recessed for that purpose. I
was not present at the meeting between the committee and the Carlson
group.

When the meeting reconvened Mr. Hoffberger report-
ed that the committee had met with Messrs. Carlson, Douglas and
Ellis; had informed them that the League had not approved the Carlson
proposal for a number of reasons; that the League intended to stay in
Seattle, to see the Seattle Club over the immediate future period
and to carry it through spring training and that it was hoped that the
Carlson group would become a part of the Pilot's organization. Mr.
Hoffberger further reported that after the meeting between the com-
mittee and the Carlson group he had met further with Mr. Ellis
and that Mr. Ellis had stated that the terms upon which the funds
had been made available to the Carlson group by its Seattle supporters
were explicit and did not permit participation otherwise than upon
those terms. Mr. Hoffberger indicated, however, that Mr. Ellis had
stated that further work would be done by the group. Thereafter, the
Messrs. Carlson, Ellis and Douglas were reinvited into the meeting.

6

Mr. Carlson expressed to the meeting the pleasure of his group that the League had determined to retain the franchise in Seattle and added that his group felt bound by the underwriting commitments to the proposal as submitted to the League.

After the Carlson group was excused from the meeting the members turned their attention to the formalizing of the motion previously adopted, and after discussion, it was finally adopted in the form attached hereto as Exhibit B. The sixth paragraph of that resolution provided:

> "RESOLVED that the Clubs of the League
> investigate and report to the League Presi-
> dent the extent of their abilities to commit
> themselves for additional credit, if nec-
> essary, to Pacific Northwest Sports, to sup-
> port its further operations for the 1970 season."

5. The next meeting of the League was held at the International Inn, Tampa, Florida, on March 17, 1970. This meeting was also held for the purpose of considering the status of the Seattle Club.

In the course of the March 17 meeting the League received report from Mr. Joseph Cumniskey, who had served as a member of the Committee appointed by me pursuant to the third paragraph of the February 11 resolution. Mr. Cumniskey reported that the $650,000.00 made available by the League action of February 11 to support the operations of the Seattle Club would not be adequate, in his judgment, to defray the Seattle Club's expenses beyond the beginning of the 1970 season on April 7, 1970 and might be exhausted before that date. He stated that the League had chosen to make the initial advances of the

7

$650,000.00 for purposes of funding the Seattle Club's operations by way of direct payments from the funds available in the League treasury because investigation had disclosed that it would be difficult, if not impossible, for the League to borrow the amount from any bank.

After expenditure of the $650,000.00 the cash resources of the League treasury and such bank credit as is available to it will be insufficient to cover the projected losses of the Seattle Club beyond the opening of the 1970 season.

Thereafter the League received a report from Dr. John Clark of the firm of Arthur D. Little, Inc., a business consulting firm of Cambridge, Massachusetts. Immediately following the February 11 meeting I had retained Dr. Clark to conduct an independent investigation with respect to the financial condition of the Seattle Club, following which he made a trip to Seattle for that purpose. At the March 17 meeting Dr. Clark reported in substance that as a result of his review he had concluded that the net cash deficit which could be expected to result from the operations of the Seattle Club in Seattle for the 1970 championship season of the American League would probably be in excess of $3,000,000.00, and might be as much as $3,900,000.00.

It is also Dr. Clark's opinion that a net cash deficit in an almost similiar order of magnitude could be expected for the 1971 and 1972 seasons, and it would not be unreasonable to anticipate a net cash deficit in excess of $10,000,000.00 in the 1970-71 and 1972 seasons prior to the opening of the Domed Stadium if the team were to remain in Seattle.

Following Dr. Clark's report I requested each of the members of the League to make a report to the meeting in accordance

8

with the sixth paragraph of the resolution which had been adopted at
the meeting of February 11.

In response to my request I was advised as follows:

(a) One Club stated that based on conferences
with its bank it was extremely doubtful whether it
could put up its 1/11 th share of the amount needed
to carry the Seattle Club through the 1970 season.
Therefore it could make no commitment to do so.

(b) One Club stated that its bank loan prevented
its advancing money to any one and that its Board
of Directors had voted unanimously against parti-
cipating at all. It stated that in view of its finan-
cial position it was not in position to advance any funds
to anybody.

(c) One Club stated that it would honor its share of
the $650,000.00 already committed if the League
treasury could not satisfy that commitment but
that it certainly would not go beyond that. This Club
expressed itself in strong opposition to any Club
advancing money when other Clubs could not do
so on an equal basis.

(d) One Club expressed itself flatly as negative
to any advance beyond the $650,000.00.

(e) One Club said that it would vigorously oppose
a League decision to go beyond the $650,000.00 but
would come up with its share if that were the
League's decision.

9

(f) One Club said that it would participate in the $650,000.00 commitment but that it would be imprudent to put more money into the Seattle Club.

(g) Four Clubs said that they would put up their share for the 1970 season if voted by the League. One of these clubs expressly conditioned its willingness to do so on all Clubs doing the same, and I believe that the other Clubs were of the same opinion.

(h) One Club expressed reluctance to advance more money but made no commitment either way.

Based upon Dr. Clark's estimate as to the probable range of deficit a 1/11th share of the cash deficit for the 1970 season would amount to approximately $270,000.00 to $350,000.00. It was clear from the discussion that even if those who had expressed a willingness to further support the Seattle Club were to do so, the resulting funds would fall far short of the amount required to carry the Seattle Club through the 1970 season.

The above discussion was conducted upon the assumption that individual clubs of the American League could properly loan funds to the Seattle Club for use in its operations. That assumption is open to grave question, however, because of provisions of Section 3.14 (c) (1) of the American League Constitution prohibiting direct or indirect loans by a member of the League to another member. The purpose of this provision of the Constitution is to avoid conflicts of interest and specifically to avoid one Club's obtaining an advantage

10

in connection, for example, with player trade by having another Club indebted to it and because of the vital importance of avoiding even the appearance of favoritism between members.

.At the conclusion of the Tampa meeting the League unanimously adopted a resolution stating its position with respect to the Seattle Club, a true and correct copy of which is attached as Exhibit C.

7. During the interval between the February 11 and March 17 meetings and with my knowledge and approval inquiries were made on behalf of the League to determine whether the Carlson proposal or some variation of it could be kept open and to learn whether prospective investors could be found to purchase the Seattle Club and conduct its operations in that city. Discussions were held with prospective purchasers but none of them came forward to apply to the League for permission to purchase the Club and become a member of the League. So far as I am aware there is now no prospective purchaser interested in doing so.

8. In the event that the League continues to be restrained by court order from transferring the location of the Seattle Club to another city it will become inevitable, in my opinion, that the Seattle Club will .... ... be unable to continue operations in Seattle for the 1970 season and it will have to cease operations and go out of business. If this should happen the effect on the Club, on its creditors and on the League would be disastrous. So far as the League is concerned it would have no alternative but to attempt operations with eleven Clubs with the following consequences, among others.

(a) The League is now contractually required to play a schedule of 162 games per Club, consisting of 72 games (12 games each) with the Clubs of

the other Division and 90 games (18 games
each) with the Clubs of its own Division.
If the Seattle Club were to disappear from
the Western Division each Club of the Western
Division would lose 18 games from its schedule
and play only 144 games and would play the
same total number of games with the Western Div-
ision Clubs as with those of the Eastern Division.
By way of contrast the Clubs of the Eastern Div-
ision would lose 12 games from their schedule
and would each play 150 games, 90 with the
Clubs of their own Division and only 60 with
the Western Division Clubs.
Competition between the two divisions leading
to the League championship series and the World
Series at the end of the season would become
virtually meaningless under these unprecedented
circumstances, with the probable result that pub-
lic interest in the Pennant Races, the World
Series and in major league baseball would be ir-
reparably damaged. It is impossible to predict
the financial consequences of such a schedule
dislocation but I am certain that would be far-
reaching, long lasting and very substantial.
(b) In addition to the problems referred to in
the preceding paragraph there would also be
substantial financial loss from the reduced
attendance, which would directly result from
the loss of games played in 1970. Numerous

12

contracts with third parties such as pur-
chasers of radio and television rights would
be subject to renegotiations. Damages from
these sources would clearly amount to several
million dollars.

(c) It is not possible to predict what the precise
impact would be from loss of the Seattle Club on
the careers and lives of the players who are under
contract to the Seattle Club and its affiliated minor
league clubs. I am satisfied, however, that difficult
and grave problems would be presented, the solutions
to which are not readily apparent.

9. On March 9, 1970, a League meeting scheduled to
be held the next day in Tampa, Florida, was cancelled at the last minute
at the request of the Commissioner in order that a final effort could
be made to reactivate the Carlson proposal. On March 13, 1970, Mr.
Carlson wired the Commissioner that reactivation of that proposal
was no longer practical or possible. On the same day Mr. Kuhn
telegraphed Mr. Carlson expressing his disappointment and confirming
his advice that the Carlson proposal on the basis presented in Chicago
would now be acceptable to a sufficient number of owners to be approved
by the American League. A copy of this telegram is attached as Exhibit
D. I, too, am deeply disappointed in Mr. Carlson's unwillingness to
reactivate his Chicago proposal or to suggest any alternate means by
which local support and investment might make it possible for the League
to keep the Club in Seattle. In the absence of such a proposal the Club's
prospects for future operations in Seattle are utterly hopeless.

10. Attached hereto as Exhibits E, F, and G are
true and correct copies of letters received from the Bank of California,

13

a principal creditor of Pacific Northwest Sports, Inc. subsequent
to the February 11 meeting. As indicated herein the Bank of California
is pressing that its existing loans for the account of Pacific Northwest
Sports, Inc. be fully collateralized in order for the bank to agree to
defer collection of such loans, which are in default. Neither the
League nor its members are able to comply with this request. So far
as I am aware this demand was not a condition of the bank's willingness
to loan the $3,500,000.00 to the Carlson group.

       11. As I have indicated above the members of the
American League must conduct their affairs and the affairs of the League
with both sports and business considerations in mind. The League
and its members have clearly and unequivocally recognized on at least
four separate occasions that both considerations made it highly desir-
able to retain the Pilots in Seattle if any acceptable way could be
found to do so. The occasions were (a) on October 21, 1969, at an
informal meeting of League members when it was determined not
to act upon the request of Pacific Northwest Sports, Inc. to transfer
the Club out of Seattle but instead to explore avenues for alternative
local ownership; (b) at the annual meeting of the League on December
5, 1969, when an application for membership from Fredric Danz of
Seattle was conditionally approved by the League notwithstanding
substantial doubt which proved to be well founded as to the financial
ability of his group to consummate the transaction; (c) At the League
meeting of January 26-27, 1970; and (d) at the League meeting of
February 10--, 1970. In my opinion the decisions of the League at
these meetings were based upon the clear recognition by the members

that in order for major league baseball to enjoy the loyalty of its

fans it must do its very best to demonstrate its loyalty to them. As

I am confident that the contents of this affidavit demonstrate the

American League has done everything within its power to carry out

this obligation to those who have supported it in Seattle in the past

year. The League is most grateful for that support and for the support

and interest of those including especially the Messrs. Carlson, Ellis,

and Douglas and their group who have attempted to make it possible

to retain the Club in Seattle during the next three seasons. It is now

acknowledged by all concerned that there is no financial means of

doing so. It is therefore my earnest and heartfelt wish that existing

obstacles to the League's consideration of transferring the ownership

and location of the Seattle Club to another location should be removed

prior to the start of the 1970 season. If these obstacles remain in effect

the interests of all concerned will suffer greatly. I have every con-

fidence that if Seattle proceeds to construct it new multi-purpose stadium

as other cities are doing without major league commitments, it will

be a irresistible attraction for professional sports teams and that

Seattle will not wait long for a major league baseball franchise.

Further affiant saith note.

Sworn to and subscibed
before me this 23rd
day of March, 1970

Notary Public. State at large
My commission expires Dec. 6, 1973

# CONSTITUTION

## OF

# THE AMERICAN LEAGUE

## OF

# PROFESSIONAL BASEBALL

# CLUBS

JANUARY 1, 1966

(Full Text Omitted; Document Already in Evidence
as Plaintiffs' Exhibit #6)

THE JUDSON-BROOKS COMPANY — CLEVELAND

EXHIBIT A

RESOLUTIONS

RESOLVED, that it is the intention of the American League to retain the Seattle Club in the City of Seattle.

RESOLVED, that the President of the American League is hereby authorized to negotiate a loan in the name of the American League in the amount of $650,000 with a bank or banks in the City of Seattle or elsewhere and to execute such notes or furnish such other evidences of indebtedness as may be required by such banks to commit the credit of the American League.

RESOLVED, that the proceeds of such loan be used to meet the current operating obligations and expenses of Pacific Northwest Sports, Inc., to be disbursed by a certified public accountant in Seattle selected by the League President under instructions from a committee appointed by the League President.

RESOLVED, that the League open a commercial checking account in a Seattle bank under the name "American League - Special - Seattle" for the above purposes, to be drawn upon by checks signed by such representative or representatives as may be designated by the League President, which representatives shall include the certified public accountant referred to above.

RESOLVED, that all amounts disbursed out of the above account shall be deemed to have been loaned by the League for the account of Pacific Northwest Sports, Inc., to bear interest at the rate being paid by the League.

RESOLVED, that the clubs of the League investigate and report to the League President the extent of their abilities to commit themselves for additional credit, if necessary, to Pacific Northwest Sports to support its further operations for the 1970 season.

RESOLVED, that the search be continued for new ownership to continue the operation of the Seattle Club in that City.

Chicago, Illinois
February 11, 1970

EXHIBIT B

1. The American League is now under a legal restraint whereby it cannot approve transfer of the Seattle franchise to any other city of the United States. But for that restraint, at this meeting, it would have given consideration to such a transfer.

2. There are valid and substantial legal and practical reasons why the American League and its constituent members cannot continue financial support of the Seattle Pilots beyond the amount ~~clearly~~ already committed for that purpose.

3. Even with the amount already committed by the American League, Pacific Northwest Sports, Inc. appears to be financially incapable of continuing its baseball operation in Seattle for the 1970 season, and at the present time there is no proposal for any Seattle interests to continue the Pilots in Seattle.

4. It has therefore been resolved that (a) that the American League instruct its counsel to proceed with all possible speed in using every tool at their command to have these restraints lifted and removed in order that the American League can conduct its business of playing baseball beginning on the 6th day of April 1970 with 12 teams, and (b) that when all legal restraint has been lifted so that Pacific Northwest Sports, Inc. may transfer the Seattle franchise to a city other than Seattle and the American League may approve such a transfer, without violating any Court Order, and if at that time there is no opportunity to transfer the ownership of the Seattle Pilots on a reasonable basis to a responsible party who will continue its operation in Seattle, the American League will give favorable consideration to any responsible proposal providing for its transfer to another city.

EXHIBIT C

March 13, 1970

Edward Carlson
Western International Hotels
Olympic Hotel
Seattle, Washington

This will acknowledge your teletype of this date. I am extremely
disappointed that your group is now unwilling to assume the
operation of the Seattle franchise on the basis discussed with
and offered to the American League in Chicago in February. As I
advised you on the telephone, I am satisfied by reason of my
discussions with the American League that your offer on that
basis would now be acceptable to the American League. I am trans-
mitting a copy of your teletype to American League President
Cronin.

Bowie K. Kuhn

King County Sup. Ct. No. 720599
CITY OF SEATTLE and STATE
v.
AMERICAN LEAGUE, et al.

EXHIBIT "D" to Cronin Affidavit



# THE BANK OF CALIFORNIA  *National Association*

*SEATTLE OFFICE: 815 Second Avenue, P. O. Box 3095, Seattle, Washington 98114  ·  (206) 587-3600*

WARREN G. CAMPBELL
SENIOR VICE PRESIDENT AND MANAGER

February 18, 1970

Mr. Roy Hamey
c/o Pacific Northwest Sports, Inc.
2700 Rainier Avenue South
Seattle, Washington 98144

Dear Mr. Hamey:

You asked us to summarize in writing the situation which was discussed with you at our meeting today regarding our loans which are secured by the assets of Pacific Northwest Sports, Inc.

We have one loan which was in the original principal sum of $4,000,000., present principal balance $3,500,000., which was made to Pacific Northwest Sports, Inc. in September 1968. It is secured by all of the assets of Pacific Northwest Sports, Inc., including franchise and player contracts. We have other loans which are secured by pledges of stock and subordinated notes issued by Pacific Northwest Sports, Inc. and pledged to us as collateral security for loans to individuals. The status of those obligations is as follows:

Loan to Pacific Northwest Sports, Inc. –

| | |
|---|---|
| Principal balance – | $3,500,000.00 |
| Delinquent interest – | 41,660.37 as of January 31, 1969 |
| | $3,541,660.37 |
| (Next quarterly interest installment of $83,125.08 will be due March 31, 1969) | |
| Advances pursuant to the loan agreement for protection of collateral | $ 26,719.11 |
| Interest on above advances and accruing at – | $ 195.94 to January 31, 1970 |
| | $ 8.91 per day from February 1, 1970 |
| Estimated costs and fees since delinquency – | $ 25,000.00 |

EXHIBIT E

(Actually accrued to
January 31, 1970 -                    $   16,372.35)

Payment of this loan was demanded September 24, 1969 because of losses and apparent insolvency of the borrower. This demand was confirmed in writing on December 12, 1969 after receipt of the audit report from Price Waterhouse and Company.

On January 23, 1970 we gave Pacific Northwest Sports, Inc. notice that pursuant to our loan agreement and provisions of the Uniform Commercial Code, we intended to sell the collateral at private sale at some time subsequent to February 3, 1970.

Loans secured by subordinated notes and stock -

We have loans having a principal balance of $875,000. with interest accrued to January 31, 1970 in the sum of $62,696.57 and interest accruing at $280.56 per day thereafter, which are secured by pledges of subordinated notes issued by Pacific Northwest Sports, Inc., in the principal sum of $337,500. and by 3,375 shares of the capital stock of Pacific Northwest Sports, Inc. Those Pacific Northwest Sports, Inc. notes are subordinated to the above-mentioned obligation of Pacific Northwest Sports, Inc. to The Bank and to Sportservice, Inc.

All of the above loans are in the past-due list and either have been or will be listed and classified by the Bank examiners.

Based upon the offer made by Milwaukee for the assets of Pacific Northwest Sports, Inc., we would be fully secured if a sale of the club were made at this time.

In view of the condition of Pacific Northwest Sports, Inc. as reflected by the report of the certified public accountants and by the action of the American League, The Bank, if it is to be asked to defer collection of the loans, must request assurances in the form of pledges of marketable collateral supported by evidence of authority, or by a take-out commitment from a bank or financial institution capable of complying with a commitment to purchase

THE BANK OF CALIFORNIA
*National Association*

Mr. Roy Hamey
c/o Pacific Northwest Sports, Inc.                    -2-                    February 18, 1970
Seattle, Washington

our above loans if they are not otherwise paid by the end of the club's fiscal year, namely October 31, 1970, for the face amount then owing on the loans, together with interest and costs, or such other security as would be the equivalent of the foregoing.

We would also have to request that the delinquent interest, advances and interest thereon, and costs since delinquency be paid promptly so that the loans will be current.

Very truly yours,

W. G. Campbell
Senior Vice President & Manager

WGC/m

cc: Mr. Roy Hamey
    Mr. Dewey Soriano
    Mr. Max Soriano
    Mr. Marvin Milkes
    Mr. Grunke - 2
    Mr. Schutt



*Offices in all three Pacific Coast states*

# THE BANK OF CALIFORNIA *National Association*

*SEATTLE OFFICE: 815 Second Avenue, P. O. Box 3095, Seattle, Washington 98114 · (206) 587-3600*

WARREN G. CAMPBELL
SENIOR VICE PRESIDENT AND MANAGER

February 26, 1970

RECEIVED

FEB 2 7 1970

EISELE, EATES, BOSKIR, MAXFIELD & LONG

Mr. Roy Hamey
c/o Seattle Pilots
2700 Rainier Avenue South
Seattle, Washington

Re: Pacific Northwest Sports, Inc.

Dear Mr. Hamey:

In accordance with your directions, we have applied the sum of $41,660.37 paid to us yesterday to the delinquent interest owing the $3,500,000. obligation of Pacific Northwest Sports, Inc., and the sum of $27,128.89 to payment of the advances for protection of collateral and interest thereon.

We understand that you are discussing the other matters in our letter of February 18, 1970 with American League officers, and will advise us promptly of the type of security we will be offered to assure payment of the sum of $4,462,696.57 owing to us as of January 31, 1970, together with accruing interest thereon, secured by the security interest in the assets of Pacific Northwest Sports, Inc. and by pledges of its capital stock and subordinated notes.

Very truly yours,

W. G. Campbell
Senior Vice President
& Manager

WGC/m

cc: Mr. Marvin Milkes
Mr. Arthur Grunka

EXHIBIT F

# THE BANK OF CALIFORNIA

NATIONAL ASSOCIATION
SEATTLE, WASHINGTON 98114

CARBON COPY

March 12, 1970

Mr. Roy Hamey
c/o Seattle Pilots
2700 Rainier Avenue South
Seattle, Washington 98144

Dear Mr. Hamey:

You will recall that we wrote to you on February 18, 1970 and February 26, 1970 regarding the obligations owing to us with respect to the loans we have made to the Seattle Pilots.

We have not had any response to these letters but at your request we held the matter in abeyance pending the American League meeting which was scheduled for March 10.

In view of the great amount of time that has elapsed we would appreciate being advised whether there will be some prompt disposition of the matter which will result in our receiving the $4,541,232.30 owing to us, or whether you wish to have us defer the matter further. The foregoing sum includes interest and costs to March 15, 1970. If you wish to have us stand by, please advise us what type of collateral or other security the American League will furnish to us. In our letter of February 18, we suggested two alternatives, namely, depositing with us marketable collateral, or furnishing us with a commitment from a bank or other financial institution to purchase our loans if they are not otherwise paid by October 31, 1970.

Very truly yours,

T. E. Comer
Vice President

TEC/m
cc: Mr. Joe Cronin
    Mr. W. G. Campbell

EXHIBIT G

**EXHIBIT 19**

## LICENSE AGREEMENT
(United States)

THIS LICENSE AGREEMENT ("Agreement"), effective as
of July 1, 1996, is by and between the NATIONAL HOCKEY LEAGUE,
a joint venture organized as an unincorporated not-for-profit
association ("League"), and NHL ENTERPRISES, L.P., a Delaware
limited partnership ("Enterprises").

WHEREAS, League is the owner of the League Symbols
(as hereinafter defined); and

WHEREAS, Enterprises desires to obtain and League
desires to grant, a license to use the League Symbols in
connection with the manufacture, distribution, promotion,
advertising and sale of products and services in the Territory
(as hereinafter defined); and

WHEREAS, Enterprises is the licensee and sublicensor
of the Team Symbols (as hereinafter defined) and Player
Promotional Rights (as hereinafter defined) in the Territory;

NOW, THEREFORE, in consideration of the promises and
mutual covenants hereinafter set forth, the parties agree as
follows:

1. **Definitions**. For purposes of this Agreement, the
following terms shall have the meanings indicated below:

(a) "League Constitution and Agreements" shall mean
(i) the League Constitution, (ii) the League By-Laws, (iii)
such other League rules, regulations, resolutions and
policies, (iv) all agreements (including, without limitation,

collective bargaining agreements), consent decrees and
settlement agreements between or among League and its Member
Clubs (as hereinafter defined) and/or their lenders or League
and any other persons in furtherance of League business or
interests or as otherwise authorized, directly or indirectly,
by League's Board of Governors, the League Constitution or By-
Laws or the League Commissioner and (v) the League
Commissioner's interpretation of any of the foregoing.

(b)  "League Symbols" shall mean the names,
initials, slogans, emblems, insignia, logos, symbols, signs,
colors, uniform designs including color patterns, and other
indicia of League (including, without limitation, any indicia
used by League during its history), and all trademarks,
service marks, trade names, trade dress, copyrights,
collective marks and other proprietary rights pertaining
thereto, including, without limitation, the conference and
division names and/or logos, League slogans and logos relating
thereto, and League award, trophy and program names (including
STANLEY CUP and all logos therefor and depictions thereof).

(c)  "Member Club Agreement" shall mean the License
Agreement dated as of the date hereof between Enterprises and
the Member Clubs.

(d)  "Member Clubs" shall mean the member clubs
which are from time to time members of the National Hockey
League.

(e) "Player Promotional Rights" shall mean the right, pursuant to various forms of standard player contracts currently authorized by League and the National Hockey League Players' Association, as they may be amended from time to time, to the participation by and cooperation of every player in any and all reasonable advertising, sales promotion and public relations efforts which serve to promote the Member Clubs, League, League-related events and professional hockey generally, including, without limitation: (i) appearances at photographic sessions; (ii) public appearances; (iii) use of the player's name, likeness, any nicknames and relevant material concerning the player and/or his performance; and (iv) television and/or radio interview or taping sessions.

(f) "Team Symbols" shall mean the names, initials, slogans, emblems, insignia, logos, symbols, signs, colors, uniform designs including color patterns and player numbers, team events and other indicia of any Member Club (including, without limitation, any indicia used by any Member Club during its history), such as team mascots or symbols that may come to be associated with such teams, and the city or regional identification (by name, landmark or other recognized symbol) of each of the Member Clubs in conjunction with their colors and an appropriate hockey reference, and all trademarks, service marks, trade names, copyrights and other proprietary rights pertaining thereto.

(g)  "Territory" shall mean the United States and
each and every jurisdiction therein.

2.  Grant of License.

(a) By League.  Subject to the terms and conditions
herein, League hereby grants to Enterprises and Enterprises
hereby accepts, the nonexclusive right and license to use, and
to sublicense others to use, the League Symbols together with
any trade dress associated therewith on or in connection with
the manufacture, distribution, marketing or sale of products
or services in the Territory.

(b)  By Enterprises.  Enterprises hereby grants to
League and League hereby accepts, the nonexclusive right and
license to use the Team Symbols and the Player Promotional
Rights in the Territory in connection with, and to the extent
necessary for, League's tax exempt purposes.  This right shall
be subject to all of the limitations and quality control
provisions in favor of the Member Clubs' ownership of their
Team Symbols contained in the Member Club Agreement.

3.  Payments.

(a)  Royalties.  (i)  Enterprises shall pay to
League royalties for the license described in paragraph 2(a)
of this Agreement in an amount equal to (x) all revenues
derived by Enterprises from its exploitation of the license
described in paragraph 2(a) hereof, net of any commissions
payable, less (y) the sum of (A) all payments made by

Enterprises to third party contractors (but not Enterprises'
employees) in connection with Enterprises' exploitation or
protection of the license described in paragraph 2(a) hereof,
plus (B) all other costs incurred by Enterprises in connection
with Enterprises' exploitation or protection of the license
described in paragraph 2(a) hereof multiplied by 1.07.  The
amount of the royalties payable to League shall be determined
on a modified cash basis.  The League recognizes that 90% of
the aggregate amount of revenues earned, commissions paid,
payments made to third party contractors, and all other costs
incurred by Enterprises in connection with Enterprises'
exploitation or protection of the rights granted to
Enterprises pursuant to this Agreement and the Member Club
Agreement are attributable to the rights granted under the
Member Club Agreement.

(ii)  Enterprises and League agree that 50% of the
royalties payable to League pursuant to paragraph 3(a)(i) are
attributable to the use by Enterprises of League's logos.

(b)  **Time of Payment/Audit**.  Royalties shall be due
and payable annually on October 31st of each year based upon
Enterprises' receipts and expenditures for the fiscal year
ending on the immediately preceding June 30th.  Enterprises
shall keep accurate, full and complete books and accounts
showing its assets and liabilities, receipts and expenditures,
operations, transactions, and financial condition.

Enterprises' financial statements shall be accurate in all
material respects and shall present fairly the financial
position and results of the operations of Enterprises.
Enterprises shall prepare or cause to be prepared and
submitted to League as soon as practical after the end of each
fiscal year of Enterprises, a balance sheet, profit and loss
statement, and statement of changes in cash flows accompanied
by an audit opinion of independent certified public
accountants of recognized standing satisfactory to League.

4.    **Warranties and Covenants of Enterprises**.

(a)    **Standards**.  Enterprises may license the rights
granted above to use the League Symbols to third parties,
provided:

(i)    Any such license shall be granted pursuant to
an ongoing, professionally administered licensing program of
the League Symbols for promotional use or use in collateral
merchandise or services;

(ii) The foremost objective of such program shall be
to reflect favor and good will upon League;

(iii)  The nature of licensed products and levels of
quality standards imposed for them will be consistent with
those for merchandise previously licensed by Enterprises (and
its predecessors) and its licensing agent, and with those
generally applicable to products heretofore licensed in other
prestigious sports merchandise licensing programs;

(iv) Enterprises will employ at least one experienced, full-time quality assurance executive to administer the quality control program;

(v) Enterprises will make available to League opportunities to purchase all items of licensed merchandise for any purpose, and will as often as feasible distribute licensee lists and/or catalogs to League;

(vi) Enterprises will report periodically to League at a meeting of the Board of Governors of League, and will at least annually show the League representative samples of licensed products which utilize the League Symbols and which have been newly approved since the last such showing; and

(vii) If League complains to Enterprises about the depiction of the League Symbols on any licensed merchandise, or if League complains about the quality of any licensed merchandise and said complaint is reasonable under the guidelines set forth above, then Enterprises will take corrective measures as soon as such steps reasonably can be taken.

(b) **Enterprises Promotional Activities.**
Enterprises hereby agrees to exercise its best efforts to publicize and promote the goodwill and renown of League within the Territory. Enterprises at its own expense shall, subject to prior approval by League as to content and form, undertake appropriate promotional efforts to increase the number of

sublicensees and increase the revenues generated by
sublicenses.  These promotional efforts shall include
appropriate participation at trade shows, mailings to
retailers, and such meaningful activities that in Enterprises'
judgment shall generate increased licensing revenues.
Enterprises shall keep League reasonably informed regarding
the status of licensing and promotional activities of
Enterprises.  League shall be given reasonable consultation
rights with respect to any licensing or promotional activity
at League's request.

     (c)  **Change or Modifications of League Symbols**.
League expressly reserves the right from time to time to
modify or change the League Symbols.  The League Symbols, as
so modified or changed, shall for all purposes be deemed to be
the League Symbols referred to in this Agreement.  Any and all
such modifications or changes in the said League Symbols
developed or adopted by League shall be the sole and absolute
property of League, and League shall have the exclusive right
to register in the Territory such modified or changed marks as
trademarks and/or service marks.  Enterprises may propose
changes to the League Symbols for adoption and approval by
League.

     (d)  **Assignment/Sublicensing**.  Except as set forth
in this paragraph 4(d), Enterprises shall not sell, assign,
transfer or alienate its rights, privileges or obligations in

or under this Agreement without the prior written consent of
League.  Enterprises may sublicense its rights and privileges
under this Agreement without the prior written consent of
League, provided that any such sublicense shall be subject to,
and any such sublicensee shall be bound by, the terms and
provisions of this Agreement, and provided further that
Enterprises may grant a sublicense of the League Symbols to a
Member Club only pursuant to a sublicense which grants the
Member Club a nonexclusive license to use the League Symbols
provided that such use shall be subject to the prior written
approval of League.

    (e)  **Compliance with Law**.  Enterprises shall not
sell or offer any products or services which do not comply in
all respects with applicable federal, state, and local laws
and regulations pertaining to the manufacture, distribution
and provision, as the case may be, of such products and
services.

    5.  **Ownership of the League Symbols**.  Enterprises
acknowledges and agrees that the League Symbols and the
goodwill associated therewith are the sole and exclusive
property of League and that all use of the League Symbols by
Enterprises and its sublicensees shall inure to the benefit of
and be on behalf of League.  Enterprises acknowledges and
agrees that nothing in this Agreement shall give Enterprises
any right, title, or interest in and to the League Symbols

other than the right to use the League Symbols in accordance
with this Agreement, it being understood that this provision
shall not by deemed to prevent actions by Enterprises pursuant
to paragraph 7 of this Agreement. Enterprises will not at any
time do, or knowingly permit to be done, any acts or things
which would in any way challenge or impair the rights of
League in and to the League Symbols or which would or could
affect the validity of the League Symbols. Enterprises agrees
to execute all documents reasonably required by League to
obtain, maintain, and renew registrations of the League
Symbols and to record this Agreement with appropriate.
government authorities.

6. **Proprietary Interest of League**. Enterprises
acknowledges and agrees that the League Symbols are the sole
and exclusive property of League and that, upon the expiration
or termination of this Agreement, Enterprises shall have no
further right to use the League Symbols; provided, however,
that any and all products manufactured or packaged in
accordance with this Agreement prior to the expiration of the
Agreement which bear the League Symbols may be sold by
Enterprises or its sublicensees for a period of three (3)
months following the expiration date. Neither Enterprises nor
its sublicensees shall have such right to continue to sell
products bearing the League Symbols if League terminates this
Agreement due to a breach of this Agreement by Enterprises.

The restrictions in this paragraph 6 shall survive the expiration or termination of this Agreement.

7.  **Registration**.  Enterprises shall cause the League Symbols to be registered in the name of League as trademarks, service marks, copyrights or other intellectual property in such jurisdictions within the Territory as Enterprises determines appropriate and shall maintain all such registrations in such manner as Enterprises determines appropriate and prudent.  The costs of such registration shall be the responsibility of Enterprises.  League hereby covenants and confirms that it will take such further reasonable action and execute such documents or agreements which may reasonably be required by Enterprises in discharging its responsibility under this Agreement to register, maintain or renew any trademark or copyright registration.

8.  **Infringement**.  (a)  If any suit, action or proceeding is brought against League or Enterprises arising out of the use of any of the League Symbols, the party against whom such suit, action or proceeding is brought shall notify the other party forthwith.  All involved parties shall cooperate in the defense of any such action, suit or proceeding.  League, or Enterprises at the direction of League, shall arrange and control the defense of any such action, suit or proceeding at League' sole cost.

(b)   Enterprises shall notify League of any material infringement or imitation of the League Symbols which may come to its attention.  League shall notify Enterprises of any material infringement or imitation of the League Symbols which may come to its attention.  League shall have the right to determine whether or not any action shall be taken with respect to any infringement or imitation of League Symbols and the nature of any such action and Enterprises shall pursue such action at League's direction and sole cost. Specifically, at the instruction of League, Enterprises may institute legal proceedings either in its own name, and/or in the name of League, for infringement of trademarks, trade names, copyrights and other intellectual property rights directly or indirectly owned by League which are part of or related to the League Symbols in any appropriate court or administrative body having jurisdiction to hear any such infringement action.

9.   **Term**.  This Agreement shall continue in full force until June 30, 2006 or, if earlier, until terminated as herein provided.  This Agreement shall be terminated: (i) upon the written approval of both of the parties hereto or (ii) in the event of the bankruptcy or judicial or administrative declaration of insolvency of Enterprises.

10. **Miscellaneous**.

(a) **Entire Agreement/Amendment**. This Agreement represents the entire agreement between League and Enterprises with respect to licenses to use the League Symbols, Team Symbols, and Player Promotional Rights and supersedes all existing contracts or agreements previously executed between said parties, their predecessors, successors or assigns. This Agreement may be modified and amended only in a writing executed by a duly authorized representative of each party hereto.

(b) **Parties' Relationship**. Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers, and no party shall have any right or power to obligate or bind another party in any manner whatsoever except as authorized in this Agreement or as otherwise specifically authorized in writing.

(c) **Severability**. Invalidation of any provision of this Agreement, whether by adjudication or otherwise, shall not affect the validity of any other provision of this Agreement and all such other provisions shall remain in full force and effect.

(d) **Notices**. All notices, consents, requests, instruments, approvals and other communications provided for herein shall be validly given, made or served effective on the date of dispatch thereof, if in writing and delivered

personally or sent by registered or certified mail, postage prepaid, return receipt requested, or by overnight courier service, as follows:

        If to Enterprises:   NHL Enterprises, L.P.
                             c/o NHL Enterprises, Inc.
                             1251 Avenue of the Americas
                             New York, New York 10020
                             Attention: Senior Vice President and
                                        General Counsel


        If to League:        National Hockey League
                             1251 Avenue of the Americas
                             New York, New York 10020
                             Attention: Senior Vice President and
                                        General Counsel

or to such other persons or to such other addresses as the parties hereto shall designate from time to time by like notice.

(e) **Titles**. The headings and titles herein are for the convenience of the parties and shall not influence the construction of this Agreement.

(f) **Successors and Assigns**. This Agreement shall be binding upon the successors and permitted assigns of the parties.

(g) **Waiver**. League may in writing waive any default without waiving any other default and the failure of League to exercise any right, power or remedy upon default shall not be taken as a waiver thereof.

(h) **League Constitution and Agreements**. The parties hereto hereby recognize all League rules, regulations, resolutions and policies heretofore adopted which relate to the subject matter of this agreement, and acknowledge and agree that notwithstanding any term or provision of this Agreement to the contrary, the terms and provisions of this Agreement are subject to (i) the League Constitution and Agreements as in effect on the date hereof, and (ii) such League Constitution and Agreements as may be adopted or amended after the date hereof with the consent of not less than three-fourths (3/4) of the Member Clubs.

(i) **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the substantive laws of the State of New York.

(j) **Counterparts**. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, and all of which shall together constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers effective as of the date first above written.

NATIONAL HOCKEY LEAGUE

By: _____
    Name: JEFFREY PASH
    Title: SENIOR VICE PRESIDENT
           & GENERAL COUNSEL

NHL ENTERPRISES, L.P.

By: NHL Enterprises, Inc.,
    its general partner

By: _____
    Name:
    Title:

## LICENSE AGREEMENT
### (United States)
### AMENDMENT NO. 1

THIS AMENDMENT dated as of July 1, 2006 by and between the NATIONAL

HOCKEY LEAGUE, a joint venture organized as an unincorporated not-for-profit association, and

NHL ENTERPRISES, L.P., a Delaware limited partnership with its principal place of business at 1251

Avenue of the Americas, New York, New York 10020, which amends the License Agreement dated as of

December 16, 1996 and effective as of July 1, 1996 by and between the National Hockey League and

NHL Enterprises, L.P. (the "Original Agreement") in accordance with the terms of the Original

Agreement, as follows:

      1.     The first sentence of paragraph 9 of the Original Agreement is amended to read

in its entirety as follows: "This Agreement shall continue in force until June 30, 2016 or, if earlier, until

terminated as herein provided."

      2.     Except as expressly modified by paragraph 1 of this Amendment (or as may be

required to conform the Original Agreement with such modification), the Original Agreement shall

remain in full force and effect.

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be

executed as of the date first above written.

NATIONAL HOCKEY LEAGUE

By: _____
David Zimmerman
Executive Vice President and General Counsel

NHL ENTERPRISES, L.P.

By: NHL Enterprises, Inc.,
its general partner

By: _____
Richard H. Zahnd
Executive Vice President and General Counsel

**EXHIBIT 20**

LEWIS
AND
ROCA
LLP
L A W Y E R S

1   40 North Central Avenue
    Phoenix, Arizona 85004-4429
    Facsimile (602) 734-3824
2   Telephone (602) 262-5756

3   Susan M. Freeman State Bar No. 004199
    E-mail: SFreeman@LRLaw.com

4   Stefan M. Palys State Bar No. 024752
    E-mail: SPalys@LRLaw.com

5   Attorneys for PSE Sports & Entertainment LP and S&E Interim
    Facility Corporation

6

7                   UNITED STATES BANKRUPTCY COURT

8                        DISTRICT OF ARIZONA

9   In re:                                    Chapter 11

10  DEWEY RANCH HOCKEY, LLC,                   Case No. 2:09-bk-09488-RTBP

11  COYOTES HOLDINGS, LLC,

12  COYOTES HOCKEY, LLC, and

13  ARENA MANAGEMENT GROUP, LLC,               DECLARATION OF JAMES BALSILLIE

14

15  Debtors.

16  This Filing Applies to:

17  ☒   All Debtors

18  ☐   Specified Debtors

19

20          I, James Balsillie, declare under penalty of perjury:

21          1.      I am a citizen of Canada.

22          2.      I am the President of PSE Sports & Entertainment GP, Inc., the General Partner of

23  PSE Sports & Entertainment LP, a Delaware limited partnership ("PSE"), and am authorized to

24  make these statements on behalf of myself and of PSE.

25

26

3.     I am an adult person competent to testify in Court. I make the following statements based upon my personal knowledge except as otherwise indicated.

4.     I earned a Bachelor of Commerce degree from the University of Toronto, and a Masters of Business Administration degree from Harvard University. I am a Fellow of the Institute of Chartered Accountants of Ontario. My curriculum vitae is attached as Exhibit 1

5.     Since 1992, I have been co-CEO of Research in Motion, the makers of the BlackBerry.

6.     I grew up loving the game of hockey and dreaming of playing in the greatest professional sports league in the world, the National Hockey League, competing for and winning the oldest and most revered trophy in professional sports, the Stanley Cup, donated by the Governor-General of Canada in 1893. While that dream of playing for the Stanley Cup will never come true, I am in the privileged position of having the resources to compete for one as a potential owner of an NHL franchise on behalf of Canadian hockey fans everywhere, and particularly those in southern Ontario.

7.     I care deeply about Canada and southern Ontario. While I have had the opportunity to invest millions of dollars in community projects, programs and institutes of higher learning in an effort to help Canadians and to put Canada on the global map, I believe there is more I can do.

8.     In fact, I have been convinced for several years that one of the most important contributions I can make to my country and my community is to bring a seventh NHL franchise to the greatest under-served hockey market in the world and locate it in Hamilton, a great city with unlimited potential in the heart of a huge and rabid hockey market and in the midst of one of the greatest tourism destinations on Earth, the Niagara Region.

9.     To this end, I would like to invest in the Coyotes franchise on behalf of those fans. Like many, I do not believe that the team is economically viable in Glendale, but I do believe it does have value of $212.5 million if moved to Hamilton before it has another season of losses.

LEWIS
ROCA
LAWYERS

10.     I have secured an option for a long-term lease at the municipally owned Copps Coliseum in Hamilton, an arena built for NHL hockey at the same time as Detroit's Joe Louis Arena. Copps has seating capacity of up to 19,000 and has played host to numerous NHL regular season games as well as the historic in 1987 Canada Cup.

11.     Under the terms of the leasing agreement, an NHL franchise could start playing at Copps this fall with very modest enhancements. The plans are in place for a major renovation that will make it even better. I firmly believe that moving the Coyotes from Glendale to Hamilton will make the franchise one of the strongest in the League from a business and hockey perspective. If given this opportunity, I will operate and invest in this franchise to win a Stanley Cup in Hamilton.

12.     I have welcomed the opportunity to provide all the information and applications required of a good NHL owner, because that is exactly what I aspire to be, a good NHL owner, who will work with the League and other Clubs within the rules. I will sign a standard Consent Agreement and other standard NHL member/owner forms, modified as appropriate for the home territory I am seeking.

13.     From the onset of discussions with the Coyotes management, I expected that if an agreement was reached, PSE would submit applications to the NHL to transfer Club ownership to PSE and to relocate the Club to Hamilton. The opportunity did not arise until the Spring of 2009, so PSE was unable to submit the applications on January 1. However, I understand that the NHL can process applications in the Spring for Fall season games. If PSE acquires the Club, and (a) the NHL and all other parties respect the decision of the Court by foregoing their appeal rights; and (b) the NHL is willing to cover the losses from operating the Club in Glendale for another year in the Glendale arena on current lease terms (subject to the right to terminate the lease at the end of the season), I would be willing to delay the move to Hamilton for that period to alleviate the difficulty to the NHL of re-scheduling 2009-2010 games.

WSLegal 056893 00002 5534194v5 5

14.     The NHL form of Application to Acquire NHL Membership or an Ownership Interest in an NHL Member Club (the "Transfer Application") was initially submitted to the NHL in the form provided by the NHL on May 22, 2009. I understand a copy was filed with the Court at Docket 228.

15.     The Transfer Application contains extensive disclosures of personal financial information about my companies, my family, and my net worth. I believe the information is sufficient to demonstrate my ability and the ability of PSE to commit sufficient financial resources to provide for the financial stability of the Club under PSE ownership and operations in Hamilton. I am not only able, but also willing, to commit the resources needed to provide for such financial stability, as required by NHL By-Law 35.1(a).

16.     NHL By-Law 35.1(b) provides that the NHL will consider the good character and integrity of proposed holders of an ownership interest in an NHL Club. A Supplement to the Transfer Application, providing information not specifically addressed in the NHL form including a letter from me explaining my motives in attempting to buy the Coyotes for relocation to Hamilton together with my curriculum vitae, was provided to the NHL on June 1, 2009, and I understand a copy was filed with the Court at Docket 237 (the "Supplement").

17.     The Supplement further includes true and correct copies of selected letters that I received from various dignitaries and community leaders over the past two years, and of a few of the news articles about recent awards and contributions.

18.     The purpose of the Supplement and enclosures is to show the NHL that I have earned a reputation for good character and integrity and have established strong ties with community and business leaders. As stated in my letter in the Supplement and as noted above, I want to help build the strength of the NHL with business partners and sponsors, and believe that these relationships will enable me to accomplish that goal.

19.     There seems to be a belief by some that I will not "play by the rules" or that I am attempting to enter the NHL through the backdoor or that I don't want to submit to the scrutiny of

1   the NHL Board of Governors. To that I would reply that I am in a United States federal court,

2   having made a very significant "stalking horse" bid to acquire the Coyotes, a team that has been

3   for sale since October 14, 2008 without having received any firm bids. As a stalking horse bid,

4   my offer is there for anyone to outbid me, with the auction to be run by a federal judge. I have

5   removed my requirement for a break fee. In accordance with the purchase agreement and NHL

6   rules, I have submitted to the NHL for consideration by the NHL Board of Governors what I

7   believe to a complete and fulsome Transfer Application and a membership relocation application.

8   I have secured an option for a suitable arena in which to play. I believe I am fully complying with

9   the rules as I understand them, under the full scrutiny of the NHL, creditors of the Coyotes who

10  are most affected by the offer, and the Bankruptcy Court.

11          20.     Mr. Daly suggests in paragraph 15 of his declaration of May 13, 2009 that I have a

12  record of unwillingness to comply with the NHL constitution and bylaws and that I verbally

13  agreed to the 7 year non-relocation covenant in respect of the Pittsburgh Penguins. If that was his

14  understanding, then there was a misunderstanding. In my agreement with the Pittsburgh team, I

15  specifically negotiated the right to negotiate certain terms of the Consent Agreement with the

16  NHL. While certain specific terms for the Consent Agreement were mandated by the purchase

17  agreement, the seller acknowledged that I would **not** be required to agree to the standard 7 year

18  non-relocation covenant. In my view, the reason the seller acknowledged that the 7 year non-

19  relocation was **not** a tenable commitment was because the arena in which the Pittsburgh team

20  played was the oldest in the League and needed to be replaced. If I was to agree to a 7 year non-

21  relocation covenant, I would have no leverage with local public officials to seek funding for a new

22  arena. In my meetings with the Commissioner and Mr. Daly, the Commissioner said that he

23  would consider a relocation in a shorter period of time if a new arena was not obtained. However,

24  I was unwilling to complete the purchase without a written understanding. As none was

25  forthcoming, I chose to terminate my agreement to purchase the team as I was permitted to do

26

under the purchase agreement, and my $15 million deposit was refunded except for $1 million which the seller was contractually entitled to keep.

21. Mr. Daly suggests in his declaration that I broke NHL rules by entering into an option to lease and taking season ticket deposits in Hamilton at the time I was seeking to acquire the Nashville Predators. Mr. Daly suggests that my actions constituted a significant attempt to "destabilize the franchise's exiting business in Nashville". I had no intention of destabilizing the team in Nashville and my position was that the team would not move unless the lease was terminated and the NHL consented to the move. However, I knew that the then current owner of the Nashville team was about to, and subsequently did, give notice to the City of Nashville to terminate the lease. To me, that was the destabilizing act. I secured an option on the arena in Hamilton well before I began negotiating the purchase of Nashville and began taking season ticket deposits in Hamilton because I needed a place to play if the Nashville lease was terminated. The League's policy at the time was that a substantial number of season ticket deposits had to be obtained to demonstrate that a community could support an NHL team. In retrospect, I regret that I did not seek NHL permission before taking these steps. In connection with the Coyotes, given the NHL's objections to my actions in Nashville, I have secured an option on the arena in Hamilton to ensure that I can demonstrate to the NHL that I have a place for the team to play, but I have not sought to take deposits for seasons tickets.

22. I would also note that one of the eventual owners of the Nashville team in 2007, Mr. William Del Baggio, secured an option on an arena in Kansas City in anticipation of a potential relocation of an NHL team to Kansas City at some future date. Although Mr. Del Baggio has since pleaded guilty to fraud, I am unaware of his being viewed by the NHL as an owner who was unwilling to comply with League rules in 2007.

23. In his declaration, Mr. Daly suggests that there is something improper with making a secret stalking horse bid. I am told that these are common in the United States and that a seller commonly does not advise creditors and potentially affected parties until an actual written

1  agreement is signed. I further understood from my experience with the potential acquisition of the

2  Predators that the NHL would not consider any offer for a NHL team unless it was finalized and

3  signed. My understanding is that after more than 5 fruitless months of searching for a buyer who

4  would keep the team in Glendale, Mr. Moyes believed he had no other option but to proceed with

5  searching for and negotiating with a potential buyer like me who is interested if the team can be

6  relocated.

7      24.     It is my fondest ambition to do all that I can to build up the strength of the League

8  with business partners and sponsors, as well as strengthening community ties to the game of

9  hockey that I still play. I firmly believe that the best way for me to do that is as owner of my

10  proposed Hamilton NHL franchise, which will be a credit to the greatest game in the world, NHL

11  hockey, for many years to come.

12      I make this declaration under penalty of perjury of the laws of Ontario, Canada in Toronto,

13  Canada on June 4th, 2009.

14

15  By: _____

16  James Balsillie

17

18

19

20

21

22

23

24

25

26

1

**Exhibit 1**

2

**Jim Balsillie – Curriculum Vitae**

3 Jim Balsillie is co-CEO of Research in Motion (RIM)

4 **Community Involvement**

5 **Boards**

6 Member, Board of Directors – Canadian Olympic Foundation

7 Founder – The Centre for International Governance Innovation (CIGI)
Chair, Operational Board of Directors – CIGI

8 Founder and Chair – Canadian International Council (CIC)

9 Honourary Police Chief – Ontario Association of Chiefs of Police

10 Member, Ontario Task Force on Productivity, Competitiveness and Economic Progress
Member, YPO-WPO Western Chapter

11 Honourary Captain, Director General Maritime Force Development – Canadian Navy

12 Campaign Leader – Child Witness Centre of Waterloo Region

13 Honourary Chair – Kids at Risk, KW Counseling
Member, International Advisory Board of Governors – CIGI

14 Honourary Chairperson – Intelligent Waterloo Leadership Group

15 Founding Member & Current Board of Advisors member – Communitech

16

17 **Community Contributions**

18 The Centre for International Governance Innovation (CIGI)
- Balsillie Centre of Excellence

19 - CIGI Organization

20 - University of Waterloo: Chair, International Governance
- Wilfrid Laurier University: Chair, International Governance

21 - Establish Balsillie School of International Affairs

22 Grand River Regional Cancer Centre
- The Balsillie Family Building

23 Founding Donor – The Perimeter Institute for Theoretical Physics

24 Founding Donor – Waterloo Regional Children's Museum

25 KW Counseling Services Family First Campaign
Founding Donor – RIM Park

26 Donor – Kitchener-Waterloo Food Bank

Jim & Heidi Balsillie Endowment Fund (via KWCF) – the Child Witness Centre of Waterloo Region

Donor – Kidsability

Donor – Family & Children's Services of Waterloo Region Foundation

**Recognition & Awards**

Barron's List of World's Best 30 CEOs, 2008 and 2009

Top 25 Most Influential People in Business, Canada Business, 2009

Inductee, the Canadian Business Hall of Fame, 2009

Recipient, International Distinguished Entrepreneur Award, ASPER School of Business, 2009

Recipient, Paul Harris Fellowship Award for International and Community Service, Rotary, 2009

Named 'Outstanding Business Leader of the Year' by Wilfrid Laurier University, 2009

Recipient, Annual Testimonial Award, Public Policy Forum, 2009

Appointed to Canada's Outstanding CEO of the Year Advisory Board, 2008

Canadian of the Year Award, Canadian Club of Toronto, 2006

Co-winner of the Canada's Outstanding CEO of the Year award by Financial Post Business magazine, 2006

TIME 100 Most Influential People, Time Magazine, 2005

Recipient, Canada-U.S. Business Achievement Award, 1999

Recipient of the Canada Award for Business Excellence, 1998

Canada's 50 Most Influential People in Graphic Communications, PrintAction Magazine, 2005

E&Y Entrepreneur of the Year, 1996

**Honourary Degrees**

Recipient of Honourary Doctor of Laws – University of Waterloo (2007)

Recipient of Honourary Bachelor of Applied Studies – Seneca College (2007)

Recipient of Honourary Doctor of Laws – Trent University (2007)

Recipient of Honourary Doctor of Laws – Dalhousie University (2006)

Recipient of Honourary Doctor of Laws – Wilfrid Laurier University (2003)

**Education**

Bachelor of Commerce, Trinity College, University of Toronto, 1984

MBA, Harvard University, 1989

Chartered Accountant

Fellow, Institute of Chartered Accountants of Ontario (FCA), (2003)