C. Taylor Ashworth, 010143
Alan A. Meda, 009213
STINSON MORRISON HECKER LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004
Telephone:  (602) 279-1600
Facsimile:  (602) 240-6925
tashworth@stinson.com
ameda@stinson.com

J. Gregory Milmoe (admitted *pro hac vice*)
Shepard Goldfein (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
gregory.milmoe@skadden.com
shepard.goldfein@skadden.com

Anthony W. Clark (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
Telephone:  (302) 651-3000
Facsimile:  (302) 651-3001
anthony.clark@skadden.com

Attorneys for the National Hockey League

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Case No. 2:09-bk-09488-RTBP |
| DEWEY RANCH HOCKEY, LLC, | (Jointly Administered) |
| COYOTES HOLDINGS, LLC, | Chapter 11 |
| COYOTES HOCKEY, LLC, and | **National Hockey League's Objection to the Debtors' Request to Sell the Phoenix Coyotes Under Sections 365 and 363 of the Bankruptcy Code** |
| ARENA MANAGEMENT GROUP, LLC, | |
| Debtors. | Date:      June 9, 2009 |
| | Time:      9:00 a.m. |
| | Location:  U.S. Bankruptcy Court |
| | 230 N. First Ave, Courtroom 703 |
| | Phoenix, AZ 85003 |

This filing applies to:

- ▪  All Debtors
- ☐  Specified Debtors

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...................................................................................... 1

ARGUMENT ................................................................................................................ 4

    I.     THE DEBTORS ARE ATTEMPTING TO SELL RIGHTS THAT ARE
          NOT PART OF THE ESTATE. .................................................................... 4

    II.    SECTION 365 DOES NOT AUTHORIZE THE ASSUMPTION AND
          ASSIGNMENT OF THE NHL CONTRACTS AS "MODIFIED" BY THE
          APA. ............................................................................................................. 7

          A.    The Debtors Do Not Seek To Assume, Assign And Sell All Contracts
               That Make The Coyotes An NHL Franchise. ........................................... 7

          B.    The Debtors Do Not Intend To Cure The Default Caused By Breach
               Of The Consent Agreement In Order To Properly Assume The
               Consent Agreement. ................................................................................ 9

               1.    The Debtors are unable to cure the default. ................................ 9

               2.    The Debtors do not intend to provide monetary compensation
                    as required by section 365(b)(1)(B). .......................................10

               3.    The Debtors are unable to provide adequate assurance of
                    future performance under either section 365 or 363. ...................12

           C.    The NHL Is Excused Under Section 365(c)(1) From Accepting
                Performance Of NHL Contracts From Anyone Other Than The
                Phoenix Coyotes. ...................................................................................14

               1.    Corporate governance law excuses the NHL from accepting
                    performance. .............................................................................14

                2.    Intellectual property law excuses the NHL from accepting
                    performance. .............................................................................16

           D.    The Debtors Cannot Provide Adequate Assurance Of Future
               Performance Under Section 365(f)............................................................17

    III.   THE COURT SHOULD NOT EXERCISE ITS DISCRETION UNDER
          SECTION 363 TO ORDER A FREE AND CLEAR SALE OF THE
          COYOTES. ...............................................................................................18

           A.    There Is No Bona Fide Dispute Over The NHL's Interests. ....................18

               1.    The League's consent rights are lawful. .......................................19

                2.    There is no factual or legal basis for an "as applied" challenge
                    to the League's consent rights. ....................................................21

i

(a)  The League has not "applied" its rules. ...........................21

(b)  Delaying a potential relocation cannot create a bona fide dispute under the antitrust laws. ...............................26

(c)  The Debtors released any potential antitrust claim relating to the League's consent rights. ...........................28

B.  Ordering A Free And Clear Sale Of A Professional Sports Franchise Would Wreak Havoc In The Professional Sports Industry. ......................31

CONCLUSION .........................................................................................................32

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                                    **Page(s)**

Adaptive Power Solutions, LLC v. Hughes Missile System Co.,
    141 F.3d 947 (9th Cir. 1998).............................................................................................27

Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.),
    No. 02-41729, 2004 WL 2186582 (S.D.N.Y. Sept. 27, 2004)...........................16

American Needle, Inc. v. National Football League, 538 F.3d 736 (7th Cir. 2008),
    petition for cert. filed, 77 U.S.L.W. 3326 (U.S. Nov. 17, 2008) (No. 08-661)................29

Arnstein v. American Society of Composers, Authors & Publishers,
    29 F. Supp. 388 (S.D.N.Y. 1939) .....................................................................14

Avery Federal Savings & Loan Association v. Klayer (In re Klayer),
    20 B.R. 270 (Bankr. W.D. Ky. 1981) ................................................................ 5

Baseball at Trotwood, LLC v. Dayton Professional Baseball Club, LLC,
    113 F. Supp. 2d 1164 (S.D. Ohio 1999) ...........................................................23

Board of Trade of Chicago v. Johnson, 264 U.S. 1 (1924) ....................................6, 15

Bhan v. NMB Hospital Inc., 929 F.2d 1404 (9th Cir. 1991) ......................................27

In re Bon Ton Restaurant & Pastry Shop, Inc., 53 B.R. 789 (Bankr. N.D. Ill. 1985).................12

Branagan v. Buckman, 122 N.Y.S. 610 (Sup. Ct. 1910).............................................14

California v. Farmers Markets, Inc. (In re Farmers Markets, Inc.),
    792 F.2d 1400 (9th Cir. 1986)........................................................................... 5

Calvert v. Bongards Creameries (In re Schauer), 835 F.2d 1222 (8th Cir. 1987) ........................ 5

Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),
    103 B.R. 524 (Bankr. D.N.J. 1988) ...................................................................18

In re Cedar Chemical Corp., 294 B.R. 224 (Bankr. S.D.N.Y. 2003)...........................................16

Copperweld Corp v. Independence Tube Corp., 467 U.S. 752 (1984) .......................................29

Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986) .....................................20, 23

In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007).........................................................18

Gough v. Rossmoor Corp., 585 F.2d 381 (9th Cir. 1978) .........................................27

Gramercy Equities Corp. v. Dumont, 531 N.E.2d 629 (N.Y. 1988)............................................15

Gumport v. Sterling Press (In re Transcon Lines), 58 F.3d 1432 (9th Cir. 1995) ........................ 5

In re Hernandez, 285 B.R. 435 (Bankr. D. Ariz. 2002) ............................................17

*Hyde v. Woods*, 94 U.S. 523 (1876) ...................................................................6, 15

*J.W. Fortune, Inc. v. McLean Square Associates, G.P.* (In re J.W. Fortune, Inc.),
    173 F.3d 424, 1999 WL 95529 (4th Cir. 1999)...............................................10

*Jandel v. Precision Colors, Inc.*, 19 B.R. 415 (Bankr. S.D. Ohio 1982) .....................19

*Justice v. National Collegiate Athletic Association*, 577 F. Supp. 356 (D. Ariz. 1983)...............26

*In re Kellstrom Industries, Inc.*, 282 B.R. 787 (Bankr. D. Del. 2002) .........................13

*Kelly v. Kosuga*, 358 U.S. 516 (1959) ...................................................................30

*Kishi v. Greco (In re Greco)*, No. 0975-1-79-00484, 1980 Bankr. LEXIS 5461
    (Bankr. D. Haw. Mar. 14, 1980)....................................................................12

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    726 F.2d 1381 (9th Cir. 1984)...................................................................20, 25

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    791 F.2d 1356 (9th Cir. 1986)...............................................................7, 10, 20

*Levin v. National Basketball Association*, 385 F. Supp. 149 (S.D.N.Y. 1974).....................20, 23

*Liberty Tool & Manufacturing v. Vortex Fishing System, Inc.* (In re Vortex Fishing System,
    Inc.), 277 F.3d 1057 (9th Cir. 2002)..............................................................19

*Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455,
    2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ..........................................28, 29

*Mid-South Grizzlies v. National Football League*, 550 F. Supp. 558 (E.D. Pa. 1982)................15

*National Basketball Association v. SDC Basketball Club, Inc.*,
    815 F.2d 562 (9th Cir. 1987)......................................................... 7, 20, 21, 25

*N.C.P. Marketing Group, Inc. v. Blanks* (In re N.C.P. Marketing Group, Inc.),
    337 B.R. 230 (D. Nev. 2005) ......................................................................17

*National Football League v. Los Angeles Raiders*, No. CV 95-5885 (GHK)
    (C.D. Cal. Feb. 26, 1999).............................................................................27

*In re Octagon Roofing*, 123 B.R. 583 (Bankr. N.D. Ill. 1991) ...................................19

*Perlman v. Catapult Entertainment, Inc.* (In re Catapult Entertainment, Inc.),
    165 F.3d 747 (9th Cir. 1999)........................................................................17

*Rice v. Shoney's Inc.* (In re Dean), 174 B.R. 787 (Bankr. D. Ark. 1994)...........................5, 6, 15

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985)...........................12

*In re Sanders*, 969 F.2d 591 (7th Cir. 1992) .......................................................... 5

*In re Schick*, 235 B.R. 318 (Bankr. S.D.N.Y. 1999)................................................15

St. Louis Convention & Visitors Commission v. National Football League,
   154 F.3d 851 (8th Cir. 1998) ........................................20

In re Taylor, 198 B.R. 142 (Bankr. D.S.C. 1996) ........................................19

Texaco Inc. v. Dagher, 547 U.S. 1 (2006) ........................................29, 30

In re Todd, 118 B.R. 432 (Bankr. D.S.C. 1989) ........................................15

United States v. Gerth, 991 F.2d 1428 (8th Cir. 1993) ........................................ 8

Universal Studios, Inc. v. Viacom Inc., 705 A.2d 579 (Del. Ch. 1997)........................................30, 31

VKK Corp. v. National Football League, 244 F.3d 114 (2d Cir. 2001) ........................................28, 29

Viacom International, Inc. v. Tandem Products, Inc., 526 F.2d 593 (2d Cir. 1975) ...................30

Worthington v. General Motors Corp. (In re Claremont Acquisition Corp., Inc.),
   113 F.3d 1029 (9th Cir. 1997) ........................................ 9

**Statutes**

11 U.S.C. § 361 ........................................13

11 U.S.C. § 363(e) ........................................13

11 U.S.C. § 365(a) ........................................ 8

11 U.S.C. § 365(b)(1) ........................................ 9

11 U.S.C. § 365(b)(1)(B) ........................................10

11 U.S.C. § 365(b)(1)(C) ........................................12

11 U.S.C. § 365(c)(1) ........................................14

11 U.S.C. § 365(f)(1) ........................................14

11 U.S.C. § 365(f)(2) ........................................17

11 U.S.C. § 541(a)(1) ........................................ 5

N.Y. Partnership Law § 40 (McKinney 2005) ........................................15

**Miscellaneous**

2 Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust 1085 (2002)..................23

6 Am. Jur. 2d Associations and Clubs § 17 (2009)........................................14

6A N.Y. Jur. 2d Associations and Clubs § 17 (2009) ........................................14

The National Hockey League ("NHL" or "League") hereby submits this Objection to the Debtors' Request to Sell the Phoenix Coyotes under Sections 365 and 363 of the Bankruptcy Code (the "Objection").[1] In further support of this Objection, the NHL respectfully represents as follows:

## PRELIMINARY STATEMENT

The case began with the Debtors rushing unnecessarily into bankruptcy with the hope that the Bankruptcy Code would permit them to consummate a transaction – in blatant disregard of long-established NHL rules – that they could not accomplish outside of bankruptcy. Specifically, the Debtors proposed to transfer ownership of the Phoenix Coyotes ("Coyotes" or "Club") without obtaining NHL consent, convey membership in the NHL without the prospective owner having to abide by NHL rules and procedures, and relocate the Club without NHL consent and in disregard of the property rights of the NHL and its member teams. The proposed transaction was intended to favor the economic interests of the owner, Mr. Moyes, over the interests of certain creditors of the Club who either would have been paid in full or, in the case of the City of Glendale, would suffer no economic injury if the NHL rules had been followed. The NHL believes that the Debtors' efforts fundamentally misconstrue relevant Bankruptcy Code provisions and the case law interpreting them, and that it would be inappropriate for this Court to permit any transfer of ownership or relocation that does not comply with the NHL rules and procedures.

---

[1] For the time being, at the request of the Court, the parties have developed a protocol to accommodate an ongoing dispute regarding the governance of the Club. The NHL reserves all rights regarding this issue. In support of this Objection, the NHL has filed concurrently herewith the Declaration of Gary B. Bettman and the Declaration of Shepard Goldfein, and also relies on certain portions of the Declaration of William L. Daly filed on May 13, 2009. The NHL also respectfully refers the Court to its Memorandum of Points and Authorities in Support of National Hockey League's Motion for Determination (I) of Authority to Manage the Business and Affairs of the Debtors, and (II) that William Daly is the Representative of the Estates [dkt. no. 91]; Limited Objection of the National Hockey League to Motion of the Debtors for Entry of an Order (A) Authorizing Conduct of an Auction of Coyotes Hockey, LLC's Assets; (B) Establishing Procedures to be Employed in Connection with the Sale Including Approval of the Termination Fee; and (C) Approving Form of Order and Manner of Notice of Conditional Cure Notice and Solicitation Notice [dkt. no. 92]; Reply of The National Hockey League to (A) Debtors' Reply in Support of their Motion to Approve Bid Procedures and Termination Fee, and (B) PSE Sports & Entertainment LP's Response to Sale Procedures Objections [dkt. no. 123]; and Reply in Support of National Hockey League's Motion for Determination (I) of Authority to Manage the Business and Affairs of the Debtors, and (II) that William Daly is the Representative of the Estates [dkt. no. 124], previously filed on the authority and relocation issues, which it incorporates by reference herein.

**First**, under section 541 of the Bankruptcy Code, the "property" that the Debtors are seeking to convey is a membership in the League. As discussed below, that membership carries with it certain rights and obligations that, contrary to the Debtors' wish, cannot be expanded or modified by the fact that the Debtors have filed for bankruptcy. The Debtors' estates do not include the right to operate an NHL franchise in Hamilton, Ontario or indeed anywhere other than the Phoenix home territory. No provision of the Bankruptcy Code permits the Debtors to sell what they do not own.

**Second**, what makes the Phoenix Coyotes an NHL franchise, as opposed to an unaffiliated sports team, are its agreements with the League – most notably the NHL Constitution and By-Laws (including specifically its agreement to be an NHL Member Club in the Phoenix home territory) and the 2006 Consent Agreement that confirmed those rights and obligations (collectively, the "NHL Contracts"). These are the agreements that, among other things, allow the Coyotes to call themselves an NHL Club, to participate in scheduled games against other NHL teams, to employ professional hockey players who are members of the NHL Players' Association, and to share in national television and other League-generated revenues. Yet, incredibly, the Debtors are asking this Court to allow the Debtors to sell and relocate the Phoenix Coyotes without assuming or assigning these contracts. Specifically, under the Debtors' Revised Asset Purchase Agreement (the "APA")[2] with PSE Sports & Entertainment LP ("PSE"), the forced sale of the Coyotes is expressly conditioned on the Court rejecting the NHL Constitution and By-Laws, including both the NHL's consent rights over the transfer of ownership and the NHL's right under the NHL's By-Laws (and as a matter of law) to a relocation fee for any move of the Club. If, however, the Court were to allow the sale of the Coyotes without assigning the NHL Contracts, the assumed and assigned assets would not even be an "NHL" hockey Club; at most, the proposed transaction would transfer a collection of used hockey equipment – none of which could bear the NHL logo.

---

[2] The APA and Amendments thereto are attached to the Motion of the Debtors for an Order Under Sections 105(a), 363, and 365 of the Bankruptcy Code (i) Authorizing Coyotes Hockey, LLC's Sale of Substantially All of Its Assets, Free and Clear of Liens, Claims, and Encumbrances, Subject to Higher and Better Offers, and (ii) Approving an Asset Purchase Agreement [dkt. no. 18] ("Sale Approval Motion"); and the Second Declaration of Richard Rodier and Amendments to APA [dkt. no. 191].

Third, the Debtors' attempt to assume and assign the NHL Contracts directly conflicts with the terms of the APA itself. Under section 365 of the Bankruptcy Code, the Debtors cannot "cherry-pick" those parts of the NHL Contracts they wish to assume, assign and sell. The APA requires that the League consent provisions of the NHL Contracts be deemed null and void and that there be no relocation or indemnity payments to the NHL or any other Member Clubs. Assuming that the APA were to be reformed to accept all of the consent obligations under the NHL Contracts, the issues of "cure" and adequate assurance would still need to be addressed. As discussed below, apart from the question of whether the Debtors' non-monetary defaults could ever be cured, the size of potential relocation fees and indemnities would dwarf the consideration offered under the APA and leave creditors out in the cold.

Finally, in an effort to accomplish a transaction in bankruptcy that would be impossible outside of bankruptcy, the Debtors have alleged that the NHL rules violate antitrust law and that therefore there is a bona fide dispute under section 363(f) of the Bankruptcy Code. There is no "bona fide dispute" under section 363(f) as to the NHL's legitimate interest in determining who owns its Member Clubs and where their home territories will be located. The Debtors' assertion that the NHL Constitution and By-Laws violate the antitrust law is directly contrary to controlling Ninth Circuit authority. Moreover, any assertion that the NHL already has "applied" its rules and procedures regarding the proposed transfer of ownership and relocation is specious; under the Debtors' chosen schedule, the Debtors and PSE only filed their relocation application this week. Instead, as this Court has observed, the Debtors are simply seeking an order for the assumption, assignment and sale of the Coyotes expressly without NHL consent.

Honoring the NHL's consent rights will not harm the Coyotes' creditors. The NHL has been paying the Club's obligations since November 2008 and is committed to continuing to fund the Club in Phoenix on appropriate terms until a suitable local purchaser can be found. Indeed, in the past week the NHL has received applications from four different potential purchasers of the Coyotes in Phoenix. (Bettman Decl. ¶ 33.) If such a purchaser is not found after an appropriate effort (an effort that was cut short by the Debtors' precipitous and unnecessary rush into Chapter

11), the League will find a purchaser for another location in cooperation with this Court, and in accordance with the League's transfer and relocation rules and procedures, that will maximize the recovery for creditors. (Bettman Decl. ¶¶ 35-36.)

The transaction contemplated by the Debtors ignores the fact that the Debtors are members of a complex, economically interdependent association of professional hockey clubs that have carefully structured their membership, franchise locations, collective bargaining agreement, and broad range of other collective decision-making initiatives to promote NHL hockey as a major league sport and maintain and protect the value of the NHL and its Member Clubs. Attempting to force a sale of the Coyotes without NHL consent has far-reaching implications not only for the NHL, but also for all professional sports leagues. Every sports league is built on the fundamental right of its members to choose for the venture the owners and franchise locations that will generate and optimize overall interest in the sport from the perspective of fans, sponsors, advertisers and other constituents. Thus, even if the Court were to entertain the Debtors' section 363 arguments, the Court should not exercise its discretion to order, over the League's objection, a sale and relocation of a professional sports franchise that seeks to maintain its membership in that League.

## ARGUMENT

## I. THE DEBTORS ARE ATTEMPTING TO SELL RIGHTS THAT ARE NOT PART OF THE ESTATE.

A threshold issue in this case is whether what the Debtors propose to sell under the APA is actually part of their estates. As a factual matter, the APA makes clear that Mr. Balsillie's group is not purchasing any interest of the Debtors that includes transfer of ownership restrictions, relocation restrictions or related requirements for relocation and indemnity fees. Specifically, section 2.2(a)(i) of the APA provides that the Debtors anticipate selling "[t]he Team's NHL Franchise and Seller's membership interest in the NHL, as modified and assigned under the Sale Approval Order." (Sale Approval Motion Ex. A at 8 (emphasis added).) In the Sale Approval Motion, the Debtors seek an order granting them the right to transfer their contractual rights not as they presently exist, but only after significant modification to include (i) the right to transfer the Club without the consent of the League, (ii) the right to a "home territory" in Hamilton, Ontario,

4

and (iii) the extinguishment of the contractual requirement to compensate the League for the value of the Hamilton, Ontario "home territory."  (See Sale Approval Motion at 11-12.)

Under section 541 of the Bankruptcy Code, however, a debtor's estate acquires as property only "legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "Because the estate may take no greater interest than that held by the debtor, the estate takes the license subject to the restrictions imposed on the debtors by its transferor." California v. Farmers Mkts., Inc. (In re Farmers Mkts., Inc.), 792 F.2d 1400, 1403 (9th Cir. 1986); accord Gumport v. Sterling Press (In re Transcon Lines), 58 F.3d 1432, 1438 (9th Cir. 1995); Avery Fed. Sav. & Loan Ass'n v. Klayer (In re Klayer), 20 B.R. 270, 272 (Bankr. W.D. Ky. 1981) ("The rule is elementary that the estate succeeds only to the title and rights in the property that the debtor possessed.").  Thus, the filing of the bankruptcy petition on May 5, 2009, did not change in any way what "property" may be sold.  For example, in Calvert v. Bongards Creameries (In re Schauer), 835 F.2d 1222, 1224 (8th Cir. 1987), a trustee maintained that "[f]ederal bankruptcy law . . . grants a trustee greater rights to dispose of property of the bankruptcy estate than the debtor held."  The Eighth Circuit expressly rejected that argument:  "Although there are no cases directly on point, numerous courts have asserted the general principle that the trustee takes only those rights that the debtor had under state law."  Id. at 1225; accord In re Sanders, 969 F.2d 591, 593 (7th Cir. 1992).

The court applied this basic principle in a case dealing with transfer restrictions contained in a joint venture agreement.  Rice v. Shoney's Inc. (In re Dean), 174 B.R. 787, 790 (Bankr. D. Ark. 1994).  Observing that the trustee possessed the same rights the pre-petition debtor had under the agreement, Judge Scott dispensed with the argument that the interest in the joint venture could be modified to eliminate the transfer restrictions:

> [T]he trustee and intervenor, in effect, argue that property rights are expanded simply by virtue of the fact that the property belongs to the estate.  There is no foundation in the Bankruptcy Code for such an assertion.  The estate succeeds only to that interest of the debtor.  The fact that the joint venture may be of lesser value to the estate than the trustee would like does not expand the rights in the property.

Id. at 790 (alteration in original) (citation omitted).

The <u>Dean</u> court further held that the parties were "confus[ing] the issues of what is property of the estate with the bundle of rights associated with the property." <u>Id.</u> The estate acquires only "the rights of the debtor, <u>including restrictions on transfers</u> and options of others to purchase." <u>Id.</u> at 791 (emphasis added). Thus, the court concluded: "Based upon the transfer restrictions set forth in the joint venture agreement, the joint venture interests may not be sold to a person or entity other than according to those terms stated in the joint venture agreement." <u>Id.</u>; <u>see also</u> <u>Bd. of Trade of Chi. v. Johnson</u>, 264 U.S. 1, 12, 13 (1924) (holding that a debtor's membership interest in the Board of Trade did constitute property of the estate disposable by the trustee, but would remain "<u>subject to</u> rules of the exchange," including the association's consent rights (emphasis added)); <u>Hyde v. Woods</u>, 94 U.S. 523, 525 (1876) (membership rules with respect to the transfer of seats on the San Francisco Stock and Exchange Board, a voluntary association, are an "incident of the property when it was created, and remain a part of it into whose hands soever it may come").

Here, under the NHL contracts, the Debtors own the right to operate a hockey club in the Phoenix, Arizona "home territory" – nothing more. (<u>See</u> Daly Decl. Ex. A (Constitution and By-Laws); Ex. E (2006 Consent Agreement) at ¶ 4 (Moyes Entities "represent, warrant and covenant to the NHL that the acquisition of interests in the Franchise . . . is solely for the purpose of operating the Franchise in its current location.").) While an owner may apply for transfer of ownership (and/or relocation), the NHL's consent rights on those matters are part of the estate itself; hence, any proposed sale without those restrictions directly contravenes section 541(a) of the Code.

The violation of section 541(a) is even more stark on the specific issue of relocation. Separate and apart from the estate being defined in part by the NHL's consent rights, the Ninth Circuit has made clear that the right to operate a franchise in Hamilton, Ontario is a franchise opportunity <u>owned exclusively by the League</u>. Even if the NHL were to consent to a relocation, the League's By-Laws specifically provide that such consent may be made subject to reasonable and appropriate conditions, including payment to the League of a relocation fee to reflect the goodwill developed by the League in the new location, and/or payment of an indemnification fee to reflect the goodwill developed by neighboring Member Clubs in the new location. (Daly Decl. ¶¶

15-16; Ex. D (By-Law 36.6 provides for relocation fees).) In other words, any value reflected in cities that have the potential to host an NHL team belongs to the League and cannot be unilaterally usurped by any single Member Club. The contractual rights of sports leagues to the corporate opportunity in connection with potential franchise relocations has been expressly upheld by the Ninth Circuit and other authorities. See L.A. Mem'l Coliseum Comm'n v. NFL ("Raiders II"), 791 F.2d 1356, 1371-73 (9th Cir. 1986) (league owns franchise opportunities for which league may charge team in the event of relocation); NBA v. SDC Basketball Club, Inc., 815 F.2d 562, 568-59 (9th Cir. 1987) (same).

Indeed, in Raiders II, the Ninth Circuit concluded that even though the antitrust laws in that case prevented the League from blocking the Raiders' move, the NFL could still charge the Raiders a relocation fee for having usurped the opportunity that belonged to the League as a whole. The Raiders were required to compensate the League for the difference in value between the usurped Los Angeles franchise opportunity and the value of the Oakland opportunity returned to the league by virtue of the team moving. The law of the Ninth Circuit is yet another separate and independent reason why the Debtors do not have a legally cognizable property interest in operating the Club outside of the Phoenix, Arizona area, have no property interest in the value of the Hamilton market, and why, under section 541(a), the Court may not abrogate (as provided in the APA) the right to charge a relocation fee to the Debtors and/or Mr. Balsillie in the event the team relocates.

## II. SECTION 365 DOES NOT AUTHORIZE THE ASSUMPTION AND ASSIGNMENT OF THE NHL CONTRACTS AS "MODIFIED" BY THE APA.

### A. The Debtors Do Not Seek To Assume, Assign And Sell All Contracts That Make The Coyotes An NHL Franchise.

Should the Debtors overcome their section 541(a) deficiency, they encounter the problem of not assuming, assigning or selling the executory contracts that make the Coyotes an "NHL" franchise. As discussed above, in the APA the Debtors anticipate selling "[t]he Team's NHL Franchise and Seller's membership interest in the NHL, as modified and assigned under the Sale Approval Order." (Sale Approval Motion Ex. A at 8 (emphasis added).) Thus, the Debtors do not seek to transfer their contractual rights as they presently exist, but only after presuming significant

modification by the Court that would abrogate the NHL's constitutional provisions for Board of Governors' consent to sale and relocation of Member Clubs. Specifically, Schedule 2.2(a) of the APA, does not include the NHL Constitution and By-Laws or the 2006 Consent Agreement as Acquired Assets or Contracts. (Id. at Schedule 2.2(a).) Rather, the NHL Constitution and By-Laws and the 2006 Consent Agreement are listed in Schedule 4.7 as Material Contracts that are Excluded Assets in Schedule 2.3 that are not to be assumed and assigned. (Id. at Schedules 2.3 and 4.7.)[3]

The NHL Constitution and By-Laws and the 2006 Consent Agreement, however, are the very documents that grant the Coyotes the right to participate in the National Hockey League as an NHL Club. Without assuming these contracts under the APA – which is expressly conditioned on the Court ordering the consent of the NHL Board of Governors "deemed" and prohibiting the imposition of any relocation fee – the Debtors are attempting to sell, at best, the right to intrasquad scrimmages among non-NHL players or exhibitions against non-NHL affiliated teams at Copps Coliseum at the whim of Mr. Balsillie. If, however, the Debtors want to transfer the right to be an NHL Member Club, the Debtors must assume and assign to any purchaser, among other things, the NHL Constitution and By-Laws and the Consent Agreement that Mr. Moyes signed to obtain membership in the League. In short, the obligations under these contracts, which the Debtors attempt to avoid through rejection, are the very essence of the rights that the Debtors wish to sell.

PSE's attempted "side door" into the NHL is blocked by the Bankruptcy Code itself. Bankruptcy Code section 365(a) provides that a trustee "may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Assumption of executory contracts such as the Constitution and By-Laws, however, requires assumption in entirety "cum onere," or subject to all burdens. U.S. v. Gerth, 991 F.2d 1428, 1432 (8th Cir. 1993) (section 365 and case

---

[3]     The incongruity in the Debtors' position regarding the NHL Constitution and By-Laws is demonstrated by the fact that they amended the APA to add the NHL Collective Bargaining Agreement to the list of contracts they intend to assume and assign. Yet, the CBA itself requires "the NHL, each Club, and each player" to be bound by League rules, including expressly the NHL Constitution and By-Laws, which the Debtors intend to reject. (See Goldfein Decl. Ex. 1, § 30.1.)

law "establish[] that when assuming a contract, the debtor assumes all the benefits and burdens of the contract" (citing <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 531 (1984))).  The Constitution and By-Laws require the NHL's consent for any ownership transfer or relocation of the Club, as well as the payment of a relocation fee to the League and, if applicable, indemnity fees to affected Clubs.  (Bettman Decl. ¶¶ 15-30, 38-40.) By virtue of its entry into the APA with Mr. Balsillie, the Debtors seek to assume and assign all of the benefits of membership in the NHL, while impermissibly rejecting the obligations of that same membership.

### B.     <u>The Debtors Do Not Intend To Cure The Default Caused By Breach Of The Consent Agreement In Order To Properly Assume The Consent Agreement.</u>

It is equally clear that as a precursor to assignment under Bankruptcy Code section 365(f), the Debtors must cure all defaults under the NHL Contracts, compensate the non-debtor party for any pecuniary loss caused by the default and provide adequate assurance of future performance under the agreements.  11 U.S.C. § 365(b)(1).  Even if the Court were to deem the Debtors' motion as a request to assume and assign the NHL Contracts, the APA forecloses that possibility.

### 1.     <u>The Debtors are unable to cure the default.</u>

A debtor "must cure all defaults, both monetary and nonmonetary, prior to the assumption and assignment of an executory contract."  <u>Worthington v. Gen. Motors Corp. (In re Claremont Acquisition Corp., Inc.)</u>, 113 F.3d 1029, 1033 (9th Cir. 1997) (construing 11 U.S.C. § 365(b)(1)).  In <u>Claremont</u>, the Ninth Circuit held that, where there are nonmonetary defaults that, by their nature, are not curable, the executory contract cannot be assumed and assigned.  <u>Id.</u> at 1034-35.  Here, the Debtors' defaults include, among other things, negotiating and agreeing to the APA without the NHL's knowledge or consent, seeking to transfer ownership of the team without the NHL's consent, and seeking to relocate the Club without the NHL's consent or payment of appropriate relocation and indemnity fees.  All of these acts breached the NHL Contracts and constitute defaults that must be cured.  Inasmuch as the Debtors are asking this Court to approve the APA as is – including the express exclusion of the Constitution and By-Laws and the 2006

Consent Agreement – these defaults are not curable.[4]  Accordingly, the Debtors are incapable of assuming and assigning the Constitution and By-Laws and the Consent Agreement that provide for NHL membership.

### 2. The Debtors do not intend to provide monetary compensation as required by section 365(b)(1)(B).

Under the APA, the proposed sale is conditioned on the Court ordering that the Debtors can sell and relocate the Club without the consent of the League and without the payment of a relocation fee to the NHL or indemnity payments to certain affected Clubs (likely, the Toronto Maple Leafs and/or Buffalo Sabres).  Bankruptcy Code section 365(b)(1)(B) mandates compensation for any actual pecuniary loss arising from these defaults.[5]  11 U.S.C. § 365(b)(1)(B). While section 365(b)(1)(A) speaks to the default itself, section 365(b)(1)(B) speaks to the consequences of such default.  J.W. Fortune, Inc. v. McLean Square Assocs., G.P. (In re J.W. Fortune, Inc.), 173 F.3d 424, 1999 WL 95529, at *2 n.3 (4th. Cir. 1999) (unpublished table decision).  Even if the NHL hypothetically consented to a sale and relocation of the Coyotes or this Court abrogated the NHL's consent rights, the Constitution and By-Laws (and related past practice) as well as settled Ninth Circuit law would require a new owner to pay a relocation fee and, depending on the location, an indemnity fee for the goodwill developed by any neighboring members.  See Raiders II, 791 F.2d at 1371-73 (even if antitrust laws allow team to move over league's objection, team must still compensate league for value of the market).  But since the Debtors and Mr. Balsillie have conditioned the proposed sale on not paying such fees, they would be unable to comply with section 365(b)(1)(A).

---

[4]    To date, the Debtors have not suggested that they plan to cure their current breaches of the Constitution and By-Laws and the Consent Agreement.  To the extent the Debtors may argue that they can reject the Consent Agreement and still be the Phoenix Coyotes, that would vitiate the obligations the Debtors agreed to perform in order to become a member of the League.  Moreover, it says nothing about the NHL Constitution and By-Laws, which without question must be agreed to in full by any and all members of the NHL.

[5]    The negotiation and execution of the APA – both done without the NHL's knowledge or consent and prior to the filing of the petition – themselves constitute defaults under the NHL Constitution and By-Laws and the Consent Agreement.  (See Daly Decl. Ex. E. at 6)

The consequences of this particular default on the Debtors' creditors are quite significant. As an initial matter, because a relocation opportunity is the property of the NHL rather than the Debtors, any relocation fee amount would reduce any proceeds from the sale to Mr. Balsillie's group. (The current version of the APA simply excludes these fees altogether.) The calculation of an appropriate relocation fee here (and indemnity fees, if applicable) would be a complex matter that would include such things as a calculation and determination of the difference in value to the League between the Club's current and prospective locations. (See Bettman Decl. ¶¶ 37-39.) It is noteworthy that the Debtors' own position is that the Phoenix marketplace is worth "zero" and that any expansion opportunity in the NHL is worth at least **[REDACTED]**. (See Bettman Decl. ¶ 44.) Further, after accounting for adjustments to the "Purchase Price" under the express provisions of the APA, the amount of money that would actually be payable by PSE to the Debtors is likely to be only approximately $165 million, substantially less than the $212.5 million PSE purports to offer.[6] (Bettman Decl. ¶¶ 42-43.) Accordingly, even under the Debtors' own assumptions, PSE is paying **[REDACTED]** less than the Debtors' view of the value of the Hamilton opportunity – a value that is likely much greater than **[REDACTED]**. This does not take into account the increase in creditors' claims against the estate that will result from rejection of the Coyotes' contract with the City of Glendale. Moreover, the amount actually payable by PSE will be reduced further (or eliminated altogether) to the extent the Court confirms the League's right to charge appropriate relocation and indemnity fees. As a practical matter, therefore, there would be no meaningful recovery left for creditors from a forced relocation to Hamilton – not even secured creditors – which obviously is why the Debtors and PSE expressly exclude the relocation fee and indemnity payments from their APA. By contrast, in the absence of a relocation there would be no need for any "cure" payments due to the NHL or the City of Glendale for a sale to an owner keeping the

---

[6] These deductions include approximately $25 million relating to amounts already paid to the Debtors by the NHL in the form of advances of League distributions and revenue sharing funds and $22.5 million that would be payable to Mr. Gretzky as deferred compensation and future payments pursuant to his employment agreement. (See Bettman Decl. ¶ 42.)

Club in Glendale, and it is likely that all creditors other than Mr. Moyes would be better off financially.

### 3. The Debtors are unable to provide adequate assurance of future performance under either section 365 or 363.

The Debtors also must provide adequate assurance of future performance in order to assume the NHL Constitution and By-Laws and the 2006 Consent Agreement. <u>See</u> 11 U.S.C. § 365(b)(1)(C). Adequate assurance of performance is to be given a "practical pragmatic construction based upon the facts and circumstances of each case." <u>In re Bon Ton Rest. & Pastry Shop, Inc.</u>, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (citing <u>In re U.L. Radio Corp.</u>, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982)); <u>see also</u> <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1309 (5th Cir. 1985) (same). Thus, courts consider the factual circumstances surrounding the debtor or the debtor's assignee.

Critically, in addition to the relocation and indemnity payments discussed above, adequate assurance requires proof of non-monetary performance – i.e., complying with the NHL's Constitution and By-Laws and the 2006 Consent Agreement. For example, in <u>Kishi v. Greco (In re Greco)</u>, No. 0975-1-79-00484, 1980 Bankr. LEXIS 5461, at *30-31 (Bankr. D. Haw. Mar. 14, 1980), the court refused to approve the assumption of a master lease where the debtor's sublease agreement with a sublessor directly conflicted with those of the master lease. Here, the same reasoning applies: neither the Debtors nor the proposed buyer can provide adequate assurance of future performance of the Constitution and By-Laws and the Consent Agreement because the APA to which they have agreed directly conflicts with these contracts. Indeed, if anything, the Debtors have provided the NHL with adequate assurance of their future <u>non</u>-performance of the NHL Contracts.[7]

---

[7] For the same reason, the proposed buyer cannot assure future performance under section 365(f) relating to the assignee's obligations. <u>See</u> <u>infra</u> pp. 17-18.

12

Likewise, in the face of a section 363(f) request for a "free and clear" sale of the Club,[8] the Debtors cannot provide adequate protection to the NHL's interests as required by section 363(e) of the Bankruptcy Code.  Section 363(e) requires the Court to adequately protect the NHL's interest:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).  Bankruptcy Code section 363(e) exists to protect those very interests subject to section 363(f).  Under Bankruptcy Code section 361, when adequate protection is required to be provided to an interest holder under section 363, such adequate protection may be provided by, among other things, cash payments, a replacement lien or such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  See generally In re Kellstrom Indus., Inc., 282 B.R. 787, 794 (Bankr. D. Del. 2002) (discussing interplay between sections 363(f), 363(e) and 361).

In a typical sale scenario, cash payments and liens would protect the non-debtor party's interests in property of the estate.  Here, however, the NHL cannot be financially compensated for deprivation of the fundamental right to decide Club ownership and location.  Nor can the NHL be adequately protected by attachment of its interests to sale proceeds or by any other monetary compensation, and there is no alternative remedy to realize the "indubitable equivalent" of its interests.  Frankly stated, the NHL is interested in promoting fan interest in the game of NHL hockey through the choice of good business partners and stable franchises.  Indeed, no level of relocation fees or indemnity payments could compensate for the chaos and harm that would ensue to the game of NHL hockey if bankruptcy courts could force the sale of Clubs to any person and permit Clubs to be relocated to any location.  Allowing the sale in the manner proposed leaves the NHL without adequate protection or remedy for the Debtors' destruction of its rights in direct contravention of Bankruptcy Code section 363(e).

---

[8]    The other defects in the Debtors' section 363(f) arguments are discussed below.  See infra pp. 18-31.

### C. The NHL Is Excused Under Section 365(c)(1) From Accepting Performance Of NHL Contracts From Anyone Other Than The Phoenix Coyotes.

Even if the Court were able to ignore the Debtors' express violation of section 365(b), the Debtors' ability to assign a contract is still subject to, among other things, the limitations imposed by Bankruptcy Code section 365(c). See 11 U.S.C. § 365(f)(1). Under section 365(c)(1), a debtor may not assume or assign an executory contract if:

> (A) applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract . . . prohibits or restricts assignment of rights or delegation of duties; and

> (B) such party does not consent to such assignment . . . .

11 U.S.C. § 365(c)(1). Because applicable law excuses the NHL from accepting performance from someone other than the Debtors, the Debtors cannot assume the Constitution and By-Laws and the 2006 Consent Agreement.

#### 1. Corporate governance law excuses the NHL from accepting performance.

The NHL is a joint venture organized as an unincorporated association with its headquarters in New York, New York. It has long been the case that an unincorporated association has the "sole power to say who shall belong and who shall not." Arnstein v. Am. Soc'y of Composers, Authors & Publishers, 29 F. Supp. 388, 393 (S.D.N.Y. 1939) (voluntary unincorporated association has right to refuse plaintiff's attempt to join association); see also Branagan v. Buckman, 122 N.Y.S. 610, 612-13 (Sup. Ct. 1910) (as a matter of common law, an unincorporated association has right not to accept the purchaser of a member's interest in the association). See generally 6 Am. Jur. 2d Associations and Clubs § 17 (2009) ("Membership in a voluntary unincorporated association generally is held to be a privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced. Generally, courts will not compel admission to a voluntary association."); 6A N.Y. Jur. 2d Associations and Clubs § 17 (2009) ("The right of a membership in a voluntary unincorporated association is a privilege which may not be transferred or sold without the consent of the association."). Accordingly, the law governing unincorporated

associations excuses the NHL from accepting performance under the NHL Constitution and By-Laws and the 2006 Consent Agreement from any party other than the Debtors within the meaning of Bankruptcy Code section 365(c)(1).

The NHL also is considered a joint venture among its thirty Member Clubs to create the product of NHL Hockey. A joint venture is a "'special combination of two or more persons where in some specific venture a profit is jointly sought.'" Gramercy Equities Corp. v. Dumont, 531 N.E. 2d 629, 632 (N.Y. 1988) (citation omitted). The law is clear that courts may look to partnership law for guidance in assessing the rights of members of a joint venture. Id. And, under applicable partnership law, a partner may not assign its partnership interests absent the consent of its partners. See, e.g., N.Y. P'ship Law § 40 (McKinney 2005). In the context of this case, therefore, the Court may look to analogous partnership law to find that, under section 365(c)(1), membership in the NHL may not be assigned unless the other members agree to admit the assignee as a substitute Club owner. See In re Schick, 235 B.R. 318, 325 (Bankr. S.D.N.Y. 1999) (applying principle to partnership membership); see also In re Todd, 118 B.R. 432, 434 (Bankr. D.S.C. 1989) (recognizing that a non-selling partner has a "legitimate interest in the identity of his partner, which is worthy of protection by way of the protective provisions of . . . the partnership agreement."); In re Dean, 174 B.R. at 790; Bd. of Trade of Chi., 264 U.S. at 12-13; Hyde, 94 U.S. at 525. In Todd, the Court observed that Section 541 of the Bankruptcy Code was not intended "to void any restrictions on the transfer of the property from the trustee, as successor to the debtor, to third parties." 118 B.R. at 435. As the court observed in an action involving NFL membership:

> "[A] league is more like a partnership. While each club initially contributes its own capital, the various participants to a large extent share in the joint profits of the venture. This participation in profits is achieved through various arrangements, such as the pooling of television receipts . . . between home and visiting clubs. Thus, a decision on access to membership is basically a decision as to whether particular individuals (or their business entities) will be allowed to participate in the partnership venture."

Mid-South Grizzlies v. NFL, 550 F. Supp. 558, 568 (E.D. Pa. 1982) (quoting John C. Weistart & Cym H. Lowell, The Law of Sports § 3.16, at 315 (1979)) (emphasis added).

Indeed, there is precedent for applying section 365(f) itself by way of analogy to a partnership agreement, even in the absence of a partnership agreement. For example, in In re Cedar Chemical Corp., 294 B.R. 224, 232 (Bankr. S.D.N.Y. 2003), a member of a "task force" filed for bankruptcy and attempted to assign its membership interest in the task force under section 365(f). In recognizing the potential section 365(c) issue, the court noted that the task force agreement "was similar to a partnership agreement, and partnership membership is not ordinarily assignable under non-bankruptcy law in the absence of the other parties' consent." Id. at 230.

Much more so than the task force in Cedar Chemical, the League is an interdependent group of Member Clubs formed into an enterprise to achieve the goal of producing, promoting and selling NHL Hockey. Indeed, in this context, if the sale were approved on the terms the Debtors propose, it would not only force a marriage between non-consenting venture partners, but also effectively rewrite the terms of the parties' joint venture agreement to impermissibly compel (i) the League to re-write its schedule and alter its current Conference and Divisional alignments and (ii) the other twenty-nine Clubs to play a team located in Hamilton, Ontario (including travel to and from) instead of Phoenix, Arizona. See Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.), No. 02-41729, 2004 WL 2186582, at *12 (S.D.N.Y. Sept. 27, 2004) ("[I]f the Bankruptcy Court is going to use its discretionary equitable powers to exercise the fullest possible extent of its control over the debtor, it must first determine that, under the relevant contracts and applicable corporate or partnership law, it is awarding property only to those with a legitimate claim to it, and not using those equitable powers, in effect, to rewrite contracts and reorder property relations among non-debtor entities in a manner that is wholly unauthorized by the Bankruptcy Code."). Membership in the League, therefore, is not assignable without the other Member Clubs' consent inside or outside the scope of Bankruptcy Code section 365(c).

## 2. Intellectual property law excuses the NHL from accepting performance.

Separate and apart from the governance considerations, the sale of the Club's assets here necessarily contemplates assignment of certain intellectual property rights that belong to the NHL. Indeed, one of the primary benefits of being an NHL Member Club is the right to promote the team

16

itself <u>as an NHL team</u>.  Among the NHL's copyright and trademark rights are the NHL Shield, the names, logos, symbols, and other indicia of the League, including the Conference and Division names and logos, and League award, trophy and program names, such as the Stanley Cup. (Bettman Decl. ¶ 14.)

Federal intellectual property law prohibits an assignment of such personal intellectual property rights without the property owner's consent.  <u>See N.C.P. Mktg. Group, Inc. v. Blanks (In re N.C.P. Mktg. Group, Inc.)</u>, 337 B.R. 230, 236-38 (D. Nev. 2005).  This is because "'copyright and trademark licensors share a common retained interest in the ownership of their intellectual property – an interest that would be severely diminished if a licensee were allowed to sub-license without the licensor's permission.'"  <u>Id.</u> at 236 (quoting <u>Miller v. Glenn Miller Prods.</u>, 318 F. Supp. 2d 923, 938 (C.D. Cal. 2004)).  Trademarks, for instance, "allow their owners to protect the good will of their name and products."  <u>Id.</u> at 236.  Thus, an owner "has a significant interest in controlling to whom the mark is transferred because the subsequent value of the trademark will be based entirely on good will."  <u>Id.</u> (citing <u>Stork Rest., Inc. v. Sahati</u>, 166 F.2d 348, 354 (9th Cir. 1948)).  Similarly, the Ninth Circuit has held that non-exclusive patent licenses are not assignable under section 365(c)(1) because they are "'personal and assignable only with the consent of the licensor.'"  <u>Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.)</u>, 165 F.3d 747, 750 (9th Cir. 1999) (quoting <u>Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC, Inc.)</u>, 89 F.3d 673, 680 (9th Cir. 1996)); <u>see also</u> <u>In re Hernandez</u>, 285 B.R. 435, 439-40 (Bankr. D. Ariz. 2002) (both exclusive and non-exclusive patent licenses are not assignable under section 365(c)(1) without licensor's consent).

Accordingly, because the NHL has the right to determine who may license its intellectual property rights outside of the Bankruptcy Code, it similarly has the right to make this determination within the scope of section 365(c)(1).

D. **The Debtors Cannot Provide Adequate Assurance Of Future Performance Under Section 365(f).**

Finally, under Bankruptcy Code section 365(f)(2), to assign an executory contract, the debtor also must provide adequate assurance of assignee's future performance of such contract.  11 U.S.C. § 365(f)(2).  Courts have applied a "material and economically significant" standard to

determine whether the non-debtor party has been given adequate assurance of future performance under Bankruptcy Code section 365(f)(2). See In re Fleming Cos., 499 F.3d 300, 305 (3d Cir. 2007) (citing In re Joshua Slocum Ltd., 922 F.2d 1081, 1091 (3d Cir. 1990)). The "material and economically significant" standard focuses on balancing two concerns: (1) preventing substantial economic detriment to the non-debtor contracting party, and (2) permitting the bankruptcy estate's realization of the intrinsic value of its assets. See Fleming Cos., 499 F.3d at 306; see also Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (section 365 balances two concerns: "'the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain'").

As noted above, the APA by its express terms makes clear that the Debtors and Mr. Balsillie have no intention of performing the contractual obligations of the Debtors under the NHL contracts (assuming arguendo that the Debtors intended to assume and assign such contracts) because the agreement calls for the rejection of the NHL Constitution and By-Laws and the 2006 Consent Agreement and the avoidance of NHL consent to the sale and relocation of the franchise, as well as any relocation or indemnity fees. The Debtors and Mr. Balsillie thus have provided the NHL with adequate assurance that they will <u>not</u> perform under such contracts. By contrast, the NHL is attempting to protect itself from the inevitable detriment to the League if it is not able to choose its owners or the locations of its Clubs' home territories; the Debtors and Mr. Balsillie apparently could not care less. Thus, Debtors cannot demonstrate compliance with section 365(f).

## III. THE COURT SHOULD NOT EXERCISE ITS DISCRETION UNDER SECTION 363 TO ORDER A FREE AND CLEAR SALE OF THE COYOTES.

### A. There Is No Bona Fide Dispute Over The NHL's Interests.

As discussed above, under section 541(a)(1) the Debtors do not own and cannot sell the right to operate the Club outside of Phoenix; nor, under section 365, can they cherry-pick which parts, if any, of the Debtors' executory contracts with the NHL they wish to assume and assign. Nevertheless, the Debtors claim that there is a "bona fide dispute" regarding the NHL's interests.

The Debtors confuse the relevant "interests" at issue. In order to invoke the provisions of section 363(f)(4) to permit a sale where an interest is in "bona fide dispute," a non-debtor must be

claiming a disputed interest <u>in property of the debtor</u>.  Indeed, even the Debtors agree that the definition of "interest" under section 363(f) "encompasses obligations . . . that may flow from ownership of the property," which obligations include environmental clean-up claims, tax interest and tort claims as cited by the Debtors.  (Debtors' Reply in Support of Their Motion to Approve Bid Procedures and Termination Fee ¶ 20.)  Here, the NHL is merely seeking to enforce the Debtors' obligations flowing from their ownership interest in the Coyotes; the NHL is not seeking to enforce a lien on the Debtors' property or some monetary judgment from a lawsuit against the Debtors.  <u>See</u> <u>Jandel v. Precision Colors, Inc.</u>, 19 B.R. 415, 419 (Bankr. S.D. Ohio 1982) (restrictions on sale and transfer of shares do not constitute a "lien" within meaning of § 363(f)). The NHL is seeking to exercise rights that transcend the Debtors – the right of the NHL venture to choose its members and the location of its teams.

In addition, it is insufficient for the Debtors merely to allege a dispute; rather, there must be an objective basis for the Court to determine a legitimate dispute exists.  <u>In re Octagon Roofing</u>, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991) (citing <u>In re Busick</u>, 831 F.2d 745, 750 (7th Cir. 1987)); <u>see</u> <u>Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)</u>, 277 F.3d 1057, 1064 (9th Cir. 2002).  Moreover, not just any alleged dispute satisfies section 363(f)(4); rather, it must entail "some sort of meritorious, existing conflict."  <u>In re Taylor</u>, 198 B.R. 142, 162 (Bankr. D.S.C. 1996) (citing <u>Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.</u>, 986 F.2d 709, 715 (4th Cir. 1993)).  Here, the Debtors have no objective basis to claim that a bona fide dispute exists as to the NHL's legitimate interests.[9]

### 1.    The League's consent rights are lawful.

As discussed above, joint ventures, including unincorporated associations, have the right to approve new members.  Consent rights relating to transfers of ownership interests are especially important in the professional sports league context given the economic interdependence of the

---

[9]    In any event, even if the Court were to find the existence of a bona fide dispute, the NHL's damages arising from a relocation of the Club, including without limitation, the NHL's claims for a relocation fee and indemnity payments would attach to sales proceeds and significantly reduce the sums otherwise available for payment to unsecured creditors.

members of the League, which play half their games (50% of their business) in the arenas of their joint venture partners. The NHL rules and procedures relating to transfers of ownership are tailored to address the legitimate interests of the Member Clubs in ensuring that any new owners are people of good moral character, have adequate financial means, and would make good partners. (Bettman Decl. ¶¶ 16-20.) No one has even suggested that having rules and procedures to exercise such consent rights is unlawful. See, e.g., Levin v. NBA, 385 F. Supp. 149 (S.D.N.Y. 1974); Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986).

Sports leagues also have legitimate (indeed, critical) interests in regulating and determining where the members of the league are located and play their games. The geographic distribution of teams affects the exposure of the sport to fans and impacts national and regional television ratings. The location of individual teams also impacts Conference and Divisional alignments, as well as League rivalries. (Bettman Decl. ¶ 10.) See also L.A. Mem'l Coliseum Comm'n v. NFL ("Raiders I"), 726 F.2d 1381, 1391-92 (9th Cir. 1984) ("[NFL] owners have a legitimate interest in protecting the integrity of the League itself. Collective action in areas such as League divisions, scheduling and rules must be allowed, as should other activity that aids in producing the most marketable product attainable."). Moreover, sports leagues themselves, apart from their individual members, have compelling interests in the league's relationships with fans and local governments and in maintaining the league's goodwill and credibility. (See Bettman Decl. ¶¶ 22-26.) See also Raiders I, 726 F.2d at 1396 ("[T]here is some legitimacy to the NFL's argument that it has an interest in preventing transfers from areas before local governments, which have made a substantial investment in stadia and other facilities, can recover their expenditures. In such a situation, local confidence in the NFL is eroded, possibly resulting in a decline in interest.").

As a result, it has long been established that sports leagues are entitled to have rules and procedures relating to the potential relocation of their franchises and that doing so cannot violate the antitrust laws. See, e.g., SDC Basketball Club, 815 F.2d at 568 ("The mere existence of [relocation rules], and various provisions for franchise movement evaluation, cannot violate antitrust law."); Raiders II, 791 F.2d at 1369 (NFL relocation rule not illegal on its face); St. Louis

Convention & Visitors Comm'n v. NFL, 154 F.3d 851, 864-65 (8th Cir. 1998) (judgment as matter of law for defendant league on claim challenging "very existence" of relocation rule without any showing of anticompetitive effect or antitrust injury).

Indeed, the Canadian Competition Bureau squarely addressed this issue just last year in response to Mr. Balsillie's prior attempts to acquire and move two other NHL franchises, the Pittsburgh Penguins and the Nashville Predators. (See Daly Decl. ¶¶ 50-51; Ex. I.) The Competition Bureau concluded that professional sports leagues must have the right to control the location of franchises, that restrictions on franchise relocations serve "a number of legitimate interests," and that the NHL's "policies and procedures appropriately reflect the NHL's legitimate concern that franchises should only be relocated in extraordinary circumstances." (Id. Ex. I.)

### 2. There is no factual or legal basis for an "as applied" challenge to the League's consent rights.

Because the NHL is entitled to have consent rights and the League's rules and procedures relating to such rights do not violate the antitrust laws, the Debtors are left to argue that the League's legitimate rules and procedures have been "applied" in an illegal manner. See SDC Basketball Club, 815 F.2d at 568 (holding that "mere existence" of relocation rules and procedures "cannot violate antitrust law" and that "only the particular application of the franchise movement rules" can provide a basis to find a "violation of the antitrust laws"). But the Debtors do not have an "as applied" claim relating to the League's consent rights for at least three independent reasons: (i) the League has not applied them, so any challenge is both hypothetical and premature, (ii) the League's position that it is too late to apply for a relocation for next season cannot as a matter of law cause an injury to competition and hence raise any bona fide dispute in and of itself; and (iii) the Debtors released any right to challenge the League's consent rights.

### (a) The League has not "applied" its rules.

The League understands that at the hearing on June 9 the Court will address whether the Debtors can sell the Club free and clear of the League's consent rights. The resolution of that issue will determine who may submit bids, what terms the bids may include, what details must be submitted with the applications, and whether the League may apply its consent rights to any bids

for the Club.  The Court's decision also will affect the timing of the sale auction for the franchise because, if the Court finds that NHL consent is required, the NHL's Proposed Bid Procedures currently contemplate a September auction.  Significantly, however, none of the creditors (except perhaps Mr. Moyes whose loans were made in the nature of equity) will be prejudiced because the NHL is committed to funding the Club in Phoenix on appropriate terms until a suitable purchaser is found.  If a suitable local purchaser is not found, the League will find a purchaser for another location in cooperation with this Court and in accordance with the League's transfer and relocation rules and procedures.  (Bettman Decl. ¶¶ 35-36.)

Obviously, as of this filing the NHL Board of Governors has not applied either the League's ownership transfer rules and procedures or the League's relocation rules and procedures to Mr. Balsillie's bid or anyone else's potential bid.  Because the League has not had a reason or opportunity to apply its rules or make any determinations, it is necessarily premature to speculate regarding either (a) whether any application would be approved, or (b) whether the hypothetical denial of any application would be anticompetitive.

As to potential ownership transfers, the decision whether to approve an application is vested in the League's Board, which is comprised of one representative from each of the thirty Member Clubs.  Before the Board of Governors even meet to consider the issue, the Commissioner is charged with investigating the proposed transfer and submitting a recommendation to the Board of Governors – all of which has yet to happen here.  While the Debtors assume that Mr. Balsillie should be approved and that there could be no legitimate grounds for rejecting him, it is premature to make any determination on that issue one way or the other.  For example, the League has only just begun its investigation of Mr. Balsillie, but already has learned from public sources that both the Securities Exchange Commission (SEC) and the Ontario Securities Commission (OSC) filed complaints against Mr. Balsillie personally accusing him of misconduct.  In oral rulings published on May 21, 2009, the OSC found that for approximately ten years, Mr. Balsillie was personally

involved in making misleading or untrue public disclosures in various RIM public filings.[10]  As part of a settlement of the charges, Mr. Balsillie agreed to pay millions of dollars in penalties, tens of millions of dollars to RIM, voluntarily stepped down as chairman of RIM's Board, agreed "not to act as a director of any reporting issuer" for a defined period of time and was personally reprimanded by the OSC.  Mr. Balsillie may well have reasonable explanations for these matters that will satisfy the Board of Governors, but the League has a legitimate interest in conducting a full and proper investigation, and it is impossible to determine at this time how the Board of Governors would vote on Mr. Balsillie's application or the application of any other potential bidder.[11]

Moreover, the overwhelming authority holds that an "as applied" challenge to ownership determinations cannot give rise to a viable antitrust claim because the substitution of one owner for another has no effect on output or prices and is thus competitively neutral.  See, e.g., Levin, 385 F. Supp. at 152 (rejecting antitrust challenge to the denial of ownership transfer of the Celtics based on purported personal reasons because "the plaintiffs wanted to join with those unwilling to accept them, not to compete with them, but to be partners in the operation of a sports league for plaintiffs' profit").[12]

As to potential franchise relocations, such decisions also are vested in the NHL's Board of Governors.  Under the League's procedures, upon receipt of any written application with

---

[10]    See In re Research in Motion Ltd., James Balsillie, et al., OSC Oral Ruling and Reasons (May 21, 2009), available at http://www.osc.gov.on.ca/Enforcement/Proceedings/RAD/rad_20090521_rim_set.pdf

[11]    It bears mention that in an interview with the NHL Executive Committee in December 2006, Mr. Balsillie trivialized the significance of the allegations in the then-ongoing investigation into his activities.

[12]    See also Fishman v. Estate of Wirtz, 807 F.2d 520, 562 (7th Cir. 1986) (rejecting antitrust challenge based on rejected transfer of the Chicago Bulls); id. at 563 (Easterbrook, J., dissenting in part) (no antitrust violation because conduct does not "reduce the quantity produced, increase the price charged, or affect the quality supplied."); Baseball at Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC, 113 F. Supp. 2d 1164, 1175 (S.D. Oh. 1999) (holding that there is "bound to be one winner and one loser" in a competition to purchase a sports team, and a league's rejection of a particular owner falls short of an antitrust violation as a matter of law); 2 Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust 1085 (2002) ("[Sports leagues] cannot have an antitrust duty to admit every member who has shown that it meets certain qualifications.").

appropriate documentation, the Commissioner assigns one or more League committees to investigate the merits of the proposed relocation.  Each such committee can request additional documentation or information from the applicant.  At the conclusion of their investigation, each committee makes a report to the Board of Governors.  The applicant also is afforded an opportunity to make a presentation to the Board of Governors and answer any questions the Board may have.

The approval or rejection of a relocation application is determined by a majority vote of the Board of Governors.  The Debtors' mantra that NHL teams have "veto" rights over the potential relocation of another team in their home territory is simply not true.  Since the early 1990s, the NHL has required only a majority vote of the Member Clubs to approve a relocation without allowing any single team a veto based on exclusive territorial rights.  (Bettman Decl. ¶ 24; Daly Decl. ¶ 51; Ex. I ("The Bureau found no instance where a 'veto' was exercised by an incumbent team to protect its local territory from entry by a competing franchise.  Since at least 1993, no franchise has been permitted to exercise a veto to prevent a team from entering into its local territory.  Further, under the NHL's rules and procedures, in respect of the proposed relocation of a franchise to Southern Ontario, the NHL would not permit any single team to exercise a veto, but would only require a majority vote."); Ex. D at 36.4(c) (requiring majority vote).)

In this case, pursuant to the Debtors' and Mr. Balsillie's chosen schedule, the League has only recently received a relocation application from the Debtors and Mr. Balsillie.  That application does not request a waiver by the Board of the January 1 deadline as required by the By-Laws.  In any event, the League has not had time to evaluate Mr. Balsillie's ownership application, much less the relocation application.  As a result, the Debtors – as a result of their own chosen timing – are left with a hypothetical antitrust challenge that assumes Mr. Balsillie will be the successful bidder, will be approved as an owner, but then will have his relocation application denied for anticompetitive reasons.

The Debtors base their antitrust argument entirely on <u>Raiders I</u>, which is no longer the law and, in any event, in no way supports such a hypothetical claim.  First, <u>Raiders I</u> addressed the actual denial of a relocation request made by an owner, rather than a hypothetical denial of a

relocation request made by a non-owner.  Second, the Ninth Circuit expressly held that the NFL had several legitimate, objective reasons for restricting franchise movement, and affirmed the jury verdict against the NFL only because:  (i) the NFL's rules at the time did not incorporate those objective criteria, and (ii) the NFL did not have any "sort of procedural mechanism to ensure consideration" of such criteria.  726 F.2d at 1397.  In <u>SDC Basketball Club</u>, the Ninth Circuit declared that, while the objective factors identified in <u>Raiders I</u> "are not . . . <u>necessary</u> conditions to the legality of franchise relocation rules," incorporation of those factors would likely ensure that a professional sports league's relocation procedures would pass muster "<u>in all cases</u>."  815 F.2d at 567-68 (emphasis added).

The NHL's relocation rules and procedures here incorporate both the "procedural mechanism" and the "objective criteria" that the Ninth Circuit held would protect sports leagues from antitrust challenges "in all cases."  If and when the Board of Governors does vote on a proposed relocation, it is guided by 24 factors set forth in the League's By-Laws, which are all highly fact dependent.  (Bettman Decl. ¶¶ 24, 30.)  And, as discussed above, any vote regarding relocation to Southern Ontario or another location would be decided by majority vote.

Even a cursory review of the NHL's objective criteria reveals several factors that the Board of Governors would need to consider that could weigh for or against approving the Debtors and Mr. Balsillie's submission, including whether and the extent to which:  (i) the present owner of the Club has made a good faith effort to find prospective purchasers who are prepared to continue operating the Club in its present location, (ii) the Club might be operated in its present location in a more prudent, efficient, and/or cost-effective manner than it has been in the past, (iii) local government authorities in the present location are prepared to reduce the operating costs of the Club, (iv) consent to the proposed transfer is likely to damage the image of the League as a major professional sports league, be a disincentive to participation in the League, or otherwise have an adverse effect on the League's ability to market and promote the League in the United States or Canada, (v) consent to the proposed transfer would result in the absence of a League franchise in a major market, (vi) the Club has, directly or indirectly, received public financial support in its

present location by virtue of any publicly financed arena, special tax treatment, or any other form of public financial support, (vii) the proposed transfer, if approved, would affect any contract or agreement in effect between the Club and any public or private party, and (viii) there is an adequate arena in the new proposed location as well as anticipated public and fan support. (See Bettman Decl. ¶ 30.)

In sum, the Debtors argue and allege in their antitrust complaint that they can state a claim under section 16 of the Clayton Act based on "threatened injury." But section 16 does not extend to hypothesized injuries premised upon speculation regarding events that have not occurred and may never occur. See Justice v. NCAA, 577 F. Supp. 356, 376 (D. Ariz. 1983) ("This Court is well aware that a plaintiff need only show threatened rather than actual injury under section 16, but it does not share plaintiffs' apparent belief that section 16 provides standing for any threatened injury, no matter how insignificant the threat or attenuated the causal nexus between the alleged injury and violation. Under section 16, a plaintiff must demonstrate a significant threat of injury from a violation of antitrust laws likely to continue or recur, and that it is 'reasonably likely' that the contingencies upon which the injury is dependent will occur." (citation omitted)). The Debtors' antitrust claim here is improperly based on a hypothetical application of the antitrust laws (including a non-existent veto right) to a hypothetical application of the League's relocation rules and procedures.

**(b)** **Delaying a potential relocation cannot create a bona fide dispute under the antitrust laws.**

No determination has been made regarding the location of the Coyotes beyond the 2009-10 season. The only definitive determination the League office has been able to make (subject to waiver of the relocation application deadline by majority vote of the Board of Governors and/or the Court's determination on this motion) is that the Club will play next season in Glendale, Arizona.[13]

---

[13] Given the limited issues presently before the Court, we will not repeat here all the reasons that a relocation for 2009-10 is not feasible. (See Bettman Decl. at ¶¶ 46-48.)

1  In any event, the Debtors' antitrust claim also fails because a decision that may impact a team's

2  playing site for a single season cannot constitute an injury to competition as a matter of law.

3  The Ninth Circuit has expressly held that restraints that last for a limited period of time do

4  not have a sufficient impact on competition to be actionable.  See Adaptive Power Solutions, LLC

5  v. Hughes Missile Sys. Co., 141 F.3d 947, 952 (9th Cir. 1998) (decline in number of competitors

6  that lasted four to ten months was not actionable).[14]  This principle has been expressly applied to

7  dismiss an antitrust claim based on a league not allowing a team to play where it wishes for a

8  single season.  In a case relating to the Raiders' 1995 move back to Oakland, the Raiders alleged

9  that the team had actually wanted to play in Oakland in 1994.  The Raiders alleged that the

10  League's refusal to schedule the Raiders in Oakland for the 1994 season amounted to a violation of

11  section 1 of the Sherman Act.  In granting summary judgment for the NFL, the court held that a

12  one-year foreclosure was insufficient as a matter of law to state an antitrust claim:

13
14
15  > The Raiders allege that they tried to "enter" the Bay area football
16  > market in 1994 for the limited purpose of playing home games there
17  > for a single season, but were prevented by the NFL's scheduling
18  > conduct.  Insofar as this conduct had any anticompetitive effect on
19  > football in the Bay area, the effect lasted no longer than the home
20  > games scheduled for the 1994 season.  Thus, we conclude that even if
21  > we were to agree . . . that the NFL's scheduling conduct barred them
22  > from that market for the 1994 season, the Raiders could not show the
23  > substantial anticompetitive effect required to establish a § 1 violation.

18  NFL v. L.A. Raiders, No. CV 95-5885 (GHK) (C.D. Cal. Feb. 26, 1999) (Judgment and Order).

19  (Goldfein Decl. Ex. 2 at 5-6.)

20  Consequently, the League's inability and refusal to consider a relocation in time for the

21  2009-10 season cannot as a matter of law constitute a violation of the antitrust laws and therefore

22  cannot raise a bona fide dispute under section 363(f).

23
24
25  [14]  In order for a purported restraint of trade to be actionable, it must cause an anticompetitive effect
26  "of significant magnitude."  Bhan v. NMB Hosp. Inc., 929 F.2d 1404, 1413 (9th Cir. 1991).  "[T]rivial" or
   "de minimis" effects on competition do not give rise to an antitrust claim.  Gough v. Rossmoor Corp., 585
27  F.2d 381, 389 (9th Cir. 1978) (plaintiff failed to prove adverse effect on competition that was "more that
   trivial").

**(c)    The Debtors released any potential antitrust claim
relating to the League's consent rights.**

In the 2006 Consent Agreement that the Debtors executed when they joined the League, the Debtors not only affirmatively agreed to be bound by the NHL Constitution and By-Laws, they also released any claim that any NHL rules and procedures in existence at that time, including specifically those related to ownership transfer and territorial rights, were in any way unlawful. (Daly Decl. Ex. E, ¶3(a).)  In addition, Mr. Balsillie and PSE, in submitting their ownership application, released any claims they may have to challenge the NHL's ownership procedures and decisions.  The Debtors do not dispute they executed a release.  They instead argue only that application of the release to their antitrust claim would violate public policy.  They are wrong. Both VKK Corp. v. NFL, 244 F.3d 114, 125 (2d Cir. 2001), and Madison Square Garden, L.P. v. NHL, No. 07 CV 8455 (LAP), 2008 WL 4547518, at *10-11 (S.D.N.Y. Oct. 10, 2008), are on point.

In VKK Corp., a court applied a release to bar an antitrust claim by Victor Kiam against the NFL.  Kiam had purchased the New England Patriots in 1988.  Kiam's first two seasons "were not profitable, and [he] was required personally to guarantee loans and use personal funds to cover the resulting cash flow shortages."  244 F.3d at 119.  When he fell further into debt, he sought to sell the team to a buyer who wanted to move the Patriots out of New England.  The Commissioner "responded that he opposed such a move and that the Patriots would not be allowed to relocate."  Id. at 120.  Kiam ultimately was forced to sell the team to a local buyer.  In connection with the league's approval of the ownership transfer, Kiam was required to sign a release.

Two years later Kiam sued the league alleging that the NFL had "lowered the value of the franchise by limiting the pool of prospective purchasers to those interested in owning the team in New England."  Id. at 120.  Kiam made the same argument the Debtors have advanced here – that the release was invalid as against public policy because it was part and parcel of an ongoing

conspiracy to restrict movement of clubs.[15]  The Second Circuit squarely rejected Kiam's public

policy argument:

> VKK's argument also proves too much.  It is not uncommon, we
> assume, for a release to prevent the releasor from bringing suit
> against the releasee for engaging in a conspiracy that is later alleged
> to have continued after the release's execution.  Such a release would
> seem always to protect the ongoing conspiracy because it always
> prevents the releasor from beginning litigation that would establish
> the scheme's illegality.  We do not think that the part and parcel
> doctrine can be read so broadly as thus to render void all releases
> relating to conspiracies alleged to continue post-release.

Id. at 126.

Similarly, in Madison Square Garden, a court applied VKK Corp. to the release set forth in

the NHL Consent Agreement.  2008 WL 4547518, at *10-11.  Several years after joining the NHL

and signing the NHL Consent Agreement, Madison Square Garden, owner of the New York

Rangers, alleged that the territorial restrictions in the NHL Constitution violated the antitrust laws.

MSG argued that the release was unenforceable as against public policy to the extent it purported

to bar future antitrust claims.  The court squarely rejected the "public policy" argument, holding the

release barred challenges to any League rules and procedures that had not changed in any material

way since the Club executed the release.  Id.

Here, the Debtors executed a release that expressly bars their attack upon the League's

consent rights.  Because there have been no changes in the rules and procedures since the Debtors

executed the release – material or otherwise (Bettman Decl. ¶ 16), their antitrust claims are barred

as a matter of law.[16]

---

[15]     Kiam also argued that he signed the release under economic duress and that he received no
consideration for the release.  Both arguments were rejected.

[16]     The Debtors' antitrust claim also fails as a matter of law because the NHL is a single economic
entity incapable of conspiring with itself in violation of section 1 of the Sherman Act.  See Copperweld
Corp v. Independence Tube Corp., 467 U.S. 752 (1984).  Although a divided panel of the Ninth Circuit did
find section 1 to be applicable in Raiders I, that decision was based on an analysis that the Supreme Court
subsequently rejected in Copperweld.  Since Raiders I, the Supreme Court has expressly held the pricing
decisions of a legitimate joint venture to be akin to pricing of a single entity.  See Texaco Inc. v. Dagher,
547 U.S. 1 (2006).  More recently, the Seventh Circuit expressly found the NFL was a single entity when
promoting the NFL collective product.  See Am. Needle, Inc. v. NFL, 538 F.3d 736, 744 (7th Cir. 2008),
petition for cert. filed, 77 U.S.L.W. 3326 (U.S. Nov. 17, 2008) (No. 08-661).  Because no single Club can

29

*(cont'd)*

Finally, the Debtors' argument is particularly inappropriate when, as here, one considers that the Debtors essentially are using the antitrust laws as a pretext for this Court to use its discretionary powers to rewrite the parties' agreements. Attempts by contracting parties to use the antitrust laws to evade their own contractual obligations are strongly disfavored. See Kelly v. Kosuga, 358 U.S. 516, 518 (1959) (rejecting antitrust argument and noting that use of antitrust laws as defense to contract claim "has not met with much favor in this Court"); Viacom Int'l, Inc. v. Tandem Prods., Inc., 526 F.2d 593, 599 (2d Cir. 1975) ("It seems apparent that the overriding consideration which has persuaded the Supreme Court is its concern that the successful interposition of antitrust defenses is too likely to enrich parties who reap the benefits of a contract and then seek to avoid the corresponding burdens.").

This general principle applies with even greater force in the joint venture context. Universal Studios, Inc. v. Viacom Inc., 705 A.2d 579 (Del. Ch. 1997), is instructive. Viacom was a member of a joint venture known as the "USA Networks." While a member of the venture, Viacom sought to void a "non-compete provision" in the parties' joint venture agreement based on the theory that it was "an illegal restraint on competition." Id. at 596. The court had little trouble concluding that it would be improper to use its equitable powers to void obligations under the parties' joint venture agreement based on what were, at best, rule of reason claims:

> I note initially, that I do not find [the non-compete provision] to be violative per se, and thus consider the provision under the "rule of reason" analysis. . . .
>
> The only anti-competitive effect of [the non-compete provision] is that it restricts Viacom's ability to compete as it wishes. Viacom would prefer to continue to operate its MTV Networks (and develop new channels) and continue its one-half ownership in the USA Networks. [The non-compete provision] flatly prohibits this conduct. This does not make the [provision] anti-competitive – much less violative of the antitrust laws. While it may be true that Viacom is an important force in the cable television and related industries, this does not mean that the antitrust laws, or public policy, require it to be able to operate as it wishes and without regard to agreements by which it is bound.

_____

*(cont'd from previous page)*

create the collective product – NHL Hockey – by itself, the Clubs cannot possibly be viewed as "competing entities" selling "competing products." See Dagher, 547 U.S. at 6.

. . . .

> As a matter of policy, leaders in industry must be encouraged to pool their resources without fear that they run the risk of having the conditions changed when they no longer serve the purposes of their coventurers. It may well be true that one or the other or all of the coventurers will eventually determine the rules of the game ought to be changed. At such time, the parties must operate within their previously agreed guidelines or otherwise by mutual agreement. A court of equity will not step in to alter the playing field to the distinct disadvantage of one over the other.

Id. at 597-99. Here, the Debtors' baseless antitrust claims are at best subject to the rule of reason, which makes it particularly inappropriate for the Debtors to attempt to have this Court rewrite their NHL Contracts to achieve a "free and clear" sale of the Club.

**B.** **Ordering A Free And Clear Sale Of A Professional Sports Franchise Would Wreak Havoc In The Professional Sports Industry.**

Ultimately, if the Court were to reach the point where its discretion under section 363 comes into play, it should not exercise it to allow the Debtors' free and clear sale of a professional sports franchise. As an initial matter, because of this critical interest in maintaining the support of cities, business partners and fans, the NHL is prepared to continue to fund the Coyotes' operations until a League-approved purchaser can be found. (Bettman Decl. ¶ 35.) If a suitable purchaser to keep the team in Phoenix cannot be found, the League will cooperate with this Court to find a purchaser for another location in accordance with League rules and procedures. This funding will include the payment of pre- and post-petition bills and the payment of interest on the secured creditors' loans out of the proceeds of the eventual sale of the Coyotes franchise.

Equally important, a forced sale over the objection of the NHL would turn the federal bankruptcy courts into the option of first resort for any financially distressed owner seeking to sidestep league rules and sell or relocate a franchise without league consent or without otherwise complying with League rules and procedures. This would mean chaos for the NHL and all other professional sports leagues, especially in the current economic environment. As more fully discussed in the Brief of Amici Curiae National Basketball Association, National Football League, and Major League Baseball, the NHL franchises (and those of the other major professional sports leagues) are both operationally and economically interdependent with respect to their joint sports

31

entertainment product.  Further, fan loyalty, community identification with the franchise, and substantial investments from the city, sponsors, vendors and fans are necessary to the success of every franchise and professional sports league.  Allowing a bankruptcy court to install prospective owners who refuse to comply with league rules and procedures, or to prematurely and unjustifiably relocate a franchise at the whim of that new owner, would eviscerate the collective ability of any professional sports league to create and promote its sport.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the NHL respectfully requests that the Court enter an order enforcing the NHL's rights in these cases.

DATED:  June 5, 2009

STINSON MORRISON HECKER LLP

By: /s/ Alan A. Meda (#009213)
    C. Taylor Ashworth, 010143
    Alan A. Meda, 009213

and

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    J. Gregory Milmoe
    Shepard Goldfein
    Anthony W. Clark

    Attorneys for the National Hockey League