C. Taylor Ashworth, 010143
Alan A. Meda, 009213
STINSON MORRISON HECKER LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004
Telephone: (602) 279-1600
Facsimile: (602) 240-6925
tashworth@stinson.com
ameda@stinson.com

J. Gregory Milmoe (*admitted pro hac vice*)
Shepard Goldfein (*admitted pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
gregory.milmoe@skadden.com
shepard.goldfein@skadden.com

Anthony W. Clark (*admitted pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
Telephone: (302) 651.3000
Facsimile: (302) 651.3001
anthony.clark@skadden.com

Attorneys for the National Hockey League

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC, and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>Debtors.<br><br>This filing applies to:<br><br>■ All Debtors<br>☐ Specified Debtors | Case No. 2:09-bk-09488-RTBP<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**NATIONAL HOCKEY LEAGUE'S RESPONSE TO OBJECTIONS TO THE MOTION FOR RESCHEDULING OF 363 AUCTION SALE**<br><br>Date: August 3, 2009<br>Time: 1:30 p.m.<br>Location: U.S. Bankruptcy Court<br>230 N. First Ave, Courtroom 703<br>Phoenix, AZ 85003 |

The National Hockey League (the "League" or "NHL"), through its undersigned counsel, hereby responds to the Objections to the NHL's motion to modify the schedule for the "Glendale Sale"[1] and "Relocation Sale" set forth in the Procedures Order. The NHL respectfully requests that (i) the Glendale Sale Hearing be scheduled for September 10, 2009, or such later date as the Court may determine, so that the prospective Glendale purchasers will have sufficient time to complete the work necessary to make Qualified Bids and (ii) a Relocation Sale auction, if necessary, be held in the spring of 2010, such that all interested parties will have adequate time to prepare for an orderly auction, and the team and the NHL will have adequate time to make the necessary arrangements for the 2010-11 season.

## PRELIMINARY STATEMENT

Two issues need to be reassessed given the current practical realities of the sale process and how this case has unfolded: (1) when should the Glendale Sale auction take place, and (2) when, if necessary, should the Relocation Sale auction take place?

On the first issue, the Glendale Sale auction needs to be postponed until at least September 10, 2009. There are two serious bidders currently interested in buying the Club and keeping it in Glendale. They are working hard and making progress, but they need more time. The numerous objections to the Glendale bids are all based on deficiencies that stem from the simple fact that the bidders have not yet completed all arrangements and negotiations necessary to ensure consummation of their respective transactions, which include renegotiating many of the Coyotes' contracts that Mr. Balsillie's offer proposes to leave behind, including prominently the lease with the City of Glendale. But these bidders are making real progress – despite the continual roadblocks and obstructionist behavior by Mr. Moyes and the Debtors whose only apparent interest seems to be clearing a path to a sale to Mr. Balsillie. The most outrageous of these actions occurred just on Friday, when Mr. Moyes filed objections publishing the highly confidential and highly sensitive

---

[1] Capitalized terms not otherwise defined herein shall have the meanings set forth in the "Order Approving Bid Procedures for Auction/Sale of the Phoenix Coyotes National Hockey League Team and Related Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases," filed in these case on July 6, 2009 [dkt no. 408] (the "Procedures Order"). The Procedures Order is incorporated herein by reference and for all purposes.

1

terms of a tentative deal between the Reinsdorf Group and the City of Glendale – terms which had yet to be approved by or even disclosed to the Glendale City Council – despite the fact that the sensitivity of the issue had been raised previously with Mr. Moyes's counsel who expressly agreed to file his objections under seal.

As the Court has previously recognized, the NHL has legitimate consent rights and the City of Glendale has raised serious issues regarding the damages it would indisputably suffer if the Coyotes were to relocate. Before throwing in the towel prematurely, the NHL, which has been funding the Club for nearly a year, and the City of Glendale, not to mention Coyotes' fans, deserve a full and meaningful opportunity to find a purchaser who will operate the Club in Glendale.

On the second issue, any Relocation Sale must be postponed until the spring of 2010. From the beginning of this case, the NHL has stated that a relocation for the 2009-10 season would be highly impractical. Nevertheless, at the Court's prompting, the NHL has done everything within its power to accomplish the Glendale Sale in accordance with the deadlines set by the Court. Although a Glendale Sale has not yet happened, the fact remains that a relocation for this season is now <u>impossible</u>.

From the beginning of this case the purported final, drop dead dates insisted upon by Mr. Balsillie – which he has now twice postponed – have been false dates set with the transparent purpose of compelling an auction at which he would be the only bidder. The reality is that there are no viable Relocation Bidders at this time. Mr. Balsillie is not viable because the NHL has disapproved his application for ownership. Fully aware of his disreputable conduct over the last three years toward the NHL and its Clubs, Mr. Balsillie has admitted that this decision was not a surprise to him. Since his previous interview with the NHL Executive Committee in 2006, Mr. Balsillie has reneged on commitments he made to the League and engaged in otherwise disingenuous and outrageous behavior that not only showed no regard for the interests of current NHL owners, but appeared to have been specifically intended to harm their interests.

There are no other Relocation Bidders, and until certain predicate matters are resolved, there will be no serious Relocation Bidders because no serious potential purchaser will invest the substantial time and money necessary to pursue an acquisition of this magnitude until they know

both that the team will actually be allowed to relocate and what the cure costs would be in connection with Glendale's claim. Moreover, no such serious potential purchaser would want to purchase a Club based on a timetable that would involve relocating it literally on the eve of the beginning of a new season. Legitimate and serious potential purchasers all know that the work involved in relocating a professional sports franchise – including negotiating a lease, television and radio contracts, sponsorship and advertising agreements, and marketing and selling suites, season tickets and game day tickets – all would take a minimum of several months to effectively activate. And there is real harm in continuing to cling to the illusion that there can be a Relocation Sale this fall. The current Relocation Sale schedule is materially chilling sales of Coyotes' tickets, suites, advertising and corporate sponsorships. It also places the NHL in the untenable position of having to expend resources applying its relocation rules and procedures and calculating relocation fees for a relocation that will never occur.

Simply put, there is a real chance with more time that this Club can be saved, that it can be sold to a local buyer that would protect, at a minimum, the interests of the City of Glendale, the Glendale community, the secured creditors, the NHL, and most or all of the bona fide unsecured creditors. There is no reason to throw out that opportunity based on the histrionics of a (disqualified) bidder who has previously backed out of purchases of two other NHL clubs and who himself has yet to make an irrevocable Qualified Bid.

## ARGUMENT

### I. RESCHEDULING THE GLENDALE SALE IS NECESSARY TO ALLOW THE BIDS TO MATURE.

#### A. The Glendale Hockey and Ice Edge Bids Need Additional Time to Become "Qualified Bids."

The Court should reschedule the Glendale Sale Hearing for September 10 to give the two Glendale bids the opportunity to fully mature. Although Mr. Moyes, the Debtors and PSE portray the NHL's motion as a stall tactic, arguing that the Reinsdorf Group has had months to negotiate a final transaction and that the Ice Edge Group's bid is a mere expression of interest, in fact, both Glendale bids continue to progress toward fruition. The Reinsdorf Group has submitted a draft

APA (which reflected the last minute comments received from the Debtors' counsel), and the Ice Edge Group, which entered the process weeks after the Court entered the Procedures Order, has now submitted one as well.[2] As this Court is well aware, one of the major hurdles to finalizing these APAs is an agreement with Glendale regarding the arena lease, a hurdle that seems likely to be cleared in the near future if Mr. Moyes's disclosure of highly confidential information has not poisoned the process irretrievably. As Glendale stated in its July 31, 2009 Statement in Support for Pending Bids, "it has conducted very extensive, constructive and good faith discussions with each bidder and as of this day, is very close to a definitive agreement with each of the Reinsdorf Group and Ice Edge that would allow the Team, under new ownership, to continue to play at the Jobing.com Arena in Glendale for the foreseeable future with strong economic essentials and support from all necessary constituencies."[3] The NHL believes that the remaining open terms of these draft APAs will fall into place once the arena lease is finalized. Based on the City's representations and the League's own discussions with the bidders, it appears that extending the Glendale Sale auction until September 10 will put at least one and perhaps both of these bidders into a much better position to be "Qualified Bidders" with "Qualified Bids."

### B. The Debtors' and PSE's Portrayal of the NHL as Disruptive to an Orderly Sale Process Is False.

Mr. Moyes and the Debtors, acting at Mr. Balsillie's behest, have endeavored at every turn to counteract legitimate efforts to find a Glendale solution and to chill the bidding process for the Glendale auction. We understand that the Debtors have shown a curious lack of enthusiasm or urgency when negotiating with groups interested in keeping the Coyotes in Glendale. For example, in June, the NHL was startled to learn that the Debtors took more than a week to negotiate a standard confidentiality agreement that would give the Reinsdorf Group access to the data room, which was required to conduct the appropriate due diligence necessary to formulate its bid. (See Exhibit A to Declaration of Alan A. Meda, filed herewith.) Similarly, after receiving the first draft

---

[2] Dkt. no. 523.

[3] Dkt. no. 512 at 3.

of the Reinsdorf APA on July 15, the Debtors waited until July 20 to respond with "preliminary" comments and until the evening before the July 24 deadline to provide specific markups. Instead of negotiating the APA, the Debtors were focused on discovery, trying to concoct a bid chilling conspiracy.

The Debtors were not the only ones who were distracted by their time-consuming and irrelevant Rule 2004 discovery. Rather than spending their time attempting to work out their remaining issues with the Glendale bidders, City officials have had to spend the last week preparing for and attending depositions. This discovery was purportedly for the primary purpose of exploring possible collusion in bidding (of which there is no evidence), but in reality it focused on the Reinsdorf Group's bidding strategy and its highly confidential and sensitive negotiations with Glendale. The tragic irony is that the Debtors and Moyes used discovery into purported bid collusion as the primary tool in their own conspiracy to chill bids.

Even worse than time wasted by this discovery is the completely inappropriate disclosure of the highly confidential testimony that was made by counsel for Mr. Moyes in his July 31, 2009 submission to the Court.[4] In that submission, Mr. Moyes publicly disclosed sensitive terms of the Reinsdorf Group's negotiations with the City of Glendale that are still subject to approval by public officials, including the terms of the City's proposed business participation to help ensure that the Coyotes can be viable in Glendale. This testimony was designated highly confidential pursuant to the Confidentiality Order,[5] and the fact that any objections discussing the testimony would need to be filed under seal was specifically discussed and acknowledged by Mr. Moyes's counsel at the depositions last week.[6] Regardless of whether this violation of the Confidentiality Order was

---

[4] Dkt. no. 525 at 6 & Appx. A.

[5] Dkt. no. 455.

[6] **REDACTED**

We understand Mr. Moyes's counsel have acknowledged to the City's counsel that this information concerning the ongoing negotiations properly was designated as Confidential or Highly Confidential at the July 27 deposition of Arthur Lynch, the City's Deputy City Manager, and the July 28 deposition of Edward Beasley, the City

*(cont'd)*

intentional, it has created tremendous additional complications in already-complex negotiations between Glendale and the Reinsdorf Group. The enormity of that "mistake" was underscored by the decision of Judge Burke, who denied the Goldwater Institute's request for access to such papers at this time. As reported in the press, "[a]fter reading the sealed documents, Burke concluded the city has not yet clinched a deal with the two groups aiming to take over the Coyotes. Until that time, the 'disclosure of the majority of the documents,' he said, 'would have a devastating impact on the city's ability to negotiate with the bidders.'"[7] There needs to be time to repair that damage.

In sharp contrast to the Debtors' and Mr. Moyes's obstructionist behavior since the bankruptcy petition was (needlessly) filed, the NHL has worked with the Court and all interested parties to effectuate a sale of the Coyotes in a manner that provides the most value to the Debtors while accommodating the NHL's legitimate business interest as well as the interests of the Glendale community. In addition to funding the ongoing expenses of the Club on a highly favorable basis, the NHL encouraged numerous individuals and entities to investigate and bid on the assets, resulting in the two serious and substantial bids discussed above. In addition, the NHL significantly expedited its normal processes for considering applications for transfer of ownership. These efforts included: (i) soliciting background materials regarding all interested parties; (ii) employing investigators, accountants and attorneys to conduct background investigations of those parties; (iii) evaluating the results of those investigations; (iv) conducting interviews of the interested parties; and (v) convening a special in-person meeting of the entire Board of Governors to consider and vote upon whether to approve the interested parties as potential owners of the Coyotes. Rather than the one to two months it takes for the NHL to consider applications in the

---

*(cont'd from previous page)*
Manager, and should not have been publicly disclosed under the terms of the Court's protective order, but that Mr. Moyes's counsel claim this violation of the protective order was inadvertent. No doubt the facts surrounding this violation will be investigated further. But it is notable that Mr. Moyes's counsel on the papers in which the violation occurred also was in attendance at both depositions where the testimony clearly was designated for protection just a few days before the papers improperly disclosing these matters were filed.

[7] Rebekah L. Sanders, Most Coyotes Documents Remain Sealed, Judge Decides, The Arizona Republic, Jul. 31, 2009, available at http://www.azcentral.com/news/articles/2009/07/31/20090731gl-records0731-ON.html (emphasis added).

ordinary course, and despite not having all information normally collected during NHL due diligence, the NHL considered them by the Court-ordered July 30, 2009 deadline. The NHL granted conditional approval to the Reinsdorf Group pending completion of due diligence and review of specific transaction terms, and deferred consideration of the Ice Edge Group until certain background information was supplied, due diligence was completed, and its evolving bid was more fully developed. Ironically, after having chided the NHL for its purported delay and refusal to process the PSE application (a "pocket veto"), PSE now faults the NHL for interviewing Mr. Balsillie and voting on his suitability to be an NHL owner on July 29, 2009 because, according to PSE, it was premature to do so. But the interviews and decisions were scheduled on that date in order to meet the July 30, 2009 deadline and to complete the consideration of Mr. Balsillie's application within the two-month timeframe that the NHL had informed the Court was feasible.

In sum, the Glendale bidders have prepared and submitted documents, conducted due diligence and negotiated with relevant parties at tremendous personal expense and as expeditiously as possible under very difficult circumstances and in an attempt to meet an aggressive Court-ordered schedule. While these bidders do not yet satisfy all of the criteria for "Qualified Bidders," there is every reason to believe that at least one of the draft APAs will mature into a "Qualified Bid" given more time and, more importantly, good faith cooperation from the Debtors and an end to their abusive discovery and other practices.

C.  **The Objections to the Glendale Sale Bids Are Neither Ripe nor Legally Supportable.**

Most of the issues raised by the Debtors, PSE, Mr. Moyes and the Creditors' Committee in their July 31 objections regarding the substance of the Glendale bids simply are not ripe for discussion. Instead, they should be raised, if at all, only when negotiations to finalize those bids into Qualified Bids have been completed.

During such further negotiations, many of these issues may be resolved between the parties. This is typical of a section 363 sale process where, unlike what has occurred in this case to date, the debtors actively encourage all bids and negotiate with potential purchasers in good faith, rather than pushing the process toward a predetermined result (i.e., a relocation-based sale to PSE). For

7

example, the objection that the bids do not adequately provide for all unsecured creditors, as well as administrative claims, and would leave the estates administratively insolvent may be resolved through further negotiations with the Glendale bidders and other parties in interest to provide additional value sufficient to bridge any gap between what the Qualified Bids may yield and amounts owed to bona fide unsecured or administrative creditors. The NHL has been paying administrative expenses so far in the case under a highly favorable (to the Debtors) interim DIP financing, which will be presented to the Court for final approval on August 5, 2009, out of a conviction that the Club is worth substantially more as a going business than a liquidation and because not having an NHL team playing in Phoenix this season would cause massive disruption to the NHL game schedule. It appears that the DIP is likely to be effectively assumed by both Glendale Bidders. The NHL finds it offensive that the Debtors are demanding that the NHL subordinate its DIP to claims of unsecured creditors. The NHL also finds it curious that there has been no effort by the Debtors or the Creditors Committee to explore other assets that might be available to satisfy administrative and unsecured claims (e.g., through the pursuit of preference actions against insiders or, perhaps, liquidation of Mr. Moyes's $30 million personal guaranty to the NHL for the benefit of creditors).

Further, an adjournment of the Glendale Sale process to September 10 also would provide more clarity as to what claims are asserted by whom and on what basis, since the bar date for filing proofs of claims is August 14. For example, the vast majority of unsecured claims identified thus far are attributable to the interests of Mr. Moyes and his family ($104 million) or Mr. Gretzky ($16 million). If these parties do file proofs of claim for these amounts by the bar date, other parties in interest, including the City of Glendale, which already is looking into these matters through Rule 2004 discovery, will be better able to investigate and assess the bona fides of the claims as to which substantial questions have been raised, such as:

- whether Mr. Moyes's claims should be equitably subordinated in whole or in part because, <u>inter alia</u>:
    - **REDACTED**

- REDACTED

- he waived, for the benefit of the NHL and the other creditors of Coyotes Hockey, LLC, any and all rights of recourse to any assets of Coyotes Hockey, LLC in connection with his obligations under various agreements, pursuant to paragraph 2(j) of the Second Amendment to the Letter Agreement among Mr. Moyes, Coyotes Hockey, LLC, Coyotes Holdings, LLC, Arena Management Group, LLC, the NHL and the other parties thereto, dated May 13, 2004 (see Meda Decl. Ex. D); and

- as discussed above, his representatives violated the Court's Confidentiality Order by publicly disclosing highly confidential and plainly sensitive details of the ongoing negotiations between Glendale and the Reinsdorf Group.

As for the objections that a sale to either the Reinsdorf or Ice Edge Groups would be a sub rosa plan of reorganization that improperly discriminates among creditors, these are meritless as a matter of law. Courts have been very clear that a section 363(b) sale transaction is not objectionable as a sub rosa plan based on the fact that the purchaser is to assume some but not all of the debtor's liabilities, or because some creditors may benefit disproportionately compared with others whose claims are not assumed. As stated in In re Trans World Airlines, Inc., No. 01-00056 (PJW), 2001 WL 1820326 (Bankr. D. Del. April 2, 2001):

> [N]othing in § 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. . . . [W]here there is a § 363 sale of substantially all of the debtor's business as a going concern, there is bound to be disparate treatment of similarly situated creditors. . . . The treatment of creditors in a § 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. Thus, the <u>disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.</u>

---

[8] Excerpts of the depositions of Jerry C. Moyes and Michael Nealy appear at Exhibits B and C, respectively, to the Declaration of Alan A. Meda.

Id. at *11 (emphasis added). A sale pursuant to either of the Glendale bids is not intended to be a plan of reorganization, nor is it an attempt to circumvent the distribution scheme of the Code. Rather, any alleged disparate treatment of creditors would simply be the result of the sale transaction itself, and the inherent right of a purchaser to pick which assets and liabilities it wishes to acquire. This argument comes with ill grace from the Debtors, who were supporting the PSE offer that was not seeking to assume the Club's largest unsecured liability – the Glendale lease.

Finally, as this Court is aware, it is very common for a debtor to sell most or all of its assets in a section 363 sale, rather than under the terms of a plan of reorganization. See In re General Motors Corp., 2009 WL 1959233 (Bankr. S.D.N.Y. Jul. 5, 2009) (citing Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2331 n.2 (2008), "which recognized the common practice in chapter 11 cases of selling the bulk of a debtor's assets in a section 363 sale, to be followed by confirmation of a liquidating plan"). The Glendale bids each propose a common, straightforward sale that can be approved under section 363 of the Bankruptcy Code.

## II. CONDUCTING A RELOCATION AUCTION IN SEPTEMBER IS IMPOSSIBLE AND NOT IN THE BEST INTERESTS OF THE ESTATE.

The NHL reiterates that it simply is not possible to have an auction on September 10 that would include bidders for a relocation of the team away from Glendale. Indeed, as of today, no viable Relocation Bidders have been identified – or at least the Debtors have not brought any to the attention of the NHL.[9] And despite its protestations to the contrary, PSE is not a viable purchaser of the Club because Mr. Balsillie's application for ownership has been unanimously disapproved by the NHL Board of Governors under the League's lawful rules and procedures for transfers of

---

[9] PSE disingenuously suggests that "[p]resumably . . . the Debtors have been looking for such bidders . . . ." (PSE Sports & Entertainment LP's Position on August 5 Sale Hearing and August 3 NHL Rescheduling Motion [dkt. no. 533] at 8.) But there has been no indication by the Debtors that they have in fact been doing so. Instead, it has become apparent that the Debtors are essentially colluding with PSE – including by attempting to chill bidding for the Glendale Sale – by doing nothing to seek other bidders for any potential auction, relocation or Glendale-only, and by continuing to do all that they can to favor a "fixed" deal with PSE, even though from the estates' perspective, the PSE scheme may not be in the best interest of creditors. See In re Embrace Sys. Corp., 178 B.R. 112, 126-27 (W.D. Mich. 1995) (debtors have fiduciary duty to market assets to find the highest and best buyer for estate, which duty is breached by making sweetheart deal with one prospective bidder for benefit of "insider").

10

ownership.[10] Accordingly, it is now clearer than ever that if the Court ultimately does not approve a bid for the Glendale Sale, additional time will be needed before any Relocation Sale in order to provide for a rational marketing and sale process for the franchise that, in turn, will maximize value for all interested parties. Particularly in light of the continuing damage to the value of the Club caused by the specter of relocation – including lost ticket sales, advertising revenue, corporate sponsorships and television revenue – any potential Relocation Sale should be postponed until the spring of 2010.

### A. No Relocation Bid Currently Exists Because PSE and Mr. Balsillie Have Been Rejected by the NHL as Potential Owners of the Coyotes.

On July 29, 2009, the NHL Board of Governors voted unanimously to deny Mr. Balsillie's application for transfer of ownership, finding that he lacks the good character and integrity required under Article 3.5 and By-Law 35 of the NHL Constitution and By-Laws. As a result, PSE cannot qualify as a viable bidder for the franchise by September 10, 2009. See Procedures Order ¶ 19 (NHL approval of ownership transfer required for bid to be deemed "Qualified Bid").

#### (a) The NHL properly applied its procedures regarding transfer of ownership in rejecting PSE and Mr. Balsillie.

PSE and Mr. Balsillie have challenged the reasonableness and validity of their rejection by the NHL as potential owners of the Coyotes. The deliberations of the NHL Executive Committee and ultimate vote by the NHL Board of Governors were entirely proper and in accordance with the NHL's Constitution and By-Laws.

In his declaration in opposition to the NHL's request for a continuance, Mr. Balsillie states that he believes some members of the Executive Committee may have had a "grudge" against him. While we would not use the word "grudge," he is correct that several of the owners formed an unfavorable opinion of him as a potential business partner well before his current attempt to buy

---

[10] Further, PSE's amended APA illustrates that it would be imprudent to schedule the Relocation Sale on the basis of the PSE bid. This Court has already found, and the APA now admits, that PSE would be required to pay the NHL a relocation fee to transfer the franchise to Hamilton, Ontario. However, now as a condition precedent to closing, PSE "in its sole discretion" must accept the amount of any such fee – whether determined by the NHL or the Court under the Procedures Order. (See Exhibit B to PSE Notice of Filing [dkt. no. 538] at § 7.1(g).) Thus, PSE is not a Qualified Bidder not just because it has not received NHL Board approval, but also because it has not made an "irrevocable" offer to buy the Club.

the Coyotes. Those opinions were based largely on the owners' personal dealings with Mr. Balsillie since the more favorable reception he received from the Executive Committee in 2006. And Mr. Balsillie knew that several owners likely had an unfavorable opinion of him based on those dealings, which is precisely why he constructed an entire strategy and scheme to buy the Coyotes through the bankruptcy process – hoping that a court would order the sale to him regardless of the NHL's consent rights and without him having to reappear before the NHL Executive Committee to explain his conduct since his last Executive Committee interview in 2006.

Contrary to Mr. Balsillie's protestations, the Executive Committee gave his application the same consideration it gave the applications of the other ownership candidates. (See Second Declaration of William L. Daly, filed herewith, ¶ 11.) If Mr. Balsillie decides to challenge the good faith basis of the League's determination, discovery will demonstrate that the Executive Committee conducted due diligence on each of the potential ownership groups, and its recommendations were based on the facts before them relating to each group. (Id. ¶¶ 11-14.)[11] At the Executive Committee meeting on July 29, 2009, members of the Executive Committee also orally reported on their prior dealings with Mr. Balsillie. (Id. ¶ 14.) There were a variety of issues discussed, some during the actual interview of Mr. Balsillie and others during the Executive Committee's private deliberations. (Id. ¶¶ 14-15.) All of the issues focused on Mr. Balsillie's character and integrity, including his willingness to be a good partner within the League and to comply with League rules and procedures. (Id. ¶ 14.)

What follows is a brief summary of some of the issues that the Executive Committee considered relating to Mr. Balsillie:

(1) <u>Mr. Balsillie reneged on representations he made to the Executive Committee in 2006 relating to his application to purchase the Pittsburgh Penguins.</u> During his December 4, 2006 interview with the Executive Committee, Mr. Balsillie's commitment to keeping the Penguins in

---

[11] Any such discovery (which would include, at a minimum, the examination of Mr. Balsillie under oath and depositions of some if not all of the ten members of the Executive Committee) and the resulting trial of these issues could not be completed in time to allow PSE to participate in a relocation auction in September.

12

Pittsburgh was a major issue. (Id. ¶ 9.) Mr. Jeremy Jacobs, owner of the Boston Bruins and Chairman of the NHL Board of Governors, pointedly asked Mr. Balsillie if he was committed to keeping the Penguins in Pittsburgh. (Id.) Current members of the Executive Committee who were also members in 2006 distinctly remember that Mr. Balsillie's unequivocal answer was "yes," he was committed to keeping the team in Pittsburgh. (Id. ¶ 15.) On the subject of a potential "buy back" provision, during the interview Mr. Balsillie orally agreed to a provision that would have given the League the option to buy the Club from Mr. Balsillie at the price he had paid for the Club in the event that the two arena deals under contemplation failed and he sought to relocate the Club. (Id. ¶ 9.) There was no discussion of a "put." (Id.) Based on his representations and the agreement reached during the interview, the Executive Committee recommended his approval as an owner to the NHL Board of Governors. (Id.) When it came time to reduce his commitments to writing, however, Mr. Balsillie balked and claimed that they would eliminate his "leverage" to negotiate for a new arena. (Id. ¶ 10.) When the League offered to place his commitments in a confidential side letter, he reneged and backed out of the deal. (Id.)

During his interview on July 29, 2009, several members of the Executive Committee, including Mr. Jacobs, Mr. Tim Leiweke, Mr. Peter Karmanos, and Mr. Tom Hicks questioned Mr. Balsillie regarding his prior interview and his refusal to follow through with the commitments he made during that meeting, including the "buy back" agreement. (Id. ¶ 15.) They each stated that they clearly recall that Mr. Balsillie's unequivocal answer to Mr. Jacob's question in 2006 regarding whether he was committed to keeping the team in Pittsburgh was "yes," he was committed to keeping the team in Pittsburgh. (Id.) Mr. Balsillie did not have satisfactory answers to their questions. (Id.) Without directly denying his prior commitments, Mr. Balsillie simply argued that he had never been willing to sign the League's standard form consent agreement, and claimed that it was the League who attempted to change the deal at the last moment – which is flatly untrue. (Id.)[12]

---

[12] Mr. Balsillie's declaration regarding what transpired during an earlier meeting in August 2006 with Commissioner Bettman is also patently incorrect. As reflected in a contemporaneously prepared memorandum to file by Deputy Commissioner Daly who also attended the meeting, Commissioner Bettman

*(cont'd)*

1    (2)  <u>Mr. Balsillie's conduct relating to his attempt to purchase the Nashville Predators in 2007.</u> Mr. Craig Leipold, the current owner of the Minnesota Wild and the former owner of the Nashville Predators, vociferously argued against approving Mr. Balsillie as an owner. (<u>Id.</u> ¶ 14.) Mr. Leipold read a lengthy statement to the Executive Committee in advance of Mr. Balsillie's interview. (<u>Id.</u> ¶ 14, Ex. C.) Mr. Leipold raised three basic issues. <u>First</u>, in 2007, Mr. Leipold learned that Mr. Balsillie and his counsel, Richard Rodier, were behind a surreptitious and possibly unlawful attempt in 2005 to devalue and destabilize the Nashville Predators. (<u>Id.</u> Ex. C at 1.) Without the prior knowledge of Mr. Leipold (and before Mr. Leipold had even met Richard Rodier), Mr. Rodier secretly contacted the City of Nashville in 2005 to suggest that the Predators could be in default of the net worth requirements of its lease with the City. (<u>Id.</u>) Within days of making the suggestion to the City, Mr. Rodier sent a letter to Mr. Leipold introducing himself and inquiring about purchasing the Predators. (<u>Id.</u> Ex. C at 2.) Mr. Rodier's suggestion led Nashville to publicly question whether the Predators were in compliance with the terms of the lease, leading to a two-year legal battle with the City, which cost Mr. Leipold and the Club tens of thousands of dollars. (<u>Id.</u>) Mr. Leipold did not learn of Mr. Balsillie's scheme until the City of Nashville informed him of it in 2007 after the negotiations with Mr. Balsillie to purchase the Predators had ended. (<u>Id.</u>)

<u>Second</u>, Mr. Balsillie negotiated in extreme bad faith with Mr. Leipold in 2007. (<u>Id.</u> Ex. C at 2.) Mr. Balsillie agreed in his negotiations that he would buy the Predators, which at the time

---

*(cont'd from previous page)*
"emphasized that it was the League's strong desire to have the Penguins remain in Pittsburgh and that he was intent on doing everything within his power (in cooperation with whatever entity or group that might own the Penguins) to seek the construction of a new arena and the negotiation of satisfactory new arena lease that would enable the Penguins to remain in Pittsburgh for the long-term." (<u>See</u> Second Daly Decl. Ex. A.)

When asked at the meeting about his opinion regarding the public authorities' back-up plan (known as "Plan B") to get a local arena built, Mr. Balsillie said he agreed with the Commissioner's judgment that the plan was "sufficient" to support the Penguins in Pittsburgh and to avert the Club's need to explore a relocation of the franchise. (<u>Id.</u> at 2) The memorandum reflects that Mr. Balsillie stated that "even [if], despite his best efforts, he was unable to 'improve' the financial parameters of 'Plan B,' and such Plan 'materialized,' he was committed to maintaining the Pittsburgh Penguins' franchise in Pittsburgh and would not, under any circumstances, seek to relocate the franchise to another market." (<u>Id.</u>) The memorandum indicates that Mr. Balsillie "reiterated his position in this regard two additional times during the course of the meeting." (<u>Id.</u>) Consequently, Mr. Balsillie's objections to including certain relocation-related provisions in a side letter were pretextual at best.

had a binding lease with the City of Nashville, on a "where is, as is" basis. (Id. Ex. C at 3.) Mr. Balsillie also signed a Term Sheet premised on the team remaining in Nashville at least until the lease terminated. (Id.) Yet Mr. Balsillie proceeded to engage in a number of actions wholly inconsistent with his agreement with Mr. Leipold, all of which had the purpose and effect of destabilizing the franchise in Nashville. (Id. Ex. C at 3-4.) Without the consent of Mr. Leipold and against the express direction of Commissioner Bettman, Mr. Balsillie began soliciting "Hamilton Predators" ticket orders in Hamilton, Ontario unlawfully using the Predators' intellectual property. (Id. Ex. C at 4.) He also publicly announced lease negotiations with the arena in Hamilton and submitted a "conditional relocation application" to the League. (Id.) Further, he failed to put $10 million in escrow as required by the term sheet and ignored his obligation to make the Term Sheet "binding." (Id. Ex. C at 3.) Mr. Leipold, Mr. Gillett, Mr. Ed Snider, Mr. Ted Leonsis and Deputy Commissioner Daly all questioned Mr. Balsillie about his conduct relating to these activities and his answers were (again) wholly unsatisfactory. (Id. ¶ 16.) Mr. Balsillie actually had the temerity to suggest that his unauthorized activities somehow "helped" Mr. Leipold by leading to a resurgence of interest in the team in Nashville. (Id.)

Third, Mr. Balsillie and Mr. Rodier threatened that the Canadian Competition Bureau would bring legal action against the NHL, the Predators, and Mr. Leipold personally if the transaction did not close on Mr. Balsillie's terms. (Id. Ex. C at 4-5.) Within days of such a threat, Mr. Leipold in fact received an inquiry from the Canadian Competition Bureau. (Id.)

These and other events, each of which relates to conduct subsequent to the Executive Committee's 2006 vote in relation to Mr. Balsillie's attempt to purchase the Pittsburgh Penguins, show that the Executive Committee has significant and legitimate concerns regarding Mr. Balsillie's trustworthiness as a business partner and that the NHL properly exercised its business judgment in determining that Mr. Balsillie was not a suitable owner under Article 3.5 and By-Law 35 of the NHL Constitution and By-Laws. (Id. ¶¶ 15-20.)

### (b) The Debtors and PSE have no basis to argue that the NHL's vote violated any implied duty of good faith and fair dealing.

Contrary to the suggestion of the Debtors and PSE, the Board of Governors' vote did not violate any duty of good faith and fair dealing. As a threshold matter, the law is unequivocal that the NHL owes no duty of good faith and fair dealing to Mr. Balsillie or PSE, as they are not parties to any contract with the NHL. See, e.g., Estevan Leal v. Allstate Ins. Co., 17 P.3d 95, 99 (Ct. App. Ariz. 2000) ("[I]t is well established that a third-party claimant, a stranger to the contract, cannot sue [for] breach of the duty of good faith."). Thus, any argument that the NHL has violated a duty of good faith with respect to Mr. Balsillie or PSE is likewise meritless.

As for Mr. Moyes, the law is fairly straightforward. In order to comply with the implied covenant of good faith and fair dealing, "a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." In re Sizzler Restaurants Int'l, Inc., 225 B.R. 466, 473 (Bankr. C.D. Cal. 1998); see Scottsdale Ins. Co. v. Market Finders Ins. Co., No. CV 04-118-PHX-SMM, 2008 U.S. Dist. LEXIS 76473, at *11 (D. Ariz. Sept. 12, 2008) (insurer did not violate duty of good faith and fair dealing by not enrolling particular doctor in insurance plan where insurer had discretion over which doctors to enroll). A court will not examine the actual decision reached, but rather must consider the manner in which that decision was reached. See In re Sizzler, 225 B.R. at 474. As long as a legitimate business reason exists for a party's discretionary decision, there is no breach of the covenant of good faith and fair dealing. See Svela v. Union Oil Co. of California, 807 F.2d 1494, 1501 (9th Cir. 1987) (court cannot second-guess franchisor's economic decisions made in good faith); Burger King Corp. v. Agad, 941 F. Supp. 1217, 1222 (N.D. Ga. 1996) (implied covenant of good faith and fair dealing cannot be used to second-guess franchisor's legitimate business decisions). Moreover, this implied duty, if applicable, cannot be used to create duties that do not exist under the contract. See Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, No. 01 Civ. 2946 (DLC), 01 Civ. 7670 (DLC), 2004 U.S. Dist. LEXIS 17282, at *15-16 (S.D.N.Y. Sept. 1, 2004); Villegas v. Transamerica Fin. Servs., Inc., 708 P.2d 781, 783 (Ariz. 1985) ("Courts have no right to remake contracts to comport with some

unspecified notion of fairness nor to refuse enforcement on that ground. That parties have been held to a duty of good faith compliance with contract terms does not create a duty to offer particular terms or to forego available contract remedies.").

Further, courts have traditionally granted considerable deference, analogous to the business judgment rule, to the autonomy of professional sports leagues in resolving internal disputes. See, e.g., Chicago Prof'l Sports Ltd. v. NBA, 95 F.3d 593, 597 (7th Cir. 1996) ("Courts must respect a league's disposition of [internal] issues, just as they respect contracts and decisions by a corporation's board of directors.").[13] Accordingly, courts do not interfere with a league's internal decision-making unless it "plainly contravenes the association's bylaws" and is not taken in good faith to further a legitimate interest of the league. Oakland Raiders v. NFL, 93 Cal. App. 4th 572, 581-82 (Cal. App. 6th Dist. 2001). Here, the Board of Governors acted in good faith and in accordance with the NHL's Constitution and By-Laws in rejecting Mr. Balsillie as a potential owner of the Coyotes.

Indeed, a new owner's "character" is one of the factors listed in Section 35 of the NHL's By-Laws. Moreover, both the Debtors and PSE agree that Mr. Balsillie's trustworthiness is a determinative factor in the Board of Governors' decision on whether to approve or disapprove the Debtors' request to transfer the Coyotes to PSE. But there is no obligation, either express or implied, to approve the sale simply because the current owner – or anyone other than the Board members – believes that the candidate would be a good business partner. As discussed above, the Board of Governors reasonably exercised its right under the NHL Constitution and By-Laws to determine that Mr. Balsillie would not be a trustworthy business partner. Despite Mr. Moyes' disagreement with this decision, the Board of Governors had numerous legitimate business reasons for rejecting PSE's and Mr. Balsillie's application and acted in good faith in reaching its decision.

---

[13] Courts have applied a similar rule to insulate the good faith decisions of a board of an unincorporated association. See Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n, 980 P.2d 940, 942 (Cal. 1999); see also Schoninger v. Yardarm Beach Homeowners' Ass'n, Inc., 523 N.Y.S. 2d 523, 529 (App. Div. 1987) ("We can see no sound reason to adopt a differing standard of review in cases such as the one at bar, where the actions to be reviewed are those of an unincorporated as opposed to an incorporated board of managers.").

17

Mr. Moyes could have no reasonable expectation that any particular candidate for ownership would be approved, and the League's rejection of Mr. Balsillie on the basis that he would not be a trustworthy business partner (for all of the reasons discussed above and more fully in Mr. Daly's Second Declaration) cannot violate any duty of good faith and fair dealing. Cf. In re David Schick, 235 B.R. 318 (Bankr. S.D.N.Y. 1999) (absent bad faith, trustees could not compel assignment over its partners' objection to estate's status as partner in business venture).

### B. Any Relocation Sale Should Be Continued to Allow Adequate Time for Proper Marketing of the Club, the Formulation of Relocation Bids, and Arrangements for Operation of the Club in a New Location.

Even if the PSE bid could be considered a "Qualified Bid" – which, as shown above, has been precluded by proper, reasonable and good faith application of the NHL's rules and procedures regarding transfer of ownership – any Relocation Sale must be delayed because the Club has not been marketed on a relocation basis. In order to attract qualified bidders, it is important that any Relocation Sale be far enough in the future (in the event it becomes clear that there are no viable Glendale bidders) that the team can be properly marketed to potentially interested parties, who would need time to conduct their own due diligence, negotiate terms with an arena operator in the proposed location, and go through the League's processes for transfer of ownership, transfer of franchise location, and calculation of potential relocation and/or indemnification fees (which are location specific).[14] If done properly, that process generally takes several months. Moreover, it is unlikely that any potential bidders for a Relocation Sale would expend the time, effort and resources necessary to formulate a bid unless and until the Glendale Sale is resolved and there is clarity with respect to the Glendale lease.[15] Thus, the proper identification of Relocation Bidders will not, in practical terms, be possible until well after the Glendale Sale.

---

[14] Not only are the relocation and/or indemnification fees location specific, but the calculation of such fees is costly and time consuming, including detailed expert analyses, and this process cannot and should not begin until qualified Relocation Bidders are identified.

[15] A fundamental issue to any potential relocation bidder will be resolution of the equitable issues relating to the claim of the City of Glendale. Before that issue is resolved, it is unlikely that very many, if any, Relocation Bidders would step forward.

It also is imperative that any new location – including the specific arena with potentially conflicting dates – be decided upon in time for the Club to market tickets and negotiate sponsorships and media deals, and for the League to prepare its playing schedule.[16] Thus, a change of the Club's location plainly cannot occur immediately prior to or during the playing season. The resulting logistical nightmare would materially damage the Club's and League's business and would adversely impact the rights and expectations of third parties, including players and teams that have to travel to play the Coyotes, vendors, and producers of other entertainment programs scheduled in the arenas. Thus, if a Glendale Sale cannot be achieved – and, again, the NHL submits that it can if more time is afforded the interested bidders to finalize their proposals – then the NHL respectfully suggests that any Relocation Sale should be delayed until the spring of 2010.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the NHL respectfully requests that (i) the Glendale Sale commence on a date certain no earlier than September 10, 2009, and (ii) the Relocation Sale be postponed until the spring of 2010.

DATED: August 3, 2009

STINSON MORRISON HECKER LLP

By: /s/ Alan A. Meda (#009213)
C. Taylor Ashworth, 010143
Alan A. Meda, 009213

and

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
J. Gregory Milmoe
Shepard Goldfein
Anthony W. Clark

Attorneys for the National Hockey League

---

[16] Indeed, the Debtors themselves observed in the Sales Procedure Motion that "[i]t will be very difficult to transfer the Phoenix Coyotes to another location (as contemplated by the APA) once the 2009-2010 schedule is released." (See dkt. no. 19 at 4.)