

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

MINUTE ENTRY/ORDER

FOR MATTER TAKEN UNDER ADVISEMENT



SEP 3 0 2009

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bankruptcy Judge: | Hon. Redfield T. Baum |
| Case Name: | Dewey Ranch Hockey, LLC      Chapter 11 |
| Case No.: | 2:09-bk-09488-RTBP |
| Subject of Hearing: | Hearing on the Sale of the Phoenix Coyotes, a National Hockey League Team located in Glendale, Arizona |
| Date Matter Ruled Upon: | September 2, 2009 |
| Date Ruled Upon: | September 30, 2009 |

Submitted to the court are the two competing bids to purchase various assets commonly considered the Phoenix Coyotes, a National Hockey League team currently located in Glendale, Arizona. The auction and the proceedings related thereto have been hotly and vigorously contested by all of the involved parties. In connection with the auction sale proceedings, the attorneys for the parties have inundated the court with multiple motions, massive briefs and legal memorandums, numerous expert opinions on antitrust and other esoteric issues, conflicting declarations on issues tangentially related to the bankruptcy auction sale and the assertion of many satellite issues. For the reasons set forth below, the court can not approve either bid.

## I. THE FACTS AND BACKGROUND LEADING TO THE BANKRUPTCY AUCTION

There is a significant factual history here leading up to these bankruptcy cases and this auction. That history creates the stage upon which these parties now come before this court regarding a sale of the hockey team.

### A.     THE PHOENIX COYOTES

In January 1996, the National Hockey League ("NHL" or "League") approved the change of ownership and authorized the relocation of the Winnipeg Jets to Phoenix, Arizona. The team's name was changed to the Phoenix Coyotes ("Coyotes"). The Coyotes have not been a particularly successful team on the ice having never won a playoff series since moving to Arizona and have not made the playoffs since moving to a new, state of the art arena in Glendale, Arizona in 2003. More importantly, from the bankruptcy perspective, the Coyotes have lost money every year since moving to Arizona. The Coyotes audited financial statements for the years 2004 - 2008 show the following devastating results:

|      | Deficit/No Equity | Operating Loss | Total Loss    |
|------|-------------------|----------------|---------------|
| 2004 | $258,830,000      | $49,425,000    | $75,352,000   |
| 2005 | $309,505,000      | $26,786,000    | $50,675,000   |
| 2006 | $384,848,000      | $31,410,000    | $75,343,000   |
| 2007 | $36,854,000       | $107,763,000   | $117,175,000  |
| 2008 | $108,985,000      | $54,817,000    | $72,131,000   |

Further, in accordance with an auditor's obligations under generally accepted accounting principles, each of these annual financial statements contain a statement by the certified public accountants that the financial statements "raise substantial doubt as to the Company's ability to

continue as a going concern".

In September 2006, Jerry Moyes ("Moyes") purchased a controlling interest (91.7%) in the Coyotes from Steve Ellman ("Ellman"), who transferred his entire interest in the Coyotes, which transfer of ownership was approved by the NHL. Their entire agreements involved more assets and liabilities than just the Coyotes but those other agreements are not relevant to the issues before the court. However, their agreements included significant cancellation of debts owed by the Coyotes resulting in the material change in the Deficit/No Equity from 2006 to 2007 as reflected above. Moyes or entities he controlled advanced the funds needed to pay the operating deficits of the Coyotes until approximately August 2008.

In August 2008, Moyes meet with and advised the NHL that he would no longer fund the operating losses of the Coyotes. At the request of Moyes and the Coyotes, the NHL began advancing funds to pay the Coyotes operating losses. Thereafter and until the May 2009 bankruptcy filings, the NHL has funded the Coyotes ongoing operating losses by early payment of prospective revenue sharing payments due the Coyotes and, beginning in the fall of 2008, by loans. During this period of time, there were meetings and regular communications amongst these parties regarding the on going financial problems of the Coyotes and their efforts to resolve these problems by finding a new owner to acquire the team from Moyes.

In early 2009, Moyes hired his personal attorney, Earl Scudder ("Scudder"), to formally market the team for sale and, additionally, there were contacts with other professional marketeers of professional sports teams. Scudder routinely communicated with the NHL, particularly with Commissioner Gary Bettman ("Bettman") and Deputy Commissioner William Daley ("Daley") regarding his efforts to sell the Coyotes. In the spring of 2009, Richard Rodier ("Rodier"), a

Canadian attorney and officer of PSE Sports and Entertainment LP ("PSE") contacted Scudder regarding purchasing the Coyotes and relocating the team to Hamilton, Ontario, Canada. The principal of PSE is James Balsillie ("Balsillie"). Initially Scudder did not seriously pursue the inquiry from Rodier. However, in April 2009 with no other offers available, negotiations with PSE for the purchase of the Coyotes became serious. Scudder advised Bettman about that fact and Bettman told Scudder to not pursue such a deal because the Coyotes were staying in Arizona.

On May 5, 2009, the Coyotes and three related entities filed chapter 11 bankruptcy reorganization cases and also executed a purchase and sale agreement with PSE for the sale of the Coyotes, conditioned upon the team moving to Hamilton.

B.     THE CITY OF GLENDALE AND THE NEW GLENDALE HOCKEY
       ARENA

In November 2001, the City of Glendale ("Glendale"), on the one hand, and Arena Management Group, LLC, one of the chapter 11 debtors, and other entities including the Coyotes, on the other hand, all owned and/or controlled by Ellman, entered into the Arena Management, Use and Lease Agreement ("AMULA"). Pursuant to the AMULA, Glendale built a new hockey arena in Glendale, Arizona. That agreement contained a "Team Use Covenant" wherein the Coyotes covenanted and agreed that it would play all its home games in the Glendale Arena and would not play its home games "at any other location" for the thirty hockey seasons after the arena opens for play by the Coyotes. That agreement required Glendale to advance $183 million dollars to build the arena. Glendale issued bonds for approximately $155 million of that amount. Glendale's plan was that the arena would be the main feature of a multi-use sports and entertainment facility of a planned 233 acre $1 billion development known as Westgate City

Center.   Ellman was the developer for that project.

The AMULA also provided that Glendale had the right to have the Team Use Covenant specifically enforced and  the AMULA contained a  liquidated damages clause in favor of Glendale.  The liquidated damages clause provided that  if the agreement was terminated early and could not be  specifically enforced  the damages due Glendale would be calculated  by a complex formula starting at $794,663,034.00 with specified annual reductions therefrom which were essentially tied to revenues received and adjusted for the then remaining term of the thirty year use covenant.  The Coyotes have played all of their home games at the Glendale arena through the end of the 2009 regular season.

## C.    THE NATIONAL HOCKEY LEAGUE

The NHL is the premier professional ice hockey league,  founded in 1917.  The League is comprised of thirty teams, six located in Canada and twenty-four in the United States.  The thirty teams are divided into two conferences and each conference is divided into three divisions.  The conferences and divisions are generally aligned based on the geographic location of the teams. The Coyotes are in the "Pacific" division along with teams in Anaheim, Dallas, Los Angeles and San Jose.

### 1. The Pertinent Provisions of the League's Constitution and By-Laws.

The NHL and its member teams are governed by a written constitution and by-laws. Article 3.5 of its constitution provides that to transfer ownership of a team requires, among other requirements, the "consent of three-fourths of the members of the League".  Article 4.1 of its constitution provides that (1) the League shall have exclusive control over all hockey games played by  the member teams, (2) the home team shall have exclusive control over the hockey

games played in its "home territory", and (3) no games and no franchises shall be granted in a home territory without the written consent of the home team. Section 35 of the NHL By-Laws regarding transfers of ownership provides, among other requirements, that a proposed new owner should have "sufficient financial resources to provide for the financial stability of the franchise" and have "good character and integrity". Section 36 of the NHL By-Laws regarding transfers of locations requires, among other requirements, that a detailed written application for a transfer be filed no later than January 1 of the year prior to the proposed transfer. An applicant "shall be afforded an opportunity to make a presentation" to the NHL and its members and the members can question the applicant regarding "any aspect of the transactions". This By-Law lists twenty-four factors to be considered in voting on the relocation application and provides that the league may require a transfer fee "to reflect the goodwill developed by the League in the new location" and an indemnification fee "to reflect the goodwill developed by" the neighboring teams in the new location.

    2. <u>The Prior Dealings Between the NHL and PSE/Balsillie</u>.

    PSE's proposed purchase agreement for the Coyotes is the third attempt by PSE and Balsillie to acquire a NHL team. In 2006, Balsillie sought to purchase the Pittsburgh Penguins ("Penguins"). The parties followed the NHL's procedures for a change in ownership of the Penguins and Balsillie was approved by the NHL to become the owner of the Penguins. However, the parties could not agree in writing on the terms of their transaction and ultimately Balsillie terminated the agreement. Their failure to reach an agreement was in large part due to issues regarding the ability to relocate the Penguins and the NHL's right to purchase the team from Balsillie if he sought to relocate it.

In 2007, PSE/Balsillie entered into a non-binding term sheet to purchase the Nashville Predators. Balsillie informed the seller that he would like to relocate the team to Hamilton, which information was provided to the NHL. There were discussions amongst the seller, the NHL, and PSE/Balsillie regarding the Nashville lease and arena, the views of PSE/Balsillie regarding relocating to Hamilton, and their request that the NHL consider a conditional relocation application by them. No binding agreement was ever entered into and the League never considered whether to approve a change of ownership involving PSE/Balsillie or a conditional relocation.

Also in 2007, the Canadian Bureau of Competition ("CBC") investigated the NHL's rules and procedures regarding ownership and relocation including the proposed transactions of the Penguins and Predators. The investigation concluded that the NHL's rules and procedures did not violate any applicable laws.

## II. THE BANKRUPTCY PROCEEDINGS

These four debtors filed their chapter 11 petitions on May 5, 2009. Also on that date, the Coyotes signed an Asset Purchase Agreement ("APA") with PSE. The essence of the APA was that (1) PSE would pay the Coyotes $212,500,000.00 in cash for the Coyotes and most of its assets including all of its rights as a member team in the NHL and (2) the bankruptcy court order approving the sale must expressly provide that the home games would be played at the location of PSE's choice in Southern Ontario, Canada, regardless of the lack of consent or agreement of the NHL and its members. By its terms, the APA terminated on June 29, 2009. The debtors obtained an accelerated hearing on its motion to approve such sale. Following extensive proceedings on that motion, the motion was denied without prejudice. See In re Dewey Ranch

Hockey, LLC., 406 B.R. 30 (Bankr. AZ. 2009).

On May 7, 2009, the Coyotes filed an adversary proceeding against the NHL alleging antitrust claims seeking a permanent injunction to prohibit the NHL from prohibiting the relocation of the Coyotes to Hamilton. On August 7, 2009, the NHL filed its motion to dismiss and for summary judgment. Those motions have not been submitted to the court for ruling.

The foregoing unsuccessful sale proceeding resulted in the unanimous agreement of all parties, and probably the only thing that all have agreed upon to date, that the Coyotes needed to be sold to a new owner. Accordingly, at a hearing on June 22, 2009, following lengthy discussions with all parties, the court scheduled two auctions. The first auction was set for August 5th as a Glendale only auction, i.e., the court would only consider bids from parties committing to keep the team in Glendale and playing all home games at the Glendale arena. The second auction was set for September 10th for bidders at any location. On July 6, 2009, the court entered a detailed order setting forth the bid procedures and requirements for bidders at either auction.

One of those requirements was that all bidders submit the required change of ownership or location applications to the NHL by the court ordered deadline. PSE and two other potential bidders submitted such applications. On July 29 at a meeting of the NHL Board of Governors (team representatives), the Board voted unanimously to not approve PSE's/Balsillie's application because Balsillie, in their view, did not have the "character and integrity" required under NHL By-Law 35 to be an owner of a NHL team. Also at that July 29th meeting, the Board approved an ownership transfer to the Reinsdorf group and made no decision on the ownership transfer to another potential bidder, Ice Edge Hockey, awaiting submission of further documents.

-8-

A.    THE NHL'S DECISION TO REJECT PSE'S/BALSILLIE'S APPLICATION FOR NHL
      MEMBERSHIP

That decision and the effect thereof on these proceedings has become a hotly contested

issue before this court and, therefore, the events at that meeting are summarized here. There is no

record or transcription of that meeting. The memorandum provided the attendees at that meeting

stated that Balsillie had "sufficient financial means to ensure the financial stability of the

Coyotes". The memorandum also stated that there were five issues relating to his "integrity and

willingness to be a good partner that warrant discussion during his interview". Those five issues

were his conduct regarding the Penguins, the Predators, the CBC's investigation of the NHL, his

"wrongdoing at RIM related to the backdating of options", and his "conduct relating to his current

attempt to purchase the Phoenix Coyotes". The memorandum regarding PSE/Balsillie is twenty-

one pages long. The memorandum regarding the other two potential bidders total nine pages.

The attachments to the memorandum regarding PSE/Balsillie consists of some, and perhaps all, of

the documents relating to the five issues, which materials exceed 200 pages, many of which were

lengthy single spaced documents.

Regarding the Penguins dealings, there were two main points. First, that Balsillie

committed to the Board he would attempt to keep the team in Pittsburgh. Second, that the NHL

and Executive Committee believe that he orally committed that the NHL would have the right to

buy the team back from him at the same price (the "Call") if he applied to relocate the team from

Pittsburgh. The attorneys for the NHL submitted a proposed draft of the Call to Balsillie's

attorney. That right is set forth in paragraph 19 and states, in principal part:

... Purchasers shall sell to League (or any entity designated by the League), the Club and all of the Hockey-Related Assets and any and all other assets purchased by the Purchasers pursuant to the Purchase Agreement for the Purchase Price – $175 million adjust to actual – that the Purchasers actually paid therefor. The closing shall occur on a date designated by the League. The Purchasers agree that the League may assign its right to so purchase the franchise to a third party.

Thereafter, there were numerous and sometimes lengthy communications/negotiations (written and oral) on multiple topics regarding the proposed transaction including, but not limited to, deleting the Call right. Ultimately, no agreement was reached and the proposed transaction was terminated.

Regarding the Predators dealings, there were three main points: (1) did Balsillie attempt to devalue the Predators, (2) did he negotiate in bad faith, and (3) were threats made regarding the CBC. There was a signed, written term sheet regarding the proposed Predators' transaction. That term sheet stated, in pertinent part:

Except with respect to the provisions relating to ... Breakup Fee...(collectively, the Binding Provisions"),.. this Term Sheet does not constitute a legally binding obligation or commitment of either of us, and no such legally binding obligation or commitment shall exist unless and until (subject to the terms of the Section below entitled Seller's Option Break Up Fee")...: provided however, that each of the Buyer and Sellers acknowledge and agree that the Binding Provisions shall be deemed to be legally binding and enforceable obligations between the parties hereto.

... .

Sellers' Option; Breakup Fee: The Buyer hereby specifically acknowledges and agrees that, at any time prior to the execution of the Purchase Agreement, the Sellers shall have the option to (I) ... , and (ii) require the Buyer to place $10,000,000 in escrow, with such escrowed funds to be automatically released to Sellers as a "break up" fee in the event that the Buyer refuses to Close the Transaction because the NHL's Consent Agreement is unsatisfactory to the Buyer for any reason.... . In the event that the Buyer refused to amend this Term Sheet in accordance with the terms of the first sentence of this Section, then this Term Sheet would remain in effect ( as a non-binding term sheet); provided, that the Sellers would no longer be subject to the terms and conditions of the Section above entitled "Exclusivity".

Craig Leipold, the then owner of the Predators, asserts, and stated at the July 29th meeting, that

(1) he believes that his Predator franchise was devalued during the negotiations because Rodier contacted the Nashville representatives in 2005 inquiring whether the Predators were in compliance with their net worth requirements under the lease and, if not, whether they were in default under the lease; that he/the Predators spent two years negotiating with the city on this issue, spent thousands of dollars in legal fees and that this made the sale of the Predators far more difficult; (2) Balsillie negotiated with him in bad faith because he would not make the term sheet binding and refused to pay the $10,000,000.00 dollar break up fee, and Balsillie began taking "Hamilton Predator ticket orders for the new franchise in Hamilton" wrongfully using the Predators' trademarks; and (3) Rodier threatened him with investigation by the CBC if he refused to sell the Predators to Balsillie and that shortly thereafter the CBC did investigate the NHL and interviewed him.

Jeremy Jacobs, the long time owner of the Boston Bruins franchise and current chairman of the NHL Board of Governors, asserts, and stated at the July 29th meeting, that in 2006 Balsillie had agreed to give the NHL the Call right for the Penguins but at the July 29th interview he denied that "he had reached agreement with the Executive Committee regarding the terms of the call". Further, when Balsillie was asked if "he would be willing to abide unqualifiedly by the NHL Constitution and By-Laws, he stated that "he would be willing to abide by the NHL's rules in Hamilton". His response was interpreted to mean "that he is not willing to comply with the NHL Constitution and By-Laws now, but that he wants us to trust that in the future he will comply with them". Based upon the interview, Jacobs concluded, and believes the others also concluded, that Balsillie "was not willing to comply with League rules and procedures and would not be a good business partner".

The memorandum also described the 2007 investigation by the CBC of the NHL regarding its proposed transfers of the Predators and Penguins and the possible relocation of those franchisees. During the investigation, the NHL through Bettman and Daly represented to the CBC that the NHL required a majority of owners to approve a new member or for a member to relocate a club's territory. The CBC concluded that the requirements of the NHL were not anticompetitive and served legitimate needs of the NHL.

Finally, the memorandum stated that Balsillie, through his attorneys, in the Coyotes bankruptcy case, had made statements and taken a number of legal positions that were not in the NHL's best interests. Specifically, that his strategy included "attempting to hold the League and Commissioner Bettman up to public ridicule as allegedly anti-Canadian and harming the League's goodwill with fans in Phoenix and throughout North America". Further, that his attorneys had asserted that (1) the NHL was an illegal cartel, (2) the Leagues rules were anti-competitive under the antitrust laws, (3) the NHL is not a single entity for antitrust purposes, (4) in his agreement he required that the Coyotes "initiate antitrust litigation against the NHL", and (5) the Bankruptcy Court had the power to force the sale and relocation of the Coyotes over the NHL's objection.

At the July 29th meeting, the NHL Executive Committee and the Board of Governors voted unanimously to reject Balsillie's membership application on character and integrity grounds. The Reinsdorf Group was approved as a potential member of the NHL and the decision regarding Ice Edge was deferred pending submission of further information to the NHL.

## B. THE AUGUST GLENDALE ONLY AUCTION WAS CONTINUED AT THE REQUEST OF THE NHL

A few days before the scheduled August Glendale only auction, the NHL sought and

obtained a continuance of that auction to September 10th. The NHL also sought a continuance of

the relocation auction sale until after the end of the Coyotes 2009-10 season. That request was

denied and the September 10th auction was opened to all bidders at any location.

The essence of the NHL's request was that there was simply insufficient time for the

probable Glendale only bidders to comply with the numerous requirements by the scheduled

August auction. The NHL stated that the Reinsdorf group was close to a deal with Glendale,

which deal was the most significant outstanding contingency regarding its bid. Ice Edge, a

probable bidder at the Glendale only auction, supported the requested continuance to allow it

more time to conclude its negotiations with all parties so that it could make a definitive bid at the

auction. Ice Edge filed a draft 103 page asset purchase agreement evidencing its assumed bid for

the Coyotes.

### C.     THE NHL'S DECISION TO BID AT THE AUCTION

On August 25th, the last day to submit a bid under the court ordered bid procedures, the

NHL submitted its bid in the form of a fifty-three page draft Asset Purchase Agreement with

forty-three pages of exhibits to that draft agreement. By this date, the other two potential bidders

for the Coyotes, the Reinsdorf Group and Ice Edge, who had stated that they would each keep the

team in Arizona, had publicly announced that they would not be submitting any bid(s) at the court

auction. The NHL stated that it reluctantly concluded that it should make its bid because doing so

was in the best interests of the NHL, the Coyotes, Glendale and the creditors.

The NHL bid, at this time, was for a total amount of $140,000,000.00, which amount

would be reduced by the payment or assumption of the secured debt due SOF and the NHL, the

cure costs, and the amount of assumed unsecured debt. At this time, the bid did not state the

-13-

amount of cure costs or unsecured debt which would be assumed under the bid. It appears that the bid was intended to pay the unsecured creditors in full in cash, but excluding any claims by Moyes or any Moyes affiliate(s) and any claims of Wayne Gretzky. Its bid also committed to perform all obligations due Glendale under the AMULA until the end of the Coyotes' 2009-10 season and during that time to attempt to find a new owner who would keep the Coyotes in Glendale. The NHL's bid contemplated that if by the end of that season there was no new owner in Glendale then it would sell the team "pursuant to a professionally conducted relocation sales process".

D.     THE AUCTION AND THE RELATED MOTIONS

Full day hearings on the auction and the numerous motions related thereto were held on September 3rd, 10th and 11th. The parties stipulated into evidence all of the declarations filed with the court and all of the depositions taken in this case. The parties so agreed because that procedure was the only way to get the collective issues raised by all the parties submitted to the court; otherwise it would have taken weeks if not months to submit these issues.

1. The Expert Evidence.

PSE and the NHL both presented expert testimony to support their positions on the appropriate relocation fee due the NHL if the court approved PSE's bid and the appropriateness of Hamilton as an NHL site for the Coyotes. Tom Wright is the former commissioner of the Canadian Football League and has spent the majority of his business career in the sports industry. It is his expert opinion that the relocation of the Coyotes is reasonable, comports with the requirements of the NHL, and should be approved. It is his further opinion that the relocation for the 2009-10 season is possible.

Andrew Zimbalist ("Zimbalist") is a long time economics professor at Smith College in

Massachusetts. He has consulted extensively in the area of sports economics, has testified as an expert witness in sports-related litigation and before the U.S. Congress and other governmental bodies. It is his expert opinion that (1) Hamilton is a superior economic location to many of the metropolitan areas that currently host NHL teams, (2) the highest possible relocation fee that would be economically reasonable under the standards in the NHL Bylaws is $12.9 million, and (3) the relocation fee under the "Raiders II" standard is in the range of $11 million to $13 million.

Andy Baziliauskas has a Ph. D. in economics, has served as a senior economist on the CBC, and has extensive experience in the antitrust area including expert work in cases involving alleged violations of competition laws. It is his expert opinion that (1) the relevant market is professional major league hockey games and the relevant geographic market is regional, centering on Toronto, (2) the Toronto Maple Leafs possess considerable market power, (3) the Maple Leaf's veto and the NHL's By-Laws prevent the relocation of an existing NHL franchise to Hamilton, and are therefore anticompetitive, (4) the NHL's restrictions on franchise relocation are unlikely to have a valid business justification, and (5) any demand for a significant transfer fee and/or indemnification fee from a team relocating to Hamilton would be anticompetitive.

Franklin M. Fisher is a professor of microeconomics, emeritus, at the Massachusetts Institute of Technology. He has written and testified extensively in the areas of antitrust and sports related matters, with particular emphasis on economic issues pertaining to the geographic siting of major league sports franchises and the policies and rules that various leagues use to regulate the creation, sale and relocation of franchises. It is his expert opinion that (1) from an economic point of view, the NHL operates as a single entity, (2) the NHL has a procompetitive interest in producing high quality on ice entertainment that can compete successfully in the

entertainment market, (3) the NHL has no anticompetitive interest in reviewing the ownership

changes of individual franchises, (4) the proposed sale of the Coyotes presents the type of

economic circumstances where the NHL's ownership transfer rules are likely to be particularly

important to safeguard the quality of NHL hockey and promote the league's competitive success,

(5) the potential relocation of the Coyotes to Hamilton would present circumstances in which the

NHL's relocation rules would have a particularly strong economic justification for curbing

externalities and free riding concerns relating to the League's pursuit of geographic diversity,

franchise stability, competitive balance, and community commitment, (6) an NHL decision, were

it to occur, to deny relocation could be justified as reasonable based on the relevant facts and

would not be anticompetitive, and (7) the NHL's authority to levy appropriate relocation and

indemnification fees in the context of franchise relocations is procompetitive. Fisher also opined

that the relocation estimates by the NHL's other experts are consistent with the economic

principles presented by him in his testimony and that the approach used by Zimbalist is wrong in

at least five import respects as a matter of economic analysis.

     Daniel S. Barrett is the founder and principal owner of Barrett Sports Group, LLC, a

boutique consulting firm specializing in the business of sports. He has direct experience in

valuing sports franchises. It is his expert opinion that based on the fair market values of teams in

Glendale and Hamilton, the appropriate relocation fee here is $101.1 million.

     Michael Rapkoch is the founder and president of Sports Value Consulting, LLC, a

professional valuation and advisory firm to the sports business. He has been involved in the

valuation of over sixty sports franchises, including fifteen NHL franchises. It is his expert opinion

that based upon the fair values of the business enterprise values of a Glendale and Hamilton NHL

teams that the relocation fee here is $195 million.

    2. <u>The Bids</u>.

Only PSE and the NHL submitted bids to purchase the Coyotes. On September 11th, both bidders substantially raised and/or improved their bids. PSE's final bid, expressly conditioned upon the court approving the relocation of the Coyotes to Hamilton, was $212,500,000.00. PSE also offered to pay Glendale $50,000,000.00 if Glendale withdraw its objection to the sale to PSE. On September 7th (Labor Day), PSE first offered to purchase Glendale's claim if it would withdraw its objection to the sale to PSE for the same amount, but the amount could be reduced by $10,000,000.00 depending upon the amount of the relocation fee due the NHL. PSE also removed its right to be subrogated to Glendale's claim if Glendale accepted PSE's offer. If Glendale accepted that offer, PSE's bid was reduced to $192,500,000.00., i.e., a twenty million dollar reduction from $212,500,000.00. Further, PSE also agreed to immediately pay the same group of unsecured creditors as the NHL offered to immediately pay in its bid. These unsecured claims total approximately $11,600,000.00 and represent virtually all of the unsecured claims excluding some rejection damage claims (particularly Glendale's claim) plus the Moyes and Gretzky claims. PSE would become subrogated to the rights of the unsecured claims it paid. In simple terms, PSE raised its bid to $242,500,000.00 if Glendale accepted PSE's $50,000,000.00 offer to withdraw its objection to the sale to PSE, i.e., the Glendale offer effectively added $30,000,000.00 to PSE's bid.

The NHL's bid remained $140,000,000.00. However, the NHL for the first time listed the specific cure costs and trade creditors that it would pay, which claims totaled approximately $11,600,000.00. Both bids were effectively cash bids.

### 3. The Debtors' and PSE's Arguments.

Leading up to these hearings, the parties submitted massive and lengthy memorandums, declarations and other documents in support of their respective positions and in opposition to the claims of other parties. The ultimate issue was the resolution of which of the two bids was the highest and best bid for the Coyotes and whether either of those bids satisfied the requirements of the Code. The parties collectively raised many factual and legal issues which they asserted supported their positions regarding which bid should be approved by the court.

The core of the debtors' and PSE's claims is that under the power of the Bankruptcy Code ("Code"), the bankruptcy court can and should order the sale of the Coyotes to PSE, including authorizing the relocation of the Coyotes to Hamilton, notwithstanding the claims and objections of the NHL and Glendale. Further, that the NHL's actions and inactions regarding the PSE offer is a quintessential breach of the duty of good faith and fair dealing.

In support of these core claims, they make many arguments. They assert that once the NHL became a bidder for the Coyotes, it forfeited its right to decide the membership or relocation requests by the Coyotes and PSE and/or to determine the relocation fee due it. They point to the NHL's insider status[1] and the case law which they assert provides that an insider cannot be allowed to further its own bid over other bids, the NHL's obvious conflict of interest in determining that Balsillie lacked the required character and integrity to be an NHL member when

---

[1]Post-petition the NHL has (1) been the court approved Section 364 lender to the debtors-in-possession to fund the ongoing operating losses of the debtors, (2) pursuant to stipulated orders of this court had joint control over the debtors' operation based upon proxies obtained by the NHL pre-petition delivered in connection with the NHL's loans and advances to the debtors, and (3) become a bidder for the Coyotes. Based on such actions, PSE and the debtors assert that the NHL is an insider of the debtors.

it intended to make its own bid for the Coyotes, and the fundamental unfairness of the July 29th meeting and decision by the NHL. They further assert that the joint relocation application more than satisfies a good faith application of the NHL's relocation rules. Specifically, they assert that (1) Glendale is not a financially viable venue for the Coyotes based upon its years of large financial losses both in Glendale and Phoenix, (2) that Hamilton is a viable NHL market for the Coyotes based upon the testimony of the experts from all parties, and (3) there is no reasonable economic basis for the NHL to refuse to consent to the move to Hamilton. They further assert that there is overwhelming evidence to establish that the NHL's actions regarding PSE's offer and the joint relocation application have been done in bad faith. In that regard, they assert that (1) the NHL's de facto rejection and failure to even consider the relocation application is bad faith, (2) the NHL's actions and inactions are really to protect the unlawful territorial veto rights of the Toronto Maple Leafs, (3) the NHL's bid further evidences its bad faith, (4) the failure of Commissioner Bettman to disclose at his August 20th deposition when asked about the NHL's current plans regarding the Coyotes that the NHL was considering bidding for the Coyotes, and (5), at a minimum, their arguments establish that there is a bona fide dispute regarding the NHL's collective rights (consent to membership and ability to relocate) and under Section 363(f)(4) of the Code such bona fide dispute authorizes the bankruptcy court to approve the sale to PSE free and clear of the interests and claims of the NHL. Finally, PSE places great reliance on a 2006 letter from the Toronto Maple Leafs to Commissioner Bettman which stated, in part:

> The Toronto Maple Leafs do not agree that a relocation of another club into their home territory would be subject to a majority vote. They continue to believe that a unanimous vote would be required before a team could be relocated into their home territory. ... . The Maple Leafs reserve all rights to take whatever actions are necessary to protect their exclusive rights to their home territory.

The essence of their arguments is that under Section 363 and 365 of the Code and based upon the facts here, the bankruptcy court has the power, and should exercise it, to approve the sale of the Coyotes to PSE over the objections and without the consent of the NHL and Glendale. Simply stated, PSE asserts that the executory contract rights of the Coyotes can be assumed and assigned by the debtors under the provisions of Section 365 of the Code and then sold to it under the provisions of Section 363 of the Code free and clear of the contractual restrictions of the NHL and Glendale that require the Coyotes to play all of their home games in Arizona; and that the bankruptcy court has the power to effectively enter a mandatory injunction requiring that the NHL accept the "Hamilton Coyotes" as a league member with a designated "home territory" in Hamilton.

4. The NHL's Opposition to the Proposed PSE Sale.

The NHL asserts that there are a number of reasons why the proposed sale to PSE can not be approved. The NHL argues that (1) Section 365 provides no basis to force a relocation of the Coyotes rather it directs the assumption and assignment of an executory contract which requires the Coyotes to play their home games in Glendale, (2) the NHL rightfully denied the PSE/Balsillie ownership application on character and integrity grounds, (3) there has been no showing that the NHL's decision not to consider the joint relocation application was in bad faith or that such decision was done for anticompetitive reasons, (4) there has been no showing that an objective application of the NHL's relocation rules would compel a relocation to Hamilton, (5) that the debtors and Moyes have breached their implied covenant of good faith and fair dealing, (6) that the proposed relocation fee by PSE is insufficient under the Raider's II test, (7) the appropriate relocation fee is in the range of $101 to $195 million, (8) the purported Section 363(f)(4) bona

fide dispute claim is specious, (9) the PSE bid can not adequately protect the interests of the NHL as required by Section 363(e), and (10) for various reasons, PSE's bid is not the best bid.

5. Glendale's Opposition to the Proposed PSE Sale.

Glendale asserts that its claimed contractual right to specific performance is an interest under Section 363 and that the Code does not allow a sale free and clear of that interest; and, in any event, Glendale's interest can not be adequately protected as required by Section 363(e). Glendale also asserts that rejection of its agreement does not pass the business judgment test and/or the harm to it is so disproportionate to any possible benefit to all creditors that rejection should be denied.[2] Glendale further asserts that the debtors are incorrect in their claim that all of the damages of Glendale are limited (capped) by Section 502(b)(6); and that the damages to Glendale in the event of rejection under both the liquidated damages agreement in its contract and the uncontroverted evidence establish that its damages under the liquidated damage agreement are in excess of $560,000,000.00 (present value estimated at in excess of $289,000,000.00). Lastly, Glendale asserts that the proposed relocation sale to PSE does not meet the good faith requirement of Section 363. In that regard, Glendale claims that the bankruptcy cases and proposed PSE sale were filed solely to benefit Moyes, are not in the best interests of the creditors, and that Moyes and his control of the auction process has improperly chilled the bidding and driven away other bidders.

On August 18, 2009, Glendale filed an adversary proceedings against Moyes alleging that his more than $100,000,000.00 in loans to the Coyotes and/or the other debtors, evidenced in part

_____

[2] See, e.g., In re Pomona Valley Med. Group, Inc, 476 F.3d 665 (9th Cir. 2007); In re Chi-Feng Huang, 23 B.R. 798 (9th Cir. B.A.P. 1982); In re Petur U.S.A. Instrument Co. Inc., 35 B.R. 561 (Bankr. W.D. Wash. 1983).

by proofs of claims filed with this court, should be re-characterized as equity and were not true loans, that due to his misconduct such claims should be equitably subordinated, and that due to certain avoidance claims, his proof of claims should be disallowed under Section 502(d) of the Code. On August 21, 2009, Glendale filed an emergency motion seeking that its claims be tried prior to or at the September 10th auction. At the September 2nd hearing, Glendale acknowledged the obvious impossibility of its request.

6. Section 363(f)(4) Bona Fide Dispute.

The parties have briefed and argued their many issues as if this were the actual trial. As noted at the hearing on these issues, it is critical to note that all of these assertions have been made in the administrative portion of these chapter 11 cases in connection with the core motions to assume and assign the Coyotes' NHL rights, to sell the Coyotes, and to reject the AMULA with Glendale. Much of the evidence set forth in the declarations including, but not limited to, the expert declarations is inherently conflicting. For purposes of this decision, the court will assume that the debtors and PSE have established that the interests of the NHL and Glendale are subject to bona fide dispute as that term is used in Section 363(f)(4). Hence, the court need not and will not make any decision on the merits of the many factual and legal issues raised by all of these parties.

7. PSE Can Not Adequately Protect the NHL'S Interests as Section363(e) Requires.

The corner stone of these assertions is PSE's reliance on the right under Section 363(f)(4) which permits a sale free and clear of "any interest" if "such interest is in bona fide dispute". The purpose of Section 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the representatives of the estate so that liquidation of the estate's

assets need not be delayed while such disputes are being litigated. Typically, the proceeds of sale are held subject to the disputed interest and then distributed as dictated by the resolution of the dispute; such procedure preserves all parties' rights by simply transferring interests from property to dollars that represent its value. In re Clark, 266 B.R. 163 (9th Cir. B.A.P. 2001).

Such view is based upon Section 363(e) of the Code which requires the court when selling property under Section 363 "to provide adequate protection" of any interest in the property being sold free and clear of that interest. Further that sub-section expressly states, in mandatory language, that the court "shall prohibit or condition" the proposed sale "as is necessary to provide adequate protection of such interest". In most cases involving the form of adequate protection required, the interest which is to be removed by the sale of the property free and clear of that interest is a lien or other economic interest, i.e., dollars, which interest can be adequately protected by impounding funds to pay such interest if it is ultimately determined to be a valid interest, as discussed above in Clark. Generally it is relatively easy to determine how to adequately protect economic interests. In this court's view, determining how to adequately protect non-economic interests, particularly the interests claimed here by the NHL is exceedingly more challenging. PSE asserts that the NHL can be adequately protected by the payment of the appropriate relocation fee required by the NHL constitution and applicable case law. See Los Angeles Memorial Coliseum Com'n v. NFL, 791 F.2d 1356 (9th Cir. 1986). However, the NHL asserts and the court agrees that the NHL has three claimed rights/interests at issue here. First, the right to admit only new members who meet its written requirements. Second, the right to control where its members play their home hockey games. The very nature of professional sports requires some territorial restrictions in order both to encourage participation in the venture and to secure to

-23-

each venturer the legitimate fruits of that participation.  See Los Angeles Memorial Coliseum Com'n v. NFL, 726 F.2d 1381, 1396 (9th Cir. 1984).  Third, the right to a relocation fee, if appropriate, when a member team relocates to a new site.  The court does not agree with PSE's assertion that the payment of the appropriate relocation fee adequately protects all of the claimed interests of the NHL.   This court struggles with how it can adequately protect the NHL's membership selection right and control over home team location rights if the court were to allow PSE to move the Coyotes to Hamilton.  These are not monetary/economic rights such that impounding funds would be adequate protection.  If the NHL ultimately prevails in litigation on these issues and the team has already moved to Hamilton in the interim, there will have been no adequate protection of the NHL's interest.  Such an ultimate outcome is apropos to the old adages about closing the barn door after the horse is long gone and how do you un-ring the bell. The obvious refrain  to the first adage is, "it's too late", and to the second, "you can't".   In the final analysis, the court can not find or conclude that the interests of the NHL can be adequately protected if the Coyotes are moved to Hamilton without first having a final decision regarding the claimed rights of the NHL and the claims of the debtors and PSE. Neither the parties nor the court have found much case law which would assist in applying the "shall prohibit . . .  such sale" language in Section 363(e) but this court has the firm sense, based upon the record,  that the situation here directs the application of the "shall prohibit" requirement of Section 363(e) to this sale.  In In re Magness, 972 F.2d 689 (6th Cir. 1992), the court prohibited a chapter 7 trustee from selling a golf and country club membership where such sale would move the sale of that membership ahead of those on the country club's waiting list.  That court relied, in part, on Section 363(e)'s shall prohibit standard. ["The interest of the persons presently involved in this

-24-

orderly succession cannot adequately be protected in any manner except by prohibiting the sale and assignment of the membership."] 972 F.2d at 697. The requirement of adequate protection in Section 363(e) is mandatory. If adequate protection cannot be provided, such sale must be prohibited. See 3 Collier on Bankruptcy ¶ 363.05[2], at p. 363-42 (15th ed. rev. 2007).

In summary, the clear statutory statement in Section 363(e) requires that the court "shall prohibit" any sale, where the interests sought to be removed by the proposed sale free and clear of such interests, can not be adequately protected. This conclusion effectively is the end for the efforts of PSE, Balsillie, Moyes and the Coyotes to force a sale and relocation of the hockey team based upon the claimed powers in Section 363(f)(4) of the Code; i.e., those efforts and related motions are denied with prejudice. Given that conclusion, the court does not need to resolve the numerous issues regarding Glendale and the AMULA.

8. The NHL's Bid.

There are multiple factors that support the NHL bid. Generally speaking, its bid will either pay the unsecured creditors in full or make a significant payment to them. It will pay the secured debt in full. It is supported by Glendale and has significant support from some of the other creditors. It has materially less "execution risks" as noted by some of the creditors.

However, the court's concerns regarding the NHL's bid are the terms of that bid that allow the NHL to select the unsecured creditors that will be paid in full by the NHL. As presented, the NHL bid allows it to select which unsecured creditors will be paid in full by the NHL. It appears that the NHL has selected virtually all of the unsecured creditors other than any claims by Moyes, Gretzky, or any entity affiliated with them. By the terms of the NHL bid, every dollar that the NHL elects to pay to an unsecured creditor reduces the remaining pot of dollars, on

a dollar for dollar basis, for those unsecured creditors not selected for payment by the NHL. The NHL asserts that it is taking this action because it is in the NHL's commercial interest to do so and to maintain the good will of the team. In connection with the NHL's bid Commissioner Bettman stated in his declaration that "the bid is structured to allow payment of all legitimate creditors".

A sale of all of the bankruptcy estate's assets may, and probably does, have the practical effect of deciding issues that would ordinarily arise and be resolved in connection with the confirmation of a plan of reorganization. Because there is a real danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under Section 363 must be scrutinized closely by the court. Attempts to determine plan issues in connection with the sale will be improper and should result in a denial of the relief requested. See 3 Collier on Bankruptcy ¶ 363.02[3], at p. 363-17 (15th ed. rev. 2007). If a proposed plan of reorganization is contested, it can only be confirmed if, among other requirements, it does not discriminate unfairly, and is fair and equitable, with respect to each claim of creditors that is impaired by such plan. 11 U.S.C. § 1129(b)(1).

It appears to this court that there is a disconnect between the NHL's evidence and bid. The evidence is that its bid is designed to allow payment of "all legitimate creditors". It may be that such statement is ambiguous because it could mean a payment of differing amounts to legitimate creditors or it could mean payment of all legitimate creditors. If it is the latter meaning then the bid differs from that evidence. This court is not inclined to approve a sale based upon critical, ambiguous evidence. If that statement means various payments of differing amounts to legitimate creditors, this court struggles to not conclude that such requirement does not

"discriminate unfairly" and to find that such term is "fair and equitable". It seems obvious to this court and the apparent practical effect of the NHL's bid is to pay all creditors in full except the Moyes and Gretzky claimants. Accepting the NHL's assertion that a buyer in bankruptcy may pay some trade creditors in full because commercial factors and good will so require, that is radically different from paying virtually all unsecured creditors except the two a buyer views as its opponents. Generally speaking, where a Section 363 sale will produce sufficient proceeds to make a significant payment to the unsecured creditors when the buyer claims the right to materially control how some or all of those proceeds are paid out, such assertion must be supported by compelling evidence; particularly where the proposed distribution by the buyer appears to be fundamentally inconsistent with the requirements of the Code. One of the prime policies of bankruptcy is equality of distribution amongst the creditors. See Union Bank v. Wolas, 502 U.S. 151, 112 S.Ct.527, 116 L.Ed 2d 514 (1991). There has been no determination that the Moyes and Gretzky claims are not "legitimate creditors". It would be inherently unjust for this court to deprive them of their possible rightful share of any proceeds without first providing all involved a fair trial on their claims.

For the reasons set forth above, the NHL bid is denied, without prejudice. The denial of the NHL's bid is done without prejudice because it seems to the court that the defect in the NHL's bid could be easily cured by the NHL. In hockey parlance, the court is passing the puck to the NHL who can decide to take another shot at the sale net or it can pass off the puck.

## III. CONCLUSION

For the reasons set forth above, the court can not approve the bids by PSE and the NHL.

Therefore, PSE's bid is denied, with prejudice because the interests of the NHL can not be

adequately protected as required by Section 363(e) if the sale to PSE were approved. The NHL's

bid is denied, without prejudice. As stated above, the NHL can probably cure the defect in its bid if

it elects to make the required amendment(s). Counsel for the debtors shall serve and lodge an

appropriate form of order.

Copy of the foregoing
mailed this _30_ day of
September, 2009 to:

Susan G. Boswell
QUARLES & BRADY, LLP
One South Church Avenue, Suite 1700
Tucson, Arizona  85701-1621

Thomas Allen
Paul Sala
ALLEN SALA & BAYNE, PLC
Viad Corporate Center
1850 North Central Avenue, Suite 1150
Phoenix, Arizona  85004

Scott J. Greenberg
John J. Rapisardi
CADWALADER WICKERSHAM & TAFT, LLP
One World Financial Center
New York, NY  10281

Chad L. Schexnayder
Kristin W. Mazon
JENNINGS HAUG & CUNNINGHAM, LLP
2800 North Central Avenue, Suite 1800
Phoenix, Arizona  85004-1049

Donald L. Gaffney
SNELL & WILMER, LLP
One Arizona Center
Phoenix, Arizona  85004-2202

Sean O'Brien
GUST ROSENFELD, P.L.C.
201 East Washington Street, Suite 800
Phoenix, Arizona  85004-2327

Jonathan P. Ibsen
Laura A. Rogal
JABURG & WILK, P.C.
3200 North Central Avenue, Suite 2000
Phoenix, Arizona  85012

Edward M. Zachary
BRYAN CAVE LLP
2 North Central Avenue, Suite 2200
Phoenix, Arizona 85004

Kelly Singer
SQUIRE SANDERS & DEMPSEY
40 North Central Avenue, Suite 2700
Phoenix, Arizona  85004-4498

Thomas J. Salerno
Jordan A. Kroop
SQUIRE SANDERS & DEMPSEY, LLP
40 North Central Avenue, Suite 2700
Phoenix, Arizona  85004

Larry Lee Watson
Office of the United States Trustee
230 North First Avenue, Suite 204
Phoenix, Arizona  85003-1706

Alan A Meda
C. Taylor Ashworth
STINSON MORRISON HECKER, LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona   85004

Susan M. Freeman
Stefan M. Palys
LEWIS & ROCA, LLP
40 North Central Avenue
Phoenix, Arizona   85004-4429

Cathy Reece
Nicholas B. Hoskins
FENNEMORE CRAIG, P.C.
3003 North Central Avenue, Suite 2600
Phoenix, Arizona   85012-2913

William R. Baldiga
Paul W. Shaw
BROWN RUDNICK, LLP
One Financial Center
Boston, Massachusetts 02111

Carolyn J. Johnsen
Peter W. Sorensen
JENNINGS STROUSS & SALMON, P.L.C.
The Collier Center, 11th Floor
201 East Washington Street
Phoenix, Arizona   85004-2385

Dale C. Schian
Cody J. Jess
SCHIAN WALKER, P.L.C.
3550 North Central Avenue, Suite 1700
Phoenix, Arizona   85012-1501

Steven M. Abramowitz
VINSON & ELKINS, LLP
666 Fifth Avenue, 26th Floor
New York, New York, 10103-0040

James E. Cross
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona  85012-2794

Anthony W. Clark
SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
One Rodney Square
Wilmington, Delaware   19899

J.Gregory Milmoe
Shepard Goldfein
SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
4 Times Square
New York, New York 10036

by _____
        Judicial Assistant