1

2

3

4

5

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **FOR THE DISTRICT OF ARIZONA**

10   In re                                    )   Case No. 2:09-bk-09488-RTBP
                                              )
11   DEWEY RANCH HOCKEY, LLC,                 )   (Jointly Administered)
                                              )
12   COYOTES HOLDINGS, LLC,                   )   Chapter 11
                                              )
13   COYOTES HOCKEY, LLC, and                 )   **Stipulated Order Approving Amended**
                                              )   **and Clarified Bid**
14   ARENA MANAGEMENT GROUP, LLC,             )
                                              )
15                      Debtors.              )
                                              )
16                                            )
                                              )
17   _____ )
     This filing applies to:                  )
18   ▪    All Debtors                          )
     ☐    Specified Debtors                    )
19

20          On May 5, 2009 (the "Petition Date"), the above-captioned debtors and debtors in

21   possession (collectively, the "Debtors") filed a Motion of the Debtors for an Order Under Sections

22   105(a), 363 and 365 of the Bankruptcy Code (i) Authorizing Coyotes Hockey, LLC's Sale of

23   Substantially All of its Assets Free and Clear of Liens, Claims and Encumbrances, Subject to

24   Higher and Better Offers, and (ii) Approving an Asset Purchase Agreement (Docket No. 18) (the

25   "Sale Motion"), pursuant to which the Debtors sought approval of a sale and relocation of the

26   Phoenix Coyotes hockey team (the "Team") to Hamilton, Ontario and to convey membership rights

27   in the National Hockey League (the "NHL") to a designated proposed purchaser.

28   Contemporaneously therewith, the Debtors filed a Motion of the Debtors for Entry of an Order

(A) Authorizing Conduct of an Auction of Coyotes Hockey, LLC's Assets; (B) Establishing Procedures to be Employed in Connection with Sale Including Approval of Termination Fee; and (C) Approving Form and Manner of Notice of Conditional Cure Notice and Solicitation Notice (Docket No. 19) (the "Bid Procedures Motion"). The Bid Procedures Motion and matters related thereto came before this Court at hearings held on May 7, May 19, May 27, June 9, June 22, August 3, and August 11, 2009. On August 13, 2009, this Court entered an AMENDED Order Approving Bid Procedures for Auction/Sale of Phoenix Coyotes Hockey League Team and Related Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Docket No. 638) (the "Bid Procedures Order").

In accordance with the Bid Procedures Order, the NHL, on behalf of Coyotes Newco, LLC and Arena Newco, LLC (collectively, the "Buyers") submitted a Qualified Bid (as defined in the Bid Procedures Order) on the terms set forth in a form of Asset Purchase Agreement attached to the Bid Letter (the "Bid Letter") with respect to the Acquisition of the Phoenix Coyotes National Hockey League Team and Related Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, dated as of August 25, 2009.[1] On September 3, 2009, the Buyers submitted a revised bid to the Sellers.

The Court held an auction and sale hearing on September 10 and 11, 2009 (the "Sale Hearing"), at which the Buyers amended their bid again, which was filed in definitive form with the Court on September 15, 2009. On September 30, 2009, the Court entered a minute entry/order denying, inter alia, the sale of the Debtors' assets to the NHL or the Buyers without prejudice. On October 13, 2009, the Court entered an order confirming such denial (Docket No. 1042).

On October 26, 2009, the Court held a status conference (the "Status Conference") with respect to sale of the Debtors' assets. At the Status Conference, the NHL (on the Buyers' behalf) amended and clarified its bid in open court, which bid is memorialized in a revised form of Asset

---

[1] On August 26, 2009, the Debtors filed a copy of the NHL's initial bid with the Court. (See Notice of Receipt of Bids Under Sale Procedures Order and Filing of Same (Docket No. 809), Ex. 1.)

Purchase Agreement among Coyotes Hockey, LLC, Arena Management Group, LLC and the Buyers, attached hereto as <u>Exhibit A</u> (the "APA").[2]

The Court has considered the APA, all objections thereto, the relevant pleadings in these chapter 11 cases (the "Cases"), the statements of counsel, the declarations submitted by the parties and any other testimony or offer of proof as to testimony on the record at the Sale Hearing and the Status Conference, at which time all interested parties were offered an opportunity to be heard, and the entire record in these Cases. It appears that a sale to the Buyers is in the best interests of the Debtors, their bankruptcy estates (the "Estates"), their creditors and other parties in interest. After due deliberation and good cause shown,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[3]

A. **<u>Jurisdiction and Venue</u>**. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B. **<u>Statutory Predicates</u>**. The statutory predicates for relief are sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 3001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C. **<u>Notice</u>**. As evidenced by the affidavits of service filed with this Court and based upon the representations of counsel at the Sale Hearing and the Status Conference: (i) due, proper, timely, adequate and sufficient notice of the Sale Hearing, the Status Conference and the transactions set forth in the APA (the "Transaction"), including the assumption and assignment of the Assumed Contracts and Cure Costs with respect thereto, has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006; (ii) it appears that no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances; and (iv) no other or further notice of the Sale

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the APA.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Fed. R. Bankr. P. 7052.

3

Hearing, the Status Conference or the Transaction (including the assumption and assignment of Assumed Contracts) is or shall be required.

D. **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the Transaction has been given.

E. **Sale in Best Interests**. Good and sufficient reasons for approval of the APA and the Transaction have been articulated, and the Transaction is in the best interests of the Debtors, the Estates, their creditors and other parties in interest.

F. **Business Justification**. The Debtors, the NHL, the secured creditors, the Creditors' Committee and the City of Glendale have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transaction other than in the ordinary course of business under section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization in that, among other things, the immediate consummation of the Transaction with the Buyers is necessary and appropriate to maximize the value of the Estates. Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to the Buyers' consummating the Transaction.

G. **Arm's Length Sale**. The APA was proposed by the Buyers without collusion, in good faith and from arm's-length bargaining positions. No Buyer is an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31). Neither the Debtors nor the Buyers have engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Buyers have not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among any bidders.

H. **Good Faith Purchaser**. The Buyers are good faith purchasers of the Assets within the meaning of section 363(m) of the Bankruptcy Code and are therefore entitled to all of the protections afforded thereby. The Buyers have proceeded in good faith in all respects in connection with this proceeding in that: (a) the NHL made good faith efforts to assist the Debtors in finding an alternative purchaser before submitting a Qualified Bid on behalf of the Buyers; (b) the NHL and the Buyers complied with the provisions in the Bid Procedures Order; (c) the Buyers agreed to subject their bid to the competitive bidding procedures set forth in the Bid

Procedures Order; and (d) all payments to be made by the Buyers and other agreements or arrangements entered into by the Buyers in connection with the Transaction have been disclosed to the Court.

I.  **Highest and Best Offer**.  The auction was duly noticed and the Court conducted the auction in a non-collusive manner in accordance with, and the Debtors and Buyers have otherwise complied in all respects with, the Bid Procedures Order.  The auction established in the Bid Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets under the circumstances of these Cases which include the facts that the Debtors have limited financing, the 2009-2010 hockey season is already underway, and a prompt sale is advisable to avoid further erosion of the value of the Debtors' assets.  The Buyers' bid has no material conditions, is not subject to significant execution risk, will be able to close shortly after the Court's approval of the sale, and has also been approved by the NHL.  The Buyers intend to close the Transaction by November 2, 2009.  If for any reason the parties are unable to close the Transaction by November 2, 2009, the parties will use their commercially reasonable efforts to close the Transaction before the next anticipated date that further postpetition funding is needed from the NHL.

J.  As described in more detail in the executive summary of the NHL's bid, attached hereto as Exhibit B, the Buyers' bid equals approximately $128.4 million.  As a part of the Buyers' bid, assuming the Transaction closes prior to the next date following November 2, 2009, that further funding from the NHL is required by the Debtors, the Buyers will assume all prepetition and postpetition loans by the NHL (in an amount currently estimated to be approximately $36,331,000), of which $2 million is a carve-out available for administrative fees and expenses. The Buyers will also assume the obligation to pay and will pay in cash (unless otherwise agreed to by SOF Investments, L.P. ("SOF"), White Tip Investments, LLC ("White Tip") and Donatello Investments, LLC ("Donatello")) approximately $79.7 million in respect of allowed secured claims on account of prepetition loans provided by SOF, White Tip and Donatello plus accrued and unpaid interest, fees and expenses accruing from and after the Petition Date through and including

the Closing Date.   The remaining $11.3 million (approximately) will be provided to the Estates in cash.

K.     Furthermore, the Buyers' bid is in the best interest of the Estates because it provides payment in full for all secured creditors.  In addition, the Buyers have agreed that they will offer to purchase approximately $11.6 million in designated unsecured liabilities as set forth in Schedules 2.6(v) and 2.8(v) to the APA (the "Unsecured Liabilities") at the prices set forth in such schedules and to subordinate their recovery on such claims as described below.  The Buyers' purchase of the Unsecured Liabilities is conditioned upon the Closing under the APA and shall continue through the date that is 60 days following the Closing Date.

L.     The Buyers' purchase of the Unsecured Liabilities does not extinguish the claims underlying the Unsecured Liabilities.  The Buyers agree to voluntarily subordinate the right to receive payments from the Estates on account of underlying claims to all Allowable Unsecured Claims, other than claims of any nature whatsoever of Jerry C. Moyes, Vickie Moyes, The Jerry and Vickie Moyes Family Trust or any of their respective Affiliates.

M.     The NHL agrees, at the request of the Creditors' Committee, to amend the Moyes Guaranty to reduce the maximum cap amount under the guaranty from $30 million to $15 million. Such amendment to the Moyes Guaranty is conditioned upon the Closing under the APA.  The NHL, on the one hand, and Jerry C. Moyes, Vickie Moyes, and The Jerry and Vickie Moyes Family Trust, on the other hand, expressly reserve their respective rights to assert any claims, actions, causes of action and defenses they may have with respect to the Moyes Guaranty, as so amended.

N.     The Buyers' bid contemplates that the Buyers will pay for the ongoing costs under the AMULA with the City of Glendale, as well as related Glendale Contracts, at least through June 30, 2010 and will use commercially reasonable efforts to enter into an amended long-term AMULA.  Finally, the APA provides that, to the extent the Buyers are able to consummate a Team Sale prior to the second anniversary of the Closing Date, the Buyers will pay to the Estates an amount equal to the Net Profit received in connection with such Team Sale.

O. **Consideration**. The consideration constitutes reasonably equivalent value or fair consideration, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The APA represents a fair and reasonable offer to purchase the Assets and assume or acquire liabilities under the circumstances of these Cases. No other person or entity or group of entities, other than the Buyers, has made an offer to purchase the Assets that would render greater recovery to the Estates within a reasonable period of time that was not subject to substantial uncertainty as to their ability to consummate such a transaction. Approval of the APA and the consummation of the Transaction is in the best interests of the Debtors, their creditors, the Estates and all other parties in interest.

P. **Free and Clear**. The Debtors are the sole and lawful owner of the Assets. The transfer of the Assets to the Buyers under the APA will be a legal, valid, and effective transfer of the Assets, and vests or will vest the Buyers with all right, title and interest of the Debtors to the Assets free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Assets, or any similar rights and (ii) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date. For avoidance of doubt, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

Q. **Satisfaction of 363(f) Standards**. The Debtors may sell the Assets free and clear of any Interests of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each entity

that has asserted an Interest in the Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Transaction or is deemed to have consented to the Transaction; (ii) has an Interest that is subject to bona fide dispute; (iii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iv) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of Interests who did not timely object to the Transaction are deemed, subject to the terms of this Order, to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

R. **No Fraudulent Transfer**. The Transaction is not for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Buyers would be entering into the Transaction fraudulently.

S. **Cure/Adequate Assurance**. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtors and the Estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. To the extent not purchased or satisfied by the Buyers pursuant to paragraph 14 below, the Debtors have, (i) to the extent necessary, cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Assumed Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assumed Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code. The Buyers' promise to perform the obligations under the Assumed Contracts after the Closing Date constitutes adequate

assurance of future performance within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

T. **Prompt Consummation**. The Transaction must be approved and consummated promptly in order to preserve the viability of the business subject to the sale as going concerns, to maximize the value of the Estates. Time is of the essence is consummating the Transaction.

U. **Personally Identifiable Information**. The Transaction may include the transfer of Personally Identifiable information, as defined in section 101(41A) of the Bankruptcy Code. No Consumer Privacy Ombudsman need be appointed in section 363(b)(1) of the Bankruptcy Code because the Buyers have agreed to adhere to any privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1. **Transaction is Approved**. The APA and the transactions contemplated thereby are APPROVED, as set forth herein.

2. **Objections Overruled**. Any objections to the entry of this Order or the relief granted herein that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. **Approval**. The APA and all of the terms thereof and conditions thereto are hereby approved. The Debtors are hereby authorized and directed to (a) execute the APA, along with any additional agreements, instruments or documents that may be reasonably necessary or appropriate to implement the APA (including, without limitation, the Transition Services Agreement and the Partial Lease Assignment Agreement), provided that such additional documents do not materially change its terms; (b) consummate the Transaction in accordance with the terms and conditions of the APA and the instruments to the APA contemplated thereby; and (c) take all other and further actions as may be reasonably necessary to implement the Transaction.

4. **Free and Clear**. Except as expressly permitted or otherwise specifically provided for in the APA or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors are authorized and directed to transfer the Assets to the Buyers and, as of the Closing Date, the applicable Buyer shall take title to and possession of the Assets free and clear of all Interests of any

kind or nature whatsoever, including, but not limited to, any Excluded Team Liabilities or Excluded Arena Liabilities (collectively, the "Excluded Liabilities").

5. **Valid Transfer**.  As of the Closing Date, (a) the transactions contemplated by the APA effect a legal, valid, enforceable and effective sale and transfer of the Assets to the Buyers, and shall vest the applicable Buyer with title to such assets free and clear of all Interests and (b) the APA and the transactions and instruments contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 11 trustee of the Debtors and their applicable estates.

6. **General Assignment**.  On the Closing Date, this Order shall be construed and shall constitute, for any and all purposes, a full and complete general assignment, conveyance and transfer of the Debtors' interests in the Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction.

7. **Injunction**.  Except as expressly permitted by the APA or by this Order, all persons and entities, including, but not limited to, the Debtors, employees, former employees, all debt security holders, administrative agencies, governmental tax and regulatory authorities, secretaries of state, federal, state and local officials, lenders, contract parties, bidders, lessors, warehousemen, customs brokers, freight forwarders, carriers and other parties in possession of any of the Assets at any time, trade creditors and all other creditors, holding Interests of any kind or nature whatsoever against or in the Debtors or in the Debtors' interests in the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' business before the Closing Date or with respect to any Interests arising out of or related to the Transaction, shall be and hereby are forever barred, estopped and permanently enjoined from commencing, prosecuting or continuing in any manner any action or other proceeding of any kind against the Buyers, their property, their successors and assigns, alleged or otherwise, their affiliates, the NHL Member Clubs, or such Assets.  Following the Closing Date, no holder of an Interest in the Debtors shall

interfere with the Buyers' title to or use and enjoyment of the Assets based on or related to such Interest, or any actions that the Debtors may take in their Cases.

8. **Release of Interests**. Subject to paragraphs 4 and 36 of this Order, this Order (a) shall be effective as a determination, on the Closing Date, that all Interests of any kind or nature whatsoever existing as to the Debtors or the Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registers of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or interests, or who may be required to report or insure any title or state of title in or to any of the Assets.

9. **Direction to Release Interests**. On the Closing Date and subject to the Interests attaching to the proceeds of the Sale as provided for in paragraphs 4 and 36 of this Order, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Assets, if any, as such Interests may have been recorded or may otherwise exist.

10. **No Successor Liability**. Neither the Buyers nor their affiliates, successors or assigns shall, as a result of the consummation of the Transaction, (a) be a successor to the Debtors or the Estates, (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or the Estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. Except for the Assumed Liabilities, the transfer of the Assets to the Buyers under the APA shall not result in (i) the Buyers, their affiliates, members or shareholders, or the Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors, (ii) the Buyers, their affiliates, members, or shareholders, or the Assets, having any liability whatsoever with respect to or required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interests or Excluded

Liability, or (iii) the Buyers, their affiliates, members, or shareholders or the Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the APA.

11. **Examples of No Successor Liability**.  Without limiting the effect or scope of the foregoing, as of the Closing Date, the Buyers shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Assets prior to the Closing.

12. **Assumption and Assignment of Assumed Contracts**.  Under sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Transaction, the Debtors' assumption and assignment of the Assumed Contracts to the Buyers free and clear of all Interests pursuant to the terms set forth in the APA, as modified by the terms of any amendments reached with the respective counterparty, is hereby approved, and the requirements of sections 365(b)(1), 365(b)(3) and 365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Each counterparty to an Assumed Contract is hereby forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors or the Buyers, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinate) arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

13. **Payment of SOF, Donatello, and White Tip Claims**.  As of the Petition Date, (i) SOF shall be deemed to have an allowed secured claim against Coyotes Hockey, LLC in the amount of $72,117,126.05, (ii) Donatello shall be deemed to have an allowed secured claim against Coyotes Hockey, LLC in the amount of $3,749,242.91 and (iii) White Tip shall be deemed to have an allowed secured claim against Coyotes Hockey, LLC in the amount of $3,749,242.91 (the

amounts described in (i), (ii) and (iii), the "SOF Allowed Petition Date Secured Claims," in the aggregate amount of $79,615,611.86. On the Closing Date, the Buyers shall assume the obligation to pay and shall pay directly to each of SOF, Donatello and White Tip cash in an amount equal to their respective SOF Allowed Petition Date Secured Claims (except as may otherwise be agreed among such parties) plus accrued and unpaid interest, fees and expenses, accruing from and after the Petition Date through and including the Closing Date.

14. **Purchase of Unsecured Liabilities**. Subject to the Closing of the APA, from the Closing Date through the date that is 60 days following the Closing Date, the Buyers shall offer, and shall use their commercially reasonable efforts, to acquire the Unsecured Liabilities, in each case for the respective amounts set forth on Schedules 2.6(v) and 2.8(v) to the APA; provided, that with respect to any Unsecured Liability set forth on Schedules 2.6(v) and 2.8(v) to the APA that is marked with an asterisk, if the Buyers, the holder and the Creditors' Committee agree on a different amount, the Buyers shall purchase the claim at such agreed amount. Within five (5) Business Days after May 1, 2010, the Buyers will pay to the Sellers' estates cash in an amount equal to the difference, if any, resulting from $11,617,879 minus the aggregate amount actually paid by the Buyers for Purchased Claims pursuant to Section 8.4 of the APA.

15. The Buyers' purchase of the Unsecured Liabilities as provided for under the APA will be evidenced as provided in Bankruptcy Rule 3001(e) by the execution and filing of the Notice of Transfer of Claim, substantially in form attached to the APA. Any such transfer conforming to the APA is hereby approved under Bankruptcy Rule 3001(e) without necessity for further notice or order of the Court. The Buyers' right to receive payments from the Estates on account of Purchased Claims shall be subordinated to all other Allowable Unsecured Claims, other than claims of any nature whatsoever of Jerry C. Moyes, Vickie Moyes, The Jerry and Vickie Moyes Family Trust or any of their respective Affiliates.

16. **Transition Services Agreement**. The Sellers are hereby authorized and directed to enter into a mutually acceptable Transition Services Agreement with the Buyers, substantially in the form attached to the APA, pursuant to which (i) the Sellers will provide to the Buyers the goods, services, rights and benefits to which the Sellers are entitled under the Glendale Contracts, to the

extent reasonably requested by the Buyers consistent with past operation of the Team and the Arena; and (ii) the Buyers will pay to the Sellers, as and when due under the Glendale Contracts, all fees, costs, rents and other amounts payable by the Sellers under the Glendale Contracts for the provision of goods and services thereunder. Notwithstanding the provisions of a Glendale Contract to the contrary, the execution, delivery and performance of the Transition Services Agreement shall not give rise to any default or right to terminate any such Glendale Contract, and the Buyers shall be entitled to enforce any such Glendale Contract in the name of the Sellers, consistent with the provisions of the Transition Services Agreement.

17. **Glendale Contracts**. The Sellers shall not reject the Glendale Contracts prior to the earliest of (i) June 30, 2010, and (ii) the date of a Final Order confirming a plan of reorganization of the Sellers under the Bankruptcy Code (in which case the Sellers shall take all actions required to ensure that such rejection does not become effective until June 30, 2010).

18. **No Fees**. There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to the Buyers or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

19. **Anti-Assignment Provisions Unenforceable**. Except as provided for in section 6.5 of the APA, any provisions in any of Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.

20. **Adequate Assurance**. The Buyers have provided adequate assurance of their future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyers of the Assumed Contracts have been satisfied.

21. **The Buyers and Assumed Contracts**. Upon the Closing of the Transaction, in accordance with sections 363 and 365 of the Bankruptcy Code the Buyers shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts.

22. **Licenses and Permits**. To the extent any license or permit necessary for the operation of the business is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code, the Buyers shall apply for and obtain any necessary license or permit promptly after the Closing Date and such licenses or permits of the Debtors shall remain in place for the Buyers' benefit until new licenses and permits are obtained.

23. **Cure**. Pursuant to the APA, except with respect to Cure Costs reflected in or included as Unsecured Liabilities on Schedules 2.6(v) and 2.8(v) of the APA which are purchased by the Buyers in accordance with Section 8.4 of the APA and which shall be the obligation of the Buyers pursuant to the terms of this Order, the Debtors at the request of the Buyers shall, on or prior to the Closing Date or such later date as may be set forth herein, in any other Final Order of this Court with respect to Added Contracts or in a written agreement between a Buyer and the Person entitled thereto, pay to such Person the Cure Cost identified on Schedule 2.9 of the APA, or as otherwise provided for in paragraph 24 herein, necessary to cure any and all monetary defaults and breaches under and satisfy (or, with respect to any Assumed Liability that cannot be rendered non-contingent and liquidated prior to the Closing Date, make effective provision reasonably satisfactory to the Bankruptcy Court for satisfaction from funds of the Buyers) any Assumed Liability with respect to each Assumed Contract with such Person as may be assumed by the Sellers and assigned to the Buyers in accordance with the provisions of section 365 of the Bankruptcy Code and the APA. The Sellers and the Buyers acknowledge and agree that each Unsecured Liability set forth on Schedules 2.6(v) and 2.8(v) to the APA which is marked by a hash symbol (#) does not reflect or include any Cure Costs. In cases in which the Sellers and the Buyers are unable to establish in good faith that a default exists with respect to an Assumed Contract, the Sellers shall require that the Bankruptcy Court determine that the relevant Cure Cost for such Assumed Contract is $0. The payment of the applicable Cure Costs (if any) shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary

loss to such non-Debtor party resulting from such default, and (c) together with the assumption of the Assumed Contracts by the Debtor, constitute adequate assurance of future performance thereof. The non-Debtor party or parties to each Assumed Contract, upon receipt of their Cure Costs, if any, are enjoined and forever barred from asserting against the Buyers, any of their affiliates or any of the Assets: (i) any fee, default, breach, claim or pecuniary loss arising under or related to the Assumed Contract existing as of the Closing Date or arising by reason of the Closing, and (ii) any objection to the assumption and assignment of such non-Debtor party's Assumed Contracts.

24. **Disputed Cure Costs**. On or before the Closing Date, the Debtors shall reserve in a segregated account sufficient funds to pay in full any disputed Cure Cost that is asserted by a non-Debtor party to an Assumed Contract in an objection to be filed no later than [30] days after the entry of this Order (the "Disputed Cure Costs"). The funds reserved for any given Disputed Cure Cost may be paid (a) without further order of the Court upon the filing of a written stipulation between the applicable Buyer, the non-Debtor party and the Creditors' Committee resolving the Disputed Cure Cost of said non-Debtor party or (b) pursuant to an order of this Court. If the Debtors and the Buyers are unable to resolve any Disputed Cure Costs by December 31, 2009, a status conference will be held at [___] (MST), or as soon thereafter as possible, regarding such unresolved Disputed Cure Costs. Resolution, or lack thereof, of a Disputed Cure Cost shall not prevent the Transaction from Closing.

25. **The Arena Management, Use and Lease Agreement**. The Sellers are hereby authorized and directed to enter into a Partial Lease Assignment Agreement with the Buyers, substantially in the form attached to the APA, pursuant to which, (i) the Sellers will assign to the Buyers, pursuant to Section 17.2 of the AMULA, all of the Sellers' rights under the AMULA; (ii) the Buyers will pay either to the Sellers or to the City on behalf of the Sellers, on or before the dates such payments are due under the terms of the AMULA, all rent and other amounts payable by the Sellers under the AMULA; and (iii) the Buyers will comply with such other obligations of the Sellers under the AMULA as provided in the Partial Lease Assignment Agreement. The Partial Lease Assignment Agreement shall terminate the earlier of June 30, 2010 and the date of a Glendale Team Sale. Notwithstanding any of the provisions of the AMULA to the contrary, the

execution, delivery and performance of the Partial Lease Assignment Agreement shall not give rise to any default or right to terminate the AMULA, and the Buyers shall be entitled to enforce the AMULA against any counterparty to the AMULA in the name of the Sellers, consistent with the provisions of the Partial Lease Assignment Agreement. In addition to the amounts payable to the City of Glendale hereunder in connection with prepetition amounts due to the City of Glendale under the AMULA, the City of Glendale has asserted additional claims against the Estates, including amounts arising under that certain Team Guaranty, dated January 31, 2002, in the amount of $12,250,000.00, and additional amounts arising prepetition under the AMULA, in the amount of $2,103,685.85. Notwithstanding anything herein or in the APA to the contrary, the City of Glendale does not waive any of the asserted claims set forth in the immediately preceding sentence (the "Non-Waived Claims"), and nothing herein is intended to impair or compromise the Non-Waived Claims in any respect or the ability of any party to object to the same.

26. The Sellers shall not seek to reject the AMULA prior to June 30, 2010 and the City of Glendale has agreed that pursuant to the Partial Lease Assignment Agreement the Buyers may continue to use the Arena through such date; provided, however, that the City of Glendale has otherwise reserved all of its rights with respect to any action to reject the AMULA.

27. **Control of the Team**. Effective immediately upon entry of this Order, the NHL Commissioner, or any of the NHL Commissioner's designees, has the sole right to operate and control the operations of the Team.

28. **Preferred Glendale Team Sale**. The Buyers are authorized to accept any Glendale Team Sale (whether or not a Preferred Glendale Team Sale) in their sole discretion, notwithstanding any higher or better offer or indication of interest that would result in the relocation of the Team. No party other than the City of Glendale shall have standing to object or otherwise challenge the Buyers' decision to accept any Glendale Team Sale (whether or not a Preferred Glendale Team Sale).

29. **Binding Effect of Order**. This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title or state of title in or to any of the Assets.

30. **Binding on Successors**. The terms and provisions of the APA and this Order shall be binding in all respects upon the Debtors, the Estates, all creditors of (whether known or unknown) and holders of equity interests in, any Debtor, Buyer and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting Interests in the Assets and all non-Debtor counterparties to the Assumed Contracts, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. This Order and the APA shall inure to the benefit of the Debtors, the Estates, their creditors, the Buyers and their respective successors and assigns.

31. **Section 363(n) of the Bankruptcy Code**. The consideration provided by the Buyers for the Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

32. **Good Faith**. The Transaction is undertaken by the Buyers without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction (including the assumption and assignment of the Assumed Contracts) with the Buyers, unless such authorization is duly stayed pending such appeal. The Buyers are good faith purchasers of the Assets and are entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

33. **Fair Consideration**. The consideration provided by the Buyers to the Debtors pursuant to the APA for their purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

34.	**Retention of Jurisdiction**.  The Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Buyers; (b) compel delivery of the consideration provided for under the APA or performance of other obligations owed to the Debtors; (c) interpret, implement and enforce the provisions of this Order and the APA; (d) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transaction; (e) protect the Buyers or the Assets from or against any Interests asserted in the Assets or by or through the Debtors; and (f) review whether the Estates have received that to which they are entitled under the APA when resale of the Team occurs and the Net Profit computation is made, including, but not limited to, the determination of any relocation fee.

35.	**Surrender of Possession**.  All entities that are presently, or on the Closing Date may be, in possession of or have control over all of the Assets in which the Debtors hold an interest hereby are directed to surrender possession of or control over the Assets either to (i) the Debtors before the Closing Date, or (ii) the Buyers on the Closing Date.

36.	**Fees and Expenses**.  Any amounts payable by the Debtors under the APA or any of the documents delivered by the Debtors in connection with the APA shall be paid in the manner provided in the APA without further order of this Court, shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by agreement with the Buyers, their successors or assigns.

37.	**Non-Material Modifications**.  The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any modification, amendment or supplement does not have a material adverse effect on the Estates.

38. **Subsequent Plan Provisions**. Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or any other order in these Cases (including any order entered after any conversion of these cases into cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from, the provisions of the APA or this Order.

39. **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Order. Likewise, all the provisions of this Order are nonseverable and mutually dependent.

40. **No Stay of Order**. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for ten days after the entry hereof, but shall be effective and enforceable immediately upon issuance hereof. Time is of the essence in closing the transactions referenced herein, and the Debtors and the Buyers intend to close the Transaction as soon as practicable. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

41. **Preservation of Certain Records**. The Debtors will retain or have reasonable access to their books and records to administer their bankruptcy cases.

42. **Further Assurances**. From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Transaction, including, at the Buyers' expense, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in the Buyers their right, title and interest in and to the Acquired Assets.

**ENTERED AND DATED ABOVE**

**Stipulated and Agreed:**

SQUIRE, SANDERS & DEMPSEY L.L.P., counsel for the **Debtors**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, co-counsel for the **National Hockey League**

By: ___/s/ Jordan A. Kroop___
          Jordan A. Kroop, Esq.

By: ___/s/ J. Gregory Milmoe___
          J. Gregory Milmoe, Esq.

ALLEN SALA & BAYNE, PLC, counsel for the **Official Committee of Unsecured Creditors**

SNELL & WILMER, co-counsel for **SOF Investments, L.P., White Tip Investments, LLC, and Donatello Investments, LLC**

By: ___/s/ Paul Sala___
          Paul Sala, Esq.

By: ___/s/ Don Gaffney___
          Don Gaffney, Esq.

JENNINGS, STROUSS & SALMON, PLC, counsel for **Jerry Moyes**

FENNEMORE CRAIG, co-counsel for the **City of Glendale, Arizona**

By: ___/s/ Carolyn Johnsen___
          Carolyn Johnsen, Esq.

By: ___/s/ Cathy L. Reece___
          Cathy L. Reece, Esq.