C. Taylor Ashworth, 010143
Alan A. Meda, 009213
STINSON MORRISON HECKER LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004
Telephone: (602) 279-1600
Facsimile: (602) 240-6925
tashworth@stinson.com
ameda@stinson.com

J. Gregory Milmoe (admitted *pro hac vice*)
Shepard Goldfein (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
gregory.milmoe@skadden.com
shepard.goldfein@skadden.com

Anthony W. Clark (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899
Telephone: (302) 651-3000
Facsimile: (302) 651-3001
anthony.clark@skadden.com

Attorneys for the National Hockey League

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC, and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>Debtors. | Case No. 2:09-bk-09488-RTBP<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**Report re: Amendment No. 1 to the Asset Purchase Agreement among Coyotes Hockey, LLC, Arena Management Group, LLC, Coyotes Newco, LLC and Arena Newco, LLC** |
| This filing applies to:<br>■ All Debtors<br>☐ Specified Debtors | |

1. The National Hockey League (the "NHL") submits this report to apprise the Court that an amendment dated November 24, 2009 ("Amendment No. 1") has been made to the Asset Purchase Agreement (the "Agreement") dated November 2, 2009 among Coyotes Hockey, LLC, Arena Management Group, LLC (collectively, the "Sellers"), Coyotes Newco, LLC and Arena Newco, LLC (collectively, the "Buyers").[1]

2. This report satisfies the requirement set forth by the Court during the November 2, 2009 hearing that the parties notify the Court of any amendments to the Agreement. Amendment No. 1 is attached as <u>Exhibit A</u> to this report.

## BACKGROUND

3. On November 2, 2009 this Court approved and entered the NHL's <u>Stipulated Order Approving Amended and Clarified Bid</u> [Docket No. 1079] (the "Sale Order"). The Sale Order approved the terms of the Agreement.

4. The Sale Order provides at paragraph 37 that the Agreement may be amended, in accordance with its terms, without further order of the Court, so long as any amendment does not have a material adverse effect on the Estates (as such term is defined in the Sale Order).

5. Section 12.1 of the Agreement provides that it may be amended by written instrument executed by all parties to the Agreement.

## SUBSTANCE OF AMENDMENT NO. 1

6. Amendment No. 1 makes the following changes to the Agreement:

    (a) The Select Merchant Payment Card Processing Agreement, dated August 21, 2003, between Coyotes Hockey, LLC and Paymentech,

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Agreement.

1

L.P., as amended by that certain Merchant Agreement Addendum, dated June 7, 2005, between Coyotes Hockey, LLC and Paymentech L.P (the "Paymentech Agreement" as defined in Amendment No. 1) is now a Glendale Contract for the purposes of the Agreement and the Transition Agreement. The Paymentech Agreement is therefore added to Schedule 2.14(a) to the Agreement.

(b) The Action of Team Seller against The Pennsylvania State University is now included as a Purchased Team Asset under section 2.1(xxi) of the Agreement.

(c) Section 8.4 of the Agreement provided that any claim marked with an asterisk may be purchased for an amount other than the amount listed on Schedules 2.6(v) and 2.8(v), provided that the Buyers, the claim holder and the Creditors' Committee agree on a different amount. The Buyers and Sellers have now amended Section 8.4 to permit the Buyers to amend Schedules 2.6(v) and 2.8(v) to the Agreement by marking additional Allowable Unsecured Claims with an asterisk, without any further consent of the Sellers, provided that the aggregate increase in the amount paid by the Buyers for Allowable Unsecured Claims marked with an asterisk after the Closing Date (as compared to the amount of such claims originally set forth on the schedules) does not exceed the aggregate decrease in the amount paid for such claims (as compared to the amount of such claims originally set forth on the schedules).

7. Amendment No. 1 was executed in accordance with both paragraph 37 of the Sale Order and section 12.1 of the Agreement.

8. Amendment No. 1 does not have a material adverse effect on any of the Estates. Nevertheless, the NHL submits this report to satisfy the Court's requirement, stated on the record at the November 2, 2009 hearing, that it be apprised of any amendments to the Agreement.

DATED: December 15, 2009

           STINSON MORRISON HECKER LLP

           By: /s/ Alan A. Meda
                C. Taylor Ashworth, 010143
                Alan A. Meda, 009213

and

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    J. Gregory Milmoe
    Shepard Goldfein
    Anthony W. Clark

Attorneys for the National Hockey League

# Exhibit A

# AMENDMENT NO. 1
## TO THE
### ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 1 (this "**Amendment**"), dated as of November __, 2009, to the Asset Purchase Agreement (the "**Agreement**"), dated as of November 2, 2009, among Coyotes Hockey, LLC, a Delaware limited liability company ("**Team Seller**"), Arena Management Group, LLC, a Delaware limited liability company ("**Arena Seller**" and with Team Seller, each a "**Seller**" and collectively, the "**Sellers**"), Coyotes Newco, LLC, a Delaware limited liability company ("**Team Buyer**"), and Arena Newco, LLC, a Delaware limited liability company ("**Arena Buyer**" and with Team Buyer, each a "**Buyer**" and collectively, the "**Buyers**"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

WHEREAS, the parties hereto have entered into the Agreement;

WHEREAS, Section 8.3 of the Agreement requires each of the parties to the Agreement to take such further action after the Closing as the other party may reasonably request to carry out the purposes of the Agreement;

WHEREAS, the Sellers and the Buyers agree that the Select Merchant Payment Card Processing Agreement, dated August 21, 2003, between Team Seller and Paymentech, L.P., as amended by that certain Merchant Agreement Addendum, dated June 7, 2005, between Team Seller and Paymentech, L.P., attached hereto as <u>Exhibit A</u> (collectively, the "**Paymentech Agreement**") should be a Glendale Contract;

WHEREAS, the Sellers and the Buyers agree that the Action of Team Seller against The Pennsylvania State University should be included as a Purchased Team Asset;

WHEREAS, the Sellers and the Buyers agree to permit the Buyers to amend <u>Schedules 2.6(v)</u> and <u>2.8(v)</u> to mark additional Allowable Unsecured Claims set forth thereon with an asterisk (*) subject to certain limitations;

WHEREAS, paragraph 37 of the Sale Order entered by the Bankruptcy Court on November 2, 2009 permits the Sellers and the Buyers to modify, amend or supplement the Agreement in accordance with its terms without further order of the Bankruptcy Court if the modification, amendment or supplement does not have a material adverse effect on the Sellers' estates; and

WHEREAS, in accordance with Section 12.1 of the Agreement, the parties hereto wish to supplement and amend the Agreement as set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. <u>Paymentech Agreement</u>. The parties hereto hereby supplement Schedule 2.14(a) to the Agreement by adding the Paymentech Agreement to such Schedule. The parties agree and acknowledge that for all purposes of the Agreement and the Transition Services Agreement, the Paymentech Agreement shall be a Glendale Contract.

2. <u>"Whiteout" Action</u>.

(a) The parties hereto hereby amend Section 2.1(xxi) of the Agreement by adding at the end thereof, before the period, the words: ", which claims and causes of action shall include, without limitation, all rights and interests of the Team Seller in the pending Action of the Team Seller against The Pennsylvania State University."

(b) The parties hereto hereby amend Section 2.2(vii) to replace the word "Actions" with the word "Action" and to delete the words "(x) The Pennsylvania State University and (y)."

2. <u>Purchase of Allowable Unsecured Claims</u>. The parties hereto hereby delete Section 8.4 of the Agreement in its entirety and replace it with the following:

> "During the period commencing immediately following the Closing and ending on the 60th day following the Closing Date, the Buyers shall offer, and shall use their commercially reasonable efforts, to purchase the Allowable Unsecured Claims listed on <u>Schedules 2.6(v)</u> and <u>2.8(v)</u> from the respective owners of such Allowable Unsecured Claims, in each case for the respective amounts set forth on <u>Schedules 2.6(v)</u> and <u>2.8(v)</u>; provided, that with respect to any Allowable Unsecured Claim set forth on <u>Schedules 2.6(v)</u> or <u>2.8(v)</u> that is marked with an asterisk (*), if the Buyers, the holder and the Creditors' Committee agree on a different amount, the Buyers shall purchase the claim at such agreed upon amount (any Allowable Unsecured Claims so purchased, the **"Purchased Claims"**). Notwithstanding anything in this Agreement (including Section 12.1) to the contrary, from and after the Closing Date, the Buyers shall be entitled to amend Schedules 2.6(v) and 2.8(v) without the consent of the Sellers to mark additional Allowable Unsecured Claims set forth thereon with an asterisk (*), provided that, with respect to all Allowable Unsecured Claims marked with an asterisk (*) from and after the Closing Date, the aggregate increase in the amount paid by the Buyers for such claims (as compared to the amount that would have been paid for such claims had they not been re-marked with an asterisk (*)) does not exceed the aggregate decrease in the amount paid for such claims (as compared to the amount that would have been paid for such claims had they not been re-marked with an asterisk (*)). The Buyers' obligation to purchase any of the Allowable Unsecured Claims listed on <u>Schedules 2.6(v)</u> and <u>2.8(v)</u> will be expressly conditioned upon, and the Buyers will have no obligation to purchase any of such Allowable Unsecured Claims in the absence of, the Closing having occurred in accordance with the provisions of this Agreement and receipt of a written agreement from the sellers of such

2

Allowable Unsecured Claims effectively transferring to the Buyers all of such seller's rights with respect thereto in the form of Exhibit G (with such changes to such form as the Buyers and any creditor listed on Schedules 2.6(v) or 2.8(v) may agree). Any Purchased Claims will be subordinated in right of payment from the Sellers' estates to all other Allowable Unsecured Claims other than claims of any nature whatsoever of Jerry C. Moyes, Vickie Moyes and The Jerry and Vickie Moyes Family Trust or any of their respective Affiliates. Within five (5) Business Days after May 1, 2010, the Buyers will pay to the Sellers' estates cash in an amount equal to the difference, if any, resulting from $11,617,879 minus the aggregate amount actually paid by the Buyers for Purchased Claims pursuant to this Section 8.4. The Buyers and the Sellers expressly agree that the Creditors' Committee shall be the sole party entitled to enforce Buyers' obligation to offer and use their commercially reasonable efforts to acquire the Allowable Unsecured Claims listed on Schedules 2.6(v) and 2.8(v) from the respective owners of such Allowable Unsecured Claim in accordance with the terms of this Section 8.4."

2. No Other Amendments or Supplements to Agreement.

(a) On and after the date hereof, each reference in the Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Agreement as amended and supplemented hereby.

(b) Except as otherwise expressly provided herein, all of the terms and conditions of the Agreement remain unchanged and continue in full force and effect.

2. Counterparts. This Amendment may be executed in one or more counterparts and by different parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which when taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature to this Amendment by facsimile or emailing of a pdf file shall be as effective as delivery of a manually executed counterpart of this Amendment.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed as of the date first above written.

"BUYERS"

**COYOTES NEWCO, LLC**

By: _____
Name: William L. Daly
Title: Manager

**ARENA NEWCO, LLC**

By: _____
Name: William L. Daly
Title: Manager

"SELLERS"

**COYOTES HOCKEY, LLC**

By: _____
Name: _____
Title: _____

**ARENA MANAGEMENT GROUP, LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed as of the date first above written.

**"BUYERS"**

**COYOTES NEWCO, LLC**

By: _____
Name: _____
Title: _____

**ARENA NEWCO, LLC**

By: _____
Name: _____
Title: _____

**"SELLERS"**

**COYOTES HOCKEY, LLC**

By: */s/ Jerry Moyes/*
Name: Jerry Moyes
Title: Chairman and Chief Executive Officer

**ARENA MANAGEMENT GROUP, LLC**

By: */s/ Jerry Moyes/*
Name: Jerry Moyes
Title: Chairman and Chief Executive Officer

**EXHIBIT A**

# PAYMENTECH AGREEMENT



**SELECT MERCHANT
PAYMENT CARD PROCESSING AGREEMENT**

WHEREAS PAYMENTECH, L.P., a Delaware limited partnership, having its principal office at 1601 Elm Street, Dallas, Texas 75201 ("Paymentech," "we," "our" or "us") is a member of Visa and MasterCard and is authorized to process the payment card transactions listed on Schedule A; and

WHEREAS COYOTES HOCKEY, LLC ("Merchant," "you" or "your") wishes to accept payment cards from its customers for the sale or lease of goods or services offered by Merchant;

ACCORDINGLY, in consideration of the mutual promises made and the mutual benefits to be derived from this Merchant Agreement, Paymentech and Merchant agree to the following terms and conditions intending to be legally bound:

## 1. Merchant's Acceptance of Cards.

**1.1 Exclusivity.** You will tender to us Sales Data generated from all your Card transactions via electronic data transmission according to our formats and procedures. You will not use the services of any bank, corporation, entity or person other than Paymentech for authorization of Card transactions or for processing Card transactions throughout the term of this Agreement, except for your divisions, products or business lines specified in the Merchant Application or for which we otherwise agree in writing not to process.

**1.2 Certain Card Acceptance Policies.** You will honor without discrimination valid Cards properly tendered for use. Each sale you make involving a Card must be evidenced by a single Sales Data record completed with the sale date and the sale amount, and other information as required by the Associations or by us. You are not allowed to impose any surcharge or finance charge on the Card transaction or otherwise require the Cardholder to pay the fees payable by you under this Agreement. You are not allowed to set a dollar amount above or below which you refuse to honor otherwise valid Cards. With respect to any transaction for which a Card is not physically presented, such as in any on-line, mail, telephone or pre-authorized transaction, you must (i) have notified us on your application or otherwise in writing of your intention to conduct such transactions and we have agreed to accept them, and (ii) have reasonable procedures in place to ensure that each Card sale is made to a purchaser who actually is the Cardholder or the authorized user of the Card. Notwithstanding the foregoing, you acknowledge that under the Association Rules, you cannot rebut a Chargeback where the Cardholder disputes making the purchase without an electronic record or physical imprint of the Card.

**1.3 Operating Guide; Association Rules.** You agree to comply with all Association Rules and Operating Guide procedures, as may be applicable to you and in effect from time to time and of which you have been informed, and with such other procedures as we may from time to time prescribe for the creation or transmission of Sales Data. We may modify and supplement the Operating Guide in order to comply with requirements imposed by the Association Rules. You acknowledge that you have received a copy of the Operating Guide at or prior to your execution of this Agreement, and that you can also view the Operating Guide on-line at the Paymentech Internet website.

**1.4 Requirements for Sales Data.** As to each Sales Data you tender to us for processing, you represent and warrant that, to the best of your knowledge:

(1) The Sales Data represents payment or refund of payment, for the bona fide sale or lease of the goods, services or both, which you have provided in the ordinary course of your business, and the Sales Data is not submitted on behalf of a third party.

(2) The Sales Data does not involve any element of credit for any purpose other than payment for a current transaction (including payment of a previously-dishonored check) and, except in the case of approved installment or pre-payment plans, the goods have been shipped or services actually rendered to the Cardholder;

(3) The Sales Data is free from any material alteration not authorized by the Cardholder.

(4) Neither you nor your employee has advanced any cash to the Cardholder or to yourself or to any of your representatives, agents or employees in connection with the Card transaction, nor have you accepted payment for effecting credits to a Cardholder's account.

(5) To the best of your knowledge, the goods described in each Sales Data are your sole property and you are free to sell them.

(6) You have made no representations or agreements for the issuance of refunds except as it states in your return/cancellation policy, which has been previously submitted to us in writing as provided in Section 3.

(7) You have no knowledge or notice of information that would lead you to believe that the enforceability or collectibility of the subject Sales Data is in any manner impaired, and the transaction is in compliance with all applicable laws, ordinances, and regulations; and you have originated the Sales Data in compliance with this Agreement and the Association Rules.

(8) For a Card sale where the Cardholder pays in installments or on a deferred payment plan, a Sales Data record has been prepared separately for each installment transaction or deferred payment on the date(s) the Cardholder agreed to be charged. All installments and deferred payments, whether or not they have been submitted to us for processing, shall be deemed to be a part of the original Card sale.

## 2. Authorizations.

**2.1 Obtaining Authorizations.** You are required to obtain authorization/approval codes for all Card transactions by contacting the center designated by Paymentech. Under certain circumstances and only if we have agreed in advance, we will make authorization/approval code requests on your behalf. If you have not otherwise provided an authorization/approval code, you acknowledge that authorization/approval code of a Card transaction indicates only that credit is available for the Card transaction at the time the authorization is given, and it does not constitute a representation from us or from the Cardholder's issuing bank that a particular Card transaction is in fact a valid or undisputed transaction entered into by the actual Cardholder or an authorized user of the Card.

**2.2 Lack of Authorization.** We reserve the right to refuse to process any Sales Data presented by you (i) unless a proper authorization/approval code is recorded, (ii) if we reasonably determine that the Sales Data is or will become uncollectible from the Cardholder to which the transaction would otherwise be charged, or (iii) if we determine that the Sales Data was prepared in violation of any provision of this Agreement.

## 3. Refunds and Adjustments.

**3.1 Disclosure of Refund Policy.** You are required to maintain a fair policy with regard to the return/cancellation of merchandise or services and adjustment of Card sales. You are required to disclose to us on your application your return/cancellation policy. Your return/cancellation policy must be disclosed to your customers.

**3.2 Changes to Policy.** Any change in your return/cancellation policy must be submitted in writing to us not less than 14 days prior to any change. We reserve the right to refuse to process any Sales Data made subject to a revised return/cancellation policy of which we have not been notified in advance.

**3.3 Procedure for Refunds/Adjustments.** If you allow a price adjustment, return of merchandise or cancellation of services in connection with a Card sale, you will prepare and deliver to us Sales Data reflecting such refund or adjustment within 3 days of receiving the customer's request for such refund/adjustment. The amount of the refund/adjustment cannot exceed the amount shown as the total on the original Sales Data except by the exact amount required to reimburse the Cardholder for postage that the Cardholder paid to return merchandise. You are not allowed to accept cash or any other payment or consideration from a customer in return for preparing a refund to be deposited to the Cardholder's account nor to give cash refunds to a Cardholder in connection with a Card sale, unless required by law.

## 4. Settlement.

**4.1 Submission of Sales Data.** You are required to transmit your Sales Data to us on the next business day immediately following the day that such Sales Data is originated. Unless otherwise indicated on Schedule A, you will be solely responsible for all communication expenses required to accomplish the transmission of Sales Data.

**4.2 Merchant's Bank Account.** In order to receive funds from Paymentech, you must maintain a bank account at a bank that is a member of the Automated Clearing House ("ACH") system and the Federal Reserve wire system. You agree not to close your designated bank account without giving us at least five (5) days' prior written notice and substituting another bank account. You are solely liable for all fees and costs associated with your bank account and for all overdrafts. You authorize Paymentech to initiate electronic credit and debit entries and adjustments to your bank account at any time without respect to the source of any monies in the bank account. This authority will remain in full force and effect until we notify your bank that all monies due from you under this Agreement have been paid in full. We will not be liable for any delays in receipt of funds or errors in bank account entries caused by third parties, including but not limited to delays or errors by the Associations or your bank.

**4.3 Travel and Entertainment Cards.** You cannot submit any T&E Card transaction for processing by Paymentech unless you have in effect a valid agreement with the respective T&E Card company. For the T&E Card transactions designated on Schedule A, upon transmission of such Sales Data by you, we will forward the Sales Data to the appropriate T&E Card company. Except to the extent that we may provide funds settlement services for JCB or Diners Club/Carte Blanche transactions, payment of the proceeds due you will be governed by whatever agreement you have with that T&E Card company, and we do not bear any responsibility for their performance. If your agreement with a T&E Card company requires the T&E Card company's consent for us to perform the services contemplated by our Agreement, you are responsible for obtaining that consent.

**4.4 Transfer of Settlement Funds.** For all other Card transactions, immediately upon our receipt of your Sales Data, we will process your Sales Data to facilitate the funds transfer between the various Associations and you for Card sales. After we receive credit for such Sales Data, we will provide provisional credit to your bank account for the proceeds. The proceeds payable to you shall be equal to the amounts received by us in respect of your Sales Data minus the sum of the following: all fees, charges and discounts set forth in Schedule A, all adjustments and Chargebacks, all equipment charges (if any), all Cardholder refunds and adjustments, all Reserve Account amounts, and any fees, charges, fines, assessments, penalties, or other liabilities that may be imposed from time to time by the Associations, all of which amounts are due and payable at the time the related services are rendered to you or the related Chargebacks or other fees or adjustments are received from the Associations. Alternatively, at our option, we may debit your bank account for such amounts when they become due and payable and increase the proceeds payable to you accordingly.

**4.5 Negative Amounts.** To the extent Sales Data does not represent sufficient credits or the bank account does not have a sufficient balance to pay amounts due from under this Agreement, we may pursue one or more of the following options: (i) demand and receive immediate payment for such amounts; (ii) debit your bank account for the amount of the negative balance; (iii) withhold your settlement payments until all amounts are paid, (iv) delay presentation of your refunds until you make a payment to us of a sufficient amount to cover the negative balance; and (v) pursue any remedies we may have at law or in equity. Furthermore, if the amount represented by your Sales Data in any day is negative due to refunds/customer credits being submitted by you in excess of your sales, you are required to provide us with sufficient funds prior to the submission of the Sales Data so as to prevent the occurrence of a negative balance.

**4.6 Delinquency/Merchant Fraud.** If (i) there is a material, adverse change in your financial condition or your payment record with creditors, or if you are in material default of this Agreement; or (ii) if you adversely change your billing practice in relation to shipment of merchandise or fulfillment of service or change refund procedures currently in place, and you fail to notify us in advance, or (iii) you are receiving excessive Chargebacks (as defined in Section 7.2 below) (iv) you significantly alter the nature of your business or product lines or (v) if we have reasonable grounds to believe that we may be liable to third parties for the provisional credit extended to you or that you may be liable to your Card sale customers, we may temporarily suspend payments to you during our investigation of the issue and/or designate an amount of funds that we must maintain in order to protect us against the risk of existing or anticipated Chargebacks and to satisfy your other obligations under this Agreement (the "Reserve Account"), which may be funded in the same manner as provided for negative balances in Section 4.5. The Reserve Account will contain sufficient funds to cover any unbilled processing costs plus our estimated exposure based on reasonable criteria for Chargebacks, returns and unshipped merchandise and/or unfulfilled services. We may (but are not required to) apply funds in the Reserve Account toward, and may set off any funds that would otherwise be payable to the Merchant against, the satisfaction of any amounts which are or become due from Merchant pursuant to this Agreement. The Reserve Account will not bear interest, and you will have no right or interest in the funds in the Reserve Account; provided that upon satisfaction of all of your obligations under this Agreement, we will pay to you any funds then remaining in the Reserve Account. Any funds in the Reserve Account may be commingled with other funds, and need not be maintained in a separate account. Effective upon our establishment of a Reserve Account, if needed, you irrevocably grant to us a security interest in any and all funds, together with the proceeds thereof, that may at any time be in our possession and would otherwise be payable to you pursuant to the terms of this Agreement. You agree to execute and deliver to us such instruments and documents that we may reasonably request to perfect and confirm the security interest and right of setoff set forth in this Agreement. Merchant's obligations and Paymentech's rights under this Section 4.6 survive termination of this Agreement.

**5. Accounting.** We will supply a detailed statement reflecting the activity for your Merchant account(s). We will not be responsible for any error that you do not bring to our attention within ninety days from date of such statement.

**6. Retrieval Requests.**
**6.1 Records.** You are required by the Associations to store original documentation of each transaction for at least six months from the date of the respective transaction, and to retain copies of all such data for at least 18 months from the date of the respective transaction. You are not allowed to charge a fee for the creation or storage of such copies. We may, at our discretion, require you to deliver copies of Sales Data to us rather than storing it.
**6.2 Response to Retrieval Requests.** We will send you any Retrieval Request that we cannot satisfy with the information we have on file concerning any Card sale. In response, you must provide us in writing by certified or overnight mail or by confirmed fax (or by other means as agreed by Paymentech) the resolution of your investigation of such Retrieval Request and include legible copies of any documentation required by the Retrieval Request within seven business days after we send it to you (or such shorter time as the Association Rules may require and of which we notify you). Once we receive your response, we will take the appropriate steps in a timely manner to reduce the probability of the Cardholder's bank sending an unjustified Chargeback. You acknowledge that your failure to fulfill a Retrieval Request in accordance with Association Rules may result in an irreversible Chargeback.

**7. Chargebacks.**
**7.1 Chargeback Reasons.** You may receive a Chargeback from a Cardholder or Card issuer for a number of reasons under the Association Rules. The following are some of the most common reasons for Chargebacks:
   (1) Your failure to issue a refund to a Cardholder upon the return or non-delivery of goods or services.
   (2) An authorization/approval code was required and not obtained.
   (3) The Sales Data is prepared incorrectly or fraudulently.
   (4) We did not receive your response to a Retrieval Request within seven business days or any shorter time period required by the Association Rules.
   (5) The Cardholder disputes the Card sale or the signature on the sale documentation, or claims that the sale is subject to a set-off, defense or counterclaim.
   (6) The Cardholder refuses to make payment for a Card sale because in the Cardholder's good faith opinion, a claim or complaint has not been resolved, or has been resolved by you but in an unsatisfactory manner.
   (7) The Card was not actually presented at the time of the sale or you failed to obtain an electronic record or a physical imprint of the Card, and the Cardholder denies making the purchase. The Merchant acknowledges that, under these circumstances, the fact that an authorization/approval code was obtained does not mean that a particular Card transaction is in fact a valid or undisputed transaction entered into by the actual Cardholder or an authorized user of the Card.

**7.2 Excessive Chargebacks.** If we determine that you are receiving an excessive amount of Chargebacks, in addition to our other remedies under this Agreement we may take the following actions: (1) review your internal procedures relating to acceptance of Cards and notify you of new procedures you should adopt (at your sole discretion) in order to avoid future Chargebacks; (2) notify you of a new rate we will charge you to process your Chargebacks; or (3) collect from you (pursuant to Section 4.6) an amount reasonably determined by us to be sufficient to cover anticipated Chargebacks and related fees and fines; or (4) terminate the Agreement with written notice of termination. For purposes of this Agreement, an excessive number of Chargebacks means one Chargeback per 100 Sales Data records or the total dollar amount of Chargebacks is greater than or equal to three percent of the total dollar amount of Sales Data for any 30-day period. The foregoing percentages are subject to change in accordance with the Association Rules. You also agree to pay any and all Association fees and fines assessed against you or against Paymentech relating to your violation of the Agreement, the Operating Guide or the Association Rules with respect to your transactions or with respect to excessive Chargebacks under this Section.

**7.3 Claims of Cardholder Customers.** You have full liability if any Sales Data for which we have given your bank account provisional credit is the subject of a Chargeback. Subsequently, you are allowed to resubmit applicable Sales Data for a second presentation, but only in accordance with Association Rules. To the extent that we have paid or may be called upon to pay a Chargeback or refund/adjustment for or on the account of a Cardholder and you do not reimburse us as provided in this Agreement, then for the purpose of our obtaining reimbursement of such sums paid or anticipated to be paid, we have all of the rights and remedies of such Cardholder under applicable federal, state or local law and you authorize us to assert any and all such claims in our own name for and on behalf of any such Cardholder customer individually or all such Cardholder customers as a class.

**8. Advertising.** Wherever you accept Cards, you will inform the public of the Cards that you honor. However, you may not indicate that any of the Associations endorses your goods or services.

9. **Fees.**
9.1 **Schedule A.** You agree to pay us for our services as set forth in Schedule A in accordance with this Agreement. Unless otherwise expressly stated in Schedule A, such pricing is based on all transactions qualifying under the Association Rules for the lowest Association interchange rates. For Sales Data that does not qualify, the standard Association interchange rate will apply, which may be higher for non-qualifying transactions than the qualifying rate shown on Schedule A.
9.2 **Price Changes.** You acknowledge that your pricing is based on your representation as to your volume of Card transactions, method of processing, type of business, and interchange qualification criteria as represented in your Application and Schedule A. To the extent your actual volumes, method, type and criteria differ from this information, we may modify the pricing on Schedule A with thirty days' prior written notice. In addition, by giving written notice to you we may change our fees, charges and discounts resulting from (i) changes in Association fees (such as interchange, assessments and other charges) or (ii) changes in pricing by any third party provider of a product or service used by you. Such new prices will be applicable to you as of the effective date established by the Association or third party provider, or as of any later date specified in our notice to you.

10. **Termination.**
10.1 **Term.** This agreement takes effect on the date it is executed by Paymentech and has an initial term expiring three years from that date. Unless otherwise terminated by either party as provided in this Agreement, the Agreement will automatically extend for successive one-year terms. Either party may give notice of non-renewal of this Agreement in writing no more than 90 days and no less than 30 days prior to any expiration date. Also, we may terminate the Agreement if an Association notifies us that it is unwilling to continue accepting your Sales Data.
10.2 **Termination for Cause.** If our services provided under this Agreement fail to conform to generally accepted standards for such services in the Card processing industry then your sole remedy for such failure shall be that upon notice from you specifying the failure of performance, we will rectify such failure of performance. If we do not rectify our failure of performance within thirty days after receipt of notification, then you may terminate this Agreement upon thirty days' written notice to us. We may terminate this Agreement if you do not rectify your failure of performance within thirty days after receipt of notification upon written notice to you as a result of any of the following events: (i) any noncompliance with this Agreement, the Association Rules or the Operating Procedures, which is not cured within thirty days of our notice to you; except that no cure period is allowed for termination based on Merchant fraud or failure to fund a Reserve Account, and except as otherwise provided in this Agreement; (ii) any voluntary or involuntary bankruptcy or insolvency proceeding involving Merchant; (iii) Paymentech deems Merchant to be financially insecure, (iv) Merchant or any person owning or controlling Merchant's business is or becomes listed in the MATCH file (Member Alert to Control High-Risk Merchants) maintained by Visa and MasterCard or any Association notifies us that it is no longer willing to accept your Sales Data, or (v) for a period of more than 60 consecutive days, you do not transmit Sales Data to us.
10.3 **Account Activity After Termination.** Termination does not affect either party's respective rights and obligations under this Agreement as to Sales Data submitted before termination. If you submit Sales Data to us after the date of termination for which you have given us notice, we may, at our discretion, process such Sales Data in accordance with the terms of this Agreement. Upon notice of any termination of this Agreement, we may notify you of the estimated aggregate dollar amount of Chargebacks and other obligations and liabilities that we reasonably anticipate subsequent to termination, and you agree to immediately deposit such amount, or we may withhold such amounts from your credits, in order to establish a Reserve Account pursuant to and governed by the terms and conditions of Section 4.6.

11. **Indemnification.** The indemnity provided under this Section 11 shall survive the termination of this Agreement.
11.1 **Paymentech.** We agree to indemnify you and your affiliates, officers, directors, employees, and agents from any losses, liabilities, and damages of any and every kind (including, without limitation, your costs, expenses and reasonable attorneys' fees) arising out of any Cardholder complaint or Chargeback related to (i) any failure by us to properly safeguard the Cardholder's account information or (ii) our failure to deliver funds processed by us in accordance with Section 4.4 which relate to payments due from us for Sales Data, or (iii) any voluntary or involuntary bankruptcy or insolvency proceeding by or against us. This indemnification does not apply to any claim or complaint relating to your failure to resolve a payment dispute concerning merchandise or services sold by you. The indemnification provided for in this Section 11.1 is subject to Section 14.
11.2 **Merchant.** You agree to indemnify Paymentech, the Associations, its affiliates, officers, directors, employees, and agents from any from any losses, liabilities, and damages of any and every kind (including, without limitation, our costs, expenses and reasonable attorneys' fees) arising out of any claim, complaint, or Chargeback (i) made or claimed by a Cardholder with respect to any Sales Data submitted by you or (ii) caused by your noncompliance with this Agreement or the Association Rules, including any breach of a representation or warranty made by you, or (iii) any voluntary or involuntary bankruptcy or insolvency proceeding by or against you. The indemnification provided for in this Section does not apply to any claim or complaint to the extent it is caused by Paymentech's own negligence or willful misconduct. The indemnification provided for in this Section 11.2 is subject to Section 14.

12. **No Disclosure of Cardholder Information.** We will exercise reasonable care to prevent disclosure or use of Card information, other than as permitted under the Association Rules. You will exercise reasonable care to prevent disclosure of Card information, other than to your agents and contractors for the purpose of assisting you in completing a Card transaction, or to the applicable Association, or as specifically required by law. Each party will store all media containing Card numbers in an area limited to selected personnel and prior to either party discarding any material containing Cardholder information, the party will destroy it in a manner rendering the Card account numbers unreadable. If at any time either party determines that Card account number information has been compromised, such party will notify the other party immediately and assist in providing notification to the proper parties as we deem necessary.

13. **Information About Merchant's Business.**
13.1 **Additional Financial Information.** To the extent not available from public sources, you agree to furnish us within five days of our request (i) your most recently prepared financial statements and credit information or (ii) if applicable, your three most recent filings with the SEC.
13.2 **Other Information.** With reasonable prior notice and during your normal business hours, our duly authorized representatives may visit your business premises and may examine only that part of your books and records that pertain to your Sales Data and Card sales. You agree to provide us at least thirty days' prior written notice of your intent to change your product line or services, or your trade name, or the manner in which you accept Cards. If we determine such a change is material to our relationship with you, we may refuse to process Sales Data made pursuant to the change. You agree to provide us with prompt written notice if you are the subject of any voluntary or involuntary bankruptcy or insolvency petition or proceeding.

14. **Disclaimer; Limitation of Damages.** Subject to Section 5, we will, at our own expense, correct any data in which (and to the extent that) errors have been caused by us, or by malfunctions of our intellectual Property or machines. Under no circumstances will Paymentech's financial responsibility for Paymentech's failure of performance under this Agreement exceed the total fees paid to us under this Agreement (net of Association interchange, assessments and fines) for the six months prior to the time the liability arose. EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY, ITS RESPECTIVE EMPLOYEES OR AFFILIATES, BE LIABLE FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES. WHILE BOTH PARTIES ACKNOWLEDGE THAT THIS IS AN AGREEMENT FOR SERVICES TO WHICH THE UNIFORM COMMERCIAL CODE DOES NOT APPLY, PAYMENTECH HEREBY DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO THE SERVICES, PRODUCTS AND EQUIPMENT PROVIDED HEREUNDER, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE FOR A PARTICULAR PURPOSE.

15. **Intellectual Property.**
15.1 **License.** We retain all ownership and copyright interest in and to any and all Intellectual Property, computer programs, related documentation, technology, know how and processes developed by us and provided in connection with this Agreement (collectively, the "Intellectual Property"), and we grant you a non-exclusive license to use the Intellectual Property for the limited purpose of performing under this Agreement. Unless otherwise provided in a separate agreement between you and us, any Intellectual Property or machinery provided by us but not developed by Paymentech, is being licensed or purchased by you directly from the manufacturer or developer of such machinery or Intellectual Property. You acknowledge that the license granted herein is limited to your own use exclusively and that you do not have the right to sub-license any of the Intellectual Property in either their original or modified form. You agree that you will not reverse-engineer, disassemble or decompile the Intellectual Property. Merchant shall not give any third party, except Merchant's employees, access to the Intellectual Property without our prior written consent. Merchant's obligations under this Section 15.1 shall survive the termination of this Agreement.

**15.2 Infringement Warranty.** We represent and warrant that your use of the Intellectual Property as contemplated by this Agreement does not violate any copyright, patent, trade secret, or trademarks of any person. We will defend (or settle) at our own expense any and all claims that the above items infringe a trademark, copyright, trade secret, or patent, if you give us prompt notice of any such claim or lawsuit against you relating to the Intellectual Property. If your use of the Intellectual Property is prevented by any legal process, we will procure for you the right to continue to use the Intellectual Property, or modify the Intellectual Property so that it is no longer infringing, or replace the Intellectual Property with non-infringing Intellectual Property of equal or superior functional capability.

**16. Miscellaneous.**
**16.1. Taxes.** You agree to pay any taxes imposed on the sale or lease of Intellectual Property or services contemplated by this Agreement during the term of this Agreement and you authorize us to increase the amount of your payment to reflect any and all assessments or increases in the sales, use, occupational, property, lease or other taxes imposed on such sale or lease of services or Intellectual Property.
**16.2 Application and Credit Check.** All statements made on your Application for this Agreement are true as of the date of your execution of this Agreement. Your signature on this Agreement authorizes us to perform any credit check deemed necessary of Merchant and its principals and guarantors.
**16.3 Section Headings.** The section headings of this Agreement are for convenience only and do not define, limit or describe the scope or intent of this Agreement.
**16.4 Assignment.** We cannot assign this Agreement without your prior written consent, except that we may assign this Agreement to a Visa and MasterCard member qualified to perform our obligations under this Agreement. You cannot assign or transfer your rights or delegate your responsibilities under this Agreement without our prior written consent.
**16.5 Parties.** This Agreement binds you and us and our respective heirs, representatives, successors (including those by merger and acquisition) and permitted assigns. You represent and warrant that your execution of and performance under this Agreement (i) in no way breaches, contravenes, violates or in any manner conflicts with any of your other legal obligations, including, without limitation, your corporate charter or similar document or any agreement between you and any third party; and (ii) has been duly authorized by all necessary action and does not require any consent or other action by or in respect of any third party and that the person signing this Agreement on your behalf is duly authorized to do so. In providing services to you, we will not be acting in the capacity of your agent, partner, or joint venturer, and we are acting as an independent contractor. Each party agrees that the other party may publicly disclose, through press releases or otherwise, the existence of the business relationship that is the subject of this Agreement. Any such disclosure may identify the parties by name but shall not, without the prior written consent of the non-disclosing party, include any of the terms of this Agreement.
**16.6 Severability.** Should any provision of this Agreement be determined to be invalid or unenforceable under any law, rule or regulation, such determination will not affect the validity or enforceability of any other provision of this Agreement.
**16.7 Waivers.** No term or condition of this Agreement may be waived unless both parties sign a written waiver.
**16.8 Entire Agreement.** The Association Rules, Operating Guide, and all schedules, and attachments to this Agreement are made a part of this Agreement for all purposes. This Agreement represents the entire understanding between Merchant and Paymentech with respect to the matters contained herein. This Agreement shall prevail over the terms of any agreement governing the bank account.
**16.9 Notices.** Except as otherwise provided in this Agreement, all notices must be given in writing and either hand delivered, faxed, or mailed first class, postage prepaid (and deemed to be delivered when mailed) to the addresses set forth below or to such other address as either party may from time to time specify to the other party in writing.
**16.10 Governing Law; Waiver of Jury Trial.** This Agreement will be governed by and construed in accordance with the laws of the State of Texas without reference to conflict of law provisions. Any action, proceeding, litigation or mediation relating to or arising from this Agreement must be brought by Merchant against Paymentech exclusively in Dallas County, Dallas, Texas, and by Paymentech against Merchant in the county and state of Merchant's principal office, as indicated below. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT.
**16.11 Attorneys' Fees.** In any action to enforce obligations under this Agreement, the non-prevailing party shall pay for costs, expenses and reasonable attorney's fees.
**16.12 Force Majeure.** Neither party will be liable for delays in processing or other nonperformance caused by such events as fires, telecommunications or utility or power failures, equipment failures, labor strife, riots, war, nonperformance of our vendors or suppliers, acts of God, or other causes over which the respective party has no reasonable control, except that nothing in this Section 16.12 will affect or excuse your liabilities and obligations for Chargebacks, refunds or unfulfilled products and services.

**17. Definitions.**
**17.1** Application is your statement of the characteristics of your account that you have submitted to us to induce us to enter into this Agreement with you and that has induced us to process your Card transactions under the terms and conditions of this Agreement.
**17.2** Association is a group of Card issuer banks that facilitates the use of payment cards, such as the systems operated by MasterCard International, Inc. and Visa, Inc. Association Rules are the bylaws, rules, and regulations, as they exist from time to time, of the Associations.
**17.3** Card is both the plastic card or other evidence of the account and the account number, issued by a Card Issuer to the Cardholder, either of which you accept from your customers as payment for their purchases from you, such as a MasterCard, Visa or JCB Card or such other payment card as we may hereafter agree.
**17.4** Cardholder is the person to whom the Card is issued and who is entitled to use the Card.
**17.5** Chargeback is a reversal of a Card sale you previously presented pursuant to Association Rules.
**17.6** Retrieval Request is a request for information by a Cardholder or Card Issuer relating to a claim or complaint concerning a Card sale you have made.
**17.7** Sales Data is the evidence and electronic record of a sale or lease transaction representing payment by use of a Card or of a refund/credit to a Cardholder.
**17.8** T&E Card is a travel and entertainment Card issued by American Express, Novus/Discover, Carte Blanche, Diner's Club, or such other T&E Card for which we may agree to accept submissions in the future.

Agreed and Accepted by:

Coyotes Hockey, LLC

By _Vaibhav Gupta_ (signature)

Print Name and Title: VAIBHAV GUPTA, SR. VP. OF FINANCE + ADMIN

Date: 08/20/03

Address: 9375 E. BELL ROAD

City, State Zip: SCOTTSDALE, AZ 85260

Agreed and Accepted by:

PAYMENTECH, L.P.

By: PTI General Partner, LLC, its general partner

By _Sheryl M. York_ (signature)

Print Name: Sheryl M. York

Title: Director

8/21/03

PAYMENTECH, L.P.
SELECT MERCHANT PAYMENT CARD PROCESSING AGREEMENT
SCHEDULE A
MERCHANT NAME: Coyotes Hockey, LLC
MERCHANT AGREEMENT CONTRACT NUMBER: 079391

The average value of MERCHANT's SALES RECORD transactions will be $100.00

MERCHANT will process approximately 5,000 SALES RECORD transactions annually.

## PROCESSING FEES

| | |
|---|---:|
| BANK CARD Discount Rate (includes QUALIFYING CARD FEEs and CPU Authorizations) – RETAIL | 2.40% |
| BANK CARD Discount Rate (includes QUALIFYING CARD FEEs and CPU Authorizations) – MOTO | 2.40% |
| Per Discover and/or Diners Card SALES RECORD | $.20 |
| Per Voice Authorization | $.75 |
| Per Voice AVS (Address Verification Service) Authorization | $.75 |
| Per Audio Response Unit Authorization | $.25 |
| Per Voice Authorization Referral | No Charge |
| Per Voice Referrals/Number of Minutes | $.90/per minute |
| NON-QUALIFYING (Downgrade) SURCHARGE | At Cost |
| Per MCI and VISA CHARGEBACK Processed/Represented | $5.00 |
| Collection, Pre-Arbitration & Compliance | $10.00 |
| ACH (Automated Clearing House) Funds Transfer | No Charge |
| WIRE Funds Transfer | $10.00 |
| Paymentech Online Access | No Charge |

# MERCHANT APPLICATION AND AGREEMENT
## PARTIES AND SERVICES

THIS MERCHANT APPLICATION AND AGREEMENT (this "Agreement") is entered into by and between PAYMENTECH, L.P., a Delaware limited partnership, and the Merchant identified in this Agreement. Under the terms of this Agreement, Company will be the sole provider to Merchant of the services necessary to authorize, process and settle all of Merchant's credit and debit card transactions set forth in Schedule A to this Agreement. If a third party referred you to Paymentech for the services provided under this Agreement, such third party may be party to the Agreement, but has no rights with respect to Merchant except as provided in such third party's agreement with us.

ESTIMATED DATE OF FIRST CREDIT CARD ACCEPTANCE:

**PAYMENTECH USE ONLY**
OUTLET #
HIERARCHY
MCC 7941
REFERRAL SOURCE
SALES REPRESENTATIVE DAN CAHSTON PHONE 7562
SALES ID PC 70
REFERRAL NUMBER 1000094780

### MERCHANT INFORMATION

IS YOUR BUSINESS SEASONAL? ☐YES ☒NO
NAME OF CORPORATION OR PARTNERSHIP: COYOTES HOCKEY LLC.
MAILING/BILLING ADDRESS: 9375 E. BELL ROAD
CITY, STATE AND ZIP: SCOTTSDALE, AZ 95260
TELEPHONE NUMBER: 480-473-5654
FAX NUMBER: 480-473-5699
BUSINESS START DATE: 1-1995    HOW LONG AT THIS LOCATION: 8 YEARS

MERCHANT "DOING BUSINESS AS" NAME: PHOENIX COYOTES
LOCATION ADDRESS:
CITY, STATE AND ZIP: SAME
TELEPHONE NUMBER:
PRIMARY MERCHANT CONTACT: JOHN GABRIEL
E-MAIL ADDRESS:
TAX ID #: 86-0989289    TOTAL # OF LOCATIONS: ONE

TYPE OF BUSINESS: ☐RETAIL ☐WHOLESALE ☐RESTAURANT ☐LODGING ☐MAIL ORDER ☒TELEPHONE ORDER ☐CONVENIENCE STORE ☐CONVENIENCE STORE WITH GAS ☐INTERNET ☐BUSINESS TO BUSINESS ☐HOME-BASED ☐OTHER
IF INTERNET BUSINESS, LIST WEBSITE ADDRESS:
DESCRIBE THE MERCHANDISE SOLD OR SERVICE PROVIDED: SEASON TICKET SALES
CHECK METHOD OF ADVERTISING AND INCLUDE ANY MATERIALS: ☒YELLOW PAGES AD ☐CATALOG ☐DIRECT MAIL - LETTER/BROCHURE ☒TV/RADIO ☐TELEPHONE/TELEMARKETING ☒NEWSPAPER/MAGAZINE ADVERTISEMENT ☐REFERRAL ☒INTERNET/E-MAIL
TYPE OF OWNERSHIP: ☐SOLE OWNERSHIP ☐PARTNERSHIP ☐JOINT VENTURE ☒LLC CORP ☐PUBLIC CORP ☐PRIVATE CORP ☐GOVERNMENT CORP ☐NON-PROFIT CORP ☐OTHER
MAIL/FAX C/B'S RETRIEVALS TO: ☐OUTLET ☒CORPORATE    MAIL/FAX STATEMENTS TO: ☐OUTLET ☒CORPORATE
AMERICAN EXPRESS MERCHANT #: ~~~~~~~    DISCOVER MERCHANT #: 601101028254173
EQUIPMENT TYPE: PC CHARGE    ☐RENT ☐PURCHASE ☐LEASE ☒REPROGRAM
5020079224

**OWNERS**
(OWNERSHIP MUST EQUAL 100% — ADD ADDITIONAL SHEETS AS NECESSARY)
NAME: VAIBHAV GUPTA    TITLE: SENIOR V.P. OF FINANCE    PERCENT OF OWNERSHIP: ____%
RESIDENCE ADDRESS:    SOCIAL SECURITY #:
CITY:    STATE:    ZIP:    DATE OF BIRTH:
DRIVER'S LICENSE #:    STATE:    HOME TELEPHONE: (___)

NAME:    TITLE:    PERCENT OF OWNERSHIP: ____%
RESIDENCE ADDRESS:    SOCIAL SECURITY #:
CITY:    STATE:    ZIP:    DATE OF BIRTH:
DRIVER'S LICENSE #:    STATE:    HOME TELEPHONE: (___)

**OFFICERS**
COMPANY PRESIDENT:    COMPANY CFO:

### CREDIT INFORMATION

ANNUAL VISA/MASTERCARD VOLUME: $17,700,000    AVERAGE CREDIT CARD TICKET: $875    TOTAL SALES: $63 million

**MAIL OR TELEPHONE ORDER SALES**
(Complete if your sales are generated by mail, telephone or internet orders, or if your product is not delivered at the point of sale.)
PERCENT OF ANNUAL CREDIT CARD SALES GENERATED THROUGH MAIL 95% PHONE ____ INTERNET ____ CARD SWIPE 5% TOTAL = 100%
PERCENTAGE OF HAND-KEYED ITEMS ____%
NUMBER OF DAYS TO PREPARE SHIPMENTS FOR DELIVERY TO CUSTOMER FROM DATE OF ORDER
PERCENT OF CUSTOMER ORDERS DELIVERED IN 0-7 DAYS ____ 8-14 DAYS ____ 15-30 DAYS ____ MORE THAN 30 DAYS ____ = 100%
MC/VISA SALES ARE DEPOSITED (CHECK ONE): ☐AT DATE OF ORDER ☐AT DATE OF DELIVERY ☐OTHER
NAME OF FULFILLMENT HOUSE (IF ANY):    DELIVERY TIME FRAME:
STREET ADDRESS:    CITY:    STATE:    ZIP:
NAME OF SHIPPING SERVICE USED:    DELIVERY TIME FRAME:
STREET ADDRESS:    CITY:    STATE:    ZIP:

FEDERAL REGULATIONS REQUIRE THAT WE COLLECT INFORMATION TO VERIFY CUSTOMER IDENTITY AND THAT WE RETAIN THIS INFORMATION IN OUR RECORDS.

## SALES DEPOSIT POLICY

ARE CONSUMERS REQUIRED TO PROVIDE A DEPOSIT? ☐ YES ☒ NO    IF YES, WHAT PERCENT OF YOUR CREDIT CARD TRANSACTIONS REQUIRE A DEPOSIT? _____ %    IF A DEPOSIT IS REQUIRED, WHAT PERCENT OF THE TOTAL SALE IS REQUIRED? _____ %

## REFUND POLICY

DO YOU HAVE A REFUND POLICY FOR YOUR MASTERCARD/VISA SALES? ☒ YES ☐ NO
CHECK THE APPLICABLE REFUND POLICY: ☐ CASH ☐ EXCHANGE ☒ STORE CREDIT ☒ MASTERCARD/VISA CREDIT
IF MC/VISA CREDIT, WITHIN HOW MANY DAYS DO YOU DEPOSIT CREDIT TRANSACTIONS? ☒ 0-3 DAYS ☐ 4-7 DAYS ☐ 8-14 DAYS ☐ OVER 14 DAYS

## BANK AND BUSINESS TRADE REFERENCES

BANK NAME __WELLS FARGO BANK__ PHONE __800 451-5817__
ADDRESS _____ CITY/STATE/ZIP _____
CONTACT _____ ACCOUNT __4496846924__
T/R# __121000248__

TRADE NAME _____ PHONE (___) _____
ADDRESS _____ CITY/STATE/ZIP _____
CONTACT _____ ACCOUNT _____

TRADE NAME _____ PHONE (___) _____
ADDRESS _____ CITY/STATE/ZIP _____
CONTACT _____ ACCOUNT _____

**IF THE MERCHANT HAS PREVIOUSLY ACCEPTED CREDIT CARDS, THE LAST 3 MONTHS MERCHANT STATEMENTS MUST BE PROVIDED**

CURRENT CREDIT CARD PROCESSING BANK, IF APPLICABLE
BANK OR PROCESSOR NAME __WELLS FARGO BANK__ PHONE (___) _____
CITY/STATE/ZIP _____ CONTACT _____
REASON FOR CHANGING BANK OR PROCESSOR _____

HAVE ANY OF THE PRINCIPALS EVER FILED FOR BANKRUPTCY? ☐ YES ☒ NO
IF YES, NAME _____ CHAPTER FILED _____ DATE _____

HAVE ANY OF THE PRINCIPALS EVER MANAGED OR OWNED ANOTHER BUSINESS THAT ACCEPTED CREDIT CARDS? ☐ YES ☒ NO
IF YES, PROVIDE BUSINESS NAME _____ CITY/STATE _____

FOR MERCHANT - As the person signing below on behalf of the business designated on the above Application ("Merchant"), I certify that I am an owner, partner or officer of the Merchant and have been duly authorized to sign this Merchant Application and Agreement on behalf of the Merchant. I also acknowledge that Merchant has received and read (1) Terms and Conditions for Merchant Agreement, (2) Schedule A (Pricing) and (3) the Operating Guides - Retail and Mail Order/Telephone Order/Internet Transactions, and Merchant agrees to be bound by the terms and conditions contained in those documents. Merchant hereby authorizes Paymentech to credit and debit Merchant's designated bank account(s) in accordance with this Agreement. Merchant represents and warrants that all information on this Application, and the related information submitted in conjunction with the Application, is true, complete and not misleading. The Application now belongs to Paymentech. Merchant understands that the application fee is non-refundable.
FOR MERCHANT AND INDIVIDUAL GUARANTORS - Merchant and each guarantor signing below ("Guarantor") hereby authorizes and agrees that Paymentech, or its designee, may investigate and verify the credit and financial information of Merchant and any individual Guarantor and may obtain consumer and commercial credit reports on the Guarantors and the Merchant from time to time. If the Application is approved, subsequent consumer and business credit reports may be required or used in connection with the maintenance, updating, renewal or extension of the Agreement. The Merchant and each Guarantor agrees that all business references, including banks, may release any and all credit and financial information to Paymentech. ANY UNILATERAL ALTERATION, STRIKEOVER OR MODIFICATION TO THE PREPRINTED TEXT OR LINE ENTRIES OF THIS MERCHANT APPLICATION AND LEGAL AGREEMENT SHALL BE OF NO EFFECT WHATSOEVER, AND AT PAYMENTECH'S SOLE DISCRETION, MAY RENDER THIS MERCHANT APPLICATION INVALID.
FOR EACH INDIVIDUAL GUARANTOR - As an individual Guarantor, I hereby agree to be bound as a Guarantor of the Merchant's obligations under this agreement, according to the Personal Guaranty contained in the Terms and Conditions for Merchant Agreement. I acknowledge that I have received and read (1) Terms and Conditions for Merchant Agreement including the terms and conditions of the Personal Guaranty, (2) Schedule A (Pricing) and (3) the Operating Guides - Retail and Mail Order/Telephone Order/Internet Transactions.
FOR OWNERS - Each owner signing below authorizes Paymentech, as part of its investigation, to obtain and review third party credit bureau consumer credit reports on such owner. Ownership must equal at least 50% and must include at least two individual owners, if applicable.

**MERCHANT:**
BUSINESS LEGAL NAME __COYOTES HOCKEY L.L.C.__

By: _____ Title: _____ Date: _____
Individual Signature
Print Individual Name: _____

**GUARANTORS:**

Individual Signature _____ Individual Signature _____
Print Guarantor Name: _____ Date: _____ Print Guarantor Name: _____ Date: _____

**OWNERS** (SIGNORS' OWNERSHIP MUST EQUAL AT LEAST 50% AND, IF APPLICABLE, MUST INCLUDE AT LEAST TWO INDIVIDUAL OWNERS):

Owner Signature _____ Owner Signature _____
Print Owner Name: _____ Date: _____ Print Owner Name: _____ Date: _____

**APPROVED:**
PAYMENTECH, L.P., by PTI General Partner, LLC, its general partner

Title: _____ Date: _____



## MERCHANT AGREEMENT ADDENDUM

THIS MERCHANT AGREEMENT ADDENDUM (this "Addendum") is dated as of June 7, 2005 by and between Paymentech, L.P., a Delaware limited partnership ("Paymentech"), and Coyotes Hockey, LLC ("Merchant").

1. **Effect.** This Addendum supplements, and is hereby incorporated into and made a part of, that certain Merchant Application and Agreement dated effective as of June 7, 2005, between Paymentech and Merchant (the "Merchant Agreement"). This Addendum, and the rights and obligations of the Parties hereunder, are expressly made subject to the terms and conditions contained in the Merchant Agreement. Except as otherwise defined herein, capitalized terms used herein shall have the meaning assigned to them in the Merchant Agreement. This Addendum shall supplement (and, as necessary, amend) the Merchant Agreement. Any express conflict between the terms and conditions of this Addendum and the Merchant Agreement shall be resolved in favor of this Addendum.

2. **Ticketmaster Agreement.** Merchant understands and acknowledges that Paymentech and Ticketmaster, L.L.C. ("Ticketmaster") are parties to a Payment Card Processing Agreement (the "Ticketmaster Agreement") that has enabled merchant to enter into the Merchant Agreement. Merchant hereby agrees that: (i) for operational and monitoring purposes, Paymentech will provide access to Merchant's processing and settlement reports to Ticketmaster; (ii) unless otherwise agreed to by Paymentech and Merchant, Section 1.1. of the Agreement will only apply to the ticketing operations of Merchant, and (iii) notwithstanding anything in the Agreement to the contrary, the Merchant Agreement will terminate without any early termination penalties or charges in the event of the termination or expiration of the Ticketmaster Agreement.

3. **Miscellaneous.** With exception of the Merchant Agreement, which is incorporated herein and made a part hereof by reference, and the applicable terms and conditions of the Ticketmaster Agreement, this Addendum (including all schedules, riders and exhibits attached thereto) embodies the parties' final, complete and exclusive agreement with respect to the subject matter. This Addendum shall supersede all prior and contemporaneous agreements, understandings and representations, written or oral. Any waiver, amendment, or modification of this Addendum or any of its terms must be in writing and signed by the party against whom such waiver, amendment or modification is sought to be enforced. No waiver by either party of any breach of this Addendum will be deemed a waiver of any other breach or any subsequent breach; nor shall such waiver affect either party's right thereafter to enforce any provision of this Addendum or to exercise any right or remedy in the event of any other default.

IN WITNESS WHEREOF, Paymentech and Merchant have caused this Addendum to be executed by their duly authorized officers as of the date first written above.

Agreed and Accepted by:

Coyotes Hockey, LLC
MERCHANT LEGAL NAME: (Print or Type)

5800 W. Glenn Drive, Suite 350
Address (Print or Type)

By (authorized signature)

Joseph L. Lahnfried - VP & Controller
By, Name, Title (Print or Type)

June 7, 2005
Date

Agreed and Accepted by:

PAYMENTECH, L.P.

By: PTI General Partner, LLC
Its: General Partner

By: _Sheryl M. York_

Print Name: Sheryl M. York

Title: Director

Date: 6/9/05

Address: 4 Northeastern Boulevard, Salem, NH 03079

Date Printed　　　　　　　　　　　　　　　　　　　　　　　　　　　　6/7/2005