Robert J. Miller, Esq. (#013334)
Edward M. Zachary, Esq. (#019643)
**BRYAN CAVE LLP**
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004
Telephone: (602) 364-7000
Internet: rjmiller@bryancave.com
         edward.zachary@bryancave.com

Christopher J. Lawhorn, Esq. (MO. # 45713) (Admitted *Pro Hac Vice*)
Herbert R. Giorgio, Jr., Esq. (MO. # 58245) (Admitted *Pro Hac Vice*)
**BRYAN CAVE LLP**
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Internet: cjlawhorn@bryancave.com
         herb.giorgio@bryancave.com

Conflicts Counsel to the Debtors-In-Possession

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC, and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>Debtors.<br><br>This Filing Applies to:<br>☐ All Debtors<br>■ Specified Debtors<br>   Coyotes Hockey, LLC | In Proceedings Under Chapter 11<br><br>Case No. 2:09-bk-9488-RTB<br>(Jointly administered)<br><br>Chapter 11<br><br>**MOTION TO ESTIMATE CLAIMS RELATED TO CERTAIN ADDITIONAL CONTRACTS FOR PURPOSES OF PLAN DISTRIBUTION UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 502(c)**<br><br>Hearing Date: April 8, 2010<br>Hearing Time: 1:30 p.m. |

Coyotes Hockey, LLC ("Coyotes Hockey" or the "Debtor"), debtor-in-possession in Case No. 2:09-bk-09491 (jointly administered under Case No. 2:09-bk-09488), files this Motion under Sections 105(a) and 502(c) of Title 11 of the United States Code (the "Bankruptcy Code") for an order providing for the estimation of certain potential claims (the "Potential Claims") against the Debtor that may arise from the termination, breach, or potential rejection under Bankruptcy Code Section 365 of certain contracts and leases to which the Debtor is a party, as set forth on <u>Exhibit A</u> hereto (the "Contracts"). The Potential Claims are contingent claims that must be estimated now to avoid any delay in the administration of the Debtor's estate.

The sale of the Debtor's assets to affiliates of the National Hockey League closed on November 2, 2009. On December 7, 2009, the Debtor filed a Chapter 11 plan for the purpose of making distributions to holders of allowed claims against the Debtor [Docket No. 1149] (the "Plan"). As is common in any Chapter 11 distribution plan, the Plan requires that a sufficient amount of cash will be held in reserve to pay contingent unsecured claims before any pro rata distributions can be made to the holders of allowed unsecured claims.

The Contracts relate, directly or indirectly, to the operation of Coyotes Hockey, LLC (the "Team") and/or Jobing.com Arena (the "Arena"), the partition of the Team assets from the Ellman real property assets and/or the development and operation of certain real property and facilities related to the Arena or the development of Westgate City Center. The Contracts generally consist of the Partition and Sale Agreement with respect to the partition of the Team assets from the Ellman real property assets, related agreements pertaining to guarantees and indemnification in connection with such partition and/or certain post-partition rights, various leases with respect to office and/or media tower space, various easements and other contracts with respect to rights and restrictions affecting real property and/or parking, various non-disturbance agreements and various agreements with respect to naming and/or sponsorship rights with respect to the Arena and/or Westgate property and other related rights. Many of the Contracts may constitute executory contracts and unexpired leases subject to rejection under Bankruptcy Code Section 365. As explained below, whether the Contracts will be rejected under

Bankruptcy Code Section 365 or are otherwise terminated is contingent on the National Hockey League's ability to consummate a sale of the Phoenix Coyotes (the "Team") to a third party on or before June 30, 2010, and that third party's decision to keep the Team in Glendale, Arizona. If the Team remains unsold as of June 30, 2010, or if the Team is sold and relocated outside of Glendale, Arizona, then the Contracts must be rejected or otherwise terminated.

Accordingly, the non-debtor parties to the Contracts currently hold contingent unsecured claims for potential damages related to the rejection, termination, or other potential breach of the Contracts. Those contingent claims (i.e., the Potential Claims) must be estimated, and an appropriate reserve established, before the Debtor can make any pro rata distributions to holders of allowed unsecured claims under the Plan. Under these circumstances, estimation of the Potential Rejection Claims is mandated under Bankruptcy Code Section 502(c).

## I. BACKGROUND

### Jurisdiction and Venue

1. On May 5, 2009 (the "Petition Date"), the above-captioned debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona (the "Court").

2. The debtors continue to operate as debtors-in-possession in accordance with Bankruptcy Code §§ 1107 and 1108.

3. The Court has jurisdiction over these jointly administered cases under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

4. Dewey Ranch Hockey, LLC, is an Arizona limited liability company with its principal place of business located in Yavapai County, Arizona. The remaining debtors are affiliates of Dewey Ranch Hockey, LLC. Accordingly, venue is proper in the District of Arizona under 28 U.S.C. §§ 1408 and 1409.

5. The statutory predicates for the relief requested in this Motion are Bankruptcy Code Sections 105(a) and 502(c).

6. No trustee or examiner has been appointed in these cases. An official committee of unsecured creditors was appointed on May 21, 2009 [Docket No. 176].

**Sale of the Phoenix Coyotes**

7. On November 2, 2009, the Court entered the Stipulated Order Approving Amended and Clarified Bid [Docket No. 1079] (the "Stipulated Order"), which approved the sale of substantially all the assets of the Debtor and Arena Management Group LLC ("Arena Management" and, together with the Debtor, the "Sellers") to affiliates of the National Hockey League (the "Buyers") under the Asset Purchase Agreement Among Coyotes Hockey, LLC, Arena Management Group LLC, Coyotes Newco LLC, and Arena Newco LLC dated November 2, 2009 (the "APA"). A copy of the APA is attached to the Stipulated Order as Exhibit A. The sale of assets to the Buyers closed on November 2, 2009 (the "Closing").

8. The APA contemplates, but does not require, that the Buyers will sell the Team to a third party sometime in the future. The Buyers, therefore, might: (a) sell the Team to a third party who keeps the Team in Glendale, Arizona (a "Glendale Sale"); (b) sell the Team to a third party who moves the Team to another location (a "Relocation Sale"); or (c) retain ownership of the Team.

9. Schedule 2.14(a) of the APA is a list of contracts that relate, directly or indirectly, to the operation of the Arena. The Contracts are included within the list of contracts identified on Schedule 2.14(a) to the APA.

10. Because of the uncertainty regarding the future ownership and location of the Team, none of the Contracts were assumed and assigned to the Buyers at the Closing. Under the APA, however, the Buyers can direct the Sellers to assume and assign any of the Contracts to the Buyers at any time between the Closing and June 30, 2010. See APA §§ 2.9(b) and 2.14(b). Accordingly, the Sellers are not permitted to reject any of the Contracts before June 30, 2010. See APA § 2.14(a).

11. The practical effect of the APA as it relates to the Contracts, therefore, is that if the Buyers are unable to consummate a Glendale Sale by June 30, 2010, then the Sellers must move the Court for an order approving the rejection of the Contracts under Bankruptcy Code

SL01DOCS\3325813.3

4

Section 365 as of June 30, 2010, to the extent such Contracts are subject to Section 365. To the extent the Contracts are not subject to rejection under Section 365, they will simply be terminated or breached, and the Sellers will no longer perform any remaining obligations thereunder.[1]

**Chapter 11 Plan**

12. The Debtor filed its Plan on December 7, 2009. The Plan provides for the formation of a liquidation trust to make cash distributions to creditors on account of their allowed claims. See Plan, Article IV. The Plan requires that a sufficient amount of cash will be held in reserve to pay any disputed or contingent unsecured claims before the holders of allowed unsecured claims can receive their pro rata distributions of available cash under the Plan. See Plan § 4.02(c). The ability of the Debtor to create the necessary reserves is dependent upon the Debtor's ability to estimate the Potential Claims that may be associated with the Contracts.

## II. RELIEF REQUESTED AND BASIS FOR RELIEF

13. The sale of the Sellers' assets to the Buyers is complete, and the Sellers will reject any of the Contracts that are not assumed and assigned to the Buyers on or before June 30, 2010. As such, the Potential Claims must be estimated so that the Debtor can administer and wind down its bankruptcy case. Indeed, the Debtor cannot make any pro rata distributions to holders of allowed unsecured claims under the Plan unless this Court estimates the Potential Claims.

14. To bring this bankruptcy case to a conclusion, the Debtor seeks entry of an order under Bankruptcy Code Sections 105(a) and 502(c) estimating the amount of the Potential Claims against the Debtor for the purpose of establishing an appropriate reserve of funds under section 4.02(c) of the Plan.

15. However, for purposes of clarity, the Debtor is _not_ requesting that the Court allow any Potential Claims on a final basis under Bankruptcy Code § 502 at this time. Instead, the Debtor is simply requesting that the Court estimate and determine a maximum amount in which

---

[1] Some of the Contracts may not be eligible for assumption or rejection under Bankruptcy Code Section 365 because they are not executory contracts or unexpired leases, or because the contracts will have expired by their terms on or before June 30, 2010.

Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
(602) 364-7000

each Potential Claim might be allowed under Bankruptcy Code § 502, subject to final determination and allowance at a later time. As a result, the Debtor will be able to establish an appropriate reserve of cash under the Plan to pay each Potential Claim in the event that such claim ultimately becomes a non-contingent allowed claim.

16. Bankruptcy Code Section 502(c) provides that "[t]here shall be estimated for purpose of allowance under this section -- (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ." 11 U.S.C. § 502(c). The Potential Claims are contingent claims for purposes of Section 502(c) because the parties do not know whether the Contracts will be assumed and assigned to the Buyers or rejected or otherwise terminated by the June 30, 2010 deadline set forth in the APA. See In re Kriesler, 407 B.R. 321, 325 (Bankr. N.D. Ill. 2009) ("a contingent claim . . . is a claim which has not yet accrued and which is dependent upon some future event, an event that may in fact never happen") (emphasis added).

17. The administration of the Debtor's estate will be delayed for months or more if the Potential Claims are not estimated now. The Debtor needs to establish an appropriate cash reserve for the Potential Claims before any pro rata distributions can be made on allowed unsecured claims under the Plan. Estimation of the Potential Claims is necessary, therefore, to avoid delay in the administration of the Debtor's estate. See In re Dant & Russell, Inc., 951 F.2d 246, 248 (9th Cir. 1991) ("Section 502(c) permits the estimation of contingent or unliquidated claims so that delay in the administration of the estate may be avoided"); In re Corey, 892 F.2d 829, 834 (9th Cir. 1989) (holding that estimation of claim under section 502(c) was appropriate to avoid delay in confirming plan and making distributions to creditors under plan); see also 11 U.S.C. § 105(a) (providing that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").

### III. ESTIMATION OF POTENTIAL CLAIMS

18. For purposes of estimating the Potential Claims, the applicable date for the determination of any damages or claims related to the Contracts will be June 30, 2010, because

June 30, 2010 is the date on which the Debtors must reject any Contracts that have not been assumed and assigned to the Buyers under the APA.

19. The Debtor is engaged in the process of reviewing each of the Contracts in detail to determine the magnitude of the Potential Claim, if any, that would accompany the rejection, termination, or other potential breach of each Contract, should the Buyers determine that any particular Contract will not be assumed and assigned in connection with a Glendale Sale.

20. The precise damage calculations for each Potential Claim remain unknown at this time, and thus, the Debtor is not able to provide estimates of the Potential Claims as part of this Motion. Rather, the Debtor requests simply that the Court acknowledge the pressing need to estimate the Potential Claims and set a schedule for their estimation and determination for purposes of distributions under the Plan. Discovery of the counterparties to the Contracts may be necessary in order to accurately estimate the amount of each Potential Claim, and the parties may need to engage experts with respect to the determination of certain damages issues. Accordingly, the Debtor requests that the Court set a final evidentiary hearing with respect to the determination of each Potential Claim under the Contracts, as well as a schedule for briefing and discovery with respect to the determination of the Potential Claims.

21. The estimation of the Potential Claims is crucial to the Debtor's ability to create appropriate reserves so that it may begin making distributions under the Plan in a timely fashion. At the same time, a briefing and discovery schedule for the estimation of the Potential Claims will allow the Debtor and the relevant Contract counterparties to obtain the information necessary to estimate each Potential Claim accurately and to narrow the issues and scope of such claims prior to a final evidentiary hearing.

## IV. CONCLUSION

22. WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) recognizing the need to estimate the Potential Claims pursuant to Bankruptcy Code Sections 105(a) and 502(c) for the purpose of establishing an appropriate reserve of funds under Section 4.02(c) of the Plan, (b) setting a final evidentiary hearing on the estimation of the Potential Claims, (c) setting a schedule for discovery (including discovery of experts) and briefing with

respect to the estimation of each Potential Claim, and (d) granting such other and further relief as is just and proper.

DATED: March 11, 2010.

By: /s/ [signature]
Robert J. Miller, Esq. (#013334)
Edward M. Zachary, Esq. (#019643)
**BRYAN CAVE LLP**
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004
Telephone: (602) 364-7000
Internet: rjmiller@bryancave.com
edward.zachary@bryancave.com

- and –

Christopher J. Lawhorn, Esq.
(Missouri Bar No. 45713)
(Admitted Pro Hac Vice )
Herbert R. Giorgio, Jr., Esq. (Missouri Bar No. 58245)
(Admitted Pro Hac Vice )
**BRYAN CAVE LLP**
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone:(314) 259-2000
Internet: cjlawhorn@bryancave.com
herb.giorgio@bryancave.com

*Conflicts Counsel to the Debtors-In-Possession*

# EXHIBIT A - CONTRACTS

| Contract Number[1] | Description and Parties to Agreement | Subject Matter of Agreement |
|---|---|---|
| 1 | Partition and Sale Agreement, dated as of September 25, 2006, by and among Arizona Hockey Management, Inc., Arena Management Group, LLC, Arena Management Holdings, LLC, Arena Development, LLC, Center Ice Holdings, LLC, Coyote Center Development, LLC, Coyotes Hockey, LLC, Coyotes Holdings, LLC, E-Arena Holdings, LLC, Ellman Holdings, Inc., Glendale-101 Development, LLC, Jerry Moyes, Coyotes Holdings MemberCo, LLC, 101 Holdings, LLC, Steve M. Ellman, SUB Investments, LLC, Jerry and Vickie Moyes Family Trust, Westgate Investments, LLC and Westgate Signage, LLC | Relates to restructuring of Coyotes ownership and other assets |
| 2 | Memorandum of Amended and Restated Agreement in Respect of Parking and Mixed-Use Development Agreement dated July 1, 2008, by and among Coyote Center Development, LLC, Glendale 101-Development, LLC, Arena Development, LLC, Westgate Investments, LLC, Coyotes Hockey, LLC, and Arena Management Group, LLC | Notice of the existence of the Amended and Restated Agreement in Respect of Parking and Mixed-Use Development Agreement (Document #2) |
| 3 | Agreement for the Replacement of Temporary Parking, dated as of July 1, 2008, by and among City of Glendale, Coyote Center Development, LLC, Coyotes Hockey, LLC, Arena Management Group, LLC and Glendale Garage LLC | Relates to contribution to construction of parking facilities |

---

[1] References to each Contract number are to the number ascribed to such Contract in Schedule 2.14(a) of the APA.

| Contract Number[1] | Description and Parties to Agreement | Subject Matter of Agreement |
|---|---|---|
| 4 | Declaration of Easements, dated as of September 25, 2006, by and among Coyotes Center Development, LLC, Coyotes Hockey, LLC and Arena Management Group, LLC | Non-exclusive, perpetual easements for specified purposes |
| 5 | Master Declaration of Easements, Covenants, Conditions and Restrictions for Westgate, dated as of January 30, 2006, by Coyote Center Development, LLC and Entertainment Center Development, LLC (as supplemented and amended by certain Supplemental Declarations) | Easements and covenants related to certain real property |
| 6 | Common Operation and Reciprocal Easement Agreement for the Entertainment District at Westgate, dated as of February 15, 2006, by Coyote Center Development, LLC and Entertainment Center Development, LLC | Covenants, conditions and restrictions related to the Entertainment District within Westgate and related easements |
| 7 | Common Operation and Reciprocal Easement Agreement for the Village Retail District at Westgate, dated as of February 15, 2006, by Coyote Center Development, LLC (as supplemented and amended by Supplemental Declaration) | Covenants, conditions and restrictions related to Village Retail District within Westgate and related easements |
| 8 | Common Operation and Reciprocal Easement Agreement for the Destination Retail District at Westgate, dated as of February 15, 2006, by Coyote Center Development, LLC (as supplemented and amended by Supplemental Declaration) | Covenants, conditions and restrictions related to Destination Retail District within Westgate and related easements |
| 9 | Nondisturbance and Attornment Agreement by and among Credit Suisse, Coyotes Hockey, LLC, Arena Management Group, LLC and Coyotes Holdings, LLC | Non-disturbance and attornment agreement related to the Westgate Development Project |

| Contract Number[1] | Description and Parties to Agreement | Subject Matter of Agreement |
|---|---|---|
| 10 | Parking Replacement Agreement, dated as of September 25, 2006, by and among Coyote Center Development, LLC, Coyotes Hockey, LLC and Arena Management Group, LLC | Relates to an option to purchase certain real property |
| 11 | Revised and Restated Parking Use License and Easement Agreement, dated as of July 1, 2008, by and among Coyotes Hockey, LLC and Arena Management Group, LLC and Westgate Investments, LLC and Coyote Center Development, LLC | Parking agreement |
| 12 | Reassignment and Assumption Agreement dated as of September 25, 2006, by and among Coyote Center Development, LLC and Coyotes Hockey, LLC | Naming rights |
| 13 | Safety and Security Agreement, dated as of November 29, 2001, by and among the City of Glendale, Arena Management Group, LLC and Coyotes Hockey, LLC | Security and traffic control |
| 14 | Consolidated Trailing Agreement dated as of September 25, 2006, by and among Arena Management Group, LLC, Arizona Lacrosse, LLC, Coyote Center Development, LLC, Coyotes Hockey, LLC, Entertainment Center Development, LLC, Steven M. Ellman and Westgate Investments, LLC | Additional agreement related to Partition and Sale Agreement |
| 15 | Sponsorship and Marketing Cooperation Agreement, dated as of September 25, 2006, by and among Coyote Center Development, LLC, Entertainment Center Development, LLC, Westgate Signage, LLC, Arena Management Group, LLC and Coyotes Hockey, LLC | Agreement regarding sponsorship and marketing efforts related to the Coyotes, the Arena, and the Westgate project |

SL01DOCS\3326039.3

| Contract Number[1] | Description and Parties to Agreement | Subject Matter of Agreement |
|---|---|---|
| 17 | Agreement dated August 29, 2002, by and among B&B Holdings d/b/a Arizona Cardinals, Coyote Center Development, LLC, Arena Development, LLC, Glendale-101 Development, LLC, Coyotes Hockey, LLC, and Arena Management Group, LLC | Relates to certain development and other rights |
| 18 | Assignment and Assumption Agreement dated as of September 25, 2006 by and among Coyote Center Development, LLC, Arena Development, LLC, Glendale-101 Development, LLC and Coyotes Hockey, LLC | Relates to agreement with B&B Holdings, Inc. |
| 117 | Office Lease, dated as of December 28, 2007 by and between Coyotes Hockey, LLC and Whiteout Way Investments, LLC | Office lease for Building "E" of the Entertainment District of Westgate |
| 131 | Agreement in Respect of Parking and Mixed-Use Development Agreement, dated September 25, 2006, among Coyote Center Development, LLC, Glendale-101 Development, LLC, Arena Development, LLC, Westgate Investments, LLC, Coyotes Hockey, LLC, and Arena Management Group, LLC | Parking agreement |
| 132 | Memorandum of Agreement, dated February 27, 2004, by and among the City of Glendale, Arena Management Group, LLC, Coyotes Hockey, LLC, Glendale-101 Development, LLC and Coyotes Center Development, LLC | Notice of the Arena Management, Use and Lease Agreement between the City of Glendale, Arena Management Group, LLC, Coyotes Hockey, LLC, Glendale-101 Development, LLC and Coyotes Center Development, LLC |
| 133 | Lots 7 and 14A Temporary Parking License Agreement, dated November 29, 2005, by and between the City of Glendale, Coyote Center Development, LLC, Arena Management Group, LLC and Coyotes Hockey, LLC | Parking agreement |

4

| Contract Number[1] | Description and Parties to Agreement | Subject Matter of Agreement |
|---|---|---|
| 134 | Media Tower Lease Agreement dated September 25, 2006, between Westgate Signage, LLC, as Lessor, and Coyotes Hockey, LLC, as Lessee | Lease of Media Tower |
| 135 | Parking Use License and Easement Agreement, dated September 25, 2006, by and among Coyotes Hockey, LLC and Arena Management Group, LLC, as Licensees, and Westgate Investments, LLC and Coyote Center Development, LLC, as Licensors | Parking agreement |
| 136 | Partial Re-Assignment and Assumption Agreement dated as of September 25, 2006, by and between Arena Development, LLC and Arena Management Group, LLC | Reallocation of certain fees |
| 137 | Recognition and Non-Disturbance Agreement, dated as of September 25, 2006, by and between Coyote Center Development, LLC and Coyotes Hockey, LLC | Non-disturbance agreement related to the Media Tower |
| 138 | Team Guaranty, dated as of January 31, 2002, by Coyotes Hockey, LLC, to and in favor of the City of Glendale | Guaranty related to certain tax payments |
| 141 | Recognition and Non-Disturbance Agreement dated September 25, 2006, by and between Coyotes Center Development, LLC, and Coyotes Hockey, LLC | Non-disturbance agreement |
| 142 | First American Title Insurance Company Construction Disbursement Escrow Agreement, dated as of July 1, 2008, by and among the City of Glendale, Coyote Center Development, LLC, Coyotes Hockey, LLC, Arena Management Group, LLC, Glendale Garage LLC and First American Title Insurance Company | Deposit and disbursement agreement |

SL01DOCS\3326039.3