Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Squire, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000
Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>COYOTES HOCKEY, LLC,<br><br>        Debtor. | Chapter 11<br>Case No. 2:09-bk-09488-RTBP<br>(Jointly Administered)<br><br>**DISCLOSURE STATEMENT IN SUPPORT OF AMENDED PLAN**<br>Dated May 25, 2010 |

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED FOR USE BY ANY PARTY IN THIS CASE. YOU ARE NOT NOW BEING ASKED TO VOTE. YOUR VOTE WILL NOT BE SOLICITED UNLESS AND UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT WITH RESPECT TO A PLAN. IF AND WHEN THAT OCCURS, YOU WILL RECEIVE A SEPARATE MAILING DESCRIBING THE PLAN VOTING PROCESS.**

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY ...................................................................................1

    A.      Overview....................................................................................................................1
    B.      Notice to Holders of Claims and Equity Interests.....................................................1
    C.      Summary Of Treatment Of Claims And Equity Interests Under The Plan.....................2

        NHL Subordinated Claims .........................................................................................3
        Equity Interests .........................................................................................................3

    D.      Voting Procedures, Ballots, and Voting Deadline .....................................................3
    E.      Confirmation Procedures ..........................................................................................4

II.     BACKGROUND REGARDING THE DEBTOR ........................................................5

    A.      Overview and History................................................................................................5
    B.      Prepetition Debt Structure ........................................................................................6
    C.      Prepetition Capital Structure .....................................................................................6
    D.      Events Precipitating the Chapter 11 Case ..................................................................8

III.    SIGNIFICANT EVENTS IN CHAPTER 11 CASE...................................................8

    A.      Automatic Stay; Administrative Status......................................................................8
    B.      Significant Events During the Chapter 11 Case; Asset Sale......................................9

IV.     DESCRIPTION OF THE PLAN ..................................................................................11

    A.      Introduction.............................................................................................................11
    B.      Summary of Claims Process, Bar Date, and Professional Fees ...............................12
    C.      Classification and Treatment of Claims and Equity Interests, Generally ........................12
    D.      Treatment of Unclassified Claims ...........................................................................12

        1.      Allowed Administrative Claims ..................................................................12
        2.      Priority Tax Claims ....................................................................................13
        3.      Professional Fees ........................................................................................13
        4.      Treatment ...................................................................................................13

    E.      Treatment of Classified Claims and Interests .........................................................14

        1.      Class 1 (Priority Claims)............................................................................15
        2.      Class 2 (General Unsecured Claims) ..........................................................15
        3.      Class 3 (NHL Subordinated Claims) ..........................................................15
        4.      Class 4 (Equity Interests) ...........................................................................16

V.      IMPLEMENTATION OF THE PLAN........................................................................16

    A.      Effective Date Funding............................................................................................16
    B.      Liquidation Trust ....................................................................................................16

        1.      The Liquidation Trustee..............................................................................17
        2.      Purposes .....................................................................................................18
        3.      Disputed Claims .........................................................................................18
        4.      Section 1145 Exemption .............................................................................18

VI.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................18

    A.      Assumption and Rejection of Contracts and Leases.................................................18

|   |   |   |   |
|---|---|---|---|
| | B. | Cure of Defaults | 19 |
| | C. | Rejection Damages Bar Date | 19 |
| | D. | Indemnification Obligations | 19 |
| | E. | Benefit Plans | 20 |

| VII. | | DESCRIPTION OF OTHER PROVISIONS OF THE PLAN | 20 |
|---|---|---|---|
| | A. | Vesting of Assets | 20 |
| | B. | Injunction | 20 |
| | C. | Exculpation | 21 |
| | D. | Avoidance Actions and Litigation Claims | 21 |
| | E. | Retention of Jurisdiction After the Effective Date | 21 |

| VIII. | | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 23 |
|---|---|---|---|
| | A. | Acceptance of the Plan | 23 |
| | B. | Feasibility of the Plan | 23 |
| | C. | Best Interests Test | 24 |
| | | 1. Explanation | 24 |
| | | 2. Application of the Liquidation Analysis | 25 |

| IX. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 25 |
|---|---|---|---|
| | A. | Introduction | 25 |
| | B. | United States Federal Income Tax Consequences to the Debtor | 26 |
| | C. | Federal Income Tax Consequences to Creditors | 26 |
| | | 1. Generally | 26 |
| | | 2. Accrued Interest | 29 |
| | | 3. Market Discount | 29 |
| | | 4. Original Issue Discount | 29 |
| | | 5. Other Claimholders | 30 |
| | | 6. Information Reporting and Backup Withholding | 30 |
| | D. | Importance of Obtaining Professional Tax Assistance | 30 |

| X. | | RISK FACTORS | 31 |
|---|---|---|---|
| | A. | Generally | 31 |
| | B. | Risk of Non-Confirmation of the Plan | 31 |

| XI. | | ALTERNATIVES TO THE PLAN | 31 |
|---|---|---|---|
| | A. | Continuation of the Chapter 11 Case | 32 |
| | B. | Alternative Plans of Reorganization | 32 |
| | C. | Liquidation Under Chapter 7 | 32 |

| XII. | | CONCLUSION | 32 |
|---|---|---|---|
| | A. | Hearing on and Objections to Confirmation | 32 |
| | | 1. Confirmation Hearing | 32 |
| | | 2. Deadline for Objections to Confirmation | 33 |
| | B. | Recommendation | 33 |

APPENDICES TO DISCLOSURE STATEMENT

Appendix 1 – Plan

Appendix 2 – Order Approving Disclosure Statement

Appendix 3 – CV of Michael Carmel

Appendix 4 – Selected Financial Information

Appendix 5 – Liquidation Analysis

# I.  INTRODUCTION AND SUMMARY

## A.  Overview

Coyotes Hockey, LLC (the "*Debtor*") filed its voluntary Chapter 11 bankruptcy petition under Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Arizona (the "*Bankruptcy Court*") on May 5, 2009 (the "*Petition Date*"), the same day the Debtor's affiliates, Arena Management Group, Inc. ("*AMG*"), Coyotes Holdings, LLC ("*Holdings*"), and Dewey Ranch Hockey, LLC ("*Dewey*") filed voluntary Chapter 11 petitions, commencing these jointly-administered cases.

The Bankruptcy Court has approved this disclosure statement (the "*Disclosure Statement*") under Bankruptcy Code § 1125 in connection with confirmation of the Plan (the "*Plan*") proposed by the Debtor in this case (the "*Chapter 11 Case*"). The Plan was filed with the Bankruptcy Court on May 10, 2010. The Plan addresses the assets and liabilities of the Debtor only; it does not address the assets and liabilities of AMG, Holdings, or Dewey.

The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan. A copy of the Plan, separately filed in the Chapter 11 Case, is **Appendix 1** to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the circumstances giving rise to this Chapter 11 Case, significant events that have occurred during the Chapter 11 Case, and the anticipated liquidation of the Debtor under the Plan. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how voting on the Plan will occur. Certain provisions of the Plan, and the descriptions and summaries contained in this Disclosure Statement, may be the subject of continuing negotiations among the Debtor and various parties, may not have been finally agreed on, and may be modified. Those modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Debtor is the proponent of the Plan within the meaning of Bankruptcy Code § 1129. The Plan contains separate Classes and proposes recoveries for holders of Claims against and Equity Interests in the Debtor. After careful review of the Debtor's current financial condition and the needs associated with the liquidation of the Debtor's assets, the Debtor has concluded that the recovery to Creditors will be maximized by the structured liquidation of the Debtor as contemplated by the Plan.

## B.  Notice to Holders of Claims and Equity Interests

This Disclosure Statement is being used to solicit votes on the Plan only from holders of impaired Claims, and is being transmitted to Creditors with unimpaired Claims and to Equity

Holders and other parties in interest for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of an impaired Claim to make a reasonably informed decision with respect to the Plan before voting to accept or reject the Plan.

On DATE, 2010 the Bankruptcy Court entered an order, attached as **Appendix 2** to this Disclosure Statement, approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Creditors to vote on the Plan as required by Bankruptcy Code § 1125. **The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guaranty of the accuracy or completeness of the information contained in this Disclosure Statement or the Bankruptcy Court's endorsement of the Plan.**

Holders of Claims are encouraged to read this Disclosure Statement and its appendices carefully and completely before deciding to accept or reject the Plan. If a description in this Disclosure Statement and a term of the Plan conflict, the Plan governs.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions and projections that may be materially different from actual or future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may have a material effect on the information contained in this Disclosure Statement. The Debtor does not intend to update the information contained in this Disclosure Statement.

The financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

This Disclosure Statement has been prepared in accordance and compliance with Bankruptcy Code § 1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "*SEC*"), nor has the SEC passed on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Equity Interests in, the Debtor.

## C.     Summary Of Treatment Of Claims And Equity Interests Under The Plan

The Plan contains definitions and rules of interpretation and provides the treatment of separate classes for holders of Claims against, and Equity Interests in, the Debtor. As provided

by Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in Section IV of this Disclosure Statement and Articles 2 and 3 of the Plan.

| Class | Description | Treatment |
|---|---|---|
| 1 | Priority Claims<br><br>**(Unimpaired; deemed to accept)** | Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of those two dates, the holder of the Claim and the Liquidation Trust agree in writing to a different date. |
| 2 | Unsecured Claims<br><br>**(Impaired; entitled to vote)** | Each holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of its Allowed Class 2 Claim, a Pro Rata beneficial interest in the Liquidation Trust. |
| 3 | NHL Subordinated Claims<br><br>**(Impaired; entitled to vote)** | The NHL will receive, on account of and in full and final satisfaction of each of its Allowed Class 3 Claims, a Pro Rata beneficial interest in the Liquidation Trust. The NHL agreed under the Asset Purchase Agreement to voluntarily subordinate all NHL Subordinated Claims to all Non-Insider Claims. Accordingly, all distributions from the Liquidation Trust on account of the beneficial interests attributable to the NHL Subordinated Claims are automatically redistributed Pro Rata to the beneficial interests attributable to all Non-Insider Claims until the latter beneficial interests have received distributions totaling the amount of all Allowed Non-Insider Claims, after which the beneficial interests attributable to the NHL Subordinated Claims and the beneficial interests attributable to the Moyes Claims and the Gretzky Claims receive all distributions Pro Rata. |
| 4 | Equity Interests<br><br>**(Impaired; deemed to reject)** | The holders of Equity Interests will not receive or retain any rights, property, or distributions on account of their Equity Interests under the Plan. |

## D.     Voting Procedures, Ballots, and Voting Deadline

Accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (**Appendix 1** and separately filed in this Chapter 11 Case); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the

hearing to consider confirmation of the Plan, and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"); and (3) if you are entitled to vote, a Ballot (and return envelope along with detailed instructions accompanying the Ballot) to be used in voting to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by completing the Ballot. You must provide all the information requested on the Ballot; failure to do so may result in your vote being disqualified. For your vote to be counted, your Ballot must be properly completed and **ACTUALLY RECEIVED** no later than DATE, 2010 at 5:00 p.m. Arizona Time (the "*Voting Deadline*") by counsel for the Debtor, whose address and contact information is on the Ballot.

**Ballots should NOT be sent to the Debtor, the Bankruptcy Court, the U.S. Trustee, or any other party other than the Debtor's Counsel. Ballots not received by the Voting Deadline by the Debtor's counsel will not be counted.**

If: (1) you have any questions about the procedure for voting or the packet of materials that you have received; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to either of those documents, please contact: Karen Graves; Squire, Sanders & Dempsey L.L.P.; 40 North Central Avenue, Suite 2700; Phoenix, AZ 85004; Telephone: (602) 528-4000; e-mail kgraves@ssd.com.

**E.      Confirmation Procedures**

Under Bankruptcy Code § 1126(f), if a class of claims or interests is unimpaired under a plan, that class (and each member of that class) is conclusively presumed to have voted in favor of the plan and is not solicited to vote on the plan. In this Chapter 11 Case, the Plan contains two Classes of Creditors and one Class of Equity Interests. All Unclassified Claims and Claims in Class 1 are unimpaired by the Plan and holders of such Claims are presumed to have voted in favor of the Plan and will not be solicited to vote on the Plan. All Claims in Classes 2 and 3 are impaired and holders of such Claims are entitled to vote to accept or reject the Plan. Class 4 under the Plan (Equity Interests) is impaired under the Plan; members of that Class will neither receive nor retain any property on account of their Equity Interests. Accordingly, Class 4 is deemed to reject the Plan and its members will not be solicited to vote on the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to begin on DATE, 2010 at _____ __.m. (Arizona time) before the Honorable Redfield T. Baum, United States Bankruptcy Judge, at the United States Bankruptcy Court, 203 North 1st Avenue, Phoenix, Arizona 85003. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjournment date made at the Confirmation Hearing. The Bankruptcy Court has ordered that any objections to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are actually received on or before DATE, 2010, at 5:00 p.m. (Arizona time) by Counsel to the Debtor and the Office of the United States Trustee.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AND STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      BACKGROUND REGARDING THE DEBTOR

### A.      Overview and History

The Debtor, Coyotes Hockey, is a Delaware limited liability company based in Glendale, Arizona that owned and operated the Phoenix Coyotes professional hockey team (the "*Phoenix Coyotes*"), which is a member of the Pacific Division of the Western Conference of the National Hockey League (the "*NHL*"). The NHL is a professional ice hockey league composed of 30 teams in North America. It is the premier professional ice hockey league in the world and one of North America's major professional sports leagues.

The Phoenix Coyotes were founded in 1972 as the Winnipeg Jets of the World Hockey Association (the "*WHA*"). The Winnipeg Jets were the most successful team in the short-lived WHA, winning three Avco World Trophies, the WHA's championship trophy, and making the finals five out of the WHA's seven seasons. The NHL and WHA competed for players and fans until the WHA folded in 1979 as part of an agreement under which four of the remaining six WHA teams, including the Winnipeg Jets, entered the NHL as expansion teams.

In October 1995, the Winnipeg Jets were purchased by American businessmen Richard Burke and Steven Gluckstern. Mr. Burke and Mr. Gluckstern relocated the team to Phoenix, Arizona and renamed the team the "Phoenix Coyotes." In 1997, Mr. Burke purchased Mr. Gluckstern's interest in the Phoenix Coyotes.

From the commencement of the 1996–1997 season until December 2003, the Phoenix Coyotes played their home games in the America West Arena in downtown Phoenix (now US Airways Arena). This location was a state-of-the-art basketball facility, but its small size made it grossly inadequate for a professional hockey organization. Poor sight lines for hockey games (more than 4,000 seats had obstructed views of the on-ice play) hurt ticket sales, and this— combined with an unfavorable lease that had the Phoenix Coyotes turning over a sizeable portion of its ticket revenues to the Phoenix Suns professional basketball team—resulted in financial woes for the Phoenix Coyotes.

Mr. Burke sold the Phoenix Coyotes in 2001 to Phoenix-area real estate developer Steven Ellman, with Wayne Gretzky as a part-owner and Managing Partner. Mr. Ellman was successful in attracting new investors, the largest of whom was Jerry Moyes, the founder and Chief Executive Officer of Phoenix-based trucking company Swift Transportation Co., Inc. With significant financial support from Mr. Moyes, the Phoenix Coyotes were able to obtain additional bank financing and the commitment of the City of Glendale to build a new hockey arena. In this regard, the Phoenix Coyotes played their first game in the new Glendale Arena, which has since been renamed "Jobing.com Arena," on December 27, 2003.

Until September 2006, Steven Ellman and Jerry Moyes were co-owners of the Westgate City Center Development, a suburban shopping and entertainment development that includes Jobing.com Arena. In September 2006, Jerry Moyes, deciding to focus his energies on the Phoenix Coyotes, entered into an agreement with Steven Ellman, that left Mr. Ellman and certain of his affiliates in control of the Westgate City Center Development, and ultimately, through various affiliated entities, left Mr. Moyes and his wife Vickie Moyes as super-majority owners of the Phoenix Coyotes.

Coyotes Hockey is owned by a handful of investors, the foremost of whom (in terms of ownership percentage and dollars invested) are ultimately Jerry and Vickie Moyes. Hockey Hall of Fame member Wayne Gretzky also owns a portion of Coyotes Hockey, and, until shortly before the start of the 2009-2010 season, was the team's head coach.

## B.    Prepetition Debt Structure

As of the Petition Date, the Debtor was the borrower under two significant secured debts. The Debtor owed the NHL approximately $23.7 million as of the Petition Date for periodic advances made to the Debtor beginning in November 2008, and approximately $13.3 million as of the Petition Date under a February 2009 letter agreement. All loans from the NHL were secured by a perfected security interest in substantially all the Debtor's assets. Before the NHL made those loans to the Debtor, the Debtor had borrowed approximately $75,000,000 from SOF Investments, L.P., White Tip Investments, LLC, and Donatello Investments, LLC (collectively, "*SOF*"). The loans from SOF were secured by a perfected security interest in substantially all the Debtor's assets. In connection with the NHL's loans to the Debtor, SOF agreed to subordinate their security interest in the Debtor's assets to the NHL's security interest in the Debtor's assets to the extent of any amounts loaned by the NHL to the Debtor.

Also as of the Petition Date, the Debtor had approximately $159,800,000 in unsecured debt obligations, comprising trade debt of approximately $52,300,000 and two substantial obligations to insiders: (a) a debt of approximately $100,000,000 to Jerry Moyes, the ultimate owner of the Debtor and its affiliates, for unsecured loans made to the Debtor to fund substantial operating losses (the "*Moyes Claim*"); and (b) a claimed debt of approximately $7,500,000 to Wayne Gretzky, the Phoenix Coyote's former head coach and minority owner of the Debtor, for employment compensation (the "*Gretzky Claim*"). The City of Glendale, Arizona ("*Glendale*") and the Official Committee of Unsecured Creditors (the "*Committee*") have objected to the allowance and priority of both the Moyes Claim and the Gretzky Claim on various bases, including that those Claims should be equitably subordinated under Bankruptcy Code § 510(c). The Debtor has not taken a formal position as to the allowance or priority of the Moyes Claim or the Gretzky Claim, and has assigned to the Committee its rights to object to the allowance and priority of the Moyes Claim and related claims in accordance with a stipulated order entered by the Bankruptcy Court on September 23, 2009.

## C.    Prepetition Capital Structure

The Debtor is a Delaware limited liability company, who sole member is Holdings. The organizational structure of the Debtor and its affiliates is reflected in the following chart:



Jerry and Vickie Moyes
(Jerry and Vickie Moyes are co-trustees and beneficiaries of The Jerry and Vickie Moyes Family Trust)
Jerry Moyes Owns 99% of Coyotes Holdings MemberCo., LLC
Vickie Moyes owns 1% of Coyotes Holdings MemberCo, LLC
The Jerry and Vickie Moyes Family Trust
owns 75.14% of Coyotes Holdings, LLC
Coyotes Holdings MemberCo, LLC
owns 24.86% of Coyotes Holdings, LLC
Coyotes Holdings, LLC
is the Managing Member and owner of 91.79% of the Units of Coyote Hockey, LLC
and
is the Managing Member and 100% owner of Arena Management Group, LLC
Hunter ½ Class A Unit
0.7463%
Breslow IRA 1 Class A Unit
1.4925%
Breslow 1 Class A Unit
1.4925%
Wikert 1 Class A Unit
1.4925%
Lake Street 1 Class A Unit
1.4925%
Gretzky 1 Class A Unit
1.4925%
Arena Management Group, LLC
Coyotes Hockey, LLC
Dewey Ranch Hockey, LLC
Jerry Moyes is the Manager and Coyotes Hockey, LLC is the sole Member

**D. Events Precipitating the Chapter 11 Case**

The Phoenix Coyotes have never operated at anything approaching a profit in any year since relocating from Winnipeg, Manitoba (where they played as the Winnipeg Jets) for the 1996 season. Since moving from the America West Arena (now US Airways Center) in downtown Phoenix to the Jobing.com Arena in Glendale, the Phoenix Coyotes' operating losses deepened, posting negative EBITDA of $21,870,000 for the 2005-2006 season, negative $29,511,000 for 2006-2007, and negative $21,727,000 for the 2007-2008 season.

Moyes determined that continued operations of the Debtor's hockey team were not sustainable and that he was unwilling to continue to provide unsecured loans to the Debtor to maintain those operations. Although the NHL provided secured funding as outlined above, there was no certain source of future funding for the Debtor and the NHL could discontinue funding at any time. The Debtor, therefore, undertook a concerted effort to market the Debtor for sale or other capital infusion. On behalf of the Debtor, Citi Private Bank Group at Citibank, N.A. ("*Citi*") and the Scudder Law Firm, P.C. (the "*Scudder Firm*"), identified and contacted strategic investors that may be interested in purchasing the Debtor's assets or investing in the organization. Both Citi and the Scudder Firm provided interested investors and purchasers with substantial amounts of information regarding the Debtor to assist them with their evaluation of the Debtor's business. Citi and the Scudder Firm received and evaluated proposals from interested purchasers and investors, the descriptions of which were filed under seal.

After months of substantial prepetition marketing efforts to find one or more purchasers or investors, the Debtor located PSE Sports & Entertainment, L.P. ("*PSE*"), which is an acquisition vehicle owned by Jim Balsille, a Canadian millionaire and founder of Research In Motion (the maker of the Blackberry communication devices). After substantial arm's-length negotiations, the Debtor and PSE entered into an asset purchase agreement dated May 5, 2009, under which PSE agreed to purchase substantially all of the Debtor's assets in the context of a Chapter 11 bankruptcy for an aggregate purchase price of $212.5 million. This sale also contemplated the relocation of the Phoenix Coyotes to Hamilton, Ontario in time to begin the 2009-2010 hockey season in October 2009. The Debtor commenced this Chapter 11 Case to, among other things, effectuate the proposed sale to PSE under the PSE asset purchase agreement and relocate the Phoenix Coyotes to Hamilton, Ontario.

**III.     SIGNIFICANT EVENTS IN CHAPTER 11 CASE**

**A.     Automatic Stay; Administrative Status**

The Chapter 11 Case was assigned to the Honorable Redfield T. Baum, United States Bankruptcy Judge for the District of Arizona. Since the Petition Date, the Debtor has operated as a debtor-in-possession under Bankruptcy Code §§ 1107 and 1108. The Debtor hired Squire, Sanders & Dempsey, L.L.P. as its general bankruptcy counsel and Bryan Cave, LLP as special conflicts counsel. An Official Committee of Unsecured Creditors was appointed in the Chapter 11 Case on DATE, 2009. The Committee hired Allen, Sala & Bayne, P.C. as its bankruptcy counsel.

An immediate effect of the commencement of the Chapter 11 Case was the imposition of the automatic stay under Bankruptcy Code § 362 that, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the commencement or continuation of litigation against the Debtor. This relief provided the Debtor with the "breathing room" necessary to pursue its business objectives in the Chapter 11 Case without undue pressure or litigation by Creditors. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of the Plan.

## B.    Significant Events During the Chapter 11 Case; Asset Sale

Substantially all the activity in the Chapter 11 Case from the Petition Date was devoted to an extensive sale process designed to solicit competitive bids for the purchase and sale, under Bankruptcy Code § 363, of substantially all the Debtor's assets (the "*Sale Process*").

The Sale Process began shortly after the Petition Date, when the Debtor filed a motion with the Bankruptcy Court seeking approval of certain procedures designed to solicit bids for a sale of the Phoenix Coyotes (a "*Sale*") competing with a "stalking horse" offer of approximately $212.5 million in cash by PSE. The Debtor's proposed sale procedures—and ultimate goal of a Sale to PSE—met with immediate and profound opposition from, among other parties, the NHL and Glendale. Among many other arguments, the NHL argued that the Debtor could not sell the Phoenix Coyotes to a proposed buyer that had not been approved as an owner in accordance with a vote of the other NHL team owners and under the terms of the NHL's constitution and bylaws and that any such approval was not possible within the deadlines required under the terms of PSE's proposed purchase. Glendale argued, among other things, that the Debtor's agreement with Glendale—the *Arena Management, Use, and Lease Agreement* (the "*AMULA*")—could not be rejected as an executory contract under Bankruptcy Code § 365 and that the Debtor could not sell its assets to a purchaser that would relocate the team without violating alleged specific performance provisions of the AMULA or incurring a debt of many hundreds of millions of dollars.

Without resolving the issues pertaining to the AMULA, on June 15, 2009, the Bankruptcy Court ruled that it could not approve a sale of the Phoenix Coyotes to PSE in accordance with the PSE offer on the record before it. Specifically, the Bankruptcy Court ruled, among other things, that the record did not establish that a *bona fide* dispute existed under Bankruptcy Code § 363 to sell the assets free and clear of the NHL's interests. Moreover, the Bankruptcy Court ruled that it likely could not force the NHL to make a decision on the Debtor's and PSE's relocation application prior to the June 29, 2009, deadline imposed under the PSE asset purchase agreement. The Bankruptcy Court, therefore, denied the Debtor's efforts to sell the Debtor's assets to PSE and relocate the Phoenix Coyotes without prejudice.

Notwithstanding that ruling, the Debtor negotiated with PSE a revised bid to purchase the Debtor's assets, renewed its motion to sell the Debtor's assets to PSE, and sought to further develop the record before the Bankruptcy Court to establish, among other things, a *bona fide* dispute under Bankruptcy Code § 363. The Debtor and the NHL engaged in a disputed process to have the Bankruptcy Court approve alternative sale procedures that would permit potential buyers to again submit competing bids for the Phoenix Coyotes. The NHL prevailed, and the

Bankruptcy Court limited the initial round of bid solicitation to only those potential buyers who would agree to keep the Phoenix Coyotes in Glendale. After the completion of that initial round, no party had submitted a qualified, unconditional bid to purchase the Phoenix Coyotes and keep the team in Glendale. Under the procedures adopted by the Bankruptcy Court, the Debtor was permitted at that point to solicit bids from any potential purchasers, including those that, like PSE, would relocate the team out of Glendale.

Ultimately, only two qualified bidders agreed to pursue a purchase of the Phoenix Coyotes: PSE, which would relocate the team to Hamilton, Ontario; and the NHL. The NHL's bid would have satisfied all secured debt either by credit bid (for its own secured debt) or cash (of approximately $80 million, to satisfy SOF's secured debt), and that would have paid, in cash, substantially all unsecured claims against the Debtor other than the Moyes Claim and the Gretzky Claim. The NHL's bid was characterized generally as being worth approximately $140 million, while PSE's bid was characterized as being worth approximately $212.5 million, but ultimately included an offer to purchase Glendale's claims for up to $50 million in cash. By the time the Bankruptcy Court had scheduled an evidentiary hearing to consider the competing bids, the NHL's owners had voted to reject Balsille's application to be approved as an owner, and the NHL argued that PSE's bid could not be approved because the NHL's interest in protecting its membership parameters as a private organization could not be adequately protected.

The Bankruptcy Court conducted a lengthy evidentiary hearing on the competing bids and issued its ruling on September 30, 2009. The Bankruptcy Court ruled that the NHL had a non-monetary interest in maintaining the integrity of its private membership, that such an interest was not compensable by the payment of a "relocation fee" or other remuneration, and that the interest could not be adequately protected as required under Bankruptcy Code § 363(e). Accordingly, the Bankruptcy Court held that it could not approve the PSE bid and rejected that bid with prejudice. The Bankruptcy Court also found that the NHL bid unfairly and unjustifiably discriminated between similarly-situated unsecured claims—the NHL bid would have paid trade claims in full while leaving nothing for the Moyes Claim and the Gretzky Claim, among other discriminatory effects—and rejected the NHL bid without prejudice, expressly inviting the NHL to amend its bid to correct the infirmities the Bankruptcy Court identified.

Balsille and PSE declined to continue any further involvement in the Chapter 11 Case. At a hearing conducted in the Bankruptcy Court on October 26, 2009, the NHL announced the terms of a revised bid to purchase the Debtor after lengthy and detailed consultation with the Debtor, the Committee, and Jerry Moyes, represented by his own, separate counsel. The revised NHL bid proposed to purchase or pay substantially all (in number) of the Debtor's prepetition unsecured creditors, and pay the secured prepetition debt and secured postpetition debtor-in-possession financing debt owed to the NHL and SOF. The revised bid also proposed that the NHL and the Debtor enter into a transition services agreement and a partial lease assignment agreement under which the NHL will operate the Phoenix Coyotes and pay the Debtor's obligations under substantially all of its executory contracts and the AMULA for a period of time to allow the NHL to market the Phoenix Coyotes. This would effectively allow the NHL to solicit bids to purchase the Debtor's assets and keep the Phoenix Coyotes in Glendale, while at the same time leave open the possibility of a relocation of the Phoenix Coyotes (and rejection of executory contracts and the AMULA) if the NHL cannot find a Glendale purchaser.

The revised NHL bid is valued at approximately $128,382,121, which amount includes the payment of approximately $13.3 million to the Debtor's estate to satisfy professional administrative claims and to pay the allowed unsecured claims of creditors the NHL did not purchase or pay for under the revised NHL bid (effectively the Moyes Claim and the Gretzky Claim).

On November 2, 2009, the Bankruptcy Court entered an order approving the revised NHL bid, as further amended and described in that order, and the NHL closed the Sale the same day, wiring approximately $13.3 million in cash into the Debtor's estate.

As a part of the NHL sale transaction, the Debtor committed itself not to assume or reject any executory contract or unexpired lease, including the AMULA, until June 30, 2009, so that the NHL could continue to market the Phoenix Coyotes for sale to a buyer that will keep the team in Glendale. If such a buyer is found, the NHL will direct the Debtor to assume and assign some or all of the Glendale-related executory contracts and unexpired leases, including the AMULA (possibly, as amended under agreement between the buyer and Glendale). If such a buyer cannot be found by June 30, 2009—the approximate date of the end of the 2009-2010 NHL season—the NHL will likely pursue a sale of the team to a buyer that will relocate the team out of the Glendale area, necessitating a rejection of substantially all Glendale-related executory contracts and unexpired leases, including the AMULA.

Following the closing of the Sale, the Debtor's estate consists of little more than cash in the amount of $13.3 million and certain limited non-liquid assets, including causes of action under Chapter 5 of the Bankruptcy Code, not purchased by the NHL in the Sale. The Holdings and Dewey estates have essentially no debts and no assets. The AMG estate has some unsecured debts and may, if the Glendale-related contracts and leases (including the AMULA) are rejected, have additional, substantial debts. The AMG estate does not, however, have any substantial assets. Accordingly, its estate, as well as the Holdings and Dewey estates, may ultimately be liquidated under Chapter 7 of the Bankruptcy Code. The debts and assets of those estates are not the subject of the Plan.

## IV.  DESCRIPTION OF THE PLAN

### A.  Introduction

This section provides a summary of the Plan's structure, classification, treatment, and implementation. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to in the Plan, this Disclosure Statement is not a precise or complete statement of all the terms and provisions of the Plan or documents referred to in the Plan. Refer to the Plan and its exhibits for a complete statement of all the Plan's terms.

The Plan itself and the documents it refers to will control the treatment of holders of Claims against, and Equity Interests in, the Debtor under the Plan and will, on the Effective Date, be binding on all parties-in-interest, including holders of Claims against, and Equity Interests in, the Debtor. The Plan is designed to effect the complete liquidation of the Debtor's assets and a distribution of all Cash proceeds of that liquidation to Creditors.

**B.      Summary of Claims Process, Bar Date, and Professional Fees**

The Bankruptcy Court entered an order (the "*Bar Date Order*") setting August 14, 2009 as the deadline for filing proofs of claim against the Debtor (the "*Bar Date*"). The Bar Date does not apply to certain types of Claims, including Administrative Claims, Professional Fee Claims, and Rejection Claims arising after the Bar Date, as to which the bar date is controlled by provisions of the Plan and orders of the Bankruptcy Court authorizing the rejection of contracts or leases. Notice of the Bar Date was mailed to each person listed in the Schedules along with a copy of the Bar Date Order and a proof of claim form.

All Administrative Claims, Professional Fee Claims and Rejection Claims must be filed on or before the date that is the first Business Day that is 30 days after the Confirmation Date.

**C.      Classification and Treatment of Claims and Equity Interests, Generally**

Bankruptcy Code § 1122 requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if the claim or interest is substantially similar to the other claims or interests of that class. The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

The Debtor believes that it has classified all Claims and Equity Interests in compliance with the requirements of the Bankruptcy Code. If a holder of a Claim or Equity Interest challenges the Plan's classification of Claims or Equity Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor, to the extent permitted by the Bankruptcy Court, intends to modify the classifications of Claims or Equity Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. Except if a modification of classification adversely affects the treatment of a holder of a Claim or Equity Interest, acceptance of the Plan by any holder of a Claim or Equity Interest will be deemed to be a consent to the Plan's treatment of the holder of a Claim or Equity Interest regardless of the class as to which that holder ultimately is deemed to be a member.

**D.      Treatment of Unclassified Claims**

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Sections 2.02 and 2.03 of the Plan and under Bankruptcy Code § 1129(a)(9)(A).

      1.      *Allowed Administrative Claims*

An Administrative Claim is a Claim for any cost or expense of administration of the Chapter 11 Case Allowed under Bankruptcy Code §§ 503(b), 507(b) or 546(c)(2) and entitled to

priority under Bankruptcy Code § 507(a)(2), including: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's business; (c) actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case; and (d) all Professional Fee Claims to the extent Allowed by Final Order under Bankruptcy Code §§ 330, 331, or 503.

The Debtor estimates that, assuming an Effective Date of DATE, 2010, unpaid Administrative Claims will total approximately $_____, comprising:

| **Administrative Claim** | **Estimated Amt.** |
|---|---|
| **Squire, Sanders & Dempsey** – Counsel to Debtor | $ _____ |
| **Bryan Cave** – Special Counsel to Debtor | $ _____ |
| **Miller Thomson LLP** -- Special Arbitration Counsel to Debtor | $ _____ |
| **Greenberg Traurig LLP** -- Special Counsel to Debtor | $ _____ |
| **BDO Seidman LLP** -- Accountant for Debtor | $ _____ |
| **Allen, Sala & Bayne** – Counsel to the Committee | $ _____ |
| **Bryan Cave** – Special Counsel to the Committee | $ _____ |
| **Operating Expenses** | $ _____ |
| **TOTAL** | **$ _____** |

2.      *Priority Tax Claims*

These are Claims of a Governmental Unit for taxes entitled to priority under Bankruptcy Code § 507(a)(8). The Debtor does not believe there are any substantial Priority Tax Claims.

3.      *Professional Fees*

Claims for Professional Fees are Claims of Professionals, including an entity (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Bankruptcy Code §§ 327, 328, 363, or 1103 and to be compensated for services under Bankruptcy Code §§ 327, 328, 329, 330, and 331 or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b). A significant portion of the Professional Fee Claims have been paid, on an interim basis, from the proceeds of the Sale in accordance with orders of the Bankruptcy Court approving interim fee applications.

4.      *Treatment.*

(i)      Allowed Administrative Claims. Each Allowed Administrative Claim (other than a Professional Fee Claim) will be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as feasible; (b) any date the Bankruptcy Court may fix, or as soon after that date as feasible; (c) 30

days after the Claim is Allowed; and (d) any date on which the holder of the Claim and the Debtor or the Liquidation Trust agree.

(iii)    <u>Allowed Priority Tax Claims</u>. Any Allowed Priority Tax Claim will be paid in full in Cash on the latest of: (a) the Effective Date (or as soon after that date as feasible); and (b) 30 days after the Claim is Allowed. The Liquidation Trust may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by the Plan. If the Liquidation Trust so elects, the installment payments will be made in equal quarterly installments of principal plus interest, at a rate determined under applicable nonbankruptcy law, on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date. The first payment will be made on the latest of: (a) the Effective Date, or as soon after that date as feasible; (b) 30 days after the Claim is Allowed, or as soon after than date as feasible; and (c) another date on which the holder of the Claim and the Liquidation Trust agree. The Liquidation Trust retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

(iv)    <u>Professional Fee Claims</u>. Each Allowed Professional Fee Claim will be paid in full in Cash on the latest of: (a) three days after the Professional Fee Claim is Allowed; and (b) another date on which the holder of the Professional Fee Claim and the Liquidation Trust agree. Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Liquidation Trust its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by the Professional Fee Bar Date.

All claims of Professionals for services rendered or expenses incurred after the Confirmation Date in connection with the Chapter 11 Cases and the Plan including those relating to consummation of the Plan, any appeal of the Confirmation Order, the preparation, filing, and review of Professional Fee Claims, the prosecution of Avoidance Actions and Litigation Claims, and the resolution of Disputed Claims, will be paid by the Liquidation Trust on receipt of an invoice, or on other terms on which the Liquidation Trust and the Professional agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

## E.    Treatment of Classified Claims and Interests

In accordance with Bankruptcy Code § 1123(a)(1), set forth below is a designation of classes of Claims against, and Equity Interests in, the Debtor (except the unclassified Claims receiving the treatment described in Section IV.D above). A Claim or Equity Interest is placed in a particular Class for the purpose of receiving distributions in accordance with the Plan only if that a Claim or Equity Interest has not been paid, released, or otherwise settled before the Effective Date. The treatment of classified Claims and Equity Interests and the provisions governing distributions on account of Allowed Claims and Allowed Equity Interests is set forth in Articles 3 and 4 of the Plan. You should refer to the Plan itself for the complete provisions governing the treatment of your particular Claim or Equity Interest.

1.      *Class 1 (Priority Claims)*

Class 1 consists of all Priority Claims other than Priority Tax Claims. Class 1 is unimpaired by the Plan. All holders of Allowed Priority Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan. Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as feasible; and (ii) 30 days after the Priority Claim is Allowed; unless, before the later of those two dates, the holder of the Claim and the Liquidation Trust agree in writing to a different date.

2.      *Class 2 (General Unsecured Claims)*

Class 2 consists of all General Unsecured Claims, including Rejection Claims, other than NHL Subordinated Claims. Class 2 is impaired by the Plan. All holders of Allowed Unsecured Claims are entitled to vote and will be solicited to vote on the Plan. Each holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of its Allowed Class 2 Claim, a Pro Rata beneficial interest in the Liquidation Trust.

The Debtor estimates that the Moyes Claim is approximately $100,000,000 and that the Gretzky Claim is approximately $5,000,000. Other than the Moyes Claim and the Gretzky Claim, the Non-Insider Claims in Class 2 consist primarily of claims totaling approximately $_____ not purchased by the NHL and claims for potential rejection damages associated with contracts related to Jobing.com Arena, claims that the Debtor is in the process of estimating.

3.      *Class 3 (NHL Subordinated Claims)*

Class 3 consists of all NHL Subordinated Claims. Class 3 is impaired by the Plan. The NHL is entitled to vote each of its Claims in Class 3 separately and will be solicited to vote on the Plan. The NHL will receive, on account of and in full and final satisfaction of each of its Allowed Class 3 Claims, a Pro Rata beneficial interest in the Liquidation Trust. The NHL agreed under the Asset Purchase Agreement to voluntarily subordinate all NHL Subordinated Claims to all Non-Insider Claims. Accordingly, all distributions from the Liquidation Trust on account of the beneficial interests attributable to the NHL Subordinated Claims are automatically redistributed Pro Rata to the beneficial interests attributable to all Non-Insider Claims until the latter beneficial interests have received distributions totaling the amount of all Allowed Non-Insider Claims, after which the beneficial interests attributable to the NHL Subordinated Claims and the beneficial interests attributable to the Moyes Claims and the Gretzky Claims receive all distributions Pro Rata.

The Debtor estimates that the NHL Subordinated Claims total approximately $11,300,000. To illustrate the effect of the NHL's voluntary subordination and the distributions on account of Claims in Classes 2 and 3 under the Plan from the Liquidation Trust, assume the following:

| Non-Insider Claims | Moyes Claims/Gretzky Claims | NHL Subordinated Claims |
|---|---|---|
| $10 | $20 | $20 |

Assume first that $25 is available for distribution to the beneficial interests in the Liquidation Trust. Before any subordination, the $25 would be distributed thus:

| Non-Insider Claims | Moyes Claims/Gretzky Claims | NHL Subordinated Claims |
|---|---|---|
| $5 (20%) | $10 (40%) | $10 (40%) |

In light of the subordination, $5 of the NHL's $10 distribution would be redistributed to the Non-Insider Claims, giving them a $10 distribution, which equals the full amount the Non-Insider Claims. Redistribution would result in the original $25 being distributed thus:

| Non-Insider Claims | Moyes Claims/Gretzky Claims | NHL Subordinated Claims |
|---|---|---|
| $10 | $10 | $5 |

Assume later that another $10 becomes available for distribution to the beneficial interests in the Liquidation Trust. Because the Non-Insider Claimholders' beneficial interests have been satisfied, the $10 would be distributed thus:

| Non-Insider Claims | Moyes Claims/Gretzky Claims | NHL Subordinated Claims |
|---|---|---|
| $0 | $5 (50%) | $5 (50%) |

4.    *Class 4 (Equity Interests)*

Class 4 consists of all Equity Interests. Holdings is the sole holder of Equity Interests in the Debtor. Class 4 is impaired by the Plan. All holders of Equity Interests are deemed to reject the Plan and will not be solicited to vote on the Plan. The holders of Equity Interests will not receive or retain any rights, property, or distributions on account of their Equity Interests under the Plan.

## V.    IMPLEMENTATION OF THE PLAN

### A.    Effective Date Funding

Funds needed to make Cash payments on and after the Effective Date on account of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims under the Plan will come from the Debtor's Cash. The Debtor must reserve sufficient Cash on the Effective Date to pay all Administrative Claims, Priority Tax Claims, and Priority Claims in the Maximum Amount. All Cash not so reserved will vest in the Liquidation Trust on the Effective Date. Any Cash remaining on reserve after all Administrative Claims, Priority Tax Claims, and Priority Claims have been either Disallowed or Allowed and paid in accordance with the Plan will vest in the Liquidation Trust.

### B.    Liquidation Trust

As of Effective Date, the Liquidation Trust will be formed and vested with all assets of the Estate other than the Cash reserved under Section 4.01 of the Plan for payments to holders of Administrative Claims, Priority Tax Claims, and Priority Claims. The Liquidation Trust will be

administered by the Liquidation Trustee, who will be appointed on the Effective Date. All holders of Allowed General Unsecured Claims in Class 2 will be the beneficiaries of the Liquidation Trust, which will be administered for those Creditors' sole benefit.

1.  *The Liquidation Trustee.*

Michael Carmel will begin serving as the Liquidation Trustee on the Effective Date. Michael Carmel is a highly-experienced bankruptcy lawyer and has served as a bankruptcy trustee or a plan liquidation trustee many times. A copy of Mr. Carmel's CV is attached as **Appendix 3** to this Disclosure Statement.

The Liquidation Trustee:

(i)     is a fiduciary of the beneficiaries of the Liquidation Trust, which are the holders of Allowed General Unsecured Claims;

(ii)     must administer the Liquidation Trust for the benefit of all holders of Allowed General Unsecured Claims;

(iii)     must make distributions from the Liquidation Trust to its beneficiaries strictly in accordance with the Plan;

(iv)     must use his reasonable best efforts to maximize the value of, and liquidate into Cash, all the Liquidation Trust's non-Cash assets, make timely distributions to beneficiaries, and not unduly prolong the existence of Liquidation Trust, which must wind down and dissolve after liquidating all its assets and distributing all Cash proceeds of that liquidation to the beneficiaries;

(v)     must control and manage the Liquidation Trust's assets, including, as necessary or appropriate: (A) selling assets and collecting proceeds; (B) filing, prosecuting, and settling objections to Claims; (C) prosecuting and settling Avoidance Actions and Litigation Claims; and (D) making distributions to the Liquidation Trust's beneficiaries in accordance with the Plan;

(vi)     may retain any Professional deemed necessary in its discretion to assist in the administration of Claims and Claims, prosecution of Avoidance Actions and Litigation Claims, and as otherwise needed to carry out the Liquidation Trust's business, with any such Professionals to be paid either from available Cash or on other terms to which the Liquidation Trustee and the Professional agree;

(vii)     subject to applicable law, will not be liable for any act or omission, except to the extent that the act or omission is determined by a court of competent jurisdiction to be the result of gross negligence, fraud, or willful misconduct (this limitation on liability applies equally to the agents, employees, and Professionals acting on the Liquidation Trust's behalf; all Persons dealing with the Liquidation Trust will be required to look solely to the Liquidation Trust's assets for the enforcement of any claims against the Liquidation Trust);

(viii)     is compensated according to the fee schedule of Bankruptcy Code § 326;

(ix)     may: (A) file interim fee notices with the Bankruptcy Court, detailing the services performed and costs incurred for which he seeks compensation and reimbursement; (B) be paid from available funds, 15 days after filing the related fee notice with the Bankruptcy Court, unless objections are filed within that 15-day period; (C) if no objections are timely filed, may receive full payment requested or, if an objection is timely filed, may receive payment of the uncontested portion; (D) file a final fee notice, detailing total distributions, and the total fees requested, under Bankruptcy Code § 326, with the Bankruptcy Court retaining jurisdiction to resolve any disputes regarding the reasonableness of the Liquidation Trustee's fees and expenses.

2.     *Purposes.*

The Liquidation Trust will operate, and its assets may be used, solely for the purposes of: (i) investigating, enforcing, abandoning, prosecuting and resolving (by litigation, settlement, or otherwise) the Avoidance Actions, the Litigation Claims, and all Disputed Claims; (ii) collecting on or liquidating all its non-Cash assets; (iii) distributing all Cash to its beneficiaries; and (iv) after all non-Cash assets are liquidated and all Cash is distributed, winding down and dissolving.

3.     *Disputed Claims.*

The Liquidation Trust must manage Cash distributions to beneficiaries so as to reserve sufficient Cash to make appropriate distribution on account of any beneficial interest attributable to a Disputed General Unsecured Claim as if that Disputed General Unsecured Claim were an Allowed General Unsecured Claim on the Effective Date in the Maximum Amount. If and when any Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, Cash sufficient to make appropriate distribution to the holder that Claim will be made from such reserves. If a Disputed General Unsecured Claim becomes a Disallowed General Unsecured Claim, all reserved distributions attributable to the holder of that Disputed General Unsecured Claim will become available for Pro Rata distribution to all beneficial interests attributable to Allowed General Unsecured Claims.

4.     *Section 1145 Exemption.*

In accordance with Bankruptcy Code § 1145, the issuance under the Plan of the beneficial interests in the Liquidation Trust is exempt from all federal, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealer in such securities and is deemed to be a public offer of such securities.

## VI.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption and Rejection of Contracts and Leases

All executory contracts and unexpired leases set forth on the schedule of assumed executory contracts and unexpired leases filed with the Bankruptcy Court as part of Exhibit C to the Plan will be deemed assumed and assigned to a third party (as indicated on Exhibit C to the Plan) as of the Effective Date, except for any executory contract or unexpired lease: (i) that has

been rejected in accordance with a Final Order entered before the Confirmation Date; or (ii) as to which a motion to reject has been filed with the Bankruptcy Court before the Confirmation Date.

All executory contracts and unexpired leases either (i) set forth on the schedule of rejected executory contracts and unexpired leases filed with the Bankruptcy Court as part of Exhibit C to the Plan or (ii) existing but not listed on Exhibit C to the Plan will be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease that has been assumed or rejected in accordance with a Final Order entered on or before the Confirmation Date.

Entry of the Confirmation Order constitutes: (a) the approval under Bankruptcy Code § 365 of the assumption and assignment of the executory contracts and unexpired leases assumed and assigned under the Plan; and (b) the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan. Notwithstanding anything contained in Section 5.02 of the Plan to the contrary, the Debtor retains the right to add or change the treatment (assumed or rejected) of any executory contract or unexpired lease on Exhibit C to the Plan, thus changing the treatment of the contract or lease under the Plan, at any time within 30 days after the Effective Date.

## B.      Cure of Defaults

On the Effective Date or as soon after that date as feasible, the Debtor will Cure any defaults under any executory contract or unexpired lease assumed and assigned under the Plan. The Debtor will not, and need not as a condition to assuming and assigning any executory contract or unexpired lease under the Plan, Cure any default that need not be cured under Bankruptcy Code § 365(b).

## C.      Rejection Damages Bar Date

All Rejection Claims must be filed with the Bankruptcy Court no later than 30 days after the Confirmation Date. Any Rejection Claim not filed within that time will be forever barred. All Rejection Claims are Class 2 Claims under the Plan. With respect to any executory contract or unexpired lease rejected by the Debtor before the Confirmation Date, the deadline for filing a Rejection Claim remains the deadline set forth in the order of the Bankruptcy Court authorizing that rejection. If such an order did not contain such a deadline, the deadline for filing a Rejection Claim is 30 days after the Confirmation Date.

## D.      Indemnification Obligations

Any obligation of the Debtor to indemnify any Person serving as a fiduciary of any employee benefit plan or employee benefit program of the Debtor, under charter, by-laws, contract, or applicable state law is deemed to be an executory contract and rejected as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including but not limited to any officer or director of the Debtor, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtor related to any acts or omissions occurring before the Petition Date is rejected and canceled under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any Claim resulting from these rejections in favor of any

Person must be filed no later than 30 days after the Confirmation Date. Notwithstanding any of the foregoing, nothing contained in the Plan affects the rights of any Person covered by any applicable D&O Policy with respect to any such policy.

### E.  Benefit Plans

All Benefit Plans are rejected and terminated as of the Confirmation Date if not earlier terminated. Any such terminations will be completed according to the terms and conditions of each Benefit Plan and effected in conformity with all statutory and regulatory requirements including any applicable notice provisions. Any undistributed, vested benefits of the terminated Benefit Plans will be distributed to the participants as provided by applicable statutes and regulations and the Benefit Plans' provisions. To ensure that the Benefit Plans' terminations comply with the Benefit Plans' terms and applicable statutes and regulations, the Debtor will obtain any necessary approvals of the relevant regulatory agencies, such as the Pension Benefit Guaranty Corporation, the IRS, and the U.S. Department of Labor, in respect of such terminations. The Bankruptcy Court will retain jurisdiction to hear and determine any disputes relating to the termination of any Benefit Plans.

## VII.  DESCRIPTION OF OTHER PROVISIONS OF THE PLAN

### A.  Vesting of Assets

Except as provided in the Plan or the Confirmation Order, all property of the Estate will vest in the Liquidation Trust on the Effective Date free and clear of all Liens and Claims existing before the Effective Date. From and after the Effective Date, the Liquidation Trust may use and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in the Plan or the Confirmation Order.

### B.  Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim that is unclassified by the Plan or that is classified by Article 3 of the Plan or that is subject to a distribution under the Plan, or an Equity Interest or other right of an equity holder, are permanently enjoined from taking any of the following actions on account of any such Claims or Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against any property to be distributed under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any property to be distributed under the Plan; (c) creating, perfecting, or enforcing any Lien or encumbrance against any property to be distributed under the Plan; and (d) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code. Nothing in Section 9.02 of the Plan or elsewhere in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan. Nothing in Section 9.02 of the Plan or elsewhere in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or

otherwise limiting, the right of the Estate or the Liquidation Trust to assert and prevail on any Avoidance Action or Litigation Claim. Nothing in Section 9.02 of the Plan or elsewhere in the Plan enjoins or otherwise precludes (or may be construed to enjoin or otherwise preclude) any party in interest from enforcing the terms of the Plan and the Confirmation Order.

## C.    Exculpation

None of the Debtor, the Liquidation Trust, the Committee, or any of their respective members, officers, directors, trustees, employees, advisors, professionals, or agents (other than those Persons identified as a possible defendant on Exhibit B to the Plan) have or will incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, the Liquidation Trust, the Committee, and each of their respective members, officers, directors, trustees, employees, advisors, professionals, and agents (other than those Persons identified as a possible defendant on Exhibit B to the Plan) are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

## D.    Avoidance Actions and Litigation Claims

All Avoidance Actions and Litigation Claims are retained and reserved for the Liquidation Trust, which is designated as the Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Avoidance Actions and Litigation Claims. The Liquidation Trust will have the authority to prosecute, defend, compromise, settle, and otherwise deal with any Avoidance Actions and Litigation Claims, and will do so in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). The Liquidation Trust will pay the fees and costs associated with litigating the Avoidance Actions and the Litigation Claims. The Liquidation Trust will have sole discretion to determine in its business judgment which Avoidance Actions and Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements.

## E.    Retention of Jurisdiction After the Effective Date

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain as much jurisdiction over the Chapter 11 Case after the Effective Date as legally permissible including jurisdiction to:

a.    Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

b.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

c.     Resolve any matters related to the rejection of any executory contract or unexpired lease to which the Debtor is a party and to hear, determine and, if necessary, liquidate any Claims arising from rejection;

d.     Ensure that distributions required under the Plan are accomplished in accordance with the Plan;

e.     Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtor that may be pending on the Effective Date;

f.     Enter any necessary or appropriate orders to implement or consummate the Plan's provisions and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

g.     Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection with the Plan;

h.     Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement; or hear or determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

i.     Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to restrain any entity's interference with consummation or enforcement of the Plan;

j.     Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

k.     Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

l.     Issue a final decree and enter an order closing the Chapter 11 Case; and

m.     Adjudicate the Disputed Claims, the Avoidance Actions, and the Litigation Claims and any other cause of action or claims of the Estate.

# VIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

## A.      Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired Claims and Equity Interests accept the Plan, except under certain circumstances. Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Under Bankruptcy Code § 1126(d), a Class of Equity Interests has accepted the Plan if holders of such Equity Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Bankruptcy Code § 1126(f) deems a Class of Claims or Equity Interests to have accepted the Plan without voting if that Class is unimpaired under the definition in Bankruptcy Code § 1124. Class 1 under the Plan is unimpaired and, therefore, is deemed to accept the Plan. Classes 2 and 3 are impaired under the Plan and, therefore, will be solicited to vote on the Plan. Class 4 under the Plan is impaired but will receive or retain no property under the Plan and, therefore, is deemed to reject the Plan without voting.

## B.      Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Bankruptcy Code § 1129(a)(11) and is popularly referred to as the "feasibility" requirement. The Debtor believes that it or the Liquidation Trust will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtor refers to the Effective Date Balance Sheets included in **Appendix 4**. This document demonstrates that the Debtor will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments on account of all Administrative Claims and Priority Claims and that substantial funds will remain for vesting in the Liquidation Trust.

Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11). The Debtor cautions that no representations can be made as to the accuracy of the Effective Date Balance Sheet or as to the Liquidation Trust's ability to achieve the projected results. Certain of the assumptions on which the Effective Date Balance Sheet are based are subject to uncertainties outside the Debtor's control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Effective Date Balance Sheet was prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's or the Liquidation Trust's financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

The Effective Date Balance Sheet was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections.

Furthermore, the Effective Date Balance Sheet has not been audited by independent accountants. Although presented with numerical specificity, the Effective Date Balance Sheet is based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, and many of which are beyond any party's control. Consequently, the Effective Date Balance Sheet should not be regarded as a representation or warranty by the any Person, that projections will be realized. Actual results may vary materially from those presented.

## C. Best Interests Test

1. *Explanation*

Even if a plan is accepted by each class of claim holders, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(7), requires a bankruptcy court to find either that: (i) all members of an impaired class of claims or interests have accepted the plan; or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor or the Chapter 11 Trustee in the bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors under the plan, then the plan is not in the best interests of creditors and equity security holders.

2. *Application of the Liquidation Analysis*

A liquidation analysis prepared with respect to the Debtor is attached as **Appendix 5** to this Disclosure Statement. The Debtor believes that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtor has projected the amount of Allowed Claims based on a review of the Schedules, the Debtor's books and records, and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Allowed Interests under the Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor believes that, taking into account the liquidation analysis, the Plan meets the "best interests" test of Bankruptcy Code § 1129(a)(7). The Debtor believes that each member of each Class will receive at least as much under the Plan as it would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because avoiding the additional costs and delay of a Chapter 7 trustee and the trustee's new set of professionals, including statutory fees owing to the Chapter 7 trustee, will allow the realization of more value for Creditors.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

A summary description of certain United States federal income tax consequences ("*Tax Consequences*") of the Plan follows. This description is for informational purposes only and, owing to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various Tax Consequences of the Plan discussed below. This disclosure describes only the principal Tax Consequences of the Plan to the Debtor and to holders of Claims and Equity Interests. No opinion of counsel has been sought or obtained with respect to any Tax Consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any Tax Consequences of the Plan, and the discussion below is not binding on the IRS or other authorities. No representations are being made to the Debtor or any holder of a Claim or Equity Interest regarding the particular Tax Consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed here.

The following discussion of the Tax Consequences is based on the Internal Revenue Code of 1986, as amended, (the "*Code*") Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the Tax Consequences of the Plan to special classes of taxpayers (*e.g.,* banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees of the Debtor, persons who received their Claims by exercising an employee stock option or otherwise as compensation, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

Holders of Claims and Equity Interests are strongly urged to consult their own tax advisor regarding the United States federal, state, local, and foreign tax consequences of the transactions described in this Disclosure Statement and in the Plan.

**B.      United States Federal Income Tax Consequences to the Debtor**

The Debtor is a limited liability company taxed as a partnership for United States federal income tax purposes ("*Tax Purposes*"). A partnership is not a taxable entity; rather, any gains, losses or other items of income or deductions or credit realized by the Debtor ("*Tax Items*") will be passed through to the holders of Equity Interests. The fact that the Debtor is subject to a Chapter 11 proceeding will not change this result. Thus, the Chapter 11 bankruptcy proceeding has no impact on the Tax Consequences of the transactions contemplated by the Plan.

**C.      Federal Income Tax Consequences to Creditors**

1.      *Generally*

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below. The Tax Consequences of the transactions contemplated by the Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for Tax Purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for Tax Purposes. Creditors, therefore, should consult their own tax advisors regarding the particular Tax Consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source;

or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

Each holder of a Class 2 or Class 3 Allowed Claim may be permitted to recognize a loss or may be required to recognize gain on the distribution to it of its beneficial interests in the Liquidation Trust under the terms of the Plan or on the distribution of the Liquidation Trust's cash on account of the holder's beneficial interest. The loss (or gain) to be recognized by the holder of a Class 2 or Class 3 Allowed Claim will equal the positive difference in the case of a loss (and negative difference in the case of a gain) between (1) the adjusted tax basis such holder has in its Class 2 or Class 3 Allowed Claim (excluding any adjusted tax basis attributable to accrued but unpaid interest), and (2) the fair market value of the beneficial interest distributed (or deemed distributed) to the holder of the Class 2 or Class 3 Allowed Claim (excluding any cash or property received or deemed received attributable to accrued interest). Depending on the manner in which the Class 2 or Class 3 Claim arose, applicability of the market discount rules and other factors, such loss (or gain) may be capital or ordinary in nature. Due to limitations in the Code, a holder of a Class 2 or Class 3 Claim that recognizes a capital loss relating to its Class 2 or Class 3 Claim may not be able to utilize such capital loss in the taxable year it arises or possibly ever.

Although many holders of Class 2 or Class 3 Claims will not be required to recognize gain or income as a result of the property distributions (including cash distributions) made or deemed to be made to them under the terms of the Plan, certain situations may exist which will require a holder of a Class 2 or Class 3 Claim to do so. For example, if a Class 2 or Class 3 Claim relates to a transaction under which the holder is required to recognize gain on payment (for example, an installment sale), the holder may be required to recognize gain as a result of the actual or deemed distributions made to it under the Plan. Moreover, if (1) a holder of a Class 2 or Class 3 Claim previously took a deduction or loss relating to the partial or entire worthlessness of its Class 2 or Class 3 Claim, and (2) the fair market value of the property (including cash) it receives or is deemed to receive for its Class 2 or Class 3 Claim under the Plan exceeds the remaining adjusted tax basis, if any, it has in its Class 2 or Class 3 Claim, such holder will be required to recognize gain or income. Similarly, a holder of a Class 2 or Class 3 Claim that purchased its Claim at a discount may be required to recognize gain if the amount received in satisfaction of the Claim exceeds such holder's adjusted tax basis in the Claim. There are several other reasons why a holder of a Class 2 or Class 3 Claim may be required to recognize gain or income as a result of the actual and/or deemed distributions made to it under the Plan. Therefore, each holder of a Class 2 or Class 3 Claim should consult its own tax advisor to determine the tax consequences to it of the receipt of or deemed receipt of property (including cash) under the Plan.

To the extent that the property (including cash) received or deemed to be received by a holder of a Class 2 or Class 3 Claim is attributable to accrued interest on the Class 2 or Class 3 Claim, the cash or property will be deemed made in payment of such interest. While the federal income tax laws are unclear regarding how much consideration may be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed, the Debtor intends to treat amounts distributed or deemed distributed under the Plan as attributable first to principal and then to any accrued but unpaid interest. To the extent that the holder of the Class 2 or Class 3 Claim has not yet included the accrued interest in gross income,

the fair market value of the cash or property deemed received in payment of such interest will generally be included in the holder's gross income for federal income tax purposes. To the extent the holder has previously included accrued interest on the Class 2 or Class 3 Claim in gross income, the fair market value of the cash or property deemed received in payment of such interest generally will not be included in gross income. The holder of the Class 2 or Class 3 Claim may be able to claim a deductible loss if the fair market value of the cash or property deemed received for the accrued interest is less than the amount the holder had previously included in gross income. Holders of Class 2 or Class 3 Claims should consult with their tax advisors regarding the allocation of distributions between principal and interest.

The beneficial interests in the Liquidation Trust deemed issued to a holder of an Allowed Class 2 or Class 3 Claim on consummation of the Plan will not include any beneficial interests held in reserve for holders of Disputed Claims. As a result, in determining the amount of loss (or gain) recognized by a holder of an Allowed Class 2 or Class 3 Claim on consummation of the Plan, the holder will not be treated as receiving any property attributable to the assets that are held by or for the benefit of holders of Disputed Claims. As discussed below, when a Disputed Claim becomes Disallowed in whole or in part, the holders of Allowed Class 2 or Class 3 Claims will be treated as receiving additional consideration in respect of their Allowed Class 2 or Class 3 Claims at such time. It is possible, however, that the IRS or a court may conclude that the amount of consideration deemed received for tax purposes by a holder of an Allowed Class 2 or Class 3 Claim on consummation of the Plan should be determined by disregarding the Disputed Claims and treating any beneficial interests held in reserve for holders of Disputed Claims as proportionately distributed to the holders of Allowed Class 2 or Class 3 Claims. In such case, appropriate downward adjustments would be made on the allowance of a Disputed Claim in whole or in part. Holders of Class 2 or Class 3 Claims should consult with their tax advisors as to the proper amount of consideration deemed received on consummation of the Plan.

Holders of Disputed Claims will not be treated as receiving any consideration in respect of their claims on consummation of the Plan. On the allowance of a Disputed Claim in Class 2 or Class 3, the holder of the Disputed Claim will be treated as realizing in satisfaction of its Claim the amount of cash distributed to the holder by the Liquidation Trust at such time (except to the extent such cash is attributable to amounts realized by the Liquidation Trust in the fiscal year in which the Disputed Claim becomes Allowed), plus the fair market value of the beneficial interest distributed to such holder. On the disallowance of a Disputed Claim, the beneficial interest attributable to such Disputed Claim will be cancelled and the cash attributable to the Disallowed Disputed Claim and held in reserve will be released from the reserve. While not entirely clear, at such time, such holders of Allowed Class 2 or Class 3 Claims will likely be treated as having received additional consideration in satisfaction of their Allowed Class 2 or Class 3 Claims equal to their proportional shares of (i) the fair market value of the cancelled beneficial interests and (ii) the cash released from the reserve (except to the extent such cash is attributable to amounts realized by the Liquidation Trust in the fiscal year in which the Disputed Claim becomes disallowed). If the Disputed Claim becomes Disallowed in the year in which the Plan is consummated, then such additional consideration would either reduce the loss or increase the gain that was recognized with respect to their Allowed Class 2 or Class 3 Claims on consummation of the Plan and would possess the same character (*i.e.,* capital or ordinary) as the gain or loss recognized on consummation of the Plan. If the Disputed Claim becomes disallowed after the year in which the Plan is consummated, then the additional amount deemed received on

disallowance of the Disputed Claim will be treated as gain with the same character (*i.e.,* capital or ordinary) as the gain or loss recognized on consummation of the Plan. Holders of Allowed Class 2 or Class 3 Claims would increase the tax bases in their beneficial interests by the additional amounts deemed received on the disallowance of a Disputed Claim.

2. *Accrued Interest*

Holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of Cash received under the Plan with respect to such Claims for accrued interest. Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any Cash received in exchange for a Claim for accrued interest will equal the amount of Cash on the Effective Date, and the holding period for the property will begin on the day after the Effective Date. It is not clear the extent to which consideration that may be distributed under the Plan will be allocable to interest. Creditors are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

3. *Market Discount*

In general, a debt obligation, other than one with a fixed maturity of one year or less, that is acquired by a holder in the secondary market (or, in certain circumstances, on original issuance) is a "market discount bond" as to that holder if the obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the holder's adjusted tax basis in the debt obligation immediately after its acquisition. A debt obligation will not, however, be a "market discount bond" if such excess is less than a statutory *de minimis* amount. To the extent that a Creditor has not previously included market discount in its taxable income, gain recognized by a Creditor on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Creditor's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Creditor that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Creditor's period of ownership.

4. *Original Issue Discount*

The original issue discount ("*OID*") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is

not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Creditor must consult its own tax advisor.

5. *Other Claimholders*

If a Creditor reaches an agreement with the Debtor or the Liquidation Trust to have its Claim satisfied, settled, released, exchanged, or otherwise discharged in a manner other than as described in the Plan, that Creditor should consult with its own tax advisors regarding the Tax Consequences of that satisfaction, settlement, release, exchange, or discharge.

6. *Information Reporting and Backup Withholding*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. These reportable payments do not include those that give rise to gain or loss on the exchange of a Claim. Moreover, such reportable payments are subject to backup withholding under certain circumstances. A United States holder may be subject to backup withholding at rate of 28 percent with respect to certain distributions or payments of accrued interest, market discount, or similar items under the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments that give rise to gain or loss on the exchange of a Claim are not subject to backup withholding. Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

## D. Importance of Obtaining Professional Tax Assistance

**The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Creditor's particular circumstances. Accordingly, Creditors are strongly urged to consult their tax advisors about the United States federal, state and local and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.**

**IRS Circular 230 Notice: To comply with U.S. treasury regulations, be advised that any U.S. federal tax advice included in this communication (and it is not intended that any such advice be given in this Disclosure Statement) is not intended or written to be used, and cannot be used, to avoid any U.S. federal tax penalties or to promote, market, or recommend to another party any transaction or matter.**

# X. RISK FACTORS

## A. Generally

The liquidation of the Debtor involves a degree of risk, however small, and this Disclosure Statement and certain of its Exhibits contain forward-looking statements that involve risks and uncertainty. The Liquidation Trust's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **Holders of Claims should consider carefully the following factors in addition to the other information contained in this Disclosure Statement.**

*Liquidation Trustee.* The Liquidation Trust's post-Effective Date performance depends to a great extent on the efforts of the Liquidation Trustee and his professionals. There can be no assurance that the Liquidation Trust will be successful in attracting and retaining the most suitable professionals or that the Liquidation Trustee will perform as well as hoped or expected. Such underperformance could have a material adverse effect on the recoveries of Creditors from the Liquidation Trust.

*Claim Amount Estimates.* The estimated Claims set forth in the Disclosure Statement are based on various assumptions, and the actual amount of Allowed Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in the Disclosure Statement. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

*Litigation Claims.* The Liquidation Trust will undertake to investigate and possibly pursue Litigation Claims against various parties. Realizing recoveries from those Litigation Claims may depend on the Liquidation Trust's ability to obtain contingency fee-based counsel. If necessary and unless the Liquidation Trust is able to hire counsel on that basis, there is a substantial risk that no meaningful recoveries from the Litigation Claims will be realized. Additionally, some of the targets of the Litigation Claims may be partially or completely incapable of paying any judgments that may be obtained against them.

## B. Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will agree. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate solicitation or re-solicitation of votes.

# XI. ALTERNATIVES TO THE PLAN

The Debtor believes that the Plan affords holders of Claims the greatest realization on the Debtor's assets and, therefore, is in the best interests of Creditors. But if the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case

without any immediately available financing; (b) an alternative plan; or (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

## A.   Continuation of the Chapter 11 Case

Because the Debtor's financial affairs following the Sale will not change in any material respect, continuing the Chapter 11 Case would only increase the amount of Administrative Claims against the Estate to the detriment of other Creditors. Since the Plan is designed to distribute a relatively fixed sum of Cash, continuing the Chapter 11 Case would serve no purpose other than increasing costs to the Estate and reducing recoveries to holders of Class 2 and Class 3 Claims.

## B.   Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtor or any party in interest in the Chapter 11 Case could propose a different plan or plans. Those plans might involve either a reorganization and continuation of the Debtor's business, or some other form of orderly liquidation of the Debtor's assets, or a combination of both.

## C.   Liquidation Under Chapter 7

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtor. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtor or how that would differ materially from what the Plan provides. The Debtor believes, however, that holders of Claims would lose substantial value if the Debtor were forced to liquidate under Chapter 7 because the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist those trustees would cause a substantial diminution in the value of the Estate. The assets available for distribution to holders of Claims would be reduced by those additional expenses.

## XII.   CONCLUSION

## A.   Hearing on and Objections to Confirmation

### 1.   *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for _____, 2010 at _____ __.m. (Arizona time). The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties in interest, and the Plan may be modified under Bankruptcy Code § 1127 before, during, or as a result of that hearing, without further notice to parties in interest.

2.    *Deadline for Objections to Confirmation*

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for <mark>DATE</mark>, 2010 at 5:00 p.m. (Arizona time).

**B.    Recommendation**

The Plan provides for the best possible and most equitable distribution to Creditors. The Debtor believes that any alternative to confirmation of the Plan, such as Chapter 7 liquidation or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs with no corresponding benefit. For these reasons, the Debtor urges you to vote to accept the Plan and to support Confirmation of the Plan.

Dated:      May 25, 2010                        Respectfully submitted,

**SQUIRE, SANDERS & DEMPSEY L.L.P.**    **COYOTES HOCKEY, LLC**

By: */s/ Jordan A. Kroop*                     By: */s/ Jerry Moyes*
    Thomas J. Salerno                          Jerry Moyes
    Jordan A. Kroop                            Managing Member

**Appendix 1**

**Plan**

34

**Appendix 2**

**Order Approving Disclosure Statement**

**Appendix 3**

**CV of Michael Carmel**

Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona 85012-2334
_____
(602) 264-4965
Facsimile (602) 277-0144
e-mail michael@mcarmellaw.com

Born: Chicago, IL
November 5, 1957

## EXPERIENCE

Sole Practitioner, Michael W. Carmel, Ltd. - February, 1986 - Present

Practice has emphasized all areas of bankruptcy, including representation of trustees, debtors, creditors' committees, secured creditors, and examiners. Bankruptcy work has included several appeals to the Ninth Circuit Bankruptcy Appellate Panel, District Court, and Ninth Circuit Court of Appeals.

Associate, Lee, Theisen & Eagle - October 1982 - February 1986

Civil litigation with emphasis on contract law, later moving to bankruptcy.

## PROFESSIONAL ACTIVITY

Chair, Committee to Revise Local Bankruptcy Rules, 2005-present

Member, Thurgood Marshall Inn of Court, 1998 - 2002

Lawyer Member - District of Arizona Bankruptcy Judge Merit Selection Committee; 1993

Lawyer Delegate to Ninth Circuit Judicial Conference; 1988 - 1991

Lawyer Delegate to Ninth Circuit Committee on Automation & Technology; February 1991 - 1993

## MAJOR CASES/REPRESENTATIONS

• Co-Counsel-Debtor, In re Bashas', Inc.;

• Debtor's Counsel-(4) Danny's Family Car Wash entities

• Liquidation Trustee, Crown Pacific consolidated cases. Creditor claims exceeded $500 Million. Responsible for distribution of $90 Million to creditors, and sale of variety of assets in large timber case.

• Special bankruptcy counsel - Mathon Fund, L.L.C. consolidated cases. Responsible for resolving $77 Million Ponzi Scheme. Have worked on selling assets around the country, including environmentally sensitive real estate.

• Liquidation Trustee, and Attorney for Trustee, Styling Technology Corporation consolidated cases. Handled $8 Million in Creditors' claims, and prosecuted malpractice claim against Arthur

Andersen.

- Special Bankruptcy Counsel, James Sell, State Court Receiver/Designated Representative for <u>ANMP</u> and 100+ related entities; in process of recovering proceeds on $25 Million+ Ponzi Scheme.  Representing ANMP in the Dexter Distributing bankruptcy case to collect on $14 Million claim.

- Liquidation Trustee, and Attorney for Trustee, <u>Hi-Rise Recycling</u> consolidated cases.

- Counsel, Microsoft Corporation - <u>In re MicroAge</u> consolidated cases.

- Special Counsel, Plan Trustee, <u>Boston Chicken</u> consolidated cases.  Represented Plan Trustee in pursuit of 20+ avoidance actions against law firms, accounting firms, and various trade vendors.

- Special Counsel, Liquidating Trustee, <u>Baptist Foundation of Arizona</u> consolidated cases<u>.</u>

- Chapter 11 Trustee,  <u>Cameo Development Co..</u> Handled liquidation of assets, as well as claims against insurance company for bad faith.

- Chapter 11 Trustee,  <u>Freckles I, II, III</u> consolidated Cases<u>.</u>

- Debtor's counsel, <u>Conley D. Wolfswinkel</u>, largest individual Chapter 11 in Arizona District. This case involved real estate holdings exceeding $100 Million, and resolving (2) separate claims each exceeding $1 Billion.  One was asserted by the Resolution Trust Corporation, and the other by Bondholders of Lincoln Savings & Loan.  Mr. Wolfswinkel was also prosecuted by the Federal Government.

- Debtor's counsel, <u>Bobby McGee's U.S.A., Inc., and subsidiaries</u>

- Creditors' Committee counsel, <u>RDS Acquisition Corp.</u> (After confirmation, acted as attorney for disbursing agent.)

- Trustee's counsel, <u>Canyon Communications Corporation</u>    (Assisted Trustee in sale of real estate; and radio stations).

- Chapter 11 Trustee, <u>In re Larry's Apartment, L.L.C.</u>   (Managed adult nightclub and oversaw major 37-day trial over ownership rights in land.)

## LEGAL EDUCATION

Arizona State University College of Law
Juris Doctor, May, 1982

## UNDERGRADUATE EDUCATION

Arizona State University - B.S. in Business
Accounting Major - May, 1979, Graduated with Honors

# Appendix 4

## Selected Financial Information

**(to come)**

**Appendix 5**

**Liquidation Analysis**

**(to come)**