## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

In re:

DEWEY RANCH HOCKEY, LLC,

COYOTES HOLDINGS, LLC,

COYOTES HOCKEY, LLC and

ARENA MANAGEMENT GROUP, LLC,

Debtors.

Case No. 2:09-bk-09488-RTBP
(Jointly Administered)

Chapter 11

This filing applies to:
■ All Debtors
□ Specified Debtors

## DISCLOSURE STATEMENT
## WITH RESPECT TO PLAN OF LIQUIDATION BY
## THE CITY OF GLENDALE

### Dated: June 16, 2010

FENNEMORE CRAIG, P.C.
Cathy L. Reece
Nicolas B. Hoskins
3003 North Central Avenue
Suite 2600
Phoenix, Arizona 85012-2913
Telephone: (602) 916-5000
Facsimile: (602) 916-5999
Email:      creece@fclaw.com
            nhoskins@fclaw.com

BROWN RUDNICK LLP
William R. Baldiga
Cheryl B. Pinarchick
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 289-0420
Email:      wbaldiga@brownrudnick.com
            cpinarchick@brownrudnick.com

*Counsel for the City of Glendale*

**THIS IS NOT A SOLICITATION FOR ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**\*\*\*\*NOTICE\*\*\*\***

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION SUPPLEMENTARY TO THE PLAN AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED TO STUDY THE PLAN CAREFULLY TO DETERMINE THE PLAN'S IMPACT ON THEIR CLAIMS OR EQUITY INTERESTS.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  ALTHOUGH GREAT EFFORT WAS TAKEN TO ENSURE THE ACCURACY OF THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN, NEITHER THE PLAN PROPONENT NOR ITS PROFESSIONALS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN AND THEREIN IS WITHOUT INACCURACIES OR ERRORS.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS CONTAINING INFORMATION THAT HAVE BEEN AUTHORIZED TO BE DISTRIBUTED TO CREDITORS AND EQUITY INTEREST HOLDERS.  CREDITORS AND EQUITY INTEREST HOLDERS SHOULD NOT RELY ON REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THE DISCLOSURE STATEMENT OR THE PLAN IN CONSIDERING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE PLAN PROPONENT STRONGLY URGES YOU TO READ THIS DISCLOSURE STATEMENT BECAUSE IT CONTAINS A SUMMARY OF THE PLAN AND IMPORTANT INFORMATION CONCERNING THE DEBTORS' HISTORY AND OPERATIONS.  THE DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN.  A COPY OF THE PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT.  THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES ONLY CERTAIN PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN.  THE PLAN SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT.  YOU SHOULD CONSULT YOUR OWN COUNSEL AND/OR FINANCIAL ADVISOR IN CONNECTION WITH YOUR CLAIM AGAINST OR EQUITY INTEREST IN THE DEBTORS AND THE TREATMENT ACCORDED YOUR CLAIM(S) OR EQUITY INTEREST(S) UNDER THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS' ESTATES, THE LIQUIDATING TRUST OR ANY OTHER PARTY.  NO REPRESENTATIONS BY ANY PERSON CONCERNING THE DEBTORS (PARTICULARLY AS TO THEIR BUSINESS OPERATIONS, OR THE VALUE OF THEIR PROPERTIES) ARE AUTHORIZED BY THE PLAN PROPONENT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION.

# TABLE OF CONTENTS

**Page**

ARTICLE I Introduction.................................................................................................... 1

    1.01       Summary of Treatment of Claims and Interests Under the Plan. ................................ 1

ARTICLE II Historical Information ................................................................................... 7

    2.01       Description of the Debtors' Business.................................................................... 7

    2.02       Prepetition Ownership and Capital Structure of the Debtors Prior to the
                Chapter 11 Cases.................................................................................................... 8

    2.03       Events Leading to the Chapter 11 Filing........................................................... 11

ARTICLE III The Debtors' Chapter 11 Bankruptcy Cases ............................................. 11

    3.01       Brief Explanation of Chapter 11. ...................................................................... 11

    3.02       Commencement of the Chapter 11 Cases. ......................................................... 12

    3.03       Appointment and Dissolution of a Creditors' Committee. ............................... 12

    3.04       Significant Events During the Chapter 11 Cases. ............................................. 12

    3.05       Monthly Financial Reports.................................................................................. 15

ARTICLE IV General Information on Confirmation Procedure and Voting.................... 15

    4.01       Purpose of Disclosure Statement. ...................................................................... 15

    4.02       Voting On the Plan............................................................................................... 16

    4.03       Plan Confirmation Process. ................................................................................ 17

ARTICLE V The Plan of Liquidation .............................................................................. 19

    5.01       Plan Objectives................................................................................................... 19

    5.02       Overview of the Plan........................................................................................... 19

    5.03       Administrative Claims, Priority Tax Claims, and Professional Fee Claims. ............. 20

    5.04       Classification and Treatment of Claims and Interests.................................... 21

ARTICLE VI Implementation of the Plan........................................................................ 25

6.01    Implementation on the Effective Date. .................................................. 25

6.02    Creation of Liquidating Trust. ............................................................. 25

6.03    Vesting and Transfer of Assets to the Liquidating Trust. ...................... 27

6.04    The Liquidating Trustee. ..................................................................... 27

6.05    Compensation of Liquidating Trustee. ................................................. 27

6.06    Prosecution and Settlement of Litigation Claims. ................................. 28

6.07    Liquidating Trust Oversight Board. ..................................................... 28

6.08    Continuation of Bankruptcy Injunction or Stays. ................................. 29

6.09    Substantive Consolidation. ................................................................. 29

6.10    Allocation of Proceeds. ...................................................................... 29

6.11    Full and Final Satisfaction. ................................................................. 29

6.12    Administration Pending Effective Date. ............................................... 29

6.13    Closing of Chapter 11 Cases. .............................................................. 29

6.14    Permanent Injunction. ........................................................................ 30

6.15    No Discharge. .................................................................................... 30

6.16    Dissolution of the Debtors. ................................................................. 30

6.17    Cancellation of Documents. ................................................................ 30

ARTICLE VII Provisions Governing Distributions ....................................... 30

7.01    Method of Distributions Under the Plan ............................................... 30

7.02    Disputed Claim Reserves. ................................................................... 31

7.03    Disputed Payments. ............................................................................ 32

7.04    Unclaimed Distributions. .................................................................... 32

7.05    Setoffs. .............................................................................................. 32

7.06    Minimum Distributions. ...................................................................... 32

7.07    Final Distribution. .............................................................................. 33

ARTICLE VIII Effects of Confirmation of the Plan ..................................................... 33

ARTICLE IX Executory Contracts and Leases; Benefit Plans ..................................... 34

    9.01     Rejection of Contracts and Leases. ............................................................. 34

    9.02     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
             Unexpired Leases Rejected Pursuant to the Plan. ...................................... 35

    9.03     Retiree Benefits. ........................................................................................ 35

    9.04     Employee Benefit Plans. ............................................................................ 35

ARTICLE X Disputed, Contingent and Unliquidated Claims and Interests ................. 35

    10.01    Objections to and Resolution of Claims and Equity Interests. .................... 35

    10.02    Estimation of Claims or Interests. .............................................................. 36

ARTICLE XI Retention of Jurisdiction ........................................................................ 36

    11.01    Jurisdiction of Bankruptcy Court. .............................................................. 36

    11.02    Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court. ........... 37

ARTICLE XII Best Interests Test ................................................................................. 37

ARTICLE XIII Feasibility of the Plan .......................................................................... 39

ARTICLE XIV Risk Factors ........................................................................................ 39

ARTICLE XV Certain Federal Income Tax Consequences .......................................... 41

ARTICLE XVI Alternatives to the Plan ....................................................................... 43

ARTICLE XVII Miscellaneous Provisions ................................................................... 44

    17.01    Successors and Assigns. ............................................................................. 44

    17.02    Effectuating Documents and Further Transactions. .................................... 44

    17.03    Exemption from Transfer Taxes ................................................................. 44

    17.04    Amendment, Modification, Withdrawal or Failure of the Plan ................... 44

    17.05    Post-Effective Date Fees and Expenses of Professionals and of Winding up
             the Estates. ................................................................................................. 45

    17.06    Payment of Statutory Fees. ........................................................................ 45

17.07     Dissolution of the Creditors' Committee and of the Liquidating Trust
Oversight Board. ............................................................................................... 45

17.08     Courts of Competent Jurisdiction............................................................................. 45

17.09     Binding Effect. ....................................................................................................... 46

17.10     Reservation of Rights. ........................................................................................... 46

17.11     Section 1146 Exemption. ........................................................................................ 46

17.12     Further Assurances. ............................................................................................... 46

17.13     Filing of Additional Documents............................................................................... 46

17.14     Plan Supplement. .................................................................................................. 47

17.15     Withholding and Reporting Requirements................................................................ 47

17.16     Headings. ............................................................................................................... 47

17.17     Inconsistency. ........................................................................................................ 47

17.18     Severability. .......................................................................................................... 47

17.19     Waiver of Ten Day Stay........................................................................................ 47

17.20     Governing Law. ..................................................................................................... 48

17.21     Exemptions from Securities Laws Registration and Considerations ........................ 48

ARTICLE XVIII Recommendation and Conclusion.................................................................... 48

**EXHIBITS**

Exhibit A       The Plan

Exhibit B       Notice Fixing Time For Casting Ballots, Deadline for Objections and Hearing on Confirmation

Exhibit C       [Proposed] Order Approving the Disclosure Statement

Exhibit D       Ballot

Exhibit E       Liquidating Trust Agreement

Exhibit F       Identification and Curriculum Vitae of the Liquidating Trustee

Exhibit G       Initial Members of the Liquidating Trust Oversight Board

# ARTICLE I
## Introduction

The City of Glendale, an Arizona municipal corporation (the "Plan Proponent" or "City") proposes the Plan, as it may be modified or amended from time to time, for the resolution of Litigation Claims, the distribution of value to Holders of Claims and Equity Interests, and the efficient and cost effective resolution of all administrative matters relating to these Chapter 11 cases. This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan. Simultaneously with the filing of this Disclosure Statement, the Plan Proponent is filing the Plan that is discussed and described in this Disclosure Statement.

Each of Coyotes Hockey, LLC ("Coyotes Hockey") and Arena Management Group, LLC ("Arena Management", and together with Coyotes Hockey, the "Debtors") filed its voluntary Chapter 11 bankruptcy petition under Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") on May 5, 2009 (the "Petition Date"), the same day the Debtors' affiliates, Coyotes Holdings, LLC ("Holdings") and Dewey Ranch Hockey, LLC ("Dewey"), filed voluntary Chapter 11 petitions, commencing these jointly-administered cases.

This solicitation is being conducted to obtain sufficient acceptances of the Plan and contains information relevant to a decision to accept or reject the Plan. This Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Plan addresses the assets and liabilities of the Debtors only; it does not address the assets and liabilities of Holdings or Dewey.

All capitalized terms used in this Disclosure Statement ("Disclosure Statement") that are not defined herein but that are defined in Article I of the Joint Chapter 11 Plan of Liquidation (as attached hereto as Exhibit A, the "Plan") shall have the meanings ascribed to such terms by the Plan and such definitions are incorporated herein by reference.

**1.01   Summary of Treatment of Claims and Equity Interests Under the Plan.**

Set forth below is a table summarizing the classification and treatment of Claims and Equity Interests under the Plan.

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN | % RECOVERY | AMOUNT OF CLAIM |
|---|---|---|---|
| **Administrative Claims** | Allowed Administrative Claims shall be paid in full in Cash (i) when and as such Administrative Claims become due and owing by their ordinary course terms, (ii) on the Effective Date, or (iii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative | 100% | [TBD] |

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN | % RECOVERY | AMOUNT OF CLAIM |
|---|---|---|---|
| | Claim becomes an Allowed Administrative Claim. | | |
| **Priority Tax Claims** | Allowed Priority Tax Claims shall be paid in full in Cash on the latest of (i) the Effective Date, (ii) 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim and (iii) the date on which an Allowed Priority Claim would be due and payable in the ordinary course of business. | 100% | [TBD] |
| **Class 1a: Secured Claims (Coyotes Hockey)** | Each Holder of an Allowed Secured Claim against Coyotes Hockey shall receive, in full and final satisfaction thereof, either (i) Cash in an amount equal to such Allowed Secured Claim, (ii) a return of its Collateral, or (iii) such other treatment as shall satisfy the requirements of section 1124(2) of the Bankruptcy Code, on the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable, unless the Holder of an Allowed Secured Claim agrees to a different treatment thereof. | 100% | [TBD] |
| **Class 1b: Secured Claims (Arena Management)** | Each Holder of an Allowed Secured Claim against Arena Management shall receive, in full and final satisfaction thereof, either (i) Cash in an amount equal to such Allowed Secured Claim, (ii) a return of its Collateral, or (iii) such other treatment as shall satisfy the requirements of section 1124(2) of the Bankruptcy Code, on the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable, unless the Holder of an Allowed Secured Claim agrees to a different treatment thereof. | 100% | [TBD] |

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN | % RECOVERY | AMOUNT OF CLAIM |
|---|---|---|---|
| **Class 2a: Other Priority Claims (Coyotes Hockey)** | Each Holder of an Allowed Priority Claim against Coyotes Hockey in Class 2a shall receive, in full and final satisfaction thereof, Cash (i) in an amount equal to such Allowed Other Priority Claim, (ii) in such amounts and on such other terms as may be agreed between the Holder of the Other Priority Claim and the Liquidating Trustee; or (iii) with respect to any Allowed Other Priority Claim other than a Priority Tax Claim, in accordance with the terms of the particular agreement under which such Other Priority Claim arose, on the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as practicable, unless the Holder of an Allowed Other Priority Claim agrees to a different treatment thereof. | 100% | [TBD] |
| **Class 2b: Other Priority Claims (Arena Management)** | Each Holder of an Allowed Priority Claim against Arena Management in Class 2b shall receive, in full and final satisfaction thereof, Cash (i) in an amount equal to such Allowed Other Priority Claim, (ii) in such amounts and on such other terms as may be agreed between the Holder of the Other Priority Claim and the Liquidating Trustee; or (iii) with respect to any Allowed Other Priority Claim other than a Priority Tax Claim, in accordance with the terms of the particular agreement under which such Other Priority Claim arose, on the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as practicable, unless the Holder of an Allowed Other Priority Claim agrees to a different | 100% | [TBD] |

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN | % RECOVERY | AMOUNT OF CLAIM |
|---|---|---|---|
| | treatment thereof. | | |
| **Class 3a: General Unsecured Claims (Coyotes Hockey)** | Each Holder of an Allowed General Unsecured Claim against Coyotes Hockey in Class 3a shall receive, in full and final satisfaction thereof, one or more Distributions of Coyotes Hockey Available Cash in an amount equal to its Pro Rata Share of (i) the Coyotes Hockey Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests. | [TBD] | [TBD] |
| **Class 3b: General Unsecured Claims (Arena Management)** | Each Holder of an Allowed General Unsecured Claim against Arena Management in Class 3b shall receive, in full and final satisfaction thereof, one or more Distributions of Arena Management Available Cash in an amount equal to its Pro Rata Share of (i) the Arena Management Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests. | [TBD] | [TBD] |
| **Class 4a: NHL Subordinated Claims (Coyotes Hockey)** | Each Holder of an Allowed NHL Subordinated Claim against Coyotes Hockey in Class 4a shall receive, in full and final satisfaction thereof, one or more Distributions of Coyotes Hockey Available Cash in an amount equal to its Pro Rata Share of (i) the Coyotes Hockey Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims | [TBD] | [TBD] |

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN | % RECOVERY | AMOUNT OF CLAIM |
|---|---|---|---|
| | or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests; provided, however, no Available Cash may be distributed to an Allowed NHL Subordinated Claim unless and until all Allowed Non-Moyes General Unsecured Claims receive Distributions equal to the Face Amount of such Allowed Non-Moyes General Unsecured Claims. | | |
| **Class 4b: NHL Subordinated Claims (Arena Management)** | Each Holder of an Allowed NHL Subordinated Claim against Arena Management in Class 4b shall receive, in full and final satisfaction thereof, one or more Distributions of Arena Management Available Cash in an amount equal to its Pro Rata Share of (i) the Arena Management Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests; provided, however, no Available Cash may be distributed to an Allowed NHL Subordinated Claim unless and until all Allowed Non-Moyes General Unsecured Claims receive Distributions equal to the Face Amount of such Allowed Non-Moyes General Unsecured Claims. | [TBD] | [TBD] |
| **Class 5a: Equity Interests (Coyotes Hockey)** | Each Holder of an Allowed Equity Interest in Coyotes Hockey in Class 5a shall receive one or more Distributions of Coyotes Hockey Available Cash in an amount equal to its Pro Rata Share of (i) the Coyotes Hockey Available Cash remaining after payment in full of, or adequate reserve for, | [TBD] | [TBD] |

| DESCRIPTION CLASS | CLASS TREATMENT UNDER THE PLAN | % RECOVERY | AMOUNT OF CLAIM |
|---|---|---|---|
| | Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 – 4, and (ii) the Tier Two Trust Beneficial Interests. | | |
| **Class 5b: Equity Interests (Arena Management)** | Each Holder of an Allowed Equity Interest in Arena Management in Class 5b shall receive one or more Distributions of Arena Management Available Cash in an amount equal to its Pro Rata Share of (i) the Arena Management Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 – 4, and (ii) the Tier Two Trust Beneficial Interests. | [TBD] | [TBD] |
| **Classes 6a and 6b: Intercompany Claims (Coyotes Hockey and Arena Management)** | Each Allowed Intercompany Claim against the Debtors shall, at the sole discretion of the Liquidating Trustee, receive the following treatment: (i) be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights as to an Allowed Intercompany Claim shall be fully reinstated and retained, (ii) be paid in accordance with the terms under which such Allowed Intercompany Claim arose, (iii) receive such other treatment as may be agreed upon in writing by the Holder of such Claim; provided that such agreed upon treatment may not provide the Holder of such Claim with a return having a present value as of the Effective Date that is greater than the amount of such Allowed Intercompany Claim, or (iv) be canceled and be of no further force or effect. | [TBD] | [TBD] |

## ARTICLE II
## Historical Information

**2.01    Description of the Debtors' Business.**

Coyotes Hockey is a Delaware limited liability company based in Glendale, Arizona that owned and operated the Phoenix Coyotes professional hockey team (the "Phoenix Coyotes"), which is a member of the Pacific Division of the Western Conference of the National Hockey League (the "NHL").  The NHL is a professional ice hockey league composed of 30 teams in North America.  It is the premier professional ice hockey league in the world and one of North America's major professional sports leagues.

Arena Management is a Delaware limited liability company based in Glendale, Arizona that was formed to operate and manage the Jobing.com Arena (described below).

The Phoenix Coyotes were founded in 1972 as the Winnipeg Jets of the World Hockey Association (the "WHA").  The Winnipeg Jets were the most successful team in the short-lived WHA, winning three Avco World Trophies, the WHA's championship trophy, and making the finals five out of the WHA's seven seasons.  The NHL and WHA competed for players and fans until the WHA folded in 1979 as part of an agreement under which four of the remaining six WHA teams, including the Winnipeg Jets, entered the NHL as expansion teams.

In October 1995, the Winnipeg Jets were purchased by American businessmen Richard Burke and Steven Gluckstern.  Mr. Burke and Mr. Gluckstern relocated the team to Phoenix, Arizona and renamed the team the "Phoenix Coyotes."  In 1997, Mr. Burke purchased Mr. Gluckstern's interest in the Phoenix Coyotes.

From the commencement of the 1996–1997 season until December 2003, the Phoenix Coyotes played their home games in the America West Arena in downtown Phoenix (now US Airways Arena).  This location was a state-of-the-art basketball facility, but its small size made it grossly inadequate for a professional hockey organization.  Poor sight lines for hockey games (more than 4,000 seats had obstructed views of the on-ice play) hurt ticket sales, and this— combined with an unfavorable lease that had the Phoenix Coyotes turning over a sizeable portion of its ticket revenues to the Phoenix Suns professional basketball team—resulted in financial woes for the Phoenix Coyotes.

Mr. Burke sold the Phoenix Coyotes in 2001 to Phoenix-area real estate developer Steven Ellman, with Wayne Gretzky as a part-owner and Managing Partner.  Mr. Ellman was successful in attracting new investors, the largest of whom was Jerry Moyes, the founder and Chief Executive Officer of Phoenix-based trucking company Swift Transportation Co., Inc.  With significant financial support from Mr. Moyes, the Phoenix Coyotes were able to obtain additional bank financing and the commitment of the City to build a new hockey arena.  In this regard, the Phoenix Coyotes played their first game in the new Glendale Arena (the "Arena"), which has since been renamed "Jobing.com Arena," on December 27, 2003.  Pursuant to agreements with the City, Coyotes Hockey committed to play 30 hockey seasons at the Arena while Arena Management was charged with various managerial responsibilities with regard to the Arena.

Until September 2006, Steven Ellman and Jerry Moyes were co-owners of the Westgate City Center Development, a suburban shopping and entertainment development that includes Arena. In September 2006, Jerry Moyes entered into an agreement with Steven Ellman, that left Mr. Ellman and certain of his affiliates in control of the Westgate City Center Development, and ultimately, through various affiliated entities, left Mr. Moyes and his wife Vickie Moyes as super-majority owners of the Phoenix Coyotes.

Coyotes Hockey is owned by a handful of investors, the foremost of whom (in terms of ownership percentage and dollars invested) are ultimately Jerry and Vickie Moyes. Hockey Hall of Fame member Wayne Gretzky also owns a portion of Coyotes Hockey, and, until shortly before the start of the 2009-2010 season, was the team's head coach.

**2.02    Prepetition Ownership and Capital Structure of the Debtors Prior to the Chapter 11 Cases.**

**a.    Prepetition Debt**

As of the Petition Date, Coyotes Hockey was the borrower as to two significant secured debts. Coyotes Hockey borrowed approximately $75,000,000 from SOF Investments, L.P., White Tip Investments, LLC, and Donatello Investments, LLC (collectively, "SOF"). The loans from SOF were secured by a perfected security interest in substantially all Coyotes Hockey's assets. Coyotes Hockey also owed the NHL approximately $23.7 million as of the Petition Date for periodic advances made to Coyotes Hockey beginning in November 2008, and approximately $13.3 million as of the Petition Date under a February 2009 letter agreement. All loans from the NHL were secured by a perfected security interest in substantially all of the assets of Coyotes Hockey. In connection with the NHL's loans to Coyotes Hockey, SOF agreed to subordinate their security interest in Coyotes Hockey's assets to the NHL's security interest in Coyotes Hockey's assets to the extent of any amounts loaned by the NHL to Coyotes Hockey.

In its schedules and statement of financial affairs, Coyotes Hockey listed approximately $159,800,000 in unsecured debt obligations, comprising trade debt of approximately $52,300,000 and two substantial obligations to insiders: (a) a debt of approximately $100,000,000 to Jerry Moyes, the ultimate super-majority owner of Coyotes Hockey and its affiliates, for unsecured loans made to Coyotes Hockey to fund operating losses (the "Moyes Claim"); and (b) a claimed debt of approximately $7,500,000 to Wayne Gretzky, the Phoenix Coyote's former head coach and minority owner of Coyotes Hockey, for employment compensation (the "Gretzky Claim"). The City and the Creditors' Committee have objected to the allowance and priority of both the Moyes Claim and the Gretzky Claim on various bases, including that those Claims should be equitably subordinated under section 510(c) of the Bankruptcy Code and that the Moyes Claim is properly characterized as equity, not debt. Coyotes Hockey has not taken a formal position as to the allowance or priority of the Moyes Claim or the Gretzky Claim, and initially assigned to the Creditors' Committee all causes of action with respect to Moyes and the Moyes Affiliates (as more particularly defined in the Plan, the "Insider Claims") pursuant to a stipulated order entered by the Bankruptcy Court on September 23, 2009. Following the purchase of the Claims of the Creditors' Committee's members in connection with the Sale (described below), the Creditors' Committee assigned the Insider Claims back to Coyotes Hockey for the limited purpose of holding such Insider Claims

until they could be transferred to a Liquidating Trustee or other independent party pursuant to a Chapter 11 plan or Chapter 7 proceeding.

As of the Petition Date, Arena Management did not have any debt other than general unsecured debt in the amount of approximately $33,808,387.99, which amount includes an intercompany payable to Coyotes Hockey in the amount of $29,302,475.00.

**b.** **Equity**

Coyotes Hockey is a Delaware limited liability company, whose majority member is Coyotes Holdings, LLC. Arena Management is a Delaware limited liability company, wholly owned by Coyotes Holdings, LLC. The organizational structure of the Debtors and their affiliates is reflected in the following chart:




**Jerry and Vickie Moyes**

(Jerry and Vickie Moyes are co-trustees and beneficiaries of The Jerry and Vickie Moyes Family Trust)

Jerry Moyes Owns 99% of Coyotes Holdings MemberCo., LLC

Vickie Moyes owns 1% of Coyotes Holdings MemberCo, LLC

**The Jerry and Vickie Moyes Family Trust**

owns 75.14% of Coyotes Holdings, LLC

**Coyotes Holdings MemberCo, LLC**

owns 24.86% of Coyotes Holdings, LLC

**Coyotes Holdings, LLC**

is the Managing Member and owner of 91.79% of the Units of Coyote Hockey, LLC
and
is the Managing Member and 100% owner of Arena Management Group, LLC

| **Hunter ½ Class A Unit** | **Breslow IRS A Unit** | **Breslow 1 Class A Unit** | **Wikert 1 Class A Unit** | **Lake Street 1 Class A Unit** | **Gretzky 1 Class A Unit** |
|---|---|---|---|---|---|
| 0.7463% | 1.4925% | 1.4925% | 1.4925% | 0.7463% | 1.4925% |

**Coyotes Hockey, LLC**

**Arena Management Group, LLC**

**Dewey Ranch Hockey, LLC**

Jerry Moyes is the Manager and Coyotes Hockey, LLC is the sole Member

**2.03    Events Leading to the Chapter 11 Filing.**

The Phoenix Coyotes have never operated at a profit in any year since relocating from Winnipeg, Manitoba (where they played as the Winnipeg Jets) for the 1996 season. Since moving from the America West Arena (now US Airways Center) in downtown Phoenix to the Arena in Glendale, the Phoenix Coyotes' operating losses continued, posting negative EBITDA of $21,870,000 for the 2005-2006 season, negative $29,511,000 for 2006-2007, and negative $21,727,000 for the 2007-2008 season.

On or about September 2008, Moyes determined that he was unwilling to continue to provide financial support to the Debtors to maintain the operation of the Phoenix Coyotes hockey team. Although the NHL provided secured funding as outlined above, there was no certain source of future funding for the Debtors and the NHL could discontinue funding at any time. The Debtors attempted to market the Debtors for sale or other capital infusion by hiring the Scudder Law Firm, P.C. (the "Scudder Firm") to identify and contact strategic investors that may be interested in purchasing the Debtors' assets or investing in the organization. Although the Scudder Firm had no previous experience selling sports teams, the Scudder Firm provided interested investors and purchasers with information regarding the Debtors to assist them with their evaluation of the Debtors' business. The Scudder Firm received and evaluated proposals from interested purchasers and investors, the descriptions of which were filed under seal.

The Debtors were contacted by PSE Sports & Entertainment, L.P. ("PSE"), which is an acquisition vehicle owned by Jim Balsille, a Canadian millionaire and founder of Research In Motion (the maker of the Blackberry communication devices) as a potential buyer. Coyotes Hockey and PSE entered into an asset purchase agreement dated May 5, 2009, under which PSE agreed to purchase substantially all of Coyotes Hockey's assets in the context of a Chapter 11 bankruptcy for an aggregate purchase price of $212.5 million. This sale also contemplated the relocation of the Phoenix Coyotes to Hamilton, Ontario in time to begin the 2009-2010 hockey season in October 2009. The Debtors commenced this jointly administered Chapter 11 Case to effectuate the proposed sale to PSE under the PSE asset purchase agreement and relocate the Phoenix Coyotes to Hamilton, Ontario.

## ARTICLE III
## The Debtors' Chapter 11 Bankruptcy Cases

**3.01    Brief Explanation of Chapter 11.**

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.

The confirmation of a plan of reorganization or liquidation is the principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (a) is impaired under or has accepted the plan or (b) receives or retains any

property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

**3.02    Commencement of the Chapter 11 Cases.**

The Debtors' Chapter 11 Cases were assigned to the Honorable Redfield T. Baum, United States Bankruptcy Judge for the District of Arizona. Since the Petition Date, the Debtors have operated as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. The Debtors hired Squire, Sanders & Dempsey, L.L.P. as their general bankruptcy counsel and Bryan Cave, LLP as special conflicts counsel.

**3.03    Appointment of a Creditors' Committee.**

On May 21, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed the Creditors' Committee to represent the interests of the unsecured creditors. The Creditors' Committee's members were comprised of the following: (i) Clear Channel Radio, (ii) Climatic Building Technologies Group, LLC, (iii) Coyotes Ice, LLC, (iv) Landcorp Property Maintenance I, Inc. and (v) Maintenance Mart. Following the purchase of the Claims of the Creditors' Committee's members in connection with the Sale (described below), the Creditors' Committee became a largely defunct committee.

**3.04    Significant Events During the Chapter 11 Cases.**

**a.    Asset Sale**

Substantially all the activity in these Chapter 11 Cases since the Petition Date was devoted to an extensive sale process for the purchase and sale, under section 363 of the Bankruptcy Code, of substantially all the Debtors' assets (the "Sale Process").

The Sale Process began shortly after the Petition Date, when the Debtors filed a motion with the Bankruptcy Court seeking approval of certain procedures designed to solicit bids for a sale of the Phoenix Coyotes (a "Sale") competing with a "stalking horse" offer of approximately $212.5 million in cash by PSE. The Debtors' proposed sale procedures—and ultimate goal of a Sale to PSE—met with immediate and profound opposition from, among other parties, the NHL and the City. Among many other arguments, the NHL argued that Coyotes Hockey could not sell the Phoenix Coyotes to a proposed buyer that had not been approved as an owner in accordance with a vote of the other NHL team owners and under the terms of the NHL's constitution and bylaws and that any such approval was not possible within the deadlines required under the terms of PSE's proposed purchase. The City argued, among other things, that Coyotes Hockey's agreement with the City—the *Arena Management, Use, and Lease Agreement* (the "AMULA") – could not be rejected as an executory contract under section 365 of the Bankruptcy Code and that Coyotes Hockey could not sell its assets to a purchaser that would relocate the team without violating specific performance provisions of the AMULA or incurring a debt of many hundreds of millions of dollars.

Without resolving the issues pertaining to the AMULA, on June 15, 2009, the Bankruptcy Court ruled that it could not approve a sale of the Phoenix Coyotes to PSE in accordance with the PSE offer on the record before it. Specifically, the Bankruptcy Court ruled, among other things, that the record did not establish that a bona fide dispute existed under section 363 of the Bankruptcy Code to sell the assets free and clear of the NHL's interests. Moreover, the Bankruptcy Court ruled that it likely could not force the NHL to make a decision on Coyotes Hockey's and PSE's relocation application prior to the June 29, 2009, deadline imposed under the PSE asset purchase agreement. The Bankruptcy Court, therefore, denied the Debtors' efforts to sell Coyotes Hockey's assets to PSE and relocate the Phoenix Coyotes without prejudice.

Notwithstanding that ruling, Coyotes Hockey negotiated with PSE a revised bid to purchase its assets, renewed its motion to sell its assets to PSE, and sought to further develop the record before the Bankruptcy Court to establish, among other things, a bona fide dispute under section 363 of the Bankruptcy Code. The Debtors and the NHL engaged in a disputed process to have the Bankruptcy Court approve alternative sale procedures that would permit potential buyers to again submit competing bids for the Phoenix Coyotes. The NHL prevailed, and the Bankruptcy Court limited the initial round of bid solicitation to only those potential buyers who would agree to keep the Phoenix Coyotes in Glendale. After the completion of that initial round, no party had submitted a qualified, unconditional bid to purchase the Phoenix Coyotes and keep the team in Glendale. Under the procedures adopted by the Bankruptcy Court, the Debtors were permitted at that point to solicit bids from any potential purchasers, including those that, like PSE, would relocate the team out of Glendale.

Ultimately, only two qualified bidders agreed to pursue a purchase of the Phoenix Coyotes: PSE, which would relocate the team to Hamilton, Ontario, and the NHL. The NHL's bid would have satisfied all secured debt either by credit bid (for its own secured debt) or cash (of approximately $80 million, to satisfy SOF's secured debt), and would have paid, in cash, substantially all unsecured claims against the Debtors other than the Moyes Claim and the Gretzky Claim. The NHL's bid was characterized generally as being worth approximately $140 million, while PSE's bid was characterized as being worth approximately $212.5 million, but ultimately included a conditional offer to purchase the City's claims for up to $50 million. By the time the Bankruptcy Court had scheduled an evidentiary hearing to consider the competing bids, the NHL's owners had voted to reject Balsille's application to be approved as an owner, and the NHL argued that PSE's bid could not be approved because the NHL's interest in protecting its membership parameters as a private organization could not be adequately protected.

The Bankruptcy Court conducted a lengthy evidentiary hearing on the competing bids and issued its ruling on September 30, 2009. The Bankruptcy Court ruled that the NHL had a non-monetary interest in maintaining the integrity of its private membership, that such an interest was not compensable by the payment of a "relocation fee" or other remuneration, and that the interest could not be adequately protected as required under section 363(e) of the Bankruptcy Code. Accordingly, the Bankruptcy Court held that it could not approve the PSE bid and rejected that bid with prejudice. The Bankruptcy Court also found that the NHL bid unfairly and unjustifiably discriminated between similarly-situated unsecured claims—the NHL bid would have paid trade claims in full while leaving nothing for the Moyes Claim and the Gretzky Claim,

among other discriminatory effects—and rejected the NHL bid without prejudice, expressly inviting the NHL to amend its bid to correct the infirmities the Bankruptcy Court identified.

At a hearing conducted in the Bankruptcy Court on October 26, 2009, the NHL announced the terms of a revised bid to purchase the Debtors' assets after lengthy and detailed consultation with the Debtors, the Creditors' Committee, the City and Jerry Moyes, represented by his own, separate counsel. The revised NHL bid proposed to purchase or pay substantially all (in number) of the Debtors' prepetition unsecured creditors, and pay the secured prepetition debt and secured postpetition debtor-in-possession financing debt owed to the NHL and SOF. The revised bid also proposed that the NHL and the Debtors enter into a transition services agreement and a partial lease assignment agreement under which the NHL will operate the Phoenix Coyotes and pay the Debtors' obligations under substantially all of its executory contracts and the AMULA for a period of time to allow the NHL to market the Phoenix Coyotes. This would effectively allow the NHL to solicit bids to purchase the Debtors' assets and keep the Phoenix Coyotes in Glendale, while at the same time leave open the possibility of a relocation of the Phoenix Coyotes (and rejection of executory contracts and the AMULA) if the NHL cannot find a Glendale purchaser before June 30, 2010.

The revised NHL bid is valued at approximately $128,382,121, which amount includes the payment of approximately $13.3 million to the Debtors' Estates to satisfy professional administrative claims and the allowed unsecured claims of creditors the NHL did not purchase or pay for under the revised NHL bid (effectively the Moyes Claim, the Gretzky Claim, certain of the City's claims and potential rejection damages claims if certain executory contracts or unexpired leases are rejected by the Debtors on or after June 30, 2010).

On November 2, 2009, the Bankruptcy Court entered an order approving the revised NHL bid, as further amended and described in that order, and the NHL closed the Sale the same day, wiring approximately $13.3 million in cash into the Debtors' estates.

As a part of the NHL sale transaction, each of Coyotes Hockey and Arena Management committed itself not to assume or reject any executory contract or unexpired lease, including the AMULA, until June 30, 2010, so that the NHL could continue to market the Phoenix Coyotes for sale to a buyer that will keep the team in Glendale. If such a buyer is found, the NHL will direct the Debtors to assume and assign some or all of the Glendale-related executory contracts and unexpired leases, including the AMULA (possibly, as amended under agreement between the buyer and the City). If such a buyer cannot be found by June 30, 2010—the approximate date of the end of the 2009-2010 NHL season—the NHL will likely pursue a sale of the team to a buyer that will relocate the team out of the Glendale area, necessitating a rejection of substantially all Glendale-related executory contracts and unexpired leases, including the AMULA.

Following the closing of the Sale, the Debtors' Estates consist of approximately $13.3 million and certain limited non-liquid assets, including causes of action under Chapter 5 of the Bankruptcy Code and the Insider Claims (as discussed below), not purchased by the NHL in the Sale. The Holdings and Dewey estates have essentially no debts and no assets and may ultimately be liquidated under Chapter 7 of the Bankruptcy Code. The debts and assets of those estates are not the subject of the Plan.

### b. Insider Claims

The Insider Claims, which are comprised of causes of action against Moyes and the Moyes Affiliates, were transferred to the Creditor's Committee pursuant to a stipulated order on September 23, 2009 because of a conflict of interest resulting from Jerry Moyes' control over the Debtors. In connection with the sale of the Debtors' assets to the NHL, the NHL Entities purchased the Claims of the Creditor's Committee's members. As a result, the Creditors' Committee did not investigate or pursue the Insider Claims. Prior to dissolution of the Creditor's Committee, the Insider Claims were transferred back to the Debtors pursuant to a stipulated order entered by the Court on May 7, 2010. Notwithstanding the transfer of the Insider Claims to the Debtors, the Debtors acknowledged and agreed that they would not settle or otherwise resolve the Insider Claims but rather would maintain the "status quo" and hold the Insider Claims until such claims could be transferred to a Liquidating Trustee or another independent party. Under the terms of the Plan, the Insider Claims would be transferred by the Debtors to the Liquidating Trustee on the Effective Date.

### c. Conversion Motion

On December 3, 2009, the City filed a motion seeking to convert these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code (the "Conversion Motion"). The Conversion Motion was filed in order to reduce the cost administrating the Debtors' estates and to ensure that the Insider Claims were investigated and pursued by an independent party.

### 3.05 Monthly Financial Reports.

Monthly financial reports have been filed by the Debtors for each month beginning in May 2009 through and including March 2010.

### ARTICLE IV
### General Information on Confirmation Procedure and Voting

### 4.01 Purpose of Disclosure Statement.

The Bankruptcy Code requires the provisions of this Disclosure Statement to all Holders of Claims and Equity Interests in the Debtors entitled to vote upon the Plan pursuant to section 1125 of the Bankruptcy Code to enable such Holders of Claims and Equity Interests to make an informed judgment concerning the Debtors' solicitation of acceptances of the Plan. After notice and a hearing conducted on _____, the Bankruptcy Court by Final Order dated _____, approved this Disclosure Statement as containing "adequate information" (as defined in section 1125(a) of the Bankruptcy Code) of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Holders of Claims against and Equity Interests in the Debtors to make an informed judgment in voting to accept or reject the Plan. Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation to accept or reject the Plan.

**4.02    Voting On the Plan.**

        **a.        Who May Vote.**

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims or Equity Interests in Classes that are Impaired by the Plan may vote on the Plan.  Holders of Claims or Equity Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.  Administrative Claims and Priority Tax Claims are not generally classified for purposes of voting or receiving Distributions under the Plan.  In this case, Holders of Claims in the following Classes are entitled to vote to accept or reject the Plan:  Class 3a, Class 3b, Class 4a, Class 4b, Class 5a and Class 5b.  This Disclosure Statement is being distributed for informational purposes to all Creditors, the Equity Interest Holders and parties-in-interest without regard to their right to vote.  If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting.

        **b.        Eligibility.**

In order to vote on the Plan, a Creditor must have timely filed or been assigned a timely filed proof of claim, unless its Claim is listed on the Debtors' Schedules and is not identified as disputed, unliquidated, or contingent or has been objected to prior to the Confirmation Hearing.  Creditors having an Allowed Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.  The Bar Date set by the Bankruptcy Court for filing proofs of claim for general claims was August 14, 2009.

        **c.        Binding Effect.**

Whether a Creditor votes on the Plan or not, such person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.  Unless a Ballot is completed and returned in accordance with approved Bankruptcy Court procedures, a Creditor will not be included in the vote for purposes of accepting or rejecting the Plan or for purposes of determining the number of Persons voting on the Plan.

        **d.        Procedure/Voting Deadlines.**

In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to the following:

[ATTORNEY NAME]
[ADDRESS]

Pursuant to Federal Rule of Bankruptcy Procedure 3017, the Bankruptcy Court ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery to the address set forth above on or before _____**p.m., MST on _____ (the "Voting Deadline").  Facsimile or electronically submitted Ballots will not be counted.**  A form of the Ballot is attached hereto as <u>Exhibit B</u>.  Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

(i)    Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim shall be completed or corrected, as the case may be, based upon the following hierarchy:  (i) the claim amount temporarily Allowed by Court order for voting purposes pursuant to Bankruptcy Rule 3018; (ii) the amounts of any timely filed proofs of Claim which have not been objected to prior to the Voting Deadline; and (iii) the claim amount listed on the Schedules if no proof of Claim has been filed by such Creditor, and counted as a vote to accept or reject the Plan;

(ii)    Ballots received that do not identify the Creditor, whether or not signed by the Creditor, shall not be counted as a vote to accept or reject the Plan;

(iii)    Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim and that are otherwise properly completed shall be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan; and

(iv)    Ballots that are completed, except that such Creditor failed to vote to accept or reject the Plan, shall be completed and counted as a vote to accept the Plan.

You are urged to timely complete, date, sign and promptly mail the enclosed Ballot. **BALLOTS TRANSMITTED BY FACSIMILE, TELEX, ELECTRONICALLY (E-MAIL) OR TELECOPIER WILL NOT BE ACCEPTED.**  Please be sure to complete the Ballot properly and legibly identifying the exact amount of your Claim, the Class(es) in which the Claims(s) is/are classified under the Plan and the name of the Creditor.

**4.03    Plan Confirmation Process.**

**a.    Requirements.**

The requirements for confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code.  The following summarizes some of the pertinent requirements:

(i)    **Acceptance by Impaired Classes.**  Except as noted below, each Impaired Class of Claims and the Class of Equity Interests must either vote to accept the Plan or be deemed to accept the Plan.  "Impaired" is defined in section 1124 of the Bankruptcy Code.  A Claim or Equity Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the Holder.  Under the Plan, Class 3a, Class 3b, Class 4a. Class 4b, Class 5a and Class 5b are Impaired.  The Holders of Claims in Class 3a, Class 3b, Class 4a, Class 4b, Class 5a and Class 5b are entitled to vote, separately, to accept or reject the Plan.  As a voting Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number holding two-thirds in dollar amount of the Claims voting (of such Impaired class of Claims) must vote to accept the Plan.  At least one Impaired Class of Claims must accept the Plan for it to be confirmed by the Court.

(ii)    **Feasibility.**  The Bankruptcy Court is required to find that the Plan is likely to be implemented and that the parties required to perform or pay monies under the Plan will be able to do so.

(iii)   **"Best Interests" Test.**  The Bankruptcy Court must find that the Plan is in the "best interests" of Creditors and Equity Interest Holders.  To satisfy this requirement, the Bankruptcy Court must determine that each Holder of a Claim against, or Equity Interest in, the Debtors:  (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property that, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtors' property were liquidated under Chapter 7 of the Bankruptcy Code on that date.

(iv)    **"Cramdown" Provisions.**  Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though a Class of Claims or Equity Interests has not voted to accept the Plan, so long as one Impaired class of Claims has accepted the Plan (excluding the votes of Insiders) and the Plan is fair and equitable and does not discriminate unfairly against the non-accepting Classes.  The Plan Proponent may invoke the "cramdown" provisions of section 1129(b) of the Bankruptcy Code should any voting class fail to accept the Plan.

**b.    Confirmation Hearing.**

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code (the "Confirmation Hearing").  The Bankruptcy Court has set _____ (**MST**) for the Confirmation Hearing.  The Confirmation hearing will be conducted in the courtroom of the Honorable Redfield T. Baum, United States Bankruptcy Court for the District of Arizona, 203 North 1st Avenue, Phoenix, Arizona 85003.

**c.    Objections to Confirmation.**

Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  The Bankruptcy Court has set [July 15,1010] as the deadline for filing and serving Objection upon Plan Proponent's attorneys.  Objections to confirmation must also be filed electronically with the Bankruptcy Court located at the following address:

United States Bankruptcy Court Clerk
District of Arizona
203 North 1st Avenue
Phoenix, Arizona 85003

with a copy served upon attorneys for the following at the addresses below:

**The Plan Proponent:**

William R. Baldiga, Esq.
Cheryl B. Pinarchick, Esq.
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Facsimile: (617) 856-8201
Email:  wbaldiga@brownrudnick.com
        cpinarchick@brownrudnick.com

        - and -

Cathy L. Reece, Esq.
Nicolas B. Hoskins, Esq.
Fennemore Craig, P.C.
3003 North Central Avenue
Suite 2600
Phoenix, AZ 85012-2913
Facsimile:  (602) 916-5999
Email: creece@fclaw.com
       nhoskins@fclaw.com

**The Office of the United States Trustee:**

230 North First Avenue
Suite 204
Phoenix, AZ 85003
Attn:  Larry L. Watson

**ARTICLE V**
**The Plan of Liquidation**

**5.01    Plan Objectives.**

The primary objectives of the Plan are to:  (i) liquidate the Assets of the Estates and prosecute Litigation Claims, (ii) maximize the value of the ultimate recovery to all Creditors and Equity Interest Holders on a fair and equitable basis, compared to the value they would receive if the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code; and (iii) settle, compromise, or otherwise dispose of certain disputes.

**5.02    Overview of the Plan.**

The Plan Proponent believes that the Plan provides the best and most prompt recovery to Holders of Claims and Equity Interests.  Under the Plan, Claims against and Equity Interests in the Debtors are divided into different classes.  Under the Bankruptcy Code, the terms "claims" and "interests" are used to identify "creditors" and "shareholders" because such entities may

hold Claims or Equity Interests in more than one Class. If the Plan is confirmed by the Bankruptcy Court and consummated, then on the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall be formed and shall make distributions in respect of certain Classes of Claims and Equity Interests as provided for in the Plan. In addition, distributions will be funded from the proceeds of any Litigation Claims. The Classes of Claims against and Equity Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and distributions to be made under the Plan are described below.

The Plan provides for the liquidation of Assets of the Estates, including the investigation and prosecution of the Litigation Claims, by a Liquidating Trust to be formed pursuant to the Plan, and a Liquidating Trust Agreement. The Liquidating Trust is to be managed by a Liquidating Trustee, as well as by a Liquidating Trust Oversight Board (as further described in the Liquidating Trust Agreement). The Liquidating Trust shall be responsible for making distributions to Holders of Claims and Equity Interests, as well as all other administrative tasks necessary for ultimate resolution of the Chapter 11 Cases, pursuant to the terms of the Plan and the Liquidating Trust Agreement. Distributions otherwise allocable on account of Disputed Claims shall be placed in Disputed Claims Reserves pending adjudication of such Disputed Claim. At the heart of the Plan is the transfer of the Insider Claims to the Liquidating Trust to be investigated and pursued by an independent Liquidating Trustee for the benefit of Holders of Claims and Equity Interests.

**5.03  Administrative Claims, Priority Tax Claims, and Professional Fee Claims.**

Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and are excluded from the Classes set forth in Article III of the Plan in accordance with section 1123(a)(1) of the Bankruptcy Code.

Subject to the terms of the Plan and the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the Liquidating Trustee, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim (i) when and as such Administrative Claims become due and owing by their ordinary course terms, (ii) on the Effective Date, or (iii) if the Administrative Claim is not allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 shall be paid in Cash equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Liquidating Trust in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

Subject to the terms of the Plan, and unless the Holder of an Allowed Priority Tax Claim agrees to receive other less favorable treatment, each Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the latest of (i) the Effective Date, (ii) thirty (30) days

after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim and (iii) the date on which an Allowed Priority Tax Claim would be due and payable in the ordinary course of business. Any Claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in section 507(a)(8)(G) of the Bankruptcy Code) shall be Disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Estates, the Liquidating Trust, or any of their respecting Assets or property.

All Persons or entities seeking an award by the Bankruptcy Court of professional fees, or of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, including members of the Creditors' Committee, (1) shall provide the Debtors with an invoice for all accrued and unpaid fees and expenses as of the date of such invoice and an estimate of their fees and expenses to be incurred from the Confirmation Date through the Effective Date no later than ten (10) days before the Confirmation Hearing, (2) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date (each, a "Final Fee Application") within thirty (30) days after the Effective Date, and (3) if such Final Fee Application is granted by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (ii) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Administrative Claim and the Liquidating Trustee, on and after the Effective Date. Objections to Final Fee Applications must be filed and served on or before five (5) Business Days prior to the hearing set by the Bankruptcy Court to consider such Final Fee Applications, unless extended by agreement of the parties. All Professional Fee Claims for services rendered in connection with the Chapter 11 Cases and the Plan after the Effective Date, including, without limitation, relating to the resolution of Disputed Claims, shall be paid by the Liquidating Trustee upon receipt of an invoice therefor, or on such other terms as may be agreed by the applicable Professional and the Liquidating Trustee, without the need for further Bankruptcy Court authorization or entry of a Final Order. If the Liquidating Trustee and any Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Professional, such amount shall be determined by the Bankruptcy Court. The Debtors shall reserve an amount sufficient to pay the aggregate sum of all unpaid Professional Fees that have been or are estimated to be incurred through the Effective Date.

**5.04    Classification and Treatment of Claims and Equity Interests.**

The categories of Claims and Equity Interests and their treatment listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1a -- Secured Claims | Unimpaired | Not Entitled to Vote; Deemed Accepted |
| Class 1b -- Secured Claims | Unimpaired | Not Entitled to Vote; Deemed Accepted |
| Class 2a -- Other Priority Claims | Unimpaired | Not Entitled to Vote; Deemed Accepted |
| Class 2b -- Other Priority Claims | Unimpaired | Not Entitled to Vote; Deemed Accepted |
| Class 3a -- General Unsecured Claims | Impaired | Entitled to Vote |
| Class 3b -- General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4a -- NHL Subordinated Claims | Impaired | Entitled to Vote |
| Class 4b -- NHL Subordinated Claims | Impaired | Entitled to Vote |
| Class 5a -- Equity Interests | Impaired | Entitled to Vote |
| Class 5b -- Equity Interests | Impaired | Entitled to Vote |
| Class 6a -- Intercompany Claims | Unimpaired | Not Entitled to Vote; Deemed Accepted |
| Class 6b -- Intercompany Claims | Unimpaired | Not Entitled to Vote; Deemed Accepted |

a.     **Classes 1a and 1b (collectively, "Class 1") – Secured Claims.**

Classes 1a and 1b consist of Secured Claims, if any, against Coyotes Hockey and Arena Management, respectively. Class 1 is unimpaired by the Plan. Consequently, each Holder of an Allowed Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. Each Holder of an Allowed Secured Claim shall receive, in full and final satisfaction thereof, either (i) Cash in an amount equal to such Allowed Secured Claim, (ii) a return of its Collateral, or (iii) such other treatment as shall satisfy the requirements of section 1124(2) of the Bankruptcy Code, on the later of the Effective Date or the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable, unless the Holder of an Allowed Secured Claim agrees to a different treatment thereof.

Currently, the Plan Proponent is not aware of any Claims in Class 1a and 1b and reserve their right to delete such Classes.

**b.     Classes 2a and 2b:  Other Priority Claims.**

Classes 2a and 2b consist of Other Priority Claims against Coyotes Hockey and Arena Management, respectively.  Class 2 is unimpaired by the Plan.  Consequently, each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.  Each Holder of an Allowed Priority Claim in Class 2 shall receive, in full and final satisfaction thereof, Cash (i) in an amount equal to such Allowed Other Priority Claim, (ii) in such amounts and on such other terms as may be agreed between the Holder of the Other Priority Claim and the Liquidating Trustee; or (iii) with respect to any Allowed Other Priority Claim other than a Priority Tax Claim, in accordance with the terms of the particular agreement under which such Other Priority Claim arose, on the later of the Effective Date or the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as practicable, unless the Holder of an Allowed Other Priority Claim agrees to a different treatment thereof.  All amounts previously paid on account of a Holder's Allowed Other Priority Claim shall be credited towards amounts to be paid under the Plan.

Currently, the Plan Proponent is not aware of any Claims in Class 2a and 2b and reserve the right to delete such Classes.

**c.     Classes 3a and 3b:  General Unsecured Claims.**

Classes 3a and 3b consist of all General Unsecured Claims against Coyotes Hockey and Arena Management, respectively.  Class 3 is impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

Each Holder of an Allowed General Unsecured Claim in Class 3a shall receive, in full and final satisfaction thereof, one or more Distributions of Coyotes Hockey Available Cash in an amount equal to its Pro Rata Share of (i) the Coyotes Hockey Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests.

Each Holder of an Allowed General Unsecured Claim in Class 3b shall receive, in full and final satisfaction thereof, one or more Distributions of Arena Management Available Cash in an amount equal to its Pro Rata Share of (i) the Arena Management Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests.

Distributions to be paid to Holders of Allowed General Unsecured Claims shall be made on the Initial Distribution Date and any Subsequent Distribution Date on which Available Cash is available for distribution, which aggregate amount of Distributions made to each Holder shall not exceed the Face Value of its Allowed Class 3 General Unsecured Claim.  Any recoveries by the Liquidating Trustee on a Litigation Claim shall be treated as Available Cash and distributed to the Holders of Allowed Class 3 General Unsecured Claims in accordance with the Plan.

**d.    Classes 4a and 4b:  NHL Subordinated Claims.**

Classes 4a and 4b consist of NHL Subordinated Claims against Coyotes Hockey and Arena Management, respectively.  Class 4 is impaired by the Plan.  Each Holder of NHL Subordinated Claim shall be entitled to vote to accept or reject the Plan.

Each Holder of an Allowed NHL Subordinated Claim in Class 4a shall receive, in full and final satisfaction thereof, one or more Distributions of Coyotes Hockey Available Cash in an amount equal to its Pro Rata Share of (i) the Coyotes Hockey Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests; provided, however, no Available Cash may be distributed to an Allowed NHL Subordinated Claim unless and until all Allowed Non-Moyes General Unsecured Claims receive Distributions equal to the Face Amount of such Allowed Non-Moyes General Unsecured Claims.

Each Holder of an Allowed NHL Subordinated Claim in Class 4b shall receive, in full and final satisfaction thereof, one or more Distributions of Arena Management Available Cash in an amount equal to its Pro Rata Share of (i) the Arena Management Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 and 2, and (ii) the Tier One Trust Beneficial Interests; provided, however, no Available Cash may be distributed to an Allowed NHL Subordinated Claim unless and until all Allowed Non-Moyes General Unsecured Claims receive Distributions equal to the Face Amount of such Allowed Non-Moyes General Unsecured Claims.

Distributions to be paid to Holders of Allowed NHL Subordinated Claims shall be made on the Initial Distribution Date and any Subsequent Distribution Date on which Available Cash is available for distribution, which aggregate amount of Distributions made to each Holder shall not exceed the Face Value of its Allowed Class 4 NHL Subordinated Claim.  Any recoveries by the Liquidating Trustee on a Litigation Claim shall be treated as Available Cash and distributed to the Holders of Allowed Class 4 NHL Subordinated Claims in accordance with the Plan.  Each of the NHL Entities has voluntarily subordinated all NHL Subordinated Claims to all other Allowed Non-Moyes General Unsecured Claims.  Accordingly, as described above and as set forth in the Plan, no Available Cash may be distributed to an Allowed NHL Subordinated Claim unless and until all Allowed Non-Moyes General Unsecured Claims receive Distributions equal to the Face Amount of such Allowed Non-Moyes General Unsecured Claims.

**e.    Classes 5a and 5b:  Equity Interests.**

Classes 5a and 5b consist of Equity Interests in Coyotes Hockey and Arena Management, respectively.  Class 5 is impaired by the Plan.  Each Holder of an Allowed Equity Interest shall be entitled to vote to accept or reject the Plan.

Each Holder of an Allowed Equity Interest in Class 5a shall receive one or more Distributions of Coyotes Hockey Available Cash in an amount equal to its Pro Rata Share of (i) the Coyotes Hockey Available Cash remaining after payment in full of, or adequate reserve for,

Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 – 4, and (ii) the Tier Two Trust Beneficial Interests.

Each Holder of an Allowed Equity Interest in Class 5b shall receive one or more Distributions of Arena Management Available Cash in an amount equal to its Pro Rata Share of (i) the Arena Management Available Cash remaining after payment in full of, or adequate reserve for, Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims or Disputed Claims in Classes 1 – 4, and (ii) the Tier Two Trust Beneficial Interests.

Distributions to be paid to Holders of Allowed Equity Interests shall be made on the Initial Distribution Date and any Subsequent Distribution Date on which Available Cash is available for distribution. Any recoveries by the Liquidating Trustee on a Litigation Claim shall be treated as Available Cash and distributed to the Holders of Allowed Equity Interests after payment in full, or adequate reserve for, all Allowed Claims in Classes 3a and 3b as set forth in the Plan.

On the Effective Date, the membership interests and other instruments evidencing Equity Interests in the Debtors shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby shall be extinguished.

  **f.  Classes 6a and 6b: Intercompany Claims.**

Classes 6a and 6b consist of Intercompany Claims. Class 6 is unimpaired by the Plan. Consequently, each Holder of an Allowed Intercompany Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. Each Allowed Intercompany Claim against the Debtors shall, at the sole discretion of the Liquidating Trustee, receive the following treatment: (i) be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights as to an Allowed Intercompany Claim shall be fully reinstated and retained, (ii) be paid in accordance with the terms under which such Allowed Intercompany Claim arose, (iii) receive such other treatment as may be agreed upon in writing by the Holder of such Claim; provided that such agreed upon treatment may not provide the Holder of such Claim with a return having a present value as of the Effective Date that is greater than the amount of such Allowed Intercompany Claim, or (iv) be canceled and be of no further force or effect.

# ARTICLE VI
## Implementation of the Plan

**6.01 Implementation on the Effective Date.**

The Plan shall be implemented on the Effective Date.

**6.02 Creation of Liquidating Trust.**

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and accept all Assets of the Estates on behalf of the beneficiaries thereof, and be authorized to obtain, liquidate, and collect all of the Assets of the Estates not in its possession

and pursue all of the Litigation Claims. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any party. The Liquidating Trust shall be established for the sole purpose of liquidating its assets, with no objective to continue or engage in the conduct of a trade or business. The beneficiaries of the Liquidating Trust shall be bound by the Liquidating Trust Agreement. The Liquidating Trust Agreement shall provide for the establishment of two classes of beneficial interests and shall make distributions to holders thereof in accordance with the Plan and the Liquidating Trust Agreement: Tier One Trust Beneficial Interests; and Tier Two Trust Beneficial Interests. Interests in the Liquidating Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidating Trust to extend such terms as applicable law shall allow.

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, as authorized by the Liquidating Trust Oversight Board; provided, however, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Liquidating Trustee shall be the exclusive trustee of the assets of the Liquidating Trust for purposes of 31 U.S.C. Section 3713(b) and 26 U.S.C. Section 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and, under the supervision of the Liquidating Trust Oversight Board, shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of trust assets; (d) calculate and implement distributions of trust assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of that agreement, all Claims and Causes of Action (including, without limitation, the Litigation Claims) vested in the Liquidating Trust; (f) resolve issues involving Claims and Equity Interests pursuant to the Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the ultimate closing of the Chapter 11 Cases.

All costs and expenses associated with the administration of the Liquidating Trust, including reasonable professional costs related to the prosecution of Litigation Claims, objecting to Disputed Claims or Equity Interests, and reasonable compensation for the Liquidating Trustee and, as set forth in the Liquidating Trust Agreement, the Liquidating Trust Oversight Board, shall be the responsibility of and paid by the Liquidating Trust in accordance with the Liquidating Trust Agreement. The Liquidating Trust is the successor to the Debtors and the Estates' rights to books and records.

The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all

distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

**6.03    Vesting and Transfer of Assets to the Liquidating Trust.**

Pursuant to section 1141(b) of the Bankruptcy Code, all Assets of the Estates shall vest in the Liquidating Trust; provided, however, that the Liquidating Trust, with the consent of the Liquidating Trustee, may abandon or otherwise not accept any Assets that the Liquidating Trust believes, in good faith, have no value to the Liquidating Trust.  Any Assets the Liquidating Trust so abandons or otherwise does not accept shall not vest in the Liquidating Trust and shall revest in the Debtors.

On the Effective Date, the Liquidating Trust shall: (i) take possession of all books, records, and files of the Debtors and their Estates; (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required; and (iii) file a notice with the Bankruptcy Court identifying the location at which such books, records, and files are stored.

As of the Effective Date, all Assets vested in the Liquidating Trust and all Assets dealt with in the Plan, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan or in the Confirmation Order.  The Liquidating Trust shall make distributions in accordance with the Plan and the Liquidating Trust Agreement.

**6.04    The Liquidating Trustee.**

The Liquidating Trustee shall be an independent and disinterested Person.   The Liquidating Trustee shall be the successor to all of the privileges of the Estates and the Debtors. The Liquidating Trustee shall serve pursuant to the Liquidating Trust Agreement, Plan, and Confirmation Order, until death, resignation, or discharge and the appointment of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement.   The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust's Assets under title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  No current or former officer, director, member, manager, stockholder, employee or professional of the Debtors nor member of the Creditors' Committee shall serve as the Liquidating Trustee.  The Person selected to be the Liquidating Trustee shall be approved by the Bankruptcy Court at the Confirmation Hearing.  If the Person so selected is approved by the Bankruptcy Court, such approval shall be made part of the Confirmation Order.

**6.05    Compensation of Liquidating Trustee.**

The Liquidating Trustee shall be compensated pursuant to the terms of the Liquidating Trust Agreement to be approved by the Bankruptcy Court.  Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee. The Liquidating Trustee may retain any professional of his or her choosing, but may not include any Professionals in the Chapter 11 Cases.  The payment of fees and expenses of the Liquidating

Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

**6.06    Prosecution and Settlement of Litigation Claims.**

Prosecution and settlement of all Litigation Claims, including Avoidance Actions, shall be the sole responsibility of the Liquidating Trust, pursuant to the Plan and the Confirmation Order.  Except as otherwise provided in the Plan, the Liquidating Trust shall have exclusive rights, powers, and interests of the Estates to pursue, settle or abandon such Litigation Claims as the sole representative of the Estates pursuant to section 1123(b)(3) of the Bankruptcy Code.  From and after the Confirmation Date, the Debtors shall not have the authority to pursue, settle or abandon such Litigation Claims.

Settlement by the Liquidating Trust of any Litigation Claim shall require approval by a majority of the disinterested members of the Liquidating Trust Oversight Board.

**6.07    Liquidating Trust Oversight Board.**

The Liquidating Trust Oversight Board shall be comprised of five (5) members consisting of a representative of the City, Moyes, Wayne Gretzky, the NHL and Aramark.  The Liquidating Trustee shall consult regularly with the Liquidating Trust Oversight Board when carrying out the purpose and intent of the Plan.  The members of the Liquidating Trust Oversight Board shall not receive compensation, but shall be reimbursed for their reasonable and necessary expenses by the Liquidating Trustee.

In the case of an inability or unwillingness of any member of the Liquidating Trust Oversight Board to serve, such member shall be replaced by designation by the remaining members of the Liquidating Trust Oversight Board.  If any position on the Liquidating Trust Oversight Board remains vacant for more than thirty (30) days, the Liquidating Trustee may, in its sole discretion and without the requirement of a vote by the members of the Liquidating Trust Oversight Board, designate a replacement member or otherwise elect to leave the vacancy unfilled.

Upon the certification by the Liquidating Trustee that all Liquidating Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the Liquidating Trust Oversight Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

The Liquidating Trust Oversight Board may, by majority vote, remove the Liquidating Trustee in its discretion.  The Liquidating Trustee also may be removed by the Bankruptcy Court for cause shown after a hearing on notice to all interested parties and the Liquidating Trust Oversight Board by the movant.  In the event of the resignation or removal of the Liquidating Trustee, the Liquidating Trust Oversight Board shall, by a majority vote, designate a person to serve as successor Liquidating Trustee.   In the event majority consent cannot be obtained, the Bankruptcy Court shall select a new Liquidating Trustee.

The Liquidating Trust Oversight Board may, by majority vote, enter into one or more agreements to carry out, implement and enforce the Plan, including but not limited to entering into one or more agreements with the Liquidating Trustee providing for the Liquidating Trustee's compensation.

Notwithstanding anything to the contrary in the Plan, neither the Liquidating Trust Oversight Board nor any of its members, designees or any duly designated agent or representative of such party shall be liable for the act, default or misconduct of any other member of the Liquidating Trust Oversight Board, nor shall any member be liable, and the Liquidating Trust shall indemnify each member, for anything other than such member's own gross negligence or willful misconduct.

**6.08    Continuation of Bankruptcy Injunction or Stays.**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed or dismissed or the property affected by such stay is no longer property of the Debtors' Estates.

**6.09    Substantive Consolidation.**

The Debtors will not be substantively consolidated.

**6.10    Allocation of Proceeds.**

Prior to any Distribution Date, all Available Cash shall be allocated between the Estates of Coyotes Hockey and Arena Management by the Liquidating Trustee.

**6.11    Full and Final Satisfaction.**

All payments and all distributions hereunder shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests, except as otherwise provided in the Plan.

**6.12    Administration Pending Effective Date.**

During the period after the Confirmation Date and prior to the Effective Date, the Debtors shall continue to operate their businesses in the ordinary course of business and in accordance with any applicable Orders of the Bankruptcy Court, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.  After the Effective Date, the Liquidating Trustee (in consultation with the Liquidating Trust Oversight Board) shall administer and close the Estates subject to the continuing jurisdiction of the Bankruptcy Court as set forth in the Plan.

**6.13    Closing of Chapter 11 Cases.**

When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by a Final Order, or otherwise resolved, and all Cash and Assets of the Liquidating Trust have been distributed in accordance with the Plan, or at such earlier time as the Liquidating Trustee deems appropriate, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**6.14    Permanent Injunction.**

From and after the Confirmation Date, as provided for in the Confirmation Order and except as otherwise expressly provided herein or as may be agreed to in writing by the Liquidating Trustee, there shall be in place with regards to the Assets and any Claims against the Debtors, their Estates, the Liquidating Trust or any Assets of the foregoing a permanent injunction (i) to the same extent and with the same effect as the stay imposed by section 362 of the Bankruptcy Code, and (ii) permanently enjoining all Persons from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any Claim, debt, right or Cause of Action against the Debtors or their Assets.  Such permanent injunction shall remain in effect notwithstanding the closure of the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.

**6.15    No Discharge.**

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge the Debtors.

**6.16    Dissolution of the Debtors.**

On or after the Effective Date, the Liquidating Trustee shall be authorized to effectuate the dissolution of the Debtors.

**6.17    Cancellation of Documents.**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and Equity Interests in any of the Debtors shall, with respect to such Debtors, be canceled and deemed rejected and terminated.

**ARTICLE VII**
**Provisions Governing Distributions**

**7.01    Method of Distributions Under the Plan**

**a.      In General.**

Subject to Bankruptcy Rule 9010, unless otherwise expressly provided for in the Plan, all distributions under the Plan shall be made (i) to the Holder of each Allowed General Unsecured Claim at the address of such Holder as listed in the Debtors' books and records or on the Schedules as of the Confirmation Date, unless the appropriate party has been notified in writing of a change of address, including, without limitation, by the filing of a Proof of Claim or notice of transfer of claim filed by such Holder that provides an address, if any, for such Holder different from the address reflected in the Debtors' books and records or on the Schedules on the Confirmation Date.

**b.     Distributions of Cash.**

Any payment of Cash shall be made by check drawn on a domestic bank or by wire transfer of same day funds.

**c.     Timing of Distributions.**

Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**d.     Distributions to Holders as of the Confirmation Date.**

As of the close of business on the Confirmation Date, the claims register and membership interest transfer ledgers of the Debtors shall be closed, and there shall be no further changes in the record Holders of any Claims or Equity Interests. The Liquidating Trustee shall not have any obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as of the close of business on the Confirmation Date.

**7.02    Disputed Claim Reserves.**

**a.     General.**

The Debtors shall reserve funds to satisfy potential and/or contingent or unliquidated claims as required under the Plan and Disputed Claims as required under the Plan as of the Effective Date. The total amount of such reserves cannot be determined at this time as such amounts will be fixed by the Bankruptcy Court on or prior to the Confirmation Hearing.

**b.     Establishment and Maintenance of Reserve for Disputed Claims.**

The Disputed Claims Reserve shall (i) be established on the Effective Date and (ii) equal the estimated aggregate of any distributable amounts of Cash to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims had been Allowed Claims on the Initial Distribution Date in the amount set forth in the Face Amount of such Disputed Claim or, if no amount was set forth in the Proof of Claim, in such other amount as provided by an Order of the Bankruptcy Court, plus any additional funds necessary to adequately provide for postpetition interest on such Claims in the amount provided for in the Plan. For the purposes of effectuating the provisions of the Plan and the distributions to Holders of Allowed Claims, the Bankruptcy Court, on appropriate motion made prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set (or as set forth in the Plan), may fix, estimate or liquidate the amount of Disputed Claims pursuant to section 502(c) or other provisions of the Bankruptcy Code and the Plan. The Allowed amount of any Disputed Claim may be fixed by agreement in writing by and between the Liquidating Trustee and the Holder of a Disputed Claim.

c.      **Distributions Upon Allowance or Disallowance of Disputed Claims.**

Except as otherwise provided in the Plan, no payments shall be made in respect of any Disputed Claim until (and only to the extent) it becomes an Allowed Claim. If a portion of a Disputed Claim becomes Allowed, such portion shall be paid and the balance shall continue to be treated as a Disputed Claim. The Holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order, but in no case more than five (5) business days after the date of the Final Order. Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to such Holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date. Except as otherwise provided in the Plan, no Holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve until such Disputed Claim shall become an Allowed Claim. Cash resulting from disallowance or settlement of Disputed Claims (and any interest earned thereon) shall be treated as Available Cash and distributed, from time to time, to Holders of Allowed Equity Interests in accordance with the Plan.

**7.03    Disputed Payments.**

In the event of any dispute between and among Holders of Claims, Equity Interests and/or the Holders of a Disputed Claim as to the right of any Person to receive or retain any payment or distribution to be made to such Person under the Plan, the Liquidating Trustee may, in lieu, of making such payment or distribution to such Person, instead hold such payment or distribution, until the disposition thereof shall be determined by a Final Order of the Bankruptcy Court or other court with appropriate jurisdiction.

**7.04    Unclaimed Distributions.**

Any Person who receives a check pursuant to the Plan must present such check for payment within six (6) months of its date of issuance. Any checks not presented within such six (6) month period (including checks that have been returned to the Liquidating Trustee as undeliverable) will be void, and such funds shall be returned to the Liquidating Trust for distribution in accordance with the Plan. The Liquidating Trustee shall have no obligation to attempt to redeliver any check returned as undeliverable unless notified in writing of a new or alternative address for the Person whose check was returned.

**7.05    Setoffs.**

All rights of setoff and/or recoupment of the Debtors and of any other Person, and any and all defenses thereto are fully preserved.

**7.06    Minimum Distributions.**

No Distribution in the aggregate amount of $10.00 or less shall be made to a Holder of an Allowed Claim or Equity Interest on the Initial Distribution Date or any Subsequent Distribution Date, notwithstanding any contrary provision of the Plan. Any undistributed Cash will become Available Cash for Distribution on the Final Distribution Date

**7.07    Final Distribution.**

       If after the estate has been fully administered there remains Cash on hand in an amount less than $15,000, the Liquidating Trustee, in consultation with the Liquidating Trust Oversight Board, may donate the same to a registered charity of his or her choice in lieu of making a final Distribution.

**ARTICLE VIII**
**Effects of Confirmation of the Plan**

       The confirmation of the Plan will have certain effects as described in the Plan and summarized below.

       (i)    **Binding Effect.**  Upon the entry of the Confirmation Order, the Plan shall be binding upon the Debtors, all Creditors, Equity Interest Holders and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.  The rights, benefits and obligations conferred on any Person by the Plan will be binding upon, and inure to the benefit of, the executors, successors, heirs and assigns of and any Persons claiming an interest in any and all property in which the Estates have an interest within the meaning of section 541 of the Bankruptcy Code through such Person.

       (ii)    **Retention of the Litigation Claims/Reservation of Rights.**  Except as expressly provided for in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to (i) be res judicata or the basis for estoppel of, (ii) create any other defense to the prosecution to judgment on the merits of, (iii) be a waiver of or (iv) be a relinquishment of any Litigation Claims, including Avoidance Actions, left unaltered or unimpaired by the Plan.  On and after the Effective Date, the Liquidating Trust shall have, retain, reserve and be entitled to assert, prosecute, settle or abandon all such Litigation Claims, including, without limitation, the Insider Claims.

       (iii)    **Direct Causes of Action.**  Nothing in the Plan is intended to, nor shall be interpreted as, impairing, waiving or otherwise affecting in any way Causes of Action that do not belong to the Estates, including assessments of damages.  Moreover, it is intended that any and all such rights, claims and defenses with respect to any Causes of Action that do not belong to the Estates are reserved expressly, and nothing in the Plan shall constitute a waiver or release with respect to same.

       (iv)    **Preservation of Insurance.**  Except as necessary to be consistent with the Plan, the Plan shall not diminish or impair the enforceability of insurance policies that may cover Claims against the Debtors, the Estate, or Assets or any other Person or Entity.

       (v)    **Term of Injunctions or Stays.**  Until the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under sections 105(a) or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect.  After the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under sections 105(a) or 362 of the Bankruptcy Code, or otherwise,

and in existence on the Confirmation Date, shall remain in full force and effect to the extent provided for herein and in the Confirmation Order.

(vi) **Exculpation.** On the Effective Date of the Plan, no Person who was serving as an officer, director or employee of the Debtors on the Petition Date, acting in their capacity as such, nor the Debtors, the Debtors' Estates, the Creditors' Committee or their present or former members, the Plan Proponent, the Liquidating Trustee or any of the foregoing's respective affiliates, members, stockholders, advisors, agents or Professionals (collectively, the "Exculpated Parties") shall have or incur any liability to any Person for any act or omission taken or omitted on or after the Petition Date in connection with, related to, or arising out of, the preparation, filing, negotiation or formulation of the Plan, the pursuit of confirmation of the Plan including without limitation, the consummation of the Plan or the implementation or administration of the Plan or the property to be distributed under the Plan, and any such Claim or Cause of Action shall be deemed released, except for (i) any Claim or Cause of Action arising from the fraud or willful misconduct of any Exculpated Party. In all respects the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that nothing in the Plan shall, or shall be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect, to any of the Exculpated Parties' obligations or covenants arising pursuant to the Plan or the Confirmation Order. For the avoidance of any doubt, nothing in the Plan shall be deemed to, release, waive, affect, or limit any of the Insider Claims.

(vii) **Injunctions**. As of the Effective Date, except as otherwise provided in the Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, or pursing any cause of action or Claim, or effectuating any set-off, whether directly, derivatively or otherwise against any or all of the Exculpated Parties, on account of or respecting any Claims, debts, causes of action, rights, or liabilities released or discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

## ARTICLE IX
### Executory Contracts and Leases; Benefit Plans

**9.01    Rejection of Contracts and Leases.**

The Plan provides that each executory contract or unexpired lease of the Debtors that has not expired by its own terms prior to the Effective Date, and that has not been assumed or rejected during the Chapter 11 Cases prior to the Effective Date shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date; except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Confirmation Date, or (iii) identified in the Plan Supplement for assumption or assumption and assignment. The Confirmation Order shall constitute the approval, pursuant to section

365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.

**9.02    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.**

Claims arising out of the rejection of executory contracts or unexpired leases pursuant to the Plan and the Confirmation Order must be filed with the Bankruptcy Court and/or served upon the Liquidating Trustee or as otherwise may be provided in the Confirmation Order by no later than fifteen (15) days after the entry of the Confirmation Order.  Any Claims not filed within such time will be forever barred from assertion against the Debtors, their Estates or the Liquidating Trust.

**9.03    Retiree Benefits.**

The Debtors have never funded nor maintained any retiree benefit plans, funds or programs, as defined in section 1114 of the Bankruptcy Code, for the purpose of providing or reimbursing payments for retired employees and their spouses and dependants for medical, surgical, or hospital care benefits or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise).  Accordingly, the Plan does not make provisions to pay any such benefits under section 1129(a)(13) of the Bankruptcy Code.

**9.04    Employee Benefit Plans.**

The Liquidating Trustee shall consummate the termination of the Debtors' pension plan and the transfer of vested interest in the assets of such plan to the beneficiaries entitled thereto. The Liquidating Trustee shall also effectuate the termination of any 401(K) plan that the Debtors administer and the transfer of the assets of such plan to the beneficiaries thereof.

## ARTICLE X
### Disputed, Contingent and Unliquidated Claims and Equity Interests

**10.01   Objections to and Resolution of Claims and Equity Interests.**

The Plan provides that except as to Professional Fee Claims (with respect to which procedures respecting objections shall be governed by Article III of the Plan, the Confirmation Order or other order of the Bankruptcy Court), any party in interest may make and file objections to Claims, including Administrative Claims, through and until the Claim Objection Deadline. All objections shall be litigated to Final Order; provided, however, that the Liquidating Trustee shall have the authority to compromise, settle or otherwise resolve or withdraw any objections without Bankruptcy Court approval, after consultation with the Liquidating Trust Oversight Board; provided, further, that a majority of the disinterested members of the Liquidating Trust Oversight Board shall approve the compromise, settlement or other resolution of: (i) any Claim with a Face Amount in excess of $100,000; or (ii) any Claim held by the City, Moyes, Wayne Gretzky, the NHL, Aramark or any affiliate thereof.  Unless extended by the Bankruptcy Court, upon motion of the Liquidating Trustee without notice or hearing, all objections to Claims (other than Professional Fee Claims), including Administrative Claims, shall be filed and served upon

the Holder of the Claim or the Administrative Claim as to which the objection is made as soon as is practicable, but in no event later than the Claim Objection Deadline. From and after the Confirmation Date, the Debtors shall not have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims.

**10.02   Estimation of Claims or Equity Interests.**

The Plan provides that the Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to section 502(c) or other provisions of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated (the "Estimated Amount") shall constitute the maximum Allowed amount, if any, for such Claim, as determined by the Bankruptcy Court. If the Estimated Amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned rights (i.e., objection, estimation, and resolution procedures) are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. All rights, arguments, defenses and/or setoffs of any party to an estimation hearing are fully preserved.

**ARTICLE XI**
**Retention of Jurisdiction**

**11.01   Jurisdiction of Bankruptcy Court.**

The Plan provides for the Bankruptcy Court to retain exclusive jurisdiction of all matters arising under or arising in or related to the Chapter 11 Cases and the Plan, pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, among other things, the following:

> (i)     To hear and determine any motions for the assumption, assignment or rejection of executory contracts or unexpired leases, and the allowance of any Claims resulting therefrom;

> (ii)    To determine any and all pending adversary proceedings, applications, and contested matters;

> (iii)   To hear and determine any objection to any Claim or Equity Interest;

> (iv)    To estimate or liquidate any Disputed Claim;

> (v)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(vi)    To issue orders in aid of execution of the Plan pursuant to section 1142 of the Bankruptcy Code;

(vii)   To interpret or consider any modifications of the Plan, and to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(viii)  To hear and determine all applications for compensation and reimbursement of expenses of Professionals, any transfer agent or similar persons, or other Persons under sections 330, 331, and 503(b) of the Bankruptcy Code;

(ix)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(x)     To recover all Assets and property of the Estates or Liquidating Trust wherever located;

(xi)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code Filed, or to be Filed, with respect to tax returns for any and all taxable periods ending after the Petition Date through, and including entry of the Final Decree);

(xii)   To hear any other matter consistent with the provisions of the Bankruptcy Code or as otherwise provided in the Plan;

(xiii)  To adjust, as necessary, the Disputed Claims Reserve;

(xiv)   To hear and determine disputes concerning the Liquidating Trust;

(xv)    To hear and determine All Litigation Claims transferred to the Liquidating Trust;  and

(xvi)   To enter the Final Decree.

## 11.02   Retention of Non-Exclusive Jurisdiction by the Bankruptcy Court.

Notwithstanding anything else in the Plan, the Bankruptcy Court shall retain non-exclusive jurisdiction over all Litigation Claims prosecuted by the Liquidating Trust.

## ARTICLE XII
## Best Interests Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code (sometimes called the "Best Interests Test"), the Bankruptcy Code requires that each Holder of an Impaired Claim or Impaired  Equity Interest either (a) accepts the Plan or (b) receives or retains under the Plan

property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine what would be generated from the hypothetical liquidation of the Debtors' Assets and other properties in the context of a Chapter 7 liquidation case. The gross amount of cash and cash equivalents available would be the sum of the proceeds from the disposition of the Debtors' Assets and the cash held by the Debtors at the time of the commencement of the Chapter 7 case. Such amount is reduced by the amount of any Claims secured by such Assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of Debtors' businesses and the use of Chapter 7 for the purposes of a hypothetical liquidation. Any remaining net cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

In a Chapter 7 liquidation, a trustee in bankruptcy would be appointed and the net amount generated from the liquidation of the Debtors' assets would be reduced by the administrative expenses of both the Chapter 7 case and the Chapter 11 Case. The cost of a Chapter 7 liquidation would include the fees and commissions of a trustee in bankruptcy, as well as those of counsel and other professionals that might be retained by the trustee in addition to unpaid expenses incurred by the Debtors during the Chapter 11 Case. These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims in Chapter 7 liquidation. The hypothetical outcome of the Chapter 7 liquidation is then compared with the provisions of the Plan and treatment of each of the Classes of Claims and Equity Interests under the Plan to determine if the Plan is in the best interests of each Creditor or Holder of an Equity Interest.

In these Chapter 11 Cases, there will be a liquidation of the Estates in accordance with the terms of the Plan. The Plan Proponent believes that a Chapter 11 liquidation will yield a recovery equal to or greater than a Chapter 7 liquidation. The trustee in Chapter 7 would liquidate the assets of the Debtors' estates but it is not likely that the Debtors' assets would be liquidated on terms that are better than those under the Plan. In particular, the Plan Proponent believes that the oversight of the liquidation under the Plan by the Liquidating Trust Oversight Board will ensure that the liquidation is completed effectively and efficiently for the benefit of the Holders of Claims and Equity Interests.

Other recoveries in Chapter 7 are more speculative. The trustee in Chapter 7 could pursue the same Litigation Claims as contemplated under the Plan but would require a source of funding in order for the prosecution of those Litigation Claims to be undertaken and to be successful. Under the Plan, a source of funding for the pursuit of the Litigation Claims has been created from the Estates' Assets. Specifically, the Plan provides for proceeds from the disposition of Estates' Assets to be made available to the Liquidating Trust. Thus, it is not certain whether the trustee in a Chapter 7 could obtain the necessary funding to properly investigate, pursue, litigate and successfully conclude the Litigation Claims, and any such funding might only be available at significantly higher cost to the Chapter 7 estate. Therefore, it is likely that any recoveries from the Litigation Claims that would be received in a Chapter 7 would result in Distributions to Creditors and Holders of Equity Interests that are materially less than those under the Plan.

For the foregoing reasons, the Plan Proponent believes that the level of recovery by a trustee in Chapter 7 would be equal to or less than that under the Plan, and the costs and expenses of pursuing the recoveries and resolving the other issues would be equal to or greater. Therefore, the Plan Proponent believes that the Plan will produce a recovery equal to or greater than what Holders of Claims would achieve in a Chapter 7 liquidation.

## ARTICLE XIII
### Feasibility of the Plan

Bankruptcy law provides that a Chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. The feasibility standard requires that there is a reasonable probability that the Confirmation of the Plan will not likely be followed by liquidation or the need for further financial reorganization of the Debtors or any successor of the Debtors under the Plan, unless liquidation is contemplated under the Plan.

The Plan contemplates and provides for the orderly liquidation of the Estates. The Plan provides for resolution and compromise of issues that otherwise might require litigation and expenditure of available resources and also provides for funding of the Liquidating Trust to allow the pursuit of the Litigation Claims described in the Plan. Accordingly, the Plan Proponent believes that the Plan is feasible.

The Plan provides for the transfer of all of the all of the Debtors' Assets to the Liquidating Trust. Such Assets, which are comprised of, among other things, approximately $13.3 million cash and the Litigation Claims, are in an amount sufficient to (a) make the payments of approved Administrative and Priority Tax Claims in accordance with the treatment of those Claims under the Plan and (b) establish the Plan Funding Reserve in accordance with the Plan and the Liquidating Trust Agreement. The Plan Funding Reserve will be an amount sufficient to satisfy the Liquidating Trust's anticipated future administrative expenses and to permit the Liquidating Trustee to pursue the Litigation Claims. The amount of the reserve will be established in accordance with and may be modified from time-to-time by the Liquidating Trust in accordance with the Liquidating Trust Agreement. By these provisions, the Plan provides for funding of the Liquidating Trust in amounts needed to permit it to make the payments required to be made under the Plan with respect to Administrative and Priority Claims and to satisfy anticipated future administrative expenses and funds the anticipated costs of pursuing the Litigation Claims. Accordingly, the Plan Proponent believes the Plan is feasible.

## ARTICLE XIV
### Risk Factors

ALL IMPAIRED HOLDERS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

Parties in interest may object to the classification of Claims. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The

Plan Proponent believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor Claim or Equity Interest Holder of the Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, and the value of distributions to non-accepting Holders of Claims and Equity Interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Plan Proponent believes that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such Chapter 7 case.

If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Equity Interests ultimately would receive with respect to their Claims or Equity Interests. If an alternative plan could not be agreed to, it is possible that the Debtors would have to liquidate its assets in Chapter 7, in which case it is quite possible that Holders of Claims and Equity Interests would receive less favorable treatment than they would receive under the Plan.

The Effective Date of the Plan may be delayed or may not occur even if the Plan is confirmed.

A party may object to the amount or classification of a Claim. Any estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest whose Claim or Equity Interest is subject to an objection. Any such Claim or Equity Interest Holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

There can be no assurance that the prosecution of the Litigation Claims will be successful, or what amounts will be recoverable from the pursuit of the Litigation Claims.

There are tax and security risks associated with the use of a Liquidating Trust. Although the Liquidating Trust is being organized and structured in a manner believed to compliant with applicable tax laws and regulations and to minimize taxes where lawfully permissible, there is no assurance that the taxing authorities will agree with the assumptions being made in this regard as to the structure, organization and status of the Liquidating Trust.

In addition, although the Liquidating Trust is intended to be established in a manner that does not constitute the interests in the Liquidating Trust as securities or require registration under or compliance with security laws and regulations, regulators could disagree with or dispute the applicability of security laws. The potential consequences could include challenges to the validity of the Liquidating Trust or, at a minimum, increased compliance cost and greater expense to the operation of the Liquidating Trust.

There is a risk that the assignment or transfer of the Litigation Claims, claims and privileges to the Liquidating Trust as contemplated by the Plan could be subject to challenge that, if successful, could nullify the transfer of the Litigation Claims, in whole or in part, and result in the Liquidating Trust being unable to pursue those Litigation Claims or assert claims or privileges in connection therewith.

The Plan includes provisions that nothing in its provisions or the establishment of the Liquidating Trust and the transfer of Litigation Claims to the Liquidating Trust in intended to create or give rise to any claim or preclusion or estoppel in defense of any Litigation Claims. Nevertheless, there is a risk that despite such intention and such provisions, there could be a determination that some act or event occurring in connection with the Plan, its implementation and the establishment and operation of the Liquidating Trust will be deemed to create such defenses.

There is a risk that the term of the Liquidating Trust will be inadequate to complete the full pursuit and resolution of the Litigation Claims.

The Plan and provisions regarding the establishment and operation of the Liquidating Trust require the selection of Liquidating Trustee that is an independent and disinterested Person. There is a risk, despite every effort to select a Person who is qualified to perform the tasks of the Liquidating Trustee, that the Person selected will be less effective than what might have been achieved by continued proceeding in the Chapter 11 Cases.

## ARTICLE XV
## Certain Federal Income Tax Consequences

Creditors and Equity Interest Holders concerned with how the Plan may affect their tax liability should consult with their own accountant, attorney and/or advisor. The following disclosure of possible of tax consequences is intended solely for the purpose of alerting readers to possible tax issues the Plan may present to the Debtors, Creditors and Equity Interest Holders. The Plan Proponent cannot and does not represent that the tax consequences identified below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules that make it difficult to state completely and accurately all of the tax implications. Pursuant to section 1125(a) of the Bankruptcy Code, a disclosure statement is to include a discussion of the potential material federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims and interest in the case.

The Plan does not contemplate or provide for any continuing operations or income-producing activity by the Debtors. The Debtors may not recognize income as a result of a discharge of debt pursuant to the Plan because section 108 of the Internal Revenue Code

provides that the taxpayers in bankruptcy proceedings do not recognize income from the discharge of debt. However, a taxpayer in a bankruptcy is required to reduce its "tax attributes" by the amount of debt discharged. Tax attributes are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryforwards; (iv) basis in assets; and (v) foreign tax credits.

Under the provisions of the Plan, the Liquidating Trust will be responsible for filing all federal, state, and local tax returns for the Liquidating Trust. The Liquidating Trust will provide reports to holders of beneficial interests in the Liquidating Trust, as the Liquidating Trust Oversight Board deems appropriate.

The Plan sets forth a description of the federal income tax treatment of the Liquidating Trust and Assets that should be reviewed by all creditors and parties voting on the Plan. For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries (i.e., Holders of Allowed Claims in Class 3a, Class 3b, Class 4a, Class 4b, Class 5a and Class 5b). Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in each of the assets of the Liquidating Trust and then contributed such interests to the Liquidating Trust. For all federal income tax purposes, all parties shall treat the transfer of Assets to the Liquidating Trust for the benefit of the Holders of Allowed Claims in Class 3a, Class 3b, Class 4a and Class 4b, as (a) a transfer of the assets of the Liquidating Trust directly to the Holders of Allowed Claims in Class 3a, Class 3b, Class 4a, Class 4b, Class 5a and Class 5b, followed by (b) the transfer by such Holders to the Liquidating Trust of the Assets of the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. Accordingly, the Holders of such Allowed Claims in Class 3a, Class 3b, Class 4a, Class 4b, Class 5a and Class 5b shall be treated for federal income tax purposes as the grantors and owners of their respective share of the Assets of the Liquidating Trust.

The Liquidating Trust will file returns for the Liquidating Trust as a grantor trust pursuant to Treasury regulation section 1.671-4(a). The Liquidating Trust will annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their federal income tax returns. The Liquidating Trust's taxable income, gain, loss, deduction, or credit will be allocated to Holders of Allowed Claims in Class 3a, Class 3b, Class 4a, Class 4b, Class 5a and Class 5b in accordance with their relative beneficial interests in the Liquidating Trust. Creditors should be aware that the Plan provides that to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. The Plan provides that any federal, state or local withholding taxes or other amounts required to be withheld under applicable law will be deducted from distributions hereunder.

## ARTICLE XVI
## Alternatives to the Plan

The Plan Proponent believes that the Plan provides Creditors and Holders of Equity Interests with the greatest possible value and earliest possible returns that can be realized on their respective Claims and Equity Interests. The Plan Proponent also believes that the Plan is fair and reasonable in its treatment of all constituencies. The alternatives to Confirmation of the Plan are (i) confirmation of an alternative Plan submitted by a party in interest in the Chapter 11 Cases; (ii) liquidation of the Assets, if necessary, and distribution under Chapter 7 of the Bankruptcy Code; and (iii) dismissal of the Chapter 11 Cases. As discussed below, the Plan Proponent believes that the alternatives will be less beneficial to Creditors and Holders of Equity Interests than if the Plan is consummated.

### a.      Alternative Plan.

On June 2, 2010, Coyotes Hockey filed an amended plan in these Chapter 11 Cases (the "Debtor Plan"). The Debtor Plan provides for the creation of a liquidating trust and the appointment of a liquidating trustee to receive and administer certain property of Coyotes Hockey's estate. The Plan Proponent believes that the Plan would provide Creditors and Holders of Equity Interests with a greater value or earlier recovery than they would be entitled to receive under the Debtor Plan because the Debtor Plan fails to provide for any oversight of the activities of the liquidating trustee after the Effective Date. In contrast, the Liquidating Trust Oversight Board established under the Plan will be charged with overseeing the effective resolution of Litigation Claims, the prompt distribution of value to Holders of Claims and Equity Interests, and the efficient and cost effective resolution of all administrative matters relating to these Chapter 11 cases.

### b.      Chapter 7 Liquidation.

A Chapter 7 liquidation of the Debtors' Assets and liabilities could be carried out with the anticipated results described above. For the reasons set forth above, the Plan Proponent believes that the Distributions to Creditors under the Plan will be greater and earlier than the distributions that might result after conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code.

### c.      Dismissal.

Upon dismissal of the Chapter 11 Cases, the protections of the Bankruptcy Code would disappear, thereby resulting in costly, uncontrolled and protracted litigation in various jurisdictions among and between the Creditors. Therefore, the Plan Proponent believes that dismissal of the Chapter 11 Cases is not a viable alternative to confirmation of the Plan.

# ARTICLE XVII
## Miscellaneous Provisions

**17.01  Successors and Assigns.**

The rights and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of that Person.

**17.02  Effectuating Documents and Further Transactions.**

The Debtors and the Liquidating Trustee are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**17.03  Exemption from Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of Assets contemplated by the Plan, shall not be subject to any stamp.

**17.04  Amendment, Modification, Withdrawal or Failure of the Plan**

The Plan Proponent may alter, amend or modify the Plan at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponent shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code. Material modifications to the Plan made prior to the Effective Date must be approved by the Plan Proponent; provided, however, that such approval may not be unreasonably withheld.   No amendment or modification to the Plan after the Effective Date can be effective without the written approval of the Liquidating Trust Oversight Board; provided, however, that such approval may not be unreasonably withheld.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder. The Plan Proponent may, without notice to Holders of Claims or Equity Interests insofar as it does not materially and adversely affect the interests of any such Holders, correct any defect or omission in the Plan and any exhibit hereto.  Furthermore, no party may withdraw the proposed Plan without the consent of the Plan Proponent unless, at the time of such withdrawal, it has been determined by the Bankruptcy Court that one or more conditions to confirmation or the Effective Date cannot occur.  In the even the Plan is revoked or withdrawn, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings

involving the Debtors.  If revoked or withdrawn, all provisions of the Plan shall be deemed null and void.

**17.05  Post-Effective Date Fees and Expenses of Professionals and of Winding up the Estates.**

After the Effective Date until the entry of the Final Decree, the Liquidating Trustee shall, without further approval by the Bankruptcy Court, except as otherwise provided herein, pay the reasonable fees and expenses, accruing on and after the Confirmation Date, of the Professionals employed by the Liquidating Trustee in accordance with the procedures herein.  The Liquidating Trust shall maintain sufficient funds to ensure that all such ongoing fees and expenses of the Professionals employed by the Liquidating Trustee shall be paid in full.  Such fees and expenses shall be paid within fifteen (15) Business Days after submission of detailed invoices to the Liquidating Trustee. If the Liquidating Trustee objects to any invoice, the Liquidating Trustee or the affected professional may submit such dispute to the Bankruptcy Court for determination and the disputed portion of such invoice shall not be paid until the dispute is resolved.  After the Effective Date, the costs associated with winding up the affairs of the Estate including statutory fees, if any, payable to the United States Trustee's Office, shall be paid in the ordinary course as they become due and without further approval by the Bankruptcy Court.

**17.06  Payment of Statutory Fees.**

All fees payable pursuant to chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date.  Any such statutory fees accruing on and after the Confirmation Date shall be paid in accordance with the Plan.  In the event of a dispute as to the amount of such fees, the Bankruptcy Court will determine the amount, if any owed by the Debtors.

**17.07  Dissolution of the Creditors' Committee and of the Liquidating Trust Oversight Board.**

The Liquidating Trust Oversight Board shall continue in existence until entry of the Final Decree.  Upon entry of the Final Decree, the Liquidating Trust Oversight Board shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.  If not yet dissolved by an order of the Bankruptcy Court, the Creditors' Committee shall be deemed dissolved as of the Effective Date and the members thereof deemed released and discharged from further duties relating thereto; provided, however, that the Creditors' Committee shall remain in effect for the purpose of preparing, filing and prosecuting to Final Order any Professional Fee Claim.

**17.08  Courts of Competent Jurisdiction.**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**17.09   Binding Effect.**

The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims and Equity Interests, the members of the Liquidating Trust Oversight Board and their respective successors and assigns, including, without limitation, the Liquidating Trustee and any affiliates thereof.

**17.10   Reservation of Rights.**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

**17.11   Section 1146 Exemption.**

In accordance with Section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by the Plan, (b) the making, delivery, creation, assignment, amendment or recording of any note or other obligation for the payment of money or any mortgage, deed of trust or other security interest under, in furtherance of, or in connection with the Plan, the issuance, renewal, modification or securing of indebtedness by such means, and (c) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any stamp tax or other similar tax.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax or other similar tax.

**17.12   Further Assurances.**

The Debtors, the Liquidating Trustee and all Holders of Claims and Equity Interests receiving distributions under the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**17.13   Filing of Additional Documents.**

On or before substantial consummation of the Plan, the Plan Proponent and such other parties as necessary shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**17.14  Plan Supplement.**

Unless specifically otherwise provided herein, as early as practicable (but in no event later than five (5) Business Days) prior to the earlier of (i) the deadline fixed for voting on the Plan, and (ii) the deadline for filing objections to confirmation of the Plan, the Plan Proponent shall file with this Court copies of all documents necessary for confirmation of the Plan, including the Liquidating Trust Agreement.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Debtors or their counsel.  The Plan Supplement is incorporated into and a part of the Plan as if set forth in full thereto.

**17.15  Withholding and Reporting Requirements.**

In connection with the consummation of the Plan, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**17.16  Headings.**

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

**17.17  Inconsistency.**

In the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

**17.18  Severability.**

In the event that the Bankruptcy Court determines, prior to Confirmation, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Plan Proponent (which consent shall not be unreasonably withheld), have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such determination, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such determination, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**17.19  Waiver of Ten Day Stay.**

The Confirmation Order shall contain a provision waiving any stay of the Confirmation Order imposed by Bankruptcy Rules 3020(e) and/or 6004(h).

## 17.20   Governing Law.

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Arizona, without giving effect to the principles of conflicts of law thereof.

## 17.21   Exemptions from Securities Laws Registration and Considerations.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of Securities Act and state laws if three principal requirements are satisfied: (i)  the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii)  the recipients of the securities must hold claims against or interests in the debtor; and (iii)  the securities must be issued in exchange (or principally in exchange) for the recipient's claims against or interests in the debtor. The Plan Proponent believes and asserts that the issuance of the beneficial interests in the Liquidating Trust under the Plan satisfy the requirements of Section 1145(a)(1) of the Bankruptcy Code and the beneficial interests  in the Liquidating Trust are, therefore, exempt from registration under the Securities Act and state securities laws.

The Plan Proponent expresses no view as to whether any particular person receiving a beneficial interest in the Liquidating Trust under the Plan would be an "underwriter" with respect to such beneficial interest. The Plan Proponent recommends that potential recipients of the beneficial interests in the Liquidating Trust consult with their own counsel concerning whether they may transfer their interests.

## ARTICLE XVIII
## Recommendation and Conclusion

It is the position of the Plan Proponent that the Plan is substantially preferable to any other plan, to liquidation under Chapter 7 of the Bankruptcy Code or to a dismissal of these Chapter 11 Cases.  Conversion of this Chapter 11 Cases to a Chapter 7 proceeding would result in delays in the distribution of proceeds available under such an alternative, and increase administrative costs, including trustee's fees, expenses and commissions, and, therefore, would materially reduce Creditor recovery.

The Plan Proponent recommends that you vote in favor of the Plan.

It is important that you exercise your right to vote on the Plan.  It is the Plan Proponent's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Equity Interests in the Debtors.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

DATED this 16th day of June, 2010.

FENNEMORE CRAIG, P.C.


By:   /s/ *Cathy L. Reece* (005932)
     Cathy L. Reece (No. 005932)
     Nicolas B. Hoskins (No. 023277)
     3003 N. Central Ave. Suite 2600
     Phoenix, AZ  85012-2913
     Telelphone: (602) 916-5343
     Facsimile: (602) 916-5543

     -and-

     BROWN RUDNICK LLP
     William R. Baldiga, Esq.
     Cheryl B. Pinarchick, Esq.
     One Financial Center
     Boston, MA 02111
     Telelphone: (617) 856-8200
     Facsimile: (617) 856-8201

     *Counsel for the City of Glendale*